DAVID W. MEADOWS, State Bar No. 137052
LAW OFFICES OF DAVID W. MEADOWS
1801 Century Park East, Suite 1250
Los Angeles, California  90067
Tel: (310) 557-8490
Fax: (310) 557-8493
Email: david@davidwmeadowslaw.com

Bankruptcy Counsel for Beshmada, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

(LOS ANGELES DIVISION)

| | |
|---|---|
| In re<br><br>BESHMADA, LLC,<br><br>          Involuntary Debtor. | Bk. No. 2:09-bk-25523-BR<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION OF BESHMADA, LLC FOR AN ORDER APPROVING RESTRUCTURING AGREEMENT; DECLARATIONS IN SUPPORT THEREOF**<br><br>**11 U.S.C. §§ 363(b)(1); 363(f), Fed. R. Bank. Proc. 9019.**<br><br>Hearing:<br><br>Date:   February 23, 2010<br>Time:  10:00 a.m.<br>Place:  Courtroom 1668<br>        255 East Temple Street<br>        Los Angeles, CA  90012 |

1

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, AND INTERESTED PARTIES:**

      **PLEASE TAKE NOTICE** that on February 23, 2010 at 10:00 a.m., or as soon thereafter as the matter can be heard, before the Honorable Barry Russell, United States Bankruptcy Judge, in Courtroom 1668, located at 255 East Temple Street, Los Angeles, California, the Bankruptcy Court will consider the *Motion of Beshmada, LLC and for an Order Approving Restructuring Agreement"* (the "Motion"). This Motion is brought on the grounds that the Restructuring Agreement is fair, reasonable and in the best interests, of Beshmada, Namvar, their creditors and their estates[1]. This Motion is based upon this Notice and the Motion, the accompanying Memorandum of Points and Authorities, the accompanying declarations of Louis A. Cicalese ("Cicalese" and the "Cicalese Declaration"), the Declaration of R. Todd Neilson (the "Neilson Declaration"), and any additional evidence and argument that may be submitted at or before the hearing on the Motion.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1]     Contemporaneously with the filing of this motion, a substantially identical motion is being filed by R. Todd Neilson, Chapter 11 trustee of the Estate of Ezri Namvar in the Namvar Chapter 11 case pending in this court as case number 2:08-bk-32349-BR.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f), any opposition to the Motion must be filed with the Bankruptcy Court and served on counsel for Beshmada no later than 14 days before the date designated for hearing on the Motion.  Pursuant to Local Bankruptcy Rule, 9013-1(h), the failure to file and serve timely a response to the Motion may be deemed by the Court to be consent to the granting of the Motion.

Date:  February 2,  2010                    LAW OFFICES OF DAVID W. MEADOWS


By: _____/s/ David W. Meadows_____
                        David W. Meadows
                        Bankruptcy Counsel for Beshmada, LLC.

3

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 7

I. ................................................................................................................................ 7

JURISDICTION AND VENUE .................................................................................... 7

II. ............................................................................................................................... 7

SUMMARY OF THE MOTION ................................................................................. 7

III. ............................................................................................................................. 8

STATEMENT OF FACTS ......................................................................................... 8

   A.  The Parties to the Restructuring Agreement ........................................................ 10

   B.  The Consideration Being Paid by the Weintraub Entities ................................... 10

   C.  The Real Estate Properties and the Associated Entities ..................................... 11

   D.  The "True Ups" .................................................................................................... 17

IV ............................................................................................................................. 18

RELIEF REQUESTED .............................................................................................. 18

V ............................................................................................................................... 19

THE RELIEF REQUESTED IS AUTHORIZED  BY SECTION 363(b) and SECTION 363(f) ............ 19

   A.  Summary of the Business Justification for the Restructuring Agreement ................ 20

   B.  The Sale Satisfies the Standards for Approval of a Sale Outside the Ordinary

Course of Business ..................................................................................................... 22

     1.  Sound Business Justification .......................................................................... 22

     2.  Accurate and Reasonable Notice .................................................................... 23

     3.  Adequate Price .............................................................................................. 24

     4.  Good Faith ..................................................................................................... 24

   C.  The Transfer of the Membership Interests Should be Approved Free and Clear of all Liens,

     Claims, Interests and Encumbrances, If Any, In or Against Such Transferred Interests ............... 24

4

VI. .................................................................................................................... 25

THIS COURT SHOULD EXERCISE ITS DISCRETION  AND APPROVE THE COMPROMISE

BETWEEN RELATING TO THE TRUE UP PROVISIONS AND OTHER RELEASES .......................

VII. THE RESTRUCTURING AGREEMENT SHOULD BE APPROVED .......................................... 27

UNDER THE FOUR PART TEST GOVERNING APPROVAL OF COMPROMISES ....................... 27

    A.   Probability Of Success ..................................................................................... 28

    A.   Cost, Complexity And Delay............................................................................ 28

    B.   Difficulty In Collection ................................................................................... 29

    C.   The Interest Of Creditors................................................................................. 29

VIII. CONCLUSION ........................................................................................................... 30

5

**Cases**

10 *Collier on Bankruptcy*, paragraph 9019.01 at 9019-2 (15th Ed. Rev. 2007) ....................................... 26

11 U.S.C. § 363(f) ........................................................................................................................................... 24

Bankruptcy Rule 9019(a) ............................................................................................................................. 25

Cosoff v. Rodman, (In re W.T. Grant Company) 699 F.2d 599, 608 (2nd Cir. 1983) ............................ 26

F.R.B.P. 2002(a). ......................................................................................................................................... 23

Federal Rule of Bankruptcy Procedure 6004 ............................................................................................ 23

In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985) ..................................................... 23

In re Canyon Partnership, 55 B.R. 520, 526 (Bankr. S. D. Cal. 1985 ...................................................... 22

In re Copy Crafters Quickprinting, Inc., 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988) .............................. 22

In re Equity Funding Corp., 492 F.2d 793, 794 (9th Cir. 1974) ............................................................... 22

In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987) ...................... 27

In re Huntington Ltd., 654 F.2d 578, 589 (9th Cir. 1991) ........................................................................ 22

In re Huntington Ltd., 654 F.2d 578, 589 (9th Cir. 1991) ……………………………………………22

In re Equity Funding Corp., 492 F.2d 793, 794 (9th Cir. 1974) ............................................................... 22

In re Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987) ...... 22

In re Technology For Energy Corp., 56 B.R. 307, 311, 312 (Bankr. E.D. Tenn. 1985) ........................... 27

In re Thrifty Liquors, Inc., 26 B.R. 26, 28 (Bankr. D. Mass. 1982) .......................................................... 22

Matter of WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991), *aff'd in part, rev'd in part*, 983 F.2d 336
     (1st Cir. 1993); .................................................................................................................................... 22

re Flight Trans. Corp. Securities Litigation, 730 F.2d 1128, 1135-1136 (8th Cir. 1984) ........................ 29

6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the debtor's involuntary bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Sections 105(a) and 363 of title 11, United States Code (the "Bankruptcy Code") and Rules 6004, 9006 and 9019 of the Federal Rules of Bankruptcy Procedure ("FRBP").

### II.

### SUMMARY OF THIS MOTION

Beshmada, LLC, involuntary debtor ("Beshmada") and R. Todd Neilson, chapter 11 trustee of the estate of Ezri Namvar  (the "Namvar Trustee") request approval to enter into that certain Agreement for Restructuring of Limited Liability Companies (the "Restructuring Agreement"),  which is attached as Exhibit 1 and described in more detail below.   By way of summary of the Restructuring Agreement's key provisions, Beshmada and Namvar will assign their member interests or assign a portion of their member interests depending on the entity involved, to Richard Weintraub ("Weintraub") or to one or more of his affiliates, who are current members in the affected entities.  The Restructuring Agreement also provides for settlement of certain "true up" obligations by the Weintraub entities in

7

favor of Beshmada.   In exchange, Weintraub will pay $3,000,000.00 (the "Purchase Price").[2] A total of $500,000 of the Purchase Price will be paid in cash at closing, with the balance paid over a five (5) year period, without interest.     The Purchase Price balance will be collateralized by the member interests being transferred, by a deed of trust on one of the properties (which currently is unencumbered), and by a personal guaranty by Weintraub.     The details of the Restructuring Agreement are more fully set forth below.[3]

### III.

### <u>STATEMENT OF FACTS</u>

1.     On December 22, 2008, involuntary chapter 11 petitions were filed against Namco Capital Group, Inc., ("Namco") and its sole shareholder, Ezri Namvar ("Namvar").     On January 29, 2009, orders for relief were entered in both the Namco bankruptcy case and the Namvar bankruptcy case. On March 11, 2009, the Court entered an order approving the appointment of R. Todd Neilson as the chapter 11 trustee in the Namvar bankruptcy case.   On May 8, 2009, the Court entered an order approving the appointment of Bradley D. Sharp as the chapter 11 trustee in the Namco bankruptcy case. On June 19, 2009, an involuntary chapter 7 petition  was filed against Beshmada.     On the same date, involuntary petitions were filed against two other entities, Beshmada of Delaware, LLC ("Beshmada Delaware") and Dimes, LLC ("Dimes") (collectively, the "Involuntary Debtors").          Pursuant to

---

[2]     Pursuant to Section 1 of the Restructuring Agreement, the Purchase Price shall be allocated among the various Transferred Membership Interests as reasonably agreed upon by the parties prior to the Closing.

[3]     A true and correct copy of the Restructuring Agreement is attached hereto as **Exhibit 1**.   In the event of any inconsistency between the description of the Restructuring Agreement contained in the Motion and the Restructuring Agreement itself, the provisions of the Restructuring Agreement shall control over the description provided in this Motion

stipulations and orders entered by this Court, the Involuntary Debtors have not yet answered or otherwise responded to the involuntary petitions.   No orders for relief have been entered with respect to the involuntary cases.   On August 13, 2009, an Interim Order was entered by this Court approving a certain "*Stipulation Between Debtor Ezri Namvar and the Trustees re Control of Affiliated Limited Liability Companies.*" Pursuant to that Stipulation and Interim Order, among other things, Louis Cicalese, LLC, a Delaware limited liability company ("Cicalese") became the new manager of certain limited liability companies, including each of the Involuntary Debtors.

*2.* Prior to the December 22, 2008 commencement of the Namvar and Namco cases, Namvar indirectly and through literally a morass of affiliated entities entered into a number of real estate projects with an individual, Richard E. Weintraub ("Weintraub") directly and through various of Weintraub's affiliated entities.   These projects include Rancho Malibu, LLC, ("Rancho Malibu") which owns undeveloped real estate in Malibu, and which has been the subject of prior hearings before the Court.   Other projects involve both developed and undeveloped commercial real property and residential (apartment) buildings in Southern California.

3. This Motion pertains to all of the real estate projects involving Weintraub entities in which there is a direct or indirect bankruptcy related affiliate except Rancho Malibu.   In other words, the Restructuring Agreement resolves all issues and liquidates all membership interests that either Beshmada or Namvar have with Weintraub and his affiliates in the applicable LLC entities which own the subject properties, with the exception of the Rancho Malibu property.   The intent of the Restructuring Agreement is that Rancho Malibu and the relations of the parties with respect to it are not affected whatsoever by the agreement.

9

**A.    The Parties to the Restructuring Agreement**

4.    The <u>bankruptcy affiliated parties</u> to the Restructuring Agreement are <u>Beshmada</u> and <u>Panamo LLC</u>, a California limited liability company ("Panamo").    Although Panamo is not an entity that is the subject of a bankruptcy case, its sole member is Namvar. It is because of the Namvar ownership interest in Panamo that bankruptcy court approval of the Restructuring Agreement is sought in the Namvar bankruptcy case.    Beshmada and Panamo are referred to in the Motion as the "Namco Parties" and are defined as such in the Restructuring Agreement.

5.    The <u>Weintraub affiliated parties</u> to the Restructuring Agreement are, in addition to Weintraub individually:    a) Americana Glendale, Inc., an Arizona corporation ("Americana"); b) Weintraub Financial Services, Inc., a California corporation ("WFS"); and c) REW De Soto Investors, LLC, a California limited liability company ("De Soto Investors").    These entities are collectively referred to as the "Weintraub Parties."

**B.    The Consideration Being Paid by the Weintraub Entities**

6.    The Purchase Price set forth in the Restructuring Agreement is $3,000,000.00 and is being paid in exchange for the transfers and releases by the Namco Parties as well as for settling the "true-ups" as hereinafter defined in Section D hereof.    The Purchase Price will be paid as follows: (i) $500,000 in cash at the Closing as set forth in the Agreement, and (ii)the $2,500,000.00 balance of the Purchase Price will be evidenced by a Promissory Note and paid in installments, without interest. There will be no installments under the Promissory Note for the first six (6) months following the Closing. Thereafter, there will be monthly payments of $40,540.54 commencing on the sixth month after the Closing and continuing through and including the forty-second month after the Closing.    In other words,

10

in 37 monthly installments following the Closing, Weintraub or his entities will pay $1,500,000.00.  This will leave a balance due of $1,000,000.000.  Commencing on the forty-third month after closing, there will be monthly installments of $55,555.56 through and including the sixtieth month after Closing for an additional payment of $1,000,000.  The payment provisions are more particularly described in the Restructuring Agreement.

7.    As security for the obligations, the Promissory Note will be secured by a pledge of the membership interests being transferred under the Restructuring Agreement.  In addition, the Namco Parties will be granted a first Deed of Trust on the Malibu Lot (described below.)    The Restructuring Agreement has detailed provisions relating to the Deed of Trust and the potential sale of the property and the release of the Deed of Trust.    In summary, the Namco Parties agree to reconvey the deed of trust to permit a bona fide arms-length sale of the Malibu lot upon receiving required notice.  These provisions are set out in Section 1.3 of the Restructuring Agreement.

8.    The Promissory Note will be personally guaranteed by Weintraub pursuant to a Guaranty more fully defined in the Restructuring Agreement.  The Guaranty will include an exemption for recourse to Weintraub's personal residence and the art and furnishings in it.    The specific provisions applicable to the Guaranty are set out in the Restructuring Agreement, at Section 1.2.

C.    **The Real Estate Properties and the Associated Entities**

9.    **Malibu Lot**:    WN Malibu Lot LLC ("WN Malibu") owns a vacant lot in Malibu, California.    The members of WN Malibu are Weintraub Financial Services, Inc., a California Corporation ("WFS") and Beshmada.    WFS and Beshmada each have a 50% membership interest. The lot in Malibu is owned free and clear.  The lot was appraised in July, 2009.  Its appraised value is $550,000.00 with a quick sale value of $330,000.00. The City of Malibu has initially requested that, as a

11

condition of approval of the entitlement requests for Rancho Malibu, it wants the lot donated to the City

for use as a parking area. Accordingly, the property may have value to the bankruptcy related entities, in

excess of its appraised or sale value.  The Rancho Malibu property currently is a viable asset.  Therefore,

it is in the best interest of Beshmada to attempt to not only preserve but to increase the value of Rancho

Malibu for Dimes LLC, an entity related to Beshmada, which is one of the members of Rancho Malibu,

LLC.

      10.    **WN 2 – Brentwood Gardens**:  This property is owned by WN2 LLC ("WN2").

The members of WN2 are Americana Glendale, Inc., an Arizona corporation ("Americana") owned by

Weintraub, and Beshmada.    WN2 and Beshmada each have a 50% membership interest.   WN2 owns a

leasehold interest in an apartment complex, the Brentwood Garden Apartments.   The property is located

on San Vincente Avenue in Brentwood.  WN2 is the lessee under a lease which expires April 7, 2016.

The property is encumbered by a note, secured by a first deed of trust, which is self amortizing, and

matures on July 1, 2014. Following the maturity date  of the loan, there will be approximately 21 months

remaining in the lease term during which net operating income will be generated without a debt service

obligation being payable.  The present annual gross rental amount is $993,518.00, and debt service is

$563,520.00.  This results in currently approximately $430,000.00 of annual operating income before

expenses.   All maintenance and repair obligations under the lease are the obligation of the lessee.

Current expenses are approximately $342,000.00 per year, and it is expected that the maintenance and

repair obligations will increase over the remaining term of the lease as a result of the aging of the

building.  As a result of the maturity date of the secured note predating the expiration of the lease,

between July 1, 2014 and April 7, 2016, plus total annual net income of approximately $484,000.00

prior to the maturity of the loan, there should be a total of approximately $1,200,000.00 of income to

12

WN2, of which Beshmada would be entitled to receive $600,000.00. There is no residual value to the lease, and the present value of Beshmada's interest assuming an 8% discount rate is $868,503.00.

      11.   **WN Sunset:**   This Property is owned by WN Sunset LLC ("WN Sunset"). WN Sunset is owned by Americana and Beshmada, each having a 50% membership interest. WN Sunset owns an assemblage of approximately 1.37 acres of land acquired for a mixed use development (hotel/residential and retail) with the following addresses: 9031, 9035 & 9041 Harrat Street; 1018 N. Doheny Drive; and 9040 and 9056 W. Sunset Boulevard, West Hollywood, California. The property is presently improved with an older, 1957 constructed restaurant fronting Sunset Boulevard, which is vacant, and an existing eight unit, 1951 constructed apartment building fronting Doheny Drive. In addition, the site involves two vacant parking lots. Entitlements are being sought for a mixed use hotel/residential/commercial development and a preliminary sketch plan approval has been given by the City of West Hollywood. However, the City of West Hollywood has a very active and litigious civic association. In all likelihood once final approval for the entitlements has been received, such approval will most likely be contested. East West Bank has a first deed of trust securing a $12,500,000.00 obligation of which approximately $11,707,000 has been funded. The original loan had $2,000,000 of interest reserve and $2,000,000 of entitlement reserves. All of the entitlement reserves have been funded, and there is a balance of $793,000 in the interest reserve account. The loan matures on January 15, 2010, and it is anticipated that a Notice of Default will be coming shortly The East West Bank loan is personally guaranteed by Weintraub, Weintraub Financial Services, Inc. (a Weintraub-related entity), AGI, Namvar and Beshmada. East West Bank is unlikely to refinance this debt with Beshmada as a member and even if the Bank would do so, Beshmada cannot meet its obligations under the Operating Agreement, which include debt service payments as well as paying additional entitlement costs. The

13

current appraised value is $9,500,000.00 with a liquidation value of $7,000,000.00.  The property, fully

entitled in an improved real estate and capital market, would have value in excess of the secured debt.

There is currently no equity in the property.

12. **Panavision (Desoto):**   This property is owned by REW De Soto Partners, LLC

("De Soto Partners").    The members of De Soto Partners are REW De Soto Investors, a California

limited liability company ("De Soto Investors"), and Panamo LLC, a California limited liability

company ("Panamo").   The sole member of Panamo is Ezri Namvar.   Panamo also is an investor in De

Soto Investors, having a 27.59% capital interest and a 15.14% profit interest.   De Soto Investors holds a

50% capital interest and a 62.5% profit interest in De Soto Partners.  Panamo holds the other 50% capital

interest and a 37.5% profit interest.  De Soto Partners owns the real property located at 6219 De Soto

Avenue, Woodland Hills.     The property consists of 10.46 acres of land improved with a 175,300

square foot industrial building occupied by Panavision and is located at the Northwest corner of De Soto

and Erwin Street, Los Angeles (the Warner Area).   The property is fully approved for 312 senior

condominium units and 395 market rate condominium units.

13. Wachovia Bank has a first deed of trust securing a note in the original principal

amount of $39,450,00.00 and has a current outstanding balance of $30,878,063.00  The note matures

December 14, 2010. There is an interest reserve with a balance of $7,316,053 and an entitlement reserve

of approximately $1,255,884.05.   The annual debt service on the Wachovia note is $1,663,688.00.

Obviously at the time the Wachovia note matures, it will have to be refinanced or extended. Currently,

due to the financial problems that Wachovia has and the softness of the residential real estate market in

Southern California it is extremely unlikely that Wachovia will refinance this loan.  Given the status of

the capital markets today, and assuming no significant change at the maturity date of the loan, there is no

14

possibility of refinancing this property with a loan that would generate enough proceeds to pay off

Wachovia.   Panavision currently leases the property with an annual rent of $1,829,000.00.   The

Panavision lease expires on June 1, 2012.  Panavision has refused to negotiate an extension of the lease

under terms similar to the existing lease; but rather would only extend the lease at a base rent

significantly lower than the current lease provides.  Such terms would not provide sufficient income to

refinance the existing debt at maturity.  Further, if the lease were to be extended for any significant

period of time, the entitlements which the property currently has would expire.    The appraised value of

the property is $16,000,000 with a liquidation value of $11,500,000.00.  The long-term strategy for this

property would be to attempt to lease the building at the expiration of the Panavision lease, negotiate a

deal with a new lender that would provide for interest only debt service and to invest enough new capital

into the property so that ownership can  hold onto the property until the residential market rebounds.  In

a strong residential market at a time when reasonable financing would be available to develop residential

property, the property could have a value in excess of $40,000,000.00.    However, as with other

properties in this economy, the potential value is inherently speculative. There is no equity at this time in

this property.

14.   **Indio:**     This property is owned by WN Indio, LLC ("WN Indio").    The

members of WN Indio are Weintraub, individually, and Beshmada, each having a 50% membership

interest.   This property is undeveloped land in Indio, California.    The land is a fully entitled as a

commercial/retail site.  It originally consisted of 75 acres of which 13 acres have subsequently been sold

to Lowes.  Lowes bought the property with the intention of immediately building a Lowes Retail Home

Center, but due to the softness of the real estate market in the area and the economy in general, Lowes

has decided not to go forward with its development plans.

15

15.    Wells Fargo Bank has a note secured by a first deed of trust which matured on May 20, 2009.  The note has an outstanding balance of $8,893,079 ($9,438,157 including interest and late charges). There was an interest reserve in the amount of $622,451.00, which, since the loan has matured and remains unpaid will not be released by Wells Fargo Bank. In addition there were sitework reserve escrows totaling $ 5,132,444.00 which reserve was to be used  principally for off-site improvements relating to the Lowes' parcel.    The original loan amount reflected in a June 19, 2008 promissory note in favor of Wells Fargo is $14,658,235.00.  The appraised value assuming a long term hold, the construction of the Lowes Retail Home Center, which at this time is not likely, a rebound of both the real estate and the capital markets within a one year period of time is $18,890,000.  Its present liquidation value is $5,670,000.  The disparity in the two appraised values arises as a result of the soft market for this type of property in Indio.  The property has been marketed both for sale and build-to-suit lease for the last 16 months.  There has been no interest either from potential buyers or tenants for the property.  The property will have value in excess of its current debt at some point in the future, but given the softness of the Indio market this is a long term and highly speculative proposition.

16.    Wells Fargo has issued a letter of default but has not filed a Notice of Default.  It is highly unlikely that Wells Fargo will extend its note without at least a partial pay down of the debt, an interest reserve funded by the borrower and perhaps  additional financial commitments that the Namvar and Namco entities are not in a position to make.    Namvar, the Namvar Family Trust and Weintraub have guaranteed the Wells Fargo obligation.    Again, there is no equity in the property at this time, and no prospect for refinancing.

16

### D.   The "True Ups"

17.     In the context of these transactions, a "true up" refers to a contractual obligation, set out in an applicable limited liability company operating agreement, of members of a limited liability company to "true up" their capital accounts by causing their actual contributed capital to match their contractual obligation.   The operating agreements of WN2, WN Indio, LLC and WN Sunset, LLC, have such provisions.

18.     Based on ledgers maintained by the various entities, the following true ups exist as obligations of Weintraub or a Weintraub affiliate in favor of Beshmada:

| | |
|---|---|
| WN2: | $282,291.15 |
| WN Indio, LLC | $2,661,687.35 |
| WN Sunset, LLC | <u>$3,531,003.65</u> |
| Total: | $6,474,982.15 |

It should be noted that the above "true up" calculations are derived from a schedule supplied by Weintraub.   The records of Beshmada indicate that the "true up" obligations are approximately $6,202,000.00.

19.     The obligation to pay these "true up" numbers, however, may be subject to substantial defenses by Weintraub and the Weintraub entities.     Weintraub has asserted that no true up obligations remain based on defaults by Beshmada in failing to make required capital contributions and failing to arrange for financing for the companies.     Weintraub further alleges that Namvar fraudulently misrepresented his ability to raise such financing and made other material misrepresentations to the various lenders to induce the lenders to make the loans in these properties and these false and or fraudulent representations are specific violations of the operating agreement provisions that constitute

17

defenses to the true up obligations.  Beshmada and the Namvar Trustee dispute Weintraub's position and assert that the true up obligations are enforceable.  However, without a settlement the resolution of these issues will require litigation.  Such litigation will be extremely costly and lengthy with the outcome uncertain.  Additional time and costs will be involved in attempting to collect on the "true-up" obligations should Beshmada be successful in the threshold litigation.

<div align="center">

**IV**

**RELIEF REQUESTED**

</div>

Beshmada and the Namvar Trustee request Court approval of the Restructuring Agreement.  A true and complete copy of the Agreement is attached to this Motion as **Exhibit 1**.  The Motion is brought under Sections 363(b) and 363(f) because the Restructuring Agreement provides for the transfer by Beshmada and Panamo of a portion of their membership interests, transferring all of their interests in some of the companies to Weintraub and/or his affiliates and in other cases transferring a portion of their interests and retaining an economic interest.   Weintraub has the right under the Restructuring Agreement to further dilute the remaining economic interests.   (*See* Restructuring Agreement at Section 2.3.9;  *see* also Cicalese Declaration at para. 20.)    The Restructuring Agreement amounts to a modification of the substantive rights of Beshmada and Namvar (through Panamo) under the limited liability company operating agreements.

If an order for relief had been entered in the Beshmada case, Beshmada would have sought an order from the Court authorizing Beshmada to enter into the Restructuring Agreement pursuant to Section 363 of the Bankruptcy Code.  Therefore, Beshmada makes this request for such approval, even in the absence of an order for relief.    An order for relief has been entered as to Namvar. Consequently, the companion motion of the Namvar trustee requests court approval under Section 363

<div align="center">18</div>

of the Bankruptcy Code to approve the Trustee causing Panamo to enter into the Restructuring Agreement, as the Namvar estate wholly owns Panamo.

Namco and the Namvar Trustee believe that Beshmada or Panamo has pledged none of these interests as collateral to any third party. (*See* Cicalese Declaration, at para. 19; Neilson Declaration at para. 3.)    Nonetheless, relief is sought on the basis of Section 363(f)(1), authorizing the transfer of the member interests free and clear of any interest of any third party in any such member interest that is being transferred pursuant to the Restructuring Agreement.

**V**

**THE RELIEF REQUESTED IS AUTHORIZED**

**BY SECTION 363(b) and SECTION 363(f)**

Section 363(b)(1) of the Bankruptcy Code authorizes a sale, other than in the ordinary course of business, of property of the estate, after notice and a hearing.    11 U.S.C. § 363(b).    The Restructuring Agreement amounts to a sale with respect to the transfers of member interests as part of the consideration by Beshmada and Panamo to Weintraub and his affiliates in exchange for some portion of the $3,000,000 Purchase Price.  The specific member interests that are being transferred are shown below.

/ / /

/ / /

/ / /

/ /

19

| Entity | Transfer | Retained Membership Interest |
|---|---|---|
| WN Sunset LLC (Sunset/Doheny) | Transfer by Beshmada of all of its member interest, except for a 25% profit interest | 25% profit interest |
| WN2 LLC (Brentwood Gardens) | Transfer by Beshmada of all of its member interest | None |
| WN Malibu Lot LLC | Transfer by Beshmada of all of its member interest | None |
| WN Indio LLC | Transfer by Beshmada of all of its member interest, except for a 25% profit interest | 25% profit interest |
| De Soto Partners and De Soto Investors | Transfer by Panamo of all of its membership interest in De Soto Investors and De Soto Partners, except for a 25% profit interest in De Soto Partners | 25% profit interest |

*See* Restructuring Agreement and attached Schedules.

Summary of the Business Justification for the Restructuring Agreement

Beshmada and Panamo (Namvar) are exchanging membership interests, releasing "true up" demands in exchange for $3,000,000.00 with the retention of profit participation in various properties. The description of the current status of the affected properties is set out in the Cicalese Declaration and as set out above. The present equity or realizable value to Beshmada and Panamo can be summarized as follows:

20

| Property | Equity/Value to Beshmada |
|---|---|
| WN Malibu (Lot) | Estimated $225K (50% Beshmada) |
| WN 2 – Brentwood Gardens | Estimated – zero, after operating expenses. |
| WN Sunset | Equity zero |
| De Soto Partners (Panavision) | Equity zero |
| Indio | Equity zero |

The Restructuring Agreement is an opportunity to liquidate the values in the two properties where there is value and an opportunity to obtain a very substantial portion of the "true up" values without lengthy and contentious litigation.  The Weintraub entities contend that there are numerous defaults by Beshmada under the various operating agreements, including fraudulent misrepresentations and failure by Beshmada to contribute agreed upon capital.

As to the "true up" provisions under the respective operating agreements, these are complex and provide for arbitration.    Beshmada is not in a position to incur substantial legal fees and engage in lengthy litigation with Weintraub over these issues.  In particular, the litigation will put the Trustees in a position of *defending* Namvar against Weintraub allegations that Namvar made fraudulent misrepresentations to Weintraub and will require complex litigation as the existence and effect of the alleged breaches by Namvar and the Namvar affiliated entities.    The true ups could be worth less than zero, taking into account not only the cost of pursuing them, but the position it will put the Trustees in defending the allegations being made by Weintraub against Namvar.

In sum, the total $3,000,000 Purchase Price, achieves the goal of liquidating the values of the real property and favorably liquidates the speculative and litigious "true ups."

21

B.    <u>The Sale Satisfies the Standards for Approval of a Sale Outside the Ordinary Course of Business</u>.

Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and hearing, may . . . sell, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Ninth Circuit Court of Appeals has ruled in cases under the Bankruptcy Act that a sale of a debtor's property should be approved if it is in the best interests of the estate and creditors.  <u>In re Huntington Ltd.</u>, 654 F.2d 578, 589 (9th Cir. 1991); <u>In re Equity Funding Corp.</u>, 492 F.2d 793, 794 (9th Cir. 1974).  Whether such a transaction is in the best interests of the estate is still a significant factor under the Bankruptcy Code.  <u>In re Canyon Partnership</u>, 55 B.R. 520, 526 (Bankr. S. D. Cal. 1985).

In evaluating the propriety of a sale of property of the estate, courts have evaluated whether: (i) a "sound business purpose" justifies the sale; (ii) "accurate and reasonable notice" of the sale was provided; (iii) "the price to be paid is adequate, i.e., fair and reasonable;" and (iv) "good faith, i.e., the absence of any lucrative deals with insiders, is present."  <u>In re Copy Crafters Quickprinting, Inc.</u>, 92 B.R. 973, 983 (Bankr. N.D.N.Y. 1988) and <u>In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.</u>, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).  An examination of each of the above four factors reveals that the transactions contemplated by the Restructuring Agreement should be approved.

1.    <u>Sound Business Justification</u>

Application of a debtor in possession's or trustee's sound business judgment in the use, sale or lease of property of the estate is subject to great judicial deference.  <u>Matter of WPRV-TV, Inc.</u>, 143 B.R. 315, 319 (D. P.R. 1991), *aff'd in part, rev'd in part*, 983 F.2d 336 (1st Cir. 1993); <u>In re Thrifty Liquors, Inc.</u>, 26 B.R. 26, 28 (Bankr. D. Mass. 1982).  The application of the business judgment test

22

affords a debtor in possession or trustee discretion in balancing the costs and benefits of administering or

disposing of estate assets according to the needs of the estate.  *See* <u>In re Canyon Partnership</u>, 55 B.R.

520, 524 (Bankr. S.D. Cal. 1985).

Here, confirmation of the provisions of the Restructuring Agreement will substantially

benefit Beshmada, its Estate, the Namvar estate and all creditors because: (a) it will liquidate the value in

its real property interests where there is value; (b) it will liquidate without litigation the value of the

"true up" obligations; and (c) Beshmada and Panamo (Namvar) will still benefit from the potential

development of certain properties on account of the retained economic interests.

### 2.        **Accurate and Reasonable Notice.**

Pursuant to § 363(b)(1), a debtor in possession or trustee must give notice of any sale of

property of the estate.  Federal Rule of Bankruptcy Procedure 6004 governs most transactions not in the

ordinary course of business.  Rule 6004(a) refers, in turn, to Rule 2002(a), which requires a twenty (20)

day notice period for any "proposed use, sale, or lease of property of the estate other than in the ordinary

course of business, unless the court for cause shown, shortens the time . . . ."  F.R.B.P. 2002(a).

The Trustee, pursuant to that Order Establishing Notice Procedures and Permitting

Service on Insured Depository Institutions by First Class Mail (the "Limited Notice Order"), entered on

February 9, 2009, has served the Notice of Motion and Motion on all parties entitled thereto as

established by the Limiting Notice Order.  As such, the Trustee, as to the Namvar estate, has satisfied the

requirements for accurate and reasonable notice.  No order for relief has yet been entered in the

Beshmada case.  However, the Notice and Motion is being served pursuant to the Limited Notice Order,

and therefore is reasonably believed to reach all interested parties.

23

### 3. <u>Adequate Price.</u>

Cicalese and the Trustees believe that the consideration provided to the estate by the Restructuring Agreement represents adequate and fair consideration for such claims, rights, interests and assets that are being transferred, modified or released under the proposed Restructuring Agreement. (*See* Cicalese Declaration at para 30.;  Neilson Declaration at para. 4.)

### 4. <u>Good Faith.</u>

Finally, the transfer and assignment contemplated by the Restructuring Agreement is proposed in good faith.  The "good faith" requirement focuses principally on the element of special treatment of a debtor's insiders in the sale transaction.  <u>Industrial Valley</u>, 77 B.R. at 21.  Here, neither Weintraub nor the Weintraub entities are insiders or affiliates of Beshmada or Namvar, and the negotiations between the Beshmada and Weintraub regarding the Restructuring Agreement provisions were at arms-length and no collusion was involved.   (*See* Cicalese Declaration at para. 27.)

C. <u>The Transfer of the Membership Interests Should be Approved Free and Clear of all Liens, Claims, Interests and Encumbrances, If Any, In or Against Such Transferred Interests.</u>

Section 363(f) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee may sell property . . . free and clear of any interest in such property of an entity other than the estate, only if . . . . (2) such entity consents; [or] (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; [or] (4) such interest is in bona fide dispute  . . ." 11 U.S.C. § 363(f).

Here, to the extent any party holds or asserts a pledge, security interest or any other interest in the membership interests that are to be transferred pursuant to the Restructuring Agreement,

24

such interests are unknown.  (*See* Cicalese Declaration at para. 28.; Neilson Declaration at para. 3.)

Consequently, the assertion of any such interest is subject to a good faith dispute.

Accordingly, pursuant to Bankruptcy Code § 363, the member interests affected by the

Restructuring Agreement can be transferred and assigned free and clear of all claims, liens, interest and

encumbrances.

## VI.

### THIS COURT SHOULD EXERCISE ITS DISCRETION

### AND APPROVE THE COMPROMISE BETWEEN

### RELATING TO THE TRUE UP PROVISIONS AND OTHER RELEASES

The transactions provided for by the Restructuring Agreement include a compromise

between the Beshmada and the Weintraub Entities insofar as there is a compromise of the "true up"

obligations, as well as general reciprocal releases.    While the "true ups" have a face value of

approximately $6 million, as set forth above, the Weintraub Entities assert defenses to the true up

obligations due to defaults by Beshmada and Namvar.    In a litigation context, the true up obligations

may be valueless but certainly will be expensive and time consuming to litigate.

Mr. Cicalese, acting as the Manager of Beshmada, reasonably believes that it is in the best

interests of the Beshmada to enter into the Restructuring Agreement.    This business judgment is joined

by the Trustee of the Namvar estate.  (*See* Neilson Declaration at para. 4.)

Compromises that satisfy the "reasonableness standard" should be approved.

Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after notice and a

hearing, the court may approve a compromise or settlement."   By its own terms, Bankruptcy Rule

25

9019(a) commits the approval or rejection of a compromise to the sound discretion of the Bankruptcy Court.

> Sound discretion is judicial power exercised fairly and equitably.  As the Supreme Court writes: the term "discretion" denotes the absence of a hard and fast rule . . . when invoked as a guide to judicial action, it means a sound discretion, that is to say, a discretion exercised not arbitrarily or willfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reasonableness and conscience of the judge to a just result.

Langnes v. Green, 282 U.S. 531, 541, 51 S.Ct. 243, 247 (1931).  Correspondingly, the Ninth Circuit has recognized that "the bankruptcy court has great latitude in approving settlements."  In re Woodson, 839 F.2d 610, 620 (9th Cir. 1988).

In determining whether the proposed settlement is "right" in "law," "reason," and "conscience," two principles should guide the Court.  First, compromises are "favored in bankruptcy" 10 Collier on Bankruptcy, paragraph 9019.01 at 9019-2 (15th Ed. Rev. 2007), and "are a normal part of the reorganization process." Case v. Los Angeles Lumber Products Company, 308 U.S. 106, 130, 60 S.Ct. 1 (1939).

Second, settlements should be approved if they fall above the lowest point in the continuum of reasonableness.  As the Court of Appeals for the Second Circuit states:

> [The] responsibility of the bankruptcy judge and ours upon review, is not to decide the numerous questions of law and fact raised by the appellants but rather to canvas the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'

Cosoff v. Rodman, (In re W.T. Grant Company) 699 F.2d 599, 608 (2nd Cir. 1983). Thus, the question is not whether a better settlement might have been achieved, or a better result if litigation pursued.  Instead, the Court should approve settlements which meet a minimal threshold of reasonableness.  As one bankruptcy court has pointed out:

26

In assessing a settlement agreement the court is not obliged to determine and rule upon disputed facts and questions of law.  Instead, the court's duty is to "canvas the issues" and decide whether the settlement falls below the nadir in the range of reasonableness.

In re Technology For Energy Corp., 56 B.R. 307, 311, 312 (Bankr. E.D. Tenn. 1985).

In determining whether to approve a trustee's proposed settlement, the court does not substitute its judgment for that of the trustee . . . instead, the court will, at the hearing on the proposed settlement, canvas the issues and see if the settlement falls below the lowest point in the range of reasonableness . . . the purpose of the hearing is not for the court to determine the numerous issues of law and fact raised by the objectors . . . what is being sought is not the resolution of issues, but rather the identification and clarification of the litigation issues so that the Court can make an informed decision on the reasonableness of the settlement.

In re Bell & Beckwith, 93 B.R. 569, 574-575 (Bankr. N.D. Ohio 1988).

Beshmada, joined by the Namvar and Namco Trustees, contends that the proposed compromise which is set forth in the Restructuring Agreement is fair, reasonable and in the best interests Beshmada as well as the Namvar estate and therefore their respective estates and creditors and should be approved.

## VII.

## THE RESTRUCTURING AGREEMENT SHOULD BE APPROVED

## UNDER THE FOUR PART TEST GOVERNING APPROVAL OF COMPROMISES

Decisional law regarding the exercise of the court's discretion in determining whether a compromise satisfies the reasonableness standard is "remarkably consistent in establishing that there are but four considerations which a court must address."  In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).  These considerations are:

(1)    the probability of success in the litigation;

27

(2)    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

(3)    the likely difficulty in collection; and

(4)    the paramount interest of creditors.

In re A&C Properties, Inc., 784 F.2d 1377, 1381 (9th Cir. 1986).  Each of these factors militate in favor of approving the settlement.

## A.    Probability Of Success

The Weintraub Entities assert that they have credible defenses to the "true up" obligations, based on defaults of Beshmada in making required capital contributions and arranging financing for the companies.   While not conceding the validity of these defenses, Beshmada and the Namvar Trustee acknowledge that the asserted defenses raise substantial factual issues and will not be easily overcome.   The Weintraub Entities have made it plain that they also will allege that Namvar engaged in a multitude of fraudulent misrepresentations to Weintraub and to the various lenders in connection with each of the properties and Namvar's financing capabilities.   These allegations could be seen as creating  direct defenses to the true up obligations and there is at least a fair possibility that the estate might not prevail in seeking to enforce the true up obligations through litigation.  Based upon the foregoing, the proposed settlement is in the best interests of the estate and its creditors.

## A.    Cost, Complexity And Delay

The second factor that must be considered in evaluating the settlement is the expense, complexity, inconvenience and delay that would be entailed if the matters were litigated.   In the present case, if not settled in the Restructuring Agreement, the parties will have to litigate with the Weintraub Entities over the capital accounts of three separate entities.  Worse, Beshmada and the Trustees will have

28

to litigate – *and defend* -- Namvar against fraudulent misrepresentation allegations by Weintraub.   This is not litigation the estates should engage in.  The risks and the potential negative outcome of taking the litigation route are easily outweighed by the benefits provided by the proposed settlement.

### B.    Difficulty In Collection

Collection against Weintraub individually and the Weintraub Entities will be difficult. Weintraub has significant real estate holdings, but these holdings are subject to many of same current valuation issues plaguing most property owners and developers.   Collection of the true up accounts, even if litigation were pursued and successful, should be expected to be slow, expensive, and problematic.

### C.    The Interest Of Creditors

The final, but most significant, part of the analysis involves an evaluation of whether the settlement is in the best interests of creditors.   *See generally*, In re Flight Trans. Corp. Securities Litigation, 730 F.2d 1128, 1135-1136 (8th Cir. 1984).  The Restructuring Agreement is useful in several important ways.  First, it cashes out Beshmada's remaining equity in the projects where there *is* any equity.  Second, it cashes out at a very reasonable sum the Weintraub Entity "true up" liability which, if litigated, could result in no collection after substantial litigation cost to the estates.   Third, it preserves some economic benefit to Beshmada and Panamo on the projects where those entities are retaining an economic interest.    More broadly, the Restructuring Agreement amounts to the first steps toward liquidating the assets of these bankruptcy estates into cash for the benefit of creditors.    Accordingly, it is submitted that the proposed Restructuring Agreement is in the best interests not only of Beshmada, but also the best interests of the Namvar and Namco estates.

29

Based upon the above four factors, it is submitted that the proposed settlement is fair, and reasonable and should be approved.

## VIII.

## CONCLUSION

For the reasons set forth above, Beshmada and the Namvar Trustee respectfully request that the Restructuring Agreement attached hereto as Exhibit 1 be approved for execution.

Respectfully submitted,

Date:  February 2, 2010                LAW OFFICES OF DAVID W. MEADOWS


By:  /s/ David W. Meadows
                David W. Meadows
        Bankruptcy Counsel for Beshmada, LLC.

30

### DECLARATION OF LOUIS A. CICALESE

I, Louis A. Cicalese, declare as follows:

1.      Each of the facts contained in this declaration is based upon my personal knowledge, except for those matters stated on information and belief and, if called as a witness to do so, I could competently testify thereto.  I make this declaration in support of *"Notice of Motion and Motion of Beshmada, LLC for an Order Approving Restructuring Agreement" (the "Motion")*.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of proposed "Agreement for Restructuring of Limited Liability Companies" (the "Restructuring Agreement").

3.       Prior to the December 22, 2008 commencement of the Namvar and Namco cases, Namvar indirectly entered into a number of real estate projects with an individual, Richard E. Weintraub ("Weintraub") directly and through various of Weintraub's affiliated entities.   These projects include Rancho Malibu, LLC, ("Rancho Malibu") which owns undeveloped real estate in Malibu.    Other projects involve both developed and undeveloped commercial real property and residential (apartment) buildings in Southern California.

4.      The **Purchase Price** set forth in the Restructuring Agreement is $3,000,000.00 and is being paid in exchange for the transfers and releases by the Namco Parties as well as for settling the "true-ups" as hereinafter defined in Section D hereof.    The Purchase Price will be paid as follows: (i)  $500,000 in cash at the Closing as set forth in the Agreement, and (ii)the $2,500,000.00 balance of the Purchase Price will be evidenced by a **Promissory Note** and paid in installments, without interest. There will be no installments under the Promissory Note for the first six (6) months following the Closing.   Thereafter, there will be monthly payments of $40,540.54 commencing on the sixth month after the Closing and continuing through and including the forty-second month after the Closing.   In

other words, in 37 monthly installments following the Closing, Weintraub or his entities will pay

$1,500,000.00.  This will leave a balance due of $1,000,000.000.  Commencing on the forty-third month

after closing, there will be monthly installments of $55,555.56 through and including the sixtieth month

after Closing for an additional payment of $1,000,000.  The payment provisions are more particularly

described in the Restructuring Agreement.

        5.    As security for the obligations, the Promissory Note will be secured by a pledge of

the membership interests being transferred under the Restructuring Agreement.  In addition, the Namco

Parties will be granted a first **Deed of Trust** on the Malibu Lot (described below.)    The Restructuring

Agreement has detailed provisions relating to the Deed of Trust and the potential sale of the property and

the release of the Deed of Trust.    In summary, the Namco Parties agree to reconvey the deed of trust to

permit a bona fide arms-length sale of the Malibu lot upon receiving required notice.  These provisions

are set out in Section 1.3 of the Restructuring Agreement.

        6.    The Promissory Note will be personally guaranteed by Weintraub pursuant to a

**Guaranty** more fully defined in the Restructuring Agreement..    The Guaranty will include an

exemption for recourse to Weintraub's personal residence and the art and furnishings in it.    The specific

provisions applicable to the Guaranty are set out in the Restructuring Agreement, at Section 1.2.

### C.   <u>The Real Estate Properties and the Associated Entities</u>

        7.    <u>**Malibu Lot**</u>:    WN Malibu Lot LLC ("WN Malibu") owns a vacant lot in

Malibu, California.    The members of WN Malibu are Weintraub Financial Services, Inc., a California

Corporation ("WFS") and Beshmada.    WFS and Beshmada each have a 50% membership interest.

The lot in Malibu is owned free and clear.  The lot was appraised in July, 2009.  Its appraised value is

$550,000.00 with a quick sale value of $330,000.00. The City of Malibu has initially requested that, as a

condition of approval of the entitlement requests for Rancho Malibu, it wants the lot donated to the City

for use as a parking area. Accordingly, the property may have value to the bankruptcy related entities, in

excess of its appraised or sale value.  The Rancho Malibu property currently is a viable asset.  Therefore,

it is in the best interest of Beshmada to attempt to not only preserve but to increase the value of Rancho

Malibu for Dimes LLC, an entity related to Beshmada, which is one of the members of Rancho Malibu,

LLC.

        8.    **WN 2 – Brentwood Gardens**:  This property is owned by WN2 LLC ("WN2").

The members of WN2 are Americana Glendale, Inc., an Arizona corporation ("Americana") owned by

Weintraub, and Beshmada.    WN2 and Beshmada each have a 50% membership interest.    WN2 owns a

leasehold interest in an apartment complex, the Brentwood Garden Apartments.   The property is located

on San Vincente Avenue in Brentwood.  WN2 is the lessee under a lease which expires April 7, 2016.

The property is encumbered by a note, secured by a first deed of trust, which is self amortizing, and

matures on July 1, 2014. Following the maturity date  of the loan, there will be approximately 21 months

remaining in the lease term during which net operating income will be generated without a debt service

obligation being payable.  The present annual gross rental amount is $993,518.00, and debt service is

$563,520.00.  This results in currently approximately $430,000.00 of annual operating income before

expenses.   All maintenance and repair obligations under the lease are the obligation of the lessee.

Current expenses are approximately $342,000.00 per year, and it is expected that the maintenance and

repair obligations will increase over the remaining term of the lease as a result of the aging of the

building.  As a result of the maturity date of the secured note predating the expiration of the lease,

between July 1, 2014 and April 7, 2016, plus total annual net income of approximately $484,000.00

prior to the maturity of the loan, there should be a total of approximately $1,200,000.00 of income to

WN2, of which Beshmada would be entitled to receive $600,000.00.  There is no residual value to the lease, and the present value of Beshmada's interest assuming an 8% discount rate is $868,503.00.

9.    **WN Sunset:**    This Property is owned by WN Sunset LLC ("WN Sunset").  WN Sunset is owned by Americana and Beshmada, each having a 50% membership interest.   WN Sunset owns an assemblage of approximately 1.37 acres of land acquired for a mixed use development (hotel/residential and retail) with the following addresses:  9031, 9035 & 9041 Harrat Street; 1018 N. Doheny Drive; and 9040 and 9056 W. Sunset Boulevard, West Hollywood, California.  The property is presently improved with an older, 1957 constructed restaurant fronting Sunset Boulevard, which is vacant, and an existing eight unit, 1951 constructed apartment building fronting Doheny Drive.  In addition, the site involves two vacant parking lots.  Entitlements are being sought for a mixed use hotel/residential/commercial development and a preliminary sketch plan approval has been given by the City of West Hollywood.  However, the City of West Hollywood has a very active and litigious civic association.  In all likelihood once final approval for the  entitlements has been received, such approval will most likely be contested.

10.    East West Bank has a first deed of trust securing a $12,500,000.00 obligation of which approximately $11,707,000 has been funded.  The original loan had $2,000,000 of interest reserve and $2,000,000 of entitlement reserves.  All of the entitlement reserves have been funded, and there is a balance of $793,000 in the interest reserve account.  The loan matures on January 15, 2010, and it is anticipated that a Notice of Default will be coming shortly  The East West Bank loan is personally guaranteed by Weintraub, Weintraub Financial Services, Inc. (a Weintraub-related entity), AGI, Namvar and Beshmada.  East West Bank is unlikely to refinance this debt with Beshmada as a member and even if the Bank would do so, Beshmada cannot meet its obligations under the Operating Agreement, which

include debt service payments as well as paying additional entitlement costs.    The current appraised value is $9,500,000.00 with a liquidation value of $7,000,000.00.    The property, fully entitled in an improved real estate and capital market, would have value in excess of the secured debt.    There is currently no equity in the property.

   11. **Panavision (Desoto):** This property is owned by REW De Soto Partners, LLC ("De Soto Partners").    The members of De Soto Partners are REW De Soto Investors, a California limited liability company ("De Soto Investors"), and Panamo LLC, a California limited liability company ("Panamo").    The sole member of Panamo is Ezri Namvar ("Namvar").    Panamo also is an investor in De Soto Investors, having a 27.59% capital interest and a 15.14% profit interest.    De Soto Investors holds a 50% capital interest and a 62.5% profit interest in De Soto Partners.    Panamo holds the other 50% capital interest and a 37.5% profit interest.    De Soto Partners owns the real property located at 6219 De Soto Avenue, Woodland Hills.    The property consists of 10.46 acres of land improved with a 175,300 square foot industrial building occupied by Panavision and is located at the Northwest corner of De Soto and Erwin Street, Los Angeles (the Warner Area).    The property is fully approved for 312 senior condominium units and 395 market rate condominium units.

   12. Wachovia Bank has a first deed of trust securing a note in the original principal amount of $39,450,00.00 and has a current outstanding balance of $30,878,063.00    The note matures December 14, 2010. There is an interest reserve with a balance of $7,316,053 and an entitlement reserve of approximately $1,255,884.05.    The annual debt service on the Wachovia note is $1,663,688.00. Obviously at the time the Wachovia note matures, it will have to be refinanced or extended. Currently, due to the financial problems that Wachovia has and the softness of the residential real estate market in Southern California it is extremely unlikely that Wachovia will refinance this loan.  Given the status of

the capital markets today, and assuming no significant change at the maturity date of the loan, there is no possibility of refinancing this property with a loan that would generate enough proceeds to pay off Wachovia.    Panavision currently leases the property with an annual rent of $1,829,000.00.    The Panavision lease expires on June 1, 2012.  Panavision has refused to negotiate an extension of the lease under terms similar to the existing lease; but rather would only extend the lease at a base rent significantly lower than the current lease provides.  Such terms would not provide sufficient income to refinance the existing debt at maturity.  Further, if the lease were to be extended for any significant period of time, the entitlements which the property currently has would expire.    The appraised value of the property is $16,000,000 with a liquidation value of $11,500,000.00.  The long-term strategy for this property would be to attempt to lease the building at the expiration of the Panavision lease, negotiate a deal with a new lender that would provide for interest only debt service and to invest enough new capital into the property so that ownership can  hold onto the property until the residential market rebounds.  In a strong residential market at a time when reasonable financing would be available to develop residential property, the property could have a value in excess of $40,000,000.00.    However, as with other properties in this economy, the potential value is inherently speculative. There is no equity at this time in this property.

13.    **Indio:**    This property is owned by WN Indio, LLC ("WN Indio").    The members of WN Indio are Weintraub, individually, and Beshmada, each having a 50% membership interest.    This property is undeveloped land in Indio, California.    The land is a fully entitled as a commercial/retail site.  It originally consisted of 75 acres of which 13 acres have subsequently been sold to Lowes.  Lowes bought the property with the intention of immediately building a Lowes Retail Home

Center, but due to the softness of the real estate market in the area and the economy in general, Lowes

has decided not to go forward with its development plans.

14.    Wells Fargo Bank has a note secured by a first deed of trust which matured on

May 20, 2009.  The note has an outstanding balance of $8,893,079 ($9,438,157 including interest and

late charges.) There was an interest reserve in the amount of $622,451.00, which, since the loan has

matured and remains unpaid will not be released by Wells Fargo Bank. In addition there were site work

reserve escrows totaling $5,132,444.00   which reserve was to be used   principally for off-site

improvements relating to the Lowes' parcel.    The original loan amount reflected in a June 19, 2008

promissory note in favor of Wells Fargo is $14,658,235.00.  The appraised value assuming a long term

hold, the construction of the Lowes Retail Home Center, which at this time is not likely, a rebound of

both the real estate and the capital markets within a one year period of time is $18,890,000.  Its present

liquidation value is $5,670,000.  The disparity in the two appraised values arises as a result of the soft

market for this type of property in Indio.  The property has been marketed both for sale and build-to-suit

lease for the last 16 months.  There has been no interest either from potential buyers or tenants for the

property.  The property will have value in excess of its current debt at some point in the future, but given

the softness of the Indio market this is a long term and highly speculative proposition.

15.    Wells Fargo has issued a letter of default but has not filed a Notice of Default.  It

is highly unlikely that Wells Fargo will extend its note without at least a partial pay down of the debt, an

interest reserve funded by the borrower and perhaps  additional financial commitments that the Namvar

and Namco entities are not in a position to make.   Namvar, the Namvar Family Trust and Weintraub

have guaranteed the Wells Fargo obligation.   Again, there is no equity in the property at this time, and

no prospect for refinancing.

### D. The "True Ups"

16.     In the context of these transactions, a "true up" refers to a contractual obligation, set out in an applicable limited liability company operating agreement, of members of a limited liability company to "true up" their capital accounts by causing their actual contributed capital to match their contractual obligation.   The operating agreements of WN2, WN Indio, LLC and WN Sunset, LLC, have such provisions.

17.     Based on ledgers maintained by the various entities, the following true ups exist as obligations of Weintraub or a Weintraub affiliate in favor of Beshmada:

| | |
|---|---|
| WN2: | $282,291.15 |
| WN Indio, LLC | $2,661,687.35 |
| WN Sunset, LLC | <u>$3,531,003.65</u> |
| Total: | $6,474,982.15 |

It should be noted that the above "true up" calculations are derived from a schedule supplied by Weintraub.   The records of Beshmada indicate that the "true up" obligations are approximately $6,202,000.00.

18.     The obligation to pay these "true up" numbers, however, may be subject to substantial defenses by Weintraub and the Weintraub entities.     Weintraub has asserted that no true up obligations remain based on defaults by Beshmada in failing to make required capital contributions and failing to arrange for financing for the companies.    Weintraub further alleges that Namvar fraudulently misrepresented his ability to raise such financing and made other material misrepresentations to the various lenders to induce the lenders to make the loans in these properties and these false and or fraudulent representations are specific violations of the operating agreement provisions that constitute

defenses to the true up obligations.  Beshmada and the Namvar Trustee dispute Weintraub's position and assert that the true up obligations are enforceable.  However, without a settlement the resolution of these issues will require litigation.  Such litigation will be extremely costly and lengthy with the outcome uncertain.  Additional time and costs will be involved in attempting to collect on the "true-up" obligations should Beshmada be successful in the threshold litigation.

19.    To the best of my knowledge, Beshmada has not pledged its interests in the affected entities as collateral to any third party.

20.    Weintraub has the right under the Restructuring Agreement to further dilute the remaining economic interests.

21.    The specific member interests that are being transferred are shown below.

| Entity | Transfer | Retained Membership  Interest |
|---|---|---|
| WN Sunset LLC (Sunset/Doheny) | Transfer by Beshmada of all of its member interest, except for a 25% profit interest | 25% profit interest |
| WN2 LLC (Brentwood Gardens) | Transfer by Beshmada of all of its member interest | None |
| WN Malibu Lot LLC | Transfer by Beshmada of all of its member interest | None |
| WN Indio LLC | Transfer by Beshmada of all of its member interest, except for a 25% profit interest | 25% profit interest |
| De Soto Partners and De Soto Investors | Transfer by Panamo of all of its membership interest in De Soto Investors and De Soto Partners, except for a 25% profit interest in De Soto Partners | 25% profit interest |

22.    The present equity or realizable value to Beshmada and Panamo can be summarized as follows:

| Property | Equity/Value to Beshmada |
|---|---|
| WN Malibu (Lot) | Estimated $225K (50% Beshmada) |
| WN 2 – Brentwood Gardens | Estimated – zero, after operating expenses. |
| WN Sunset | Equity zero |
| De Soto Partners (Panavision) | Equity zero |
| Indio | Equity zero |

23.    The Restructuring Agreement is an opportunity to liquidate the values in the two properties where there is value and an opportunity to obtain a very substantial portion of the "true up" values without lengthy and contentious litigation.   The Weintraub entities contend that there are numerous defaults by Beshmada under the various operating agreements, including fraudulent misrepresentations and failure by Beshmada to contribute agreed upon capital.

24.    As to the "true up" provisions under the respective operating agreements, these are complex and provide for arbitration.    Beshmada is not in a position to incur substantial legal fees and engage in lengthy litigation with Weintraub over these issues.  In particular, the litigation will put the Trustees in a position of *defending* Namvar against Weintraub allegations that Namvar made fraudulent misrepresentations to Weintraub and will require complex litigation as the existence and effect of the alleged breaches by Namvar and the Namvar affiliated entities.    The true ups could be worth less than zero, taking into account not only the cost of pursuing them, but the position it will put the Trustees in defending the allegations being made by Weintraub against Namvar.   In sum, the total

$3,000,000 Purchase Price, achieves the goal of liquidating the values of the real property and favorably liquidates the speculative and litigious "true ups."

25.    Confirmation of the provisions of the Restructuring Agreement will substantially benefit Beshmada, its Estate, the Namvar estate and all creditors because: (a) it will liquidate the value in its real property interests where there is value; (b) it will liquidate without litigation the value of the "true up" obligations; and (c) Beshmada and Panamo (Namvar) will still benefit from the potential development of certain properties on account of the retained economic interests.

26.    The consideration provided to the estate by the Restructuring Agreement represents adequate and fair consideration for such claims, rights, interests and assets that are being transferred, modified or released under the proposed Restructuring Agreement.

27.    Neither Weintraub nor the Weintraub entities are insiders or affiliates of Beshmada or Namvar, and the negotiations between the Beshmada and Weintraub regarding the Restructuring Agreement provisions were at arms-length and no collusion was involved

28.    To the extent any party holds or asserts a pledge, security interest or any other interest in the membership interests that are to be transferred pursuant to the Restructuring Agreement, such interests are unknown to me in my capacity as the Manager of Beshmada.

29.    The transactions provided for by the Restructuring Agreement include a compromise between the Beshmada and the Weintraub Entities insofar as there is a compromise of the "true up" obligations, as well as general reciprocal releases.   While the "true ups" have a face value of approximately $6 million, as set forth above, the Weintraub Entities assert defenses to the true up obligations due to defaults by Beshmada and Namvar.   In a litigation context, the true up obligations may be valueless but certainly will be expensive and time consuming to litigate.

1    30.    I believe that it is in the best interests of the Beshmada to enter into the

2 Restructuring Agreement.

3    I declare under penalty of perjury under the laws of the United States of America.

4

5    Executed this /5 day of February, 2010 at Los Angeles, California.

6

7    _Louis A. Cicalese_

8    Louis A. Cicalese

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Besh RW Cicalese Decl 02 01 10 fnl.doc                    12

### DECLARATION OF R. TODD NEILSON

I, R. Todd Neilson, declare as follows:

1.      I am the chapter 11 trustee for the bankruptcy estate of Ezri Namvar ("Namvar"). Each of the facts contained in this declaration is based upon my personal knowledge, except for those matters stated on information and belief and, if called as a witness to do so, I could competently testify thereto.

2.      I make this declaration in support of the *Notice of Motion and Motion of Beshmada, LLC for an Order Approving Restructuring Agreement"* filed by Beshmada, LLC ("Beshmada").    This Declaration also is in support of the concurrent notice of motion and motion being brought on my behalf in the Namvar case (collectively, the "Motions").

3.      To the best of my knowledge, there has been no pledge by Namvar of any interest he holds in Panamo, LLC or any pledge by that entity of any of its interests in REW De Soto Partners, LLC.

4.      I have discussed the substantive business issues set forth in the motions with Mr. Louis Cicalese and I have reviewed both motions.   Based on the reasons set forth in the motions, as well as my discussions with Mr. Cicalese, I support the approval of both motions.   I believe the motions are in the best interests of the estates and their creditors.

5.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _____day of January, 2010 at Los Angeles, California

.                              See next page

_____
R. Todd Neilson

Besh RW Restructuring Neilson Decl fnl.doc          1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF R. TODD NEILSON

I, R. Todd Neilson, declare as follows:

1.     I am the chapter 11 trustee for the bankruptcy estate of Ezri Namvar ("Namvar"). Each of the facts contained in this declaration is based upon my personal knowledge, except for those matters stated on information and belief and, if called as a witness to do so, I could competently testify thereto.

2.     I make this declaration in support of the *Notice of Motion and Motion of Beshmada, LLC for an Order Approving Restructuring Agreement"* filed by Beshmada, LLC ("Beshmada").   This Declaration also is in support of the concurrent notice of motion and motion being brought on my behalf in the Namvar case (collectively, the "Motions").

3.     To the best of my knowledge, there has been no pledge by Namvar of any interest he holds in Panamo, LLC or any pledge by that entity of any of its interests in REW De Soto Partners, LLC.

4.     I have discussed the substantive business issues set forth in the motions with Mr. Louis Cicalese and I have reviewed both motions.   Based on the reasons set forth in the motions, as well as my discussions with Mr. Cicalese, I support the approval of both motions.   I believe the motions are in the best interests of the estates and their creditors.

5.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _31st_ day of January, 2010 at Draper, Utah

R. Todd Neilson

~1267441.doc                              1

# Exhibit 1

# AGREEMENT FOR RESTRUCTURING OF LIMITED LIABILITY COMPANIES

This Agreement for Restructuring of Limited Liability Companies ("**Agreement**") is made as of January 19, 2010 ("**Execution Date**") by and among Beshmada LLC, a California limited liability company ("**Beshmada**"), Panamo LLC, a California limited liability company ("**Panamo**"), Richard E. Weintraub ("**Weintraub**"), Americana Glendale, Inc., an Arizona corporation ("**Americana**"), Weintraub Financial Services, Inc., a California corporation ("**WFS**"), and REW De Soto Investors, LLC, a California limited liability company ("**De Soto Investors**"). Beshmada and Panamo are sometimes referred to individually as a "**Namco Party**" and collectively as the "**Namco Parties**," and Weintraub, Americana, WFS and DeSoto Investors are sometimes referred to individually as a "**Weintraub Party**" and collectively as the "**Weintraub Parties**." This Agreement is made with reference to the following:

A.    Certain of the Weintraub Parties and Namco Parties are members of the following California limited liability companies:

1.    REW De Soto Partners, LLC ("**De Soto Partners**"), the members of which are De Soto Investors and Panamo. De Soto Investors holds a 50% capital interest and 62.5% profit interest in De Soto Partners, and Panamo holds the other 50% capital interest and a 37.5% profit interest. De Soto Partners owns real property located at 6219 De Soto Avenue, Woodland Hills, California containing a building leased to Panavision;

2.    De Soto Investors, in which Panamo is a member with a 27.59% capital interest and 15.14% profit interest;

3.    WN Sunset LLC ("**WN Sunset**"), the members of which are Americana and Beshmada, each having a 50% membership interest. WN Sunset owns a property intended for mixed use development located at Sunset Boulevard and Doheny Drive in West Hollywood, California;

4.    WN2 LLC ("**WN2**"), the members of which are Americana and Beshmada, each having a 50% membership interest. WN2 owns a leasehold interest in the Brentwood Garden Apartments in Los Angeles, California;

5.    WN Malibu Lot LLC ("**WN Malibu**"), the members of which are WFS and Beshmada, each having a 50% membership interest. WN Malibu owns an undeveloped lot in Malibu, California; and

6.    WN Indio, LLC ("**WN Indio**"), the members of which are Weintraub and Beshmada, each having a 50% membership interest. WN Indio owns undeveloped land in Indio, California.

WN Sunset, WN2, WN Malibu and WN Indio are collectively referred to as the "**Beshmada Member Companies**," and De Soto Partners and De Soto Investors are collectively referred to

1

as the "**Panamo Member Companies**." The Beshmada Member Companies and the Panamo
Member Companies are sometimes collectively referred to as the "**Companies;**"

B.    Ezri Namvar ("**Namvar**") is the sole member of Panamo. Ezri Namvar is in
bankruptcy (Case No.: 2:08-bk-32349-BR, United States Bankruptcy Court, Central District of
California ("**Namvar Bankruptcy**")), and Beshmada is subject to an involuntary petition in
bankruptcy ((Case No.: 2:09-bk-25523-BR, United States Bankruptcy Court, Central District of
California ("**Beshmada Bankruptcy**")). Namvar was a manager of the Beshmada Member
Companies but has been replaced in that capacity by Louis Cicalese LLC, a Delaware limited
liability company ("**Cicalese**");

C.    Given the Namvar Bankruptcy and Beshmada Bankruptcy, the Namco Parties are
not in a position to make additional capital contributions that may be required of them by the
Companies, and the Weintraub Parties desire to have management control of all the Beshmada
Member Companies in which Cicalese is now a manager; and

D.    Based upon the foregoing concerns and desires, among others, the Namco Parties
and Weintraub Parties have reached an understanding respecting the restructuring of the
Companies that, as more fully set forth below and in the Schedules to this Agreement, involves
the transfer to the Weintraub Parties of a portion of the membership interests of the Namco
Parties in the case of De Soto Partners, WN Sunset and WN Indio (collectively, the "**Continuing
Member Companies**"), and in the case of De Soto Investors, WN2 and WN Malibu, all of the
membership interests of the Namco Parties, the relinquishment of management rights by the
Namco Parties, including the resignation by Cicalese of his manager positions, and certain other
changes to the operating agreements of the Continuing Member Companies, in consideration for
a payment of Three Million Dollars ($3,000,000.00). The parties desire to set forth their
understanding in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of
which is acknowledged, the parties agree as follows:

1.    **Transfer of All or a Portion of Membership Interests, Payment**. On the terms and
conditions of this Agreement, each of the Namco Parties agrees to (a) transfer and assign to the
Weintraub Party specified in **Schedule 1** attached to and made a part of this Agreement all of its
membership interest in the Companies, except for the portion of the membership interests of the
Namco Parties in the Continuing Member Companies described in Section 2.1 and 2.2.2 (each
membership interest or portion thereof being transferred, a "**Transferred Membership
Interest**"), (b) relinquish its management rights in the Companies, except for the reservation of
certain limited approval rights with respect to the Continuing Member Companies; (c) other
changes in the operating agreements of the Continuing Member Companies; and (d) waiver of
true-up and certain other rights, all as hereinafter described in more detail, in consideration for
the payment to them of the aggregate amount of Three Million Dollars ($3,000,000) ("**Interest
Purchase Price**"), which shall be allocated among various Transferred Membership Interests as
reasonably agreed upon by the parties prior to Closing. Weintraub agrees to pay or cause to be
paid by the Weintraub Parties the Interest Purchase Price as follows:

2

1.1    **Cash Payment.**  The sum of Five Hundred Thousand Dollars ($500,000) ("**Cash Payment**") in cash by wire transfer of immediately available funds at the closing ("**Closing**") of the transactions contemplated by this Agreement;

1.2    **Promissory Note.**  The balance of Two Million Five Hundred Thousand Dollars ($2,500,000) by delivery at Closing of a promissory note to be made jointly and severally by all the Weintraub Parties, except Weintraub, containing the terms described in Section 1.2.1 and otherwise in form and content reasonably approved by the parties ("**Note**") secured by: (a) a first lien deed of trust on the real property currently owned by WN Malibu (the "**Deed of Trust**") containing the terms described in Section 1.3 and otherwise in form and content reasonably approved by the parties; and (b) a security interest in the Beshmada Transferred Membership Interests in the Continuing Member Companies, the Panamo De Soto Investors Transferred Membership Interest, the Panamo De Soto Partners Transferred Membership Interest (each as hereinafter defined) and 100% of the membership interests in WN2 (collectively with the WN Malibu real property, the "**Collateral**") granted pursuant to a security agreement containing the terms described in Section 1.4 and otherwise in form and content reasonably approved by the parties ("**Security Agreement**"), and guaranteed by Weintraub pursuant to a Guaranty, containing standard guarantor/suretyship defense waivers, specifically including an exemption of Weintraub's principal residence located at 26848, 26900 and 26916 Pacific Coast Highway, Malibu, California (or any replacement principal residence in the case of a sale or other disposition thereof) and furniture, furnishings and artwork located in his principal residence from guaranty liability, and otherwise in form and content reasonably approved by the parties (the "**Guaranty**").  Weintraub and any other applicable Weintraub Parties shall execute and deliver the Note, Deed of Trust, Security Agreement and Guaranty at Closing.

1.2.1    The following is a summary of the basic terms of the Note:

1.2.1.1    The Note shall be noninterest bearing until default after which it shall bear interest at the default rate of fifteen percent (15%) per year.  The Note will include standard late charge and cost of collection provisions;

1.2.1.2    No Note payments shall be due for the first six (6) months after Closing.  Monthly payments of $40,540.54 commencing on the sixth monthly anniversary of the Closing and continuing until the forty-second monthly anniversary of the closing shall be due; and

1.2.1.3    Monthly payments of $55,555.56 shall be due commencing on the forty-third monthly anniversary of the Closing and continuing until the sixtieth monthly anniversary of the Closing, at which time the entire unpaid balance of principal and interest of the Note shall be due and payable.

Notwithstanding the deferred payment of part of the Interest Purchase Price represented by the Note, both the Interest Purchase Price and Note amount shall be fixed, and neither the amounts thereof, amount of the payment installments or timing of payments shall be modified by or conditioned upon the success, profitability or available cash flow of any of the Companies either individually or in the aggregate, their continuing ownership, development, leasing or sale of the properties owned by them or any other reason or circumstance.  The Note shall provide to the

3

Weintraub Parties the full right to offset against any liability thereunder any loss or liability arising from any breach of any representation, warranty or covenant of any of the Namco Parties under this Agreement and the offset rights described in Section 1.3 resulting from a failure of the Namco Parties to reconvey the Deed of Trust when required, as more particularly described in Section 1.3.

  1.3  **Deed of Trust Terms**. The Deed of Trust shall be prepared on a standard title insurance company long form deed of trust. In addition to the standard provisions contained in that form, the Deed of Trust shall contain the following terms:

    1.3.1  The Namco Parties, as beneficiaries, will cause the Deed of Trust to be reconveyed without any payment being required upon a bona fide arms-length sale of the real property owned by WN Malibu to a third party unaffiliated with the Weintraub Parties, provided that the Namco Parties receive at least twenty (20) days advance notice of the closing date of the sale for which the reconveyance is necessary, stating that the reconveyance or request for reconveyance is required by the terms of the Deed of Trust to be delivered to the escrow holder at least three (3) business days before the scheduled closing date, and the Weintraub Parties are not then in default under the Note, Guaranty or the Security Agreement; and

    1.3.2  If after receiving the notice described in Section 1.3.1, the Namco Parties fail to deliver the reconveyance or a request for the trustee to reconvey the Deed of Trust on or before the third (3rd) business day before the scheduled closing date, the Weintraub Parties may deliver a second notice to the Namco Parties stating that the penalty hereinafter described will be assessed if the reconveyance or request for reconveyance is not delivered to the escrow holder within two (2) business days. If the reconveyance or request for reconveyance is not delivered within the two (2) business day period, and as a result of such failure, the pending sale transaction does not close, the Weintraub Parties shall be entitled to an offset against the principal amount of the Note equal to Five Hundred Thousand Dollars ($500,000) applicable to the last payments coming due under the Note.

  1.4  **Security Agreement Terms**. In addition to standard provisions for similar security agreements covering limited liability company member interests, the Security Agreement shall contain the following terms:

    1.4.1  The requirement of the approval by the Namco Parties of the matters described in Section 2.3.2 and 2.3.8 as requiring their vote or approval with respect to De Soto Investors, WN2 and WN Malibu;

    1.4.2  Weintraub and his affiliates will not be paid any compensation for services to any of De Soto Investors, WN2 or WN Malibu or be reimbursed for general, administrative, overhead or office expenses, employee salaries or benefits or other indirect expenses paid or incurred by them;

    1.4.3  Until the Note is paid in full, Americana Glendale, Inc. will not have the right to admit any new Members in WN2 and dilute the pledged interest in WN2; and

    1.4.4  As a condition of the dilution of the retained membership interest of Beshmada in WN Indio or WN Sunset, as described in Section 2.3.9, an additional membership

4

6588012v10

interest in the applicable Company shall be pledged as security such that after an acquisition by foreclosure of the pledged membership interest in that Company, Beshmada would have an equal percentage interest in that Company as the Weintraub member or members.

      1.5    **Effect of Foreclosure.**  Upon a foreclosure by Beshmada and Panamo on the membership interests in the Continuing Member Companies securing the Note, Beshmada and Panamo will have the right to reinstate their capital accounts in the Continuing Member Companies and De Soto Investors, as if the relinquishments and modifications described in Section 2.3 or elsewhere in this Agreement had never occurred, reinstate the relinquished manager and voting rights and reinstate the waived true up and buy/sell provisions.  Beshmada and Panamo will also retain the Interest Purchase Price down payment and any Note payments previously made.

2.    **Changes in Certain Beshmada and Panamo Membership Interests.**

      2.1    **Transfers by Beshmada; Beshmada Interests in the Continuing Member Companies.**  Beshmada will continue to hold membership interests in WN Indio and WN Sunset (collectively, the "**Continuing Beshmada Member Companies**") after the Closing, but at the Closing its membership interests therein will be changed to economic interests equal to twenty five percent (25%) of the net profits of the applicable Continuing Beshmada Member Company, and Beshmada will assign the remainder of the Beshmada membership interests in each of the Continuing Beshmada Member Companies (collectively, with the Beshmada membership interests in WN Malibu and WN2, the "**Beshmada Transferred Membership Interests**") to the Weintraub Party which is the other member of the respective Continuing Beshmada Member Companies.  To effect the changes in the Beshmada membership interests in the Continuing Beshmada Member Companies and assignment of the Beshmada Transferred Membership Interests, Beshmada and the applicable Weintraub Parties will execute and deliver at Closing amended and restated operating agreements of the Continuing Beshmada Member Companies containing the applicable terms described in this Agreement and otherwise in form and content reasonably approved by the Weintraub Parties (the "**Continuing Beshmada Member Company Operating Agreement Restatements**") and assignments of the Beshmada Transferred Membership Interests for each Beshmada Member Company (the "**Beshmada Assignments**") in substantially the form of **Exhibit A** attached to and made a part of this Agreement.  For this purpose and for purposes of **Section 2.2.2**, net profits of a Company shall mean any and all amounts distributable by the Company to its members with respect to their membership interests after the members have received a preferred return at the rate of thirteen and one half percent (13 1/2%) per year on all capital contributions to pay budgeted expenses of the Company made by members after the Closing, including new members admitted in accordance with **Section 2.3.9** and a return of all capital contributions made to that Company after the Closing.  The net profits of each Company will be determined separately in accordance with the definition thereof set forth in the applicable Operating Agreement Restatement which shall be consistent with the foregoing description of net profits.

      2.2    **Panamo Interests.**  At the Closing:

<div align="center">5</div>

2.2.1   Panamo will assign to Weintraub all of its membership interest in De Soto Investors (the "**Panamo De Soto Investors Membership Interest**") pursuant to an assignment ("**Panamo De Soto Investors Assignment**") in substantially the form of **Exhibit A**; and

2.2.2   Panamo will continue to hold a membership interest in De Soto Partners after the Closing, but at the Closing its membership interest will be changed to an economic interest equal to fifteen percent (15%) of the net profits of De Soto Partners, and Panamo will assign the remainder of the Panamo membership interest in De Soto Partners to De Soto Investors (the "**Panamo De Soto Partners Transferred Membership Interest**;" and together with the Panamo De Soto Investors Membership Interest and Beshmada Transferred Membership Interests, the "**Transferred Membership Interests**").   To effect the change in the Panamo membership interest in De Soto Partners and assignment of the Panamo De Soto Partners Transferred Membership Interest, De Soto Investors and Panamo will execute and deliver at Closing an amended and restated operating agreement of De Soto Partners containing the applicable terms described in this Agreement which is otherwise in form and content reasonably approved by the Weintraub Parties (the "**De Soto Partners Operating Agreement Restatement**," and together with the Continuing Beshmada Member Company Operating Agreement Restatements, the "**Operating Agreement Restatements**") and an assignment of the Panamo De Soto Partners Transferred Membership Interest (the "**Panamo De Soto Partners Assignment**") in substantially the form of **Exhibit A**.   The net profits of De Soto Partners will be determined in accordance with the definition thereof set forth in the De Soto Partners Operating Agreement Restatement, which shall be consistent with the description of net profits set forth in Section 2.1.

2.3   **Summary of Changes to Continuing Member Company Operating Agreements**.   The Operating Agreement Restatements shall include the following terms:

2.3.1   Beshmada will cause Cicalese to resign as a manager of all the Beshmada Member Companies in which he holds that position, and Beshmada will relinquish any right it may have to name a manager of any of the Beshmada Member Companies;

2.3.2   Beshmada and Panamo will relinquish their respective voting rights on all matters of the Continuing Member Companies, except for any right either one now has to approve or vote upon the following matters involving the Continuing Member Companies: (a) admission of new members other the admission of new members to WN Indio and WN Sunset for purpose of raising of additional capital from new members, as described in Section 2.3.9; (b) any agreement or transaction between a Continuing Member Company, on the one hand, and Weintraub or any of affiliate of Weintraub, on the other hand;  (c) any amendment of the Operating Agreement Restatements, except as described in Section 2.3.9; (d) any decision to dissolve any of the Continuing Member Companies and/or continue the business of any of the Continuing Member Companies after dissolution; (e) any decision to merge any of the Continuing Member Companies with or into another entity; (f) any change in the manager; (g) any increase in an annual budget during the course of the period covered thereby of more than 25%; and (h) any loans other than for the purpose of paying budgeted or approved costs and expenses or refinancing existing mortgage loans.;

6

2.3.3    Each member having true-up or loss sharing rights under the operating agreements of the Continuing Member Companies waives those rights and releases the other member (and any guarantors) from any obligations under the true-up or loss sharing provisions;

2.3.4    Each member waives the right to exercise any buy-sell, right of first refusal and similar provisions in the operating agreements of the Continuing Member Companies;

2.3.5    Any existing defaults of Beshmada or Panamo under the operating agreements of any of the Continuing Member Companies are waived, and the Weintraub Parties and any other affiliated members waive any rights they might otherwise have under the operating agreements of any of the Continuing Member Companies as a result of the Namvar Bankruptcy and Beshmada Bankruptcy;

2.3.6    Beshmada and Panamo are relieved of any obligations to make additional capital contributions to any of the Continuing Member Companies;

2.3.7    Except as otherwise provided in this **Section 2.3**, Beshmada and Panamo, as applicable, will continue to have the rights of a member of the Continuing Member Companies, including but not limited to the right to vote on the matters described in **Section 2.3.2** and **2.3.8** and the right to review the books and records and receive financial statements. The managers of the Continuing Member Companies will keep Beshmada and Panamo, as applicable, informed respecting the business and affairs of the Continuing Member Companies, including but not limited to the status of loans and the status of entitlements efforts and will deliver to Beshmada and Panamo, as applicable, copies of any notices, including notices of default, received from any mortgage lender to any of the Continuing Member Companies;

2.3.8    The managers of each Continuing Member Company will prepare and deliver to Beshmada and Panamo, as applicable, an annual budget for the operation of their respective properties, and the initial annual budgets will be delivered on or prior to the Closing. Beshmada and Panamo will have the right to comment upon but not approve the annual budgets. However, to the extent that the expenses for a Continuing Member Company for an annual period covered by a budget will exceed the budgeted amount by more than 25%, the manager of that Continuing Member Company shall be required to submit a revised budget and obtain the approval of the revised budget by the applicable Namco Party;

2.3.9    The profit interest of Beshmada in WN Sunset or WN Indio may be diluted pari passu with the profit interest of Weintraub or his affiliated members if one of those Companies elects to admit new member(s) to it unrelated to and unaffiliated directly or indirectly with Weintraub to provide additional capital needed to carry out its business plan; provided, however, that the profit interest of Beshmada shall not be reduced below a 15% profit interest. If a new member related to Weintraub is admitted, then any profit interest granted to the new member shall reduce the profit interest of Weintraub or his affiliated members only, and if any new member is admitted and not disclosed at the time to Beshmada by Weintraub to be affiliated with or related to Weintraub is subsequently determined to be affiliated with or related to Weintraub, any reduction in the Beshmada profit interest that resulted from the admission of the new member shall be restored to it and taken from the new member, and additionally, the profit

7

interest of Weintraub or his affiliate member shall be reduced, and the profit interest of Beshmada shall be increased, by 25% of the reduction amount being restored to it. The new member may be given major decision voting rights, but Weintraub or one of his affiliates must remain the manager. As a condition of the dilution, the Weintraub members will provide the additional pledged security interest described in Section 1.4.3; and

2.3.10 Weintraub and his affiliates will not be paid any compensation for services to any of the Continuing Member Companies or be reimbursed for general, administrative, overhead or office expenses, employee salaries or benefits or other indirect expenses paid or incurred by them.

The changes and relinquished rights described in **Section 2.3.1** through **2.3.4** inclusive, together with those described in **Section 2.4.1** and **2.4.2** and the other membership rights in WN2, WN Malibu and De Soto Investors being relinquished in connection with the Transferred Membership Interests therein, are referred to as the "**Relinquished Rights.**" This term will be used in the Security Agreement, and the Relinquished Rights will be included in the Collateral.

2.4    **Relinquished Rights respecting Other Companies**. With respect to WN2, WN Malibu and De Soto Investors, effective as of the Closing:

2.4.1    Beshmada will cause Cicalese to resign as a manager of any of WN 2 and WN Malibu in which he holds that position, and Beshmada relinquishes any right it may have to name a manager thereof;

2.4.2    Each member having true-up or loss sharing rights under the operating agreements of any of WN2, WN Malibu and De Soto Investors waives those rights and releases the other member (and any guarantors) from any obligations under the true-up or loss sharing provisions;

2.4.3    Any existing defaults of any member under the operating agreements of any of WN2, WN Malibu and De Soto Investors are waived, and the Weintraub Parties and any other affiliated members in WN2, WN Malibu and De Soto Investors waive any rights they might otherwise have as a result of the Namvar Bankruptcy and Beshmada Bankruptcy; and

2.4.4    Beshmada and Panamo are relieved of any obligations to make additional capital contributions to any of WN2, WN Malibu and De Soto Investors.

3.    **Warranties And Representations**

3.1    **Warranties and Representations of Weintraub Parties**. As inducement to Beshmada and Panamo to enter into this Agreement, the Weintraub Parties make the following warranties and representations to the Namco Parties, which shall be true and correct when made and as of the Closing:

3.1.1    Due Organization; Authority. WFS is duly organized and in good standing under the laws of the state of California, and Americana is duly organized and in good standing under the laws of the state of Arizona. The execution and delivery of this Agreement by the signatories hereto on behalf of each of the Weintraub Parties and the performance of this

8

6588012v10

Agreement by the Weintraub Parties have been duly authorized by each of the Weintraub Parties. Each Weintraub Party has the legal capacity and authority to execute, deliver and perform this Agreement;

      3.1.2   No Prohibitions.  Except for any Lender Approvals (as hereinafter defined), none of the Weintraub Parties are prohibited from (i) executing or delivering this Agreement, (ii) complying with or performing the terms of this Agreement, or (iii) consummating the transactions contemplated by this Agreement by any agreement by which it is bound or by a judgment, order or decree of any governmental authority to which it is subject, and execution by the Weintraub Parties of this Agreement and performance of their obligations under this Agreement shall not be in violation of or cause a default under any applicable law, agreement by which it is bound or judgment, order or decree of any governmental authority to which it is subject;

      3.1.3   Agreement Enforceable.  This Agreement has been duly executed and delivered by the Weintraub Parties and constitutes a legal, valid, and binding obligation of the Weintraub Parties, enforceable against them in accordance with the terms hereof;

      3.1.4   No Consents Required.  Except for the Lender Approvals, no consent waiver, approval, or authorization of, or filing, registration, or qualification with, or notice to, any governmental authority or any other entity or person (including without limitation, any members of De Soto Investors that are not Weintraub Parties and any directors or shareholders of WFS and Americana) is required to be made, obtained, or given by any Weintraub Party in connection with the execution, delivery, and performance of this Agreement, except such consent, waiver, approval, authorization, filing, registration or qualification which has been made, obtained or given;

      3.1.5   Ownership of Membership Interests.  The Weintraub Parties are the owners of the membership interests in the Companies identified on **Schedule 3.1.5** and have not transferred any of those membership interests, all of which they hold free and clear of any lien, encumbrance, pledge, security interest or other interest of third parties;

      3.1.6   Investment Intent.  The applicable Weintraub Parties are acquiring the Transferred Membership Interests for investment for their own account and not with a view to the distribution of any part thereof and acknowledge that the Transferred Membership Interest have not been registered under U.S. Federal or any applicable state securities laws or the laws of any other jurisdiction and cannot be resold without registration under such laws or an exemption therefrom. The Weintraub Parties further acknowledge that (a) they have knowledge and experience in financial and business matters, that they are capable of evaluating the merits and risks of an investment in the Transferred Membership Interests, and that they can bear the economic risk of an investment in the Transferred Membership Interests, (b) the Weintraub Parties have had the opportunity to conduct an independent due diligence review of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Companies, and (c) are not relying on any representations or warranties of the Namco Parties or any of their representatives, except for those expressly contained in this Agreement.

<div align="center">9</div>

3.2    **Warranties and Representations of the Namco Parties**. As inducement to the Weintraub Parties to enter into this Agreement, each of the Namco Parties make the following warranties and representations to the Weintraub Parties regarding itself, which shall be true and correct when made and as of the Closing:

3.2.1    Due Organization: Authority.  It is duly organized and in good standing under the laws of the state of California.  Subject to obtaining Bankruptcy Court Approvals (as hereinafter defined), the execution and delivery of this Agreement by the signatories hereto on behalf of it and its performance of this Agreement have been duly authorized by it, and it has the legal capacity and authority to execute, deliver and perform this Agreement;

3.2.2    No Prohibitions.  Except for any Lender Approvals (as hereinafter defined) and Bankruptcy Court Approvals, to its actual knowledge, it is not prohibited from (i) executing or delivering this Agreement, (ii) complying with or performing its obligations under this Agreement, or (iii) consummating the transactions contemplated by this Agreement by any agreement by which it is bound or by a judgment, order or decree of any governmental authority to which it is subject, and its execution of this Agreement and performance of its obligations under this Agreement shall not be in violation of or cause a default under any applicable law, agreement by which it is bound or judgment, order or decree of any governmental authority to which it is subject;

3.2.3    Agreement Enforceable.  To its actual knowledge, upon obtaining of the Bankruptcy Court Approvals, this Agreement will be duly executed and delivered by it and constitute its legal, valid, and binding obligations, enforceable against it in accordance with the terms hereof;

3.2.4    No Consents Required.  To its actual knowledge, except for the Lender Approvals and Bankruptcy Court Approvals, no consent, waiver, approval, or authorization of, or filing, registration, or qualification with, or notice to, any governmental authority or any other entity or person is required to be made, obtained, or given by it in connection with the execution, delivery, and performance of this Agreement, except such consent, waiver, approval, authorization, filing, registration or qualification which has been made, obtained or given; and

3.2.5    Ownership of Membership Interests.  It is the legal and beneficial owner of, and has good and marketable title to, including the power to transfer, the membership interests in the Companies identified as being owned by it on **Schedule 3.2.5** and has not transferred any of those membership interests, all of which it holds free and clear of any lien, encumbrance, pledge, security interest or other interest of third parties.

The actual knowledge of a Namco Parties means the present actual (as opposed to constructive or imputed) knowledge of Cicalese, Bradley Sharp, Trustee of the Bankruptcy Estate of Namco Capital, Inc. and R. Todd Neilson, Trustee of the Bankruptcy Estate of Ezri Namvar, without any investigation or inquiry whatsoever by any of those individuals.  The Weintraub Parties acknowledge that the foregoing individuals are named solely for the purpose of defining and narrowing the scope of the Namco Parties' knowledge and not for the purpose of imposing any liability on or creating any duties running from any of such individuals to any of the Weintraub Parties.. None of those individuals shall have any personal liability either in their individual or

10

trustee capacities, including but not limited to liability for inaccuracy in any of the foregoing representations and warranties.

3.3    **Disclaimer of Other Representations and Warranties**.  None of the parties make or have made, and shall not be deemed to have made, any representations or warranties relating to any of the Companies, the properties owned by the Companies, the loans encumbering those properties, the membership interests in the Companies or otherwise in connection with the transactions contemplated hereby other than those expressly set forth in **Section 3.1** and **3.2**. Any projections or other predictions, data, financial information, appraisals, estimates of value, sale, develop or leasing potential of the properties that may have been provided by any party to another party shall not be deemed to be or to include representations or warranties of any party and are not being relied upon by any party in entering into this Agreement.  No person has been authorized by any party to make any statement, representation or warranty on its behalf, other than those expressly set forth in **Section 3.1** and **3.2**, and if made, any such statement, representation or warranty is disclaimed and must not be relied upon as having been authorized by any party.

4.    **As, Is Transfer; Release**

4.1    **As, Is**.  The Weintraub Parties acknowledge that they are familiar with all aspects of the Companies and the properties owned by them, and that except for the express warranties and representations of the Namco Parties set forth in **Section 3.2**, they are acquiring the Transferred Membership Interests in their present condition, "AS IS", "WHERE IS" AND WITH ALL FAULTS.  The parties agree that no patent or latent defect or deficiency in the condition of the properties of the Companies, whether known or discovered, shall affect the rights of any of the parties under this Agreement or any of the documents delivered at Closing pursuant to this Agreement, and the Interest Purchase Price shall not be reduced as a consequence thereof.

4.2    **Release by Weintraub Parties**.  Effective from and after the Closing, each of the Weintraub Parties and Liane Weintraub on its own behalf and on behalf of its shareholders, directors, officers, agents, affiliated and related entities, heirs and their respective successors and assigns release each Namco Party, Cicalese, Bradley Sharp, Trustee of the Bankruptcy Estate of Namco Capital, Inc., R.  Todd Neilson, Trustee of the Bankruptcy Estate of Ezri Namvar, Namco Capital, Inc.  and Ezri Namvar and their members, officers, directors, shareholders, managers, employees, agents, attorneys, affiliated and related entities, heirs, successors and assigns (collectively, the "**Namco Released Parties**") fully and forever from any and all liabilities, losses, claims, demands, damages (of any nature whatsoever), causes of action, costs, penalties, fines, judgments, attorneys' fees, consultants' fees and costs and experts' fees, whether direct or indirect, known or unknown, foreseen or unforeseen and whether arising under common law, statutes or otherwise (collectively, "**Claims**") caused by or arising out of any action or omission of any of the Namco Released Parties occurring prior to the Closing Date relating to the Companies or the properties owned by the Companies, excluding any Claims based upon or arising out of any obligations of any of the Namco Released Parties under this Agreement that survive the Closing or any Closing Document (as hereinafter defined).  Furthermore, this release does not apply to any Claims relating to Rancho Malibu, LLC, a California limited liability company, or the property owned by it.

11

4.3    **Release by Namco Parties**. Effective from and after the Closing, each of the Namco Parties on its own behalf and on behalf of its shareholders, directors, officers, agents, affiliated and related entities, heirs and their respective successors and assigns release each Weintraub Party and Liane Weintraub, and their officers, directors, shareholders, managers, employees, agents, attorneys, affiliated and related entities, heirs, successors and assigns (collectively, the "**Weintraub Released Parties**") fully and forever from any and all Claims caused by or arising out of any action or omission of any of the Weintraub Released Parties occurring prior to the Execution Date, excluding any Claims based upon or arising out of any obligations of any of the Weintraub Released Parties under this Agreement that survive the Closing or any Closing Document (as hereinafter defined). Furthermore, this release does not apply to any Claims relating to Rancho Malibu, LLC, a California limited liability company, or the property owned by it.

4.4    **California Civil Code Section 1542 Waiver**. Each party expressly waives the provisions of Section 1542 of the California Civil Code which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

and all similar provisions or rules of law. In this connection and to the greatest extent permitted by law, each party realizes that factual matters now unknown to it may have given or may hereafter give rise to Claims which are presently unknown, unanticipated and unsuspected, and acknowledges that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that it nevertheless intends its release to cover any such unknown Claims Without limiting the foregoing, if a party has actual knowledge of (i) a default in any of the covenants, agreements or obligations to be performed by any other party under this Agreement that it has released and/or (ii) any breach or inaccuracy in any warranty or representation of any other party made in this Agreement for its benefit, and it nonetheless elects to proceed to Closing, then, upon the consummation of the Closing, it shall be conclusively deemed to have waived any such default and/or breach or inaccuracy and shall have no Claim with respect thereto.

5.    **Conditions upon Effectiveness and Closing**.

5.1    **Bankruptcy Court Approvals**. Except for the obligations in **Section 5.4**, the effectiveness of this Agreement is conditioned upon final orders of the courts in the Beshmada Bankruptcy and Namvar Bankruptcy (collectively, "**Bankruptcy Court Approvals**") approving this Agreement being issued and obtained on or before March 15, 2010 (the "**Outside Bankruptcy Court Approvals Date**"). An order approving this Agreement will be deemed "final" on the first day upon which ten (10) days have passed following the date of entry of the order without the entry of any stay of the order pending the resolution of any appeal thereof. Absent a stay pending appeal of either order, the parties will effectuate the transactions contemplated pursuant to this Agreement notwithstanding any appeal of an approval order. The

12

first day upon which all the **Bankruptcy Court Approvals** are obtained (meaning they are final) is referred to as the "**Effective Date**". If the Effective Date does not occur on or before the Outside **Bankruptcy Court Approvals** Date, either the Weintraub Parties or Namco Parties may terminate this Agreement by notice to the other parties delivered before the **Bankruptcy Court Approvals** are so obtained (meaning they are final). Upon such termination of this Agreement, none of the parties shall have any further rights, remedies, liabilities or obligations to the other parties based upon or arising out of this Agreement.

      5.2    **Lender Approvals**. The mortgage lenders identified on **Exhibit B** that hold deeds of trust encumbering certain of the properties of the Companies have approved in writing the transfer of the applicable Transferred Membership Interests, grant of security interests in the applicable Collateral pursuant to the Security Agreement, including but not limited to the acquisition of the Collateral by the applicable Namco Parties by foreclosure or transfer in lieu of foreclosure, and execution and delivery of the Operating Agreement Restatements for the applicable Company conditioned upon the satisfaction by the Closing of requirements of the mortgage lenders that are acceptable in good faith to both the Weintraub Parties and applicable Namco Parties ("**Conditional Lender Approvals**;" and upon satisfaction of the conditions, the "**Unconditional Lender Approvals**"). The Weintraub Parties acknowledge that any conditions or requirements of any lender for any guarantees, indemnities or other liability of any of the Namco Parties or the bankrupt estate of Namco Capital, Inc. are not acceptable to the Namco Parties and any lack of acceptance of any such condition or requirement by the Namco Parties shall be deemed to be in good faith. If the Conditional Lender Approvals have not been obtained on or before March 15, 2010 ("**Conditional Lender Approval Date**"), either the Weintraub Parties or any Namco Party may terminate this Agreement by notice to the other parties delivered before the Conditional Lender Approvals are obtained and delivered to all parties. Upon such termination of this Agreement, none of the parties shall have any further rights, remedies, liabilities or obligations to the other parties based upon or arising out of this Agreement, except under any provisions expressly stated to survive the termination of this Agreement.

      5.3    **Closing Conditions**.

      5.3.1    Weintraub Parties Conditions. The obligations of the Weintraub Parties to close the transactions contemplated by this Agreement are conditioned upon the satisfaction or waiver in writing by the Weintraub Parties on or before the Scheduled Closing Date (as hereinafter defined) of the following:

      5.3.1.1    Namco Parties Warranties and Representations. All of Namco Parties' representations and warranties contained in **Section 3.2** shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date (as hereinafter defined);

      5.3.1.2    Namco Parties Performance. The Namco Parties shall have performed in all material respects their obligations under this Agreement required to be performed at or prior to the Scheduled Closing Date;

<div align="center">13</div>

5.3.1.3    Unconditional Lender Approvals. The Unconditional Lender Approvals shall have been obtained in writing without the imposition by the applicable lenders of any material conditions or requirements other than those contained in their respective Conditional Lender Approvals;

5.3.1.4    Title Policy Endorsements. The title companies that issued owner's title insurance policies covering each of the properties owned by each of the Companies shall have issued effective as of the closing endorsements to such policy confirming that the transactions contemplated by this Agreement do not affect the coverage afforded under such policies. The Weintraub Parties shall pay the cost of these endorsements; and

5.3.1.5    Closing Documents; Interest Purchase Price. The approval by the Weintraub Parties of the form of the Closing Documents and allocation of the Interest Purchase Price among the Transferred Membership Interests, which approvals shall not be unreasonably withheld, conditioned or delayed.

5.3.2    Namco Parties Conditions. The obligations of the Namco Parties to close the transactions contemplated by this Agreement are conditioned upon the satisfaction or waiver in writing by the Namco Parties on or before the Scheduled Closing Date (as hereinafter defined) of the following:

5.3.2.1    Weintraub Parties Warranties and Representations. All of Weintraub Parties' representations and warranties contained in **Section 3.2** shall be true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date (as hereinafter defined);

5.3.2.2    Weintraub Parties Performance. The Weintraub Parties shall have performed in all material respects their obligations under this Agreement required to be performed at or prior to the Scheduled Closing Date;

5.3.2.3    Unconditional Lender Approvals. The Unconditional Lender Approvals shall have been obtained in writing without the imposition by the applicable lenders of any material conditions or requirements other than those contained in their respective Conditional Lender Approvals; and

5.3.2.4    Closing Documents; Interest Purchase Price. The approval by the Namco Parties of the form of the Closing Documents and allocation of the Interest Purchase Price among the Transferred Membership Interests, which approvals shall not be unreasonably withheld, conditioned or delayed.

If a closing condition in favor of either the Namco Parties or Weintraub Parties is not satisfied or waived in writing on or before the Scheduled Closing Date, the parties benefited by the unsatisfied condition may terminate this Agreement by notice to the other parties, so long as the parties giving the termination notice are not in default.

5.4    **Efforts to Obtain Approvals, etc.**

14

5.4.1  <u>Bankruptcy Court Approvals</u>.  Cicalese, Bradley Sharp, Trustee of the Bankruptcy Estate of Namco Capital, Inc. and R. Todd Neilson, Trustee of the Bankruptcy Estate of Ezri Namvar, acting through their counsel, will take the lead in the filing as soon as reasonably possible after the Execution Date of the motions to the courts in the Beshmada Bankruptcy and Namvar Bankruptcy for the Bankruptcy Court Approvals, and the Weintraub Parties will reasonably cooperate in the effort to obtain the Bankruptcy Court Approvals, including provision of any information in their possession respecting the Companies, their properties and mortgage loans.

5.4.2  <u>Lender Approvals</u>.  Weintraub will use reasonable efforts to obtain the Conditional Lender Approvals by the Conditional Lender Approval Date, and once the Conditional Lender Approvals are obtained, to satisfy the conditions and requirements of the Conditional Lender Approvals in order to obtain the Unconditional Lender Approvals on or before the Scheduled Closing Date. Each of the Namco Parties shall use reasonable efforts to cooperate with Weintraub in the satisfaction of any of the conditions or requirements that relate to it, except that neither of the Namco Parties shall be required to incur any liabilities to the mortgage lenders.

5.4.3  <u>Lender Releases</u>.  Weintraub will also use reasonable efforts to obtain prior to or upon the Closing the written releases of each of the Namco Parties by the applicable mortgage lenders in form reasonably acceptable to the Namco Parties (collectively, the "**Lender Release Agreements**") from any guarantees, indemnities and any other agreements creating liability on the part of either Namco Parties to any of the mortgage lenders to the Companies (collectively, the "**Recourse Agreements**"), including but not limited to the guarantees, indemnities and other agreements described on **Exhibit C** attached to and made a part of this Agreement, unless the Namco Parties notify Weintraub that they do not desire to be released from any particular Recourse Agreement. If and to the extent that any mortgage lender requires a replacement obligor for any Recourse Agreement as to which it is releasing a Namco Party, Weintraub agrees to be the replacement obligor and to execute all documents reasonably required by the mortgage lender in connection therewith. If any required release of any of the Namco Parties by any mortgage lender is not obtained by the Scheduled Closing Date, Weintraub agrees following the Closing to indemnify, hold harmless, protect and defend the applicable Namco Parties against any claims, actions, liabilities, losses, damages and expenses, including attorney's fees and costs, arising out of the unreleased Recourse Agreements, whether incurred, payable or arising before or after the Closing, and Weintraub will execute and deliver at Closing an indemnity agreement in form reasonably approved by the applicable Namco Parties setting forth the foregoing indemnification (the "**Weintraub Indemnity Agreement**"). If the Weintraub Indemnity Agreement has been provided with respect to Recourse Agreements for a mortgage loan encumbering the property of Continuing Member Company, and pursuant to exercise of remedies under the Security Agreement, one of the Namco Parties reacquires the Transferred Membership Interest in a Continuing Member Company, the Weintraub Indemnity Agreement with respect to those Recourse Agreements for that Continuing Member Company's mortgage loan will terminate as to future claims, actions. liabilities, losses, damages and expenses, including attorney's fees and costs based upon or arising out of those Recourse Agreements.

6.  **Closing**

15

6.1    **Closing; Date of Closing**. Each of the Weintraub Parties and each of the Namco Parties agree to close the transactions contemplated by this Agreement ("**Closing**") on or before the later (the "**Scheduled Closing Date**") of (a) ten (10) days after the Bankruptcy Court Approvals are obtained (meaning have become final); or (c) thirty (30) days after the last necessary Conditional Lender Approval is obtained and delivered to the Namco Parties by the Weintraub Parties. If based upon the foregoing, the Scheduled Closing Date turns out to be a Saturday, Sunday or California legal holiday, the Scheduled Closing Date shall instead be the next business day immediately thereafter. The Closing shall take place at the offices of Jeffer, Mangels, Butler & Marmaro LLP, 1900 Avenue of the Stars, 7th Floor, Los Angeles, California 90067 at 9 am Pacific Time on the Scheduled Closing Date in accordance with **Section 6.2**.

6.2    **Closing Deliveries and Procedures**

6.2.1    Documents to be Delivered by the Namco Parties. At the Closing, each of the Namco Parties, as applicable, shall deliver to the applicable Weintraub Parties the following:

6.2.1.1    The Operating Agreement Restatements duly executed by the applicable Namco Parties;

6.2.1.2    The Beshmada Assignments duly executed by Beshmada;

6.2.1.3    The Panamo De Soto Investors Assignment duly executed by Panamo;

6.2.1.4    The Panamo De Soto Partners Assignment duly executed by Panamo;

6.2.1.5    Any documents requested by Weintraub of any of the Namco Parties by notice delivered at least five (5) business days prior to the Scheduled Closing Date that are reasonably required by the mortgage lenders from the applicable Namco Parties to satisfy the conditions of the Conditional Lender Approvals and to obtain the releases of the Recourse Agreements, which do not impose any material obligations or liabilities upon any of the Namco Parties and which are in form reasonably approved by the applicable Namco Parties;

6.2.1.6    Any documents reasonably required by Weintraub of the Namco Parties by notice delivered at least five (5) business days prior to the Scheduled Closing Date evidencing the authority of the persons signing the foregoing documents on behalf of the Namco Parties to execute and deliver them and bind the applicable Namco Parties thereto; and

6.2.1.7    Any amendments of the operating agreements of WN Malibu, WN2 and De Soto Investors reasonably required by Weintraub of the Namco Parties by notice delivered at least five (5) business days prior to the Scheduled Closing Date evidencing the withdrawal of the applicable Namco Parties from those Companies. At the option of the Weintraub Parties, the operating agreement amendment containing the withdrawal may take the form of an amended and restated operating agreement for a single member limited liability company, as long as no liabilities or obligations are imposed on the applicable Namco Party in such amended and restated operating agreement.

16

6588012v10

6.2.2    <u>Documents to be Delivered by the Weintraub Parties</u>.  At the Closing, Weintraub shall deliver or cause the Weintraub Parties to deliver to the Namco Parties the following:

6.2.2.1    The Note and the Security Agreement duly executed by the applicable Weintraub Parties;

6.2.2.2    The Deed of Trust duly executed by WN Malibu and notarized;

6.2.2.3    The Guaranty duly executed by Weintraub;

6.2.2.4    The Operating Agreement Restatements, the Beshmada Assignments, the Panamo De Soto Investors Assignment and the Panamo De Soto Partners Assignment duly executed by the applicable Weintraub Parties;

6.2.2.5    The duly executed Unconditional Lender Approvals;

6.2.2.6    Any Lender Release Agreements obtained by the Weintraub Parties for the Namco Parties;

6.2.2.7    If required, the Weintraub Indemnity Agreement duly executed by Weintraub;

6.2.2.8    Any documents reasonably required by the Namco Parties of the Weintraub Parties by notice delivered at least five (5) business days prior to the Scheduled Closing Date evidencing the authority of the persons signing the foregoing documents on behalf of the Weintraub Parties to execute, deliver and bind the applicable Weintraub Parties thereto; and

6.2.2.9    The operating agreement amendments, if any, described in **Section 6.2.1.7** duly executed by the applicable Weintraub Parties.

6.2.3    <u>Closing Procedures</u>.  When all of the documents described in **Section 6.2.1** and **6.2.2** (collectively, "**Closing Documents**") are ready to be delivered, and the parties have confirmed to each other they are ready for the Closing to occur, and all such documents have been delivered to the possession of First American Title Insurance Company, 550 South Hope Street, Suite 1950, Los Angeles, CA 90071, Attn: Glen M. W. Trowbridge, as escrow holder (the "**Escrow Holder**") and the Escrow Holder has so confirmed, Weintraub shall cause the Cash Payment to be sent by one or more wire transfer(s) in accordance with wiring instructions provided by the Namco Parties.  Upon the Namco Parties receiving confirmation of receipt of the wire transfer of the Cash Payment, the Closing shall be deemed to have occurred, and the Closing Documents shall be delivered to the parties entitled thereto.

6.2.4    <u>Post-Closing Matters</u>.

6.2.4.1    Upon the Closing, the Namco Parties shall be authorized to file with the California Secretary of State and any other UCC filing offices they deem necessary UCC-1 Financing Statements covering the Collateral described in the Security Agreement in

17

6588012v10

order to perfect the security interest in the Collateral granted in the Security Agreement. Upon receipt by the Namco Parties from the applicable filing offices of file stamped UCC-1 Financing Statements, the Namco Parties shall deliver copies thereof to the Weintraub Parties by e-mail or other means.

6.2.4.2    Upon the Closing, the Weintraub Parties shall be authorized to file with the California Secretary of State any necessary amendments (LLC-2) of the articles of the Companies (for instance, to show that they are managed by a single manager, rather than multiple, managers). Upon receipt by the Weintraub Parties from the California Secretary of State of file stamped UCC-1 Financing Statements, the Weintraub Parties shall deliver copies thereof to the Namco Parties by e-mail or other means.

6.2.4.3    The obligations of the parties under this **Section 6.2.4** shall survive the Closing.

7.    **Defaults; Remedies**.

7.1    **Defaults**.    Except in the case of a breach of an obligation by any of the Namco Parties or any of the Weintraub Parties to deliver any of the documents or funds required under **Section 6.2** on the Scheduled Closing Date, the Weintraub Parties shall not be in default under this Agreement based upon a breach of any of their obligations, unless the Namco Parties deliver a notice of default to the Weintraub Parties, and the Weintraub Parties fail to cure the breach on or before the earlier of five (5) days after delivery of the notice or the Scheduled Closing Date, and a Namco Party shall not be in default under this Agreement based upon a breach of any of its obligations, unless the Weintraub Parties deliver a notice of default to the Namco Party alleged to be in breach and a copy to the other Namco Party, and the Namco Party alleged to be in breach fails to cure the breach on or before the earlier of five (5) days after delivery of the notice or the Scheduled Closing Date. A default by one Weintraub Party shall constitute a default by all the Weintraub Parties. A default by one Namco Party shall not constitute a default by both Namco Parties, except that the Weintraub Parties may exercise the remedy of termination of this Agreement, as provided in **Section 7.2**, based upon a default of any Namco Party.

7.2    **Remedies**.

7.2.1    If a Namco Party is in default under this Agreement either as a result of a breach of an obligation to deliver any of the documents required under **Section 6.2**, or as a result of any other breach that is not cured within the time period provided in **Section 7.1**, the Weintraub Parties, as long as they are not in default, may exercise any rights or remedies that they may have at law or in equity based upon the default against the defaulting Namco Party as well as the right to terminate this Agreement in the case of any material default by a Namco Party without waiving any right to damages against the defaulting Namco Party.

7.2.2    If the Weintraub Parties are in default under this Agreement either as a result of a breach of an obligation to deliver any of the documents or funds required under **Section 6.2**, or as a result of any other breach that is not cured within the time period provided in **Section 7.1**, any Namco Party not in default may exercise any rights or remedies that it may have at law or in equity based upon the default against the Weintraub Parties as well as the right to

18

terminate this Agreement in the case of any material default by the Weintraub Parties without waiving any right to damages against the Weintraub Parties.

7.2.3   Notwithstanding anything to the contrary set forth in this **Section 7.2** or elsewhere in this Agreement, if either any of the Namco Parties or any of the Weintraub Parties knows of a breach or default of any other parties occurring prior to the Closing and nonetheless the Closing occurs, all the parties shall be deemed to have waived the breach or default and shall not have any rights or remedies against the other parties after the Closing based upon such breach or default, including but not limited to any known inaccuracies in the warranties and representations of any party.

7.2.4   Notwithstanding the foregoing provisions of this **Section 7.2** or elsewhere in this Agreement, in the case of any default under **Section 5.4.1**, the sole right and remedy of the Weintraub Parties shall be to terminate this Agreement, if the Weintraub Parties are themselves not in default, in which case none of the parties shall have any liabilities or obligations to any other parties based upon or arising out of this Agreement.

8.    **Miscellaneous**

8.1    **Representatives of the Parties**

8.1.1   Unless the Weintraub Parties are notified to the contrary by a Namco Party, Cicalese shall be the representative of each Namco Party authorized to act for and bind both of the Namco Parties with respect to matters under or relating to this Agreement, including but not limited to the giving or withholding of consents and approvals and making any discretionary judgments and decisions called for in this Agreement, and each Namco Party hereby represents and warrants to each of the Weintraub Parties that he is so authorized. A Namco Party may revoke such authorization or appoint one or more additional authorized representatives by delivering notice thereof to the Weintraub Parties and the other Namco Party.

8.1.2   Weintraub shall be the representative of each of the Weintraub Parties authorized to act for and bind all of the Weintraub Parties with respect to matters under or relating to this Agreement, including but not limited to the giving or withholding of consents and approvals and making any discretionary judgments and decisions called for in this Agreement, each Weintraub Party hereby represents and warrants to each of the Namco Parties that he is so authorized. Weintraub may appoint or more additional authorized representatives by delivering notice thereof to the Namco Parties.

8.2    **Limit on Liability**.  The Weintraub Parties on their own behalf and on behalf of their agents, shareholders, employees, representatives, related and affiliated entities, successors and assigns agree that neither Cicalese, Bradley Sharp, Trustee of the Bankruptcy Estate of Namco Capital, Inc., R. Todd Neilson, Trustee of the Bankruptcy Estate of Ezri Namvar nor any of their employees, agents or any of their affiliated or related entities, shall have any personal liability under this Agreement.  The provisions of this **Section 8.2** shall survive the Closing and any earlier termination of this Agreement.

8.3    **Notices**.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given when delivered by U.S. mail, registered or

<center>19</center>

certified, return receipt requested, postage prepaid, or by overnight delivery service showing receipt of delivery, or by personal delivery, or by facsimile transmission. Such notices shall be sent to the parties at the following addresses, or such other address as may otherwise be indicated by any such party in writing.

If to the Namco Parties:

> Bradley Sharp, Trustee of the Bankruptcy Estate of
> Namco Capital, Inc.
> Development Specialists, Inc.
> 333 South Grand Avenue, Suite 2010
> Los Angeles CA 90071-1524
> Fax: (213) 617-2718
>
> Todd Neilson
> LECG
> 2049 Century Park East - Suite 2300
> Los Angeles, California 90067
> Fax: (310) 556-0766
>
> Louis Cicalese
> 12121 Wilshire Boulevard, Suite 2600
> Los Angeles, California 90025
> Fax: (310) 820-7333

with copies to:

> Jeffer, Mangels, Butler & Marmaro LLP
> 1900 Avenue of the Stars, 7th Floor
> Los Angeles, California 90067
> Attention: David M. Poitras and Jeffrey E. Steiner
> Fax: (310) 203-0567
>
> Danning, Gill, Diamond & Kollitz, LLP
> 2029 Century Park East, Third Floor
> Los Angeles CA 90067-2904
> Attention: Richard K. Diamond Esq.
> Fax: (310) 277-5735
>
> David W. Meadows, Esq.
> Law Offices of David W. Meadows
> 1801 Century Park East, Suite 1250
> Los Angeles, CA 90067
> Fax: (310) 557-8493

If to the Weintraub Parties:

20

Richard E. Weintraub
President/ CEO
Weintraub Financial Services, Inc.
P.O. Box 6528
26880 Pacific Coast Highway
Malibu, CA 90265
Fax: (310) 457-8128

with copies to:

Rahsaana A. Allen, General Counsel
Weintraub Financial Services, Inc.
Post Office Box 6528
26880 Pacific Coast Highway
Malibu, California 90264
Fax: (310) 457-8128

Greenberg, Glusker, Fields, Claman & Machtinger LLP
1900 Avenue of the Stars, Suite 2100
Los Angeles CA 90067
Attn: Jill Cossman, Esq. and Gary Kaplan, Esq.
Fax: (310) 201-2395

Notices as aforesaid shall be effective upon actual receipt, or when receipt is refused, if on or before 6 pm Pacific Time on a business day, or else on the next business day after the day of receipt or refusal. Any party may change its address or fax number for the purpose of receiving notices, demands and other communications by giving written notice in the manner above described to the other party or parties to this Agreement.

    8.4    **Entire Agreement; Modifications; Participation in Drafting**. This Agreement constitutes the entire understanding of the parties respecting the subject matter hereof and supersedes any prior understandings, whether oral or written. Any and all future modifications of this Agreement will be effective only if it is in writing and signed by the parties hereto. The parties acknowledge that each party and/or such party's counsel have reviewed and revised this Agreement and that no rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall be employed in the interpretation or enforcement of this Agreement or any amendments or exhibits to this Agreement or any document executed and delivered by either party in connection with this Agreement.

    8.5    **No Assignments; Successors and Assigns**. Neither party shall have the right to assign this Agreement. Subject to the foregoing sentence, this Agreement shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and assigns of each of the parties hereto.

    8.6    **Severability**. If for any reason, any provision of this Agreement shall be held to be unenforceable, it shall not affect the validity or enforceability of any other provision of this

<div style="text-align:center">21</div>

6588012v10

Agreement and to the extent any provision of this Agreement is not determined to be unenforceable, such provision, or portion thereof, shall be, and remain, in full force and effect.

8.7    **California Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

8.8    **Prevailing Party Attorney's Fees and Costs**. If any dispute between the parties with respect to this Agreement results in litigation or other proceeding, the prevailing party shall be reimbursed by the party not prevailing in such proceeding for all reasonable costs and expenses, including reasonable attorneys' and experts' fees and costs incurred by the prevailing party in connection with such litigation or other proceeding and any appeal thereof Such costs, expenses and fees shall be included in and made a part of the judgment recovered by the prevailing party, if any.

8.9    **Time of the Essence; Business Days**. Time is of the essence in the performance of each of the parties' respective obligations contained in this Agreement. Unless the context otherwise requires, all periods terminating on a given day, period of days, or date shall terminate at 6:00 p.m. (Pacific Time) on such date or dates. References to "days" shall refer to calendar days except if such references are to business days. The term "business days" means days which are not a Saturday, Sunday or a legal holiday under the laws of the State of California. Notwithstanding the foregoing, if any period terminates on a Saturday, Sunday or legal holiday, under the laws of the State of California, the termination of such period shall be on the next succeeding business day. The time in which any act provided under this Agreement is to be done, shall be computed by excluding the first day and including the last day, unless the last day is a Saturday, Sunday or legal holiday under the laws of the State of California, and then it is also so excluded.

8.10    **Further Assurances**. The parties agree to execute such instruments and documents and to diligently undertake such actions as may be required by Title Company in order to consummate the purchase and sale herein contemplated.

8.11    **Multiple Counterparts**. This Agreement may be executed in multiple counterparts (each of which is to be deemed original for all purposes). The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon so long as such signature page is attached to any other counterpart of this Agreement identical thereto except having additional signature pages executed by the other parties to this Agreement attached thereto.

8.12    **Interpretation**. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires: (a) all exhibits attached hereto are incorporated herein by reference; (b) the section and subsection headings contained in this Agreement are for convenience only and in no way enlarge or limit the scope or meaning of the various sections or subsections hereof; (c) all dollar amounts are expressed in United States currency; (d) all defined terms in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other genders; (e) references herein to "Sections," subsections, paragraphs and other subdivisions without reference to a document are to designated Sections, subsections, paragraphs and other subdivisions of this Agreement; (f)

22

a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to paragraphs and other subdivisions; (g) the words "hereof," "herein," "thereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (h) the word "including" or "includes" means "including, but not limited to" or "includes without limitation"; and (i) the words "approval," "consent" and "notice" shall be deemed to be preceded by the word "written."

  8.13 **Whether Obligations and Liabilities are Joint and Several**. The Namco Parties are referred to collectively for convenience, but as they are subject to separate bankruptcy proceedings, neither the obligations nor liabilities of Namco Parties under this Agreement shall be joint or several. The obligations and liabilities of the Weintraub Parties shall be joint and several, except that because Panamo's membership interest in De Soto Investors may be reinstated pursuant to the exercise of remedies under the Security Agreement, notwithstanding anything to the contrary in this Agreement, De Soto Investors shall not have any liability for damages based upon a default under this Agreement by any other Weintraub Party.

<div align="center">

**[END OF TEXT; SIGNATURES FOLLOW
ON IMMEDIATELY SUCCEEDING PAGES]**

</div>

6588012v10

EXECUTED as of the date first above written.

**Beshmada, LLC**
a California limited liability company

By: _Louis A. Cicalese_

         Louis A. Cicalese, LLC, Manager

**Panamo, LLC**
a California limited liability company

By: _____
         R. Todd Neilson, Trustee of the
         Bankruptcy Estate of Ezri Namvar
         Manager

_____
R. Todd Neilson, Trustee of the Bankruptcy
Estate of **Ezri Namvar**

**Americana Glendale, Inc.**, a California
corporation

By _____
         Richard E.  Weintraub, President

**Weintraub Financial Services, Inc.**, a
California corporation

By _____
         Richard E.  Weintraub, President

**REW De Soto Partners, LLC**, a California
limited liability company

By    REW De Soto Investors, LLC, a
        California limited liability company,
        Manager

    By: _____
          Richard E.  Weintraub,
          Manager

**REW De Soto Investors, LLC**,
a California limited liability company

By: _____
         Richard E.  Weintraub, Manager

24

EXECUTED as of the date first above written.

**Beshmada, LLC**
a California limited liability company

By: _____
    Louis A. Cicalese, LLC, Manager

**Panamo, LLC**
a California limited liability company

By: _____
    R. Todd Neilson, Trustee of the
    Bankruptcy Estate of Ezri Namvar
    Manager

_____
R. Todd Neilson, Trustee of the Bankruptcy
Estate of **Ezri Namvar**

**Americana Glendale, Inc.**, a California
corporation

By _____
    Richard E. Weintraub, President

**Weintraub Financial Services, Inc.**, a
California corporation

By _____
    Richard E. Weintraub, President

**REW De Soto Partners, LLC**, a California
limited liability company

By    REW De Soto Investors, LLC, a
      California limited liability company,
      Manager

      By: _____
          Richard E. Weintraub,
          Manager

**REW De Soto Investors, LLC**,
a California limited liability company

By: _____
    Richard E. Weintraub, Manager

24

6583012v10

EXECUTED as of the date first above written.

**Beshmada, LLC**
a California limited liability company

By: _____
Louis A. Cicalese, LLC, Manager

**Panamo, LLC**
a California limited liability company

By: _____
R. Todd Neilson, Trustee of the
Bankruptcy Estate of Ezri Namvar
Manager


_____
R. Todd Neilson, Trustee of the Bankruptcy
Estate of Ezri Namvar

**Americana Glendale, Inc.**, a California
corporation

By _____
Richard E. Weintraub, President

**Weintraub Financial Services, Inc.**, a
California corporation

By _____
Richard E. Weintraub, President


**REW De Soto Partners, LLC**, a California
limited liability company

By    REW De Soto Investors, LLC, a
California limited liability company,
Manager

By: _____
Richard E. Weintraub,
Manager


**REW De Soto Investors, LLC,**
a California limited liability company

By: _____
Richard E. Weintraub, Manager


24

# EXHIBIT A

## FORM OF ASSIGNMENT

### ASSIGNMENT OF MEMBERSHIP INTEREST

This Assignment of Membership Interest ("**Assignment**") is made as of _____, 20__ by and between _____, a California limited liability company ("**Assignor**"), and _____, a _____ ("**Assignee**"), with reference to the following:

      A.    Assignor and Assignee are members of _____, a California limited liability company (the "**Company**"), which is governed by an Operating Agreement, dated _____, that has been previously been amended by _____, and in conjunction with this Assignment, is being amended and restated by an Amended and Restated Operating Agreement (the "**Amended and Restated Operating Agreement**"); and

      B.    Pursuant to an Agreement for Restructuring of Limited Liability Companies dated as of _____, 20__ among Assignor, Assignee and others (the "**Restructuring Agreement**"), Assignor has agreed to assign to Assignee all of Assignor's membership interest in the Company, except for a __% percentage interest in the profits of the Company, as more particularly defined and described in the Amended and Restated Operating Agreement (the membership interest to be assigned is referred to as the "**Namvar Member Transferred Membership Interest**").

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1.    **Assignment**. Effective on the date hereof, Assignor assigns to Assignee the Namvar Member Transferred Membership Interest. The assignment of the Namvar Member Transferred Membership Interest is made on an "as, is" basis without any warranty or representation, except as otherwise expressly provided in the Restructuring Agreement;

2.    **Assumption**, Assignee assumes all of the obligations of Assignor, as a member of the Company, under the Operating Agreement to be performed or complied with on or after the date hereof with respect to the Namvar Member Transferred Membership Interest;

3.    **Governing Law**. This Assignment shall be governed by, and construed in accordance with, the laws of the State of California;

4.    **Counterparts**. This Assignment t may be executed in multiple counterparts (each of which is to be deemed original for all purposes). The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon so long as such signature page is attached to any other counterpart of this Assignment except having additional signature pages executed by the other parties to this Assignment attached thereto; and

EXHIBIT A

6588012v10

5.     **Attorney's Fees**.  If any dispute between the parties with respect to this Agreement results in litigation or other proceeding, the prevailing party shall be reimbursed by the party not prevailing in such proceeding for all reasonable costs and expenses, including reasonable attorneys' and experts' fees and costs incurred by the prevailing party in connection with such litigation or other proceeding and any appeal thereof.  Such costs, expenses and fees shall be included in and made a part of the judgment recovered by the prevailing party, if any.

EXECUTED as of the date first above written.

**ASSIGNOR:**                            **ASSIGNEE:**

6588012v10

## EXHIBIT B

## SCHEDULE OF MORTGAGE LOANS

| Borrower | Lender | Original Loan Amount |
|---|---|---|
| | | |
| REW De Soto Partners, LLC | Wachovia Bank, N.A. | $39,450,000 |
| WN2 LLC | Mid First Bank | $3,170,000 |
| WN Indio LLC | Wells Fargo Bank | $14,487,883 |

EXHIBIT B

6588012v10

# EXHIBIT C

## SCHEDULE OF RECOURSE AGREEMENTS

| Company | Lender | Recourse Agreements |
|---|---|---|
|  |  |  |
| WN 2 LLC | Mid First Bank | Guaranty by Beshmada<br><br>Certificate and Environmental Indemnity by Namvar, Namvar Family Trust and Beshmada<br><br>Limited Guaranty by Namvar and Namvar Family Trust<br><br>Certificate and Indemnity Agreement re Building Laws by Namvar, Namvar Family Trust and Beshmada |
| WN Indio LLC | Wells Fargo Bank | Hazardous Materials Indemnity by Namvar<br><br>Repayment Guaranty by Namvar and Namvar Family Trust |
| WN Sunset LLC | East West Bank | Guaranties by Namvar and Beshmada |

EXHIBIT C

## SCHEDULE 1

## ASSIGNEES OF TRANSFERRED MEMBERSHIP INTERESTS; ALLOCATION OF INTEREST PURCHASE PRICE AMONG TRANSFERRED MEMBERSHIP INTERESTS

| Name of Company | Assignee of Transferred Membership Interest |
|---|---|
| REW De Soto Partners, LLC | REW De Soto Investors, LLC |
| REW De Soto Investors, LLC | Richard E. Weintraub |
| WN Sunset LLC | Americana Glendale, Inc. |
| WN2 LLC | Americana Glendale, Inc. |
| WN Malibu Lot LLC | Weintraub Financial Services, Inc. |
| WN Indio LLC | Richard E. Weintraub |

1

6588012v10

## SCHEDULE 3.1.5

## MEMBERSHIP INTERESTS OF WEINTRAUB PARTIES

| Company | Weintraub Member | Percentage Interest |
|---|---|---|
| REW De Soto Partners, LLC | De Soto Investors, LLC | 50% capital interest <br><br> 62.5% profit interest |
| REW De Soto Investors, LLC | Richard E. Weintraub | 27.94% capital interest <br><br> 60.45% profit interest |
| WN2 LLC | Americana Glendale, Inc. | 50% |
| WN Indio LLC | Richard E. Weintraub | 50% |
| WN Malibu Lot LLC | Weintraub Financial Services, Inc. | 50% |
| WN Sunset LLC | Americana Glendale, Inc. | 50% |

SCHEDULE 3.1.5

6588012v10

1

### SCHEDULE 3.2.5

2
### MEMBERSHIP INTERESTS OF NAMCO PARTIES
3

4
### MEMBERSHIP INTERESTS OF NAMCO PARTIES

| Company | Namco Member | Percentage Interest |
| --- | --- | --- |
| | | |
| REW De Soto Partners, LLC | Panamo, LLC | 50% capital interest<br><br>37.5% profit interest |
| REW De Soto Investors, LLC | Panamo, LLC | 27.59% capital interest<br><br>15.14% profit interest |
| WN2 LLC | Beshmada LLC | 50% |
| WN Indio LLC | Beshmada LLC | 50% |
| WN Malibu Lot LLC | Beshmada LLC | 50% |
| WN Sunset LLC | Beshmada LLC | 50% |

5

6

7

8
9

SCHEDULE 3.2.5

6588012v10

| In re: | CHAPTER: |
|---|---|
| Debtor(s). | CASE NUMBER: |

**NOTE**: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document described as _____
_____ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | /s/ David W. Meadows |
|---|---|
| _____ | _____ |
| Date              Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

F 9013-3.1

| | |
|---|---|
| In re: Beshmada, LLC<br>Debtor(s). | CHAPTER: 11<br>CASE NUMBER: 2:09-bk-25523-BR |

**ADDITIONAL SERVICE INFORMATION (if needed):**

I.

David Gould dgould@davidgouldlaw.com
Steven T Gubner sgubner@ebg-law.com, ecf@ebg-law.com
Stuart I Koenig Skoenig@cmkllp.com
John P Kreis jkreis@attglobal.net
Jeffrey A Krieger jkrieger@ggfirm.com
David W. Meadows david@davidwmeadowslaw.com
Ethan B Minkin ethan.minkin@kutakrock.com
David Norouzi david@norouzi.us
David M Poitras dpoitras@jmbm.com
Samuel Price sprice@donahoeyoung.com
Christopher S Reeder creeder@reederlugreen.com
Joel G Samuels jsamuels@sidley.com
David B Shemano dshemano@pwkllp.com
Robyn B Sokol ecf@ebg-law.com, rsokol@ebg-law.com
Sam Tabibian sam.tabibian@gmail.com
United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
Howard J Weg hweg@pwkllp.com