Richard M. Pachulski (CA Bar No. 90073)
Debra I. Grassgreen (CA Bar No. 169978)
Robert B. Orgel (CA Bar No. 101875)
Stanley E. Goldich (CA Bar No. 92659)
Malhar S. Pagay (CA Bar No. 189289)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone: 310-277-6910
Facsimile:  310-201-0760
E-mail:   rpachulski@pszjlaw.com
              dgrassgreen@pszjlaw.com
              rorgel@pszjlaw.com
              sgoldich@pszjlaw.com
              mpagay@pszjlaw.com

Joint Special Counsel for Bradley D. Sharp, Chapter 11
Trustee for Namco Capital Group, Inc., and R. Todd Neilson,
Chapter 11 Trustee for Ezri Namvar

David W. Meadows (CA Bar No. 137052)
LAW OFFICES OF DAVID W. MEADOWS
1801 Century Park East, Suite 1235
Los Angeles, California  90067
Telephone: 310-557-8490
Fax:  310-557-8493
Email: david@davidwmeadowslaw.com

Bankruptcy Counsel to Beshmada, LLC, Beshmada of
Delaware, LLC, and Dimes, LLC, Debtors and Debtors in
Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>NAMCO CAPITAL GROUP, INC., a California corporation,<br><br>Debtor. | Case Nos.: 2:08-bk-32333-BR<br>2:08-bk-32349-BR<br>2:09-bk-25510-BR<br>2:09-bk-25523-BR<br>2:09-bk-25517-BR |
| In re:<br><br>EZRI NAMVAR, an individual,<br><br>Debtor. | **DISCLOSURE STATEMENT WITH RESPECT TO JOINT CHAPTER 11 PLAN FOR NAMCO CAPITAL GROUP, INC., EZRI NAMVAR, BESHMADA, LLC, BESHMADA OF DELAWARE, LLC AND DIMES, LLC PROPOSED BY CHAPTER 11 TRUSTEES AND DIP DEBTORS** |
| In re:<br><br>BESHMADA OF DELAWARE, LLC, a Delaware limited liability company,<br><br>Debtor. | |

1

| In re: | Date: | September __, 2011 |
| | Time: | __:__ __.m. |

2    BESHMADA, LLC, a California limited liability
company,

Place:    Courtroom 1668
255 E. Temple Street
Los Angeles, CA  90012

3                                    Debtor.

Judge:    Hon. Barry Russell

4

In re:

5

DIMES, LLC, a California limited liability company,

6

                                    Debtor.

7

8

      [THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.

9

ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE

10

STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE

11

STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN

12

APPROVED BY THE COURT.]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

# TABLE OF CONTENTS

**Page**

I.    QUESTIONS  AND ANSWERS FOR INVESTORS/CREDITORS .......................................1
    A.    What is this document and why have I received it?.................................................. 1
    B.    I loaned Namco money.  Where did my money go?.................................................. 1
    C.    Will I get my money back?  If so, how and how much? .......................................... 2
    D.    What do I do to vote on the Plan?............................................................................ 3
II.    INTRODUCTION AND OVERVIEW ..............................................................................3
    A.    Introduction .............................................................................................................. 3
        1.    The Involuntary Filings, Orders for Relief in the Cases and Appointment of
            the Trustees and Cicalese ............................................................................... 3
            a.    Ezri Namvar and Namco Capital Group ........................................... 3
            b.    Beshmada, Beshmada of DE and Dimes ........................................... 3
        2.    Formulation of the Plan by the Proponents.................................................... 4
        3.    Disclosure Statement ...................................................................................... 4
    B.    Disclaimers .............................................................................................................. 6
    C.    Overview of Chapter 11 ......................................................................................... 10
    D.    Overview of the Plan ............................................................................................. 11
        1.    In General...................................................................................................... 11
        2.    The Continuation of the Estates and the Creation of the Liquidating Trusts.. 12
        3.    Allocations of Proceeds in the Post Confirmation Estates and Liquidating
            Trusts to Holders of General Unsecured Claims .......................................... 12
        4.    Employment and Payment of Professionals, Liquidating Trustees and Estate
            Representatives After the Effective Date...................................................... 13
        5.    Other Plan Terms .......................................................................................... 13
            a.    Payment of Administrative Claims, Priority Claims, Priority Tax
                Claims and Secured Claims ............................................................ 13
            b.    Separate Classification of Claims and Interest of Debtors ................ 13
            c.    Payment of Small Convenience Claims............................................ 13
            d.    Interests in Debtors .......................................................................... 14
            e.    Plan Funding .................................................................................... 14
            f.    No Discharge of Ezri ........................................................................ 14
        6.    Summary of Treatment of Creditors/Interest Holders Under Plan ................ 14
    E.    Voting Instructions................................................................................................. 18
        1.    How to Vote .................................................................................................. 18
        2.    Who Is Being Solicited to Vote .................................................................... 19
        3.    Record Date ................................................................................................... 20
        4.    Voting Procedures.......................................................................................... 20
        5.    Solicitation Agent ......................................................................................... 21
    F.    Confirmation .......................................................................................................... 21
III.    HISTORY, ORGANIZATION AND OPERATIONS OF THE DEBTORS ......................24
    A.    Description and History of the Debtors and Their Business Operations .................... 24
        1.    Overview ....................................................................................................... 24
        2.    Ezri Namvar .................................................................................................. 27
        3.    Namco ........................................................................................................... 29
        4.    Real Estate Market Downturn ....................................................................... 30
        5.    Foreclosures .................................................................................................. 31
        6.    Namvar Relatives LLCs ................................................................................ 31
        7.    Security Pacific Bank and Namco Investments ............................................. 32
        8.    Namco Financed Real Property Interests ...................................................... 33
            a.    Vacant Land Developments .............................................................. 33
            b.    Development Properties in Las Vegas ............................................... 34
            c.    Namwest Investments ....................................................................... 34
    B.    Ezri Indictment and Conviction ............................................................................ 36

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

i

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

C.    Creditor Claims:  Summaries of Secured, Priority  and Unsecured Claims ............... 37
D.    Significant Assets ..................................................................................................... 38
   1.    In General ...................................................................................................... 38
   2.    Cash ................................................................................................................ 38
   3.    Real Property and Other Non-Cash Assets .................................................. 39
   4.    Litigation Rights ............................................................................................ 39
E.    Events Leading to the Bankruptcy Filings ............................................................. 39
F.    Commencement of Chapter 11 Cases ..................................................................... 41
IV.    SIGNIFICANT POSTPETITION EVENTS ......................................................................... 41
A.    Ezri and Namco Cases ............................................................................................ 41
   1.    Entries of Order for Relief ............................................................................. 41
   2.    Appointment of Trustees and Committee, and Retention of Professionals .... 41
      a.    Appointment of Trustees ................................................................... 41
      b.    Appointment and Compositions of Committees ............................... 42
      c.    Retention of Professionals ................................................................ 44
   3.    Ezri Case Court Filings ................................................................................. 46
      a.    Ezri's "First Day" Motions ............................................................... 46
      b.    Ezri's Motion to Convert the Ezri Case to Chapter 7 and Related
        Postpetition Earnings Settlement ..................................................... 46
      c.    Entity Governance Events ................................................................. 47
      d.    Schedules of Assets and Liabilities and Statement of Financial Affairs
         ......................................................................................................... 49
      e.    Claims Bar Date ................................................................................ 49
      f.    Extensions of Time to Object to Discharge ...................................... 50
      g.    Extension of Removal Deadline ........................................................ 50
   4.    Joint Statement of Trustees ........................................................................... 50
   5.    Ezri Case Sales and Settlements ................................................................... 50
      a.    Wilshire Bundy Sale ......................................................................... 50
      b.    Hotel Angeleno Sale ......................................................................... 56
      c.    LA Marriott Settlement ..................................................................... 57
      d.    127 West 25th LLC and 241 Fifth Ave. Hotel, LLC Settlement ........ 57
      e.    Use of Sale Proceeds from Sale by EZ/HS, LLC .............................. 59
      f.    Settlement to Provide Time for Sale of Secret Beach Estates ........... 60
   6.    Abandonment of Property By the Ezri Trustee .............................................. 60
      a.    Abandonment of Residence ............................................................... 60
      b.    Abandonment of Possible Avoidance Claims against Hershel Bani-
        Esraili .............................................................................................. 63
   7.    Termination of Namco Family Trust ............................................................. 63
   8.    Turnover Stipulation in Ezri Case ................................................................ 63
   9.    Namco Case Court Filings ............................................................................ 63
      a.    Namco's "First Day" Motions .......................................................... 63
      b.    Exclusivity ........................................................................................ 64
      c.    Schedules .......................................................................................... 64
      d.    Claims Bar Date ................................................................................ 64
      e.    Extension of Removal Deadline ........................................................ 64
   10.    Namco Case Sales and Settlements .............................................................. 65
      a.    Namwest/Boucherian Settlement ...................................................... 65
      b.    9920 La Cienega Sale and Settlement .............................................. 67
      c.    Goshen Sale and Settlement ............................................................. 68
      d.    Safi Settlement .................................................................................. 68
      e.    Playa Properties Sale ....................................................................... 69
      f.    GH Capital/Meadow Run Settlement ................................................ 70
      g.    Alhashim Settlement ......................................................................... 72
      h.    Moossai Settlement ........................................................................... 72
      i.    Massachi Settlement .......................................................................... 73
      j.    1222 E. Grand Ave. .......................................................................... 73

ii

|  |  | 11. | 1929 Pico Blvd | 74 |
|  |  | 12. | Turnover Motion in Namco Case | 76 |
|  |  | 13. | Termination of Retirement Plans | 77 |
|  |  | 14. | Committees' Plan and Disclosure Statement | 77 |
|  | B. | Beshmada | | 77 |
|  |  | 1. | Beshmada's Consent to Entry of Order for Relief and Conversion of Case to Chapter 11 | 77 |
|  |  | 2. | Retention of Professionals | 77 |
|  |  | 3. | Court Filings | 77 |
|  |  |  | a. Claims Bar Date | 77 |
|  |  |  | b. Schedules | 78 |
|  |  |  | c. Exclusivity | 78 |
|  |  | 4. | Disposition of Assets | 78 |
|  |  |  | a. Weintraub Settlement | 78 |
|  |  |  | b. Park Fifth | 79 |
|  |  | 5. | Remaining Assets | 80 |
|  | C. | Beshmada of DE | | 80 |
|  |  | 1. | Beshmada of DE's Consent to Entry of Order for Relief and Conversion of Case to Chapter 11 | 80 |
|  |  | 2. | Retention of Professionals | 80 |
|  |  | 3. | Court Filings | 80 |
|  |  |  | a. Claims Bar Date | 80 |
|  |  |  | b. Schedules | 80 |
|  |  |  | c. Exclusivity | 81 |
|  |  | 4. | Settlement with Township of West Deptford | 81 |
|  |  | 5. | Remaining Assets | 82 |
|  | D. | Dimes | | 82 |
|  |  | 1. | Dimes Consent to Entry of Order for Relief and Conversion of Case to Chapter 11 | 82 |
|  |  | 2. | Retention of Professionals | 82 |
|  |  | 3. | Court Filings | 82 |
|  |  |  | a. Claims Bar Date | 82 |
|  |  |  | b. Schedules | 82 |
|  |  |  | c. Exclusivity | 83 |
|  |  | 4. | Disposition of Assets | 83 |
|  |  |  | a. Sales and Settlements | 83 |
|  |  | 5. | Remaining Assets | 86 |
|  | E. | Claims Bar Dates, Summary of Claims Process | | 86 |
|  |  | 1. | Claims Bar Dates | 86 |
|  |  | 2. | Claims Objection Procedures | 86 |
|  | F. | No Substantive Consolidation | | 87 |
|  | G. | The Debtors' Liabilities | | 88 |
|  |  | 1. | Administrative Claims | 90 |
|  |  | 2. | Priority Tax Claims | 90 |
|  |  | 3. | Miscellaneous Secured Claims | 90 |
|  |  | 4. | Priority Claims | 91 |
|  |  | 5. | General Unsecured Claims | 91 |
|  |  |  | a. Overview | 91 |
|  |  |  | b. Inter-Debtor Claims | 92 |
|  |  |  | c. Ezri/Namco Claim Settlement | 92 |
|  |  |  | d. DIP Debtors Claim Settlement | 93 |
|  |  | 6. | Small Convenience Claims | 93 |
|  |  | 7. | Bank Guaranty Claims and Other Guaranty Claims | 93 |
| V. |  | DESCRIPTION OF THE PLAN | | 93 |
|  | A. | Treatment of Unclassified Claims | | 93 |
|  |  | 1. | Treatment of Allowed Administrative Claims | 94 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

iii

2.     Administrative Claims Bar Dates ............................................................... 94
     a.    Bar Date for Gap Administrative Claims............................................ 94
     b.    General Administrative Claims Bar Date ........................................... 95
     c.    Administrative Tax Claims Bar Date.................................................. 95
     d.    Ordinary Course Administrative Claims Bar Date ............................. 95
     e.    Professional Fees Bar Date ................................................................. 96
3.     Treatment of Priority Tax Claims ................................................................ 96
B.    Classification of Claims and Interests ...................................................................... 97
    1.     Classification Generally .............................................................................. 97
    2.     Classes and Treatment of Claims and Interests .......................................... 98
     a.    Classes 1(a) to 1(e) – Secured Real Property Tax Claims ................. 98
     b.    Classes 2(a) to 2(e) – Miscellaneous Secured Claims ..................... 100
     c.    Classes 3(a) to 3(e) – Priority Claims .............................................. 101
     d.    Classes 4(a) to 4(e) – General Unsecured Claims ........................... 102
     e.    Class 5(b)  – Bank Guaranty Claims................................................ 103
     f.    Class 6(b) – Other Guaranty Claims ................................................ 105
     (a)   Settlement of Validity and Enforceability Objection........................ 105
     (b)   Continued Litigation over Validity and Enforceability of Guaranty 106
     g.    Classes 7(a) to 7(e) – Small Convenience Claims ........................... 107
     h.    Classes 8(a) to 8(e) – Interests ........................................................ 108
C.    Acceptance or Rejection of Plan ............................................................................ 108
    1.     Classes Entitled to Vote ............................................................................ 108
    2.     Classes Not Entitled to Vote ..................................................................... 109
    3.     Nonconsensual Confirmation .................................................................... 109
D.    Implementation of the Plan .................................................................................... 109
    1.     Funding for the Plan.................................................................................. 109
    2.     Effective Date Payments and Inter-Estate Loans ...................................... 109
    3.     The Post-Confirmation Estates/Liquidating Trusts ................................... 110
     a.    Assets to be Retained in the Post Confirmation Estates ................... 110
     b.    Estate Representatives ....................................................................... 110
     c.    Responsibilities of Estate Representatives........................................ 111
     d.    Powers of Estate Representatives to Employ and Compensate Agents
         and Professionals .............................................................................. 111
     e.    Indemnification by Post Confirmation Estates ................................. 111
     f.    Use of Plan Proceeds ........................................................................ 112
    4.     The Liquidating Trusts .............................................................................. 112
     a.    Formation of Liquidating Trusts....................................................... 112
     b.    Transfer and Vesting of Assets to and in the Liquidating Trusts ..... 112
     c.    Beneficial Entitlements to Liquidating Trust Interests ..................... 112
    5.     Liquidating Trustees ................................................................................. 113
     a.    Appointment of Liquidating Trustees............................................... 113
     b.    Responsibilities of Liquidating Trustees .......................................... 113
     c.    Powers of Liquidating Trustees to Employ and Compensate Agents
         and Professionals .............................................................................. 113
     d.    Indemnification by Liquidating Trust ............................................... 114
     e.    Use of Liquidating Trust Assets and Liquidating Trust Recovery
         Proceeds ............................................................................................ 115
     f.    Tax Matters ....................................................................................... 115
    6.     Good Faith and Compliance With Law Relating to Distributions.............. 116
    7.     Settlement of Inter-Debtor Claims............................................................. 116
    8.     Corporate Action ...................................................................................... 117
    9.     No Substantive Consolidation.................................................................... 117
    10.    Tax Indemnification................................................................................... 117
    11.    Distributions and Related Matters.............................................................. 117
     a.    Distribution Record Date .................................................................. 117
     b.    Distribution Agents........................................................................... 117

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

iv

|  |  |  | c. | Distribution Dates | 118 |
|  |  |  | d. | Distributions in Cash and Delivery of Distributions | 119 |
|  |  |  | e. | Rounding of Payments | 119 |
|  |  |  | f. | De Minimis Distributions | 119 |
|  |  |  | g. | Hardship Distributions | 120 |
|  |  |  | h. | Disputed Claims | 121 |
|  |  |  | i. | Undeliverable Distributions | 123 |
|  |  |  | j. | Unclaimed Property | 124 |
|  |  |  | k. | Setoff, Recoupment and Prior Payments | 125 |
|  |  |  | l. | Compliance with Tax Laws | 125 |
|  |  | 12. | Litigation Rights, Objection to and Estimation of Claims and Determination of Taxes | | 126 |
|  |  |  | a. | Preservation, Pursuit and Resolution of Litigation Rights | 126 |
|  |  |  | b. | Objection to Claims and Objection Deadline | 129 |
|  |  |  | c. | Determination of Taxes | 129 |
|  |  | 13. | Cancellation of Existing Notes, Securities and Agreements | | 130 |
|  |  | 14. | Tax Identification Numbers | | 130 |
|  |  | 15. | Official Committees and Their Dissolution | | 130 |
|  |  | 16. | Final Decree | | 130 |
|  | E. | Executory Contracts and Unexpired Leases | | | 131 |
|  |  | 1. | Overview | | 131 |
|  |  | 2. | Assumption and Assignment | | 131 |
|  |  | 3. | Extension of Time to Assume or Reject | | 132 |
|  |  | 4. | Assumption Obligations | | 133 |
|  |  | 5. | Rejection | | 134 |
|  |  | 6. | Rejection Claims Bar Date | | 135 |
|  |  | 7. | Bar Date for Bankruptcy Code § 365(n) Election | | 135 |
|  |  | 8. | Retention of Property Rights | | 136 |
|  |  | 9. | Effect of Confirmation Order as to Contracts, Leases and Insurance | | 136 |
|  |  | 10. | Post-Order for Relief Agreements | | 138 |
|  |  | 11. | Modifications to Plan Supplement | | 138 |
|  | F. | Conditions to Confirmation and Effectiveness of the Plan | | | 138 |
|  |  | 1. | Conditions to Confirmation | | 138 |
|  |  | 2. | Conditions to Plan Effectiveness | | 138 |
|  | G. | Effect of Confirmation | | | 139 |
|  |  | 1. | Binding Effect | | 139 |
|  |  | 2. | Property Retained Free and Clear | | 139 |
|  |  | 3. | Permanent Injunction | | 140 |
|  |  | 4. | Limitation of Liability | | 141 |
|  |  | 5. | Exculpation | | 141 |
|  |  | 6. | Releases By Estate | | 142 |
|  |  | 7. | No Third Party Release | | 143 |
|  | H. | Retention of Jurisdiction | | | 143 |
| VI. | | OTHER IMPORTANT INFORMATION REGARDING THE PLAN | | | 145 |
|  | A. | Litigation Rights, Objection to and Estimation of Claims and Determination of Taxes | | | 145 |
|  |  | 1. | Preservation, Pursuit and Resolution of Litigation Rights | | 145 |
|  | B. | Estimation of Claims | | | 148 |
|  | C. | Risk Factors | | | 149 |
|  |  | 1. | The Chapter 7 Liquidation Analysis and Confirmation Projections Are Based on Estimates and Numerous Assumptions | | 149 |
|  |  | 2. | The Debtors May Not Be Successful With Respect to Contested Claims | | 150 |
|  |  | 3. | Litigation Recoveries and Results Are Highly Speculative and Uncertain | | 150 |
|  |  | 4. | Risks Related to Trusts | | 150 |
|  | D. | Certain Federal Income Tax Consequences of the Plan | | | 151 |
|  |  | 1. | Introduction | | 151 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

v

|  |  | 2. | Tax Consequences Resulting from the Cancellation of Debt | 152 |
|  |  | 3. | U.S. Federal Tax Consequences to Creditors | 153 |
|  |  |  | a. Information Reporting and Back-up Withholding | 153 |
|  |  |  | b. Distributions in Discharge of Accrued But Unpaid Interest | 154 |
|  |  | 4. | U.S. Federal Tax Consequences to the Holders of Interests in the Debtors | 155 |
| VII. | REQUIREMENTS FOR CONFIRMATION |  |  | 156 |
|  | A. | Good Faith and Compliance with Law |  | 156 |
|  | B. | Best Interests |  | 156 |
|  | C. | Plan Acceptance |  | 156 |
|  | D. | Confirmation of the Plan Without Acceptance by All Impaired Classes |  | 157 |
|  | E. | Feasibility |  | 159 |
| VIII. | LIQUIDATION ANALYSIS |  |  | 160 |
| IX. | CONCLUSION |  |  | 164 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

vi

DOCS_LA:238119.7 59925-001

**LIST OF EXHIBITS TO PLAN AND DISCLOSURE STATEMENT**

## PLAN EXHIBITS

A.    List of Allowed Inter-Debtor Claims

B.    Definitions

C.    Bank Guaranty Claims

D.    Namvar Relatives

## DISCLOSURE STATEMENT EXHIBITS

1.    Plan

2.    Disclosure Statement Approval Order

3.    Liquidation Analysis

4.    Cash Available and Disbursements Required to Confirm Plan

5.    List of Identified Available Property and Other Non-Cash Assets

6.    List of Identified Litigation Rights

7.    Claims Charts

vii

1   A Joint Chapter 11 Plan (as may be amended, the "Plan") under chapter 11 of title 11 of the

2   Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), for Namco Capital Group,

3   Inc. ("Namco"), Ezri Namvar ("Ezri"), Beshmada, LLC ("Beshmada"), Beshmada of Delaware,

4   LLC ("Beshmada of DE"), and Dimes, LLC ("Dimes" and, collectively with Beshmada and

5   Beshmada of DE, the "DIP Debtors"), has been jointly proposed by Bradley D. Sharp and R. Todd

6   Neilson, the respective chapter 11 Trustees of Namco and Namvar (collectively, the "Trustees") and

7   the DIP Debtors (collectively, the "Proponents").[1]  The Proponents hereby submit this Disclosure

8   Statement in support of the Plan (the "Disclosure Statement").  The definitions contained in the

9   Bankruptcy Code are incorporated in this Disclosure Statement by this reference, and the definitions

10   set forth in Exhibit "B" to the Plan also apply to capitalized terms used in the Disclosure Statement.

**I.**

## QUESTIONS  AND ANSWERS FOR INVESTORS/CREDITORS

**A.**    **What is this document and why have I received it?**

13   This document is called a "Disclosure Statement".  It discusses important events that have

14   happened before and during the Namco, Ezri Namvar and related bankruptcy cases.  Its primary

15   purpose is to describe a Plan proposed by the bankruptcy Trustees and the Debtors in related cases –

16   R. Todd Neilson and Bradley D. Sharp - which, if approved by the Court, will result in payments to

17   creditors who are owed money by Namco, Ezri Namvar and certain related entities.

18   You have received the Disclosure Statement and Plan because you are a creditor or other

19   party involved in the bankruptcy cases of Ezri Namvar, Namco or related companies.  This

20   Disclosure Statement contains information for you to review to decide whether or not to vote in

21   favor of the Plan.

**B.**    **I loaned Namco money.  Where did my money go?**

24   If you loaned Namco or Ezri Namvar money, then you are among hundreds of creditors who

25   loaned over $310 million to Namco by the end of 2008, an increase of over $150 million from the

26   beginning of 2005.  Since their appointment, the Trustees and their professionals have undertaken

27   extensive investigations to determine where and how your money was spent.  They have determined

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[1] The Proponents' bankruptcy cases are referred to collectively herein as the "Cases."

DOCS_LA:238119.7 59925-001

that Namco's $150 million increase in cash from individual lenders and the $65 million increase in cash from other lenders and income sources were given primarily to Namvar family members and Namvar family-controlled entities (over $100 million), and used to pay down the loans from Namco Financial Exchange ($58 million).  Only $52 million was used to pay interest to individual and other third party lenders.

In addition to funneling cash to relatives and family-controlled companies, the Trustees' investigations also have uncovered Ezri Namvar's and Namco's practice of transferring properties to certain "favored" creditors.  Typically, these creditors either were in a position to threaten Ezri Namvar/Namco or were individuals Ezri Namvar liked (or entities controlled by such individuals).  For example, in the one year period before the Ezri Namvar and Namco bankruptcy cases were filed, Ezri Namvar/Namco assigned property or interests in entities which owned property to almost 100 "favored" creditors.  Without the commencement of the Cases and the appointment of the Trustees, the payments and assignments of property to only "favored" creditors likely would have continued, and no assets would have remained to repay the vast majority of third party loans.

## C.    Will I get my money back?  If so, how and how much?

The Plan described by this Disclosure Statement has been proposed by the Trustees and other entities to provide a means of payment to you on account of the amounts you lost to the Namvar/Namco enterprise.  The Plan will generate funds to repay you through recoveries from litigation against Namvar family members and other parties, sales of assets and cash already on hand.

Numerous creditors, like you, have filed claims against Namvar, Namco and the various Namvar-related Debtors.  The amount of all these claims totals over $1.4 billion.  The Trustees believe they can reduce this amount to around $920 million.  No one can say with any degree of certainty how much will be recovered from litigation and for how much various assets ultimately will be sold.  At this time, it is estimated that individual lenders may recover between 5% and 15% (depending on the classification of your Claim) of the amounts of their claims which are allowed by the court.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**D.      What do I do to vote on the Plan?**

You should have received a Ballot in the same envelope as this Disclosure Statement.  If you did not receive a Ballot, or are not able to find the Ballot, please contact the Solicitation Agent for another copy of the Ballot at [Omni Management Group, LLC, 16501 Ventura Blvd., Suite 440, Encino, California 91436-2068, Attn:  Namco/Namvar, Tel:  (818) 906-8300, Fax:  (818) 783-2737] (the "Solicitation Agent").  The Trustees and the DIP Debtors recommend approval of the Plan.

**II.**

**INTRODUCTION AND OVERVIEW**

**A.      Introduction**

**1.      The Involuntary Filings, Orders for Relief in the Cases and Appointment of the Trustees and Cicalese**

**a.      Ezri Namvar and Namco Capital Group**

On December 22, 2008, involuntary chapter 11 petitions were filed against Ezri and his company, Namco.  On January 29, 2009, orders for relief under chapter 11 of the Bankruptcy Code were entered in the Ezri and Namco bankruptcy cases.  On March 11, 2009, the Court entered an Order appointing R. Todd Neilson ("Neilson" or the "Ezri Trustee") as chapter 11 Trustee of the Ezri Case.  On May 8, 2009, the Court entered an Order appointing Bradley D. Sharp ("Sharp" or "Namco Trustee") as chapter 11 Trustee of the Namco Case.

**b.      Beshmada, Beshmada of DE and Dimes**

On June 19, 2009, involuntary chapter 7 petitions were filed against Beshmada, Beshmada of DE and Dimes (collectively, the "DIP Debtors") by Sharp in his capacity as the chapter 11 trustee of Namco.  Namco is the largest creditor of each of the DIP Debtors.  Pursuant to stipulations between each of the DIP Debtors and Sharp, on July 1, 2010 (with respect to Beshmada), and July 2, 2010 (with respect to the other DIP Debtors), orders for relief under chapter 11 of the Bankruptcy Code were entered in the bankruptcy cases of each of the DIP Debtors.  Although each DIP Debtor remains in possession and control of its assets as debtor in possession, the manager of each DIP Debtor is Louis A. Cicalese LLC ("Cicalese" or the "New Manager"), who was appointed as the successor manager of each DIP Debtor on or about July 2, 2009 (pursuant to a stipulation among Sharp, Neilson and Ezri), which stipulation was approved by the Bankruptcy Court.

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## 2.    Formulation of the Plan by the Proponents

The Plan is the culmination of extensive investigation concerning the financial affairs and operations of the Debtors and efforts to address claims by and among the Debtors' Estates in real estate, litigation recoveries and other Assets of the Debtors involving a labyrinth of approximately 400 limited liability companies ("LLCs") and a complex web of ownership structures created by Ezri.[2]  The Assets include real estate and real estate-related assets and other non-Cash assets, the majority of which are identified in **Exhibit "5"** hereto and Litigation Rights against Namvar Relatives and other parties listed in **Exhibit "6"** hereto.  Each of the Debtors' Estates is believed to be insolvent and it is anticipated that the Allowed Claims against each Debtor will substantially exceed the value of the Assets of each of the Debtors.

## 3.    Disclosure Statement

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Proponents.  A copy of the Plan accompanies this Disclosure Statement.  The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

This Disclosure Statement describes the Plan and contains information concerning, among other matters, (a) the history, businesses, assets and liabilities of the Debtors; (b) the Cases; (c) a discussion of the Plan's feasibility and Liquidation Analysis setting forth what holders of Claims against and Interests in the Debtors could potentially recover if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (d) the assets available for distribution to Creditors under the Plan.  The Proponents urge you to carefully review the contents of the Disclosure Statement and Plan before making a decision to accept or reject the Plan.  Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

On [September 7, 2011], after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor, typical of Holders of Claims and Interests receiving this Disclosure Statement, to make an informed judgment about the Plan.  Under section 1125 of the Bankruptcy Code, this approval

---

[2] As set forth in the Disclosure Statement, other parties also participated in Ezri's creation of the LLCs and the business operations of Namco and affiliated entities, including Namvar Relatives.

4

enabled the Proponents to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, reviewed the Plan, nor conducted a detailed investigation regarding the contents of this Disclosure Statement.

Your vote on the Plan is important. This Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. Absent acceptance of the Plan, there may be protracted delays in resolving the Cases, a chapter 7 liquidation, or the confirmation of another plan. The Proponents have examined various alternatives and, based on the information contained in this Disclosure Statement and for the reasons set forth below, have concluded that the Plan provides the most favorable recovery to holders of Allowed Claims of such alternatives.

The Proponents urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than the Voting Deadline, 4:00 p.m. Pacific time on [_____ ___], 2011. The Voting Deadline is set forth in the order approving this Disclosure Statement (the "Disclosure Statement Approval Order"), a copy of which accompanies this Disclosure Statement.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan - **Exhibit "1"**

- The Disclosure Statement Approval Order that, among other things, approved this Disclosure Statement and forms of ballots, established certain voting procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, and scheduled the Confirmation Hearing - **Exhibit "2"**.

- The Proponents' Chapter 7 Liquidation Analysis - **Exhibit "3"**.

- Cash Available and Disbursements Required to Confirm Plan- **Exhibit "4"**.

- List of Identified Available Property and Other Non-Cash Assets – **Exhibit "5."**

- List of Identified Litigation Rights – **Exhibit "6."**

- Claims Charts – **Exhibit "7"**.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5

DOCS_LA:238119.7 59925-001

1       In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the

2 Disclosure Statement submitted to those holders of Claims that the Proponents believe are entitled to

3 vote to reject or accept the Plan.  Also, Creditors shall receive a notice for voting Creditors or non-

4 voting Creditors, as applicable.

5 **B.**    **Disclaimers**

6       FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT

7 SUMMARIZES THE TERMS OF THE PLAN, BUT IF ANY INCONSISTENCY EXISTS

8 BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN

9 ARE CONTROLLING.

10       NO REPRESENTATIONS CONCERNING THE FINANCIAL CONDITION OF THE

11 DEBTORS AND THE DEBTORS' ESTATES OR ANY ASPECT OF THE PLAN ARE

12 AUTHORIZED BY THE BANKRUPTCY COURT OR THE PROPONENTS OTHER THAN AS

13 SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR

14 INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE OTHER THAN AS

15 CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE

16 RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

17       THIS DISCLOSURE STATEMENT IS CURRENT AS OF [JULY 5, 2011].  THE

18 DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY

19 CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IN THE

20 DISCLOSURE STATEMENT IS CORRECT AS OF ANY TIME AFTER SUCH DATE, OR

21 THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE DEBTORS AND THEIR

22 ESTATES AS OF SUCH LATER DATE.

23       CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE

24 STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND

25 ASSUMPTIONS.  THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL,"

26 "INTEND," AND "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY FORWARD-

27 LOOKING STATEMENTS.  ALTHOUGH THE PROPONENTS BELIEVE THAT THEIR

28 ESTIMATES AND ASSUMPTIONS REFLECTED IN THOSE FORWARD-LOOKING

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

6

STATEMENTS ARE REASONABLE, THE PROPONENTS CAN GIVE NO ASSURANCE THAT THESE ESTIMATES AND ASSUMPTIONS WILL BE REALIZED.  FORWARD-LOOKING STATEMENTS ARE BASED ON ASSUMPTIONS THAT ARE UNAVOIDABLY AND INHERENTLY IMPRECISE.  ACTUAL RESULTS, PERFORMANCE, OR ACHIEVEMENTS WILL LIKELY DIFFER MATERIALLY FROM THOSE CONTEMPLATED, EXPRESSED, OR IMPLIED BY THE FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE PROPONENTS UNDERTAKE NO OBLIGATION TO UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, WHETHER AS A RESULT OF NEW DEVELOPMENTS OR OTHERWISE.

THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AND IN ANY EXHIBITS TO THE DISCLOSURE STATEMENT, UNLESS OTHERWISE INDICATED, IS UNAUDITED.  MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE.  REASONABLE EFFORT HAS BEEN MADE, HOWEVER, TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

THE FINANCIAL PROJECTIONS AND VALUATIONS PROVIDED IN THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE TRUSTEES AND DIP DEBTORS AND THEIR FINANCIAL ADVISORS.  THESE FINANCIAL PROJECTIONS AND VALUATIONS, WHILE SOMETIMES PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY THE PROPONENTS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, LEGAL, REGULATORY, MARKET AND OTHER FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE PROPONENTS' CONTROL.  FOR EXAMPLE, THE PROPONENTS NECESSARILY MUST RELY ON THE RECORDS OF THE

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DEBTORS, WHICH MAY BE INACCURATE.  THE PROPONENTS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR VALUATIONS OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE FINANCIAL PROJECTIONS AND VALUATIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED AND/OR MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS OR VALUATIONS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

ALL PROFESSIONALS TO THE PROPONENTS HAVE RELIED UPON INFORMATION IN OR DEVELOPED FROM THE DEBTORS' RECORDS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  ALTHOUGH PROFESSIONALS FOR THE PROPONENTS HAVE PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, THE PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED IN OR ATTACHED TO THE DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBMITTED FOR APPROVAL UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED ON THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") AND THE SEC HAS BEEN GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF THE DISCLOSURE STATEMENT, NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS TO THE DISCLOSURE STATEMENT OR THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

8

1    THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE

2    CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE.  CREDITORS SHOULD CONSULT

3    THEIR OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX, AND OTHER

4    MATTERS CONCERNING THEIR CLAIMS.

5    UNLESS YOUR CLAIM IS ALLOWED, IN WHOLE OR IN PART, UNDER THE PLAN,

6    THE ABILITY TO OBJECT TO YOUR CLAIM IN ACCORDANCE WITH THE PLAN AND

7    APPLICABLE LAW IS BEING PRESERVED AND NOT WAIVED UNDER THE PLAN.

8    MOREOVER, ANY LITIGATION RIGHTS AGAINST YOU IN FAVOR OF THE DEBTORS'

9    ESTATES ARE BEING PRESERVED UNDER THE PLAN.  THE PROPONENTS DO NOT

10   BELIEVE THAT THIS RESERVATION OF RIGHTS SHOULD AFFECT YOUR DECISION ON

11   HOW TO VOTE ON THE PLAN.  ALTHOUGH THE PROPONENTS BELIEVE THAT THE

12   CONFIRMATION OF THE PLAN IS IN THE INTERESTS OF CREDITORS OF THE DEBTORS

13   AND THEIR ESTATES, THIS ADVISORY IS PROVIDED TO ENSURE THAT YOU DO NOT

14   ASSUME, BY THE PROPONENTS' SOLICITATION OF YOUR VOTE, BY THE ESTIMATES

15   CONTAINED IN THE DISCLOSURE STATEMENT, OR BY ANY OTHER PROVISIONS OF

16   THE PLAN OR DISCLOSURE STATEMENT (OTHER THAN AN EXPRESS PROVISION OF

17   THE PLAN OR A SEPARATE ORDER ALLOWING YOUR CLAIM OR WAIVING SPECIFIED

18   LITIGATION RIGHTS AGAINST YOU) THAT THE DEBTORS' ESTATES OR THE POST

19   CONFIRMATION ESTATES UNDER THE PLAN WILL NOT OBJECT TO YOUR CLAIM OR

20   INTEREST OR THAT THE TRUSTEES AND DIP DEBTORS OR THEIR SUCCESSORS

21   UNDER THE PLAN WILL NOT PURSUE ANY LITIGATION CLAIM OR RIGHT AGAINST

22   YOU.  INSTEAD, FOR THE PURPOSE OF DECIDING HOW TO VOTE ON THE PLAN, IF

23   YOUR CLAIM IS NOT EXPRESSLY ALLOWED UNDER THE PLAN OR IN A FINAL

24   BANKRUPTCY COURT ORDER, YOU SHOULD ASSUME THAT THE DEBTORS' ESTATES,

25   OR ANY SUCCESSORS OR REPRESENTATIVES WILL (A) OBJECT TO YOUR CLAIM IF

26   GROUNDS EXIST TO DO SO, AND (B) ASSERT ALL SETOFFS, RECOUPMENTS, RIGHTS

27   TO SUBORDINATE, OR AFFIRMATIVE CLAIMS THAT THE TRUSTEES, THE DIP

28   DEBTORS, THEIR RESPECTIVE ESTATES, OR ANY SUCCESSORS MAY HAVE WITH

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

9

RESPECT TO YOU AND/OR YOUR CLAIMS AGAINST THE DEBTORS AND THE

DEBTORS' ESTATES.

The Disclosure Statement may not be relied on for any purpose other than to determine

whether to vote to accept or reject the Plan, and nothing stated herein will constitute an admission of

any fact or liability by any party, or be admissible in any proceeding involving the Debtors or

Debtors' Estates or any other party, or be deemed conclusive evidence of the tax or other legal

effects of the Plan on the Debtors, Estates or Creditors.

Summaries of certain provisions of agreements referenced in this Disclosure Statement do

not purport to be complete and are subject to, and are qualified in their entirety by reference to, the

full text of the applicable agreement, including the definitions of terms contained in such agreement.

## C.    **Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under

chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for

the benefit of itself, its creditors, and equity interest holders.  Another goal of chapter 11 is to

promote equality of treatment for similarly situated creditors and similarly situated equity interest

holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is composed of all of the legal

and equitable interests of a debtor as of the filing date.  The Bankruptcy Code provides that the

debtor may continue to operate its business and remain in possession of its property as a "debtor in

possession" or that a chapter 11 trustee can be appointed "for cause" or "if such appointment is in

the best interests of creditors and the estate."  Chapter 11 trustees were appointed in both the Namco

Case and the Ezri Case, and Beshmada, Beshmada of DE and Dimes are each debtors in possession

under the management of Cicalese.

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case.  A

chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor.

Confirmation of a chapter 11 plan by the bankruptcy court makes the plan binding upon the debtor,

any issuer of securities under the plan, any person acquiring property under the plan, and any

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

10

creditor, interest holder, or general partner in the debtor.  The provisions of the Plan are summarized in sections II.C, II.D and Article V. of the Disclosure Statement.

As noted above, certain holders of claims against and equity interests in a debtor are permitted to vote to accept or reject a plan.  Prior to soliciting acceptances of a proposed plan, however, section 1125 of the Bankruptcy Code requires that plan proponents prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  The Proponents are submitting this Disclosure Statement to Holders of Claims against and Interests in the Debtors and their Estates to satisfy the requirements of section 1125.

**D.    Overview of the Plan**

**1.    In General**

The Plan is a blueprint of how the Debtors, their Estates and their Assets will be structured and liquidated after or as a result of bankruptcy.  It sets forth the form of entities they will be, who will own them and what Distributions will be made or required.  Among other things, the Plan designates Classes of Claims and a Class of Interests, identifies Unimpaired and Impaired Classes, sets forth a proposal for the satisfaction of all Claims against, and Interests in, the Debtors or their Estates, and provides adequate means for the implementation of the Plan.

The Plan's goals are to:

- establish a process for determining which of the Creditors' Claims against the Debtors or their Estates should be Allowed;
- settle the Inter-Debtor Claims;
- provide from available Cash for full satisfaction of those Administrative Claims, Priority Tax Claims and Priority Claims that are Allowed;
- provide fair treatment for any Allowed Secured Claims;
- enable the efficient liquidation of the Estates' Assets, including Litigation Rights and Real Estate Assets;
- cash out certain Small Convenience Claims;
- provide a mechanism for payment to "Hardship" creditors; and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11

- fairly divide among Holders of Unsecured Claims the proceeds of the Estates' Assets.

**2.      The Continuation of the Estates and the Creation of the Liquidating Trusts**

Following confirmation of the Plan, (a) the Namco and Ezri Estates will continue and be managed and controlled by the Estate Representatives; and (b) the assets of the DIP Debtors will be transferred to Liquidating Trusts that will be formed for each of the DIP Debtors and managed by the Liquidating Trustees.  Besides any residual Cash and Real Estate, the primary value of each Estate's Plan Assets is expected to be found in its Litigation Rights, including Litigation Rights against Namvar Relatives and against third parties.  The Litigation Rights may include claims for or result in the recovery of Available Real Estate and Real Estate.

The management structure of the Post Confirmation Estates and the Liquidating Trusts is set forth in Article VIII of the Plan.  The Estate Representatives and Liquidating Trustees are collectively referred to as the Control Parties.  The goal of the Control Parties will be to liquidate the Post Confirmation Estate Assets and make periodic Pro Rata Distributions of the Available Plan Proceeds to Holders of Allowed Claims of the applicable Debtor or Estate.  Allowed Inter-Debtor Claims will be treated the same as any other claim against a Post Confirmation Estate or Liquidating Trust and will result in some of the Plan Proceeds of one Debtor's Post Confirmation Estate or Liquidating Trust being redirected to another Debtor's Post Confirmation Estate or Liquidating Trust.

Following the Effective Date of the Plan, the Control Parties also will have the sole power to object to and resolve Disputed Claims against the respective Estates.

**3.      Allocations of Proceeds in the Post Confirmation Estates and Liquidating Trusts to Holders of General Unsecured Claims**

Available Plan Proceeds in each Post Confirmation Estate or Liquidating Trust shall be divided Pro Rata among the Creditors of such Estate holding Allowed General Unsecured Claims, Allowed Bank Guaranty Claims and Allowed Other Guaranty Claims, provided that, in exchange for the Ezri Estate waiving certain defenses to the Other Guaranty Claims, the allowed amount thereof

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

may be reduced and in exchange for such waiver as to the Bank Guaranty Claims, the pay rate for such Claims may be reduced.

**4.    Employment and Payment of Professionals, Liquidating Trustees and Estate Representatives After the Effective Date**

The Post Confirmation Estates and Liquidating Trustee shall be authorized to employ and pay Professionals after the Effective Date subject to Court approval at certain thresholds set forth in the Plan.

**5.    Other Plan Terms**

As more fully set forth in subsequent Sections of the Plan, other required and essential provisions of the Plan include the following.

**a.    Payment of Administrative Claims, Priority Claims, Priority Tax Claims and Secured Claims**

Under the Plan, proceeds of sales of Real Estate and recovery of Litigation Rights occurring during the Cases and intercompany loans will be used to make payment on the Effective Date of Allowed Secured Claims, Allowed Priority Claims, Allowed Priority Tax Claims and Allowed Administrative Claims.  To enable full and timely payment of such Claims, certain Professionals have agreed to defer payment of their Allowed Administrative Claims until after the Effective Date of the Plan.

**b.    Separate Classification of Claims and Interest of Debtors**

Because the Cases have not been substantively consolidated, the Plan provides for separate treatment for Holders of Claims and Interests against each Estate and, although described together for convenience, classifies separately Claims and Interests against each Estate through the use of subclasses.

**c.    Payment of Small Convenience Claims**

To reduce costs and promote efficiency of the administration of the Post Confirmation Estates, the Plan provides for a 10% Cash payment to cash out certain smaller Claims, the Small

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

13

Convenience Claims (which, as more fully defined in Exhibit "B" to the Plan are Claims with an Allowed Amount equal to, under or reduced to $100,000).

### d. Interests in Debtors

Upon the Effective Date of the Plan, (i) the Interests in the DIP Debtors will be cancelled; (ii) Ezri will not receive or retain any property on account of his Interest in the Ezri Estate; and (iii) Ezri Estate's interest in Namco will be retained under the Plan, but for administrative convenience and benefit to the Namco Estate only and not on account of the Ezri Estate's present ownership of such Interests.

### e. Plan Funding

The primary sources of funding for the Plan are cash on hand, proceeds of real property sales and potential tax refunds. Estimated funding needed on the Effective Date of the Plan is $19.4 million for payment of the following: (i) projected outstanding Administrative Claims of $3.6 million for professional fees (assuming 80% deferral of certain Professional Fees by agreement) and $3.5 million for post-petition inter-debtor loans, (ii) projected Priority Tax Claims of $1.5 million, (iii) funding of the Post Confirmation Estates and Liquidating Trusts in the total amount of $10.0 million, and (iv) funding for payment of Small Convenience Claims in the estimated amount of $0.8 million.

### f. No Discharge of Ezri

Ezri will not receive any discharge under section 1141 of the Bankruptcy Code.  Ezri's Postpetition Earnings and Post-Effective Date Earnings are excluded from the Assets of the Post Confirmation Estates under the Plan, but remain subject to any Litigation Rights of Post Confirmation Estates or any Creditors against Ezri.

### 6. Summary of Treatment of Creditors/Interest Holders Under Plan

The following chart briefly summarizes the treatment of Creditors and Holders of Interests under the Plan.  The amounts listed below are based principally on the Schedules and proofs of claim filed with the Bankruptcy Court and other information collected or reviewed subsequent to the filing of the Schedules and proofs of claim, and are only estimates based on various assumptions.  Actual Claims and Distributions to the Holders of Allowed Claims will vary depending upon the outcome

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

14

of objections to Claims and recoveries from the Real Estate Interests, Litigation Rights and any other Assets of the Debtors.  For a complete description of the treatment of Allowed Claims, Creditors should review the Plan.

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS *(CONSOLIDATED BASIS)* | ESTIMATED RECOVERY PERCENTAGE | SUMMARY OF TREATMENT |
|---|---|---|---|---|
| N/A | Administrative Claims | $18,022,995 | 100% | Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment, and subject to the Administrative Claims Bar Dates set forth in the Plan, the Control Parties shall pay each Allowed Administrative Claim in full, in Cash, the later of (i) on the Effective Date, (ii) within fourteen (14) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) on the date such Allowed Administrative Claim becomes due according to its terms. |
| N/A | Priority Tax Claims | $1,483,686 | 100% | Allowed Priority Tax Claims, if any, shall receive from the respective Post Confirmation Estate or Liquidating Trust (i) equal Cash payments to be made on the last Business Day of each third full-calendar month following the Effective Date, provided that the first payment need not be made any sooner than twenty-eight (28) days following the Effective Date and provided that such periodic payments are to be payable until January 29, 2014 for the Namco and Ezri Cases and July 2, 2014 for the DIP Debtors' Cases,  on which date the final payment shall be due, with all such payments totaling 100% of the principal amount of such Claim, plus interest on any unpaid balance from the Effective Date, calculated at the nonbankruptcy interest rate applicable on the Effective Date, if any, or (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the applicable Control Party, provided such treatment is on more favorable terms to the applicable Post Confirmation Estate or Liquidating Trust than the treatment set forth in clause (i) hereof; provided that, prepayments shall be permitted, including payment in full, any time on or after the Effective Date. |

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | | | |
|---|---|---|---|---|
| 1(a) – 1(e) | Secured Real Property Tax Claims[3] | None | 100% | Each Holder of an Allowed Secured Real Property Tax Claim shall receive, on account of and in full and final satisfaction of any such Claim, one of the three alternative treatments identified immediately below.  At any time prior to Confirmation, the Trustee or DIP Debtor of the applicable Estate may elect option (a): Abandonment.  If option (a):  Abandonment is not elected, the Holder of each Allowed Secured Real Property Tax Claim shall have the opportunity to elect  between treatment (b): Effective Date Payment or treatment (c): Quarterly Payments, below in connection with voting on the Plan.  If such Holder does not return a Ballot or does not otherwise make such election, such Holder will receive treatment (c): Quarterly Payments. |
| 2(a) – 2(e) | Miscellaneous Secured Claims[4] | $3,274,053 | 100% | Unless such Holder agrees to a less favorable treatment, each Holder of an Allowed Miscellaneous Secured Claim, if any, will receive, on account of and in full and final satisfaction of any such Allowed Miscellaneous Secured Claim, one of the following treatments which shall be selected by the applicable Trustee or DIP Debtor and communicated to the Holder of such Claim prior to the Voting Deadline:  (a) Surrender or Abandonment; (b) Periodic Payments Pursuant to Approved Settlement Agreements; and (c) Periodic Cash Payments. |
| 3(a) – 3(e) | Priority Claims | None | 100% | Each Holder of an Allowed Priority Claim in Class 3 shall be paid, on account of such Claim, as an obligation of the applicable Estate, Post Confirmation Estate, or Liquidating Trust, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Claim, the full amount of such Allowed Priority Claim in Cash on the later of (i) the Effective Date, and (ii) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim. |

---

[3] Each Holder of a Secured Real Property Tax Claim will be in its own separate subclass.
[4] Each Holder of a Miscellaneous Secured Claim will be in its own separate subclass.

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | | | |
|---|---|---|---|---|
| 4(a) – 4(e) | General Unsecured Claims | $1,044,707,450 | 5% – 15% | Each Holder of an Allowed General Unsecured Claim (including an Allowed Inter-Debtor Claim) shall be entitled to receive, on account of such Allowed Claim, Distribution of a Pro Rata share, together with (i) Holders of Allowed Class 4 General Unsecured Claims, (ii) as to the Ezri Estate only, Holders of Allowed Bank Guaranty Claims against the Ezri Estate and (iii) as to the Ezri Estate only, Holders of Allowed Other Guaranty Claims against the Ezri Estate, of the Available Plan Proceeds of its applicable Post Confirmation Estate or Liquidating Trust. |
| 5(b) | Bank Guaranty Claims | $190,308,655 | 2.5% - 5% | All Class 5 Bank Guaranty Claims are Disputed. Holders of Bank Guaranty Claims may select one of the following treatments on their Ballot. If no Ballot is timely returned by a Holder of a Bank Guaranty Claim or if the Holder of a Bank Guaranty Claim does not make a selection of one of the following options, then such Claim will receive the treatment set forth in section (b): (a) Settlement of Validity and Enforceability Objections; or (b) continued Litigation over Validity and Enforceability of Guaranty. |
| 6(b) | Other Guaranty Claims | $14,921,232[5] | 5% - 15% | All Other Guaranty Claims are Disputed. Holders of Other Guaranty Claims may select one of the following treatments on their Ballot. If no Ballot is timely returned by a Holder of an Other Guaranty Claim or if the Holder of an Other Guaranty Claim does not make a selection of one of the following options, then such Claim will receive the treatment set forth in Section (b): (a) Settlement of Validity and Enforceability Objection; and (b) Continued Litigation over Validity and Enforceability of Guaranty. |
| 7(a) – 7(e) | Small Convenience Claims | $7,865,011 | 10% | Each Holder of an Allowed Small Convenience Claim in Class 7 shall be paid, on account of such Allowed Small Convenience Claim, a lump sum payment in an amount equal to ten percent (10%) of such Allowed Small Convenience Claim, on or as soon as practicable following the Effective Date. |

---

[5] Based on fifteen percent (15%) of estimated Allowed Claims.

17

| 8(a) – 8(e) | Interests | N/A | 0% | (a)  DIP Debtors:  Existing Interests in the DIP Debtors shall not receive any Distributions or retain any property on account of such Interests and such Interests shall be cancelled as of the Effective Date. <br> (b)  Ezri Estate:  Interests of Ezri in the Ezri Estate shall not receive any Distributions or retain any property under the Plan and shall be extinguished as of the Effective Date.  Ezri shall not be required to relinquish Postpetition Earnings or Post-Effective Date Earnings by virtue of the Plan.  However Ezri will not receive a Discharge and his Postpetition Earnings and Post-Effective Date Earnings shall be subject to claims asserted by the Post Confirmation Estates or by Creditors asserting claims or causes of action against Ezri. <br> (c)  Namco Estate:  The Ezri Estate shall not receive any Distributions or retain any property on account of such interest, but, for administrative convenience and the benefit of creditors of the Namco Estate, the Ezri Estate shall retain its interests in the Namco Estate and if and only if all Allowed Claims of Creditors of the Namco Estate are paid in full, plus interest on such Claims (accruing until payment at the federal judgment rate applicable on the Effective Date), then Distributions of remaining Available Plan Proceeds (none are projected) would be payable to the Ezri Post-Confirmation Estate for the benefit of its Creditors holding Allowed Claims against such Post-Confirmation Estate. |

**E.    Voting Instructions**

The Disclosure Statement Approval Order, a copy of which is annexed hereto as **Exhibit "2"**, sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and applicable procedures for tabulating ballots.

**1.    How to Vote**

A ballot is enclosed herewith for Creditors to use in voting on the Plan.  To vote on the Plan, indicate on the enclosed ballot that you accept or reject the Plan, provide the requested information, sign your name, and mail the ballot in the envelope provided for this purpose.  Further, applicable

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    ballots contain instructions on how to opt into Classes 5(a) – 5(e) (Small Convenience Claims), if

2    desired.

3        In order to be counted, ballots must be properly completed, signed, and returned so that they

4    are actually **received no later than 4:00 p.m., prevailing Pacific time, on the Voting Deadline,**

5    **[_____ ___], 2011**, by the Solicitation Agent at the following applicable address:

6    Omni Management Group, LLC
     16501 Ventura Blvd., Suite 440
7    Encino, California  91436-2068
     Attn:  Namvar/Namco
8

9        **IF YOU MUST RETURN YOUR BALLOT TO YOUR AGENT, YOU MUST**

10   **RETURN YOUR BALLOT TO YOUR AGENT WITH SUFFICIENT TIME FOR**

11   **IT/HIM/HER TO PROCESS YOUR BALLOT AND RETURN IT TO THE SOLICITATION**

12   **AGENT BY THE VOTING DEADLINE**.  Ballots must be received by the Solicitation Agent at

13   the address set forth on the applicable Ballot.  To be counted for purposes of voting on the Plan, all

14   of the information requested on the Ballot must be provided.  If your Ballot is not properly

15   completed, signed and returned as described, it will not be counted.  If your Ballot is damaged or

16   lost, you may request a replacement by sending a written request to this same address.

17        **2.    <u>Who Is Being Solicited to Vote</u>**

18        Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes of

19   claims that are impaired are entitled to vote to accept or reject a proposed plan.  Classes of claims in

20   which the holders are unimpaired are deemed to have accepted a plan and are not entitled to vote to

21   accept or reject a plan.  Under the Plan, Administrative Claims and Priority Tax Claims are

22   unclassified and are not entitled to vote.

23        Classes 1(a) to 1(e), 2(a) to 2(e), 4(a) to 4(e), 5(a) to 5(e), 6(a) to 6(a) and 7(a) to 7(e) shall

24   be entitled to vote to accept or reject the Plan.  Classes 3(a) to 3(e) are unimpaired and conclusively

25   presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Holders of Claims

26   in Classes 8(a) to 8(e) receive nothing under the Plan and, thus, Classes 6(a) to 6(e) are conclusively

27   presumed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).  Therefore,

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

19

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Classes 3(a) to 3(e) and Classes 8(a) to 8(e) shall not be entitled to vote to accept or reject the Plan, and the votes of Holders of Claims and Interests in such classes will not be solicited.

The Ballot form that you received does not constitute a proof of Claim. If you are in any way uncertain whether or if your Claim has been correctly scheduled, you should review the Debtors' Schedules that are on file with the Bankruptcy Court located at 255 East Temple Street, Los Angeles, California.[6] The Debtors' Schedules (other than Ezri, who did not file Schedules) may also be viewed free of charge at http://www.namvar-namco-bankruptcy.com/. In accordance with orders of the Bankruptcy Court, (i) November 13, 2009 was established as the Bar Date by which Creditors must file proofs of claim in the Namco and Ezri Cases, and (ii) November 15, 2010, was established as the Bar Date by which Creditors (other than governmental units) must file proofs of claims in the Beshmada, Beshmada and Dimes Cases.

**3.    Record Date**

THE RECORD DATE FOR VOTING ON THE PLAN IS THE ORDER FOR RELIEF DATE FOR THE APPLICABLE CASE. To be entitled to vote to accept or reject the Plan, a holder of a Claim against the Estates must be the record holder of such Claim at the close of business on the Record Date. Holders who acquire Claims against the Estates after the Record Date must arrange with their seller to receive a proxy from the holder of record of such Claim on the Record Date.

**4.    Voting Procedures**

All votes to accept or reject the Plan must be cast by using the Ballot. Votes that are cast in any other manner will not be counted. Ballots must be received by the Solicitation Agent no later than **4:00 p.m., prevailing Pacific time, on the Voting Deadline, which is [_____ ___], 2011**.

Parties who elect to vote on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."

**BALLOTS THAT ARE PROPERLY EXECUTED BUT FAIL TO INDICATE WHETHER THE VOTING PARTY ACCEPTS OR REJECTS THE PLAN WILL CONSTITUTE ABSTENTIONS BY SUCH PARTY WITH RESPECT TO A VOTE ON THE**

---

[6] No Schedules have been filed in the Ezri Case.

**PLAN. ABSTENTIONS WILL NOT BE COUNTED AS EITHER ACCEPTANCES OR REJECTIONS OF THE PLAN. FAILURE BY A HOLDER TO DELIVER A DULY COMPLETED AND SIGNED BALLOT WILL ALSO CONSTITUTE AN ABSTENTION BY SUCH HOLDER WITH RESPECT TO A VOTE ON THE PLAN. BECAUSE ABSTENTIONS WILL HAVE NO EFFECT ON VOTING WITH RESPECT TO THE PLAN, IT IS EXTREMELY IMPORTANT THAT YOU INDICATE WHETHER YOU ACCEPT OR REJECT THE PLAN ON THE BALLOT.**

     **5.**     <u>**Solicitation Agent**</u>

     [Omni Management Group, LLC, has been appointed as Solicitation Agent for the Plan. Questions and requests for assistance and requests for additional copies of this Disclosure Statement or Ballots should be directed to the Solicitation Agent at its address set forth on the Ballots or at 16501 Ventura Blvd., Suite 440, Encino, California 91436-2068, Attn: Namco/Namvar, Tel: (818) 906-8300, Fax: (818) 783-2737.]

**F.**     <u>**Confirmation**</u>

     "Confirmation" is the technical term for a bankruptcy court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Proponents must demonstrate that they have met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Proponents believe that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code.

     Your vote on the Plan is important. Rejection of the Plan may lead to a conversion of the Cases to chapter 7 of the Bankruptcy Code and subsequent liquidation by chapter 7 trustees for each of the Debtors. This alternative may not provide for a distribution of as much value to Holders of Allowed Claims under the Plan. Accordingly, the Proponents urge you to accept the Plan by completing and returning the enclosed ballot so as to be received no later than **4:00 p.m., prevailing Pacific time, on [_____ ___], 2011**.

     Voting is tabulated by Class. An impaired Class of Claims that votes will have accepted the Plan if (a) the Holders (other than any Holder designated by the Bankruptcy Court based on its vote

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

21

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

or its solicitation not being in good faith under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims actually voting in such Class have voted to accept the Plan.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Proponents reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both.  Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests.  Under that provision, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

The Bankruptcy Court has set **[_____ ___, 2011, at __:__ __.m.],** prevailing Pacific time, for the Confirmation Hearing at which it will determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied.  The Confirmation Hearing may be continued from time to time and day to day without further notice.  If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.  Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on respective counsel for the Trustees, the DIP Debtors and the Committees, and the Office of the U.S. Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan.  Bankruptcy Rule 3007 and Local Bankruptcy Rule 3018-1 govern the form of any such objection.

The parties on whom objections must be served are:

<u>Joint Counsel for the Namco and Ezri Trustees</u>:

Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Tel:    (415) 263-7000
Fax:    (415) 263-7010
Attn:    Debra I. Grassgreen

DOCS_LA:238119.7 59925-001

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067
Tel:   (310) 277-6910
Fax:   (310) 201-0760
Attn:   Richard M. Pachulski
        Robert B. Orgel

Counsel to Beshmada, LLC, Beshmada of Delaware, LLC, and Dimes, LLC, Debtors and Debtors in Possession:

David W. Meadows
Law Offices of David W. Meadows
1801 Century Park East, Suite 1235
Los Angeles, California  90067
Tel: (310) 557-8490
Fax:  (310) 557-8493

Counsel for Bradley D. Sharp, Chapter 11 Trustee for Namco Capital Group, Inc.:

Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars, Seventh Floor
Los Angeles, CA 90067-4308
Tel:   (310) 203-8080
Fax:   (310) 712-8571
Attn:   David M. Poitras P.C.

Attorneys for R. Todd Neilson, Chapter 11 Trustee for Ezri Namvar:

Danning, Gill, Diamond & Kollitz, LLP
2029 Century Park East, Third Floor
Los Angeles, CA 90067-2904
Tel:   (310) 277-0077
Fax:   (310) 277-5735
Attn:   Richard K. Diamond
        Uzzi O. Raanan

Attorneys for Official Committee of Unsecured Creditors for Ezri Namvar:

Shulman, Hodges & Bastian, LLP
26632 Towne Centre Drive, Suite 300
Foothill Ranch, CA 92610
Tel:   (949) 340-3400
Fax:   (949) 340-3000
Attn:   Leonard M. Shulman
        Melissa Davis

Attorneys for the Official Committee of Unsecured Creditors for Namco Capital Group, Inc.:

The Lobel Firm, LLP
840 Newport Center Drive, Suite 750
Newport Beach, California  92660
Tel:   (949) 999-2860
Fax:   (949) 999-2870
Attn:   William N. Lobel
        Mike D. Neue

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

23

Creim, Macias, Koenig & Frey, LLP
633 West Fifth Street, 51st Floor
Los Angeles, CA 90071
Tel:    (213) 614-1944
Fax:    (213) 614-1961
Attn:   Stuart I. Koenig

Office of the U.S. Trustee:

U.S. Department of Justice
Office of the United States Trustee
725 South Figueroa Street, Suite 2600
Los Angeles, CA  90017
Tel:    (213) 894-4505
Fax:    (213) 894-2603
Attn:  Russell Clementson

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**III.**

**HISTORY, ORGANIZATION AND OPERATIONS OF THE DEBTORS**

**A.    Description and History of the Debtors and Their Business Operations**

**1.    Overview**

The story concerning Ezri and Namco is one of faulty judgments of monumental proportions mingled with greed and self interest.  The level of creditor/investor[7] and other obligations which started at approximately $60 million in 2001 escalated to over $600 million at the time of bankruptcy leaving in its wake the financial ruin of those who trusted Ezri.

Ezri began by investing in smaller income producing properties in the expanding real estate market.  After realizing a few dramatic gains, Ezri fully committed the increasing financial resources of Namco into large real estate projects in California, Arizona and Nevada as well as in other places throughout the United States.

With the exception of the Hotel Angeleno, which was purchased in 2002, the majority of the properties in the Ezri/Namco portfolio were acquired between 2004 and 2008, at the height of the real estate boom.  Property of every kind, size and description; hotels, rural residential development property, agricultural property with no entitlements, an equestrian center, pistachio farms, shopping

---

[7] The term "creditors" is utilized sometimes to denote creditors who advanced funds to Namco and received payments in return.  The term is not meant to define those "creditors" as having an equity position.  It is utilized to differentiate institutional investors, such as banks, from those private parties who loaned money to Namco.  These creditors are not "investors" in Namco.  They loaned money to Namco and accordingly, may be creditors of Namco.

24

DOCS_LA:238119.7 59925-001

centers, land to be developed into shopping centers, a trailer park, storage facilities, small apartment properties, small strip centers in marginal areas, single family residences, conference center sites, property to be developed into golf courses, ground leases, medical office buildings, and government assisted housing projects, were acquired often with a wanton disregard for the underlying economics of the financial viability of the project.  In fact, most, if not all, of the properties were purchased without a thoughtful period of due diligence and without the advice of qualified financial advisors skilled in the property specific expertise, but upon the recommendation of brokers or finders with a vested interest in convincing Ezri to acquire the property.

Unfortunately for those who had relied on Ezri to prudently invest their funds, the economy contracted severely and the promise of heady returns and spectacular gains evaporated in what has become the largest financial downturn in recent memory.  This headlong fall has decimated the lives of hundreds of creditors, some of whom find that their entire life savings has evaporated.

During the five year period ending in 2008, $3 billion flowed in and out of Namco.  This amount increased approximately twelve fold from 2001 through 2008.  In addition to the $3 billion of cash transactions during that period there was another $2.9 billion in non-cash journal entries which further burdened an inadequate accounting system.   The $5.9 billion of total transactions were filtered and disbursed through a dizzying array of over 400 LLCs.[8]  These numerous LLCs were interconnected through a labyrinth of mostly related companies with convoluted, inter-related ownership structures. This corporate concoction was reportedly established as a consequence of related party restrictions as outlined under the guidelines surrounding the tax deferred 1031 Exchange provisions in which Namco Financial Inc., and Namco Financial Exchange Corp. ("NFE" and, collectively with Namco Financial Inc., "Exchange") participated.  However, these primarily unsigned and undocumented transactions among Ezri and family members caused understandable angst for the creditors.

The practice employed by the Namvar Relatives when acquiring these LLC assets consisted of Namco initially advancing funds to acquire property for the LLC, while the ownership was

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[8] Many of the 400 LLCs are no longer functioning and hold no meaningful assets.  In fact, only a limited number hold any substantial value.

25

DOCS_LA:238119.7 59925-001

allocated to family members, mostly without the benefit of intercompany notes or other legal evidence of transfer. Subsequently, the property often increased in value sufficiently to allow for refinancing, often at the height of the real estate market, which often allowed Namco to be paid back for its original capital investment, with interest. This refinancing not only allowed Namco to receive a return of its capital but also allowed the participating Namvar Relatives to withdraw millions of dollars in tax free funds. When these properties were ultimately sold, profits were often rolled over into new property under the 1031 Exchange provisions. The flow of funds and granting of ownership was often completed and altered in a selective fashion, allowing family members to retain those properties with the most value.

In January 1999, Namco had total investments of approximately $48.2 million, of which $34.3 million, or 70%, represented investments in Namvar Relatives-related entities and $13.9 million to non-Namvar individuals and entities. By October 2001, Namco had total investments of approximately $57.8 million of which $40.3 million, or 70%, represented money invested in or advanced to Namvar Relatives or to entities in which Namvar Relatives had an ownership interest. The remaining $17.5 million was due from non-related individuals and entities. Beginning in late 2001 through December 2005 the total investments exploded to $505.6 million, the bulk of which was allocated to the Namvar Relatives. As of December 2008, Namvar Relatives/related LLCs represented almost 90%, or $523.9 million, of the total outstanding investments of $588.2 million.

From the period 1999 through 2001, Namco incurred annual operating losses of approximately $600,000 to $700,000 a year. From 2002 through 2004, Namco operated at a profit. However, from 2005 through the Petition Date, Namco incurred significant losses as Namco's operating expenses increased significantly from 1999 through 2007. As the financial situation worsened, Ezri became primarily concerned with four matters: (a) the outstanding obligations to Exchange (which funds were supposed to be strictly maintained on a fiduciary basis), (b) some of the bank debt (which often contained personal guarantees), (c) a number of other 1031 Exchange intermediaries who had dealings with Namco, and (d) a small group of creditors who, for whatever reason, may have been able to exert pressure on Ezri to repay their debts. To further compound the financial predicament during that period, Ezri decided prior to bankruptcy to create fictitious debt on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

26

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

many of the properties and numerous assignments of this debt as well as voluminous assignments of ownership interests in the LLCs which own the properties.  In many instances there are multiple assignments of the same debt or ownership interests.  There are over a hundred such assignments.  The filing of the involuntary bankruptcy petitions and the subsequent elimination of Ezri's control over Namco and certain of the LLC's substantially eliminated his ability to continue these kinds of activities and his ability to favor some creditors over others.

### 2.    Ezri Namvar

Ezri Namvar moved to the United States from Iran in 1969 to study electrical engineering at the University of Kansas.  Upon graduation in 1974, he moved to Los Angeles and obtained an MBA from UCLA in 1976. The remainder of his family, including his brothers,[9] ultimately followed him to the United States and subsequently settled in the Los Angeles area.

According to Ezri, Eilel Namvar, Ezri's father, was the largest Jewish land owner in Iran.  In addition to his land holdings, Eilel Namvar was reportedly a well-established hard money lender[10] in Iran. In 1980, following the seizure of his land and other holdings, Eilel, along with many other Iranian Jews escaping the new Islamic republic, moved to the United States and settled in the Los Angeles area.

The Namvar family continued the practice of hard money lending in Los Angeles, often utilizing contacts which Eilel Namvar had acquired in Iran.  The practice of hard money lending with its less restrictive environment found fertile ground among the Iranian Jewish population in the Westside of Los Angeles and Ezri and the Namvar-related companies, including Namco, found financial success in this structure.  Reportedly, Namco raised funds, at least initially, based on Eilel's relationships and reputation.  However, Ezri developed his own reputation by becoming deeply involved with the Persian Jewish community, the Orthodox Jewish community and through family

---

[9] The Namvar brother are Maghadam "Ezri" Namvar, Mousa Namvar, Homayoun "Tony" Namvar, Hooshang "Sean" Namvar and Ramin Namvar.

[10] The term "hard money lending" is used to describe loans made by lending companies that provide non-traditional loans that are not based upon traditional underwriting guidelines such as those utilized by banks. Such loans do not undergo the normal verification process of a regulated financial institution.  The loans are often not as well documented as traditional loans, have higher interest rates, and correspondingly may have higher default rates. Most of the collateral for hard money lending is based in real estate.

27

donations of large amounts of money to Jewish causes, all of which placed Ezri in a position of trust in the Persian Jewish community. That status, coupled with an established pattern of returning a reasonable and consistent rate of return to those who entrusted their funds to Namco, generated an enviable platform for the formation of wealth for Ezri and his family members.

This investment arrangement continued unabated for a number of years until approximately 1997, when Ezri made the decision to move from the standard hard money lending structure, which had generated moderate returns, into a more participatory equity structure with a greater upside possibilities. Ezri began by investing in smaller income-producing properties in the expanding real estate market. After realizing a few dramatic gains, Ezri fully committed the increasing financial resources of Namco into large real estate projects in California, Arizona and Nevada as well as in other places throughout the United States. Unfortunately for those who had relied on Ezri to prudently invest their funds, the economy contracted severely and the promise of heady returns and spectacular gains evaporated in what has become the largest financial downturn in recent memory. This headlong fall has decimated the lives of hundreds of creditors, some of whom find that their entire life savings has evaporated in this nightmarish experience.

Prior to the order for relief in the Namco case, Ezri acted as the president, chief financial officer, director and sole shareholder of Namco.[11] He was also the president, director and 100% owner of NFE, a "qualified intermediary" for "1031 exchanges" of real property, which defer a taxable event under the Internal Revenue Code for dispositions of real property. Additionally, he was the chairman of the board of directors and majority owner of Security Pacific Bancorp ("Bancorp"), which owned Security Pacific Bank f/k/a Golden Pacific Bank, a California-chartered bank ("Security Pacific Bank").[12] Each of these businesses is either in bankruptcy or was in an FDIC receivership (Security Pacific Bank).

---

[11] Ezri remains the registered stockholder in each of his corporations but the corporation's stock belongs to the Ezri Estate, which is administered by the Ezri Trustee.

[12] Security Pacific Bank is not Security Pacific National Bank, which was acquired by Bank of America in 1992.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 3. **Namco**

Since its inception, Namco has been one of the principal repositories for funds solicited by Ezri primarily from the Persian Jewish community in Los Angeles.  For many years, creditors advanced funds to Namco and, in turn, received regular monthly interest checks.  Namco's profit was derived from the difference between the interest Namco paid to creditors and the interest charged to those to whom Namco loaned money.  This economic model proved very successful for Ezri.

In 1997, Ezri chose to diversify into direct equity real estate investments and, along with other similarly situated investors, recognized substantial gains.  Most, if not all, of the properties involved in his early successes were located in Southern California, and principally in the Los Angeles area.  They were income-producing properties: mostly small apartment buildings, a medical office building, ground leases and other commercial real estate.  Vacant land intended for development was not part of the early acquisition process.

Approximately in 2002, flush with burgeoning profits and the seemingly endless availability of investment capital, Ezri launched into a real estate buying frenzy. The total amounts invested and owing to outside parties increased from approximately $100 million in 2002 to over $600 million in 2008.  As stated above, with the exception of the Hotel Angeleno, which was purchased in 2002, the majority of the properties in the Namvar/Namco portfolio as of the relevant Petition Date were acquired between 2004 and 2008, at the height of the real estate boom.  The properties were of every kind, size and description; hotels, rural residential development property, agricultural property with no entitlements, an equestrian center, pistachio farms, shopping centers, land to be developed into shopping centers, a trailer park, storage facilities, small apartment properties, small strip centers in marginal areas, single family residences, conference center sites, property to be developed into golf courses, ground leases, medical office buildings, and government-assisted housing projects.  In fact, most, if not all, of the properties were not purchased following a thoughtful period of due diligence or upon the advice of financial advisors with property-specific expertise, but upon the recommendation of brokers or finders with a vested interest in convincing Ezri to acquire the property.  The Trustees and their professionals have not located a single market or feasibility study

29

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

in the files of Namco, nor any other significant due diligence material which normally form the basis for evaluating a potential real estate project.

At the time of the filing of these bankruptcy Cases, the investments were spread through approximately 400 LLCs covering an extremely wide array of divergent assets throughout the entire United States.

### 4.     Real Estate Market Downturn

As the real estate market started to reveal the first sign of cracks in the façade, Ezri seemed oblivious to the possibility of serious losses. In the face of what was becoming a very serious economic crisis, Ezri continued to indiscriminately pour increasing sums of money into failing projects rather than take corrective action to stem the losses.  In essence, Ezri made unwise investments then "doubled down" at the worst possible time. Also, either at the time of acquisition or shortly thereafter, under the presumption of ever increasing real estate values, the properties were routinely highly leveraged, thereby rendering them especially vulnerable to any diminution of value. In many instances, in order to gain an even higher degree of leverage, Ezri personally guaranteed the debt, and in so doing, further imperiled Namco's economic viability.  Finally, as is the case in most "bubble" contractions, this high leverage and lack of liquidity turned out to be a critical factor in the collapse of the Namco/Namvar portfolio.

In addition to the interest payments on these highly leveraged assets, Namco interest payments on the borrowed funds from creditors also experienced a dramatic increase as the principal indebtedness swelled from $100 million in 2002 to over $600 million in 2008.  With the estimated debt structure of $600,000,000 and the approximate interest rate of 7.5%,[13] Namco was required to pay the projected annual sum of $45,000,000 just to cover investor interest payments and all of this occurred at a time of dwindling income from real estate investments.  In addition to these payments, the portfolio required the infusion of millions of dollars in debt, tax, insurance and entitlement payments to groom the properties for development.  Instead of competently managing his portfolio of assets to weather the substantial downturn, Ezri refused many opportunities to sell assets during

---

[13] The interest rates during the period under review ranged from 5% to 9% with an often unexplained divergence between seemingly similar investors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

30

1  crucial periods which would have substantially reduced the losses which face the creditors in the

2  Cases.

3  **5.    Foreclosures**

4      A significant component of the Namvar/Namco real estate portfolio consisted of thousands of

5  acres of vacant land in Nevada, Arizona and California.  These properties were acquired for the

6  ostensible purpose of obtaining entitlements for residential development in what then seemed an

7  insatiable demand for new homes. However, when the residential market collapsed, Ezri faced

8  hundreds of millions of dollars of debt on non-performing, highly leveraged property which had to

9  be serviced or face ultimate foreclosure.  Unfortunately, due to the acquisition of these properties at

10  the height of the market, whatever modest amount of equity which may have existed at one point in

11  time quickly evaporated. There was also little or no income from the balance of the properties in the

12  portfolio with which to service the mounting debt.  As a result of these factors, over $550 million[14]

13  of raw land and other property has already been, or is expected to be, foreclosed.

14  **6.    Namvar Relatives LLCs**

15      Eighty percent (80%) of the Debtors' affiliated LLC's ownership falls either in part or in

16  whole to Ezri and his related family members, including children, wives, brothers, aunts, uncles,

17  nephews, nieces, etc.  In the preponderance o these investments, the Namvar Relatives put up little

18  or no initial capital to secure their interests and rarely assumed personal liability for the debts

19  associated with the property.  This communal family ownership structure was probably the model

20  utilized for years by Ezri and his family while they were engaged in the hard asset money lending

21  business and accordingly did not change substantially from the years when hard money lending was

22  the primary source of business.

23      Namco would initially advance funds to acquire property in the LLC, the ownership of which

24  was allocated to family members, mostly without the benefit of intercompany notes or other legal

25  evidences of transfer. Subsequently, the property often increased in value sufficiently to allow for

26  refinancing, often at the height of the real estate market, which often allowed Namco to be paid back

27  for its original capital investment, with interest.  This refinancing not only allowed Namco to receive

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[14] These sums represents the entire purchase price of the property, not the amount invested or lost in the property by Ezri.

31

1   a return of its capital but also allowed the participating family members to withdraw millions of

2   dollars in tax free funds.  When the property was ultimately sold, profits were often rolled over into

3   new property under the 1031 Exchange provisions.  The flow of funds and granting of ownership

4   was often completed and altered in a selective fashion, allowing family members to retain those

5   properties with the most value.

6       **7.       Security Pacific Bank and Namco Investments**

7           In or about 1997, Ezri acquired a majority interest in Security Pacific Bancorp, Los Angeles,

8   California ("Bancorp"), a registered bank holding company that owned and controlled Golden

9   Pacific Bank, among other things.  In 2005, Golden Pacific Bank became known as Security Pacific

10  Bank, Los Angeles, California ("Security Pacific Bank").  The name Security Pacific had been out of

11  use after Bank of America's 1992 purchase of Security Pacific National Bank.  Security Pacific

12  Bank has no relation to Security Pacific National Bank.

13          Ezri was the majority shareholder and Chairman of the Board of Directors of Bancorp.  All

14  four of Ezri's brothers, his three sisters, three of his children and the Namvar Family Trust held

15  interests in the shares of Bancorp, as well.  Security Pacific Bank was a state chartered bank in

16  California.  Security Pacific Bank was headquartered at the Wilshire Bundy building, 12121

17  Wilshire Boulevard, in West Los Angeles, which was also the headquarters of Namco.  Security

18  Pacific Bank had four branches in Southern California.

19          On August 14, 2008, Bancorp entered into an agreement with the Federal Reserve Bank of

20  San Francisco to address concerns related to Security Pacific Bank's insufficient capital.  On

21  November 7, 2008, the California Department of Financial Institutions closed Security Pacific Bank

22  due to its inadequate capital.  Security Pacific is believed to have had a large portion of outstanding

23  loans in real estate acquisition, development, and construction in the Los Angeles and Inland Empire

24  areas of California.  As part of the bank closure, the Federal Deposit Insurance Corporation

25  ("FDIC") was named as Receiver.  The FDIC states that as of October 17, 2008, Security Pacific

26  Bank had total assets of $561.1 million and total deposits of $450.1 million.

27          The early financial records of Namco and Ezri relating to the acquisition and capital

28  infusions for Security Pacific Bank indicate that as of December 26, 2002, the Namvar Relatives

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

owned 95 shares of pre-split stock.  Non-Namvar individuals/entities owned 3 shares.  The total

stock value was $8,174,322.  Between December 26 and December 31, 2002, an additional 20

shares were purchased by the Namvar Relatives for $2,384,342.  Between 2002 and 2008, Ezri and

other Namvar family members (and non-Namvar family members) acquired additional shares, which

purchases were sometimes funded by Namco.  On July 30, 2008, 3½ months prior to the closure of

the bank by the FDIC, Ezri  purchased 1,860,468 shares of stock for $3.5 million, which was

advanced by Namco.  On August 29, 2008, Namco advanced $2.965 million.  This amount was

credited for the benefit of Trisisters, LLC, owned equally by Ezri's three sisters.  Both of these

transactions occurred just a few months before the takeover by the FDIC and the Namco bankruptcy.

    The total purchase value of stock in Security Pacific Bank was $52.763 million.  Namco

directly advanced $27.013 million of this amount from late 2002 through the petition date.  Namco

indirectly advanced an additional $3.88 million to Ezri and Mousa Namvar, which was used to

purchase Security Pacific Bank stock.  The loss to the Namco creditors during this period is at least

the $30.893 million from both direct and indirect payments.

## 8.    Namco Financed Real Property Interests

### a.    Vacant Land Developments

    Ezri made major investments in thousands of acres of vacant land in California, Arizona and

Nevada for the purpose of obtaining entitlements which would permit the development of single-

family homes and/or condominiums.  The properties were either vacant and fallow land, or in some

instances, farmland.  Most were located in rural areas far from urban centers.  These properties were

bought solely on the recommendation of brokers or finders who would earn a fee on the acquisition

and in many instances remain in the development as partners.  Many millions of dollars were spent

on the acquisition of these properties and many millions more spent on the entitlement process and

carrying costs.  However, it does not appear that a single project was ever fully entitled and sold.

Again, Ezri completed these acquisitions at the height of the real estate boom.  Following the

inevitable market downturn these properties were so highly leveraged that there were simply no

available remedies to salvage the properties and to weather the downturn in the market.  As a result,

most, if not all, of these properties have been foreclosed upon or notices of default have been

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

recorded.  In some instances lenders have instituted foreclosure proceedings but failed to complete the foreclosures simply because they have no idea what to do with the property and they do not want to be responsible for taxes and insurance.

**b.**     **Development Properties in Las Vegas**

Between 2005 and 2007, Ezri was a major player in property acquisition in Las Vegas.  He bought properties at tremendously high prices with the intention of developing residential condominiums, casinos, shopping centers and apartment projects.  These properties were acquired at the apex of the Vegas real estate expansion and with no plan to weather any kind of economic downturn.  These properties were all very highly leveraged and accordingly had enormous debt service with little or no income to support the debt service, taxes and insurance.  Millions of dollars were spent on infrastructure plans and entitlements, but little or nothing was accomplished.  No properties were fully entitled and no project was ever started, let alone completed.  Millions of dollars have been lost since most of these properties have been foreclosed or are in the process of foreclosure.  The losses are in excess of $75,000,000 on the listed properties and there may be more losses in the future.

**c.**     **Namwest Investments**

Between 2004 and 2008, the books and records of Namco and Beshmada reflect that they collectively invested/loaned over $61 million to Namwest, LLC, and its related entities. Namwest, LLC is a Delaware limited liability company.  SWB Enterprises, LLC is the manager of Namwest and holds 50% of the member interests.  The principal of SWB is Michael McBride. Beshmada owns the balance of the member interests in Namwest.

The monies advanced by Namco and Beshmada to Namwest were used to acquire, among other properties, the Cal Neva Resort, a 219-room hotel and casino located in the North Lake Tahoe area; a Crowne Plaza Hotel in Niagara Falls, New York; a development in Park City, Utah; a proposed hotel, condo and golf course project in West Deptford, New Jersey (across the river from Philadelphia); and undeveloped real property in Tempe, Arizona known as the Town Lakes project. Namwest and certain Namwest affiliated entities filed chapter 11 bankruptcy cases in Arizona on or about October 9, 2008.

34

Since the bankruptcy filings, the Cal Neva, Park City and Niagara Falls properties have been lost due to foreclosure.  The Riverwinds properties were embroiled in litigation with the Township of West Deptford at the time the bankruptcy cases commenced.  After the cases were commenced, settlement negotiations ensued and a settlement was reached.  Under the terms of the settlement, the real properties were reconveyed to the Township of West Depford (the "Township") in exchange for an agreement by the Township to pay $625,000 to Beshmada DE from the proceeds of the Township's first resale of any portion of the property.  The settlement is embodied in a Settlement Agreement approved by the Bankruptcy Court, by its Order entered on September 24, 2010.

Any other properties acquired have been foreclosed upon or returned to the senior lender pursuant to a settlement agreement approved in the Namwest bankruptcy case.  The only remaining property of value in the Namwest bankruptcy cases is the Town Lakes property, the disposition of which is set forth below.  Other than the return they may receive on account of the Town Lakes properties, the Namco, Ezri and Beshmada Estates do not expect to receive any return or distribution from the Namwest bankruptcy cases.  Notwithstanding, Namco and/or Beshmada have claims against SWB (guaranteed by McBride) to equalize the capital contributions made to Namwest as between SWB and Beshmada.  Beshmada and the bankruptcy estates intend to vigorously pursue such claims.

As for the Town Lakes properties, there are two parcels, generally referred to as Town Lakes I ("NTL") and Town Lakes II ("NTL II").  On the Petition Date, NTL was owned by Namwest Town Lakes, LLC, which is not part of the Namwest bankruptcy proceedings.  The sole member of Namwest Town Lakes, LLC is Woodman, LLC.  The manager of Woodman, LLC is Hooshang (Sean) Namvar.  The members of Woodman, LLC are the siblings and children of Ezri.  The Town Lakes I parcel consists of approximately 11 acres of undeveloped real property in Tempe, Arizona designated for mixed use.  On the Petition Date, the Town Lakes II parcel was owned by Namwest-Town Lakes II, LLC, which was in turn wholly owned by Namwest, both of which entities are part of the Namwest bankruptcy proceedings.  The Town Lakes II parcel is adjacent to the Town Lakes I parcel and consists of approximately 5 acres of undeveloped property for mixed use.  The Town Lakes II parcel is encumbered by notes and deeds of trust in favor of Namco, one in the amount of

35

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

$6 million and another in the amount of $13 million (the $13 million note includes and otherwise "wraps" the $6 million note).

The Namco Estate obtained title to the NTL property on or about April 19, 2010.  The NTL property was then transferred to Roya Boucherian ("Boucherian") – a creditor of Namco and the assignee of a $27 million note and deed of trust executed by NTL in favor of Namco –  by order of the Bankruptcy Court dated June 29, 2010, in exchange for a cash payment of $2.2 million up front and as much as $4,350,000 based upon any subsequent sale of the property. .

On or about January 28, 2010, the bankruptcy court having jurisdiction over the Namwest bankruptcy case approved a settlement between Boucherian and NTL II whereby Boucherian will obtain title to the NTL II property.  This settlement, among other factors, significantly enhances the possibility that the NTL and NTL II properties will be sold prior to a June 30, 2014 "drop dead" date, increasing the possibility for the Namco estate to realize the full $6,550,000 benefit of a settlement between Namco and Boucherian.[15]

Unfortunately, after the Boucherian-Namwest settlement, there are no material assets remaining in the Namwest bankruptcy cases.  Accordingly, it appears likely that the losses suffered by Namco and Beshmada in connection with its loans and investments with the Namwest-related entities will exceed $50 million.

**B.    Ezri Indictment and Conviction**

On September 21, 2010, Ezri and Hamid Tabatabai ("Tabatabai"), the Controller and Vice-President of Exchange and holder of similar positions at Namco, were indicted by a federal Grand Jury in the United States District Court for the Central District of California.  The indictment alleges that, between March and December 2008, Ezri and Tabatabai participated in a scheme to defraud clients seeking to implement 1031 Exchanges.  The indictment alleges that Ezri and Tabatabai would offer Exchange's services as a qualified intermediary in exchange for a fixed fee.  Under the typical arrangement, Exchange was to hold the proceeds of real property sales held for exchange in one or more accounts until needed to effectuate the 1031 Exchange transaction.  The original indictment

---

[15] The settlement with Boucherian is also described below.

1  identified five separate exchange transactions.  Ultimately, four separate exchange transactions were

2  identified.

3  Instead of holding the proceeds in one or more secure accounts, the indictment alleges that

4  Ezri, with the assistance of Tabatabai, would use client proceeds for a variety of purposes unrelated

5  to the clients' 1031 Exchange transactions and of which the clients were completely unaware.

6  Among other misrepresentations, the indictment mentions that Tabatabai would send clients letters

7  confirming that their funds were on deposit and available on demand to effectuate the 1031

8  Exchanges when, in fact, the funds had been removed and used for other purposes.  Client funds

9  allegedly found their way to a Namco bank account, to pay Namco's expenses and liabilities, and to

10  individuals to whom Ezri or Namco owed money.  The indictment alleges that of the $27 million in

11  exchange proceeds provided by the identified clients, only $4 million were returned or used in

12  connection with the clients' 1031 Exchanges.  The ultimate indictment alleges four counts of wire

13  fraud and aiding and abetting such wire fraud.

14  On May 19, 2011, a federal jury found Ezri and Tabatabai guilty of all four counts of wire

15  fraud.  According to the Office of the United States Attorney, Ezri faces a statutory maximum of 80

16  years in prison.  His sentencing is scheduled for August 22, 2011.

17  **C.**    **Creditor Claims:  Summaries of Secured, Priority  and Unsecured Claims**

18  Attached as **Exhibit "7"** are charts (the "Claims Charts") listing Secured, Priority and

19  Unsecured Claims asserted against each of the Debtors, including Inter-Debtor Claims, that was

20  prepared based on review of Scheduled and Filed Claims in the Cases as of the date of the filing of

21  this Disclosure Statement.[16]  The lists in the Claims Charts break-out the separately Classified

22  Contingent Guaranty Claims, Disputed Guaranty Claims, and Convenience Class Claims under the

23  Plan.

24

25

---

[16] While an attempt has been made to list all Scheduled and Filed  Secured and Unsecured Claims asserted against each
26  of the Debtors in the Claims Charts, there may be Claims that were missed and not included and the Claims Charts
remain subject to further review and update.  The amounts set forth on the Claims Charts are amounts alleged or asserted
27  and, except in instances where a Claim has been Allowed, do not reflect the Allowed amounts of the Claims listed
therein.  In addition, there are a number of claims which were filed in unliquidated amounts and the Claims Charts
28  include a number of Claims which appears to be duplicate Claims and therefore the Claims totals on the Claims Charts
are not an accurate representation of the total dollar amount of Claims asserted against each of the Debtors.

37

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Estimates of the Allowed amount of Scheduled and Filed Claims against each of the Debtors are set forth in the description of the Debtors liabilities in Section II. G. below.  The Claims totals therein are estimated based on the Proponent's current analysis which is on ongoing and also subject to negotiations and adjudication of Claims Objections under the Plan and  the actual amount of the Allowed Claims in each of the identified Classes may be materially different.  The estimate of Allowed Claims has been used by Proponents in the estimate of dividends to Creditors.

**D.    Significant Assets**

**1.    In General**

The Debtors' Assets primarily include (i) Cash, (ii)  promissory notes and contractual rights to payments, (iii) direct interests in real property, (iv) interests in LLCs and Partnerships or other entities with direct and indirect  interests in real property or other assets, (v) interests in LLCs and real property that were formerly owned by a Debtor that were transferred to other parties that are the subject of pending litigation to void the transfers that are identified as non-cash Assets, (vi) undocumented interests in LLCs or real property, and (vii) Litigation Rights, certain of which may involve identified non-Cash assets.

**2.    Cash**

As of May 31, 2011, the Debtors held a total of approximately $1.3 million in Cash not encumbered by any Liens, claims or other interests and an additional approximately $36.9 million of restricted Cash subject to asserted Liens, claims or interests of other parties.  The primary sources of Cash currently held by the Debtors are proceeds from the sale of the Wilshire Bundy Property, sales of other real estate assets, sale of other assets, rental income, collections of accounts receivable and settlement payments from other parties.

The unrestricted and restricted Cash held by each of the Debtors as of May 31, 2011 is set forth below.

|  | Unrestricted Cash | Restricted Cash | Total Cash |
|---|---|---|---|
| Namco | $781,499 | $2,074,880 | $2,856,378 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

| | | | |
|---|---|---|---|
| Ezri[17] | 337,320 | 27,453,392 | 27,790,712 |
| Beshmada | 105,571 | 6,429,175 | 6,534,746 |
| Beshmada of DE | 30,858 | - | 30,858 |
| Dimes | - | 892,616 | 892,616 |
| Total Cash | $1,255,248 | $36,850,061 | $38,105,310 |

### 3.  Real Property and Other Non-Cash Assets

Attached hereto as **Exhibit "5"** is a chart setting forth the primary non-Cash Assets of each of the Debtors, exclusive of Inter-Debtor Claims and Litigation Rights described below.  **Exhibit "5"** includes certain identified interests in LLCs and real property that were formerly owned by a Debtor that were transferred to other parties that are currently the subject of pending litigation to void the transfers.

### 4.  Litigation Rights

The Trustees and DIP Debtors have filed actions against numerous parties as set forth on **Exhibit "6"** hereto.  At this juncture, the Debtors cannot accurately estimate the potential recoveries from the actions listed in such exhibit or which may be brought in the future.

### E.  Events Leading to the Bankruptcy Filings

During 2004, 2005 and into 2006, Ezri's acquisition of real property, and particularly non-performing or under-performing properties, sky rocketed and expenses began to exceed revenues. As shown below, the difference between interest income and interest expense crossed over in April 2006 and increased in intensity until the end of 2008.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[17] The amounts shown do not include amounts withheld pursuant to FIRPTA and CalFIRPTA relating to the sale of Wilshire Bundy Plaza in the amounts of $11.1 million and $3,696,300 held by the Internal Revenue Service and Franchise Tax Board, respectively.

39



Diagram 2
Namco/Ezri Namvar Bakruptcy Estates
Int. Earned vs Int. Paid

Unfortunately, these circumstances made the continuation of the enterprise impossible. Beginning in late 2006, amounts owed to creditors exceeded the total investment balance. Between late 2006 and the Petition Date amounts due to creditors exceeded investment balances by approximately $40 million to $50 million.

As the financial situation worsened, it became apparent that Ezri was mostly concerned about the outstanding obligations to Exchange (which funds were supposed to be strictly maintained on a fiduciary basis), some of the bank debt (which often contained personal guarantees), a number of other 1031 Exchange intermediaries who had dealings with Namco, and a small group of creditors who, for whatever reason, may have been able to exert pressure on Ezri to repay their debts or had other relationships that resulted in their being in a favored group. Ezri sought to repay this favored group of creditors (or, at a minimum, stop on-going losses of value of their investments) through various property sales, and assigned interests of one kind or another in the most valuable properties in the real estate portfolio to a certain group of preferred creditors to the detriment of the rest of the creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**F.**     **Commencement of Chapter 11 Cases**

Commencement of each of the Cases is discussed in section I.A.1 above.  As stated above, involuntary chapter 11 petitions were filed against Ezri and Namco on December 22, 2008, and Sharp filed involuntary chapter 11 petitions against each of the DIP Debtors on June 19, 2009.

**IV.**

**SIGNIFICANT POSTPETITION EVENTS**

Copies of all relevant court papers are on file with the Bankruptcy Court and certain can be obtained free of charge by accessing the Namco- Namvar website at http://www.namvar-namco-bankruptcy.com/.

Since the Petition Date, significant events in the Cases have included the following:[18]

**A.**     **Ezri and Namco Cases**

     **1.**     **Entries of Order for Relief**

On January 28, 2009, Ezri filed a notice of consent and request for order for relief in the Ezri Case.  On January 29, 2009, the Bankruptcy Court entered its order for relief in the Ezri Case.  On the same date that Ezri consented to the commencement of his case (January 28, 2009), Namco filed a notice of consent and request for order for relief in the Namco Case.  On January 29, 2009, the Bankruptcy Court entered its order for relief in the Namco Case.

     **2.**     **Appointment of Trustees and Committee, and Retention of Professionals**

         **a.**     **Appointment of Trustees**

On January 15, 2009, the Petitioning Creditors filed motions seeking the appointment of interim trustees in the Ezri Case and Namco Case pursuant to section 303(g) of the Bankruptcy Code, which provides for the appointment of an interim trustee after the commencement of an involuntary case under the Bankruptcy Code but before an order for relief is entered to preserve property of the estate or prevent a loss to the estate.  On January 30, 2009, after the entry of the order for relief in the Ezri Case, the Petitioning Creditors filed a motion for appointment of a chapter 11 trustee alleging Ezri's inappropriate transfers of assets and conflicts of interest, and because of a

---

[18] Exhibit "7" to this Disclosure Statement summarizes the litigation to which any of the Trustees or DIP Debtors are parties.  Certain significant litigation is summarized in such exhibit rather than in this Article III of the Disclosure Statement.

41

1    potential criminal investigation of Ezri (which motion was joined by another creditor).  The

2    Bankruptcy Court did not rule on the Petitioning Creditors' motions.

3        On January 21, 2009, the U.S. Trustee filed motions in the Ezri Case and Namco Case to

4    appoint a trustee (or, in the alternative, an examiner) in each such case, alleging mismanagement,

5    fraud and the preference of some creditors over others (which motion was joined by a creditor).  On

6    February 27, 2009, the Bankruptcy Court entered its order approving the U.S. Trustee's motion and

7    directed the appointment of a trustee in the Ezri Case, and on March 9, 2009, the Bankruptcy Court

8    entered an order appointing Neilson as Ezri Trustee.

9        On March 24, 2009, a creditor sought a trustee election in the Ezri Case and, on April 24,

10    2009, Neilson was elected by creditors as chapter 11 trustee over another candidate.  On May 22,

11    2009, the U.S. Trustee filed a notice of disputed election, and on July 7, 2009, the Bankruptcy Court

12    entered an order finding that Neilson had been elected as the Ezri Trustee.

13        On May 1, 2009, the Bankruptcy Court entered its order approving the motion of the U.S.

14    Trustee for an order directing appointment of a chapter 11 trustee in the Namco Case.  On May 5,

15    2009, the U.S. Trustee filed an application for an order appointing Sharp as the Namco Trustee, and

16    on May 8, 2009, the Bankruptcy Court entered an order approving Sharp as the Namco Trustee.

17        **b.**    **Appointment and Compositions of Committees**

18        On February 13, 2009, the U.S. Trustee appointed the Ezri Committee, which currently

19    consists of creditors Marc Ashegian, Hersel Babajoni and Elliot Sharaby.  On February 13, 2009, the

20    U.S. Trustee appointed the Namco Committee, which currently consists of creditors Abraham B.

21    Assil Trust, Benjamin B. Efraim and Namco Financial Exchange Corporation (through its chapter 7

22    trustee Heide Kurtz).

23        On December 21, 2010, the Ezri Trustee and the Namco Trustee each filed a joint status

24    report regarding the composition of the Ezri Committee and the Namco Committee, and requesting a

25    status conference thereon with the Bankruptcy Court.  The Trustees stated in their joint report that

26    (a) certain members of the Namco Committee had provided confidential information to Ezri

27    concerning the GH Capital/Meadow Run Settlement (discussed in the Namco Case below); (b) that

28    Ezri was intimately involved in virtually all aspects of the Namco Committee's positions taken

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

42

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

concerning the GH Capital/Meadow Run Settlement and the offer by Shakib (discussed below); and (c) Ezri has been directly involved in various other material matters and positions taken by the Namco Committee.  After the Trustees consulted with the US Trustee, two members of the Namco Committee (John Farhamy and Joseph Ghadir) resigned from the Namco Committee, without admitting any wrongdoing.  The Trustees, after consulting the US Trustee, made a formal request to each of the Committees that each remaining members of the Committees produce all their communications with Ezri or his family concerning Namco, Namco Financial Exchange, Inc. and the Ezri bankruptcy case from the date they were appointed to their respective Committee.  The Trustees stated further that the filing of a chapter 11 plan by the Trustees was being held in abeyance pending the outcome of the production by the Committee members because plan discussions with the Committees at that time included potentially having the Committees provide oversight to the two separate entities that would hold real estate assets and litigation assets, respectively, under the contemplated chapter 11 plan.

On January 31, 2011 (in the Ezri Case) and January 27, 2011 (in the Namco Case), the Ezri Committee and Namco Committee filed a joint response to the Trustee's joint status report, stating (among other things) that the Trustees were aware that members of the Committees were in contact with Ezri, members of the Committees had not known that Joseph Ghadir had provided a confidential document to Ezri until the relevant email was produced to the Trustees, the members of the Committees would voluntarily provide their emails to and from Ezri to the Trustees, and the Committees would file their own chapter 11 plans.

On February 3, 2011, the Ezri Trustee and the Namco Trustee filed a notice of hearing on a joint status report of the Trustees regarding the composition of the Ezri Committee and the Namco Committee.  On February 16, 2011, the Trustees filed a preliminary status report in advance of hearing advising the Bankruptcy Court that the Trustees and Committees had scheduled a meeting to discuss the issues set forth in the status reports.  On February 18, 2011, the Trustees filed a second preliminary status report in advance of hearing, in which they advised the Bankruptcy Court that the Trustees and Committees were very close to consensually resolving the issues concerning the chapter 11 plan process set out in the initial status reports filed by the Trustees and Committees.

43

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    However, plan negotiations with Committees terminated after unsuccessful mediation, and on March

2    31, 2011, each Committee filed a joint chapter 11 plan (the "Committees Plan") and related

3    disclosure statement (the "Committees Disclosure Statement" in their respective Cases.

### c.    Retention of Professionals

5    In order to capitalize on the familiarity and "institutional" knowledge of certain professionals

6    and limit the fees and costs incurred in the administration of the Estates, certain professionals have

7    been employed in two or more of the Cases.  The Ezri Trustee retained as counsel:  (i) Danning, Gill,

8    Diamond & Kollitz, LLP as general bankruptcy counsel; (ii) Pachulski Stang Ziehl & Jones LLP

9    ("PSZJ") as special counsel to address certain real estate and other specialized matters, prosecute

10   and defend various litigation and to draft a joint plan and disclosure statement with the Namco

11   Trustee and the New Manager (defined below) for Beshmada, Beshmada of DE and Dimes (PSZJ

12   was also retained by the Namco Trustee for the same purpose); (iii) Jones Day as special tax counsel

13   to address, among other things, 1031 exchange issues; and (iv) Elmer Dean Martin III as special tax

14   counsel.

15   The Ezri Trustee also retained accounting firm LECG, LLC, where the Ezri Trustee was

16   employed (which was also retained by the Namco Trustee).  On May 19, 2011, the Bankruptcy

17   Court entered an order approving the Ezri Trustee's application to employ Berkeley Research Group,

18   LLC (the Ezri Trustee's new employer) as successor accountants and financial consultants for the

19   Ezri Trustee effective March 1, 2011.  Additionally, the Ezri Trustee retained various real estate

20   brokers.  On June 16, 2011, the Ezri Trustee filed an application to employ Intelligent Discovery

21   Solutions, Inc. as a consultant regarding electronically stored information.

22   The Ezri Committee retained Shulman Hodges & Bastian, LLP as general bankruptcy

23   counsel.  It also retained Alvarez & Marsal as financial advisor and Moore Stephens Wurth Frazer

24   and Torbet LLP as accountants.

25   Ezri retained the Law Offices of Stephen Biegenzahn as his counsel.

26   The Namco Trustee retained as counsel:  (i) Jeffer, Mangels, Butler & Mitchell, LLP as

27   general bankruptcy counsel; (ii) PSZJ as special counsel to prosecute and defend litigation and to

28   draft a joint plan and disclosure statement with the Ezri Trustee and the New Manager, as manager

44

for Beshmada, Beshmada of DE and Dimes, among other specialized matters; (iii) Jones Day as

special tax counsel to address, among other things, 1031 exchange issues; (iv) Ezra Brutzkus

Gubner, LLP as special counsel; (v) Stinson Morrison Hecker LLP as special bankruptcy counsel

(addressing Namwest, which is discussed below); (vi) Neufeld Law Group as special litigation

counsel (which had been special counsel to Namco); (vii) Peitzman Weg & Kempinsky, LLP as

special counsel (which had been general bankruptcy co-counsel to Namco); and (viii) Nicholas F.

Klein as special real estate counsel (who had been special real estate counsel to Namco).  The

Namco Trustee also retained accounting firm LECG, LLC (replaced by Berkeley Research Group,

LLC by order entered June 6, 2011), and financial advisor Development Specialists Inc.

Additionally, as stated above, the Namco Trustee retained various real estate brokers.

The Namco Committee retained (i) Creim, Macias, Koenig & Frey, LLP as general

bankruptcy counsel and (ii) The Lobel Firm as global settlement and plan counsel.  It also retained

FTI Consulting, Inc. as financial advisor.

Namco had retained Peitzman, Weg & Kempinsky LLP and Baker & McKenzie, LLP as

general bankruptcy co-counsel, and Nicholas F. Klein as special real estate counsel.  As discussed

above under the Ezri Case, the Bankruptcy Court denied Namco's retention of Crowe Horwath as

unnecessary in light of its approval of the appointment of the Namco Trustee.

The Bankruptcy Court entered orders in the Ezri Case (on November 11, 2009; March 25,

2010; and November 23, 2010) and the Namco Case (November 13, 2009; March 22, 2010; and

November 19, 2010) approving the interim fees of various professionals.  The interim fee orders

included a provision for fee sharing between the Ezri Estate and the Namco Estate, under which

allowed professionals' fees and expenses are to be paid by the estates *pro rata* from available cash

proceeds in both estates (after any unused retainers are applied by the professionals).  To the extent

that any payments by either estate are disproportionate, the estate that overpaid is provided with an

administrative priority expense claim against the estate that underpaid (but professionals are not

required to disgorge any amounts paid disproportionately by either estate).

On January 11, 2011 in the Namco Case and January 24, 2011 in the Ezri Case, the Trustees

and the Committees filed a joint application for an order authorizing employment of Squar, Milner,

45

Peterson, Miranda & Williamson LLP as Fee Examiner.  On April 19, 2011, the Bankruptcy Court

approved a stipulation between the US Trustee and the Committees withdrawing the joint

application for employment of Squar, Milner, Peterson, Miranda & Williamson LLP as Fee

Examiner.

**3.    Ezri Case Court Filings**

**a.    Ezri's "First Day" Motions**

On the day he consented to entry of an order for relief (January 28, 2009) in the Ezri Case,

Ezri filed motions for:  (a) joint administration of his case (for procedural purposes only) with the

Namco Case; (b) extension of the deadline for him to file his Schedules to March 15, 2009; (c)

approval of certain notice procedures.  On February 9, 2009, the Bankruptcy Court entered orders

approving these motions.  The joint administration order, however, was subsequently vacated by a

Bankruptcy Court order entered on June 25, 2009.

**b.    Ezri's Motion to Convert the Ezri Case to Chapter 7 and Related**

**Postpetition Earnings Settlement**

On May 13, 2009, Ezri made a motion to convert his case from a chapter 11 case to a chapter

7 case.  Objections to such motion were filed by the U.S. Trustee, the Ezri Committee and the Ezri

Trustee.  The motion was denied by order entered on June 18, 2009, which was appealed.

As set forth in a motion filed by the Ezri Trustee on August 12, 2009, the Ezri Trustee and

Ezri entered into a settlement that resolved the appeal and Ezri's concern that his postpetition

earnings would become property of the Ezri Estate under section 1115(b) of the Bankruptcy Code if

the Ezri Case remained a chapter 11 case.  The motion requested an order approving the settlement,

under which, in exchange for dismissing the appeal (and agreeing not to file another motion to

convert the Ezri Case for six months), Ezri would retain 75% of his postpetition earnings

commencing July 1, 2009, and the Ezri Estate would receive 25% of such earnings (with each being

responsible for their respective share of taxes on such income).  On September 3, 2009, the Namco

Committee filed a response requesting a 30-day continuance of the hearing on such motion in order

to convene a meeting of creditors to address the relief sought in the motion, but the Ezri Trustee

opposed such extension (with the support of the Ezri Committee).  On September 30, 2009, the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

Bankruptcy Court entered an order denying the requested continuance and granting the motion. By order entered on or about October 13, 2009, the United States District Court for the Central District of California dismissed the appeal with prejudice.

### c.    Entity Governance Events

#### i.    Ezri's Motion to Approve Agreement Between Ezri and Howard Grobstein, as Chief Restructuring Officer of Namco

On January 28, 2009, Ezri filed an emergency motion to approve an agreement between Ezri and Howard Grobstein ("Grobstein"), as Chief Restructuring Officer ("CRO") of Namco ("Ezri's Grobstein Motion"). In Ezri's Grobstein Motion, Ezri sought to approve an agreement with Grobstein under which Grobstein would manage Namco because creditors, including an informal committee of creditors formed prepetition, may have lost confidence in his ability to manage his companies' real estate portfolio.

Concurrently with the filing of Ezri's Grobstein Motion, Namco filed a motion ("Namco's Crowe Horwath Motion") for authorization to employ Grobstein's accounting firm Crowe Horwath LLP ("Crowe Horwath") as restructuring consultant and Grobstein as CRO. On February 10, 2009, Namco filed a supplement to Namco's Crowe Horwath Motion that stated (among other things) that Ezri resigned as an officer and director of Namco.[19]

The U.S. Trustee and various creditors filed objections to Ezri's Grobstein Motion and Namco's Crowe Horwath Motion (and an informal group of creditors filed responses in support of the motions). The Bankruptcy Court entered an order on March 4, 2009 in the Namco Case denying as unnecessary Namco's employment of Crowe Horwath and Grobstein due to the Bankruptcy Court's approval of the appointment of a chapter 11 trustee in the Namco Case.

#### ii.    Ezri Trustee's Motion to Control Namco

On April 17, 2009, the Ezri Trustee filed a motion for approval of a stipulation (the "Namco Governance Stipulation") with the Ezri Committee and the Namco Committee under which the Ezri

---

[19] In February of 2009, under pressure from the Namco Committee, Ezri resigned as the sole board member of Namco, and was replaced by Isaac Norman, Moiz Talei and Kam Babaoff. Shortly after his appointment, the Ezri Trustee named himself sole board member of Namco.

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Trustee would exercise Ezri's corporate governance powers as 100% shareholder of Namco and become chairman of the board of directors of Namco.  No objections were filed to this motion; however, on May 19, 2009 the motion was denied as moot because the Bankruptcy Court decided to approve the motion of the U.S. Trustee for the appointment of a chapter 11 trustee in the Namco Case.

### iii.    <u>Stipulation Transferring Control of LLCs to the New Manager</u>

On August 6, 2009, the Ezri Trustee and the Namco Trustee filed a joint motion in the Ezri Case and Namco Case, respectively, to approve a stipulation among the Ezri Trustee, the Namco Trustee, the Ezri Committee, the Namco Committee and Ezri under which Ezri agreed to:  (a) resign as manager of each of the LLCs for which he was manager or managing member; (b) vote all of the LLC membership interests he owns or controls, directly or indirectly, including those he controls in a custodial capacity, for appointment of the New Manager (Cicalese); (c) cause all of his children who reached the age of majority to vote the LLC interests they own or control, directly or indirectly, for appointment of a New Manager, as set forth below; and (d) to appoint the New Manager pursuant to the applicable LLC operating agreements (other than for LLCs in which Ezri owned more than 50% of the membership interests).  Additionally under the Stipulation, Cicalese, the sole member of the New Manager, would be retained as real estate consultant to the Ezri Trustee and Namco Trustee.

The Bankruptcy Court entered orders in the Namco Case (on August 12, 2009) and in the Ezri Case (on September 3, 2009) granting the joint motion on an interim basis (effective June 15, 2009) except as to Lacy 20, LLC ("Lacy 20"), Nasco, LLC, Parox, LLC ("Parox"), Whittier 26, LLC, Wilshire 19, LLC, Sierra Coast Development, LLC, Sierra Coast Management, LLC, SC Blossom Corners, LLC, SC EL Centro, LLC, SC Fallon, LLC and SC Longley, LLC (collectively, the "SC Entities").  On October 22, 2009, the Bankruptcy Court entered final orders in the Ezri Case and Namco Case granting the joint motion except as to the entities listed immediately above and Delson Brown Properties, LLC.  On October 12, 2010 (in the Namco Case) and October 13, 2010 (in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

the Ezri Case), the Bankruptcy Court entered orders continuing the hearing on the joint motion to February 1, 2011 (which hearing had been continued by three prior sets of orders).

On January 28, 2011, the moving parties filed a status report informing the Bankruptcy Court that the attorneys for certain entities had withdrawn from representation.  On February 8, 2011, the Bankruptcy Court added a docket entry to the Ezri Case and the Namco Case dockets continuing the hearing on the joint motion to March 15, 2011.  On March 7, 2011, Lacy 20 filed a response to the joint motion because (as argued) control of Lacy 20 cannot be transferred to an independent manager under the terms of its operating agreement.  On March 9, 2011, the moving parties filed another status report, stating that the Trustees have not sought to change the manager of Lacy 20 (and, therefore, Lacy 20's response is moot), and asked the Bankruptcy Court to approve the joint motion with respect to Lacy 20 and the rest of the entities for which an order had not yet been entered.  On April 28, 2011, the Bankruptcy Court entered a Final Order in the Ezri Case: (a) stating that the Bankruptcy Court's prior order entered October 22, 2009 remains in full force and effect; (b) stating that the joint motion and stipulation does not confer upon the Trustees or any other party any greater rights they otherwise have to change the manager of Lacy 20; and (c) striking certain provisions of the prior order because the SC Entities had not prosecuted any objections or reservations concerning the joint motion (excepting Lacy 20), the stipulation or consultant agreement.  The Bankruptcy Court had entered a similar order in the Namco Case on March 25, 2011.

On June 15, 2011, the Trustees filed notices in the Ezri Case and Namco Case, respectively, stating that the term of Cicalese as real estate consultant was extended to August 31, 2011, by consent of the parties to the relevant consulting agreement.

### d.    Schedules of Assets and Liabilities and Statement of Financial Affairs

As stated above, Ezri's deadline for filing his Schedules was extended to March 15, 2009.  However, Ezri did not file any Schedules.

### e.    Claims Bar Date

On August 26, 2009, the Ezri Trustee filed a motion to establish a claims bar date in the Ezri Case.  On September 30, 2009, the Bankruptcy Court entered an order establishing November 13,

2009 as the general claims bar date in the Ezri Case (other than for claims between the Ezri Estate and the Namco Estate).  The notice of bar date was served on creditors on October 8, 2009.

### f.    Extensions of Time to Object to Discharge

The deadline to file complaints to determine the dischargeability of debts in the Ezri Case was May 18, 2009.  The Ezri Trustee and Ezri entered into a series of stipulations to extend the Ezri Trustee's deadline to object to Ezri's discharge.  The deadline for the Ezri Trustee to object to Ezri's bankruptcy discharge has been extended to September 10, 2011 pursuant to the *Order Approving Trustee's Sixth Stipulation with Debtor for Extension of Time to File Complaints to Determine Non-Dischargeability of Debtors under 11 U.S.C. § 523, to May 10, 2011*, entered April 21, 2011.  Ezri also entered into stipulations to extend the time to file complaints regarding discharge with some creditors as well (and some creditors have commenced adversary proceedings objecting to Ezri's discharge).

### g.    Extension of Removal Deadline

The deadline for removal of pending lawsuits in the Ezri Case had been extended to June 29, 2009 by an order of the Bankruptcy Court entered on May 13, 2009.

### 4.    Joint Statement of Trustees

On February 26, 2010, the Namco Trustee and Ezri Trustee jointly filed their *First Financial Report of the Chapter 11 Trustees Pursuant to 11 U.S.C. § 1106(a)(3)-(4)* (the "Trustees' Report").  The Trustee's Report sets for the Trustees' findings with regard to, among other things, Ezri's and Namco's conduct prior to the Petition Date.

### 5.    Ezri Case Sales and Settlements[20]

### a.    Wilshire Bundy Sale

On March 18, 2010, the Ezri Trustee, and certain related debtors in possession, filed a *Motion for an Order (A) Approving Sale Procedures and Bid Protections, Including Break-Up Fee and Contingent Expense Reimbursement, In Connection With the Sale of the Land and Building Located at Wilshire Bundy Plaza; (B) Scheduling an Auction and a Hearing to Consider Approval of*

---

[20] Some of the sales and settlements summarized below dispose of assets of other Estates in addition to the Ezri Estate, as set forth in such summaries.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

50

*Sale; (C) Approving Notice of Auction and Hearing on Approval of Sale; (D) Approving the Purchase and Sale Agreement With the Stalking Horse Bidder; (E) Approving the Procedures for the Assumption and Assignment of Leases and Contracts; and (F) Granting Related Relief* (the "Wilshire Bundy Sale Procedures Motion"), seeking to implement procedures in connection with the disposition of real and personal property located at 12121 Wilshire Blvd., in the Brentwood District of Los Angeles, California (the "Wilshire Bundy Property").

The Wilshire Bundy Property is comprised of approximately 1.02 acres of land and a Class A 14-story office building (with more than 307,000 square feet of office space).  The fee interest in one of the parcels, comprising a land portion of the Wilshire Bundy Property, was owned by three LLCs as tenants in common:  (i) Bundy Dimes, LLC ("Bundy Dimes"),  which owns a 67% interest; (ii) Bunherst, LLC ("Bunherst"), which owns an 18% interest; and (iii) Tribun, LLC ("Tribun"), which owns a 15% interest (collectively, the "Wilshire Bundy Land Owners").  The Wilshire Bundy Land Owners leased this portion of the land, pursuant to a ground lease, to five LLCs that owned the improvements and the fee interest in the other parcels which comprised the land portion of the Wilshire Bundy Property:  (i) Civic Palm, LLC ("Civic Palm"), which owns a 17.3% interest; (ii) Mission Real Associates, LLC ("Mission"), which owns a 52% interest; (iii) Wilbun 7, LLC ("Wilbun 7"), which owns a 14.7% interest; (iv) Wilshire Bundy Holdings, LLC ("Wilshire Bundy Holdings"), which owned a 15% interest; and (v) Bunwil Capital, LLC ("Bunwil"),  which owned a 1% interest (collectively, the "Wilshire Bundy Building Owners," and collectively with the Wilshire Bundy Land Owners, the "Wilshire Bundy Property Owners").  The Wilshire Bundy Building Owners were collectively responsible for the building's operations and the Wilshire Bundy Property was managed by Pentaco Management, Inc.  Further, the membership interests of some of the Wilshire Bundy Property Owners are allegedly subject to assignments and charging liens, some of which are potentially avoidable by Ezri and/or Dimes.

The Wilshire Bundy Sale Procedures Motion sought to set procedures for an auction of the Wilshire Bundy Property, subject to Bankruptcy Court approval, free and clear of certain liens, claims and interests with the same to attach to the net sale proceeds with the same force and effect (the motion, however, stated that the $67 million of debt, as of November 24, 2009, owed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

51

collectively to consensual lienors Wells Fargo Bank, N.A. ("Wells Fargo") and General Life and Accident Insurance Company ("General Life," and, collectively, with Wells Fargo, the "Assumable Financing Lenders") may be assumed by the purchaser, subject to the approval of the Assumable Financing Lenders).

Various parties in interest objected to the Wilshire Bundy Sale Procedures Motion, including Bunherst (one of the Wilshire Bundy Land Owners) the Namco Committee (joined by the Ezri Committee) and various creditors.  Per its objection filed on March 25, 2010, the Namco Committee objected to the sale of the Wilshire Bundy Property because:  (i) the Namco Committee wanted the Ezri Estate to hold the property until the real estate market improved; (ii) the tax liability from a sale was unknown; and (iii) because the Namco Estate may have a claim to the property.

On March 31, 2010, Mission, Bundy Dimes and Bunwil (collectively, the "Wilshire Bundy Debtors") each filed a voluntary chapter 11 petition in the Bankruptcy Court.  On April 1, 2010, Bundy Dimes and Mission each filed complaints against Civic Palm, Wilbun 7, Wilshire Bundy Holdings, and Bunwil for an order authorizing Mission and Bundy Dimes to sell the interests of their co-owners in the Wilshire Bundy Property pursuant to section 363(h) of the Bankruptcy Code.  The filing of the complaints initiated adversary proceedings, which have been designated consolidated adversary proceeding number 10-ap-01637-BR (collectively, the "363(h) Action").

On April 6, 2010 in the Ezri Case, the Court entered an order (the "Wilshire Bundy Sale Procedures Order") granting the Wilshire Bundy Sale Procedures Motion (with certain modifications from the order requested by the Ezri Trustee), including approving a $500,000 break up fee for the "stalking horse bidder" Wilshire Bundy Investments, Inc. (the "Wilshire Bundy Stalking Horse Bidder"), which had bid $99.5 million.

On April 8, 2010, the Ezri Trustee and the Wilshire Bundy Debtors filed a *Joint Motion for an Order (A) Approving the Sale of the Land and Building Located at Wilshire Bundy Plaza Free and Clear of Certain Liens, Claims, Interests, and Encumbrances; (B) Authorizing Distribution of the Sale Proceeds to the Trustee; (C) Authorizing the Trustee to Pay Certain Costs of Sale and Commission; (D) Authorizing the Assumption and Assignment of Contracts and Leases; and (E) Granting Related Relief* (the "Wilshire Bundy Sale Motion") for the sale of the Wilshire Bundy

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Property to the Wilshire Bundy Stalking Horse Bidder or the bidder with the highest and best bid at

2    an auction.  The Ezri Trustee had received 41 offers of which 17 were for over $90 million,

3    including the offer from the Wilshire Bundy Stalking Horse Bidder.

4        An auction was held on May 11, 2010, upon which the winning bidder was DEI X

5    Partnership REIT, LP (the "Wilshire Bundy Buyer") at a purchase price of $111,000,000.  Various

6    parties in interest objected to the Wilshire Bundy Sale Motion, including Bunherst (which was

7    joined by Tribun) and the Namco Committee, which again argued (among other things) that the

8    Wilshire Bundy Property should be held until the real estate market improved.

9        A hearing was conducted on May 12, 2010, regarding the Wilshire Bundy Sale Motion.

10   Concurrently therewith, a hearing was held on motions for summary judgment on the 363(h) Action

11   (the "Summary Judgment Motion").  The Bankruptcy Court denied the Summary Judgment Motion,

12   and as a consequence thereof, on May 21, 2010 (as modified on June 30, 2010), denied the Wilshire

13   Bundy Sale Motion without prejudice (which order denying the sale was later vacated).

14       The Bankruptcy Court subsequently set a trial date of August 23, 2010 on the 363(h) Action

15   along with related deadlines (the hearing on the Wilshire Bundy Sale Motion was continued to the

16   363 Action trial date).  At the trial, the Bankruptcy Court ruled in favor of Bundy Dimes and

17   Mission and against the defendants.  On September 1, 2010, the Bankruptcy Court entered a

18   judgment authorizing Bundy Dimes and Mission to sell the interests of their estates along with the

19   defendants' interests pursuant to section 363(h) of the Bankruptcy Code.  On September 21, 2010,

20   the Bankruptcy Court entered its *Order (A) Approving the Sale of the Land and Building Located at*

21   *Wilshire Bundy Plaza Free and Clear of Certain Liens, Claims, Interests, and Encumbrances; (B)*

22   *Authorizing the Distribution of the Sale Proceeds to the Trustee; (C) Authorizing the Trustee to Pay*

23   *Certain Costs of Sale and Commission; (D) Authorizing the Assumption and Assignment of*

24   *Contracts and Leases; and (E) Granting Related Relief* in the Ezri Case.  The sale closed on October

25   22, 2010.[21]

26   _____

27   [21] Per the Seller's Settlement Statement (the "Closing Statement") for the Wilshire Bundy Property sale, as part of the
$111 million purchase price, the Wilshire Bundy Buyer assumed the first deed of trust debt in the approximate amount of
approximately $56.4 million (which is shown as owed to U.S. Bank, not Wells Fargo, on the Closing Statement).  Also,

28   on the Closing Statement, the second deed of trust debt of approximately $10.1 million was paid at closing (which is
shown as being paid to Midland Loan Services, Inc., not General Life).  Additionally, the Closing Statement shows that

53

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

On January 20, 2011, the Ezri Trustee and the Wilshire Bundy Property Owners entered into a stipulation for entry of an order prohibiting the issuance of tax Form K-1's by any of the Wilshire Bundy Property Owners before entry of an order authorizing the allocation of sale proceeds.  On January 27, 2011, the Bankruptcy Court entered an order approving such stipulation (the "K-1 Prohibition Order").

On April 13, 2011, the Ezri Trustee filed his *Motion of R. Todd Neilson, Chapter 11 Trustee for the Estate of Ezri Namvar, for Order:  (A) Authorizing Payment of Loans Made to Pay Expenses of Operation of the Building Located at Wilshire Bundy Plaza; (B) Approving Allocation of Net Proceeds of Sale of Wilshire Bundy Plaza; (C) Authorizing Trustee to (I) Distribute Net Proceeds of Sale Pursuant to Court-Approved Allocation, (II) Seek Recovery of Sale Proceeds from Taxing Authorities, and (III) Distribution All Funds Recovered from Taxing Authorities; and (D) Granting Related Relief* (the "Wilshire Bundy Allocation Motion").  Under the Wilshire Bundy Allocation Motion, the Ezri Trustee would, if the motion were granted:  (a) repay building operations loans for pre-sale expenses in the amount of $275,825.76 to the Wilshire Bundy Building Owners; (b) allocate $8,520,000 of the $111,000,000 purchase price to Wilshire Bundy Land Owners and $102,480,000 of such purchase price to the Wilshire Bundy Building Owners; and (c) authorize the Ezri Trustee to (i) make pro rata distributions to each of the Wilshire Bundy Building Owners, (ii) make no distributions to the Wilshire Bundy Land Owners because of a $10,040,306.67 loan secured by the land and the Wilshire Bundy Land Owners' share of the sale expenses exceed the value of the land, (iii) distribute all funds recovered from relevant taxing authorities, which amounts statutorily were withheld due to the non-Debtor TIC entities' refusal to certify their non-foreign status in connection with the transaction (per the same allocation of net proceeds in the absence of the taxing authorities retention of any funds with respect to the Wilshire Bundy Building Owners).

---

the $500,000 break up fee to the Wilshire Bundy Stalking Horse Bidder and a $1.1 million broker's commission was paid from the $111 million purchase price.  The Closing Statement further shows that the Ezri Trustee received just under $17 million at closing, in addition to the Wilshire Bundy Buyer's deposit of around $10 million.  Due to the non-Debtor TIC entities' refusal to certify their non-foreign status in connection with the transaction, pursuant to FIRPTA and CalFIRTPA, $11.1 million and $3,696,300 of the Purchase Price is being held by the Internal Revenue service and Franchise Tax Board, respectively.

54

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

On April 27, 2011, the Bankruptcy Court entered an order approving a stipulation between the Ezri Trustee and the Wilshire Bundy Property Owners, which:  (i) reschedules the hearing on the Wilshire Bundy Allocation Motion from May 4, 2011 to July 6, 2011; (iii) states that the hearing on the Wilshire Bundy Allocation Motion shall be an evidentiary hearing (unless the Bankruptcy Court otherwise indicates on its calendar notes or in a tentative ruling that the hearing shall not involve the cross-examination of appraisal experts or testimony of the Wilshire Bundy Buyer); (iii) sets forth a pre-hearing schedule; and (iii) modifies the K-1 Prohibition Order by re-setting the "FIRPTA Stipulation Hard Termination Date" to June 30, 2011.

On May 5, 2011, the Namco Trustee filed a motion (the "Varastehpour Settlement Motion") for an order approving a settlement with Alireza Varastehpour ("Alireza") and Khalil Varastehpour ("Khalil") that would, among other things, resolve and dismiss an action brought by Khalil against the Wilshire Bundy Building Owners in the Superior Court of California for the County of Los Angeles, designated as Case No. BC 410781, which was removed to the Bankruptcy Court and designated as adversary proceeding 2:10-ap-01714 BR.[22]  The settlement motion was granted by the Bankruptcy Court on June 21, 2011.

On June 6, 2011, the Ezri Trustee filed an amendment (the "Wilshire Bundy Allocation Motion Amendment") to the Wilshire Bundy Allocation Motion, asking for the requested order to provide for a reserves of (a) $6,250,000 for disputed lien claims of Starpoint Properties, LLC, Safeco Holding Corporation, Robert Hanasab, Boyle Avenue, LLC, Rolling Hills Capital, LLC and Brickwalk, LLC, and (b) $800,000 for the disputed claims of Wall Street Mart, LP, Buckingham Heights Lease, LLC, Culver Marina Lease, LLC, McConnel Marina Lease, LLC and Watt Leed Lease, LLC.

---

[22] The Varastehpour Settlement Motion also seeks to settle all disputes between Alireza and the Namco Estate regarding Alireza's rights in a promissory note executed by 16045 Victory Boulevard, LLC and Rojas Investments, LLC by providing Alireza with a $1,100,000 nonrecourse secured claim against the Namco Estate that is payable from any sale proceeds of the property securing the promissory note (under the terms set forth therein) or which shall become secured by a deed of trust in such property if the Namco Estate acquires such property, settle and dismiss the Namco Trustee's adversary proceedings seeking avoidance and recovery of fraudulent and preferential transfers from Kahlil (2:10-ap-01118 BR) for not less than $150,000 and Alireza (2:11-ap-01117 BR) for not less than $27,083.33, and withdraw with prejudice Khalil's claim no. 379 for $350,000 against the Namco Estate.

55

One June 10, 2011, Bunherst filed an evidentiary objection in the Ezri Case to the

declarations in support of the Wilshire Bundy Allocation Motion.  On June 11, 2011, Bunherst filed

an opposition in the Ezri Case to the Wilshire Bundy Allocation Motion ,which was joined on June

22, 2011 by Wilburn 7, Wilshire Bundy Holdings and Tribun (alleging, among other things, that the

Wilshire Bundy Property Owners own the Wilshire Bundy Property free of the ground lease because

their ground leases had not been properly assumed), to which the Ezri Trustee replied on June 24,

2011 disputing, among other things, the objectors' assertion that the Wilshire Bundy Property

Owners own the Wilshire Bundy Property free of the ground lease.  On June 22, 2011, Bunherst and

Mousa Namvar jointly filed a limited opposition to the Wilshire Bundy Allocation Motion

Amendment (arguing that any reserve should not affect their share of the sale proceeds).  The

Wilshire Bundy Allocation Motion is being heard on July 6, 2011.

### b.     Hotel Angeleno Sale

The Hotel Angeleno, located at 170 N. Church Lane in Los Angeles, California, was owned

by four nondebtor LLCs as joint tenants (the ownership structure involved at least 10 LLCs).[23]  The

Ezri Estate appears to have a 23.44% indirect economic interest in the Hotel Angelo property, and

Ezri's family members own the remainder.  The Hotel Angelo property was sold by Ezri (as indirect

manager of two of the selling LLCs), Hooshang Namvar (as indirect manager of another one of the

selling LLCs) and Homayoun Namvar (as indirect manager of another of the selling LLCs) for $35

million to Ascot Hotel, L.P. on September 3, 2009.  No motion for Bankruptcy Court approval was

filed for this sale, which was a sale by nondebtor entities.

The net proceeds of the sale were held by Stewart Title Guaranty Company, as escrow agent,

until they were transferred to the Ezri Trustee pursuant to the Escrow Disbursement Agreement,

under which the sellers have the right to consent to the use of the funds.  Approximately $276,000 of

such funds have been used to pay taxes for the Wilshire Bundy Property (which created a correlative

obligation to pay back such funds from the net proceeds of the Wilshire Bundy Property sale once

distributions of such proceeds are determined).

---

[23] These four LLCs are EXPO Delaware SPE LLC (managed by Ezri), Sunset-8 Delaware SPE LLC (managed by Ezri), CAP 16 Delaware SPE LLC (managed by Hooshang Namvar), and Seven Mills Delaware SPE LLC (managed by Homayoun Namvar).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### c.    LA Marriott Settlement

On April 15, 2009, LA Hotel Venture, LLC ("LA Venture"), with Ezri acting as its manager, filed a voluntary chapter 11 petition for LA Venture in the Bankruptcy Court.  LA Venture's chapter 11 case (the "LA Venture Case") was designated case number 2:09-bk-18746-BR by the Bankruptcy Court.  After the filing of the LA Venture Case, the Ezri Trustee took steps to replace Ezri as the manager of LA Venture.

On June 19, 2009, LA Venture filed a motion in the LA Venture Case and the Ezri Trustee filed a motion in the Ezri Case (then jointly administered with the Namco Case) to approve a settlement agreement with LA Venture's lender General Electric Credit Corporation ("GECC") for relief from the automatic stay in each such case to permit GECC to foreclose on the LA Venture property, which is a 469-room Marriott Los Angeles Downtown hotel and adjoining 41,100 square foot office facility.[24]  The Ezri Trustee determined that the LA Venture did not have any equity in the property and that a reorganization of LA Venture was not feasible under the economic conditions then existing or anticipated to exist in the next few years.  Under the settlement agreement, GECC waived and released its guaranty claim against the Ezri Estate.  The motion was approved by the Bankruptcy Court by orders entered on July 15, 2009, in the LA Venture Case.  The LA Venture Case was dismissed on November 24, 2009.

### d.    127 West 25th LLC and 241 Fifth Ave. Hotel, LLC Settlement

On February 11, 2010,[25] the Ezri Trustee filed a motion to approve a partial settlement  (the "Hakakian Settlement") among Nader & Sons, LLC ("Nader & Sons"), Sisko Enterprises LLC (collectively with Nader & Sons, the "Hakakian Lenders"), NY 18, LLC ("NY 18"),[26] Beshmada (collectively, with NY 18, the "Pledgors"), Ezri and Homayoun Namvar (collectively with Ezri, the "Guarantors"), which are parties to a prepetition Loan, Pledge and Security Agreement dated as of

---

[24] The Ezri Trustee's motion appears in the docket of the Namco Case (as opposed to the docket of the Ezri Case) because the motion was filed in the Namco Case docket while the Ezri Case and Namco Case were jointly administered. The resulting July 15, 2009 order also appears in the Namco Case docket, even though the joint administration order was vacated on June 25, 2009.

[25] The Ezri Trustee filed a similar motion in the Ezri Case on February 11, 2010 and Beshmada filed a similar motion in the Beshmada Case on February 16, 2010 (refiled February 17, 2010).

[26] Wholly-owned by Dimes.

57

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

June 12, 2008 (as amended on July 16, 2008, the "Pledge Agreement"), related to a $12,500,000

loan from the Hakakian Lenders to Namco that was guaranteed by the Guarantors.  On February 12,

2010, the Namco Trustee and, on February 16, 2010, Beshmada filed similar motions in their

respective cases.  According to those motions, under the Pledge Agreement, the Pledgors granted a

security interest to the Hakakian Lenders in collateral (the "Hakakian Collateral") consisting of:  (i)

NY 18's membership interest in 127 West 25th, LLC ("25 LLC"), and (ii) Beshmada's membership

interest in 241 Fifth Ave. Hotel LLC ("Fifth Ave. LLC").  25 LLC owned a vacant, twelve-story

office building that contains approximately 89,000 square feet of usable space located in New York,

New York.  Fifth Ave. LLC owned a vacant, four-story mixed-use retail and office building located

in New York, New York containing approximately 20,800 square feet of usable space (the property

is entitled for 64,797 square feet of development from an as-of-right development of 52,000 square

feet and a purchase of air rights consisting of 12,797 square feet from a neighboring property).  The

241 Fifth Ave. property has predevelopment entitlements to construct a 134-key hotel, along with a

100-seat restaurant on the ground floor.

Also, these motions allege that: (i) the Hakakian Loan went into default prepetition; (ii) 25

LLC and DHD127 LLC ("DHD"), a member of 25 LLC, had raised various disputes concerning the

Hakakian Collateral, in an action in the Supreme Court of the State of New York, County of New

York, entitled *127 West 25th LLC v. N.Y. 18, LLC, et al*., Index No. 101755/2009 (the "DHD

Action"); and (iii) the Hakakian Lenders had raised additional disputes in their answer, as well as

counterclaims and cross-claims, in the DHD Action.

On July 27 and 28, 2010, the Bankruptcy Court entered orders in the Ezri Case, the Namco

Case and the Beshmada Case, approving the partial settlement among the Pledgors, the Ezri Trustee,

the Namco Trustee and the Hakakian Lenders.  In a Partial Settlement Agreement, dated January 18,

2010, the Hakakian Lenders were granted the exclusive right to collect or otherwise realize upon the

Hakakian Collateral, subject to the Pledgors' retained interest in:  (i) 50% of any proceeds received

by such lenders with respect to the true-up obligation of Shavolian and Shavolian's affiliate Hazak

Associates LLC ("Hazak Associates") and (ii) 50% of any proceeds received by the Hakakian

Lenders with respect to collateral other than the true-up obligation not to exceed $250,000 (net of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Hakakian Lenders' costs and expenses).  No releases are provided in the Partial Settlement Agreement.

On August 10, 2010, Dan Shavolian, 127 West 25th, LLC, Hazak Associates, LLC, and 241 Fifth Avenue Hotel, LLC (collectively, "Appellants") filed notices of appeal entered to the United States District Court for the Central District of California.  By an order entered on July 28, 2010 in the Namco Case, the Bankruptcy Court denied a stay pending appeal and no stay request was docketed in the District Court docket.

On May 25, 2011, the District Court dismissed the District Court appeal, finding that the appellants had no standing because the Bankruptcy Court's Order did not affect, modify or impair the Appellants' rights or property interests.    Specifically, the Bankruptcy Court Order provided that no finding was being made by the Bankruptcy Court as to any factual or legal matter at issue in the 241 Fifth Ave. Hotel LLC v. Beshmada, LLC et al., Index No. 101754-2009, or 127 West 25th LLC v. N.Y. 18, LLC, Index No. 101755-2009 actions.

On June 23, 2011, Appellants timely filed their Notice of Appeal of the matter to the Ninth Circuit Court of Appeal.    The $250,000 remains held by Beshmada in trust pending the outcome of the Appeal.

### e.    Use of Sale Proceeds from Sale by EZ/HS, LLC

On October 6, 2009, the Ezri Trustee filed a motion for authority to use funds in an account related to non-debtor affiliate EZ/HS, LLC ("EZ/HS").  Ezri was the manager of EZ/HS and the revoked Namvar Family Trust had owned 90% of the membership interest in EZ/HS.  The motion states that:  (i) postpetition, Ezri had agreed to sell all of EZ/HS's assets without the knowledge of the Ezri Trustee; (ii) after reviewing the proposed sale, the Ezri Trustee and Namco Trustee both agreed to the sale; (iii) the sale was consummated on May 14, 2009, and the buyer provided a check of $1,615,000 to special counsel for the Ezri Trustee, which was deposited in a joint savings account of the Ezri Trustee and Namco Trustee.  The motion sought:  (i) the Bankruptcy Court's approval to pay $152,750 owed to a third party chapter 7 debtor, Persistence Capital LLC; (ii) to provide notice that the Ezri Trustee would analyze who owns the remaining funds in the joint account; and (iii) the Bankruptcy Court's approval of the Ezri Trustee's prospective use of the funds in the account to pay

59

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

administrative professional fees in the Ezri Case and the Namco Case and to pay payroll, rent and other operational expenses of EZ/HS upon agreement with the Namco Trustee.  The motion was approved (without objection) by a Bankruptcy Court order entered on November 12, 2009.

**f.      Settlement to Provide Time for Sale of Secret Beach Estates**

On March 8, 2011, the Ezri Trustee, along with Beshmada of DE and Dimes in their respective cases, filed a joint motion (the "Secret Beach Motion") for an order approving a mortgage extension agreement with FUN SBE, LLC ("FSL") and deed in lieu of foreclosure related to undeveloped property in Hawaii (the "Secret Beach Property") owned by Secret Beach Estates, LLC ("SBE), which is owned 50% by Beshmada of DE and 50% by Dimes.  The Secret Beach Property is encumbered by a mortgage in favor of FSL to secured indebtedness in the original principal amount of $1,519,875.00 owed by obligors SBE, Ezri and David M. Morrow.  The amount owed as of the date of the filing was $1,474,898.82 of unpaid principal, $393,957.28 of accrued and unpaid interest, and property taxes of approximately $43,763.05.  On July 12, 2010, FSL provided a notice of default to SBE and Ezri.  The Secret Beach Property is listed for sale in the amount of $2,500,000.00.  The Secret Beach Property was in escrow to close on December 31, 2010, but the prospective purchaser terminated the sale.  The moving parties negotiated a forbearance agreement with FSL, which provides for a moratorium on foreclosure until August 15, 2011, during which time SBE will try to sell the Secret Beach Property.  If no sale occurs by that date, then FSL may record the deed in lieu of foreclosure.  Under the agreement, Ezri, Beshmada of DE and Dimes are released of any liability under the loan.  On April 14, 2011, the Bankruptcy Court entered an order in the Ezri Case approving the Secret Beach Motion over the opposition of American Savings Bank (similar orders were entered in the Beshmada of DE and Dimes Cases on April 4, 2011).  Unfortunately, no further purchase offers have been made with respect to this property.  The negotiated Deed in Lieu of Foreclosure is anticipated to become effective on August 15, 2011.

**6.      Abandonment of Property By the Ezri Trustee**

**a.      Abandonment of Residence**

On July 20, 2009, the Ezri Trustee entered into a stipulation with the Hakakian Lenders for their consent to the sale of Ezri's and his wife's residence located at 12855 Parkyns Street, Los

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Angeles, California  (the "Residence").  Per recitals in such stipulation:  (a) Deutsche Bank Private

Wealth Mortgage Ltd. ("Deutsche Bank") was the beneficiary of a first deed of trust on the

Residence and owned a related promissory note in the amount of $7,500,000 and (b) the Hakakian

Lenders were the beneficiaries under a second deed of trust on the Residence in the amount of

$12,500,000.  The stipulation states that the Residence had been held in the Namvar Family Trust

until such trust was revoked by the Ezri Trustee on or about April 28, 2009.  Under the stipulation,

the Hakakian Lenders agreed that their lien would be transferred to the net proceeds of any sale.  An

order approving the stipulation was entered by the Bankruptcy Court on August 4, 2009.[27]

On September 3, 2009, the Bankruptcy Court entered an order approving Coldwell

Residential Brokerage and Coldwell Banker Previews International as the Ezri Trustee's real estate

brokers to market the Residence.  On September 30, 2009, the Ezri Trustee filed a motion for

approval of a stipulation (the "Occupancy Stipulation") with Ezri and his wife Ilana Namvar

permitting them to reside (with their children) in Residence pending sale.  Under the stipulation, Ezri

and Ilana Namvar would maintain the residence in lieu of paying rent.  The motion was later joined

by Ilana Namvar.  Such motion, however, was opposed by the Namco Committee (joined by the Ezri

Committee).  Over such objections, the Bankruptcy Court granted the motion by an order entered on

November 11, 2009.

On April 20, 2010, the Ezri Trustee filed his *Chapter 11 Trustee's Notice of Intention to

Abandon the Estate's Right, Title and Interest in Real Property Located at 12855 Parkyns Street, Los

Angeles, CA 90049* ("Abandonment Notice").  No timely objection to the Abandonment Notice was

filed.  The Abandonment Notice states that despite aggressive marketing efforts by the Ezri Trustee

and his brokers, the Ezri Trustee was unable to sell the Residence at a price that would generate any

return to the Ezri Estate, even though Deutsche Bank had agreed to fund a qualified buyer's

purchase of the Residence under very favorable terms and to pay the Ezri Estate a carve out from

---

[27] On December 22, 2010, the Ezri Trustee commenced an adversary proceeding (2:10-ap-03428-BR) against the Hakakian Lenders for, among other things, avoidance of their lien on the Residence as, among other things, a fraudulent transfer.  After dismissal of certain counts as redundant based on the Hakakian Lenders's motion to dismiss, the Ezri filed his second amended complaint on May 5, 2011, which also, among other things, seeks avoidance of the Hakakian Lenders lien on the Residence as, among other things, a fraudulent transfer.  A status conference is scheduled in such adversary proceeding on July 26, 2011.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

any sale proceeds it received as a result of its first deed of trust (which made it possible for the Ezri

Trustee to significantly reduce the listing price).  The Abandonment Notice also states that the Ezri

Estate would incur a substantial capital gains tax if the Residence were sold instead of abandoned.

The Abandonment Notice further states that unless an objection was filed with the Bankruptcy Court

and served on the Ezri Trustee within fourteen days of such notice, the Ezri Trustee will be deemed

to have abandoned the Residence on the fifteenth day from the date of mailing of the Abandonment

Notice, which was served on April 20, 2010.  No related objection appears on the docket in the Ezri

Case.  So (based on the terms of the Abandonment Notice and the lack of any objection), on or about

May 5, 2010, the Residence was abandoned from the Ezri Estate pursuant to section 554 of the

Bankruptcy Code.

On December 7, 2010, Kelsey Street LLC ("Kelsey Street") filed an emergency motion for

an order (i) confirming that the order approving the Occupancy Stipulation is no longer in effect or

that, in the alternative, Kelsey Street is not bound by such order and (ii) that Kelsey Street's

unlawful detainer action against Ezri and his wife does not violate the automatic stay.  According to

the emergency motion, Kelsey Street had bought the Residence at a foreclosure sale on October 7,

2010, and subsequently brought an unlawful detainer action in a California court seeking to

dispossess Ezri and his wife of their occupancy of the Residence.  The Namco Trustee filed a notice

of non-opposition to Kelsey Street's motion.  Ezri and his wife objected to Kelsey Street's motion.

On January 11, 2011, Kelsey Street filed a motion for an order retroactively lifting the stay in regard

to its unlawful detainer action against Ezri and his wife, and continuing the hearing on Kelsey

Street's December 7, 2010 motion. Also on January 11, 2011, Deutsche Bank filed a motion for

relief from stay requesting that the Bankruptcy Court confirm that the foreclosure sale of the

Residence on October 7, 2010 did not violate the automatic stay.  Over Ezri's objection, on February

21, 2011, the Bankruptcy Court entered orders (the same order docketed twice, once for each of the

above January 11, 2011 motions) retroactively annulling the automatic stay to permit the foreclosure

sale and the unlawful detainer action.  On March 4, 2011, Ezri filed a notice of appeal of the

Bankruptcy Court's February 21, 2011 orders.

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**b.** **Abandonment of Possible Avoidance Claims against Hershel Bani-Esraili**

On January 14, 2011, the Ezri Trustee filed a notice of his intention to abandon the Ezri

Estate's avoidance claims against Hershel Bani-Esraili, who is allegedly a secured creditor who

received a 10% membership interest in an entity (in which Ezri has an interest) that owns a shopping

center in Las Vegas, Nevada, that has no equity value.  The Ezri Trustee states in his notice that the

Ezri Estate's potential claim related to the estate's indirect interest is of inconsequential value, and

any attempt to set the transfer aside would be a financial burden to the estate.  The notice states that

if no objections to it are received within 14 days of mailing then the property would be abandoned.

The docket does not show that any objections to the notice were timely filed.

**7.** **Termination of Namco Family Trust**

Prior to the commencement of the Cases, Ezri formed a revocable trust – the Namvar Family

Trust – to which he transferred numerous assets and property interests.  Pursuant to a notice dated

April 28, 2009, the Ezri Trustee revoked the Namvar Family Trust, which resulted in all assets in the

trust being treated as property of the Ezri Estate.

**8.** **Turnover Stipulation in Ezri Case**

On June 20, 2011, the Bankruptcy Court entered an order approving the Ezri Trustee's

motion for approval of a stipulation between the Ezri Trustee and Prudential Insurance Company of

America regarding the turnover of the approximately $106,000 surrender value of a life insurance

policy obtained by Ezri prepetition.  The stipulation resolves an adversary proceeding (2:11-ap-

01046-BR) commenced by the Ezri Trustee against Prudential Insurance Company of America for

turnover.

**9.** **Namco Case Court Filings**

**a.** **Namco's "First Day" Motions**

On the day Namco consented to entry of an order for relief (January 28, 2009), Namco filed

motions for:  (i) joint administration of his case (for procedural purposes only) with the Ezri Case;

(ii) an extension of the deadline for Namco to file its Schedules to March 15, 2009; (iii) approval of

certain notice procedures.  On February 9, 2009, the Bankruptcy Court entered an order approving

the extension motion, and, on February 10, 2009, the Bankruptcy Court entered an order approving

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   the joint administration motion in the Namco Case.  The joint administration order, however, was

2   subsequently vacated by a Bankruptcy Court order entered on June 25, 2009.

3   **b.    Exclusivity**

4   On April 8, 2009, prior to the appointment of the Namco Trustee and prior to expiration of

5   Namco's exclusive period to file a chapter 11 plan and solicit votes (which would end on May 29,

6   2009), Namco filed a motion to approve a stipulation between Namco and the Namco Committee to

7   grant exclusive co-exclusivity rights to Namco and the Namco Committee.  No objections were filed

8   to the motion; however, on May 13, 2009, the Bankruptcy Court denied the motion as moot (because

9   the Namco Trustee had been appointed on May 8, 2009).

10  **c.    Schedules**

11  On March 15, 2009, Grobstein filed Schedules on behalf of Namco.   The Schedules reflect

12  Ezri as the sole Interest Holder of Namco.  Namco allegedly held $15.3 million in owned real

13  property – the 1929 Pico Boulevard property and La Cienega Property (as defined below) and over

14  $656 million in personal property, consisting almost entirely of accounts receivable.  The Namco

15  Schedules indicate that the Estate had aggregate liabilities of over $545 million, consisting of around

16  $20 million in secured claims, $607,118 in priority claims and over $524 million in general

17  unsecured claims.

18

19  **d.    Claims Bar Date**

20  On August 26, 2009, the Namco Trustee filed a motion to establish a claims bar date in the

    Namco Case.  On September 16, 2009, the Bankruptcy Court held a hearing and approved

21  November 13, 2009, as the general claims bar date in the Namco Case (other than for claims

22  between the Ezri Estate and the Namco Estate).  The notice of bar date was served on creditors on

23  October 6, 2009.  On November 24, 2010, the Bankruptcy Court entered an order approving the

24  November 13, 2009, claims bar date previously approved by it at the September 16, 2009 hearing.

25  **e.    Extension of Removal Deadline**

26  The deadline for removal of pending lawsuits in the Namco Case was extended by orders of

27  the Bankruptcy Court to April 29, 2011.

28

### 10.    Namco Case Sales and Settlements[28]

#### a.    Namwest/Boucherian Settlement

On July 14, 2009, Roya Boucherian ("Boucherian") filed a motion for relief from stay, asserting a $15.5 million claim (the "Boucherian Loan") against the Namco Estate that was secured by Namco notes against two adjacent properties located in Tempe, Arizona ("NTL Property" and "NTL II Property") and property located in Las Vegas, Nevada.  Such motion was opposed by the Namco Trustee and Theodore Kohan ("Kohan"), who claims to own a 27% membership interest in NTL and NTL II, which owned the NTL Property and NTL II Property, respectively.[29]

On November 3, 2009, the Namco Trustee filed a motion (the "Boucherian Settlement Motion") for an order approving a settlement agreement among the Namco Trustee, the Ezri Trustee, Beshmada and Boucherian (the "Boucherian Settlement Agreement").  Under the Boucherian Settlement Agreement:  (i) the Namco Trustee was to transfer to Boucherian certain promissory notes and deeds of trust that Namco had previously collaterally-assigned to Boucherian; (ii) Boucherian would foreclose against the NTL Property pursuant to a $27 million deed of trust and thereby obtain title to the NTL Property; (iii) the Ezri Trustee shall take or refrain from taking certain specified actions regarding a $2.78 million note and deed of trust on the NTL Property, including (but not limited to) making a good faith effort to obtain title to the NTL Property by accepting a deed from NTL; (iv) Boucherian would pay the Namco Trustee $2.2 million if within two years she obtains title to the NTL Property free and clear of all interests, claims and liens; (v) Boucherian shall thereupon have the right to grant Namwest an option to purchase the NTL Property and if the NTL Property is sold pursuant to such option, she shall pay the Namco Trustee up to $4.35 million of the sale proceeds; (vi) if within two years, Boucherian obtains title to the NTL Property and has not sold it to Namwest, she shall grant the Namco Trustee an option through June 30, 2014, to purchase the NTL Property, the NTL II Property and any loans secured by either property,

[28] Some of the sales and settlements summarized below dispose of assets of other Estates in addition to the Namco Estate, as set forth in such summaries.

[29] The Arizona properties are directly or indirectly owned by Namwest, LLC ("Namwest"), Namwest Town Lakes, LLC ("NTL") and Namwest Town Lakes II, LLC ("NTL II").  Namwest and NTL II are chapter 11 debtors in Arizona in jointly administered case number 2:08-bk-13935-GGC.  Namwest is owned in part by Beshmada.  Historical information related to Boucherian-Namwest settlement is set forth above.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

whereby the Boucherian Loan will be paid in full and the Namco Estate shall receive the next $4.35 million of sale proceeds; (vii) Boucherian shall make a new entitlement loan to NTL II secured by the NTL II Property; (viii) the Namco Trustee and Boucherian shall confirm the amount of indebtedness owed by the Namco Estate; and (ix) Boucherian and the Namco Trustee shall provide releases, including a release of Ezri's guaranty (but not the release of Eilel Namvar's guaranty).

On February 21, 2010, the Boucherian Settlement Motion was granted by a Bankruptcy Court order (the "Boucherian Settlement Order") over Kohan's and other creditors' objections. Kohan appealed the order to the Bankruptcy Appellate Panel for the Ninth Circuit (the "BAP").  On October 27, 2010, the BAP issued an unpublished opinion finding that Kohan's appeal was moot due to events that had transpired since the Bankruptcy Court's order was entered.  The BAP nevertheless analyzed the merits of the appeal and stated that it would affirm the Bankruptcy Court order if the appeal had not been moot.[30]  On November 22, 2010, Kohan appealed the BAP's ruling to the United States Court of Appeals for the Ninth Circuit.

On May 5, 2010, the Namco Trustee filed a motion (the "NTL Property Transfer Motion"), which was subsequently joined by the Namco Committee, to transfer the NTL Property to Boucherian pursuant to the Boucherian Settlement Order free and clear of liens, claims, interests and encumbrances (including, but not limited to, Kohan's asserted interests), which property the Namco Trustee had acquired by a warranty deed in lieu of foreclosure from NLT pursuant to a settlement agreement (the "NTL Settlement Agreement") in respect of the Namco Estate's $2.78 million note, under which the Namco Trustee paid NLT $75,000.  Also, on May 5, 2010, the Namco Trustee filed a motion (the "NTL Settlement Motion") for an order approving the NTL Settlement Agreement (to be heard concurrently with the NTL Property Transfer Motion).  On June 9, 2010, the Bankruptcy Court approved the NTL Settlement Motion (no objections to the NTL Settlement Motion had been filed).  On June 29, 2010, the Bankruptcy Court approved the NTL Property Transfer Motion over Kohan's objection.

---

[30] On November 11, 2009, Beshmada filed a motion in the Beshmada Case for an order approving Beshmada's ratification of the Boucherian Settlement Agreement.  Such motion was granted in the Beshmada Case on December 7, 2009 (no objections were filed).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    The NTL Property Transfer Motion states that Boucherian acquired ownership of the NTL II

2    Property pursuant to an order entered in the NTL II chapter 11 case in Arizona, and that she planned

3    to market the NTL Property and NTL II Properties jointly, which makes them more valuable.  Such

4    motion states that Boucherian will pay to complete the entitlement process for both properties.  It

5    also references the Namco Trustee's option from Boucherian under the Boucherian Settlement

6    Agreement to sell the NTL Property and NTL II Property until June 30, 2014.  Under such option, if

7    exercised, after Boucherian is paid in full, the Namco Estate would receive the next $4.35 million

8    plus 24% of any proceeds thereafter.

9    Namco does not expect a decision on the appeal before the Ninth Circuit Court of Appeals

10    prior to August 2012.

11    **b.    <u>9920 La Cienega Sale and Settlement</u>**

12    On April 28, 2010, the Namco Trustee filed a motion for an order approving a Sale and

13    Compromise Agreement entered into by the Ezri Trustee, Arnel Investments, LLC ("Arnel"),

14    Empire Capital Properties, LLC ("Empire"), Siamak Torkian and 9920 La Cienega Boulevard LLC

15    ("9920 La Cienega") under which Namco Trustee would sell to Arnel (the 40% owner of the

16    property) and 9920 La Cienega for $1 million (subject to higher and better offers):  (i) on an "as is,

17    where is" basis, Namco Estate's 60% ownership interest in 9920 La Cienega Boulevard, Los

18    Angeles, California, which is a vacant 20-story office building that contains asbestos (the "La

19    Cienega Property"), subject to all claims, liens, interests and encumbrances, and (ii) litigation rights

20    and claims and avoidance power rights and claims including, but not limited to, the rights, powers

21    and claims conferred upon the Namco Estate pursuant to 11 U.S.C. §§ 544, 545, 547, 548 and 550,

22    which concern and/or relate to the property (including the claims against all defendants in the PRI

23    Action and Empire).[31]  The motion also sought to reform Empire's deed of trust per the settlement.

24    Without any objections, on June 2, 2010, the Bankruptcy Court entered an order approving

25    the sale and the reformation of the deed of trust.  As requested in the motion, the order allocated all

26    of the $1 million purchase price to the purchased litigation claims.

---

[31] The "PRI Action" was brought prepetition in a California court for reformation of the deed of trust on the La Cienega
Property.  Such state court action was removed to the Bankruptcy Court and is currently an adversary proceeding
pending before the Bankruptcy Court designated as 2:09-ap-01307-BR.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

67

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### c.    Goshen Sale and Settlement

On November 3, 2009, the Namco Trustee filed a motion to approve a settlement and sale of a wrap note secured by a second deed of trust on a real property located at 11759 Goshen Avenue in Los Angeles, California.  Prior to the commencement of its bankruptcy case, Namco had assigned its beneficial interest in the promissory note to the Benji Trust, a Namco creditor, as collateral for a debt owed by Namco.  The Namco Trustee entered into a sale agreement under which the Namco Trustee agreed to sell the Namco Estate's and the Benji Trust's interests in the promissory note (at a discount) to the property owner Lenmar Goshen, LLC ("Lenmar"), free and clear of all claims, liens and interests for $1,300,000 (a discount of $300,000 from the Namco Estate's $1,600,000 net interest in the wrap note), and the Benji Trust agreed to discount Namco's $923,251.67 principal amount plus unpaid interest obligation it by accepting $1 million.  On January 11, 2010, the Bankruptcy Court approved the sale and settlement over the objection of Hino-8, LLC ("Hino-8"), which is owned by Ezri's father and siblings.  Hino-8 appealed the Bankruptcy Court's order but did not obtain a stay.

On September 14, 2010, the Namco Trustee filed a motion for an order approving a settlement between the Namco Trustee and Hino-8 under which:  (i) Hino-8 and the Namco Estate exchanged releases; (ii) Hino-8 agreed not to take any action that would cause the Namco Estate to lose any portion of the $1,300,000 sale price; and (iii) the Namco Trustee agreed not to oppose the appeal, which Hino-8 maintained against Lenmar.  On October 14, 2010, the Bankruptcy Court granted such motion.

### d.    Safi Settlement

On July 27, 2010, the Namco Trustee filed a motion for an order approving a settlement agreement (the "Safeco Agreement") with Sutton Way Capital, LLC ("Sutton Way"), Safco Advisory Corp. ("Safco"), Safco Holding Corp. ("Safco Holding"), and WN Cliffside, LLC ("WN").  On such date, the Ezri Trustee and Beshmada filed similar motions in their cases.  The Safeco Agreement provides that:  (i) the prepetition transfer of Beshmada's 35% membership interest (the "Parox Interest") in Parox, which owns HUD low-income housing apartment buildings in Venice, California, to Sutton Way is void *ab initio*; (ii) Beshmada shall pay Sutton Way and/or The Safi

68

Trust $32,815 (which is the amount of income taxes in respect of Sutton Way's ownership of the Parox Interest for 2008); (iii) Safco Holding shall have a $200,000 allowed general unsecured claim against Beshmada, which is the amount advanced by Safco Holding on behalf of Beshmada for Pecos Capital, LLC; (iv) Safco shall have a $8,232,400 allowed general unsecured claim against the Namco Estate, which is the net amount loaned from Safco to Namco as of the Namco Petition Date (after taking into account the return of the Parox Interest); and (v) the Namco Trustee, the Ezri Trustee, Beshmada and WN (on the one hand) and Safeco, Safeco Holding and other enumerated parties (on the other hand) exchange releases for certain listed transactions.  The motion states that the return of the Parox Interest will restore the Namco Estate's claim of $5.6 million against Parox. On September 2, 2010, the Bankruptcy Court entered an order granting the motion.

###### e. <u>Playa Properties Sale</u>

Playa Properties, LLC is indirectly owned by the Namco Estate and the Ezri Estate, and is managed by the Namco Trustee.[32]  Playa Properties commenced its chapter 11 case by filing a voluntary petition in the Bankruptcy Court on February 23, 2009, bearing case number 2:09-bk-13920-BR (the "Playa Properties Case").

On October 22, 2009, Playa Properties filed a motion to approve procedures for the sale of its 15.625% undivided ownership interest and the undivided ownership interest of its tenants in common Elbon LLC and WN Birdview LLC (which had consented to the sale) in a duplex located at 6419 Ocean Front Walk in Playa Del Rey, California (the "Duplex"), to Greg and Lily Games ("Games") for $2,090,000 on an "as is" basis free of any liens, claims, interests and encumbrances, subject to higher and better offers.  This motion was granted by an order of the Bankruptcy Court entered on November 16, 2009 (the "Playa Properties Sale Procedures Order"), over the objection of disputed lienor Tri-Center Group, Inc. ("Tri-City").

On November 24, 2009, Playa Properties filed a motion to sell the Duplex to Games for $2,090,000 on an "as is" basis free of any liens, claims, interests and encumbrances, subject to higher and better offers.  On December 23, 2009, over the objection of disputed lienor Maryam

---

[32]  The Namco Trustee became the managing member of Pico 26, LLC ("Pico 26"), which is 80% owned by the Namco Estate and 20% owned by the Ezri Estate (Ezri had formally been managing member). Pico 26 is the managing member of Playa Properties.

Pirian ("Pirian") as trustee of the M.M.P. Family Trust, the Bankruptcy Court entered an order in the Playa Properties Case, approving the sale of the Duplex, free and clear of liens and other interests, for $2,675,000 to Michael Farahnick, the successful bidder at an auction of the property conducted in accordance with the Playa Properties Sale Procedures Order.

According to the motions, the duplex was subject to two disputed deeds of trusts of $950,000 each of Tri-City and Pirian, which liens attached to the sale proceeds. According to Playa Properties's Schedules, Namco has a scheduled unsecured claim of $330,890 against Playa Properties (out of approximately $335,000 of Playa Properties' scheduled unsecured claims).

On March 8, 2011, the Namco Trustee and Playa Properties filed a joint motion in the Namco Case seeking an order approving a settlement of claims with Pirian. Under the proposed settlement, Pirian would receive an allowed general unsecured claim of $800,000 against the Namco Estate, Playa Properties would pay Pirian $400,000 in full settlement of Pirian's claim against Playa Properties, Pirian releases the Namco Estate and Playa Properties, and Playa Properties releases Pirian. On April 18, 2011, the Bankruptcy Court entered an order approving such settlement.

The Bankruptcy Court recently sustained an objection to the claim of the largest disputed creditor, Jennifer Kim, paving the way for dismissal of the bankruptcy case.

### f.    GH Capital/Meadow Run Settlement

On May 12, 2010, the Namco Trustee and Beshmada filed a joint motion in each of their cases for an order approving the sale of membership interests in GH Capital, LLC ("GH Capital") and Meadow Run Investors, LLC ("Meadow Run"). Under the terms set forth in the joint motion, (i) Beshmada shall transfer its 50% "Class B" membership interest (the "GH Capital Membership Interest") in GH Capital to Gregory Perlman ("Perlman") for $1,750,000 or a bidder with a higher and better bid; (ii) Beshmada shall transfer its 50% membership interest in Meadow Run (the "Meadow Run Membership Interest") to Perlman for $250,000 or a bidder with a higher and better bid; (iii) within 180 days of closing, Perlman, if he is the successful bidder (or the successful bidder if it is not Perlman) shall cause GH Capital to pay the Namco Estate $500,000 on account of a prior loan from Namco to GH Capital (the "Namco Equity Line"); (iv) Perlman (if he is the successful bidder) shall make the payments set forth above over time (with no interest unless there is a default),

under the terms set forth in the joint motion, to be secured by the GH Capital and Meadow Run

membership interests; and (v) Perlman, the Namco Trustee and Beshmada will exchange limited

releases under the terms set forth in the joint motion.

On July 19, 2010, the Bankruptcy Court entered an order in the Beshmada Case approving

the sale of the Meadow Run Membership Interest to Perlman for $250,000.

On July 28, 2010, the Bankruptcy Court entered orders (amended July 30, 2010) in the

Namco Case and Beshmada Case authorizing sale of the GH Capital Membership Interest and

Namco Equity Line to Sohrab Shakib ("Shakib") for $3 million.  Under the terms of such orders:  (i)

Shakib shall pay $2,500,000 for the GH Capital Membership Interest, to be purchased on an "as is"

basis, by July 30, 2010 or Beshmada may sell it to Perlman; (ii) Shakib shall pay 25% of any

distributions he receives on account of the GH Capital Membership Interest over an 8% preferred

return on his $2,500,000 equity interest in the GH Capital Membership Interest to the Namco Estate;

(iii) the Namco Trustee shall apply Shakib's expected $500,000 nonrefundable deposit to the Namco

Equity Line and the Namco Trustee shall be deemed to transfer the Namco Equity Line to Shakib on

an "as is" basis; and (iv) the proceeds of the sale shall be held in a segregated account pending a

resolution of the alleged interests of Starpoint Properties, LLC ("Starpoint"), in such funds.

Also on July 28, 2010, the Bankruptcy Court entered "conditional" orders in the Namco Case

and Beshmada Case:  (i) authorizing, in the event that the Shakib sale did not close, the sale of the

GH Capital Membership Interest to Perlman; (ii) ordering Perlman to cause GH Capital to pay

$500,000 in respect of the Namco Equity Line with in 180 days; (iii) approving the payment terms

requested in the joint motion; and (iv) ordering that that Beshmada hold the $1,750,000 proceeds of

sale in a segregated account pending a resolution of the alleged interests of Starpoint in such funds.

On September 14, 2010, the Namco Trustee and Beshmada filed a joint complaint against

Shakib that commenced an adversary proceeding (2:10-ap-02699-BR), claiming that Shakib had

defaulted on his obligations under orders approving a sale to him (per the complaint, he had not

made his required $500,000 nonrefundable deposit nor paid the remainder of the $3 million purchase

price).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

71

1    The parties to the Complaint entered into a settlement, as set forth in a Settlement Agreement

2    dated December 21, 2010.    The Settlement Agreement provided that in exchange for $200,000 cash

3    paid by Shakib to the Namco Trustee (subject to later allocation between the Namco and Beshmada

4    estates), Namco and Beshmada released Shakib as to all claims arising from the GH Capital Motion,

5    the Hearing, the Shakib Offer, the Shakib Order, the Amended Shakib Order and the Complaint, as

6    such terms were defined in the Motion to approve the Settlement Agreement.    Likewise, Shakib

7    released Namco, Beshmada and their respective professionals as to the GH Capital Motion, the

8    Hearing, the Shakib Offer, the Shakib Order, the Amended Shakib Order, the Complaint and as all

9    allegations by Shakib in the Shakib Motion.  The Motion to approve the Settlement Agreement was

10   granted, by entry of an order on February 14, 2010.  The $200,000 has been paid into the client trust

11   account of counsel to Namco, with such funds to be allocated between Namco and Beshmada

12   pursuant to the provisions of the Plan.

### g.    Alhashim Settlement

14   On May 26, 2010, the Namco Trustee filed a motion to approve a settlement with Parisa

15   Alhashim ("Alhashim").  The motion states that, on February 24, 2010, the Bankruptcy Court denied

16   (without prejudice) Deutsche Trustee Company Limited's motion for relief from stay to permit it to

17   foreclose on its first deed of trust on real property located at 924 Linda Flora Drive in Los Angeles,

18   California (the "Linda Flora Property").  Per the motion, the Namco Trustee and Alhashim, to whom

19   Namco had (prepetition) collaterally-assigned its second deed of trust note in the Linda Flora

20   Property, entered into a settlement agreement under which the Namco Trustee would foreclose on

21   the Linda Flora Property, sell the Linda Flora Property, pay off the first deed of trust note and split

22   the net proceeds 50%/50% with Alhashim until Alhashim's note against the Namco Estate is paid in

23   full (and the Namco Trustee and Alhashim would exchange mutual releases).  No objections were

24   filed to the motion.  On July 28, 2010, the Bankruptcy Court entered an order granting the motion.

### h.    Moossai Settlement

26   On July 2, 2009, Haroon Moossai, individually and as trustee of the Moossai Revocable

27   Family Trust ("Moossai"), filed a motion for relief from stay to enforce his rights as assignee of a

28   note (the "Lapico Note"), which had been issued to Namco by Lapico LLC and Picola 8, LLC

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

72

1  (collectively, "Lapico") prepetition, and which note had been collaterally-assigned to Moossai by

2  Namco prepetition.  On August 12, 2009, the Bankruptcy Court entered an order granting Moossai's

3  motion pursuant to a stipulation between Moossai and the Namco Trustee under which the Namco

4  Trustee would enforce collection of the Lapico Note.  Per the motion, after negotiations with Lapico

5  over the amount due, Lapico paid the Namco Trustee $570,000.  Under the settlement proposed by

6  the motion, Moossai would receive $540,000 and the Namco Trustee would receive $30,000 of such

7  payment to be held pending further resolution of Moossai's claim.  No objections were filed to the

8  motion.  On January 14, 2010, the Bankruptcy Court entered an order approving the motion (the

9  "Moossai Settlement Order").

10      On March 9, 2010, Moossai filed a motion for an order directing the payment of the funds he

11  claimed were owed to him under the Moossai Settlement Order, claiming his lien attached to the

12  $30,000 due the Namco Trustee under the settlement approved by such order and that he was owed

13  over $35,000 in attorneys' fees as of February 28, 2010.  The Namco Trustee opposed such motion,

14  stating that Moossai's claim was not made in good faith and that over $30,000 of attorneys' fees was

15  excessive and should be reduced if the motion is not denied.  On April 28, 2010, the Bankruptcy

16  Court entered an order granting the motion and ordered the Namco Trustee to pay Moossai $30,000.

17          **i.    Massachi Settlement**

18      On April 4, 2011, the Bankruptcy Court entered an order approving a settlement between the

19  Namco Trustee and Faramarz Massachi ("Massachi") regarding Massachi's interest in a $650,000

20  promissory note from Namco to Massachi and/or Mojan Massachi, which was secured by the pledge

21  of a $995,000 secured promissory note executed by SC Donner Pass LLC in favor of Namco (the

22  "Donner Note").  Under the approved settlement, the parties agreed (among other things) to the

23  allocation of any sale proceeds from the property secured by the Donner Note (after payment of

24  costs and expenses) $50,000 to the Namco Trustee then 50%/50% until each has received $200,000

25  and then 60% to the Namco Trustee and 40% to Massachi thereafter.

26          **j.    1222 E. Grand Ave.**

27      On February 22, 2011, the Namco Trustee filed a motion for approval of a settlement with

28  the "Nojan Parties" (as such term is defined in the motion) regarding a $1,200,000 note made by

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

73

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

LAX, LLC originally to Martin Benson, as trustee of the Martin Benson Trust, which is secured by a deed of trust that encumbers the real property located at 1222 E. Grand Avenue, El Segundo, California.  In an adversary proceeding (2:10-ap-02491-BR), the Namco Trustee alleged that any interest of the Nojan Parties in such note was unperfected as of the Petition Date.  Under the proposed settlement:  (a) the Nojan Parties shall have an allowed claim in the Namco Case of $406,367.12; (b) in respect of its allowed claim, the Nojan Parties shall receive up to $50,000 from any net monetary recovery received by Namco from the sale or other disposition of the property and shall have a general unsecured claim for the remainder of the allowed claim amount; and (c) the Nojan Parties shall reconvey the related collateral assignment (also, the parties provide mutual releases).  In the event that Namco is unable to foreclose or otherwise obtain title to the property (or if Namco's interest in the note is abandoned), the Nojan Parties shall retain all rights they had before entering into the proposed settlement.   No objections were filed to the settlement motion.  On March 25, 2011, the Bankruptcy Court entered an order approving the Namco Trustee's settlement with the Nojan Parties.

The Namco Trustee commenced foreclosure proceedings against the property and LAX, LLC in August 2010.  Between September 2010 and March 2011, the Namco Trustee and LAX, LLC exchanged information concerning the underlying claim, whereby LAX, LLC claimed that no amount was owing on the underlying note.  Notwithstanding, Namco's books and records reflect that the underlying debt from LAX, LLC is due and owing and LAX, LLC produced no evidence to substantiate any defense to the obligation.  Accordingly, the Namco Trustee continued with the foreclosure proceedings, in response to which LAX, LLC filed a chapter 11 bankruptcy case in the Central District of California on March 8, 2011, case number 2:11-bk-26440-BR.  The Namco Trustee is in the process of filing a motion for relief from stay in the LAX, LLC bankruptcy case, in order to proceed with the foreclosure sale of the underlying property

### 11.    1929 Pico Blvd.

The Namco Estate owns (directly) a single-tenant, 24,000 square foot, two-story building (on 31,000 square feet of land) located at 1929 Pico Boulevard in Los Angeles California.  On December 16, 2009, the Namco Trustee filed a motion for approval of sale procedures for such property.  The

sale procedures motion was approved by the Bankruptcy Court on January 7, 2010. The Namco Trustee then filed his sale motion on January 25, 2010, to sell the property free and clear of all liens, claims, interests and encumbrances to AJ Industrial Properties, LLC for $3.1 million or the highest and best bidder. The sale, however, did not close, and the Namco Trustee withdrew its sale motion on February 4, 2010.

The Namco Trustee filed his second sale procedures motion on March 11, 2010, which was approved by the Bankruptcy Court on March 22, 2010. The Namco Trustee then filed his second sale motion on March 23, 2010, to sell the property free and clear of all liens, claims interests and encumbrances to Rexford Industrial Realty and Management, Inc. ("Rexford") for $3 million. The second sale motion states that the property is subject to $3,650,000 of disputed liens. The second sale motion was approved by an order of the Bankruptcy Court entered on May 27, 2010, which requires that the sale proceeds be held in a segregated account pending a further order of the Bankruptcy Court. The sale, however, has not yet closed due to purported potential environmental issues at the property. The Namco Trustee recently terminated the escrow for the sale of this property as the buyer sought to reduce the purchase price to an amount that the trustee did not find acceptable.

On July 26, 2010, the Namco Trustee filed a motion to approve a settlement with Soleiman Naim and Fereshteh Kohanim, the beneficiaries of a $2 million disputed second deed of trust on the property, which holders had sought relief from the automatic stay to foreclose on the property. On September 10, 2010, the Bankruptcy Court entered an order approving the settlement with such holders (the "Naim/Kohanim Settlement") under which they would receive $200,000 from the property's segregated rents and could receive up to an additional $400,000 (upon the satisfaction of certain specified conditions) from one-half of gross rents and/or one half of sale proceeds (up to a maximum of $600,000).

On December 21, 2010, the Namco Trustee and the Ezri Trustee filed a joint motion in the Namco Case and the Ezri Case, respectively, to approve a settlement between such Trustees (on behalf of the Namco Estate, the Ezri Estate and Namco Financial, Inc.), on the one hand, and "Pirian Parties" (as such term is defined in the motion), on the other, concerning the Pirian Parties' alleged

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

75

interest in a $1,650,000 note secured by a deed of trust in 1929 Pico Boulevard.  Under the proposed

settlement (which resulted from a mediation), the Pirian Parties would:  (a) be allowed a $990,000

secured claim and a $446,882.75 general unsecured claim against the Namco Estate; (b) receive

$150,000 on account of the allowed secured claim from collected rents within ten days of the

effective date of the settlement; (c) receive $10,000 monthly from collected rents; (d) be paid the

balance of the allowed secured claim upon the sale of the property; and (e) begin accruing interest on

any unpaid portion of the allowed secured claim six months from the effective date of the settlement

(the parties also provided mutual releases).  The motion states that between the Naim/Kohanim

Settlement and the settlement with the Pirian Parties, approximately $1,410,000 would be available

to the Namco Estate, Ezri Estate and/or Namco Financial, Inc., which will be held by the Namco

Trustee in a segregated bank account, subject to further agreement of the Trustees and/or order of the

Bankruptcy Court.  Such settlement with the Pirian Parties was approved by the Bankruptcy Court

by orders entered on January 20, 2011 in the Namco Case and January 21, 2011 in the Ezri Case.

On June 10, 2011, the Namco Trustee filed a motion to approve a settlement with Mehrdad

Naim regarding a disputed $1,650,000 promissory note from Namco Financial Inc. to Namco that

Mherdad Naim asserts was pledge to him by Namco is secured by the 1929 Pico Boulevard.  Under

the proposed settlement, Mehrdad Naim would have an allowed general unsecured claim in the

Namco case of $140,000 and Mehrdad Naim would reconvey any interest he may have in purported

collateral.  This settlement has been approved by the Bankruptcy Court and Naim has executed a full

reconveyance of his interest in the 1929 Pico Boulevard property.

## 12.    Turnover Motion in Namco Case

On October 6, 2009, the Namco Trustee filed a motion for an order directing Commerce

Escrow Company to turnover property of the Namco Estate, including:  (a) promissory notes payable

to Namco; (b) documents in escrow files related to such promissory notes, the LLCs or Ezri (but

excluding documents not belonging to them); and (c) any remaining 1031 exchange funds that are

property of the Namco Estate, Ezri Estate or one of the LLCs.  No objections were filed to the

motion.  On November 19, 2009, the Bankruptcy Court entered an order approving the motion.

76

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 13. Termination of Retirement Plans

Namco's retirement plans consist of a defined benefit pension plan and a 401(k) profit-sharing plan. On June 10, 2011, Ezri and Ilana Namvar executed releases which waived any and all of their interests in or claims to the retirement plans. Professionals currently are in the process of evaluating the termination of each retirement plan.

### 14. Committees' Plan and Disclosure Statement

The Namco Trustee and his professionals have actively participated in plan negotiations. As stated above, on March 31, 2011, the Committees filed their chapter 11 plan and related disclosure statement for reorganization of the Ezri Estate and Namco Estate. The hearing on approval of the Committee's Disclosure Statement is scheduled for July 6, 2011. As stated above, the Trustees jointly, Wells Fargo Bank, N.A. separately and Mousa Namvar separately objected to approval of the Committees Disclosure Statement in the Ezri Case and Namco Case (the US Trustee also objected to approval of the Committees Disclosure Statement in the Namco Case).

## B. Beshmada

### 1. Beshmada's Consent to Entry of Order for Relief and Conversion of Case to Chapter 11

On June 19, 2009 (the "Beshmada Petition Date"), the Namco Trustee filed an involuntary chapter 7 petition against Beshmada. On June 22, 2010, the Namco Trustee and Beshmada (which is managed by the New Manager) filed a stipulation consenting to entry of an order for relief in the Beshmada Case. On July 1, 2010, the Bankruptcy Court entered an order approving the stipulation and converting the Beshmada Case from chapter 7 to chapter 11.

### 2. Retention of Professionals

Beshmada retained (a) the Law Officers of David W. Meadows as general bankruptcy counsel and (b) PSZJ as special bankruptcy counsel.

### 3. Court Filings

#### a. Claims Bar Date

On September 10, 2010, Beshmada filed a motion to establish a claims bar date in the Beshmada Case. On October 8, 2010, the Bankruptcy Court entered an order establishing November 15, 2010 as the general claims bar date in the Beshmada Case.

77

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### b.    Schedules

On August 31, 2010, Beshmada filed its Schedules.  The Schedules indicated that Beshmada was owned by four of Ezri's children in equal 25% shares.  The Schedules list no owned real property and around $140,000 in personal property, the vast majority of which consisted of interests in numerous LLC entities.  Beshmada's only scheduled secured liability related to a disputed judgment lien held by Starpoint in the amount of $5 million.[33]   Beshmada also scheduled $3,809.93 in priority claims and over $50 million in general unsecured claims.

### c.    Exclusivity

On October 28, 2010, Beshmada filed a motion to extend its exclusivity periods for filing a chapter 11 plan and soliciting votes (the "Beshmada Exclusivity Motion").  In the absence of the motion, exclusivity to file a plan would have ended on October 29, 2010.  The motion requested that the exclusivity period to file a plan be extended to March 31, 2011, and the exclusivity period to solicit votes be extended to May 31, 2011.  On February 8, 2011, the Bankruptcy Court entered an order extending Beshmada's exclusivity periods to March 31, 2011, and May 31, 2011, respectively. On March 30, 2011, Beshmada filed a motion to further extend its exclusivity periods to September 30, 2011, and November 30, 2011, respectively, except for the Committees and Trustees (as to which exclusivity would be terminated).  Such motion was approved by the Bankruptcy Court by its Order entered on May 11, 2011.

### 4.    Disposition of Assets

### a.    Weintraub Settlement

On February 2, 2010, Beshmada and the Ezri Trustee each filed a motion in their respective Cases to approve a restructuring agreement (the "Weintraub Restructuring Agreement") with entities affiliated with Richard Weintraub ("Weintraub") for all properties in which Beshmada and Weintraub had an interest (other than Rancho Malibu, which is discussed below).  Pursuant to such motion, under the Weintraub Restructuring Agreement, Weintraub would pay Beshmada $3 million ($500,000 at closing and the rest over five years) plus a profit participation in certain properties. Such motion was opposed by the Namco Committee (joined by the Ezri Committee), which sought a

---

[33] The Starpoint secured claim was scheduled as being contingent, unliquidated and disputed.

45-day continuance of the hearing on the motion.  On March 24, 2010 (in the Beshmada Case) and

March 25, 2010 (in the Ezri Case), the Bankruptcy Court entered orders granting the motion.

On April 5, 2010, the Ezri Committee filed a motion (subsequently joined by the Namco

Committee) to reconsider such order because the Ezri Committee said that it learned that after the

entry of the order that one of the properties had allegedly increased in value due to the approval of

entitlements and an agreement with the secured lender.  Beshmada opposed the Ezri Committee's

motion to reconsider.  On April 21, 2010, the Bankruptcy Court denied the Ezri Committee's motion

(the order was amended on April 22, 2010).

### b.  Park Fifth

On August 18, 2010, Beshmada filed a motion to approve a settlement under which

Beshmada would cause its wholly-owned subsidiary Ezilan 5, LLC ("Ezilan 5"), to transfer its 50%

membership interest in Afrinam LLC ("Afrinam") to AILA Corp ("AILA") for $500,000.  Pursuant

to such motion, Afrinam owns a 60% membership interest in Park Fifth, LLC, which in turn owns

2.27 acres of land located at Fifth and Olive streets in downtown Los Angeles, California, that is

currently being used as parking lot but which is entitled for a mixed-used development consisting of

790 residential units, a 212 unit hotel (with over 10,000 square feet of meeting space), 14,000 square

feet of retail space and 18,000 square feet of restaurant space, along with over 1,100 parking spaces

(the "Park Fifth Property").

The Park Fifth Property had been appraised at over $19.6 million as of December 31, 2009.

Additionally, AILA had made a series of emergency loans to Afrinam, totaling $31,303,846.35

pursuant to Afrinam's LLC operating agreement, which agreement provides that emergency loans

must be repaid (with 12% annually compounded interest) before distributions are made to members

for their equity interests.  Beshmada determined that the Park Fifth Property would need to sell for

over double its appraised value for Ezilan 5 to receive any distribution from Afrinam, and, therefore,

the $500,000 settlement payment that Ezilan 5 would receive under the settlement (embodied in a

Membership Interest Purchase Agreement) would be far more than what Ezilan 5 would receive

otherwise (if it received any amount at all).  On September 23, 2010, the Bankruptcy Court entered

an order approving such motion.

79

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 5. Remaining Assets

Assets remaining in the Estate include restricted Cash, a promissory note, interests in entities with direct or indirect interests in real property and other assets, rights against other parties to avoid transfers of interests in LLCs and other assets.

## C. Beshmada of DE

### 1. Beshmada of DE's Consent to Entry of Order for Relief and Conversion of Case to Chapter 11

On June 19, 2009 (the "Beshmada of DE Petition Date"), the Namco Trustee filed an involuntary chapter 7 petition against Beshmada of DE. On June 22, 2010, the Namco Trustee and Beshmada of DE (which is managed by the New Manager) filed a stipulation consenting to entry of an order for relief in the Beshmada of DE Case. On July 2, 2010, the Bankruptcy Court entered an order approving the stipulation and converting the Beshmada of DE Case from a chapter 7 liquidation case to one under chapter 11.

### 2. Retention of Professionals

Beshmada of DE retained (a) the Law Officers of David W. Meadows as general bankruptcy counsel; (b) PSZJ as special bankruptcy counsel and (c) Montgomery, McCracken, Walker & Rhoads, LLP as special counsel pursuant to an agreement with Deptford Township (as discussed below).

### 3. Court Filings

#### a. Claims Bar Date

On September 10, 2010, Beshmada of DE filed a motion to establish a claims bar date in the Case. On October 8, 2010, 2010, the Bankruptcy Court entered an order establishing November 15, 2010 as the general claims bar date in the Beshmada of DE Case.

#### b. Schedules

On August 31, 2010, Beshmada of DE filed its Schedules. According to the Schedules, Beshmada of DE's only assets were accounts receivable (almost all of which was allegedly owed by Beshmada) and interests in various LLC entities having unknown value. Beshmada scheduled de minimis priority tax claims and over $26 million in allegedly liquidated general unsecured claims

80

1  owed to Namco, and numerous other obligations in unknown amounts, scheduled as being

2  contingent, disputed and unliquidated.  The Schedules show that Beshmada of DE had the same

3  ownership as Beshmada.

###    c.    Exclusivity

5  On October 28, 2010, Beshmada of DE filed a motion to extend its exclusivity periods for

6  filing a chapter 11 plan and soliciting votes (the "Beshmada Exclusivity Motion").  In the absence of

7  the motion, the Beshmada of DE exclusivity to file a plan would have terminated on October 29,

8  2010.  The motion requested that the exclusivity period to file a plan be extended to March 31, 2011,

9  and the exclusivity period to solicit votes be extended to May 31, 2011.  On February 14, 2011, the

10  Bankruptcy Court entered an order extending Beshmada of DE's exclusivity periods to March 31,

11  2011, and May 31, 2011, respectively.  On March 30, 2011, Beshmada of DE filed a motion to

12  further extend its exclusivity periods to September 30, 2011, and November 30, 2011, respectively,

13  except for the Committees and Trustees (as to which exclusivity would be terminated).  Such motion

14  was approved by the Bankruptcy Court by Order entered on May 11, 2011.

###    4.    Settlement with Township of West Deptford

16  On August 23, 2010, Beshmada of DE filed a motion for an order approving a settlement

17  with the Township of West Deptford, New Jersey ("West Deptford").  As set forth in the motion,

18  Beshmada of DE had indirectly (through other LLCs) acquired real property located in West

19  Deptford for almost $9 million, of which West Deptford received approximately $5.2 million.  Per

20  the motion, Beshmada of DE's affiliated LLCs had agreed to develop the property into a hotel and

21  conference center, a marina complex and a residential complex, and operate an existing golf course

22  pursuant to a redevelopment ordinance of West Deptford.  Beshmada of DE's LLCs had defaulted

23  and West Deptford had brought suit.  Beshmada of DE negotiated a settlement with West Deptford

24  under which the property would be deeded back to West Deptford, and (in exchange) West Deptford

25  would pay Beshmada of DE $625,000 from the proceeds of West Deptford's first resale of any

26  portion of the property (the parties also provided global mutual releases).  On September 24, 2010,

27  the Bankruptcy Court approved Beshmada of DE's motion to approve the settlement with West

28  Deptford.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

81

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 5.    Remaining Assets

Assets remaining in the Estate include unrestricted Cash, promissory notes, interests in LLCs and other entities holding interests in real property or other property and various litigation.

## D.    Dimes

### 1.    Dimes Consent to Entry of Order for Relief and Conversion of Case to Chapter 11

On June 19, 2009 (the "Dimes Petition Date"), the Namco Trustee filed an involuntary chapter 7 petition against Dimes.  On June 22, 2010, the Namco Trustee and Dimes (which is managed by the New Manager) filed a stipulation consenting to entry of an order for relief in the Dimes Case.  On July 2, 2010, the Bankruptcy Court entered an order approving the stipulation and converting the Dimes Case from a chapter 7 liquidation case to a chapter 11 case.

### 2.    Retention of Professionals

Beshmada retained (a) the Law Officers of David W. Meadows as general bankruptcy counsel and (b) PSZJ as special bankruptcy counsel.

### 3.    Court Filings

#### a.    Claims Bar Date

On September 10, 2010, Dimes filed a motion to establish a claims bar date.  On October 8, 2010, 2010, the Bankruptcy Court entered an order establishing November 15, 2010 as the general claims bar date in the Dimes Case.

#### b.    Schedules

On August 31, 2010, Dimes filed its Schedules.  According to its Schedules, half of the Interest in Dimes is owned by three of Ezri's children (Daniel: 16.67%, Malka: 16.67% and Shirah: 16.66%), and half is owned by the Namvar Family Trust (care of Neilson).  Dimes's over $729,000 in personal property assets consisted largely of accounts receivable, "loan fees", miscellaneous equipment, and interests in various LLC entities of unknown value.  The LLCs included WN Birdview, LLC, the sole owner of Bunwil Capital, a co-owner (as a tenant in common) of the Wilshire Bundy Property,  Bundy Dimes, another co-owner of the Wilshire Bundy Property, and Rancho Malibu.  Dimes's over $11 million in unsecured scheduled debt is owed principally to

82

1  Beshmada and Namco.  All of Dimes's general unsecured debts are listed as being contingent,

2  unliquidated or disputed.

3          **c.**     **Exclusivity**

4       On October 28, 2010, Dimes filed a motion to extend its exclusivity periods for filing a

5  chapter 11 plan and soliciting votes (the "Dimes Exclusivity Motion").  In the absence of the motion,

6  the Dimes exclusivity to file a plan would have ended on October 29, 2010.  The motion requests

7  that the exclusivity period to file a plan be extended to March 31, 2011, and the exclusivity period to

8  solicit votes be extended to May 31, 2011.   On February 8, 2011, the Bankruptcy Court entered an

9  order extending Dimes's exclusivity periods to March 31, 2011, and May 31, 2011, respectively.

10  On March 30, 2011, Dimes filed a motion to further extend its exclusivity periods to September 30,

11  2011, and November 30, 2011, respectively, except for the Committees and Trustees (as to which

12  exclusivity would be terminated).  Such motion was approved by the Bankruptcy Court by its Order

13  entered on May 11, 2011.

14       **4.**     **Disposition of Assets**

15          **a.**     **Sales and Settlements**

16

17          **i.**     **St. Patrick's Day Lease**

18       On December 11, 2009, St. Patrick's Day Lease, LLC ("St. Patrick's Day Lease"), which is

19  managed by the New Manager, filed a voluntary chapter 11 petition in this Bankruptcy Court,

20  commencing case number 2:09-bk-45134-BR (the "St. Patrick's Day Lease Case").  On January 15,

21  2010, St. Patrick's Day Lease filed its Schedules.  St. Patrick's Day Lease's response to Item 21 of

22  its Statement states that Dimes owns 100% of the membership interest in St. Patrick's Day Lease.

23       On July 21, 2010, St. Patrick's Day Lease filed a motion for an order approving sale

24  procedures for 1.57 acres of land located in Los Angeles County, California that is subject to a long-

25  term ground lease (expiring January 31, 2024), including a reversionary fee simple interest in an

26  approximately 35,000 square feet industrial complex located at 1000-1016 Hillcrest Boulevard,

27  Inglewood, California, and 601-625 S. Hindry Avenue, Inglewood, California (the "St. Patrick's Day

28  Lease Property").  The Bankruptcy Court approved such motion on August 9, 2010.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

On August 2, 2010, St. Patrick's Day Lease filed a motion to sell the St. Patrick's Day Lease Property to Maxxam Enterprises, LP ("Maxxam").  Over the objection of Morad Radfar, the representative for a holder of a disputed lien, the Bankruptcy Court approved the sale to Maxxam and its assignee Hillcrest Woods, LLC for $1,350,000.

Per the St. Patrick's Day Lease's Schedules, the St. Patrick's Day Lease Property is subject to three disputed liens of $749,000 (Namco), $360,000 (Radfar Family Trust) and $350,000 (SMB Corporation).  St. Patrick's Day Lease states in Schedule B of its Schedules that that it has a fraudulent and/or preferential transfer avoidance claim of over $1 million against the three lienors, and on September 7, 2010, St. Patrick's Day Lease commenced an adversary proceeding against the Radfar Family Trust to avoid its lien.  St. Patrick's Day Lease's Schedules also states that St. Patrick's Day Lease has a loan receivable of $139,200 from Namco.  As of the date of this Disclosure Statement, the Radfar action has been settled pursuant to a final order of the Bankruptcy Court.  As all litigation has been settled and all claims resolved, the St. Patrick's Day Lease bankruptcy case will be dismissed.

### ii.   Rancho Malibu Settlement

On July 9, 2010, Dimes filed a motion for an order authorizing it to enter into a agreement and amendment to the operating agreement of Rancho Malibu, LLC ("Rancho Malibu"), which owned approximately 27 acres of vacant land located at 24111 Pacific Coast Highway in Malibu, California (at the intersection of Malibu Canyon Road near Pepperdine University).  Dimes owns a membership interest in Rancho Malibu.  Under the Ranch Malibu Operating Agreement, Dimes was responsible for funding development and other costs for Rancho Malibu.  According to the motion, prior to the filing of a voluntary chapter 11 petition by Rancho Malibu on July 6, 2010, in the Bankruptcy Court (case no. 1:10-bk-18138-GM, which is before Judge Mund), East West Bank ("EWB"), the holder of the deed of trust on the Rancho Malibu property, had scheduled a foreclosure sale.[34]  Under the proposed settlement, (a) Rancho Malibu would file its chapter 11 petition; (b) Weintraub and his entities would control Rancho Malibu; (c) Weintraub's entities

---

[34] Prior to Rancho Malibu's chapter 11 filing, on October 9, 2009, the Bankruptcy Court denied a motion made by Dimes it its case under which REB would advance funds to Rancho Malibu to induce EWB to forebear on its foreclosure.

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

agreed to pay Dimes (or would propose a plan for Rancho Malibu that would pay) $500,000 for

Dimes's membership interest in Rancho Malibu within specified deadlines (and provides for Dimes'

control of a sale of the Rancho Malibu property if applicable deadlines were not met); (d) mutual

releases would be provided by the parties; and (e) Rancho Malibu's operating agreement would be

amended to reflect the settlement.  The settlement would result in the release and waiver of

approximately $5 million in claims against Dimes' estate.  No objections were filed to the motion.

On August 4, 2010, the Bankruptcy Court in the Dimes Case approved the settlement.

After the approval of the amendment to Rancho Malibu's operating agreement, the

circumstances regarding the Rancho Malibu property changed for the worse.  On September 21,

2010, the State of California imposed a prohibition on certain wastewater disposal systems in the

area where the Rancho Malibu property is located which constituted an effective building

moratorium in the region.  Also, EWB filed a motion for relief from the automatic stay regarding the

Rancho Malibu property which, because the Rancho Malibu case is a single-asset real estate case,

would have to be granted pursuant to the Bankruptcy Code unless Rancho Malibu filed a

confirmable plan or commenced payments to EWB.  These events resulted in a decline in the value

of the Rancho Malibu property as well as the value of Dimes's right to effectuate a sale of the

Property if Weintraub, REB and Manhattan did not make the $500,000 payment or propose a plan

contemplated by the amendment to operating agreement.

Accordingly, the parties decided to enter into two settlement agreements, which was part of a

global settlement regarding the Rancho Malibu property, the approval of which was sought

simultaneously in the Dimes's case and in the Rancho Malibu case.  Specifically, the settlement

contemplated that, instead of the right to receive $500,000 or to seek to sell the Ranch Malibu

property under the conditions set forth in the amendment to operating agreement, Dimes would

receive (a) $200,000 from EWB, upon approval of the settlement agreement and the corresponding

settlement in the Rancho Malibu case; and (b) a secured note in the principal amount of $200,000

from Weintraub if an entity controlled by Weintraub and Sohaili (or its affiliate, successor or

assignee) exercised an option to purchase the Property from EWB, which would be granted relief

from stay in the Rancho Malibu case.  Under the settlement, the parties would exchange mutual

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

85

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    releases.  No objections were filed to the motion to approve the settlement filed in the Dimes case.

2    On December 14, 2010, the Bankruptcy Court entered its order approving the settlement.[35]

3         **5.**    **Remaining Assets**

4         Assets remaining in the Estate include restricted Cash, promissory notes, interests in entities

5    holding direct or indirect interests in real property or other property, rights against third parties to

6    avoid transfers of non-Cash assets, and various litigation rights.

7    **E.**    **Claims Bar Dates, Summary of Claims Process**

8         **1.**    **Claims Bar Dates**

9         On September 10, 2010, Beshmada filed a motion to establish a claims bar date in the

10    Beshmada Case.  On October 8, 2010, the Bankruptcy Court entered an order establishing November

11    15, 2010, as the general claims bar date in the Beshmada Case. On October 8, 2010, 2010, the

12    Bankruptcy Court entered orders establishing November 15, 2010, as the general claims bar date in

13    the Beshmada of DE and Dimes Cases, as well.

14         On September 16, 2009, the Bankruptcy Court held a hearing and approved November 13,

15    2009, as the general claims bar date in the Namco Case (other than for claims between the Ezri

16    Estate and the Namco Estate).  On November 24, 2010, the Bankruptcy Court entered an order

17    approving the November 13, 2009, claims bar date previously approved by it at the September 16,

18    2009 hearing.

19         On September 30, 2009, the Bankruptcy Court entered an order establishing November 13,

20    2009 as the general claims bar date in the Ezri Case (other than for claims between the Ezri Estate

21    and the Namco Estate).

22         **2.**    **Claims Objection Procedures**

23         As of the time that the Proponents are soliciting votes on the Plan, the Trustees and the DIP

24    Debtors have not completed their analyses of Claims (including Administrative Claims) or Interests.

25    All objections to Claims pending as of the Effective Date shall continue and the Control Parties shall

26    have the authority, exclusive of all others, to assert, file, settle, compromise withdraw or litigate to

27    _____

28    [35] On December 16, 2010, the Bankruptcy Court in the Rancho Malibu case entered its order approving the settlement in
that case.

judgment objections to Claims or settle or compromise any Disputed Claim against the Post

Confirmation Estate(s), except that any party in interest may timely object to applications for

Professional Fees incurred prior to the Effective Date.  All objections to Disputed Claims shall be

Filed on or before the Claims Objection Deadline.  The Control Parties shall have the right to seek

an extension of that date from the Bankruptcy Court, without notice or a hearing, if a complete

review of all Claims and action thereupon in not completed by such date.

Settlements of any Claim or Disputed Claim against an Estate may be effectuated by

stipulation or signed writing between the applicable Creditor and the applicable Control Party or by

the Creditor amending its claim to reduce its amount to an amount agreed upon by the Control Party.

The Control Parties may evaluate and determine strategy as to, prosecute, settle, or withdraw any

objection to a Disputed Claim, in their sole discretion, without further order of the Bankruptcy

Court.

**F.    No Substantive Consolidation**

In general, substantive consolidation is the pooling of two or more debtors' assets and

liabilities so that each of the debtor's liabilities are satisfied from the common pool of assets created

by the substantive consolidation.  Because it is an equitable remedy, substantive consolidation is

used to afford creditors equitable treatment.  While various other factors may be considered by

courts, generally, bankruptcy courts order substantive consolidation of multiple debtors if it is

demonstrated that (i) the operational and financial affairs of the debtors are so entangled that the

accurate identification and allocation of assets and liabilities cannot be achieved, or (ii) creditors

dealt with the debtors as a single economic unit and did not rely on the separate identity of an

individual debtor in extending credit.

The following facts, among others, militate against substantive consolidation:  The Debtors

maintained separate financial statements for each Debtor entity, which data can be readily identified

and reconciled on a Debtor by Debtor basis.  The Debtors maintained intercompany balances with

respect to transactions conducted by and between Debtor entities, recording the same as "payables"

or "receivables" depending upon whether the applicable Debtor maintained a positive or negative

balance from such transactions.  The Debtors' operations were structured such that individual Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

87

entities served separate purposes and functions and, accordingly, had separate bases for existence and different assets and liabilities.  In addition, historically, creditors of the various Debtors and their non-debtor subsidiaries transacted business with the Debtors in a manner that respected the separateness of such entities.  All of these facts, among others, militate against the extraordinary remedy of substantive consolidation.

If some or all of the Estates were to be substantively consolidated, the potential recoveries for creditors from Estate Assets and proceeds thereof would likely materially differ from the potential recoveries for creditors contemplated herein, with some creditors receiving a potentially lower recovery and some creditors receiving potentially higher recovery.

## G.    The Debtors' Liabilities

Below is a chart setting forth the Proponent's current estimate of Allowed and unpaid Administrative Claims as of the Effective Date of the Plan, Allowed Secured Claims, Allowed Priority Claims and Allowed Unsecured Claims against each of the Debtors after reduction for currently identified infirmities or disputes.  The Claims totals therein are estimates based on the Proponent's current analysis, which is on ongoing, and also subject to negotiations and adjudication of Claims Objections under the Plan and the actual amount of the Allowed Claims in each of the identified Classes may be materially different.  The estimate of Allowed Claims has been used by Proponents in the estimate of dividends to Creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

**Estimated Allowed Claims by Class and Case[36]**

| | Namco Classes 1-8(a) | Ezri Classes 1-8(b) | Beshmada Classes 1-8(c) | Beshmada of DE Classes 1-8(d) | Dimes Classes 1-8(e) |
|---|---|---|---|---|---|
| Unclassified Administrative Claims | $10,804,653 | $6,916,214 | $181,277 | $105,745 | $15,106 |
| Unclassified Priority Tax Claims | $617,319 | $847,387 | $3,253 | $3,712 | $12,195 |
| Class 1: Secured Real Property Tax Claims | $0 | $0 | $0 | $0 | $0 |
| Class 2: Miscellaneous Secured Claims | $2,073,966 | $0 | $1,200,088 | $0 | $0 |
| Class 3: Priority Claims | $0 | $0 | $0 | $0 | $0 |
| Class 4: General Unsecured Claims | $507,680,257 | $202,990,229 | $293,850,782 | $26,983,931 | $13,202,181 |
| Class 5: Bank Guaranty Claims[37] | N/A | $190,308,655 | N/A | N/A | N/A |
| Class 6: Other Guaranty Claims[38] | N/A | $14,921,232 | N/A | N/A | N/A |
| Class 7: Small Convenience Claims | $7,663,469 | $177,083 | $20,713 | $0 | $3,746 |
| Class 8: Interests | N/A | N/A | N/A | N/A | N/A |

In connection with voting on the Plan, confirmation of the Plan, or other purpose, the Trustees and/or DIP Debtors may file with the Bankruptcy Court a motion or motions to have

---

[36]  The amounts listed are the Proponents estimates only of what the Allowed Claims will be in each Class following the conclusion of the claim objection process.

[37]  These estimates do not take into account defenses/objections to the Bank Guaranty Claims based on the validity and enforceability of the underlying guarantee agreements.

[38]  The estimated amount of Other Guaranty Claims assumes that all Creditors holding Other Guaranty Claims agree to the proposed settlement of guaranty defenses where they agree to reduce their claims to 15% of the otherwise Allowed amount if the guarantees are valid in consideration of the Ezri Trustee's waiver of his defense to the validity and enforcement of the guaranty. The Ezri Trustee believes that it is likely that the Other Guaranty Claims will be zero if the validity and enforceability of the guaranties is litigated, however, there are risks and uncertainties in the ultimate outcome and the Ezri Estate would incur additional legal fees in litigation. If the Trustee does not prevail in litigation on the validity and enforceability of guaranty defenses the Allowed amounts of the Claims may be substantially higher.

89

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

disputed, contingent and/or unliquidated Claims estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code.

THE TRUSTEES AND THE DIP DEBTORS ARE NOT WAIVING UNDER THE PLAN OR IN THIS DISCLOSURE STATEMENT ANY RIGHT TO, AMONG OTHER THINGS, OBJECT TO THE CLAIM OF ANY CREDITOR.  IN VOTING ON THE PLAN, CREDITORS SHOULD ASSUME THAT THEIR CLAIM MIGHT BE OBJECTED TO BY THE DEBTORS, TRUSTEES, OTHER CREDITORS, THE ESTATE REPRESENTATIVES, OR OTHER PARTIES IN INTEREST.

Below is a further description of the different types of Claims against the Debtors.

**1.    Administrative Claims**

The Plan provides for the payment as an Administrative Claim of the actual and necessary costs or expenses of preserving the Debtors' Estates or conducting the affairs of the Debtors. Certain expenses have arisen during the Cases that would constitute Administrative Claims that have not been paid in the ordinary course of the Debtors' post-Petition Date affairs.  Further, the Plan provides that fees and expenses for the Professionals retained by the Trustees and the DIP Debtors and the Committee for services rendered and costs incurred after the Petition Date and prior to the Effective Date will be paid following approval by the Bankruptcy Court after notice and a hearing or pursuant to another order of the Bankruptcy Court.  Of these Administrative Claims the Proponents estimate that Allowed Professional fees and expenses in the Debtors' Cases incurred as of December 31, 2011, will total approximately $28.4 million , approximately $19.9 million of which will still not have been paid.  The breakdown for each Debtor is set forth on the chart above.

**2.    Priority Tax Claims**

Allowed Priority Tax Claims include certain unsecured income taxes, employment taxes and other Taxes described in section 507(a)(8) of the Bankruptcy Code.

**3.    Miscellaneous Secured Claims**

Under the Plan, Creditors with Allowed Miscellaneous Secured Claims that have not been paid or otherwise satisfied will be paid in full, will be treated as follows:  Unless such Holder agrees to a less favorable treatment, each Holder of an Allowed Miscellaneous Secured Claim, if any, will

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

90

receive, on account of and in full and final satisfaction of any such Allowed Miscellaneous Secured Claim, one of the following treatments which shall be selected by the applicable Trustee or DIP Debtor and communicated to the Holder of such Claim prior to the Voting Deadline:  (a)  Surrender or Abandonment; (b) Periodic Payments Pursuant to Approved Settlement Agreements; or (c) Periodic Cash Payments, all as described in greater detail in section V.D.2.b, below.

**4.    Priority Claims**

Priority Claims comprise Claims entitled to priority under section 507(a)(4) and (5) of the Bankruptcy Code.  Allowed Priority Claims are to be paid in full under the Plan on the later of the Effective Date of the date such Allowed Priority Non-Tax Claim becomes payable in accordance with the terms governing such Allowed Priority Claim.

**5.    General Unsecured Claims**

**a.    Overview**

General Unsecured Claims include:

i.    <u>Namco</u>:  Scheduled and Filed Claims arising from unsecured loans to Namco, Claims Filed by taxing authorities and other miscellaneous Claims.

ii.    <u>Ezri</u>:  Approximately $15 million in Filed Claims arising from unsecured loans to Namco which erroneously were filed in the Ezri Case, Filed Claims arising from unsecured loans from Namvar Relatives or Ezri/Namvar Relatives-owned entities, Inter-Debtor Claims, deficiency Claims and other miscellaneous Claims.

iii.    <u>Beshmada</u>:  Filed Claims arising from Beshmada's failure to fund capital contributions to various LLCs per the LLC operating agreements and other Claims related to LLC operating agreement breaches, Claims of Starpoint, Court-approved settlements and judgments, Filed Guaranty Claims, Inter-Debtor Claims, and other Claims.

iv.    <u>Beshmada of DE</u>:  Filed Claims for Beshmada of DE's failure to fund capital contributions to LLCs per those LLC operating agreements and other Claims relating to those agreements, Inter-Debtor Claims and other Claims.

91

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

v.    Dimes:  Scheduled and Filed Claims arising from unsecured loans to Dimes, judgments, Claims Filed by taxing authorities, indemnification Claims, Inter-Debtor Claims and other Claims.

**b.    Inter-Debtor Claims**

Certain Estates hold Inter-Debtor Claims against Other Estates, whether or not a proof of Claim is filed or deemed filed pursuant to section 501 of the Bankruptcy Code in the Cases.  Namco filed Inter-Debtor Claims against the other Debtors based on review and analysis of the books and records of each of the Debtors and claims of Namco against the Debtors.  Under the Plan, Inter-Debtor Claims are Allowed in the amounts set forth in Exhibit "A" to the Plan and shall be treated in the same manner as all other Class 4 General Unsecured Claims.

**c.    Ezri/Namco Claim Settlement**

The Trustees of the two Estates have considered the various factors listed below and agreed that Namco shall be allowed a General Unsecured Claim of $150 million in the Ezri Estate.  Namco has a direct claim against Ezri Namvar for funds advanced and accrued but unpaid interest at 8% through the petition date of approximately $38 million.  In addition, Namco has claims against various LLC's and Real Estate for funds advanced with accrued but unpaid interest at 8% through the petition date in which Ezri has a direct or indirect interest.  Namco is asserting that Ezri Namvar is joint and severally responsible for the full amounts of these claims.  The amount of these claims is approximately $147 million.  The total of these claims by Namco against Ezri is approximately $185 million.  Finally, the Ezri Namvar estate has an unused net operating loss carryforward of approximately $110 million as of December 31, 2009, which may be used to reduce potential income tax liability in the future thereby increasing the amount of proceeds available to the creditors of all estates.  Considering all the above amounts due to Namco from Ezri and the value of the potential tax savings through the application and use of Ezri's NOL carryforward, the Trustee's settled on the amount of $150 million.

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### d.    Small DIP Debtors Claim Settlement

The DIP Debtors are in the process of reviewing and validating the Trustees' analysis which should be completed by the scheduled hearing on this Disclosure Statement.  Tentatively, the settled amounts are set forth in Exhibit "A" to the Plan.

### 6.    Small Convenience Claims

Small Convenience Class Claims are any Claim against any of the Estates that would otherwise be a General Unsecured Claim but for the fact that the Claim is Allowed in an amount that is greater than $0 and less than or equal to $100,000 or for which the Creditor elects to reduce the Allowed amount of its Claim to $100,000; provided, however, that a Claim may not be sub-divided into multiple Claims of $100,000 or less for purposes of receiving treatment as a Small Convenience Claim.  For purposes of the estimate of Allowed Convenience Class Claims, the Proponents have only included estimates of Allowed General Unsecured Claims of $100,000 or less and have not included General Unsecured Claims which may be reduced to $100,000 or less in order to receive treatment as a Small Convenience Claim.

### 7.    Bank Guaranty Claims and Other Guaranty Claims

The Class 5 Bank Guaranty Claims all relate to loans made to LLCs that are or were owned directly or indirectly by Ezri and or Namvar Relatives for the acquisition or refinancing of real estate.  The Class 6 Other Guaranty Claims are those Claims based on a guaranty agreement not directly related to real estate acquisitions or financing, owed to Namco Exchange clients, Namco creditors and other parties.

## V.

## DESCRIPTION OF THE PLAN

### A.    Treatment of Unclassified Claims

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority. However, in accordance with Bankruptcy Code section 1123(a)(1), certain types of Claims are not classified in any Classes under the Plan, and the Proponents have not placed such Claims in a Class. These Claims are "unclassified."  Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Secured Tax Claims are not

93

considered Impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  The treatment of these unclassified Claims is as provided below.

### 1.    Treatment of Allowed Administrative Claims

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different treatment, and subject to the Administrative Claims Bar Dates set forth in the Plan, the Control Parties shall pay each Allowed Administrative Claim in full, in Cash, the later of (i) on the Effective Date, (ii) within fourteen (14) Business Days after the date such Administrative Claim becomes an Allowed Administrative Claim, or (iii) on the date such Allowed Administrative Claim becomes due according to its terms.  Nothing in the Plan shall prohibit the DIP Debtors, Trustees or Control Parties from paying, during or after the Cases, Administrative Claims in the ordinary course of business in accordance with applicable law and the terms of the particular obligation (including without limitation Ordinary Course Administrative Claims), but after the Effective Date, the DIP Debtors and Trustees shall have no obligations to pay any Claims, including Administrative Claims, and the Control Parties' obligation to pay Administrative Claims will depend upon the claimant's compliance with the applicable Plan Section and such Administrative Claim being Allowed under the provisions of the Plan.

### 2.    Administrative Claims Bar Dates

Any Administrative Claim not Filed by the applicable Administrative Claims Bar Date shall not be Allowed and no Distribution shall be made on account of any such Administrative Claim. Any Person asserting such an Administrative Claim shall be forever barred from asserting such Claim against Namco, the DIP Debtors, the Estates, the Post Confirmation Estates, the Liquidating Trusts, the Control Parties, and their Agents and property.

### a.    Bar Date for Gap Administrative Claims

In accordance with Bankruptcy Code section 502(f), all requests for payment of Gap Administrative Claims (*e.g.*, Administrative Claims that, among other things, are incurred in the ordinary course of business or financial affairs in the Cases from or after the applicable Petition Date and before the Order for Relief Date) shall be or shall have been Filed with the Bankruptcy Court

94

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  and served upon the Control Parties no later than the Prepetition Claims Bar Date (which was

2  November 13, 2009, for Namco and Ezri and November 15, 2010 for the DIP Debtors).

3  **b.    General Administrative Claims Bar Date**

4  All requests for payment of Administrative Claims incurred before the Effective Date under

5  Bankruptcy Code §§ 507(a)(2), 507(a)(3) or 507(b) shall be Filed with the Bankruptcy Court and

6  served upon the Control Parties no later than the General Administrative Claims Bar Date (which is

7  8 weeks (56 days) after the Effective Date, unless such date is extended by the Bankruptcy Court

8  after appropriate notice).

9  **c.    Administrative Tax Claims Bar Date**

10  Notwithstanding the General Administrative Claims Bar Date, all requests for payment of

11  Administrative Claims by a Governmental Unit for Taxes (and for interest and/or penalties related to

12  such Taxes) for any Tax year or period, all or any portion of which occurs or falls within the period

13  from and including the applicable Order for Relief Date and through and including the Effective

14  Date ("Administrative Tax Claims") must be Filed and served (if after the Effective Date, on the

15  Control Parties) by the Administrative Tax Claims Bar Date (which is the earlier of:  (a) any Bar

16  Date applicable to such Claim established by the Bankruptcy Court prior to the Effective Date; and

17  (b) the first Business Day following the later of (i) the fifty-sixth (56th) day after the Effective Date

18  and (ii) the one-hundred seventy-fifth (175th) day after the filing of the Tax return for such Tax year

19  or period with the applicable Governmental Unit).

20  **d.    Ordinary Course Administrative Claims Bar Date**

21  Notwithstanding the Bar Dates for General Administrative Claims and Administrative Tax

22  Claims, all requests for payment of Ordinary Course Administrative Claims (which are

23  Administrative Claims for ordinary course trade obligations and routine payroll obligations incurred

24  in the ordinary course of an Estate's business on or after the applicable Order for Relief Date and

25  before the Confirmation Date) must be Filed and served (if after the Effective Date, on the Control

26  Parties) by the Ordinary Course Administrative Claims Bar Date (which is the earlier of:  (1) any

27  Bar Date applicable to a particular Claim as previously established for such Claim in these Cases;

28  and (2) the first Business Day that is the later of (a) the one-hundred seventy-fifth (175th) day

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

following the Effective Date and (b) any other Administrative Claims Bar Date established under the Plan).

### e.    Professional Fees Bar Date

Administrative Claims for Professional Fees for services rendered and for reimbursement of expenses incurred on or after the applicable Order for Relief Date and before the Effective Date must be asserted through the Filing of Fee Application. Notwithstanding the other Administrative Claims Bar Dates, all such Fee Applications shall be Filed with the Bankruptcy Court and served upon the Control Parties no later than the Professional Fee Bar Date (which is the first Business Day following the seventieth (70th) day (ten (10) weeks) after the Effective Date, unless such date is extended by the Bankruptcy Court after appropriate notice).

### 3.    Treatment of Priority Tax Claims

Priority Tax Claims are certain unsecured income taxes, employment taxes and other Taxes described by Bankruptcy Code § 507(a)(8). The Bankruptcy Code requires that each Holder of such a Priority Tax Claim receive the present value of such Claim in deferred Cash payments over a period not exceeding five (5) years from the applicable Order for Relief Date and that such treatment not be less favorable than the treatment accorded to non-priority unsecured creditors.

Allowed Priority Tax Claims, if any, shall receive from the respective Post Confirmation Estate or Liquidating Trust (i) equal Cash payments to be made on the last Business Day of each third full-calendar month following the Effective Date, *provided that* the first payment need not be made any sooner than twenty-eight (28) days following the Effective Date and *provided that* such periodic payments are to be payable until January 29, 2014 for the Namco and Ezri Cases and July 2, 2014 for the DIP Debtors' Cases,[39] on which date the final payment shall be due, with all such payments totaling 100% of the principal amount of such Claim, plus interest on any unpaid balance from the Effective Date, calculated at the nonbankruptcy interest rate applicable on the Effective Date, if any, or (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the applicable Control Party, provided such treatment is on more favorable terms to the

---

[39] For the Namco and Ezri Cases, this date is five years after January 29, 2009, which was the date of the Orders for Relief in the Namco and Ezri Cases.  For the DIP Debtors Cases, this date is five years after July 2, 2010, which was the date of the Orders for Relief in the DIP Debtors' Cases.

96

applicable Post Confirmation Estate or Liquidating Trust than the treatment set forth in clause (i) hereof; <u>provided that</u>, prepayments shall be permitted, including payment in full, any time on or after the Effective Date.

**B.    Classification of Claims and Interests**

    **1.    Classification Generally**

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. The Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired, and the Plan sets forth the treatment each Class will receive.  The table below lists the Classes of Claims established under the Plan and the categories of unclassified Claims which were described in Article IV above.  All Classes of Claims and Interests are Impaired.

For voting purposes and to comply with Bankruptcy Code § 1122(a), each Allowed Secured Claim shall be deemed to be in its own subclass even if not expressly designated as such. Further, in the event that any alleged Secured Claim is not, or is only partially, Allowed as a Secured Claim, the deficiency amount (Unsecured Deficiency Claim) (if Allowed and, where applicable, Filed by the Unsecured Deficiency Claim Bar Date), will constitute a Class 4 Claim or Class 7 Claim against the applicable Estate, as appropriate, and will receive the same treatment as provided to other Claims in Class 4 or Class 7 of such Estate.

The Plan does not intend to and does not provide for substantive consolidation of any of the Debtors for any purpose, *e.g.*, for voting, for classification, for the testing of compliance of the Plan with applicable provisions of the Bankruptcy Code, for treatment of Claims and Interests**,** or for the obligations created under the Plan with respect to Distributions for Creditors.  Thus, each Allowed Claim in a Class shall be deemed to be in one or more subclasses of the applicable Debtor:

|  |  |
|---|---|
| Namco: | Subclass (a); |
| Namvar: | Subclass (b); |
| Beshmada: | Subclass (c); |
| Beshmada of DE: | Subclass (d); and |
| Dimes: | Subclass (e). |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

If, at the hearing on Confirmation, the Proponents establish a reasonable good faith belief that a particular Class or subclass contains no Allowed Claims, such Class or subclass shall be disregarded.

THE INVESTIGATION OF CLAIMS AND INTERESTS IS NOT YET COMPLETE, AND THEIR LISTING IN THE PLAN OR BELOW SHOULD NOT BE CONSTRUED AS INDICATING OR PROVIDING, FOR ANY PARTICULAR CLAIM, THAT SUCH CLAIM IS ALLOWED UNDER THE PLAN IN ANY RESPECT (WHETHER AS TO AMOUNT OR AS TO STATUS, *E.G.*, AS A SECURED CLAIM, SECURED REAL PROPERTY TAX CLAIM, ETC.), EXCEPT AS EXPRESSLY SET FORTH ELSEWHERE IN THE PLAN**.**

## 2.    Classes and Treatment of Claims and Interests

The following describes the treatment and Distributions, if any, to be made in respect of Allowed Claims and Allowed Interests that are classified. No Distributions will be made in respect of Claims or Interests that are not Allowed, including those Disallowed or not Filed by the applicable Prepetition Claims Bar Date.

### a.    Classes 1(a) to 1(e) – Secured Real Property Tax Claims

The treatment of any Allowed Secured Real Property Tax Claims in Class 1 under the Plan is as follows:

#### i.    Voting and Impairment

Class 1 is Impaired under the Plan, and each Holder of an Allowed Secured Real Property Tax Claim, if any, is entitled to vote on the Plan.

#### ii.    Liens

As of the Effective Date, each Holder of an Allowed Secured Real Property Tax Claim in Class 1, on account of such Claim, if any, shall retain its underlying Liens on the applicable collateral pending full payment.

#### iii.    Alternative Treatments

Each Holder of an Allowed Secured Real Property Tax Claim shall receive, on account of and in full and final satisfaction of any such Claim, one of the three alternative treatments identified immediately below.  At any time prior to Confirmation, the Trustee or DIP Debtor of the applicable

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

Estate may elect option (a):  Abandonment.  If option (a):  Abandonment is not elected, the Holder

of each Allowed Secured Real Property Tax Claim shall have the opportunity to elect  between

treatment (b): Effective Date Payment or treatment (c): Quarterly Payments, below in connection

with voting on the Plan.  If such Holder does not return a Ballot or does not otherwise make such

election, such Holder will receive treatment (c): Quarterly Payments.

**(a)    Abandonment**

At the applicable Trustee's or DIP Debtors' election, the property securing such Allowed

Secured Real Property Tax Claim shall be abandoned and, as of the Effective Date, the Holder of

any such Allowed Secured Real Property Tax Claim in Class 1, on account of such Claim, shall have

left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Secured Real

Property Tax Claim in Class 1 and shall be free to pursue its rights and remedies, if any, against the

underlying collateral under applicable non-bankruptcy law; or

**(b)    Effective Date Payment**

On the Effective Date or as soon as practicable thereafter, the Holder of the applicable

Allowed Secured Real Property Tax Claim shall receive a lump sum payment, equal to the amount

of such Allowed Secured Real Property Tax Claim as of the Petition Date, plus interest thereupon

from the Petition Date until payment at the rate of five  percent (5%) per annum; or

**(c)    Quarterly Payments**

Each Holder of an Allowed Secured Real Property Tax Claim shall receive quarterly Cash

payments, with interest at the rate applicable under non-bankruptcy law, if any, or, if none, the

federal judgment rate applicable as of the Effective Date, with each payment to be made on the last

Business Day of each third full-calendar month following the Effective Date by the applicable Estate

or Liquidating Trust (provided that the first payment need not be made any sooner than twenty-eight

(28) days following the Effective Date).  Payments shall continue until five years following the

applicable Order for Relief Date, on which date the final payment shall be due.  Prepayments are

permitted any time on or after the Effective Date, including payment in full of the Allowed Amount

of the Claim, plus accrued interest as provided in this paragraph.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

99

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

#### iv.   Sources of Payment

Any amounts payable to the Holders of Allowed Secured Real Property Tax Claims under the Plan shall be made on the Effective Date or thereafter by the applicable DIP Debtor or Trustee and, after the Effective Date, as its own obligation by the applicable Post Confirmation Estate or Liquidating Trust that owns the real property serving as collateral for the subject Claim.

### b.   Classes 2(a) to 2(e) – Miscellaneous Secured Claims

The treatment of any Allowed Miscellaneous Secured Claims in Class 2 under the Plan shall be as follows:

#### i.   Voting and Impairment

Class 2 is Impaired under the Plan, and each Holder of an Allowed Miscellaneous Secured Claim in Class 2, if any, is entitled to vote on the Plan.

#### ii.   Liens

As of the Effective Date, each Holder of an Allowed Miscellaneous Secured Claim in Class 2, if any, on account of such Claim, shall retain its underlying Liens on the applicable collateral pending full payment.

#### iii.   Alternative Treatments

Unless such Holder agrees to a less favorable treatment, each Holder of an Allowed Miscellaneous Secured Claim, if any, will receive, on account of and in full and final satisfaction of any such Allowed Miscellaneous Secured Claim, one of the following treatments which shall be selected by the applicable Trustee or DIP Debtor and communicated to the Holder of such Claim prior to the Voting Deadline:

#### (a)   Surrender or Abandonment

As of the Effective Date, the applicable DIP Debtor or Trustee of the applicable Estate will be deemed to abandon or surrender to the Holder of any Allowed Miscellaneous Secured Claim in Class 2 the property securing such Allowed Miscellaneous Secured Claim in Class 2 as of the Effective Date and will turn over possession of such collateral to the Holder of such Allowed Miscellaneous Secured Claim as soon as practicable thereafter; or

100

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(b)** **Periodic Payments Pursuant to Approved Settlement Agreements**

The Holder of any Allowed Miscellaneous Secured Claim that is subject to a settlement agreement that is approved by the Bankruptcy Court prior to or in connection with the Plan shall receive periodic payments and such other rights as are set forth in such settlement agreements; or

**(c)** **Periodic Cash Payments**

The Holder of a Miscellaneous Secured Claim shall receive twenty (20) equal quarterly Cash payments, with interest at the rate of five percent (5%) per annum, with each payment to be made on the last Business Day of each third full calendar month following the Effective Date by the applicable Post-Confirmation Estate or Liquidating Trust (provided that the first payment need not be made any sooner than twenty-eight (28) days following the Effective Date).  Prepayments are permitted any time on or after the Effective Date, including payment in full of the Allowed Amount of the Claim, plus accrued interest as provided in this paragraph.

**(d)** **Sources of Payment**

Any amounts payable to the Holders of Allowed Miscellaneous Secured Claims under the Plan shall be made by the applicable Estate, Post-Confirmation Estate or Liquidating Trust.

**(e)** **Unsecured Deficiency Claims**

If a Holder of an Allowed Miscellaneous Secured Claim contends it holds or wishes to assert an Unsecured Deficiency Claim related to its Allowed Miscellaneous Secured Claim then, by the Unsecured Deficiency Claims Bar Date (which is no later than the first Business Day that is at least twenty-eight (28) days following the Effective Date) and regardless of any prior Filing of one or more proofs of Claim by such Holder, such Holder must File (and serve upon the Control Parties) an amended proof of Claim (in compliance with Bankruptcy Rule 3001) asserting, inter alia, the amount of such Unsecured Deficiency Claim.  Any such Unsecured Deficiency Claim, if Allowed, shall be treated as a General Unsecured Claim or Small Convenience Claim, as applicable.

**c.** **Classes 3(a) to 3(e) – Priority Claims**

The treatment of any Allowed Priority Claims in Class 3 under the Plan shall be as follows:

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### i.  Voting and Impairment

Class 3 is Unimpaired under the Plan, and each Holder of an Allowed Priority Claim in Class 3 is not entitled to vote on the Plan.

### ii.  Treatment

Each Holder of an Allowed Priority Claim in Class 3 shall be paid, on account of such Claim, as an obligation of the applicable Estate, Post Confirmation Estate, or Liquidating Trust, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Claim, the full amount of such Allowed Priority Claim in Cash on the later of (i) the Effective Date, and (ii) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim.

### iii.  Source of Payment

Distributions to Holders of Allowed Priority Claims shall be paid by the applicable Estate, Post Confirmation Estate, or Liquidating Trust.

### d.  Classes 4(a) to 4(e) – General Unsecured Claims

The treatment of any Allowed General Unsecured Claims in Class 4 under the Plan shall be as follows:

### i.  Voting and Impairment

Class 4 is Impaired under the Plan, and each Holder of an Allowed General Unsecured Claim is entitled to vote on the Plan.

### ii.  Treatment

Each Holder of an Allowed General Unsecured Claim (including an Allowed Inter-Debtor Claim) shall be entitled to receive, on account of such Allowed Claim, Distribution of a Pro Rata share, together with (i) Holders of Allowed Class 4 General Unsecured Claims, (ii) as to the Ezri Estate only, Holders of Allowed Bank Guaranty Claims against the Ezri Estate and (iii) as to the Ezri Estate only, Holders of Allowed Other Guaranty Claims against the Ezri Estate, of the Available Plan Proceeds of its applicable Post Confirmation Estate or Liquidating Trust.

### iii.    Distribution Dates

Distributions of Available Plan Proceeds shall be payable at such times as determined in the sole discretion of the applicable Control Party, considering, *inter alia*, the amount of funds available for Distribution and the progress in the Claims allowance process.

### iv.    Source of Payment

Distribution to Holders of Allowed General Unsecured Claims shall be paid by the applicable Estate, Post-Confirmation Estate, or Liquidating Trust.

### e.    Class 5(b) – Bank Guaranty Claims

Class 5 only applies to the Ezri Estate.  The treatment of Allowed Bank Guaranty Claims in Class 5(b) under the Plan shall be as follows:

### i.    Voting and Impairment

Classes 5 is Impaired under the Plan.  Each Holder of a Bank Guaranty Claims is entitled to vote on the Plan.

### ii.    Treatment

All Class 5 Bank Guaranty Claims are Disputed.  Holders of Bank Guaranty Claims may select one of the following treatments on their Ballot.  If no Ballot is timely returned by a Holder of a Bank Guaranty Claim or if the Holder of a Bank Guaranty Claim does not make a selection of one of the following options, then such Claim will receive the treatment set forth in section (b) below.

### (a)    Settlement of Validity and Enforceability Objections

If a Holder of such Claim both (a) elects to settle, to the extent provided below, the dispute regarding the validity and enforceability of its guaranty and (b) votes to accept the Plan on its ballot, then:

(i)    The Ezri Estate will waive as of the Plan's Effective Date its objections to such Bank Guaranty Claim to the extent based on the validity and enforceability of the underlying guaranty agreement, but will not waive any other defenses, setoffs, recoupments or reductions and

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(ii)     To the extent of any resulting Allowed Bank Guaranty Claim, the Holder of such Allowed Claim shall receive, on account of such Allowed Claim, Distributions of a Pro Rata share, together with (I) other Holders of Allowed Class 5(b) Bank Guaranty Claims against the Ezri Estate, (II) the Holders of Allowed Class 4(b) General Unsecured Claims against the Ezri Estate and (III) the Holders of Allowed Class 6(b) Other Guaranty Claims against the Ezri Estate of the Available Plan Proceeds of the Ezri Estate, provided that

(iii)     In exchange for the Ezri Estate's objection waiver as provided above in this section, the pay rate for such electing Holders of an Allowed Bank Guaranty Claim against the Ezri Estate shall be reduced relative to the pay rate for Holders of other Allowed Claims sharing in such Available Plan Proceeds, which reduction shall be effectuated by quadrupling for purposes of calculating Distributions, the amount of other Allowed Claims in Class 4(b), Class 5(b) (if non-electing) or Class 6(b) until the amount of Available Plan Proceeds Distributed is 25% of the aggregate of all Allowed Claims in Classes 4(b), 5(b) and 6(b).

**(b)     Continued Litigation over Validity and Enforceability of Guaranty**

If a Holder of a Bank Guaranty Claim against the Ezri Estate does not both (a) vote in favor of the Plan <u>and</u> (b) elect to settle the dispute regarding the validity and enforceability of its guaranty, then:

(i)     Such Holder shall retain its Bank Guaranty Claim against the Ezri Estate and the applicable Control Party shall retain and reserve for assertion all appropriate objections and defenses to such Claim; and

(ii)     In the event such Claim is ultimately Allowed, each Holder of an Allowed Bank Guaranty Claim against the Ezri Estate shall receive on account of such Allowed Claim against the Ezri Estate Distributions of a Pro Rata share, together with (I) the other Holders of Allowed Class 5(b) Bank Guaranty Claims against the Ezri Estate, (II) the Holders of Allowed Class 4(b) General Unsecured Claims against the Ezri Estate, and (III) the Holders of

104

Allowed Class 6(b) Other Guaranty Claims against the Ezri Estate of Available Plan Proceeds of the Ezri Estate.

### iii.    Distribution Dates

Distributions of Available Plan Proceeds shall be payable at such times as determined in the sole discretion of the applicable Control Party, considering, inter alia, the amount of funds available for Distribution and the progress in the Claims allowance process.

### iv.    Source of Payment

Distributions to Holders of Allowed Bank Guaranty Claims shall be paid by the Ezri Post-Confirmation Estate.

### v.    Class 6(b) – Other Guaranty Claims

Class 6 only applies to the Ezri Estate.  The treatment of any Allowed Other Guaranty Claims in Class 6(b) under the Plan shall be as follows:

### vi.    Voting and Impairment

Class 6 is Impaired under the Plan.  Each Holder of an Other Guaranty Claim is entitled to vote on the Plan.

### vii.    Treatment

All Other Guaranty Claims are Disputed.  Holders of Other Guaranty Claims may select one of the following treatments on their Ballot.  If no Ballot is timely returned by a Holder of an Other Guaranty Claim or if the Holder of an Other Guaranty Claim does not make a selection of one of the following options, then such Claim will receive the treatment set forth in Section (b) below:

### (a)    Settlement of Validity and Enforceability Objection

Each Holder of an Other Guaranty Claim will be afforded the opportunity on its ballot to make the following election and receive the following treatment with respect to its Allowed Other Guaranty Claim:

(a)    If such Holder both (x) votes in favor of the Plan and (y) makes this election,

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    (i)    The Ezri Trustee will waive the defense to its Other Guaranty Claim that

2    would be based upon validity and enforceability, but not any other defenses, setoffs,

3    recoupments or reductions; and

4    (ii)    Such Holder's thereafter Allowed Other Guaranty Claim will be reduced to

5    15% of the otherwise Allowed amount thereof; and

6    (iii)    With respect to only such 15% of its Allowed Claim, the Holder of an electing

7    Allowed Other Guaranty Claim will receive on account of its Allowed Other Guaranty Claim

8    Distributions of a Pro Rata share, together with: (I) other Holders of Allowed Class 6(b)

9    Other Guaranty Claims against the Ezri Estate, (II) Holders of Allowed Class 4(b) General

10    Unsecured Claims against the Ezri Estate, and (III) Holders of Allowed Class 5(b) Bank

11    Guaranty Claims against the Ezri Estate of the Available Plan Proceeds of the Ezri Estate

12    (provided that the Holder of such Other Guaranty Claim will receive nothing with respect to

13    the 85% of its Claim exchanged for the waiver of the Ezri Trustee's defense set forth above);

14    and

15    **(b)    Continued Litigation over Validity and Enforceability of**

16    **Guaranty**

17    Any Holder of an Other Guaranty Claim that does not both (x) elect to vote in favor of the

18    Plan and (y) elect to settle the dispute regarding the validity and enforceability of its guaranty, shall

19    retain its Other Guaranty Claim and the applicable Control Party may continue to pursue all

20    available objections and defenses to such claim.  In the event a Class 6 Claim is ultimately Allowed,

21    each Holder of an Allowed Other Guaranty Claim shall receive Distributions of a Pro Rata share,

22    together with (i) other Holders of Allowed Other Guaranty Claims against the Ezri Estate, (ii)

23    Holders of Allowed Class 4(b) General Unsecured Claims against the Ezri Estate and (iii) Holders of

24    Allowed Class 5(b) Bank Guaranty Claims against the Ezri Estate, of the Available Plan Proceeds of

25    the Ezri Estate.

26

27

28

106

### viii.    Distribution Dates

Distributions of Available Plan Proceeds shall be payable at such times as determined in the sole discretion of the applicable Control Party, considering, inter alia, the amount of funds available for Distribution and the progress in the Claims allowance process.

### ix.    Source of Payment

Distributions to Holders of Allowed Other Guaranty Claims shall be paid by the Ezri Post-Confirmation Estate.

### f.    Classes 7(a) to 7(e) – Small Convenience Claims

This Class consists of Small Convenience Claims, which are Claims against any of the Estates that would otherwise be a General Unsecured Claim but for the fact that each Claim is Allowed in an amount that is greater than $0 and less than or equal to $100,000, or for which the Creditor elects to reduce the Allowed amount of its Claim to $100,000; provided, however, that a Claim may not be sub-divided into multiple Claims of $100,000 or less for purposes of receiving treatment as a Small Convenience Claim.

### i.    Voting and Impairment

Class 7 is Impaired under the Plan.  Each Holder of a Small Convenience Claim is entitled to vote on the Plan.

### ii.    Treatment

Each Holder of an Allowed Small Convenience Claim in Class 7 shall be paid, on account of such Allowed Small Convenience Claim, a lump sum payment in an amount equal to ten percent (10%) of such Allowed Small Convenience Claim, on or as soon as practicable following the Effective Date.

### iii.    Source of Payment

Distributions to Holders of Allowed Small Convenience Claims shall be paid, if on the Effective Date, by the applicable DIP Debtor or Trustee, and if after the Effective Date, by the applicable Control Party.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

107

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**g.**      **Classes 8(a) to 8(e) – Interests**

**i.**      **Voting and Impairment**

Class 8 is Impaired under the Plan. Holders of Interests are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

**ii.**      **Treatment**

**(a)**      **DIP Debtors:** Existing Interests in the DIP Debtors shall not receive any Distributions or retain any property on account of such Interests and such Interests shall be cancelled as of the Effective Date.

**(b)**      **Ezri Estate:** Interests of Ezri in the Ezri Estate shall not receive any Distributions or retain any property under the Plan and shall be extinguished as of the Effective Date. Ezri shall not be required to relinquish Postpetition Earnings or Post-Effective Date Earnings by virtue of the Plan. However Ezri will not receive a Discharge and his Postpetition Earnings and Post-Effective Date Earnings shall be subject to claims asserted by the Post Confirmation Estates or by Creditors asserting claims or causes of action against Ezri.

**(c)**      **Namco Estate:** The Ezri Estate shall not receive any Distributions or retain any property on account of such interest, but, for administrative convenience and the benefit of creditors of the Namco Estate, the Ezri Estate shall retain its interests in the Namco Estate and if and only if all Allowed Claims of Creditors of the Namco Estate are paid in full, plus interest on such Claims (accruing until payment at the federal judgment rate applicable on the Effective Date), then Distributions of remaining Available Plan Proceeds (none are projected) would be payable to the Ezri Post-Confirmation Estate for the benefit of its Creditors holding Allowed Claims against such Post-Confirmation Estate.

**C.**      **Acceptance or Rejection of Plan**

**1.**      **Classes Entitled to Vote**

All Classes of Claims under the Plan are Impaired and entitled to Vote to accept or reject the Plan.

**2.** **Classes Not Entitled to Vote**

Holders of Interests in Classes 8(a) to 8(e) receive nothing under the Plan and, thus, Classes 8(a) to 8(e) are conclusively presumed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).

**3.** **Nonconsensual Confirmation**

Because Classes 8(a) to 8(f) are deemed to have rejected the Plan, and in the event all Classes of Claims do not accept the Plan, the Proponents request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code § 1129 (b).  In addition to the extent that a Class of Claims that is Impaired rejects the Plan, the Proponents request that the Bankruptcy Court confirm the Plan, notwithstanding such rejection, in accordance with Bankruptcy Code section 1129(b).

**D.** **Implementation of the Plan**

The Plan shall be implemented on the Effective Date.  As more fully described in the treatment Sections of the Plan and below, under the Plan, some Allowed Secured Claims and Allowed Claims entitled to priority under the law are to be paid on the Effective Date and Other Claims, including all General Unsecured Claims, are to be satisfied by Distributions from Plan Proceeds.

**1.** **Funding for the Plan**

Funding for the Plan shall be provided by Cash on hand, including the proceeds from sales of Available Real Estate, Inter-Estate Loans, other dispositions of Assets, Litigation Rights and from other net revenue of the Post Confirmation Estates.

**2.** **Effective Date Payments and Inter-Estate Loans**

Under the Plan, on the Effective Date, the Trustees and DIP Debtors (and, after the Effective Date, the Control Parties) shall pay Cash (expected to be primarily the proceeds of sales of Real Estate occurring during the Cases and Inter-Estate Loans) to make those payments that may be due on or shortly after the Effective Date with respect to Allowed Secured Tax Claims, Allowed Miscellaneous Secured Claims, Allowed Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims or Allowed Small Convenience Claims.  To the extent a particular Estate lacks sufficient Cash to make mandatory payments due for that Estate under the Plan, available Cash

109

from other Estates shall be utilized therefor as an Inter-Estate Loan from each lending Estate, Post Confirmation Estate, or Liquidating Trust to the borrowing Estate, Post Confirmation Estate, or Liquidating Trust.  Such Inter-Estate Loans, with simple interest thereupon at eight percent (8%), shall be repaid by the borrower from the first Cash otherwise available for Distributions after the use of the proceeds of the loan.

**3.    The Post-Confirmation Estates/Liquidating Trusts**

**a.    Assets to be Retained in the Post Confirmation Estates**

Upon the Effective Date, the Assets of the Namco and Ezri Estates, including, without limitation, their Affiliated Interests and Litigation Rights, shall be retained as the property of the corresponding Post Confirmation Estate, free and clear of all Claims, Liens, charges, other Encumbrances and interests, except as set forth in the Plan.

**b.    Estate Representatives**

Each of the Post Confirmation Estates shall be managed by the Estate Representatives.  The Namco and Namvar Post Confirmation Estates shall each have two Estate Representatives.  The Estate Representatives shall be deemed appointed for each of the Post Confirmation Estates on the Effective Date of the Plan.  The Estate Representatives shall make decisions regarding the administration of the Post Confirmation Estates collectively, in accordance with the Estate By-laws, which will be filed with the Bankruptcy Court as part of the Plan Supplement.  The By-laws will contain appropriate provisions regarding resolution of any disputes between the Estate Representatives.  The Estate Representatives may employ one or more managers to assist them in carrying out their duties.  The Estate Representatives shall confer prior to the Effective Date and shall agree on which representative will have principal authority and responsibility for the various assets and Litigation Rights.  In the event an Estate Representative resigns, a successor shall be appointed by the remaining Estate Representative.  The Estate Representatives and their agents shall be entitled to hourly compensation for their personal services as Estate Representative at their regular hourly rates and shall not be entitled to any percentage compensation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

110

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

     c.     **Responsibilities of Estate Representatives**

The Estate Representatives shall:  (a) liquidate the Post Confirmation Estates for the benefit of Creditors, (b) monitor and enforce the implementation of the Plan, (c) manage, control, prosecute and/or settle objections to General Unsecured Claims, (d) manage, control, prosecute and/or settle Litigation Rights, (e) act as the Distribution Agent for payment of the Plan Proceeds to Creditors, (f) file periodic reports, and (g) pay fees as required by 28 U.S.C. § 1930.

     d.     **Powers of Estate Representatives to Employ and Compensate Agents and Professionals**

On and after the Effective Date, the Estate Representatives may employ and compensate Persons or Professionals from any funds of or borrowed by the applicable Post Confirmation Estates. The same Professionals may be retained to represent multiple Post Confirmation Estates and Liquidating Trusts except as to matters involving a direct and substantial conflict between the applicable Post Confirmation Estates.  The Estate Representatives shall be authorized to employ and pay Professionals post-confirmation without the need for Court approval, except as follows.  If fees and expenses for a particular Professional are in excess of a $50,000 payment threshold for any month, the Professional shall be paid 80% of their fees and 100% of their costs for such month (or the payment threshold, whichever is greater) and the unpaid balance shall be payable only after fourteen (14) days' notice is afforded thereof to the Notice Parties.  The Notice Parties shall have the right to object to any fees that they do not believe are reasonable or appropriate provided that such objection identifies, with specificity, the fees that are objectionable.  If a timely objection is filed, then the undisputed portion of the monthly fees shall be paid in full and there shall continue a 20% holdback on only the disputed portion of the fees pending resolution of the objection.  The Estate Representatives shall endeavor in good faith to consensually resolve any such objection.  If the objection is not consensually resolved, the Professional may apply for payment to the Court.

     e.     **Indemnification by Post Confirmation Estates**

Each Post Confirmation Estate shall indemnify and hold harmless the Estate Representatives and their Professionals, except to the extent they agree otherwise, from, inter alia, claims, losses, damages, attorney's fees, expenses or causes of action relating to the Post Confirmation Estates other

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

than for those primarily resulting from a gross negligence or intentional misconduct.  Any such indemnification claims shall be paid prior and in preference to any other Distributions to be made from the Post Confirmation Estates.

### f.    Use of Plan Proceeds

The Estate Representatives shall use the applicable Plan Proceeds of each Post Confirmation Estate to pay or reserve for expenses of such Post Confirmation Estates, to make or reserve for Inter-Estate Loans to pay expenses of a related Post Confirmation Estates, and, as Distribution Agent therefor, to distribute Plan Proceeds in accordance with the terms of the Plan.  Expenses of the Post Confirmation Estates may include, without limitation, amounts to (i) indemnify the Estate Representatives as provided in Plan Section 8.3.5, (ii)  compensate and reimburse Professionals engaged by the Estate Representatives, (iii) purchase fiduciary insurance covering the Estate Representatives, (iv) fund other of the Post Confirmation Estates' expenses, and (v) otherwise pay amounts in the exercise of the Estate Representatives' powers, duties and obligations.

### 4.    The Liquidating Trusts

### a.    Formation of Liquidating Trusts

As of the Effective Date, the Liquidation Trusts shall be established and become effective pursuant to, and be governed by, the terms of the Liquidation Trust Agreements, each in a form or substantially the form set forth in the Plan Supplement.

### b.    Transfer and Vesting of Assets to and in the Liquidating Trusts

Upon the Effective Date, the Assets of each DIP Debtor Estate, including, without limitation, its Affiliated Interests and Litigation Rights shall become the property of a corresponding Liquidating Trust, free and clear of all Claims, Liens, charges, other Encumbrances and interests, except as set forth in the Plan.  The Liquidating Trustees shall have the authority to take any corporate action, including dissolution, on behalf of the applicable DIP Debtor and, in furtherance thereof, on the respective Effective Date, each Liquidating Trustee shall be appointed the attorney in fact for its corresponding DIP Debtor.

### c.    Beneficial Entitlements to Liquidating Trust Interests

Upon and after the Effective Date, each Holder of an Allowed General Unsecured Claim

112

1    shall become a Liquidating Trust Beneficiary of the Liquidating Trust for the Estate against which it

2    holds a Claim and, thereby, shall be afforded Liquidating Trust Interests in the applicable

3    Liquidating Trust.  As more fully set forth in the Liquidating Trust Agreement, each Liquidating

4    Trust shall survive for up to five (5) years, provided that if certain Liquidating Trust Assets remain at

5    such time, extensions can be obtained with Bankruptcy Court approval.  Liquidating Trust Interests

6    are not securities, are not subject to trade or assignment and are subject to the restrictions set forth in

7    the Liquidating Trust Agreements.

8         **5.**    **Liquidating Trustees**

9         **a.**    **Appointment of Liquidating Trustees**

10         Under the Plan, on the Effective Date, Bradley D. Sharp shall be the Liquidating Trustee for

11    the Liquidating Trusts.  Successor Liquidating Trustees shall be appointed as set forth in the

12    Liquidation Trust Agreements.  The Liquidating Trustees shall be entitled to hourly compensation

13    for their personal services as Liquidating Trustees at their regular hourly rates, but shall not be

14    entitled to percentage compensation on recoveries in the manner or a similar manner applicable for

15    the period during the Cases.

16         **b.**    **Responsibilities of Liquidating Trustees**

17         Each Liquidating Trustee shall be vested with the authorities, duties and obligations set forth

18    in the Liquidating Trust Agreements, including to:  (i) monitor and enforce the implementation of

19    the Plan on behalf of the Holders of General Unsecured Claims of the Estate to which the

20    Liquidating Trustee's Liquidating Trust relates, (ii) manage, control, prosecute and/or settle on

21    behalf of the Liquidating Trust objections to General Unsecured Claims, (iii) manage, control,

22    prosecute and/or settle on behalf of the Liquidating Trust its other Litigation Rights, (iv) act as

23    Distribution Agent for payment of the Available Plan Proceeds to the Liquidating Trust

24    Beneficiaries and (v) file periodic reports and pay periodic fees as required by 28 U.S.C. § 1930.

25         **c.**    **Powers of Liquidating Trustees to Employ and Compensate Agents and**

26         **Professionals**

27         On and after the Effective Date, the Liquidating Trustees may employ and compensate

28    Persons or Professionals from any funds of or borrowed by the applicable Liquidating Trust without

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

113

Court approval and the same Professionals may be retained to represent multiple Liquidating Trusts

and Post Confirmation Estates excepting themselves from handling only those matters both:

involving a direct and substantial conflict between the applicable Liquidating Trusts; and as to which

the same Person is not making decisions as the Liquidating Trustee for both such Liquidating Trusts.

The Liquidating Trustees may employ one or more managers to assist them in carrying out their

duties.

Until the applicable Case or Cases are closed, (a) the Liquidating Trustees shall be authorized

to employ and pay Professionals post-confirmation without the need for Court approval, except as

follows.  If fees and expenses for a particular Professional are in excess of a $50,000 payment

threshold for any month, the Professional shall be paid 80% of their fees and 100% of their costs for

such month (or the payment threshold, whichever is greater) and the unpaid balance shall be payable

only after fourteen (14) days' notice is afforded thereof to the Notice Parties.  The Notice Parties

shall have the right to object to any fees that they do not believe are reasonable or appropriate

provided that such objection identifies, with specificity, the fees that are objectionable.  If a timely

objection is filed, then the undisputed portion of the monthly fees shall be paid in full and there shall

continue a 20% holdback on only the disputed portion of the fees pending resolution of the

objection.  The Liquidating Trustees shall endeavor in good faith to consensually resolve any such

objection.  If the objection is not consensually resolved, the Professional may apply for payment to

the Court.

### d.    <u>Indemnification by Liquidating Trust</u>

As more fully set forth in the Liquidating Trust Agreements, each Liquidating Trust shall

indemnify and hold harmless its Liquidating Trustee and its Professionals, except to the extent they

agree otherwise, from, inter alia, claims, losses, damages, attorney's fees, expenses or causes of

action relating to the Liquidating Trust other than for those primarily resulting from a gross

negligence or intentional misconduct.  Any such indemnification claims shall be paid prior and in

preference to any other Distributions to be made from the Liquidating Trusts.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

e.    **Use of Liquidating Trust Assets and Liquidating Trust Recovery Proceeds**

Each Liquidating Trustee may use the applicable Plan Proceeds to pay or reserve for expenses of such Liquidating Trust, to make or reserve for Inter-Estate Loans to pay expenses of a related Liquidating Trust or Post Confirmation Estate, and, as Distribution Agent therefor, to pay Plan Proceeds to the applicable Liquidating Trust Beneficiaries.  Expenses of a Liquidating Trust may include, without limitation, amounts to (i) indemnify the Liquidating Trustee as provided above or under the Liquidating Trust Agreement, (ii)  compensate and reimburse professionals engaged by the Liquidating Trustee, (iii) purchase fiduciary insurance covering the Liquidating Trustee, (iv) fund other of the Liquidating Trustee's expenses, and (v) otherwise pay amounts in the exercise of the Liquidating Trustee's powers, duties and obligations.

f.    **Tax Matters**

For federal income tax purposes, the Liquidating Trusts, the Liquidation Trustees, and the Liquidating Trust Beneficiaries shall treat the Liquidation Trusts as a liquidating trusts within the meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124.  For federal income tax purposes, the transfer of each Estate's Assets to the Liquidating Trusts under the Plan is treated as a deemed transfer to the Holders of Allowed General Unsecured Claims of such Estate in partial satisfaction of their Claims followed by a deemed transfer of such assets by such Holders of Allowed General Unsecured Claims to the applicable Liquidating Trust.  For federal income tax purposes, the Holders of Allowed General Unsecured Claims against each Estate shall be deemed to be the grantors and owners of the Liquidation Trust for that Estate and its assets.  For federal income tax purposes, the Liquidation Trusts shall be taxed as a grantor trust within the meaning of IRC sections 671-677 (a nontaxable pass-through Tax entity) owned by the Holders of Allowed General Unsecured Claims.  The Liquidating Trusts shall file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 and report, but not pay Tax on, the Liquidation Trust's Tax items of income, gain, loss deductions and credits ("Tax Items"). The Holders of General Unsecured Claims shall report such Tax Items on their federal income tax returns and pay any resulting federal income

115

1   tax liability.  The Liquidation Trusts and the Holders of Allowed General Unsecured Claims shall

2   use consistent valuations of the assets transferred to the Liquidation Trusts for all federal income tax

3   purposes, such valuations to be determined by the Liquidating Trustees.

4   **6.       Good Faith and Compliance With Law Relating to Distributions**

5           The Proponents (and each of their respective Agents and members) have, and upon

6   Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with

7   the applicable provisions of the Bankruptcy Code and applicable law with regard to the Distributions

8   under the Plan, and therefore are not, and on account of such Distributions will not be, liable at any

9   time for the violation of any applicable law, rule, or regulation governing the solicitation of

10  acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.  Upon entry of

11  the Confirmation Order, all provisions of the Plan addressing Distributions shall be deemed

12  necessary and proper.

13  **7.       Settlement of Inter-Debtor Claims**

14          Various of the Debtors' Estates have Claims against other of the Debtors' Estates (Inter-

15  Debtor Claims) for matters including, without limitation, loans, fraudulent transfers,

16  misrepresentation or fraud. The Trustees undertook diligence with respect to certain of these Claims

17  and their quantification and considered issues of the Claims' impact on Distributions and potential

18  liability disputes.  In light of this review, the Trustees determined that it is appropriate to Allow such

19  Claims in the amounts set forth in Exhibit "A" to the Plan, with the consequences of such allowance

20  to be as specified under the Plan, and, upon the Effective Date, the Inter-Debtor Claims shall be

21  deemed so Allowed.  The DIP Debtors are in the process of reviewing and validating the Trustees'

22  analysis which should be completed by the scheduled hearing on this Disclosure Statement.

23          As a result of the allowance of the Inter-Debtor Claims, the obligee Post Confirmation Estate

24  will receive from the obligor Post Confirmation Estate a Pro Rata share of the Available Plan

25  Proceeds attributable to such Inter-Debtor Claim, which, in turn, may be available for Distribution to

26  Creditors of the obligee Post Confirmation Estate.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**8.    Corporate Action**

On the Effective Date, the adoption, filing, approval and ratification, as necessary, of all corporate or related actions contemplated under the Plan with respect to each of the Estates shall be deemed authorized and approved in all respects.  Without limiting the foregoing, on or after the Effective Date, the Trustees and Control Parties are authorized and directed to issue, execute, deliver, file and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments contemplated by the Plan in the name of and on behalf of the respective Estate or Post Confirmation Estate and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**9.    No Substantive Consolidation**

Nothing in the Plan is intended to substantively consolidate the Estates.

**10.    Tax Indemnification**

The Namco Post Confirmation Estate shall indemnify the Ezri Post Confirmation Estate for any out of pocket expenses resulting from pass through taxes from the Namco Post-Confirmation Estate to the Ezri Post Confirmation Estate.  This indemnification may, at the election of the Trustees, be memorialized in a written agreement to be Filed as part of the Plan Supplement.

**11.    Distributions and Related Matters**

**a.    Distribution Record Date**

On the Distribution Record Date, the Claims Registers shall be closed and any transfer on any Claim therein shall be prohibited.  The Trustees and the DIP Debtors prior to the Effective Date and the Control Parties after the Effective Date shall be authorized and entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the Claims Registers, as applicable, as of the close of business on the Distribution Record Date.

**b.    Distribution Agents**

Whenever the Plan provides that a Trustee, DIP Debtor or Control Party shall make a Distribution under the Plan, such Distribution shall be made by the Trustee, DIP Debtor or Control Party, as applicable, and/or an agent of any of them.  In such instances, the Trustee, DIP Debtor or

1    Control Party, as applicable, shall constitute the "Distribution Agent" under the Plan and shall serve

2    in such capacity without bond.

3        A Distribution Agent shall have no liability to any Person entitled to receive a Distribution

4    pursuant to the Plan for any losses, damages, claims or causes of action, other than those primarily

5    resulting from such Distribution Agent's action or failure to act arising out of, in connection with or

6    resulting from such Distribution Agent's gross negligence or intentional misconduct, and the Post

7    Confirmation Estate against which the affected Creditor holds its Claim shall indemnify and hold all

8    Distribution Agents harmless from claims for any such losses, damages, claims or causes of action,

9    other than those primarily resulting from a Distribution Agent's action or failure to act arising out of,

10   in connection with or resulting from such Distribution Agent's gross negligence or intentional

11   misconduct.  Any such indemnification claims shall be paid prior and in preference to any other

12   payments or Distributions to be made from the Post Confirmation Estates.

13            c.        **Distribution Dates**

14       The sections of the Plan on treatment of Claims specify the times for Distributions.

15   Whenever any payment or Distribution to be made under the Plan shall be due on a day other than a

16   Business Day, such payment or Distribution shall instead be made, without interest otherwise due

17   under the Plan, if any, on the immediately following Business Day.  Distributions due on the

18   Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other

19   provisions of the Plan require the surrender of securities or establish other conditions precedent to

20   receiving a Distribution, the Distribution may be delayed until such surrender occurs or conditions

21   are satisfied.

22       If, under the terms of the Plan, the resolution of a particular Disputed Claim (e.g., it is

23   Disallowed), entitles another Holder of a Claim to a further Distribution or payment, subject to other

24   provisions of the Plan, the appropriate Distribution Agent shall make such further Distribution or

25   payment no later than the first Business Day following the earlier of (a) one year after such

26   resolution or (b) the next date at least fourteen (14) days after such resolution on which another

27   Distribution is due to such Holder of a Claim.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

118

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**d.     Distributions in Cash and Delivery of Distributions**

At the option of the Person making the Distribution, (a) Distributions of Cash pursuant to the Plan may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, provided that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction; and (b) Distributions may be delivered by first-class mail or by other equivalent or superior means.

**e.     Rounding of Payments**

Whenever payment of a fraction of a dollar would otherwise be called for, the actual payment may reflect a rounding down of such fraction to the nearest whole dollar.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole dollar, such Cash shall be treated as Unclaimed Property under the Plan.  No consideration shall be provided in lieu of fractional dollars that are rounded down.

**f.     De Minimis Distributions**

If any Distribution under the Plan to the Holder of an Allowed Claim would be less than $1,000, the applicable payor may withhold such Distribution until the amount payable equals or exceeds $1,000, provided that, for a Cash Distribution, the Distribution Agent shall make the Distribution prior to dissolution of the Post Confirmation Estate or Liquidating Trust if the Distribution to the Creditor would total at least $100.  Any Distribution not payable pursuant to Section 8.9.6 of the Plan shall be treated as Unclaimed Property under Plan Section 8.9.10.

119

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### g.  **Hardship Distributions**

#### i.  **Rationale**

Many of the victims of Ezri's abusive investment scheme were individuals of limited means who invested their life savings with Namco (the "At-Risk Creditors").  These Creditors invested their funds with Namco, seeking a steady source of income from what they understood to be safe well-managed lending arrangement.  Instead of receiving the promised source of income from Namco - an income source that they needed to help them pay for daily necessities such as food, rent and mortgage obligations - these Creditors have been denied both income and access to their principal investment for years.  Since a number of the At-Risk Creditors are aged, infirm, or otherwise cannot survive without the funds they invested, they face foreclosure, eviction and poverty.

Under the Plan, the asset-recovery and liquidation process will take time.  In the initial years, distributions may be limited.  Unfortunately, some of At-Risk Creditors could suffer severe harm before meaningful distributions are forthcoming.  They need more immediate financial relief.

Since the Bankruptcy Code requires similarly situated creditors to receive similar treatment, the Trustee's ability to make expedited payments to the At-Risk Creditors who face near-term harm is limited.  This relief is only available if the other affected Creditors give their consent.  In an effort to design sufficient flexibility into the Plan to meet the needs of those At-Risk Creditors facing time-sensitive harm, the Plan includes the following provisions: Consent By Ballot.  If a Creditor submits a ballot voting in favor of the Plan and affirmatively votes to opt-in to the Hardship Distributions ("Consenting Creditors"), such Creditors will be deemed to consent to the hardship provision described below.

#### ii.  **Mechanics**

Where the applicable Control Party receives and approves a valid hardship petition from an At-Risk Creditor seeking relief under this provision, the Control Party shall be authorized to make a hardship distribution to the qualifying At-Risk Creditor in an amount up to the lesser of twenty thousand dollars ($20,000) per Creditor, or twenty percent (20%) of a qualifying Creditor's Allowed General Unsecured Claim.

DOCS_LA:238119.7 59925-001

The hardship distributions will be funded from a reserve of up to two and one-half million dollars ($2,500,000) that will be funded by taking seven percent (7%) of the distributions that would otherwise have been paid to the Consenting Creditors by the Post Confirmation Estates or Liquidating Trusts (the "Reallocated Distributions"). The Reallocated Distributions shall be repaid to the Consenting Creditors from the distributions that would subsequently be payable to the At-Risk Creditors (if any) who received expedited distributions from the above-mentioned reserve.

All Consenting Creditors should recognize that the foregoing provision is not without risk. At-Risk Creditors who are overpaid will not disgorge such overpayment. If insufficient recoveries are obtained, after the Reallocated Distributions are paid to the At-Risk Creditors, then Consenting Creditors may receive less than they would otherwise be entitled to recover under the Plan.

> **h.** **Disputed Claims**
>
> **i.** **Distribution Calculations to Be Made as if Disputed Claims Were Allowed**

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims under the Plan, including the determination of the amount or number of Distributions due to the Holders of Allowed Claims, each Disputed Claim shall be treated as if it were an Allowed Claim, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (see Plan Section 8.9.8(b)), such amount or number as determined by the Bankruptcy Court shall be used to calculate such Claim.

> **ii.** **Temporary or Permanent Resolution of Disputed Claims**

In order to establish reserves under the Plan and avoid undue delay in the Cases or confirmation of the Plan in the Cases, prior to the Effective Date, the Trustees, and the DIP Debtors, and upon and after the Effective Date, the Control Parties, shall have the right to seek an order of the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code estimating the amount of any Claim irrespective of whether such Disputed Claim was the prior subject of objection or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

estimate any contingent or unliquidated Claim (a) if the matter is initiated prior to the Claims

Objection Deadline, or (b) if the matter relates to a Disputed Claim, in which case the matter may be

initiated at any time during the pendency of any timely Filed objection to the Disputed Claim,

including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court

estimates any contingent or unliquidated Claim, that estimated amount would constitute either the

Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the

Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Disputed

Claim, the Control Parties may elect to pursue any supplemental proceedings to object to any

ultimate Distribution on account of such Claim.  All objection, estimation and resolution procedures

are cumulative and not necessarily exclusive of one another.

### iii.    Distribution Reserves

Distributions due in respect of Disputed Claims shall be made to and/or held in reserve in one

or more Distribution Reserves by the Control Parties for the Post Confirmation Estate or Liquidating

Trust against which was asserted the applicable Disputed Claim.

Each applicable Liquidating Trust will elect to treat Disputed Claim Reserves associated with

such Liquidating Trust as a "Disputed Ownership Fund," pursuant to  Federal Tax Regulations

Section 1.468B-9(c)(2)(ii).  As outlined in this election, Creditors holding disputed claims are not

treated as transferors of the money or property transferred to the "Disputed Ownership Fund."

For Federal income tax purposes, a "Disputed Ownership Fund" is treated as the owner of all

assets that it holds.  A "Disputed Ownership Fund" is treated as a C corporation for purposes of the

Internal Revenue Code.  A "Disputed Ownership Fund" must file all required income and

information tax returns and make all tax payments.

### iv.    No Actual Distributions to be Made to Holders of Disputed Claims

Nonetheless and notwithstanding anything herein to the contrary: (a) no Distribution shall be

made with respect to any Disputed Claim until such Claim becomes an Allowed Claim, and (b)

unless determined otherwise by the Control Parties, as applicable, no Distribution shall be made to

any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

1  Claim(s) have been resolved by withdrawal of the objection to the Claim(s), settlement or Final

2  Order.

3  ### v.  Distributions After Allowance of Initially Disputed Claims

4  Within forty-two (42) days of the date that a Disputed Claim becomes an Allowed Claim,

5  *e.g.*, as a result of an objection to a Disputed Claim being withdrawn, resolved by agreement or

6  determined by a Final Order, any Distributions then due and payable on account of any resulting

7  Allowed Claim shall be made by the appropriate Distribution Agent from the Distribution Reserves.

8  No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining

9  the allowance of such Claim. Although the Trustees, DIP Debtors and Control Parties are to

10 endeavor in good faith to maintain adequate reserves, should a finally Allowed Claim otherwise

11 entitle the Holder to a Distribution in an amount or in excess of the amount allocated for such Holder

12 in the Distribution Reserves, such Holder's entitlement shall be limited to any future amounts

13 otherwise available for Distributions from the Plan Proceeds for the applicable Post-Confirmation

14 Estate, after payment and appropriate reserve for all post-Effective Date expenses. The Holder of a

15 Disputed Claim that becomes an Allowed Claim shall in no event have any recourse to: (a) any

16 payments or Distributions theretofore made to or for the benefit of any other Holder of a Claim; (b)

17 amounts owing with respect to post-Effective Date expenses of the Post Confirmation Estates; or (c)

18 other assets of the Trustees, Control Parties, or their Agents.

19 ### vi.  Disposition of Assets in Distribution Reserves after Disallowance

20 After an objection to a Disputed Claim is sustained in whole or in part by a Final Order or by

21 agreement, such that the Disputed Claim is Disallowed in whole or in part, (a) any Cash held in the

22 Distribution Reserve in respect of the particular Disputed Claim (in excess of the Distributions due

23 on account of any resulting Allowed Claim) shall become the property of the applicable Post

24 Confirmation Estate or Liquidating Trust to be used or distributed by the Control Parties in a manner

25 consistent with the Plan.

26 ### i.  Undeliverable Distributions

27 Prior to the relevant occasion when a Distribution would become Unclaimed Property, if

28 either (i) after a Distribution was sent to the Creditor and is returned as undeliverable, the applicable

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   payor is notified in writing of a new address for a Creditor or notified in writing to cause the

2   Distribution to be resent, or (ii) no Distribution was sent to a Creditor because no address was known

3   for such Creditor and such Creditor notifies the applicable payor in writing of an address for such

4   Creditor, then, the Distribution shall be re-sent, this time to the newly indicated address, within

5   forty-two (42) days after the later of such notification or the last date that the Distribution otherwise

6   was due under the Plan.  After a Distribution is returned as undeliverable, no further Distribution to

7   such Person needs to be made unless and until either the Distribution is successfully re-sent, such as

8   provided above, or the applicable payor is notified in writing of a new address for the subject

9   Creditor.

10              **j.      Unclaimed Property**

11          The Distribution due and any Cash due to a Creditor shall be deemed to be Unclaimed

12   Property if: (i) both such Distribution is returned to the Control Parties or their agents (*e.g.*, as

13   undeliverable) and the check or other similar instrument or Distribution remains unclaimed for one

14   hundred twenty-six (126) days from sending; or (ii) as to Distributions of Cash, the check or other

15   similar instrument or Distribution remains uncashed for one hundred twenty-six (126) days from

16   sending; or (iii) no address is known by the applicable payor for a Creditor for one hundred twenty-

17   six (126) days after the first day such Distribution could have been made; (iv) the Distribution is *de*

18   *minimis* and not distributable in accordance with Plan Section 8.9.6 or (v) the Distribution is a re-

19   sent Distribution, as provided in Plan Section 8.9.9, that either (a) is returned to the Control Parties

20   or their agents as undeliverable or (b) is a check or other similar instrument or Distribution that

21   remains uncashed for twenty-eight (28) days from re-sending.

22          Unclaimed Property consisting of Cash, shall be added to the Distribution Reserves if the

23   Control Parties decide such additional reserves are necessary or appropriate and, otherwise,

24   Unclaimed Property that is Cash shall vest in the appropriate Post Confirmation Estate for further

25   use or Distribution consistent with the Plan.

26          Once there becomes Unclaimed Property for a Creditor, no subsequent Distributions for such

27   Creditor which may otherwise be due under the Plan need be accrued or be held for, or paid to, such

28   Creditor; provided that, if the Control Parties are notified in writing of a Creditor's then-current

124

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

address and status as a Creditor holding an Allowed Claim entitled to undelivered Distributions under the Plan, thereafter, despite such earlier determination of Unclaimed Property, the Creditor will become entitled to its share of Distributions, if any, which first become distributable under the Plan after such notification.

Upon forfeiture of rights under this provision, subject to the terms of this provision, the Claim of any Creditor with respect to such funds shall be discharged and forever barred as to the Post Confirmation Estates notwithstanding any federal or state escheat laws to the contrary, and such Creditors shall have no claim whatsoever against Namco, the DIP Debtors, the Estates, the Post Confirmation Estates, the Liquidating Trusts or their Agents.

If at the time of making the final Distribution, Plan Proceeds remain in a Post-Confirmation Estate in a *de minimis* amount such that the administrative expense of making a final Distribution would absorb any benefit thereto, the Control Parties may contribute the remaining Plan Proceeds to a charitable organization of their choosing that is qualified as tax exempt under Internal Revenue Code section 501(c).

### k. Setoff, Recoupment and Prior Payments

Nothing contained in the Plan shall constitute a waiver or release by the Estates of any right of setoff or recoupment the Estates may have against any Creditor. To the extent permitted by applicable law, after the Effective Date, the Control Parties may set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estates or Post Confirmation Estates may have against the Holder of such Claim or Interest. Similarly, no term or provision of the Plan shall prejudice or affect any rights of any Person to assert a right of setoff or recoupment as a defense to any Litigation Rights.

### l. Compliance with Tax Laws

Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution shall have sole and exclusive responsibility for the satisfaction or payment of any Tax obligation imposed by any Governmental Unit, including income, withholding and other Tax obligation, on account of such Distribution. For Tax purposes, Distributions received in respect

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

125

1    of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess

2    allocated to unpaid accrued interest, if any.

3          The Post Confirmation Estates and Liquidating Trusts shall be authorized to take all actions

4    necessary to comply with applicable withholding and recording requirements and, specifically,

5    pursuant to section 346(i) of the Bankruptcy Code, the applicable Post Confirmation Estates shall be

6    entitled to deduct any federal, state or local withholding taxes from any Cash payments made with

7    respect to Allowed Claims, as appropriate.  With respect to any Person from whom a tax

8    identification number, certified tax identification number or other Tax information required by law

9    to avoid withholding has not been received by the applicable Post Confirmation Estate or

10   Liquidating Trust, the applicable Control Party may, at its sole option, withhold the amount required

11   and distribute the balance to such Person or decline to make such Distribution until the information

12   is received.

13   **12.    Litigation Rights, Objection to and Estimation of Claims and Determination of Taxes**

14

15   **a.    Preservation, Pursuit and Resolution of Litigation Rights**

16          In accordance with section 1123(b) of the Bankruptcy Code, all Litigation Rights, including,

17   but not limited to, (1) Avoidance Actions, and (2) any other Litigation Rights, are preserved and, as

18   of the Effective Date, the Control Parties will retain and may exclusively assert, file, settle,

19   compromise, withdraw, litigate to judgment or otherwise enforce Litigation Rights of each

20   respective Post Confirmation Estate or Liquidating Trust, subject only to any express waiver or

21   release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement

22   entered into in connection with the Plan.  Neither the failure to use a Litigation Right to set off

23   against a Claim, nor the allowance of any Claim, will constitute a waiver or release by any Estate,

24   Trustee, Post Confirmation Estate, Liquidating Trust, or Control Party, of any Litigation Rights that

25   any holder thereof may have against such Creditor.

26          Litigation Rights may include, without limitation, a broad variety of claims, rights or causes

27   of action, such as, by example only, preference actions, fraud, misrepresentation, or other tort

28   actions, contract actions, fraudulent transfer actions, and the right to seek, among other things, to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

126

have a Claim disallowed if the Control Party, at the appropriate time, determines that a Post Confirmation Estate or Liquidating Trust has a defense under 11 U.S.C. § 502(d), e.g., there exists a Litigation Right for an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

As of the time that the Proponents are soliciting votes on the Plan, the Trustees and the DIP Debtors have not completed their analyses of Claims (including Administrative Claims), Interests, or Litigation Rights.  Thus, the reservation above of Litigation Rights shall include, without limitation, a reservation by the Estates, the Control Parties, the Post Confirmation Estates, and the Liquidating Trusts, of the Litigation Rights that have already been asserted as well as any other Litigation Rights not specifically identified in the Plan or Disclosure Statement, or of which the Trustees or Cicalese may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Trustees or Cicalese at this time, or facts or circumstances that may change or be different from those that the Trustees or Cicalese now believe to exist.  Therefore and notwithstanding the failure to identify all Litigation Rights, absent an express written waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude any of the Control Parties from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Litigation Rights, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Litigation Rights upon or after Confirmation, the Effective Date or plan consummation.  Specifically, the Litigation Rights may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date and regardless of whether each Litigation Right and the target thereof has been separately listed and identified prior to the Effective Date.

A deadline for filing certain lawsuits in certain of the Cases arose during the Cases and, prior thereto, the Trustees commenced numerous proceedings.  Nonetheless, no limitations period yet bars objections to Claims or numerous other Litigation Rights.  Thus, for purposes of voting on or objecting to the Plan, any Person who has been in control of or done business with a Debtor or Trustee or with whom a Debtor or Trustee has entered into a transaction or to whom a Debtor or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

127

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Trustee has incurred an obligation or made a transfer of money or property, prepetition or postpetition, should assume that such obligation, transfer, or transaction or their interactions with the Debtor or Trustee may be reviewed by the Trustees and Control Parties, subsequent to the solicitation of votes on the Plan or after the Effective Date and that such Person may be the subject of an action, proceeding or claim by a Post Confirmation Estate or Liquidating Trust after the solicitation of votes on the Plan or after the Effective Date.

By example only and without limiting the foregoing, the utilization or assertion of a Litigation Right or the initiation of any proceeding with respect thereto against a Person, by any of the Control Parties, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of: (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Claim of such Person or such Person's predecessor in interest having been listed in the Debtors' Schedules, List of Equity Security Holders, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim, Interest or Administrative Claim of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Without notice or any need to obtain Bankruptcy Court approval, the Control Parties are hereby granted authority to and may evaluate and determine strategy to, prosecute, transfer, settle, release or waive any of their Litigation Rights including objections to Claims if no specific amount was sought by the Post Confirmation Estate/Liquidating Trust or if the amount to be received by the Post Confirmation Estate/Liquidating Trust is within $100,000 of the amount that had been sought (after deduction from such amount sought of 10% of any General Unsecured Claim and 100% of any other Claim waived under the compromise or settlement, to the extent not the subject of an objection thereto), or if the amount of the Disputed Claim is within $100,000 of the Allowed amount under the proposed compromise and settlement.  Otherwise, the applicable Control Party may evaluate and determine strategy as to, prosecution, transfer, settlement, release or waiver of any Litigation Rights or objections to claims with Bankruptcy Court approval.

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### b. Objection to Claims and Objection Deadline

As of the time that the Proponents are soliciting votes on the Plan, the Trustees and the DIP Debtors have not completed their analyses of Claims (including Administrative Claims) or Interests. All objections to Claims pending as of the Effective Date shall continue and the Control Parties shall have the authority, exclusive of all others, to assert, file, settle, compromise withdraw or litigate to judgment objections to Claims, or to settle or compromise any Disputed Claim against the Post Confirmation Estate(s), except that any party in interest may timely object to applications for Professional Fees incurred prior to the Effective Date.  All objections to Disputed Claims shall be Filed on or before the Claims Objection Deadline.  The Control Parties shall have the right to seek an extension of that date from the Bankruptcy Court, without notice or a hearing, if a complete review of all Claims and action thereupon in not completed by such date.  Settlements of any Claim or Disputed Claim against an Estate may be effectuated by stipulation or signed writing between the applicable Creditor and the Control Parties or by the Creditor amending its claim to reduce its amount to an amount agreed upon by the Control Parties; provided however that such settlements shall be subject to Court Approval pursuant to Section 8.10.1 of the Plan.

### c. Determination of Taxes

Except as may be expressly provided otherwise in the Plan, the applicable Control Party shall be responsible for the determination of Tax issues and liabilities with respect to the applicable Post Confirmation Estate or Liquidating Trust.  In addition to any other available remedies or procedures with respect to Tax issues or liabilities, the Control Parties, at any time, may utilize (and receive the benefits of) Bankruptcy Code § 505 with respect to: any Tax issue or liability relating to an act or event occurring prior to the Effective Date; or any Tax liability arising prior to the Effective Date.  If the Control Parties utilize Bankruptcy Code § 505(b): (1) the Bankruptcy Court shall determine the amount of the subject Tax liability in the event that the appropriate Governmental Unit timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with Bankruptcy Code § 505(b), the Estates, Trustees, DIP Debtors, Control Parties and their Agents shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**13.**     **Cancellation of Existing Notes, Securities and Agreements**

As of the Effective Date, all notes, securities and all agreements to which one or more of the Estates are parties not assumed as described or provided under the Plan shall be cancelled and deemed null and void and of no further force or effect without any further action on the part of the Bankruptcy Court, the Trustees, the DIP Debtors, the Control Parties, the Estates, the Post Confirmation Estates, the Liquidating Trusts, or any other Person.

**14.**     **Tax Identification Numbers**

The Post Confirmation Estates and Liquidating Trusts may require any Holders of Allowed Claims to furnish their social security number, employer or taxpayer identification number, and the Control Parties may condition any Distribution due to such Holder upon receipt of such identification number and supporting documentation (including, without limitation, an IRS Form W-9).

**15.**     **Official Committees and Their Dissolution**

On the Effective Date, the Official Committees shall be dissolved and the members of the Official Committees shall be released and discharged from any further authority, duties, responsibilities, liabilities and obligations related to, or arising from, the Cases, except that the Official Committees shall continue in existence and have standing and capacity to prepare and prosecute applications for or objections to the payment of Professional Fees incurred prior to the Effective Date.  The Professionals retained by the Official Committees and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred in such capacity after the Effective Date, except for services rendered and expenses incurred in connection with any applications for or objections to the payment of Professional Fees incurred prior to the Effective Date.

**16.**     **Final Decree**

At any time following the Effective Date, the Control Parties shall be authorized to File a motion for the entry of a final decree closing the applicable Case pursuant to section 350 of the Bankruptcy Code.

130

**E.      Executory Contracts and Unexpired Leases**

     **1.      Overview**

The Plan provides for the rejection or assumption of executory contracts and unexpired leases (except as to a real property lease subject to Bankruptcy Code § 365(d)(4) unless otherwise agreed by the lessor) to occur on or before two possible dates.   First, the Plan provides for assumption or rejection to occur on or before the Effective Date of the Plan.  Second, the Plan provides for a blanket extension of the last day for the Control Parties to assume or reject any unexpired lease, through and including the Deferred Assumption Rejection Deadline.   The provisions below establish the procedures with respect to assumption obligations, rejection damage claims, any election under section 365(n) of the Bankruptcy Code, and other applicable provisions relating to the Plan's treatment of executory contracts and unexpired leases.

     **2.      Assumption and Assignment**

As of the Effective Date, pursuant to section 1123(b)(2) of the Bankruptcy Code, (a) the executory contracts and unexpired leases of the Estates that have been expressly identified in the Plan Supplement for assumption (together with any additions, deletions, modifications or other revisions to such exhibit as may be made by the Trustees or DIP Debtors prior to the Effective Date) will be deemed automatically assumed by the applicable Post Confirmation Estates or assumed and assigned to the applicable Liquidating Trust.  The Assumption Obligations, if any, for such contracts or leases will be identified in the Plan Supplement.  Any such cure amount shall be paid in accordance with the provisions of Section 9.4 of the Plan.  Each executory contract and unexpired lease listed in the Plan Supplement shall include any modifications, amendments and supplements to such agreement, whether or not listed in the Plan Supplement.  There also may be assumed, or assumed and assigned, any executory contract or unexpired lease that is the subject of a motion by a DIP Debtor or Trustee initially heard before confirmation of the Plan, or as to which the motion or any subsequent proceeding in respect thereof is pending, as of the Effective Date, to the extent such motion is granted.  The assignee of an unexpired contract or lease shall be exclusively liable for all obligations thereunder arising after the Effective Date.

131

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**3.**    **Extension of Time to Assume or Reject**

Except with respect to a real property lease subject to Bankruptcy Code § 365(d)(4) (unless otherwise agreed by the lessor), and except as to any executory contract or unexpired lease previously assumed or rejected on the Effective Date, a DIP Debtor, Post Confirmation Estate or Liquidating Trust may assume or reject any remaining executory contract or unexpired lease until and including the date that is ninety (90) days prior to the Claims Objection Deadline (the "Deferred Assumption Rejection Deadline").  As to any such deferred assumption or rejection, assumption or rejection shall automatically occur within twenty-eight (28) days following: (i) written notice by the Control Parties delivered by U.S. Mail to the last known service address of any party to such executory contract or lease; and (ii) filing a Notice of Assumption or Rejection in the Bankruptcy Court.  Such Notice of Assumption or Rejection shall state the amount of any cure amount in the event of assumption.  In the event a non-Debtor party disputes such cure amount or otherwise disputes the assumption or rejection of such executory contract or unexpired lease, such non-Debtor party shall File an objection to the rejection or to the assumption and cure amount within twenty eight (28) days of the date of service of the Notice of Assumption or Rejection.  In such event, the applicable Control Party shall promptly file a motion in the Bankruptcy Court with service upon such objecting party, to establish the ability of the Control Party to assume such contract or lease, and to establish such cure amount, if any, to be set for hearing in the Bankruptcy Court.  In the event no timely objection is filed by a party to any unexpired lease or executory contract noticed to be assumed, such unexpired lease or executory contract shall conclusively be deemed assumed and the cure amount fixed as stated in the Notice of Assumption or Rejection.

Except with respect to a real property lease subject to Bankruptcy Code § 365(d)(4) (unless otherwise agreed by the lessor), in the event that a Control Party becomes aware after the Effective Date of the existence of an executory contract or unexpired lease that was not included in the Plan Supplement as an unexpired lease or executory contract, the Control Party may move to assume such contract or lease until the date that is twenty-eight (28) days after the date on which the applicable Control Party becomes aware of the existence of such contract or lease.

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**4.    Assumption Obligations**

(a)    *With respect to those executory contracts or leases assumed on the Effective Date as identified in the Plan Supplement*, the Post Confirmation Estates, or Liquidating Trusts, as applicable shall satisfy each Assumption Obligation, if any (a) by making a Cash payment equal to the amount specified therefor in the Plan Supplement on the later of (i) the Effective Date (or as soon as practicable thereafter), or (ii) the date when due in the ordinary course of business, or (b) in the manner and on such other terms as the non-Debtor party or parties to the applicable executory contract or unexpired lease and the applicable Trustee, DIP Debtor, or Control Party may otherwise agree, unless an objection to such proposed amount is Filed with the Bankruptcy Court and served on counsel to the applicable Trustee, DIP Debtor or Control Party on or prior to the date set by the Bankruptcy Court for Filing objections to Confirmation of the Plan, and the Bankruptcy Court, after notice and hearing, determines that the applicable DIP Debtor, Trustee or Estate is obligated to pay a different amount or provide a different cure, compensation or adequate protection under Bankruptcy Code § 365, in which case, if prior to the Effective Date, Proponents shall have the right to remove such executory contract or lease from the list of contracts to be assumed and assigned pursuant to Section 9.2 of the Plan, or, if following the Effective Date, the Control Party shall File a motion within twenty-eight (28) days after such determination to seek an order of the Bankruptcy Court rejecting such executory contract or unexpired lease.

(b)    *With respect to those executory contracts or unexpired leases assumed pursuant to the Deferred Assumption Rejection Deadline and as identified on the Plan Supplement Exhibit of Deferred Assumptions and Rejections*, the Post Confirmation Estates or Liquidating Trusts shall satisfy each Assumption Obligation, if any (a) by making a Cash payment equal to the amount specified therefor in the Plan Supplement on the later of (i), twenty-eight (28) days after the Deferred Assumption Rejection Deadline (or as soon as practicable thereafter), or (b) in the manner and on such other terms as the non-Debtor party or parties to the applicable executory contract or unexpired lease and the applicable Control Party may otherwise agree, unless an objection to such proposed amount is Filed with the Bankruptcy Court and served on counsel to the applicable Control Party.

133

Any Person that fails to object to the Assumption Obligation specified in the Plan Supplement (as to an Effective Date assumption or rejection) on or prior to the date set by the Bankruptcy Court for Filing objections to Confirmation of the Plan, or (as to a Deferred Assumption or Rejection) by the date(s) set forth above, shall be forever barred from: (a) asserting any other, additional or different amount on account of such obligation against Namco, the DIP Debtors, the Estates, the Trustees, the Control Parties, the Post Confirmation Estates, the Liquidating Trusts, or their Agents or property, and (b) sharing in any other, additional or different Distribution under the Plan on account of such obligation.

## 5.    <u>Rejection</u>

Except as set forth in this Article, supra, of the Plan, as of the Effective Date, pursuant to section 1123(b)(2) of the Bankruptcy Code:

(a)    the following contracts and leases are rejected:

(i)    those contracts and leases expressly identified for rejection in the Plan Supplement (together with any additions, deletions, modifications or other revisions thereto as may be made by the Trustees or the DIP Debtors prior to the Effective Date);

(ii)    any and all executory contracts and unexpired leases of the Estates (1) not previously assumed in these Cases, including as of the Deferred Assumption Rejection Deadline, and (2) not otherwise identified for assumption and assignment (A) under the Plan, including Section 9.2 and the Plan Supplement, or (B) in a motion to assume, or assume and assign, such contract or lease by a DIP Debtor or Trustee initially heard before, or as to which the motion or any subsequent proceeding in respect thereof is pending, as of the Effective Date, to the extent such motion is granted; and

(b)    all indemnification obligations owed to any Person who was, prior to the applicable Order for Relief, a director, officer, managing member, member, partner, employee, asset manager, attorney, accountant, financial advisor or other agent of a Debtor, are deemed to be, and shall be treated as though they are, executory contracts that are rejected (unless (i) previously assumed by order of the Bankruptcy Court, (ii) assumed under the Plan, *including as of the Deferred Assumption Rejection Deadline*, or (iii) the subject of a motion to assume, or assume and assign, by a DIP Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

134

1  or Trustee initially heard before, or as to which the motion or any subsequent proceeding in respect

2  thereof is pending, as of the Effective Date, to the extent such motion is granted).

3  **6.**     **Rejection Claims Bar Date**

4  Any Person asserting any Claim for damages arising from the rejection under the Plan or

5  after the Effective Date of an executory contract or unexpired lease of the Estates shall File a proof

6  of such Claim (in compliance with Bankruptcy Rule 3001) on or before the Rejection Claims Bar

7  Date (which is defined more specifically in Exhibit "B" to the Plan) and, generally, is twenty-eight

8  (28) days following entry of the later of the Effective Date or order effectuating rejection), or be

9  forever barred from: (a) asserting such Claim against Namco, the DIP Debtors, the Estates, the Post

10  Confirmation Estates, the Liquidating Trusts, the Control Parties, or their Agents or property, and (b)

11  sharing in any Distribution under the Plan.  For Claims other than ones for damages arising from the

12  rejection under the Plan of an executory contract or unexpired lease of the Estates and for matters

13  other than Claims, any otherwise applicable Bar Dates remain applicable and are unaffected by this

14  provision.  The Rejection Claims Bar Date is the following date:  (a) if rejection of an executory

15  contract or unexpired lease occurs under the Plan, the first Business Day that is at least twenty-eight

16  (28) days after the Effective Date; and (b) if rejection of an executory contract or unexpired lease

17  occurs after the Effective Date, the first Business Day that is at least twenty-eight (28) days after the

18  later of the date of (i) entry of an order approving such rejection, or (ii) rejection, as provided by the

19  first order approving such rejection.

20  **7.**     **Bar Date for Bankruptcy Code § 365(n) Election**

21  If the rejection of an executory contract gives rise to the right by a non-Debtor party or

22  parties to such contract to make an election under Bankruptcy Code § 365(n) to either treat such

23  contract as terminated or to retain its or their rights under such contract, unless an order of the

24  Bankruptcy Court provides otherwise, such other party or parties to such contract will be deemed to

25  elect to treat such contract as terminated unless, by the Bankruptcy Code § 365(n) Election Bar Date

26  (which is the date no later than the earlier of (i) the Confirmation Date or as to any executory

27  contract rejected as of the Effective Date, the Effective Date, or (ii) as to any executory contracts

28  rejected as of the Deferred Assumption Rejection Deadline, the first Business Day at least twenty-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

135

eight (28) days after service of notice of the rejection of such contract, or the intent hereunder to reject such contract on the non-Debtor party to the applicable contract), such other party or all such other parties File and serve on the Control Parties a notice of its or their election to retain its or their rights under such contract, in which case such non-Debtor party or parties shall retain its or their rights under such contract.

**8.    Retention of Property Rights**

To the extent that a matter that provides a Debtor, a DIP Debtor, Trustee or Estate with property rights does not constitute an executory contract or unexpired lease, or a DIP Debtor, Trustee or Estate has obtained property rights under the executed portion of an executory contract or unexpired lease, the Effective Date of the Plan and any rejection thereunder shall not cause an abandonment or rescission by the applicable Estate of or as to any such property rights.  The status of any contract or lease identified in the Plan Supplement as not being executory or as being expired shall not be subject to challenge by the non-Debtor, non-Estate party to such contract or lease, absent objection to such status prior to the Confirmation Date.  The status as executory or unexpired of any contract listed in the Plan Supplement for rejection shall not be binding on the Control Parties.

**9.    Effect of Confirmation Order as to Contracts, Leases and Insurance**

Pursuant to Bankruptcy Code §§ 365(a) and 1123(b)(2), the Confirmation Order shall constitute an order of the Bankruptcy Court approving, *as to those unexpired leases and executory contracts assumed or rejected as of the Effective Date*, as of the Effective Date, (a) the assumption and assignment of all executory contracts and unexpired leases of the Estates assumed under the Plan, specifically those identified for assumption in the Plan Supplement (as may be amended) and (b) the rejection of such executory contracts and unexpired leases of the Estates specifically identified on the Plan Supplement as to be rejected.  As to all unexpired leases and executory contracts rejected or assumed as the case may be pursuant to the Deferred Assumption Rejection Deadline, the assumption or rejection of such leases or executory contracts *shall be as of* the Effective Date.  The contracts and leases identified in the Plan will be assumed and assigned or rejected, respectively, only to the extent that such contracts or leases constitute executory contracts or unexpired leases of the Estates, and the identification of such agreements under the Plan does not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

136

constitute an admission with respect to the characterization of such agreements or the existence of any unperformed obligations, defaults, or damages thereunder.  Specifically, the Plan does not affect whether any executory contracts or unexpired leases are assumed, rejected or terminated to the extent that they: (a) have been assumed, rejected or terminated prior to the Confirmation Date, or (b) are the subject of a pending motion to assume as of the Confirmation Date that is not withdrawn or denied.

Each executory contract and unexpired lease assumed pursuant to the Plan shall remain in full force and effect and be fully enforceable by the applicable Post Confirmation Estate, Liquidating Trustee or Control Party in accordance with its terms under the law, except as modified by the provisions of the Plan, including Plan Section 9.9, or any order of the Bankruptcy Court or applicable law.  To the extent applicable, all executory contracts or unexpired leases assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control" or an unauthorized assignment, however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

Continuing obligations of third parties to the DIP Debtors, Trustees or their Estates under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, shall continue and shall be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the DIP Debtors, Trustees, Control Parties or by order of Bankruptcy Court.

To the extent a Trustee, DIP Debtor or Control Party hereafter learns that there exists an insurance policy or agreement under which an insurer has a continuing obligation to pay a Debtor, DIP Debtor, Trustee, Estate, Control Party or a third party on behalf of any of them and that it is held by the Bankruptcy Court to be an executory contract and has not otherwise been assumed upon motion by a Final Order, the applicable Control Party may elect by notice to the insurer, specifying

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

137

any Assumption Obligations, that such insurance policy be treated as though it is an executory contract that is assumed under the Plan pursuant to Bankruptcy Code § 365. Thereafter, the provisions of Plan Section 9.4(b) shall be applicable except that the insurer shall have until fourteen (14) days after notice to serve its objection to the Assumption Obligations and the applicable Control Party shall until the twenty-eighth (28th) day after its original notice to elect instead to reject such contract, which rejection may be effectuated by the serving of the notice thereof.

### 10.    Post-Order for Relief Agreements

Unless inconsistent with the provisions of the Plan, all contracts, leases and other agreements entered into by the DIP Debtors or Trustees on or after entry of an Order for Relief in the respective Cases, or previously assumed by any of the Estates prior to the Confirmation Date (or the subject of a pending motion to assume by any of the Estates as of the Confirmation Date that is granted by the Bankruptcy Court), which have not expired or been terminated in accordance with their terms and not listed for rejection in the Plan Supplement, shall be performed by the applicable Post Confirmation Estate, in the ordinary course of business and shall survive and remain in full force and effect following the Effective Date.

### 11.    Modifications to Plan Supplement

The Trustees, the DIP Debtors or the Control Parties shall have the right, any time prior to the Effective Date or the Deferred Assumption Rejection Deadline, to make additions, deletions, modifications and/or other revisions to the identification of executory contracts and leases to be assumed or rejected by the Estates on notice to the non-Debtor party to such contract or lease.

### F.    Conditions to Confirmation and Effectiveness of the Plan

#### 1.    Conditions to Confirmation

Entry of the Confirmation Order is the condition to Confirmation.

#### 2.    Conditions to Plan Effectiveness

The Plan will not be consummated and the Effective Date will not occur unless and until (a) the Confirmation Order shall be a Final Order, (b) the Trustees and the DIP Debtors shall have received any authorization, consent, regulatory approval, ruling, letter, opinion or other documents that the Trustees, in consultation with the DIP Debtors, believe may be necessary to implement the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Plan or believe is required by any law, regulation or order; (c) all actions, documents and agreements that the Trustees believe are necessary to implement the Plan other than the following requirement shall have been effected or executed as determined by the Trustees in their sole and absolute discretion in consultation with the DIP Debtors; and (d) the Trustees have Filed an Effective Date Statement with the Bankruptcy Court indicating that the Confirmation Order is Final and that, upon the Filing of such Effective Date Statement, the conditions to Plan effectiveness all appear to have been met or waived.  (The Trustees may delay the Filing of the Effective Date Statement pending, *inter alia*, negotiations over the payment of Administrative Claims.)  Any of the foregoing conditions may be waived by the Trustees and DIP Debtors.

**G.    Effect of Confirmation**

**1.    Binding Effect**

Confirmation of the Plan shall bind and govern the acts after the Effective Date of the Estates, the Post Confirmation Estates, the Trustees, the DIP Debtors, the Official Committees, the Control Parties, and all Holders of any Claims against, and Interests, in the Debtors or their Estates, whether or not: (a) a proof of Claim or proof of Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest is allowed pursuant to section 502 of the Bankruptcy Code, (c) a Claim or Interest is Impaired or Unimpaired under the Plan; or (d) the Holder of a Claim or Interest has accepted the Plan.

**2.    Property Retained Free and Clear**

Except as otherwise provided in the Plan, upon the Effective Date, title to the remaining Assets shall be retained in the Estates as Post Confirmation Estates as provided in the Plan for the purposes contemplated under the Plan.  Except as otherwise provided in the Plan, upon the Effective Date, all of the Assets shall be free and clear of all Claims, Liens, charges, other Encumbrances and Interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 3.    **Permanent Injunction**

The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in Debtors as against the Assets and as against Namco, the DIP Debtors, their Estates, the Post Confirmation Estates, the Liquidating Trusts, the Control Parties, or their Agents or property.

Except as otherwise expressly provided in the Plan, the documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, all Persons who have held, currently hold, or may hold a debt, Claim, or Interest against a Debtor or its Estate (including but not limited to States and other Governmental Entities, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units, other than as to matters excepted from the automatic stay by Bankruptcy Code § 362(b)(4)) shall be permanently enjoined from:

(a)    taking any of the following actions *on account of any such debt, Claim, or Interest*:

(1)    commencing or continuing in any manner any action or other proceeding against the Trustees, Namco, the Estates, the Post Confirmation Estates, the Liquidating Trustee, the Control Parties, their Agents, or their property;

(2)    enforcing, attaching, executing, collecting, or recovering in any manner, including by way of setoff recuperation or right of subrogation any judgment, award, decree, or order against the Trustees,  Namco, the Estates, the Post Confirmation Estates, the Liquidating Trustee, the Control Parties, or their Agents or property; and

(3)    creating, perfecting, or enforcing any Lien or Encumbrance against the Trustees, Namco, the Estates, the Post Confirmation Estates, the Liquidating Trusts, the Control Parties, their Agents or property; and

(b)    challenging the Distributions to be effected by the Plan or the classification of Claims or Interests set forth in the Plan, except as expressly provided in and permitted by the Plan.

Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.  Nothing contained in the foregoing discharge shall affect the

DOCS_LA:238119.7 59925-001

liability of Ezri for any debt of the Estates or affect the liability, to the full extent provided under section 524(e) of the Bankruptcy Code, of any other Person or their property for any debt of the Estates that is treated under the Plan.

### 4.    Limitation of Liability

Under Bankruptcy Code § 1125(e), entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.  Entry of the Confirmation Order shall be a finding that the Trustees, the DIP Debtors, Namco, the Estates, the Post Confirmation Estates, the Liquidating Trusts, the Control Parties, and their Agents, acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code to the extent that they participated in the soliciting of acceptances or rejections of the Plan or participated in the offer, issuance, sale, or purchase of securities offered or sold under the Plan and they and their property shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### 5.    Exculpation

Notwithstanding contrary provisions of non-bankruptcy law, except as expressly set forth otherwise in the Plan, as of the Effective Date, neither the Trustees, the DIP Debtors, nor the Control Parties, and their Agents (the "Exculpated Parties") shall have any liability to any Holder of any Claim or Interest or any other Person for, any act or omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Dates  in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, the administration of the Plan, the Cases or the property to be distributed under the Plan, or any contract, instrument, document or other agreement entered into pursuant thereto through and including the Effective Date, except for liability:  (a) for damages proximately

141

caused by (i) intentional misconduct as finally determined by a Final Order of the Bankruptcy Court or (ii) gross negligence in connection with (1) implementing the Distribution provisions of the Plan and (2) the making or withholding of Distributions pursuant to the Plan; (b) other than liability resulting from the order of payment of any such Distributions if such order of payment is not expressly set forth in the Plan (the "Exculpated Claims").  The Exculpated Parties may reasonably rely upon the opinions of their respective counsel, accountants, and other experts and Professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or intentional misconduct; *provided however*, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or intentional misconduct.

**6.**   **Releases By Estates**

In addition to the foregoing exoneration, the Estates shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish the Exculpated Claims against the Exculpated Parties.  **THIS RELEASE INCLUDES AN EXPRESS, INFORMED, KNOWING AND VOLUNTARY WAIVER AND RELINQUISHMENT TO THE FULLEST EXTENT PERMITTED BY LAW OF RIGHTS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH READS AS FOLLOWS, AND UNDER ANY SIMILAR OR COMPARABLE LAWS ANYWHERE IN THE WORLD:**

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

Each Estate, by this release, waives and relinquishes any right or benefit that such Estate has or may have under section 1542 of the California Civil Code or any similar provision of statutory or non-statutory law of California or any other jurisdiction to the fullest extent that such releasing Estate may lawfully waive such rights and benefits pertaining to the subject matter of the release set forth above.  In that regard, each such releasing Estate, by this release, further acknowledges that such Estate is aware that such Estate or the attorneys of such Estate may hereafter discover claims or facts in addition to or different from those which such Estate or such attorneys now know or believe

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

to exist with respect to the subject matter of the release, and that it is each such releasing Estate's intention fully, finally, and forever to settle and release any and all Exculpated Claims against each and every Exculpated Party.  Through the release, each such releasing Estate is expressly acknowledging that it understands that, notwithstanding the discovery or existence of any such additional or different claims or facts, the release shall be and remain in full force and effect as a full and complete general release with respect to any and all Exculpated Claims against each and every Exculpated Party.  Through the release, each such releasing Estate further acknowledges that no Exculpated Party has made any representation of any kind or character whatsoever in order to induce the execution of the release.

The Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this section for the Exonerated Parties in accordance herewith.

**7.** **No Third Party Release**

Nothing in the Plan shall be deemed to release claims held by non-Debtor parties against the Exculpated Parties or any other non-Debtor party.

**H.** **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court shall retain jurisdiction over the Cases and any of the proceedings related to the Cases pursuant to Bankruptcy Code § 1142 and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to a Claim;

(b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

143

(c)   Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor or Estate is a party and to hear, determine and, if necessary, liquidate, any Claims arising from, or cure amounts related to, such assumption or rejection;

(d)   Resolve any matters with respect to the timeliness or amount of Distributions to Holders of Allowed Claims in accordance with the Plan;

(e)   Decide or resolve any motions, adversary proceedings, contested or litigated matters, matters involving Litigation Rights and any other matters and grant or deny any applications or motions involving any Debtor, Trustee or Estate that may be pending on the Effective Date;

(f)   Resolve matters concerning ownership and rights to prosecute Litigation Rights;

(g)   Approve, interpret or enforce any settlements or compromises relating to the Plan or the Estates, including settlements or compromises of Claims;

(h)   Enter such other orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation or consummation of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(i)   Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's obligations incurred in connection with the Plan;

(j)   Modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan and the Disclosure Statement, in such manner as may be necessary or

144

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(k)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(l)    Enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

(m)    Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(n)    Enter an order closing the Cases at the appropriate time; and

(o)    Determine such other matters as may be authorized under the provisions of the Bankruptcy Code and exercise such other and further jurisdiction as is authorized or permitted under the Bankruptcy Code.

**VI.**

**OTHER IMPORTANT INFORMATION REGARDING THE PLAN**

**A.    Litigation Rights, Objection to and Estimation of Claims and Determination of Taxes**

      **1.    Preservation, Pursuit and Resolution of Litigation Rights**

In accordance with section 1123(b) of the Bankruptcy Code, all Litigation Rights, including, but not limited to, (1) Avoidance Actions, and (2) any other Litigation Rights, are preserved and, as of the Effective Date, the Control Parties will retain and may exclusively assert, file, settle, compromise, withdraw, litigate to judgment or otherwise enforce Litigation Rights of each respective Post Confirmation Estate or Liquidating Trust, subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan.  Neither the failure to use a Litigation Right to set off against a Claim nor the allowance of any Claim will constitute a waiver or release by any Estate,

145

Trustee, Post Confirmation Estate, Liquidating Trust, or Control Party of any Litigation Rights that any thereof may have against such Creditor.

Litigation Rights may include, without limitation, a broad variety of claims, rights or causes of action, such as, by example only, preference actions, fraud, misrepresentation, or other tort actions, contract actions, fraudulent transfer actions, and the right to seek, among other things, to have a Claim disallowed if the Control Party, at the appropriate time, determines that a Post Confirmation Estate or Liquidating Trust has a defense under 11 U.S.C. section 502(d), e.g., there exists a Litigation Right for an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

As of the time that the Proponents are soliciting votes on the Plan, the Trustees and the DIP Debtors have not completed their analyses of Claims (including Administrative Claims), Interests, or Litigation Rights.  Thus, the reservation above of Litigation Rights shall include, without limitation, a reservation by the Estates, the Control Party, the Post Confirmation Estates, and the Liquidating Trusts, of the Litigation Rights that have already been asserted as well as any other Litigation Rights not specifically identified in the Plan or Disclosure Statement, or of which the Trustees or Cicalese may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Trustees or Cicalese at this time or facts or circumstances that may change or be different from those that the Trustees or Cicalese now believe to exist.  Therefore and notwithstanding the failure to identify all Litigation Rights, absent an express written waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude any of the Control Parties from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Litigation Rights, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Litigation Rights upon or after Confirmation, the Effective Date or plan consummation.  Specifically, the Litigation Rights may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date and regardless of whether each Litigation Right and the target thereof has been separately listed and identified prior to the Effective Date.

146

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

A deadline for filing certain lawsuits in certain of the Cases arose during the Cases and, prior thereto, the Trustees commenced numerous proceedings.  Nonetheless, no limitations period yet bars objections to Claims or numerous other Litigation Rights.  Thus, for purposes of voting on or objecting to the Plan, any Person who has been in control of or done business with a Debtor or Trustee or with whom a Debtor or Trustee has entered into a transaction or to whom a Debtor or Trustee has incurred an obligation or made a transfer of money or property, prepetition or postpetition, should assume that such obligation, transfer, or transaction or their interactions with the Debtor or Trustee may be reviewed by the Trustees and Control Parties, subsequent to the solicitation of votes on the Plan or after the Effective Date and that such Person may be the subject of an action, proceeding or claim by a Post Confirmation Estate or Liquidating Trust after the solicitation of votes on the Plan or after the Effective Date.

By example only and without limiting the foregoing, the utilization or assertion of a Litigation Right or the initiation of any proceeding with respect thereto against a Person, by any of the Estate Representatives, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of: (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Claim of such Person or such Person's predecessor in interest having been listed in the Debtors' Schedules, List of Equity Security Holders, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim, Interest or Administrative Claim of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Without notice or any need to obtain Bankruptcy Court approval, the Control Parties are hereby granted authority to and may evaluate and determine strategy as to, prosecute, transfer, settle, release or waive any of their Litigation Rights including objections to Claims if no specific amount was sought by the Post Confirmation Estate/Liquidating Trust or if the amount to be received by the Post Confirmation Estate/Liquidating Trust is within $100,000 of the amount that had been sought (after deduction from such amount sought of 10% of any General Unsecured Claim and 100% of any other Claim waived under the compromise or settlement to the extent not the subject of an objection thereto), or if the amount of the Disputed Claim is within $100,000 of the Allowed amount under the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

147

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   proposed compromise and settlement.  Otherwise, the Control Party may evaluate and determine

2   strategy as to, prosecution, transfer, settlement, release or waiver of any Litigation Rights or

3   objections to claims with Bankruptcy Court approval.

4          The Trustees and the DIP Debtors have been reviewing available information regarding

5   potential causes of action against third parties, which review is ongoing and which will continue to

6   be conducted by the Trustees and the DIP Debtors and/or their respective successors or

7   representatives after the Effective Date.  Due to the size and scope of the business operations of the

8   Debtors and the multitude of business transactions therein, there may be various causes of action that

9   currently exist or may subsequently arise in addition to any matters identified herein.  Existing or

10  potential causes of action that may be pursued by the Trustees, DIP Debtors, the Estates

11  Representatives and/or their respective successors or representatives (as applicable) include, without

12  implied limitation, the following:  (i) all litigation claims and rights, and causes of action, identified

13  in **Exhibit "6"** hereto;[40] (ii) any other causes of action against current or former officers, directors,

14  employees, and/or insiders of the Debtors; (iii) any and all causes of action relating to the matters

15  listed on the Debtors' Schedules; (iv) any other litigation, whether legal, equitable or statutory in

16  nature, arising out of, or in connection with the Debtors' businesses or operations, including, without

17  limitation:  disputes with creditors, purported lienholders and pledgees in property of any of the

18  Estates, principals and guarantors of any obligations owed to the Estates, direct and indirect

19  transferees of property of the Estates, vendors and customers, overpayments, any amounts owed by

20  any creditor/investor, creditor, vendor or other entity, employee, management, or operational

21  matters, disputes with current or former employees, financial reporting, environmental matters,

22  insurance matters, accounts receivable, contractual obligations, or tort claims that may exist or

23  subsequently arise; and (v) any causes of action not expressly identified in **Exhibit "6"** hereto.

24  **B.**     **Estimation of Claims**

25         The Trustees, DIP Debtors and/or their respective successors or representatives under the

26  Plan may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated

---

[40] **Exhibit "6"** is a non-exclusive list of potential or actual Causes of Action and Defenses that the Trustees and DIP Debtors have asserted or may potentially assert.  The Proponents reserve their right to modify such list to amend such Causes of Action and Defenses or otherwise update the list, but disclaim any obligation to do so.

148

Claim pursuant to 502(c) of the Bankruptcy Code regardless of whether the Debtors, the Trustees, and/or their successors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Trustees, the DIP Debtors and/or their respective successors or representatives under the Plan may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

## C.  **Risk Factors**

Although the Proponents believe that the Plan is confirmable, there are some risks to the performance of the Plan. Certain specific risks to performance of the Plan are described below. Additionally, because of the significant issues that must be addressed with respect to the allowance of Claims, there may be significant delay before any distribution is made on account of Allowed Claims. However, the Proponents believe the very same risks described herein are present or greater to Creditors in Chapter 7 cases.

### 1.    The Chapter 7 Liquidation Analysis and Confirmation Projections Are Based on Estimates and Numerous Assumptions

Underlying the Chapter 7 Liquidation Analysis for each Debtor attached hereto as **Exhibit "3"** and the analysis of Cash Available and Disbursements Required to confirm the Plan attached hereto as **Exhibit "4"** are a number of estimates and assumptions based on current information. Although the estimates and assumptions are considered reasonable by the Proponents may not be realized as they are inherently subject to significant economic, financial, legal, tax and other uncertainties and contingencies, future events that are unknown at this time and actions of other parties beyond the control of the Proponents. Accordingly, there can be no assurance that the values and amounts projected under the Plan and in the Chapter 7 Liquidation Analysis and confirmation projections for each Debtor will be realized.

149

### 2.    The Debtors May Not Be Successful With Respect to Contested Claims

If the Trustees, DIP Debtors, the Estate Representatives, and/or their successors or representatives under the Plan are unsuccessful in their objections to contested and contingent Claims that have been filed against the Estates or their Avoidance Actions, the Estates' total liabilities will be greater than expected, and there may be less cash available for distribution to holders of unsecured non-priority Claims.  The Trustees and DIP Debtors and their successors intend to vigorously oppose the allowance of all Claims that they believe are either entirely or in part without merit and prosecute avoidance and other actions not waived pursuant to the Plan.  However, if the Trustees' or DIP Debtors' or their successors' objections and actions are not upheld by the Bankruptcy Court, and the applicable Claims are allowed in amounts in excess of the amounts that have been accrued by the Debtors, the total liabilities of the Debtors will be greater than expected, and there will be less cash than expected available for distribution to Creditors.

### 3.    Litigation Recoveries and Results Are Highly Speculative and Uncertain

The success of the Debtors and/or their respective successors or representatives under the Plan in pursuing Avoidance Actions and/or other Causes of Action and Defenses is speculative and uncertain.  Litigation may be complex and involve significant expense and delay.  Furthermore, even if successful in the causes of action, in some cases, the Debtors and/or their respective successors or representatives under the Plan may encounter difficulty in collection.  Although potential litigation recoveries are not included in the Debtors' Confirmation Projections or Chapter 7 Liquidation Analysis, such recoveries may have a significant impact upon the distributions that may be made to Creditors.

### 4.    Risks Related to Trusts

Further, as discussed in Section IV.D.10 hereof, the Debtors and/or their respective successors or representatives may be required to adhere to certain reporting, registration and/or filing requirements under federal and state securities laws, the Trust Indenture Act of 1939, as amended, and/or other applicable statutes and regulations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

150

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**D.    Certain Federal Income Tax Consequences of the Plan**

**1.    Introduction**

The following discussion summarizes the material Federal income tax consequences of the transactions that are described herein and in the Plan to the holders of Allowed Claims and holders of Interests.  This disclosure is provided for information purposes only; it is not intended to constitute legal or tax advice to any person.  The disclosure does not take into account those facts and circumstances specific to individual Creditors and/or holders of Interests that may affect the tax consequences to them of the Plan.  This summary is based upon the Tax Code, the Treasury Regulations, judicial authority and current administrative rulings and practice now in effect.

Under the Tax Code and Treasury Regulations, there are certain significant Federal income tax consequences associated with the Plan for the Debtors, Creditors, and holders of Interests in the Debtors.  Due to the lack of definitive judicial or administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  Certain tax consequences described below are subject to significant uncertainty due to (i) the complexity of the transactions contemplated by the Plan, (ii) the uncertainty as to the tax consequences of events in prior years, (iii) the differences in nature of the Claims of the various Creditors, their taxpayer status, residence and methods of accounting, and (iv) the possibility that events or legislation subsequent to the date hereof could change the Federal tax consequences of the transactions.  As noted above, there may also be state, local, or foreign tax issues that may affect particular Creditors and holders of Interests.  No opinion of counsel has been obtained, the Debtors do not intend to seek a ruling from the IRS as to any such tax consequences, and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT HIS, HER, OR ITS TAX ADVISOR CONCERNING THE U.S.

151

1  FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES APPLICABLE

2  UNDER THE PLAN.

3  **PURSUANT TO <u>U.S. TREASURY DEPARTMENT CIRCULAR 230</u>, WE ARE**

4  **INFORMING YOU THAT (A) THIS DISCUSSION IS NOT INTENDED AND WAS NOT**

5  **WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE**

6  **PURPOSE OF AVOIDING PENALTIES UNDER THE U.S. FEDERAL TAX LAWS THAT**

7  **MAY BE IMPOSED ON THE TAXPAYER, (B) THIS DISCUSSION WAS WRITTEN IN**

8  **CONNECTION WITH THE DEBTORS SOLICITING ACCEPTANCES OF THE PLAN**

9  **THROUGH THIS DISCLOSURE STATEMENT, AND (C) EACH TAXPAYER SHOULD**

10 **SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN**

11 **INDEPENDENT TAX ADVISOR..**

12     **2.**    **<u>Tax Consequences Resulting from the Cancellation of Debt</u>**

13 As a result of the Plan, the Debtors' aggregate outstanding indebtedness will be substantially

14 reduced.  In general, absent an exception, a debtor recognizes COD income upon discharge of its

15 outstanding indebtedness for an amount of consideration less than its adjusted issue price.  The Tax

16 Code provides that a debtor in a bankruptcy case may exclude COD income from income but

17 generally must reduce certain of its tax attributes by the amount of any COD income realized as a

18 result of consummation of a plan of reorganization.

19 Taxation of COD income realized by a partnership or LLC is determined by whether the

20 partner/member qualifies for one of the exclusions provided for in IRC section 108.  Taxation of

21 COD income realized by an S Corporation is determined by the S Corporation qualifying for the

22 exclusions of IRC section 108.

23 The exact amount of COD income that the Debtors will realize is unclear.  The amount of

24 COD income realized by a taxpayer is generally the excess of (i) the adjusted issue price of any

25 indebtedness discharged, over (ii) the sum of (x) the amount of cash paid, (y) the issue price of any

26 new indebtedness of the taxpayer issued and (z) the fair market value of any other consideration

27 (including any stock and warrants) given in exchange therefor, subject to certain statutory and

28 judicial exceptions that can apply to limit the amount of COD income (such as where the payment of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

152

the cancelled indebtedness would have given rise to a tax deduction). The extent of such COD income realized by the Debtors (and the resulting tax attribute reduction) will therefore depend significantly on the value of the New Common Stock and New Warrants distributed pursuant to the Plan. These values cannot be known with certainty until after the Effective Date. Thus, although it is expected that there will be a material reduction in the Debtors' tax attributes as a result of the Debtors' COD income, the exact amount of such reduction cannot be predicted with certainty.

In general, tax attributes must be reduced in the following order: (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); and (e) foreign tax credits. A debtor with COD income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Tax Code, with any remaining balance applied to the other tax attributes in the order stated above. At this time it is not clear whether the Debtors will make the election under section 108(b)(5) of the Tax Code with respect to any portion of the COD income.

Under section 108(i) of the Tax Code and applicable guidance, the Debtors can, in certain circumstances, elect to defer, rather than exclude, any portion of realized COD income from taxable income. Deferred COD income under this rule would be included in the Debtors' taxable income ratably over the five taxable-year period starting in 2014. This election is irrevocable. To the extent COD income is designated to be deferred under this rule, the Debtors would not be required to reduce their tax attributes but would have COD income includible in gross income in future tax years. A determination has not yet been made as to whether or the extent to which such an election will be made on behalf of any Debtor realizing COD.

3.    **U.S. Federal Tax Consequences to Creditors**

a.    **Information Reporting and Back-up Withholding**

Payments under the Plan in respect of Allowed Claims may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding of taxes will generally apply to payments in respect of an Allowed Claims under the Plan if the holder of such Claim fails to timely provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Backup withholding is

153

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  not an additional tax.  Amounts withheld under the backup withholding rules may be credited against

2  a holder's U.S. Federal income tax liability, and a holder may obtain a refund of any excess amounts

3  withheld under the backup withholding rules by timely filing an appropriate claim for refund with

4  the IRS (generally, a Federal income tax return).

**b.    Distributions in Discharge of Accrued But Unpaid Interest**

**i.    Accrued Interest**

7  To the extent that any amount received by a holder of a Claim is attributable to accrued but

8  unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such

9  amount should be taxable to the holder as ordinary interest income to the extent not already taken

10  into income by the holder.  Conversely, a holder of a Claim may be able to recognize a deductible

11  loss (or, possibly, write-off against a reserve for worthless debts) to the extent that any accrued

12  interest was previously included in the holder's gross income but was not paid in full by the

13  applicable Debtor(s).  Such loss may be ordinary, but the law is unclear on this point.

14  The extent to which an amount received by a holder of a Claim will be attributable to accrued

15  interest on the debt instrument constituting the Claim is unclear.  Certain Treasury Regulations treat

16  a payment under a debt instrument first as a payment of accrued and unpaid interest and then as a

17  payment of principal.  Application of this rule to a final payment on a debt instrument being

18  discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, all distributions in respect of

19  any Claim will be allocated first to the principal amount of such claim, to the extent otherwise

20  permitted and as determined for U.S. Federal income tax purposes; and thereafter to the remaining

21  portion of such Claim, if any.  However, the provisions of the Plan are not binding on the IRS or a

22  court with respect to the appropriate tax treatment for creditors.

**ii.    Market Discount**

24  Under the "market discount" provisions of the Tax Code, some or all of any gain realized by

25  a holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as

26  ordinary income (instead of capital gain), to the extent of the amount of "market discount" that

27  accrued on the debt instruments constituting the Claim while held by the holder.  In general, a debt

28  instrument is considered to have been acquired with "market discount" if it is acquired other than on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

154

original issue and if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument with original issue discount, its adjusted issue price, in the case of (i) and (ii), by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

To the extent the debt instruments constituting a surrendered Claim had been acquired with mark discount and are exchanged for any New Common Stock or New Warrants in a reorganization, any market discount that accrued on such debt instruments but was not recognized by the holder may cause any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such New Common Stock or New Warrants to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.

**4.     U.S. Federal Tax Consequences to the Holders of Interests in the Debtors**

Holders of Interests, which is being cancelled under the Plan, generally will be entitled to claim a worthless stock deduction (assuming that the taxable year that includes the Plan is the same taxable year in which the Interests first became worthless) in an amount equal to the holder's adjusted basis in the Interests.  A worthless stock deduction is a deduction allowed to a holder of a corporation's stock (that is a capital asset in the hands of such holder) for the taxable year in which such stock becomes worthless, for the amount of the loss resulting therefrom.  A worthless stock deduction is treated as a loss from the sale or exchange of a capital asset.

SINCE THE FINAL TAX TREATMENT OUTCOME DEPENDS ON EACH INTEREST HOLDER'S SPECIFIC SITUATION, HOLDERS OF INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE TAX IMPLICATIONS TO THEM WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN AND THEIR SPECIFIC SITUATION.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# VII.

## REQUIREMENTS FOR CONFIRMATION

Section 1129 of the Bankruptcy Code sets forth the requirements that must be satisfied to confirm a plan of reorganization. A number of the more significant Confirmation requirements are discussed in this Section VI of the Disclosure Statement. The Debtors believe that they have complied or will comply with each of these requirements.

### A.    Good Faith and Compliance with Law

The Bankruptcy Code requires that a plan of reorganization be proposed in good faith and disclose certain relevant information regarding payments due and the nature of compensation to insiders. The Debtors believe that they have satisfied these requirements and will seek a ruling to that effect from the Bankruptcy Court in connection with Confirmation of the Plan.

### B.    Best Interests

Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired Class, each member of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of its Claim or Interest property of a value, as of the Effective Date, that is at least equal to the amount that such member of the Class would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

Projected recoveries to Creditors for each of the Debtors is set forth in the Liquidation Analysis for each Debtor showing recoveries under the Plan compared to recoveries in a chapter 7 that is attached as **Exhibit "3"** hereto and further described in Article VIII below. For the reasons and based on the assumptions set forth in the Liquidation Analysis, the Debtors believe that the Plan meets this test and will seek appropriate findings from the Bankruptcy Court in connection with the Confirmation of the Plan.

### C.    Plan Acceptance

The Bankruptcy Code requires, subject to an exception described in Section VI.D. of the Disclosure Statement entitled "Confirmation of the Plan Without Acceptance by All Impaired Classes," that the Plan be accepted by all impaired Classes of Claims and Interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    The Bankruptcy Code defines acceptance of a plan of reorganization by a class of claims as

2  acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of

3  the allowed claims in that class, but for this purpose counts only those claims that have been voted

4  on the plan.  Holders of Claims who fail to vote or who abstain will not be counted to determine the

5  acceptance or rejection of the Plan by any impaired class of Claims.  Additionally, the vote of any

6  holder will not be counted if the holder is designated by the Bankruptcy Court based on its vote or its

7  solicitation not being in good faith under Bankruptcy Code Section 1126(e).

8    The Debtors will solicit the votes of holders of Claims in Classes 1(a) – 1(e), 2(a) – 2(e), 4(a)

9  – 4(e), 5(b), 6(b) and 7(a) – 7(e).  Classes of claims that are not impaired (unimpaired) under a plan

10  are deemed to have accepted the plan and are not entitled to vote.  Classes 3(a) – 3(e) are unimpaired

11  and deemed to have accepted the Plan.  Classes 8(a) -8(e) will not receive or retain any property

12  under the Plan and are presumed to have rejected the Plan pursuant to Bankruptcy Code Section

13  1126(g).

14  **D.**    **Confirmation of the Plan Without Acceptance by All Impaired Classes**

15    The Bankruptcy Code provides an exception to the requirement that every class must accept

16  a plan of reorganization.  This exception is commonly known as the "cram down" provision.  This

17  provision allows the Debtors to confirm the Plan notwithstanding the rejection by any Class that

18  votes on the Plan or is deemed to reject the Plan pursuant to section 1126(f) or (g) of the Bankruptcy

19  Code.  If the Debtors can demonstrate to the Bankruptcy Court that the Plan satisfies the

20  requirements of the "cram down" provision, each impaired Class that voted to reject the Plan or that

21  is deemed to reject the Plan would be bound to the treatment afforded to that Class under the Plan.

22    To obtain Confirmation of the Plan using the "cram down" provision, the Debtors must

23  demonstrate to the Bankruptcy Court that, as to each Class that has rejected the Plan, the treatment

24  afforded to such Class under the Plan "does not discriminate unfairly" and is "fair and equitable."

25    In general, a plan does not discriminate unfairly if it provides a treatment to the class that is

26  substantially equivalent to the treatment that is provided to other classes that have equal rank.  In

27  determining whether a plan discriminates unfairly, courts will take into account a number of factors,

28  including the effect of applicable subordination agreements between parties.  Accordingly, two

DOCS_LA:238119.7 59925-001

classes of unsecured creditors could be treated differently without unfairly discriminating against either class.

In general, the Bankruptcy Code applies a different test to holders of secured claims, unsecured claims, and interests to determine whether the treatment proposed in a plan of reorganization is "fair and equitable."  In general, a plan of reorganization is "fair and equitable" to a holder of:

- secured claims if the plan provides that the holder (i) will retain the lien or liens securing its claim and (ii) will receive cash payments, normally evidenced by a note, that total at least the amount of its claim, with such payments having a present value at least equal to the value of the collateral securing the claim;

- unsecured claims if the plan provides that the holder (i) will retain property equal to the amount of its claim or (ii) no holder of a claim or interest that is junior to the creditor receives any value under the plan of reorganization; and

- equity interests if the plan provides that the holder (i) will retain property equal to the greatest of the allowed amount of any liquidation preference to which such holder is entitled, any redemption price to which such holder is entitled or the value of such interest or (ii) no holder of an interest that is junior to the holder will receive any value under the plan of reorganization.

As set forth above, the Plan may be confirmed if certain conditions are met even if the Plan is not accepted by each Class of Claims entitled to vote.  The Debtors reserve the right to modify the terms of the Plan as necessary for the Confirmation of the Plan without acceptance by any Impaired Classes.  Such modification could result in a less favorable treatment to holders of certain Classes of Claims or Interests than the treatment currently provided in the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**E.**    **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan. The Plan is, essentially, a "pot plan" – the Estates are liquidated and whatever is recovered for the benefit of creditors – however much or little - is distributed. For purposes of demonstrating that the Plan meets the "feasibility" standard, the Proponents have analyzed the ability of the Post-Confirmation Estates to meet their obligations under the Plan on the Effective Date and provided funding for the post confirmation Estates or Liquidating Trusts under the Plan.

Attached as **Exhibit "4"** hereto is an analysis setting forth the ability of each of the Estates to make all required payments under the Plan on the Effective Date based on agreed fee deferrals of Estate Professionals to the extent Cash is not available to pay all Allowed Administrative Claims on the Effective Date. For purposes of the analysis, the Effective Date of the Plan is assumed to occur on December 31, 2011. The Post-Confirmation Estates and Liquidating Trusts are to be funded after the Effective Date from a combination of Cash in the aggregate amount of $10 million, proceeds of Litigation Rights, and asset dispositions to support future fees, costs and other expenses related to the management of the Real Property and other Assets, recovery of Litigation Rights and other overhead. Professionals will defer payment of the fees and expenses to the extent Cash is not available and inter-estate/liquidating trust loans will be available to cover Cash shortfalls of a particular Debtor with Assets that cannot be readily liquidated to fund current payments.

Prior to the hearing to approve the Disclosure Statement, the Trustees and the DIP Debtors may replace the Confirmation Projections and Liquidation Analysis for each Debtor with updated Confirmation Projections or Liquidation Analysis. These Confirmation Projections and Liquidation Analysis do not reflect the impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code."

The Proponents have prepared the Liquidation Analysis - setting forth projected recoveries to Creditors based on current information - solely for the purpose of providing "adequate information"

under section 1125 of the Bankruptcy Code to enable Creditors to make an informed judgment about the Plan, and the Liquidation Analysis should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors.  The estimated amounts of Allowed Claims set forth in the Liquidation Analysis and described in this Disclosure Statement are subject to further reconciliation by the Trustees and DIP Debtors and their professionals and, accordingly, may be higher or lower than the amounts listed and are also subject to other uncertainties described elsewhere in this Disclosure Statement.

In addition to the cautionary notes contained elsewhere in this Disclosure Statement, it is underscored that the Trustees and the DIP Debtors make no representation as to the accuracy of their ability to achieve the projected results. Many of the assumptions on which the Liquidation Analysis for each Debtor are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the financial results. Therefore, the actual results achieved may vary from the Confirmation Projections and the variations may be material.

Based upon the analysis set forth in **Exhibit "3"** and Liquidation Analysis for each Debtor, the Trustees and DIP Debtors believe that they will be able to make all distributions and payments under the Plan and that Confirmation of the Plan is not likely to be followed by the Debtors' liquidation or need for further restructuring.

## VIII.

## LIQUIDATION ANALYSIS

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtors must demonstrate, and the Bankruptcy Court must determine that, with respect to such Class, each Holder of a Claim will receive property of a value, that is not less than the amount that such Holder would receive if each Debtor were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is commonly referred to as the "Best Interests Test."  For the reasons set forth herein and the annexed Chapter 7 Liquidation Analysis, the Proponents believe the Plan satisfies the Best Interests Test.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

In a chapter 7 liquidation, holders of Allowed Claims receive distributions based on the liquidation or collection of the Debtors' assets. Such assets would include the same assets to be sold or collected (as applicable) under the Plan – or which have already been sold or collected during the Cases. The net proceeds from the collection and sale of property of the Estates available for distribution to Creditors would be reduced by the commission payable to the chapter 7 trustees and the trustees' attorneys and accounting fees, in addition to the chapter 11 administrative costs of the Cases. In a chapter 7 case, a trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee to Creditors, even though the Estate will have already accumulated a significant amount of monies and the existing Trustees and DIP Debtors have already incurred the expense associated with generating those funds. Pursuant to the Bankruptcy Code's guidelines for compensation to chapter 7 trustees, based on certain assumptions, a trustee could be entitled to seek many millions of dollars in compensation for distribution of funds in a chapter 7 case, as set forth more fully in **Exhibit "3"**. Although under section 326 of the Bankruptcy Code the trustee's compensation is capped by this sliding scale, and the trustee should be required to demonstrate the reasonableness of commissions in relation to work actually performed or results obtained, the Proponents cannot predict whether the trustees will seek or obtain a straight commission based solely on distributions or some lesser amount. Nonetheless, whatever the amount of compensation for a trustee, there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtors because the chapter 7 trustees would be entitled to receive a commission in some amount for distributing the funds "handed over" to the trustees by the existing Trustees and DIP Debtors.

In addition, a chapter 7 trustee would employ legal counsel and other professionals and advisors such as accountants. If the Trustees' and DIP Debtors' current counsel and advisors were not retained by the chapter 7 trustees or they decided not to take on such engagements, the chapter 7 trustees would employ new professionals who would have to expend significant time and resources to "get up to speed" with respect to the Debtors, their businesses and assets, and the Cases. These additional administrative expenses would in likelihood be substantial and would be paid ahead of general unsecured creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Holders of all Allowed Claims will receive under the Plan proposed by the Debtors property

2  of a value that is not less than the amount such Creditors would receive in a chapter 7 case.

3  However, the Plan proposed by the Proponents presents a better alternative to Creditors than a

4  chapter 7 liquidation because, among other factors, after Confirmation, the Control Parties will in all

5  likelihood be able to manage, and realize upon the Debtors' assets more expeditiously and cost-

6  effectively than trustees and professionals and agents who are unfamiliar with the Debtors'

7  businesses, assets and liabilities.

8  It is also anticipated that a chapter 7 liquidation would result in a significant delay in the

9  payments to Creditors.  Among other things, a chapter 7 case would trigger a new bar date for filing

10  Claims that would be more than ninety days following conversion of the Cases to chapter 7.  Fed. R.

11  Bankr. P. 3002(c).  Hence, a chapter 7 liquidation would not only delay distribution but also raise the

12  prospect of additional claims that were not asserted in the Cases.

13  The Proponents have prepared the hypothetical Chapter 7 Liquidation Analysis for each

14  Debtor that are attached as **Exhibit "3"** to the Disclosure Statement to assist holders of Impaired

15  Claims and Interests of each Debtor to reach their determination as to whether to accept or reject the

16  Plan.  The Liquidation Analysis for each Debtor indicates the estimated values which may be

17  obtained by Classes of Claims and of Interests if the assets of the Debtors were liquidated pursuant

18  to chapter 7, as an alternative to the scenario proposed by the Plan.  The liquidation analysis is

19  provided solely to disclose the effects of a hypothetical liquidation of the Debtors under chapter 7 of

20  the Bankruptcy Code, subject to the assumptions set forth in **Exhibit "3"**.

21  Underlying the Liquidation Analysis for each Debtor set forth in **Exhibit "3"** and the

22  analysis of Cash Available and Disbursements Required to confirm the Plan, attached hereto as

23  **Exhibit "4"**, are a number of estimates and assumptions based on current information.  Although the

24  estimates and assumptions are considered reasonable by the Proponents, they may not be realized as

25  they are inherently subject to economic, financial, legal, tax and other uncertainties and

26  contingencies, future events that are unknown at this time and actions of other parties beyond the

27  control and knowledge of the Proponents.  The values underlying estimates and assumptions are

28  subject to further reconciliation by the Proponents and their professionals and, accordingly, may be

DOCS_LA:238119.7 59925-001

1   higher or lower than those set forth in **Exhibit "3"**.  Accordingly, there can be no assurance that the

2   values and amounts projected under the Plan and in the Liquidation Analysis and Confirmation

3   Projections for each Debtor will be realized.  In addition, any liquidation that would be undertaken

4   would necessarily take place in future circumstances that cannot currently be predicted.  While the

5   Liquidation Analysis for each Debtor is necessarily presented with numerical specificity, if the

6   Debtors were liquidated under chapter 7, the actual liquidation proceeds could vary, perhaps

7   substantially, from the amounts set forth in **Exhibit "3"**.  No representation or warranty can be or is

8   being made with respect to the actual proceeds that could be received under the Plan or in a chapter

9   7 liquidation.  Nothing contained in the analyses set forth in **Exhibit "3"** is intended or may

10  constitute a concession or admission of the Proponents for any other purpose.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

# IX.

## CONCLUSION

The Proponents believe, based on the foregoing, that the Proponents and their successors are in the best position to bring the greatest return to Creditors pursuant to the Plan, that Creditors should vote in favor of the Plan, and that the Plan should be confirmed.

Dated:  July 5, 2011

BRADLEY D. SHARP,
AS CHAPTER 11 TRUSTEE FOR
NAMCO CAPITAL GROUP, INC

By:    /s/
          Trustee

Dated:    July 5, 2011

R. TODD NEILSON,
AS CHAPTER 11 TRUSTEE FOR EZRI
NAMVAR

By:    /s/
          Trustee

Dated:    July 5, 2011

BESHMADA OF DELAWARE, LLC,
AS DEBTOR AND DEBTOR IN
POSSESSION

By:    /s/
          Print Name:
          Its:

Dated:    July 5, 2011

BESHMADA, LLC,
AS DEBTOR AND DEBTOR IN
POSSESSION

By:    /s/
          Print Name:
          Its:

Dated:    July 5, 2011

DIMES, LLC,
AS DEBTOR AND DEBTOR IN
POSSESSION

By:    /s/
          Print Name:
          Its:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

164

DOCS_LA:238119.7 59925-001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Respectfully submitted by,

PACHULSKI STANG ZIEHL
& JONES LLP


By:      _/s/ Malhar S. Pagay_____
          Richard M. Pachulski
          Debra I. Grassgreen
          Robert B. Orgel
          Stanley E. Goldich
          Malhar S. Pagay

          Joint Special Counsel for Namco
          Trustee and Ezri Trustee

LAW OFFICES OF DAVID W.
   MEADOWS


By:      _/s/David W. Meadows_____
          Counsel for Beshmada of Delaware,
          LLC, debtor and debtor-in-possession

LAW OFFICES OF DAVID W.
   MEADOWS


By:      _/s/ David W. Meadows_____
          Counsel for Beshmada, LLC, debtor
          and debtor-in-possession

LAW OFFICES OF DAVID W.
   MEADOWS


By:      _/s/ David W. Meadows_____
          Counsel for Dimes, LLC, debtor and
          debtor-in-possession

DOCS_LA:238119.7 59925-001

**LIST OF EXHIBITS**

| **Exhibit** | | **Description** |
|---|---|---|
| **1** | ……………………………………… | **Plan** |
| **2** | ……………………………………… | **Disclosure Statement Approval Order** |
| **3** | ……………………………………… | **Liquidation Analysis** |
| **4** | ……………………………………… | **Cash Available and Disbursements Required to Confirm Plan** |
| **5** | ……………………………………… | **List of Identified Available Property and Other Non-Cash Assets** |
| **6** | ……………………………………… | **List of Identified Litigation Rights** |
| **7** | ……………………………………… | **Claims Charts** |

DOCS_LA:238119.7 59925-001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

## (Plan)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

1  Richard M. Pachulski (CA Bar No. 90073)
   Debra I. Grassgreen (CA Bar No. 169978)
2  Robert B. Orgel (CA Bar No. 101875)
   Stanley E. Goldich (CA Bar No. 92659)
3  Malhar S. Pagay (CA Bar No. 189289)
   PACHULSKI STANG ZIEHL & JONES LLP
4  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
5  Telephone: 310-277-6910
   Facsimile: 310-201-0760
6  E-mail:  rpachulski@pszjlaw.com
             dgrassgreen@pszjlaw.com
7            rorgel@pszjlaw.com
             sgoldich@pszjlaw.com
8            mpagay@pszjlaw.com

9  Joint Special Counsel for Bradley D. Sharp, Chapter 11
   Trustee for Namco Capital Group, Inc. and R. Todd
10 Neilson, Chapter 11 Trustee for Ezri Namvar

11 David W. Meadows (CA Bar No. 137052)
   LAW OFFICES OF DAVID W. MEADOWS
12 1801 Century Park East, Suite 1235
   Los Angeles, California  90067
13 Telephone: 310-557-8490
   Fax:  310-557-8493
14 Email:  david@davidwmeadowslaw.com

15 Bankruptcy Counsel to Beshmada, LLC, Beshmada of
   Delaware, LLC, and Dimes, LLC, Debtors and Debtors in
16 Possession

17              **UNITED STATES BANKRUPTCY COURT**

18              **CENTRAL DISTRICT OF CALIFORNIA**

19                  **LOS ANGELES DIVISION**

20 In re:                                  Case Nos.:   2:08-bk-32333-BR
                                                        2:08-bk-32349-BR
21 NAMCO CAPITAL GROUP, INC., a California              2:09-bk-25510-BR
   corporation,                                         2:09-bk-25523-BR
22                                                       2:09-bk-25517-BR
                       Debtor.
23                                          **JOINT CHAPTER 11 PLAN FOR NAMCO
   _____  CAPITAL GROUP, INC., EZRI NAMVAR,
24 In re:                                   BESHMADA, LLC, BESHMADA OF
                                            DELAWARE, LLC AND DIMES, LLC
25 EZRI NAMVAR, an individual,              PROPOSED BY THE CHAPTER 11
                                            TRUSTEES AND DIP DEBTORS**
26                     Debtor.

27

28

**PACHULSKI STANG ZIEHL & JONES LLP**
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_SF:77260.6 59701-001

In re:

BESHMADA OF DELAWARE, LLC, a
Delaware limited liability company,

                    Debtor.

In re:

BESHMADA, LLC, a California limited liability
company,

                    Debtor.

In re:

DIMES, LLC, a California limited liability
company,

                    Debtor.

**Disclosure Statement Hearing**
Date:    _____
Time:    _____
Place:   Courtroom 1660
         255 E. Temple Street
         Los Angeles, CA  90012
Judge:   Barry Russell

**Confirmation Hearing**
[To Be Set]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1
    1.1    Prefatory Statement. ........................................................................ 1
    1.2    Process, Disclosure and Recommendation. ....................................... 1
        1.2.1    Process. .................................................................................. 1
        1.2.2    Disclosure. ............................................................................. 2
II.    DEFINITIONS AND RULES OF INTERPRETATION ............................... 2
    2.1    Definitions. ....................................................................................... 2
    2.2    Rules of Construction. ...................................................................... 2
III.    PLAN OVERVIEW ....................................................................................... 3
    3.1    Background. ...................................................................................... 3
    3.2    Overview of the Plan. ....................................................................... 4
        3.2.1    In General. ............................................................................. 4
        3.2.2    The Continuation of the Estates and the Creation of the Liquidating Trusts. 5
        3.2.3    Allocations of Proceeds in the Post Confirmation Estates and Liquidating
                 Trusts to Holders of Unsecured Claims. ............................... 6
        3.2.4    Employment and Payment of Professionals, Liquidating Trustees and Estate
                 Representatives After the Effective Date. .............................. 6
        3.2.5    Inter-Debtor Settlement. ........................................................ 6
        3.2.6    Other Plan Terms. .................................................................. 6
            (a)    Payment of Administrative Claims, Priority Claims, Priority Tax
                   Claims and Secured Claims. ......................................... 6
            (b)    Separate Classification of Claims and Interest of Debtors. ...... 7
            (c)    Payment of Small Convenience Claims. ............................ 7
            (d)    Interests in Debtors. .................................................... 7
            (e)    Plan Funding. ............................................................. 7
            (f)    No Discharge of Ezri. ................................................... 7
IV.    TREATMENT OF UNCLASSIFIED CLAIMS ......................................... 8
    4.1    Treatment of Allowed Administrative Claims. ................................. 8
        4.1.1    Administrative Claims Bar Dates. ......................................... 9
            (a)    Bar Date for Gap Administrative Claims. ......................... 9
            (b)    General Administrative Claims Bar Date. ......................... 9
            (c)    Administrative Tax Claims Bar Date. .............................. 9
            (d)    Ordinary Course Administrative Claims Bar Date. ........... 10
            (e)    Professional Fees Bar Date. ......................................... 10
    4.2    Treatment of Priority Tax Claims. ................................................. 10
V.    CLASSIFICATION OF CLAIMS AND INTERESTS ............................... 11
    5.1    Classification Generally. ................................................................ 11
    5.2    Classes of Claims and Interest ...................................................... 12
VI.    TREATMENT OF CLAIMS AND INTERESTS ...................................... 13
    6.1    Classes 1(a) to 1(e) – Secured Real Property Tax Claims. .............. 14
        6.1.1    Voting and Impairment. ....................................................... 14
        6.1.2    Liens. .................................................................................. 14
        6.1.3    Alternative Treatments. ....................................................... 14
            (a)    Abandonment. ........................................................... 14
            (b)    Effective Date Payment. ............................................. 15
            (c)    Quarterly Payments. ................................................... 15
        6.1.4    Sources of Payment. ............................................................ 15
    6.2    Classes 2(a) to 2(e) – Miscellaneous Secured Claims. .................... 15
        6.2.1    Voting and Impairment. ....................................................... 15
        6.2.2    Liens. .................................................................................. 16
        6.2.3    Alternative Treatments. ....................................................... 16
            (a)    Surrender or Abandonment. ......................................... 16
            (b)    Periodic Payments Pursuant to Approved Settlement Agreements. ... 16
            (c)    Periodic Cash Payments. ............................................. 16

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

|  |  | 6.2.4 | Sources of Payment. | 17 |
|  |  | 6.2.5 | Unsecured Deficiency Claims. | 17 |
|  | 6.3 | Classes 3(a) to 3(e) – Priority Claims. |  | 17 |
|  |  | 6.3.1 | Voting and Impairment. | 17 |
|  |  | 6.3.2 | Treatment. | 17 |
|  |  | 6.3.3 | Source of Payment. | 17 |
|  | 6.4 | Classes 4(a) to 4(e) – General Unsecured Claims. |  | 18 |
|  |  | 6.4.1 | Voting and Impairment. | 18 |
|  |  | 6.4.2 | Treatment. | 18 |
|  |  | 6.4.3 | Distribution Dates. | 18 |
|  |  | 6.4.4 | Source of Payment. | 18 |
|  | 6.5 | Class 5(b) – Bank Guaranty Claims. |  | 18 |
|  |  | 6.5.1 | Voting and Impairment. | 18 |
|  |  | 6.5.2 | Treatment. | 19 |
|  |  | (a) | Settlement of Validity and Enforceability Objections. | 19 |
|  |  | (b) | Continued Litigation over Validity and Enforceability of Guaranty. | 20 |
|  |  | 6.5.3 | Distribution Dates. | 20 |
|  |  | 6.5.4 | Source of Payment. | 20 |
|  | 6.6 | Class 6(b) – Other Guaranty Claims. |  | 20 |
|  |  | 6.6.1 | Voting and Impairment. | 20 |
|  |  | 6.6.2 | Treatment. | 21 |
|  |  | (a) | Settlement of Validity and Enforceability Objection. | 21 |
|  |  | (b) | Continued Litigation over Validity and Enforceability of Guaranty. | 21 |
|  |  | 6.6.3 | Distribution Dates. | 22 |
|  |  | 6.6.4 | Source of Payment. | 22 |
|  | 6.7 | Classes 7(a) to 7(e) – Small Convenience Claims. |  | 22 |
|  |  | 6.7.1 | Voting and Impairment. | 22 |
|  |  | 6.7.2 | Treatment. | 22 |
|  |  | 6.7.3 | Source of Payment. | 23 |
|  | 6.8 | Classes 8(a) to 8(e) – Interests. |  | 23 |
|  |  | 6.8.1 | Voting and Impairment. | 23 |
|  |  | 6.8.2 | Treatment. | 23 |
| VII. | ACCEPTANCE OR REJECTION OF THE PLAN |  |  | 24 |
|  | 7.1 | Classes Entitled to Vote. |  | 24 |
|  | 7.2 | Classes Not Entitled to Vote. |  | 24 |
|  | 7.3 | Nonconsensual Confirmation. |  | 24 |
| VIII. | IMPLEMENTATION OF THE PLAN |  |  | 24 |
|  | 8.1 | Funding for the Plan. |  | 24 |
|  | 8.2 | Effective Date Payments and Inter-Estate Loans. |  | 25 |
|  | 8.3 | The Post Confirmation Estates/Liquidating Trusts. |  | 25 |
|  |  | 8.3.1 | Assets to be Retained in the Post Confirmation Estates. | 25 |
|  |  | 8.3.2 | Estate Representatives. | 25 |
|  |  | 8.3.3 | Responsibilities of Estate Representatives. | 26 |
|  |  | 8.3.4 | Powers of Estate Representatives to Employ and Compensate Agents and Professionals. | 26 |
|  |  | 8.3.5 | Indemnification by Post Confirmation Estates. | 27 |
|  |  | 8.3.6 | Use of Plan Proceeds. | 27 |
|  | 8.4 | The Liquidating Trusts. |  | 27 |
|  |  | 8.4.1 | Formation of Liquidating Trusts. | 27 |
|  |  | 8.4.2 | Transfer and Vesting of Assets to and in the Liquidating Trusts. | 27 |
|  |  | 8.4.3 | Beneficial Entitlements to Liquidating Trust Interests. | 28 |
|  |  | 8.4.4 | Liquidating Trustees. | 28 |
|  |  | (a) | Appointment of Liquidating Trustees. | 28 |
|  |  | (b) | Responsibilities of Liquidating Trustees. | 28 |
|  |  | (c) | Powers of Liquidating Trustees to Employ and Compensate Agents and Professionals. | 29 |

|  |  |  |  |
|---|---|---|---|
| | (d) | Indemnification by Liquidating Trust. | 30 |
| | (e) | Use of Liquidating Trust Assets and Liquidating Trust Recovery Proceeds. | 30 |
| | (f) | Tax Matters | 30 |
| 8.4.5 | Good Faith and Compliance With Law Relating to Distributions | 31 |
| 8.5 | Settlement of Inter-Debtor Claims. | 31 |
| 8.6 | Corporate Action. | 32 |
| 8.7 | No Substantive Consolidation. | 32 |
| 8.8 | Tax Indemnification. | 32 |
| 8.9 | Distributions and Related Matters. | 32 |
| 8.9.1 | Distribution Record Date. | 32 |
| 8.9.2 | Distribution Agents. | 33 |
| 8.9.3 | Distribution Dates. | 33 |
| 8.9.4 | Distributions in Cash and Delivery of Distributions | 34 |
| 8.9.5 | Rounding of Payments. | 34 |
| 8.9.6 | De Minimis Distributions. | 34 |
| 8.9.7 | Hardship Distributions. | 35 |
| | (a) | Rationale. | 35 |
| | (b) | Mechanics. | 35 |
| 8.9.8 | Disputed Claims. | 36 |
| | (a) | Distribution Calculations to Be Made as if Disputed Claims Were Allowed. | 36 |
| | (b) | Temporary or Permanent Resolution of Disputed Claims. | 36 |
| | (c) | Distribution Reserves. | 37 |
| | (d) | No Actual Distributions to be Made to Holders of Disputed Claims. | 37 |
| | (e) | Distributions After Allowance of Initially Disputed Claims. | 38 |
| | (f) | Disposition of Assets in Distribution Reserves After Disallowance. | 38 |
| 8.9.9 | Undeliverable Distributions. | 38 |
| 8.9.10 | Unclaimed Property. | 39 |
| 8.9.11 | Setoff, Recoupment and Prior Payments. | 40 |
| 8.9.12 | Compliance with Tax Laws. | 40 |
| 8.10 | Litigation Rights, Objection to and Estimation of Claims and Determination of Taxes. | 41 |
| 8.10.1 | Preservation, Pursuit and Resolution of Litigation Rights | 41 |
| 8.10.2 | Objection to Claims and Objection Deadline. | 44 |
| 8.10.3 | Determination of Taxes. | 44 |
| 8.11 | Cancellation of Existing Notes, Securities and Agreements. | 45 |
| 8.12 | Tax Identification Numbers. | 45 |
| 8.13 | Official Committees and Their Dissolution. | 45 |
| 8.14 | Final Decree. | 45 |
| IX. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 46 |
| 9.1 | Overview. | 46 |
| 9.2 | Assumption and Assignment. | 46 |
| 9.3 | Extension of Time to Assume or Reject | 47 |
| 9.4 | Assumption Obligations. | 48 |
| 9.5 | Rejection. | 49 |
| 9.6 | Rejection Claims Bar Date. | 50 |
| 9.7 | Bar Date for Bankruptcy Code § 365(n) Election. | 50 |
| 9.8 | Retention of Property Rights. | 51 |
| 9.9 | Effect of Confirmation Order as to Contracts, Leases and Insurance | 51 |
| 9.10 | Post-Order for Relief Agreements. | 53 |
| 9.11 | Modifications to Plan Supplement. | 53 |
| X. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN | 53 |
| 10.1 | Conditions to Confirmation. | 53 |
| 10.2 | Conditions to Plan Effectiveness. | 53 |
| XI. | EFFECT OF CONFIRMATION | 54 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11.1    Binding Effect. ................................................................................ 54
11.2    Property Retained Free and Clear. ................................................... 54
11.3    Permanent Injunction. ..................................................................... 55
11.4    Limitation of Liability...................................................................... 56
11.5    Exculpation. ..................................................................................... 56
11.6    Releases By Estate. .......................................................................... 57
11.7    No Third Party Release. ................................................................... 58
XII.    RETENTION OF JURISDICTION ........................................................... 58
XIII.   AMENDMENT, WITHDRAWAL OF PLAN  AND VACATION OF CONFIRMATION
        ORDER ....................................................................................................... 60
13.1    Amendment of the Plan. ................................................................... 60
13.2    Vacating Confirmation Order if Failure of Conditions to Plan Effectiveness............ 60
13.3    Revocation or Withdrawal of the Plan. ............................................ 61
XIV.    MISCELLANEOUS ................................................................................... 61
14.1    Effectuating Documents; Further Transactions; Timing. .................. 61
14.2    No Regulated Rate Change Without Government Approval................ 61
14.3    Pension Plans, Other Retiree Benefits and Labor Contracts............... 62
14.4    Exemption From Transfer Taxes. ..................................................... 62
14.5    Modification of Payment Terms. ...................................................... 62
14.6    Provisions Enforceable. ................................................................... 62
14.7    Quarterly Fees to the United States Trustee. .................................... 63
14.8    Post-Confirmation Status Report. .................................................... 63
14.9    Successors and Assigns..................................................................... 63
14.10   Notices. ............................................................................................ 63
        14.10.1   Notices of Confirmation and the Effective Date.................. 64
        14.10.2   Addresses and Change of Addresses. .................................. 64
        14.10.3   Persons Entitled to Post-Effective Date Notices. ................ 65
14.11   Incorporation by Reference. ............................................................. 66
14.12   Computation of Time. ...................................................................... 66
14.13   Conflict of Terms. ............................................................................ 66
14.14   Headings. ......................................................................................... 66
14.15   Severability of Plan Provisions......................................................... 66
14.16   Governing Law. ............................................................................... 67
14.17   Good Faith and Compliance with Laws............................................. 67
14.18   No Admission. .................................................................................. 67

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT LIST**

EXHIBIT A  List of Allowed Inter Debtor Claims

EXHIBIT B  Definitions

EXHIBIT C  Bank Guaranty Claims

EXHIBIT D  Namvar Relatives

# I.

## INTRODUCTION

### 1.1    Prefatory Statement.

This *Joint Chapter 11 Plan For Namco Capital Group, Inc., Ezri Namvar, Beshmada, LLC, Beshmada of Delaware, LLC and Dimes, LLC Proposed by the Chapter 11 Trustees and DIP Debtors* (the "Plan") is filed under section 1121(a) of the Bankruptcy Code by the Namco Trustee,[1] the Ezri Trustee, Beshmada, Beshmada of DE, and Dimes (the "Proponents") for the chapter 11 bankruptcy cases of Namco, Ezri Namvar, Beshmada, Beshmada of DE, and Dimes.  The Proponents are pleased to be presenting this Plan jointly.

A separate document, entitled *Disclosure Statement With Respect to Joint Chapter 11 Plan for Namco Capital Group, Inc., Ezri Namvar, Beshmada, LLC, Beshmada of Delaware, LLC and Dimes, LLC Proposed by the Chapter 11 Trustees, Official Committees and DIP Debtors* (the "Disclosure Statement") is being sent as an accompaniment to the Plan, which may be included in the same envelope as this document or under separate cover.

### 1.2    Process, Disclosure and Recommendation.

#### 1.2.1    Process.

This Plan is a blueprint of how the Debtors, their Estates and their Assets will be structured and liquidated after or as a result of bankruptcy.  It sets forth the form of entities they will be, who will own them and what Distributions will be made or required.  Among other things, the Plan designates Classes of Claims and Classes of Interests, identifies Unimpaired and Impaired Classes, sets forth a proposal for the satisfaction of all Claims against, and Interests in, the Debtors or their Estates, and provides adequate means for the implementation of the Plan.

Holders of Claims and Interests entitled to vote on the Plan will receive a Ballot for voting on this Plan and the Disclosure Statement.

---

[1]  All capitalized terms are defined as set forth on **Exhibit B**.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 1.2.2 **Disclosure.**

The Disclosure Statement is intended to provide Creditors with information sufficient to enable Creditors to vote on the Plan.  The Disclosure Statement has been approved by the Bankruptcy Court as containing sufficient information for that purpose.  The Disclosure Statement includes a summary of the Plan, the Debtors' Estates' assets and liabilities, a summary of what Holders of Allowed Claims and Interests will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures and voting requirements necessary for confirmation of the Plan.

Each Creditor of the Debtors or their Estates should thoroughly review both the Plan and Disclosure Statement before deciding whether to accept or reject the Plan.  No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith and approved for solicitation purposes by the Bankruptcy Court, have been authorized for use in soliciting acceptances or rejections of the Plan.  **The Trustees and the DIP Debtors recommend approval of this Plan.**

**II.**

**DEFINITIONS AND RULES OF INTERPRETATION**

### 2.1 **Definitions.**

The defined terms set forth in the Glossary of Defined Terms attached as **Exhibit B** hereto are incorporated into the Plan by this reference and shall apply to capitalized terms used in the Plan, provided that any capitalized term that is not defined in the Plan, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### 2.2 **Rules of Construction.**

For purposes of the Plan and Disclosure Statement, unless otherwise provided in the Plan or in the Disclosure Statement, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan or the Disclosure Statement to a document or to a schedule means such document or schedule as it may have been or may be amended, modified, supplemented or restated

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

pursuant to the Plan or otherwise from time to time; (d) any reference to a Person as a Holder of a Claim or Interest includes that Person's successors and assigns; (e) except as otherwise indicated in the Plan or Disclosure Statement, all references in the Plan or the Disclosure Statement to Sections and Articles are references to Sections and Articles of or to the Plan; (f) unless otherwise indicated, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) unless otherwise provided in the Plan or the Disclosure Statement, any reference in the Plan or the Disclosure Statement to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; (h) "include," "includes," "included," and "including" are not limiting; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or the Disclosure Statement or any other provision in this Section.

## III.

## PLAN OVERVIEW

The overview of the Plan in this Article III is not intended to substitute for the Disclosure Statement or for the more specific terms set forth in the Plan.  If there are any discrepancies between this overview, the Disclosure Statement or other provisions of the Plan, the Plan shall control.

### 3.1     Background.

The Debtors are:

- Ezri Namvar ("Ezri");

- Namco Capital Group, Inc. ("Namco");

- Beshmada, LLC ("Beshmada");

- Beshmada of Delaware, LLC ("Beshmada of DE"); and

- Dimes, LLC ("Dimes")

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Each Debtor is a debtor in a separate case pending under chapter 11 of the Bankruptcy Code (collectively, the "Cases"). The Cases are not being jointly administered and their assets and liabilities were not substantively consolidated.

The commencement of the Cases created for each Debtor, by statute (11 U.S.C. § 541), an Estate, consisting of all of the legal and equitable interests of that Debtor in property as of the commencement of the Cases, subject to certain exceptions. The Estates' Assets, more fully described in the Disclosure Statement, include Cash, Available Real Estate and Litigation Rights (which include Litigation Rights against Namvar Relatives and against third parties, and may include Litigation Rights to recover interests in real property). Each Debtor's Estate is believed to be insolvent, meaning that the Allowed Claims of Creditors against each Estate are believed to exceed the value of that Estate's interests in Cash, Available Real Estate, Other Assets and Litigation Rights. This Plan is a chapter 11 plan for each Debtor and each Estate.

For Ezri, R. Todd Neilson was appointed by the Bankruptcy Court as the chapter 11 trustee and controls the Ezri Estate and its Assets. For Namco, Bradley D. Sharp was appointed by the Bankruptcy Court as the chapter 11 trustee and controls the Namco Estate and its Assets. Although Beshmada, Beshmada of DE and Dimes remain in possession and control of their Assets as debtors in possession, each DIP Debtor retained Cicalese, for the management and operation of its businesses, who was appointed as the successor manager of each of the DIP Debtors on or about July 2, 2009 (pursuant to a stipulation between Sharp, Neilson and Ezri), which stipulation was approved by the Bankruptcy Court.

**3.2    Overview of the Plan.**

**3.2.1    In General.**

The Plan's goals are to:

- establish a process for determining which of the Creditors' Claims against the Debtors or their Estates should be Allowed;

- settle the Inter-Debtor Claims;

- provide from available Cash for full satisfaction of those Administrative Claims, Priority Tax Claims and Priority Claims that are Allowed;

- provide fair treatment for any Allowed Secured Claims;

- enable the efficient liquidation of the Estates' Assets, including Litigation Rights and Real Estate Assets;

- cash out certain Small Convenience Claims;

- provide a mechanism for payment to "Hardship" creditors; and

- fairly divide among Holders of Unsecured Claims the proceeds of the Estates' Assets.

### 3.2.2 <u>The Continuation of the Estates and the Creation of the Liquidating Trusts.</u>

Following confirmation of the Plan: (a) the Namco and Ezri Estates will continue and be managed and controlled by the Estate Representatives, and (b) the assets of the DIP Debtors will be transferred to Liquidating Trusts that will be formed for each of the DIP Debtors and managed by the Liquidating Trustees. Besides any residual Cash and Real Estate, the primary value of each Estate's Plan Assets is expected to be found in its Litigation Rights, including Litigation Rights against Namvar Relatives and against third parties. The Litigation Rights may include claims for or result in the recovery of Available Real Estate and Real Estate.

The management structure of the Post Confirmation Estates and the Liquidating Trusts is set forth in Article VIII of the Plan. The Estate Representatives and Liquidating Trustees are collectively referred to as the Control Parties. The goal of the Control Parties will be to liquidate the Post Confirmation Estate Assets and make periodic Pro Rata Distributions of the Available Plan Proceeds to Holders of Allowed Claims of the applicable Debtor or Estate. Allowed Inter-Debtor Claims will be treated the same as any other claim against a Post Confirmation Estate or Liquidating Trust and will result in some of the Plan Proceeds of one Debtor's Post Confirmation Estate or Liquidating Trust being redirected to another Debtor's Post Confirmation Estate or Liquidating Trust.

Following the Effective Date of the Plan, the Control Parties also will have the sole power to object to and resolve Disputed Claims against the respective Estates.

### 3.2.3    Allocations of Proceeds in the Post Confirmation Estates and Liquidating Trusts to Holders of Unsecured Claims.

Available Plan Proceeds in each Post Confirmation Estate or Liquidating Trust shall be divided Pro Rata among the Creditors of such Estate holding Allowed General Unsecured Claims, Allowed Bank Guaranty Claims and Allowed Other Guaranty Claims, provided that, in exchange for the Ezri Estate waiving certain defenses to the Other Guaranty Claims, the allowed amount thereof may be reduced and in exchange for such waiver as to the Bank Guaranty Claims, the pay rate for such Claims may be reduced.

### 3.2.4    Employment and Payment of Professionals, Liquidating Trustees and Estate Representatives After the Effective Date.

The Post Confirmation Estates and Liquidating Trusts shall be authorized to employ and pay Professionals after the Effective Date subject to Court approval at certain thresholds set forth in the Plan.

### 3.2.5    Inter-Debtor Settlement.

Certain Estates hold Inter-Debtor Claims against other Estates.  Under the Plan, Inter-Debtor Claims are Allowed in the amounts set forth in **Exhibit A** and shall be treated in the same manner as all other Class 4 General Unsecured Claims.

### 3.2.6    Other Plan Terms.

As more fully set forth in subsequent Sections of the Plan, other required and essential provisions of the Plan include the following.

#### (a)    Payment of Administrative Claims, Priority Claims, Priority Tax Claims and Secured Claims.

Under the Plan, proceeds of sales of Real Estate occurring during the Cases and intercompany loans will be used to make payment on the Effective Date of Allowed Secured Claims, Allowed Priority Claims, Allowed Priority Tax Claims and Allowed Administrative Claims.  To enable full and timely payment of such Claims, certain Professionals have agreed to defer payment of their Allowed Administrative Claims until after the Effective Date of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(b)** **Separate Classification of Claims and Interest of Debtors.**

Because the Cases have not been substantively consolidated, the Plan provides for separate treatment for Holders of Claims and Interests against each Estate and, although described together for convenience, classifies separately Claims and Interests against each Estate through the use of subclasses.

**(c)** **Payment of Small Convenience Claims.**

To reduce costs and promote efficiency of the administration of the Post Confirmation Estates, the Plan provides for a 10% Cash payment to cash out certain smaller Claims, the Small Convenience Claims (which, as more fully defined in **Exhibit B**, are Claims with an Allowed Amount under or reduced to $100,000).

**(d)** **Interests in Debtors.**

Upon the Effective Date of the Plan, (i) the Interests in the DIP Debtors will be cancelled; (ii) Ezri will not receive or retain any property on account of his Interest in the Ezri Estate; and (iii) Ezri Estate's interest in Namco will be retained under the Plan, but for administrative convenience and benefit to the Namco Estate only and not on account of the Ezri Estate's present ownership of such Interests.

**(e)** **Plan Funding.**

The primary sources of funding for the Plan are cash on hand, proceeds of real property sales and potential tax refunds. Estimated funding needed on the Effective Date of the Plan is $19.4 million for payment of the following: (i) projected outstanding Administrative Claims of $3.6 million for professional fees (assuming 80% deferral of certain Professional Fees by agreement) and $3.5 million for post-petition inter-debtor loans, (ii) projected Priority Tax Claims of $1.5 million, (iii) funding of the Post Confirmation Estates and Liquidating Trusts in the total amount of $10.0 million, and (iv) funding for payment of Small Convenience Claims in the estimated amount of $0.8 million.

**(f)** **No Discharge of Ezri.**

Ezri will not receive any discharge under section 1141 of the Bankruptcy Code.  Ezri's Postpetition Earnings and Post-Effective Date Earnings are excluded from the Assets of the Post

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Confirmation Estates under the Plan, but remain subject to any Litigation Rights of Post

Confirmation Estates or any Creditors against Ezri.

## IV.

## TREATMENT OF UNCLASSIFIED CLAIMS

As required by the Bankruptcy Code, the Plan places Claims and Interests into various

Classes according to their right to priority.  However, in accordance with Bankruptcy Code

§ 1123(a)(1), certain types of Claims are not classified in any Classes under the Plan, and the

Proponents have not placed such Claims in a Class.  These Claims are "unclassified."  Allowed

Administrative Claims, Allowed Priority Tax Claims, and Allowed Secured Tax Claims are not

considered Impaired, and they do not vote on the Plan because they are automatically entitled to

specific treatment provided for them in the Bankruptcy Code.  The treatment of these unclassified

Claims is as provided below.

### 4.1    Treatment of Allowed Administrative Claims.

Except to the extent that the Holder of an Allowed Administrative Claim agrees to a different

treatment, and subject to the Administrative Claims Bar Dates set forth in the Plan, the Control

Parties shall pay each Allowed Administrative Claim in full, in Cash, the later of (i) on the Effective

Date, (ii) within fourteen (14) Business Days after the date such Administrative Claim becomes an

Allowed Administrative Claim, or (iii) on the date such Allowed Administrative Claim becomes due

according to its terms.  Nothing in the Plan shall prohibit the DIP Debtors, Trustees or Control

Parties from paying, during or after the Cases, Administrative Claims in the ordinary course of

business in accordance with applicable law and the terms of the particular obligation (including,

without limitation, Ordinary Course Administrative Claims), but after the Effective Date, the DIP

Debtors and Trustees shall have no obligations to pay any Claims, including Administrative Claims,

and the Control Parties' obligation to pay Administrative Claims will depend upon the claimant's

compliance with this Plan Section and such Administrative Claim being Allowed under the

provisions of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 4.1.1    Administrative Claims Bar Dates.

Any Administrative Claim <u>not</u> Filed by the applicable Administrative Claims Bar Date shall not be Allowed and no Distribution shall be made on account of any such Administrative Claim. Any Person asserting such an Administrative Claim shall be forever barred from asserting such Claim against Namco, the DIP Debtors, the Estates, the Post Confirmation Estates, the Liquidating Trusts, the Control Parties, and their Agents and property.

#### (a)    Bar Date for Gap Administrative Claims.

In accordance with Bankruptcy Code § 502(f), all requests for payment of Gap Administrative Claims (*e.g.*, Administrative Claims that, among other things, are incurred in the ordinary course of business or financial affairs in the Cases from or after the applicable Petition Date and before the Order for Relief Date) shall be or shall have been Filed with the Bankruptcy Court and served upon the Control Parties no later than the Prepetition Claims Bar Date (which was November 13, 2009 for Namco and Ezri and November 15, 2010 for the DIP Debtors).

#### (b)    General Administrative Claims Bar Date.

All requests for payment of Administrative Claims incurred before the Effective Date under Bankruptcy Code §§ 507(a)(2), 507(a)(3) or 507(b) shall be Filed with the Bankruptcy Court and served upon the Control Parties no later than the General Administrative Claims Bar Date (which is 8 weeks (56 days) after the Effective Date, unless such date is extended by the Bankruptcy Court after appropriate notice).

#### (c)    Administrative Tax Claims Bar Date.

Notwithstanding the General Administrative Claims Bar Date, all requests for payment of Administrative Claims by a Governmental Unit for Taxes (and for interest and/or penalties related to such Taxes) for any Tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Order for Relief Date and through and including the Effective Date ("<u>Administrative Tax Claims</u>") must be Filed and served (if after the Effective Date, on the Control Parties) by the Administrative Tax Claims Bar Date (which is the earlier of:  (a) any Bar Date applicable to such Claim established by the Bankruptcy Court prior to the Effective Date; or (b) the first Business Day following <u>the later of</u> (i) the fifty-sixth (56th) day after the Effective Date, or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(ii) the one-hundred seventy-fifth (175th) day after the filing of the Tax return for such Tax year or period with the applicable Governmental Unit).

**(d)** **Ordinary Course Administrative Claims Bar Date.**

Notwithstanding the Bar Dates for General Administrative Claims and Administrative Tax Claims, all requests for payment of Ordinary Course Administrative Claims (which are Administrative Claims for ordinary course trade obligations and routine payroll obligations incurred in the ordinary course of an Estate's business on or after the applicable Order for Relief Date and before the Confirmation Date) must be Filed and served (if after the Effective Date, on the Control Parties) by the Ordinary Course Administrative Claims Bar Date (which is the earlier of: (1) any Bar Date applicable to a particular Claim as previously established for such Claim in these Cases; or (2) the first Business Day that is the later of (a) the fifty-sixth (56th) day following the Effective Date, or (b) any other Administrative Claims Bar Date established under this Plan).

**(e)** **Professional Fees Bar Date.**

Administrative Claims for Professional Fees for services rendered and for reimbursement of expenses incurred on or after the applicable Order for Relief Date and before the Effective Date must be asserted through the Filing of a Fee Application.  Notwithstanding the other Administrative Claims Bar Dates, all such Fee Applications shall be Filed with the Bankruptcy Court and served upon the Control Parties no later than the Professional Fee Bar Date (which is the first Business Day following the fifty-sixth (56th) day (eight (8) weeks) after the Effective Date, unless such date is extended by the Bankruptcy Court after appropriate notice).

**4.2** **Treatment of Priority Tax Claims.**

Priority Tax Claims are certain unsecured income taxes, employment taxes and other Taxes described by Bankruptcy Code § 507(a)(8).  The Bankruptcy Code requires that each Holder of such a Priority Tax Claim receive the present value of such Claim in deferred Cash payments over a period not exceeding five (5) years from the applicable Order for Relief Date and that such treatment not be less favorable than the treatment accorded to non-priority unsecured creditors.

Allowed Priority Tax Claims, if any, shall receive from the respective Post Confirmation Estate or Liquidating Trust (i) equal Cash payments to be made on the last Business Day of each

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

third full-calendar month following the Effective Date, provided that the first payment need not be made any sooner than twenty-eight (28) days following the Effective Date and provided that such periodic payments are to be payable until January 29, 2014 for the Namco and Ezri Cases and July 2, 2014 for the DIP Debtors' Cases,[2] on which date the final payment shall be due, with all such payments totaling 100% of the principal amount of such Claim, plus interest on any unpaid balance from the Effective Date, calculated at the nonbankruptcy interest rate applicable on the Effective Date, if any, or (ii) such other treatment agreed to by the Holder of the Allowed Priority Tax Claim and the applicable Control Party, provided such treatment is on more favorable terms to the applicable Post Confirmation Estate or Liquidating Trust than the treatment set forth in clause (i) hereof; provided that, prepayments shall be permitted, including payment in full, any time on or after the Effective Date.

## V.

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 5.1    Classification Generally.

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  This Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired, and the Plan sets forth the treatment each Class will receive.  The table below lists the Classes of Claims established under the Plan and the categories of unclassified Claims which were described in Article IV above.  All Classes of Claims and Interests are Impaired.

For voting purposes and to comply with Bankruptcy Code § 1122(a), each Allowed Secured Claim shall be deemed to be in its own subclass even if not expressly designated as such.  Further, in the event that any alleged Secured Claim is not, or is only partially, Allowed as a Secured Claim, the deficiency amount (Unsecured Deficiency Claim) (if Allowed and, where applicable, Filed by the Unsecured Deficiency Claim Bar Date), will constitute a Class 4 Claim or Class 7 Claim against the

---

[2]   For the Namco and Ezri Cases, this date is five years after January 29, 2009, which was the date of the Orders for Relief in the Namco and Ezri Cases.  For the DIP Debtors' Cases, this date is five years after July 2, 2010, which was the date of the Orders for Relief in the DIP Debtors' Cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

applicable Estate, as appropriate, and will receive the same treatment as provided to other Claims in Class 4 or Class 7 of such Estate.

The Plan does not intend to and does not provide for substantive consolidation of any of the Debtors for any purpose, e.g., for voting, for classification, for the testing of compliance of the Plan with applicable provisions of the Bankruptcy Code, for treatment of Claims and Interests, or for the obligations created under the Plan with respect to Distributions for Creditors. Thus, each Allowed Claim in a Class shall be deemed to be in one or more subclasses of the applicable Debtor:

Namco:            Subclass (a);

Namvar:           Subclass (b);

Beshmada:         Subclass (c);

Beshmada of DE:   Subclass (d); and

Dimes:            Subclass (e)

If, at the hearing on Confirmation, the Proponents establish a reasonable good faith belief that a particular Class or subclass contains no Allowed Claims, such Class or subclass shall be disregarded.

THE INVESTIGATION OF CLAIMS AND INTERESTS IS NOT YET COMPLETE, AND THEIR LISTING IN THE PLAN OR IN THE TABLES BELOW SHOULD NOT BE CONSTRUED AS INDICATING OR PROVIDING, FOR ANY PARTICULAR CLAIM, THAT SUCH CLAIM IS ALLOWED UNDER THE PLAN IN ANY RESPECT (WHETHER AS TO AMOUNT OR AS TO STATUS, E.G., AS A SECURED CLAIM, SECURED REAL PROPERTY TAX CLAIM, ETC.), EXCEPT AS EXPRESSLY SET FORTH ELSEWHERE IN THE PLAN.

**5.2    Classes of Claims and Interest**

The Plan contains 7 Classes of Claims and one Class of Interests for each case. All Classes of Claims are Impaired and entitled to vote on the Plan. All classes of Interests are Impaired, but are deemed to reject the Plan as they will receive no recovery.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Estimated Allowed Claims by Class and Case[3]**

| | Namco Classes 1-8(a) | Ezri Classes 1-8(b) | Beshmada Classes 1-8(c) | Beshmada of DE Classes 1-8(d) | Dimes Classes 1-8(e) |
|---|---|---|---|---|---|
| Unclassified Administrative Claims | $10,804,653 | $6,916,214 | $181,277 | $105,745 | $15,106 |
| Unclassified Priority Tax Claims | $617,319 | $847,387 | $3,253 | $3,712 | $12,195 |
| Classes 1: Secured Real Property Tax Claims | $0 | $0 | $0 | $0 | $0 |
| Class 2: Miscellaneous Secured Claims | $2,073,966 | $0 | $1,200,088 | $0 | $0 |
| Class 3: Priority Claims | $0 | $0 | $0 | $0 | $0 |
| Class 4: General Unsecured Claims | $507,680,257 | $202,990,229 | $293,850,782 | $26,983,931 | $13,202,181 |
| Class 5: Bank Guaranty Claims[4] | N/A | $190,308,655 | N/A | N/A | N/A |
| Class 6: Other Guaranty Claims[5] | N/A | $14,921,232 | N/A | N/A | N/A |
| Class 7: Small Convenience Claims | $7,663,469 | $177,083 | $20,713 | $0 | $3,746 |
| Class 8: Interests | N/A | N/A | N/A | N/A | N/A |

# VI.

# TREATMENT OF CLAIMS AND INTERESTS

The following describes the treatment and Distributions, if any, to be made in respect of Allowed Claims and Allowed Interests that are classified. No Distributions will be made in respect of Claims or Interests that are not Allowed, including those Disallowed or not Filed by the applicable Prepetition Claims Bar Date.

---

[3]  The amounts listed are the Proponents estimates only of what the Allowed Claims will be in each Class following the conclusion of the claim objection process.

[4] These estimates do not take into account defenses/objections to the Bank Guaranty Claims based on the validity and enforceability of the underlying guarantee agreements.

[5]  The estimated amount of Other Guaranty Claims assumes that all Creditors holding Other Guaranty Claims agree to the proposed settlement of guaranty defenses where they agree to reduce their claims to 15% of the otherwise Allowed amount if the guarantees are valid in consideration of the Ezri Trustee's waiver of his defense to the validity and enforcement of the guaranty. The Ezri Trustee believes that it is likely that the Other Guaranty Claims will be zero if the validity and enforceability of the guaranties is litigated, however, there are risks and uncertainties in the ultimate outcome and the Ezri Estate would incur additional legal fees in litigation. If the Trustee does not prevail in litigation on the validity and enforceability of guaranty defenses the Allowed amounts of the Claims may be substantially higher.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**6.1**     **Classes 1(a) to 1(e) – Secured Real Property Tax Claims.**

The treatment of any Allowed Secured Real Property Tax Claims in Class 1 under the Plan is as follows:

### 6.1.1    Voting and Impairment.

Class 1 is Impaired under the Plan, and each Holder of an Allowed Secured Real Property Tax Claim, if any, is entitled to vote on the Plan.

### 6.1.2    Liens.

As of the Effective Date, each Holder of an Allowed Secured Real Property Tax Claim in Class 1, on account of such Claim, if any, shall retain its underlying Liens on the applicable collateral pending full payment.

### 6.1.3    Alternative Treatments.

Each Holder of an Allowed Secured Real Property Tax Claim shall receive, on account of and in full and final satisfaction of any such Claim, one of the three alternative treatments identified immediately below.  At any time prior to Confirmation, the Trustee or DIP Debtor of the applicable Estate may elect option (a): Abandonment.  If option (a): Abandonment is not elected, the Holder of each Allowed Secured Real Property Tax Claim shall have the opportunity to elect between treatment (b): Effective Date Payment or treatment (c): Quarterly Payments, below in connection with voting on the Plan.  If such Holder does not return a Ballot or does not otherwise make such election, such Holder will receive treatment (c): Quarterly Payments.

**(a)**     **Abandonment.**

At the applicable Trustee's or DIP Debtor's election, the property securing such Allowed Secured Real Property Tax Claim shall be abandoned and, as of the Effective Date, the Holder of any such Allowed Secured Real Property Tax Claim in Class 1, on account of such Claim, shall have left unaltered its legal, equitable and contractual rights as a Holder of such Allowed Secured Real Property Tax Claim in Class 1 and shall be free to pursue its rights and remedies, if any, against the underlying collateral under applicable non-bankruptcy law; or

1  **(b)** **Effective Date Payment.**

2  On the Effective Date or as soon as practicable thereafter, the Holder of the applicable

3  Allowed Secured Real Property Tax Claim shall receive a lump sum payment, equal to the amount

4  of such Allowed Secured Real Property Tax Claim as of the Petition Date, plus interest thereupon

5  from the Petition Date until payment at the rate of five percent (5%) per annum; or

6  **(c)** **Quarterly Payments.**

7  Each Holder of an Allowed Secured Real Property Tax Claim shall receive quarterly Cash

8  payments, with interest at the rate applicable under non-bankruptcy law, if any, or, if none, the

9  federal judgment rate applicable as of the Effective Date, with each payment to be made on the last

10  Business Day of each third full-calendar month following the Effective Date by the applicable Estate

11  or Liquidating Trust (provided that the first payment need not be made any sooner than twenty-eight

12  (28) days following the Effective Date).  Payments shall continue until five years following the

13  applicable Order for Relief Date, on which date the final payment shall be due.  Prepayments are

14  permitted any time on or after the Effective Date, including payment in full of the Allowed Amount

15  of the Claim, plus accrued interest as provided in this paragraph.

16  **6.1.4** **Sources of Payment.**

17  Any amounts payable to the Holders of Allowed Secured Real Property Tax Claims under

18  the Plan shall be made on the Effective Date or thereafter by the applicable DIP Debtor or Trustee

19  and, after the Effective Date, as its own obligation, by the applicable Post Confirmation Estate or

20  Liquidating Trust that owns the real property serving as collateral for the subject Claim.

21  **6.2** **Classes 2(a) to 2(e) – Miscellaneous Secured Claims.**

22  The treatment of any Allowed Miscellaneous Secured Claims in Class 2 under the Plan shall

23  be as follows:

24  **6.2.1** **Voting and Impairment.**

25  Class 2 is Impaired under the Plan, and each Holder of an Allowed Miscellaneous Secured

26  Claim in Class 2, if any, is entitled to vote on the Plan.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 6.2.2   Liens.

As of the Effective Date, each Holder of an Allowed Miscellaneous Secured Claim in Class 2, if any, on account of such Claim, shall retain its underlying Liens on the applicable collateral pending full payment.

### 6.2.3   Alternative Treatments.

Unless such Holder agrees to a less favorable treatment, each Holder of an Allowed Miscellaneous Secured Claim, if any, will receive, on account of and in full and final satisfaction of any such Allowed Miscellaneous Secured Claim, one of the following treatments which shall be selected by the applicable Trustee or DIP Debtor and communicated to the Holder of such Claim prior to the Voting Deadline:

**(a)   Surrender or Abandonment.**

As of the Effective Date, the applicable DIP Debtor or Trustee of the applicable Estate will be deemed to abandon or surrender to the Holder of any Allowed Miscellaneous Secured Claim in Class 2 the property securing such Allowed Miscellaneous Secured Claim in Class 2 as of the Effective Date, and will turn over possession of such collateral to the Holder of such Allowed Miscellaneous Secured Claim as soon as practicable thereafter; or

**(b)   Periodic Payments Pursuant to Approved Settlement Agreements.**

The Holder of any Allowed Miscellaneous Secured Claim that is subject to a settlement agreement that is approved by the Bankruptcy Court prior to or in connection with the Plan shall receive periodic payments and such other rights as are set forth in such settlement agreements; or

**(c)   Periodic Cash Payments.**

The Holder of a Miscellaneous Secured Claim shall receive twenty (20) equal quarterly Cash payments, with interest at the rate of five percent (5%) per annum, with each payment to be made on the last Business Day of each third full calendar month following the Effective Date by the applicable Post-Confirmation Estate or Liquidating Trust (provided that the first payment need not be made any sooner than twenty-eight (28) days following the Effective Date).  Prepayments are permitted any time on or after the Effective Date, including payment in full of the Allowed Amount of the Claim, plus accrued interest as provided in this paragraph.

### 6.2.4    Sources of Payment.

Any amounts payable to the Holders of Allowed Miscellaneous Secured Claims under the

Plan shall be made by the applicable Estate, Post-Confirmation Estate or Liquidating Trust.

### 6.2.5    Unsecured Deficiency Claims.

If a Holder of an Allowed Miscellaneous Secured Claim contends it holds or wishes to assert

an Unsecured Deficiency Claim related to its Allowed Miscellaneous Secured Claim then, by the

Unsecured Deficiency Claims Bar Date (which is no later than the first Business Day that is at least

twenty-eight (28) days following the Effective Date) and regardless of any prior Filing of one or

more proofs of Claim by such Holder, such Holder must File (and serve upon the Control Parties) an

amended proof of Claim (in compliance with Bankruptcy Rule 3001) asserting, inter alia, the amount

of such Unsecured Deficiency Claim.  Any such Unsecured Deficiency Claim, if Allowed, shall be

treated as a General Unsecured Claim or Small Convenience Claim, as applicable.

## 6.3    Classes 3(a) to 3(e) – Priority Claims.

The treatment of any Allowed Priority Claims in Class 3 under the Plan shall be as follows:

### 6.3.1    Voting and Impairment.

Class 3 is Unimpaired under the Plan, and each Holder of an Allowed Priority Claim in Class

3 is not entitled to vote on the Plan.

### 6.3.2    Treatment.

Each Holder of an Allowed Priority Claim in Class 3 shall be paid, on account of such Claim,

as an obligation of the applicable Estate, Post Confirmation Estate, or Liquidating Trust, in full and

final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority

Claim, the full amount of such Allowed Priority Claim in Cash on the later of (i) the Effective Date,

or (ii) the date such Allowed Priority Claim becomes payable in accordance with the terms

governing such Allowed Priority Claim.

### 6.3.3    Source of Payment.

Distributions to Holders of Allowed Priority Claims shall be paid by the applicable Estate,

Post Confirmation Estate, or Liquidating Trust.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**6.4**      **Classes 4(a) to 4(e) – General Unsecured Claims.**

The treatment of any Allowed General Unsecured Claims in Class 4 under the Plan shall be as follows:

**6.4.1      Voting and Impairment.**

Class 4 is Impaired under the Plan, and each Holder of an Allowed General Unsecured Claim is entitled to vote on the Plan.

**6.4.2      Treatment.**

Each Holder of an Allowed General Unsecured Claim (including an Allowed Inter-Debtor Claim) shall be entitled to receive, on account of such Allowed Claim, Distributions of a Pro Rata share, together with (i) Holders of Other Allowed Class 4 General Unsecured Claims, (ii) as to the Ezri Estate only, Holders of Allowed Bank Guaranty Claims against the Ezri Estate and (iii) as to the Ezri Estate only, Holders of Allowed Other Guaranty Claims against the Ezri Estate, of the Available Plan Proceeds of its applicable Post Confirmation Estate or Liquidating Trust.

**6.4.3      Distribution Dates.**

Distributions of Available Plan Proceeds shall be payable at such times as determined in the sole discretion of the applicable Control Party, considering, inter alia, the amount of funds available for Distribution and the progress in the Claims allowance process.

**6.4.4      Source of Payment.**

Distributions to Holders of Allowed General Unsecured Claims shall be paid by the applicable Estate, Post Confirmation Estate, or Liquidating Trust.

**6.5**      **Class 5(b) – Bank Guaranty Claims.**

**Class 5 only applies to the Ezri Estate.**  The treatment of any Allowed Bank Guaranty Claims in Class 5(b) under the Plan shall be as follows:

**6.5.1      Voting and Impairment.**

Class 5 is Impaired under the Plan.  Each Holder of a Bank Guaranty Claim is entitled to vote on the Plan.

### 6.5.2    Treatment.

All Class 5 Bank Guaranty Claims are Disputed.  Holders of Bank Guaranty Claims may select one of the following treatments on their Ballot.  If no Ballot is timely returned by a Holder of a Bank Guaranty Claim or if the Holder of a Bank Guaranty Claim does not make a selection of one of the following options, then such Claim will receive the treatment set forth in Section (b) below.

### (a)    Settlement of Validity and Enforceability Objections.

If a Holder of such Claim both (a) elects to settle, to the extent provided below, the dispute regarding the validity and enforceability of its guaranty and (b) votes to accept the Plan on its ballot, then:

(i)    The Ezri Estate will waive as of the Plan's Effective Date its objections to such Bank Guaranty Claim to the extent based on the validity and enforceability of the underlying guaranty agreement, but will not waive any other defenses, setoffs, recoupments or reductions and

(ii)    To the extent of any resulting Allowed Bank Guaranty Claim, the Holder of such Allowed Claim shall receive, on account of such Allowed Claim, Distributions of a Pro Rata share, together with (I) other Holders of Allowed Class 5(b) Bank Guaranty Claims against the Ezri Estate, (II) the Holders of Allowed Class 4(b) General Unsecured Claims against the Ezri Estate and (III) the Holders of Allowed Class 6(b) Other Guaranty Claims against the Ezri Estate of the Available Plan Proceeds of the Ezri Estate, provided that

(iii)    In exchange for the Ezri Estate's objection waiver as provided above in this section, the pay rate for such electing Holders of an Allowed Bank Guaranty Claim against the Ezri Estate shall be reduced relative to the pay rate for Holders of other Allowed Claims sharing in such Available Plan Proceeds, which reduction shall be effectuated by quadrupling for purposes of calculating Distributions, the amount of other Allowed Claims in Class 4(b), Class 5(b) (if non-electing) or Class 6(b) until the amount of Available Plan Proceeds Distributed is 25% of the aggregate of all Allowed Claims in Classes 4(b), 5(b) and 6(b).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(b)** **Continued Litigation over Validity and Enforceability of Guaranty.**

If a Holder of a Bank Guaranty Claim against the Ezri Estate does not both (a) vote in favor of the Plan and (b) elect to settle the dispute regarding the validity and enforceability of its guaranty, then:

(i)        Such Holder shall retain its Bank Guaranty Claim against the Ezri Estate and the applicable Control Party shall retain and reserve for assertion all appropriate objections and defenses to such Claim; and

(ii)        In the event such Claim is ultimately Allowed, each Holder of an Allowed Bank Guaranty Claim against the Ezri Estate shall receive on account of such Allowed Claim against the Ezri Estate Distributions of a Pro Rata share, together with (I) the other Holders of Allowed Class 5(b) Bank Guaranty Claims against the Ezri Estate, (II) the Holders of Allowed Class 4(b) General Unsecured Claims against the Ezri Estate, and (III) the Holders of Allowed Class 6(b) Other Guaranty Claims against the Ezri Estate of Available Plan Proceeds of the Ezri Estate.

### 6.5.3    Distribution Dates.

Distributions of Available Plan Proceeds shall be payable at such times as determined in the sole discretion of the applicable Control Party, considering, inter alia, the amount of funds available for Distribution and the progress in the Claims allowance process.

### 6.5.4    Source of Payment.

Distributions to Holders of Allowed Bank Guaranty Claims in shall be paid by the Ezri Post-Confirmation Estate.

### 6.6    Class 6(b) – Other Guaranty Claims.

**Class 6 only applies to the Ezri Estate.**  The treatment of any Allowed Other Guaranty Claims in Class 6(b) under the Plan shall be as follows:

### 6.6.1    Voting and Impairment.

Class 6 is Impaired under the Plan.  Each Holder of an Other Guaranty Claim is entitled to vote on the Plan.

### 6.6.2 __Treatment.__

All Other Guaranty Claims are Disputed. Holders of Other Guaranty Claims may select one of the following treatments on their Ballot. If no Ballot is timely returned by a Holder of an Other Guaranty Claim or if the Holder of an Other Guaranty Claim does not make a selection of one of the following options, then such Claim will receive the treatment set forth in Section (b) below:

(a) Settlement of Validity and Enforceability Objection.

Each Holder of an Other Guaranty Claim will be afforded the opportunity on its ballot to make the following election and receive the following treatment with respect to its Allowed Other Guaranty Claim:

If such Holder both (x) votes in favor of the Plan and (y) makes this election,

(i) The Ezri Trustee will waive the defense to its Other Guaranty Claim that would be based upon validity and enforceability, but not any other defenses, setoffs, recoupments or reductions; and

(ii) Such Holder's thereafter Allowed Other Guaranty Claim will be reduced to 15% of the otherwise Allowed amount thereof; and

(iii) With respect to only such 15% of its Allowed Claim, the Holder of an electing Allowed Other Guaranty Claim will receive on account of its Allowed Other Guaranty Claim Distributions of a Pro Rata share, together with: (I) other Holders of Allowed Class 6(b) Other Guaranty Claims against the Ezri Estate, (II) Holders of Allowed Class 4(b) General Unsecured Claims against the Ezri Estate, and (III) Holders of Allowed 5(b) Bank Guaranty Claims against the Ezri Estate of the Available Plan Proceeds of the Ezri Estate (provided that the Holder of such Other Guaranty Claim will receive nothing with respect to the 85% of its Claim exchanged for the waiver of the Ezri Trustee's defense set forth above); and

(b) Continued Litigation over Validity and Enforceability of Guaranty.

Any Holder of an Other Guaranty Claim that does not both (x) elect to vote in favor of the Plan __and__ (y) elect to settle the dispute regarding the validity and enforceability of its guaranty, shall retain its Other Guaranty Claim and the applicable Control Party may continue to pursue all available objections and defenses to such claim. In the event a Class 6 Claim is ultimately Allowed,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

each Holder of an Allowed Other Guaranty Claim shall receive Distributions of a Pro Rata share, together with (i) other Holders of Allowed Other Guaranty Claims against the Ezri Estate, (ii) Holders of Allowed Class 4(b) General Unsecured Claims against the Ezri Estate and (iii) Holders of Allowed Class 5(b) Bank Guaranty Claims against the Ezri Estate, of the Available Plan Proceeds of the Ezri Estate.

### 6.6.3    Distribution Dates.

Distributions of Available Plan Proceeds shall be payable at such times as determined in the sole discretion of the applicable Control Party, considering, inter alia, the amount of funds available for Distribution and the progress in the Claims allowance process.

### 6.6.4    Source of Payment.

Distributions to Holders of Allowed Other Guaranty Claims shall be paid by the Ezri Post-Confirmation Estate.

### 6.7    Classes 7(a) to 7(e) – Small Convenience Claims.

This Class consists of Small Convenience Claims, which are Claims against any of the Estates that would otherwise be a General Unsecured Claim but for the fact that each Claim is Allowed in an amount that is greater than $0 and less than or equal to $100,000, or for which the Creditor elects to reduce the Allowed amount of its Claim to $100,000; provided, however, that a Claim may not be sub-divided into multiple Claims of $100,000 or less for purposes of receiving treatment as a Small Convenience Claim.

### 6.7.1    Voting and Impairment.

Class 7 is Impaired under the Plan.  Each Holder of a Small Convenience Claim is entitled to vote on the Plan.

### 6.7.2    Treatment.

Each Holder of an Allowed Small Convenience Claim in Class 7 shall be paid, on account of such Allowed Small Convenience Claim, a lump sum payment in an amount equal to ten percent (10%) of such Allowed Small Convenience Claim, on or as soon as practicable following the Effective Date.

### 6.7.3 <u>Source of Payment.</u>

Distributions to Holders of Allowed Small Convenience Claims shall be paid, if on the Effective Date, by the applicable DIP Debtor or Trustee, and if after the Effective Date, by the applicable Control Party.

### 6.8 <u>Classes 8(a) to 8(e) – Interests.</u>

#### 6.8.1 <u>Voting and Impairment.</u>

Class 8 is Impaired under the Plan.  Holders of Interests are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote on the Plan.

#### 6.8.2 <u>Treatment.</u>

(a) **DIP Debtors:**  Existing Interests in the DIP Debtors shall not receive any Distributions or retain any property on account of such Interests and such Interests shall be cancelled as of the Effective Date.

(b) **Ezri Estate:**  Interests of Ezri in the Ezri Estate shall not receive any Distributions or retain any property under the Plan and shall be extinguished as of the Effective Date.  Ezri shall not be required to relinquish Postpetition Earnings or Post-Effective Date Earnings by virtue of the Plan.  However Ezri will not receive a Discharge and his Postpetition Earnings and Post-Effective Date Earnings shall be subject to claims asserted by the Post Confirmation Estates or by Creditors asserting claims or causes of action against Ezri.

(c) **Namco Estate:**  The Ezri Estate shall not receive any Distributions or retain any property <u>on account of</u> such interest, but, for administrative convenience and the benefit of creditors of the Namco Estate, the Ezri Estate shall retain its interests in the Namco Estate and if and only if all Allowed Claims of Creditors of the Namco Estate are paid in full, plus interest on such Claims (accruing until payment at the federal judgment rate applicable on the Effective Date), then Distributions of remaining Available Plan Proceeds (none are projected) would be payable to the Ezri Post-Confirmation Estate for the benefit of its Creditors holding Allowed Claims against such Post-Confirmation Estate.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# VII.

## ACCEPTANCE OR REJECTION OF THE PLAN

### 7.1    Classes Entitled to Vote.

All Classes of Claims under the Plan are Impaired and entitled to Vote to accept or reject the Plan.

### 7.2    Classes Not Entitled to Vote.

Holders of Interests in Classes 8(a) to 8(f) receive nothing under the Plan and, thus, Classes 8(a) to 8(f) are conclusively presumed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).

### 7.3    Nonconsensual Confirmation.

Because Classes 8(a) to 8(f) are deemed to have rejected the Plan, and in the event all classes of claims do not accept the plan, the Plan Proponents request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code § 1129(b).  In addition, to the extent that a Class of Claims that is Impaired rejects the Plan, the Plan Proponents request that the Bankruptcy Court confirm the Plan, notwithstanding such rejection, in accordance with Bankruptcy Code § 1129(b).

# VIII.

## IMPLEMENTATION OF THE PLAN

The Plan shall be implemented on the Effective Date.  The following sections of this Article describe the principal means for implementation of the Plan.  Other provisions regarding the means of execution of the Plan are set forth elsewhere in the Plan.  As more fully described in the treatment sections of the Plan and below, under the Plan, some Allowed Secured Claims and Allowed Claims entitled to priority under the law are to be paid on the Effective Date and Other Claims, including all General Unsecured Claims, are to be satisfied by Distributions from Plan Proceeds.

### 8.1    Funding for the Plan.

Funding for the Plan shall be provided by Cash on hand, including the proceeds from sales of Available Real Estate, Inter-Estate Loans, other dispositions of Assets, Litigation Rights and from other net revenue of the Post Confirmation Estates.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 8.2    Effective Date Payments and Inter-Estate Loans.

Under the Plan, on the Effective Date, the Trustees and DIP Debtors (and, after the Effective Date, the Control Parties) shall pay Cash (expected to be primarily the proceeds of sales of Real Estate occurring during the Cases and Inter-Estate Loans) to make those payments that may be due on or shortly after the Effective Date with respect to Allowed Secured Tax Claims, Allowed Miscellaneous Secured Claims, Allowed Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims or Allowed Small Convenience Claims.  To the extent a particular Estate lacks sufficient Cash to make mandatory payments due for that Estate under the Plan, available Cash from other Estates shall be utilized therefor as an Inter-Estate Loan from each lending Estate, Post Confirmation Estate, or Liquidating Trust to the borrowing Estate, Post Confirmation Estate, or Liquidating Trust.  Such Inter-Estate Loans, with interest thereupon at eight percent (8%) simple interest, shall be repaid by the borrower from the first Cash otherwise available for Distributions after the use of the proceeds of the loan.

### 8.3    The Post Confirmation Estates/Liquidating Trusts.

#### 8.3.1    Assets to be Retained in the Post Confirmation Estates.

Upon the Effective Date, the Assets of the Namco and Ezri Estates, including, without limitation, their Affiliated Interests and Litigation Rights, shall be retained as the property of the corresponding Post Confirmation Estate, free and clear of all Claims, Liens, charges, other Encumbrances and interests, except as set forth in this Plan.

#### 8.3.2    Estate Representatives.

Each of the Post Confirmation Estates shall be managed by the Estate Representatives.  The Namco and Namvar Post Confirmation Estates shall each have two Estate Representatives.  The Estate Representatives shall be deemed appointed for each of the Post Confirmation Estates on the Effective Date of the Plan.  The Estate Representatives shall make decisions regarding the administration of the Post Confirmation Estates collectively, in accordance with the Estate By-laws, which will be filed with the Bankruptcy Court as part of the Plan Supplement.  The By-laws will contain appropriate provisions regarding resolution of any disputes between the Estate Representatives.  The Estate Representatives may employ one or more managers to assist them in

1    carrying out their duties.  The Estate Representatives shall confer prior to the Effective Date and

2    shall agree on which representative will have principal authority and responsibility for the various

3    assets and Litigation Rights.  In the event an Estate Representative resigns, a successor shall be

4    appointed by the remaining Estate Representative.  The Estate Representatives and their agents shall

5    be entitled to hourly compensation for their personal services as Estate Representative at their

6    regular hourly rates and shall not be entitled to any percentage compensation.

### 8.3.3    Responsibilities of Estate Representatives.

8        The Estate Representatives shall: (a) liquidate the Post Confirmation Estates for the benefit

9    of Creditors, (b) monitor and enforce the implementation of the Plan, (c) manage, control, prosecute

10   and/or settle objections to General Unsecured Claims, (d) manage, control, prosecute and/or settle

11   Litigation Rights, (e) act as the Distribution Agent for payment of the Plan Proceeds to Creditors,

12   (f) file periodic reports, and (g) pay fees as required by 28 U.S.C. § 1930.

### 8.3.4    Powers of Estate Representatives to Employ and Compensate Agents and Professionals.

15       On and after the Effective Date, the Estate Representatives may employ and compensate

16   Persons or Professionals from any funds of or borrowed by the applicable Post Confirmation Estates.

17   The same Professionals may be retained to represent multiple Post Confirmation Estates and

18   Liquidating Trusts except as to matters involving a direct and substantial conflict between the

19   applicable Post Confirmation Estates.  The Estate Representatives shall be authorized to employ and

20   pay Professionals post-confirmation without the need for Court approval, except as follows.  If fees

21   and expenses for a particular Professional are in excess of a $50,000 payment threshold for any

22   month, the Professional shall be paid 80% of their fees and 100% of their costs for such month (or

23   the payment threshold, whichever is greater) and the unpaid balance shall be payable only after

24   fourteen (14) days' notice is afforded thereof to the Notice Parties.  The Notice Parties shall have the

25   right to object to any fees that they do not believe are reasonable or appropriate provided that such

26   objection identifies, with specificity, the fees that are objectionable.  If a timely objection is filed,

27   then the undisputed portion of the monthly fees shall be paid in full and there shall continue a 20%

28   holdback on only the disputed portion of the fees pending resolution of the objection.  The Estate

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Representatives shall endeavor in good faith to consensually resolve any such objection.  If the objection is not consensually resolved, the Professional may apply for payment to the Court.

### 8.3.5    Indemnification by Post Confirmation Estates.

Each Post Confirmation Estate shall indemnify and hold harmless the Estate Representatives and their Professionals, except to the extent they agree otherwise, from, inter alia, claims, losses, damages, attorney's fees, expenses or causes of action relating to the Post Confirmation Estates other than for those primarily resulting from a gross negligence or intentional misconduct.  Any such indemnification claims shall be paid prior and in preference to any other Distributions to be made from the Post Confirmation Estates.

### 8.3.6    Use of Plan Proceeds.

The Estate Representatives shall use the applicable Plan Proceeds of each Post Confirmation Estate to pay or reserve for expenses of such Post Confirmation Estates, to make or reserve for Inter-Estate Loans to pay expenses of related Post Confirmation Estates, and, as Distribution Agent therefor, to distribute Plan Proceeds in accordance with the terms of this Plan.  Expenses of the Post Confirmation Estates may include, without limitation, amounts to (i) indemnify the Estate Representatives as provided in Plan Section 8.3.5, (ii)  compensate and reimburse Professionals engaged by the Estate Representatives, (iii) purchase fiduciary insurance covering the Estate Representatives, (iv) fund other of the Post Confirmation Estates' expenses, and (v) otherwise pay amounts in the exercise of the Estate Representatives' powers, duties and obligations.

### 8.4    The Liquidating Trusts

#### 8.4.1    Formation of Liquidating Trusts.

As of the Effective Date, the Liquidation Trusts shall be established and become effective pursuant to, and be governed by, the terms of the Liquidation Trust Agreements, each in a form or substantially the form set forth in the Plan Supplement.

#### 8.4.2    Transfer and Vesting of Assets to and in the Liquidating Trusts.

Upon the Effective Date, the Assets of each DIP Debtor Estate, including, without limitation, its Affiliated Interests and Litigation Rights shall become the property of a corresponding Liquidating Trust, free and clear of all Claims, Liens, charges, other Encumbrances and interests,

except as set forth in this Plan.  The Liquidating Trustees shall have the authority to take any

corporate action, including dissolution, on behalf of the applicable DIP Debtor and, in furtherance

thereof, on the Effective Date the respective each Liquidating Trustee shall be appointed the attorney

in fact for its corresponding DIP Debtor.

### 8.4.3  Beneficial Entitlements to Liquidating Trust Interests.

Upon and after the Effective Date, each Holder of an Allowed General Unsecured Claim

shall become a Liquidating Trust Beneficiary of the Liquidating Trust for the Estate against which it

holds a Claim and, thereby, shall be afforded Liquidating Trust Interests in the applicable

Liquidating Trust.  As more fully set forth in the Liquidating Trust Agreement, each Liquidating

Trust shall survive for up to five (5) years, provided that if certain Liquidating Trust Assets remain at

such time, extensions can be obtained with Bankruptcy Court approval.  Liquidating Trust Interests

are not securities, are not subject to trade or assignment and are subject to the restrictions set forth in

the Liquidating Trust Agreements.

### 8.4.4  Liquidating Trustees.

Each Liquidating Trust shall be managed by a Liquidating Trustee, as more fully set forth in

each Liquidating Trust Agreement.

#### (a)    Appointment of Liquidating Trustees.

Under the Plan, on the Effective Date, Bradley Sharp shall be the Liquidating Trustee for the

Liquidating Trusts.  Successor Liquidating Trustees shall be appointed as set forth in the Liquidation

Trust Agreements.  The Liquidating Trustees shall be entitled to hourly compensation for their

personal services as Liquidating Trustees at their regular hourly rates, but shall not be entitled to

percentage compensation on recoveries in the manner or a similar manner applicable for the period

during the Cases.

#### (b)    Responsibilities of Liquidating Trustees.

Each Liquidating Trustee shall be vested with the authorities, duties and obligations set forth

in the Liquidating Trust Agreements, including to:  (i) monitor and enforce the implementation of

the Plan on behalf of the Holders of General Unsecured Claims of the Estate to which the

Liquidating Trustee's Liquidating Trust relates, (ii) manage, control, prosecute and/or settle on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    behalf of the Liquidating Trust objections to General Unsecured Claims, (iii) manage, control,

2    prosecute and/or settle on behalf of the Liquidating Trust its other Litigation Rights, (iv) act as

3    Distribution Agent for payment of the Available Plan Proceeds to the Liquidating Trust

4    Beneficiaries and (v) file periodic reports and pay periodic fees as required by 28 U.S.C. § 1930.

5
6
(c)    **Powers of Liquidating Trustees to Employ and Compensate
Agents and Professionals.**

7    On and after the Effective Date, the Liquidating Trustees may employ and compensate

8    Persons or Professionals from any funds of or borrowed by the applicable Liquidating Trust without

9    Court approval and the same Professionals may be retained to represent multiple Liquidating Trusts

10    and Post Confirmation Estates excepting themselves from handling only those matters both:

11    involving a direct and substantial conflict between the applicable Liquidating Trusts; and as to which

12    the same Person is not making decisions as the Liquidating Trustee for both such Liquidating Trusts.

13    The Liquidating Trustees may employ one or more managers to assist them in carrying out their

14    duties.

15    Until the applicable Case or Cases are closed, (a) the Liquidating Trustees shall be authorized

16    to employ and pay Professionals post-confirmation without the need for Court approval, except as

17    follows.  If fees and expenses for a particular Professional are in excess of a $50,000 payment

18    threshold for any month, the Professional shall be paid 80% of their fees and 100% of their costs for

19    such month (or the payment threshold, whichever is greater) and the unpaid balance shall be payable

20    only after fourteen (14) days' notice is afforded thereof to the Notice Parties.  The Notice Parties

21    shall have the right to object to any fees that they do not believe are reasonable or appropriate

22    provided that such objection identifies, with specificity, the fees that are objectionable.  If a timely

23    objection is filed, then the undisputed portion of the monthly fees shall be paid in full and there shall

24    continue a 20% holdback on only the disputed portion of the fees pending resolution of the

25    objection.  The Liquidating Trustees shall endeavor in good faith to consensually resolve any such

26    objection.  If the objection is not consensually resolved, the Professional may apply for payment to

27    the Court.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    **(d)**    <u>**Indemnification by Liquidating Trust.**</u>

2    As more fully set forth in the Liquidating Trust Agreements, each Liquidating Trust shall

3    indemnify and hold harmless its Liquidating Trustee and its Professionals, except to the extent they

4    agree otherwise, from, inter alia, claims, losses, damages, attorney's fees, expenses or causes of

5    action relating to the Liquidating Trust other than for those primarily resulting from a gross

6    negligence or intentional misconduct.  Any such indemnification claims shall be paid prior and in

7    preference to any other Distributions to be made from the Liquidating Trusts.

8    **(e)**    <u>**Use of Liquidating Trust Assets and Liquidating Trust Recovery**</u>
<u>**Proceeds.**</u>

9

10    Each Liquidating Trustee may use the applicable Plan Proceeds to pay or reserve for

11    expenses of such Liquidating Trust, to make or reserve for Inter-Estate Loans to pay expenses of a

12    related Liquidating Trust or Post Confirmation Estate, and, as Distribution Agent therefor, to pay

13    Plan Proceeds to the applicable Liquidating Trust Beneficiaries.  Expenses of a Liquidating Trust

14    may include, without limitation, amounts to (i) indemnify the Liquidating Trustee as provided above

15    or under the Liquidating Trust Agreement, (ii)  compensate and reimburse professionals engaged by

16    the Liquidating Trustee, (iii) purchase fiduciary insurance covering the Liquidating Trustee,

17    (iv) fund other of the Liquidating Trustee's expenses, and (v) otherwise pay amounts in the exercise

18    of the Liquidating Trustee's powers, duties and obligations.

19    **(f)**    <u>**Tax Matters**</u>

20    For federal income tax purposes, the Liquidating Trusts, the Liquidation Trustees, and the

21    Liquidating Trust Beneficiaries shall treat the Liquidation Trusts as a liquidating trusts within the

22    meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-

23    45, 1994-2 C.B. 124.  For federal income tax purposes, the transfer of each Estate's Assets to the

24    Liquidating Trusts under the Plan is treated as a deemed transfer to the Holders of Allowed General

25    Unsecured Claims of such Estate in partial satisfaction of their Claims followed by a deemed

26    transfer of such assets by such Holders of Allowed General Unsecured Claims to the applicable

27    Liquidating Trust.  For federal income tax purposes, the Holders of Allowed General Unsecured

28    Claims against each Estate shall be deemed to be the grantors and owners of the Liquidation Trust

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

for that Estate and its assets.  For federal income tax purposes, the Liquidation Trusts shall be taxed as a grantor trust within the meaning of IRC sections 671-677 (a nontaxable pass-through Tax entity) owned by the Holders of Allowed General Unsecured Claims.  The Liquidating Trusts shall file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 and report, but not pay Tax on, the Liquidation Trust's Tax items of income, gain, loss deductions and credits ("Tax Items"). The Holders of General Unsecured Claims shall report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability.  The Liquidation Trusts and the Holders of Allowed General Unsecured Claims shall use consistent valuations of the assets transferred to the Liquidation Trusts for all federal income tax purposes, such valuations to be determined by the Liquidating Trustees.

### 8.4.5   Good Faith and Compliance With Law Relating to Distributions.

The Proponents (and each of their respective Agents and members) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable law with regard to the Distributions under the Plan, and therefore are not, and on account of such Distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.  Upon entry of the Confirmation Order, all provisions of the Plan addressing Distributions shall be deemed necessary and proper.

### 8.5   Settlement of Inter-Debtor Claims.

Various of the Debtors' Estates have Claims against other of the Debtors' Estates (Inter-Debtor Claims) for matters including, without limitation, loans, fraudulent transfers, misrepresentation or fraud.  The Trustees undertook diligence with respect to certain of these Claims and their quantification and considered issues of the Claims' impact on Distributions and potential liability disputes.  In light of this review, the Trustees determined that it is appropriate to Allow such Claims in the amounts set forth in **Exhibit A**, with the consequences of such allowance to be as specified under the Plan, and, upon the Effective Date, the Inter-Debtor Claims shall be deemed so

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Allowed.  The DIP Debtors are in the process of reviewing and validating the Trustees' analysis which should be completed by the scheduled hearing on this Disclosure Statement.

As a result of the allowance of the Inter-Debtor Claims, the obligee Post Confirmation Estate will receive from the obligor Post Confirmation Estate a Pro Rata share of the Available Plan Proceeds attributable to such Inter-Debtor Claim, which, in turn, may be available for Distribution to Creditors of the obligee Post Confirmation Estate.

### 8.6    Corporate Action.

On the Effective Date, the adoption, filing, approval and ratification, as necessary, of all corporate or related actions contemplated under the Plan with respect to each of the Estates shall be deemed authorized and approved in all respects.  Without limiting the foregoing, on or after the Effective Date, the Trustees and Control Parties are authorized and directed to issue, execute, deliver, file and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments contemplated by the Plan in the name of and on behalf of the respective Estate or Post Confirmation Estate and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 8.7    No Substantive Consolidation.

Nothing in this Plan is intended to substantively consolidate the Estates.

### 8.8    Tax Indemnification

The Namco Post Confirmation Estate shall indemnify the Ezri Post Confirmation Estate for any out of pocket expenses resulting from pass through taxes from the Namco Post Confirmation Estate to the Ezri Post Confirmation Estate.  This indemnification may, at the election of the Trustees, be memorialized in a written agreement.

### 8.9    Distributions and Related Matters.

#### 8.9.1    Distribution Record Date.

On the Distribution Record Date, the Claims Registers shall be closed and any transfer on any Claim therein shall be prohibited.  The Trustees and the DIP Debtors prior to the Effective Date and the Control Parties after the Effective Date shall be authorized and entitled to recognize and deal

for all purposes under the Plan with only those record Holders stated on the Claims Registers, as applicable, as of the close of business on the Distribution Record Date.

### 8.9.2 Distribution Agents.

Whenever the Plan provides that a Trustee, DIP Debtor or Control Party shall make a Distribution under the Plan, such Distribution shall be made by the Trustee, DIP Debtor, or Control Party, as applicable, and/or an agent of any of them.  In such instances, the Trustee, DIP Debtor or Control Party, as applicable, shall constitute the "Distribution Agent" under the Plan and shall serve in such capacity without bond.

A Distribution Agent shall have no liability to any Person entitled to receive a Distribution pursuant to the Plan for any losses, damages, claims or causes of action, other than those primarily resulting from such Distribution Agent's action or failure to act arising out of, in connection with or resulting from such Distribution Agent's gross negligence or intentional misconduct, and the Post Confirmation Estate against which the affected Creditor holds its Claim shall indemnify and hold all Distribution Agents harmless from claims for any such losses, damages, claims or causes of action, other than those primarily resulting from a Distribution Agent's action or failure to act arising out of, in connection with or resulting from such Distribution Agent's gross negligence or intentional misconduct.  Any such indemnification claims shall be paid prior and in preference to any other payments or Distributions to be made from the Post Confirmation Estates.

### 8.9.3 Distribution Dates.

The sections of the Plan on treatment of Claims specify the times for Distributions. Whenever any payment or Distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or Distribution shall instead be made, without interest otherwise due under the Plan, if any, on the immediately following Business Day.  Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a Distribution, the Distribution may be delayed until such surrender occurs or conditions are satisfied.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    If, under the terms of the Plan, the resolution of a particular Disputed Claim (e.g., it is

2    Disallowed) entitles another Holder of a Claim to a further Distribution or payment, subject to other

3    provisions of this Plan, the appropriate Distribution Agent shall make such further Distribution or

4    payment no later than the first Business Day following the earlier of (a) one year after such

5    resolution or (b) the next date at least fourteen (14) days after such resolution on which another

6    Distribution is due to such Holder of a Claim.

### 8.9.4    Distributions in Cash and Delivery of Distributions.

8    At the option of the Person making the Distribution, (a) Distributions of Cash pursuant to the

9    Plan may be made either by check drawn on a domestic bank or wire transfer from a domestic bank,

10    provided that Cash payments made to foreign Creditors may be made in such funds and by such

11    means as are necessary or customary in a particular foreign jurisdiction; and (b) Distributions may

12    be delivered by first-class mail or by other equivalent or superior means.

### 8.9.5    Rounding of Payments.

14    Whenever payment of a fraction of a dollar would otherwise be called for, the actual payment

15    may reflect a rounding down of such fraction to the nearest whole dollar.  To the extent Cash

16    remains undistributed as a result of the rounding of such fraction to the nearest whole dollar, such

17    Cash shall be treated as Unclaimed Property under the Plan.  No consideration shall be provided in

18    lieu of fractional dollars that are rounded down.

### 8.9.6    De Minimis Distributions.

20    If any Distribution under the Plan to the Holder of an Allowed Claim would be less than

21    $1,000, the applicable payor may withhold such Distribution until the amount payable equals or

22    exceeds $1,000, provided that, for a Cash Distribution, the Distribution Agent shall make the

23    Distribution prior to dissolution of the Post Confirmation Estate or Liquidating Trust if the

24    Distribution to the Creditor would total at least $100.  Any Distribution not payable pursuant to this

25    Section 8.9.6 shall be treated as Unclaimed Property under Plan Section 8.9.10.

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 8.9.7    Hardship Distributions.

#### (a)    Rationale.

Many of the victims of Ezri's abusive investment scheme were individuals of limited means who invested their life savings with Namco (the "At-Risk Creditors").  These Creditors invested their funds with Namco, seeking a steady source of income from what they understood to be safe well-managed lending arrangement.  Instead of receiving the promised source of income from Namco - an income source that they needed to help them pay for daily necessities such as food, rent and mortgage obligations - these Creditors have been denied both income and access to their principal investment for years.  Since a number of the At-Risk Creditors are aged, infirm, or otherwise cannot survive without the funds they invested, they face foreclosure, eviction and poverty.

Under the Plan, the asset-recovery and liquidation process will take time.  In the initial years, distributions may be limited.  Unfortunately, some of At-Risk Creditors could suffer severe harm before meaningful distributions are forthcoming.  They need more immediate financial relief.

Since the Bankruptcy Code requires similarly situated creditors to receive similar treatment, the Trustee's ability to make expedited payments to the At-Risk Creditors who face near-term harm is limited.  This relief is only available if the other affected Creditors give their consent.  In an effort to design sufficient flexibility into the Plan to meet the needs of those At-Risk Creditors facing time-sensitive harm, the Plan includes the following provisions: Consent By Ballot.  If a Creditor submits a ballot voting in favor of the Plan and affirmatively votes to opt-in to the Hardship Distributions ("Consenting Creditors"), such Creditors will be deemed to consent to the hardship provision described below.

#### (b)    Mechanics.

Where the applicable Control Party receives and approves a valid hardship petition from an At-Risk Creditor seeking relief under this provision, the Control Party shall be authorized to make a hardship distribution to the qualifying At-Risk Creditor in an amount up to the lesser of twenty thousand dollars ($20,000) per Creditor, or twenty percent (20%) of a qualifying Creditor's Allowed General Unsecured Claim.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The hardship distributions will be funded from a reserve of up to two and one-half million dollars ($2,500,000) that will be funded by taking seven percent (7%) of the distributions that would otherwise have been paid to the Consenting Creditors by the Post Confirmation Estates or Liquidating Trusts (the "Reallocated Distributions"). The Reallocated Distributions shall be repaid to the Consenting Creditors from the distributions that would subsequently be payable to the At-Risk Creditors (if any) who received expedited distributions from the above-mentioned reserve.

All Consenting Creditors should recognize that the foregoing provision is not without risk. At-Risk Creditors who are overpaid will not disgorge such overpayment. If insufficient recoveries are obtained, after the Reallocated Distributions are paid to the At-Risk Creditors, then Consenting Creditors may receive less than they would otherwise be entitled to recover under the Plan.

### 8.9.8    Disputed Claims.

#### (a)    Distribution Calculations to Be Made as if Disputed Claims Were Allowed.

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims under the Plan, including the determination of the amount or number of Distributions due to the Holders of Allowed Claims, each Disputed Claim shall be treated as if it were an Allowed Claim, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (see Plan Section 8.9.8(b)), such amount or number as determined by the Bankruptcy Court shall be used as to calculate such Claim.

#### (b)    Temporary or Permanent Resolution of Disputed Claims.

In order to establish reserves under this Plan and avoid undue delay in the Cases or confirmation of the Plan in the Cases, prior to the Effective Date, the Trustees and the DIP Debtors, and upon and after the Effective Date, the Control Parties, shall have the right to seek an order of the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code estimating the amount of any Claim irrespective of whether such Disputed Claim was the prior subject of objection or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

estimate any contingent or unliquidated Claim (a) if the matter is initiated prior to the Claims

Objection Deadline, or (b) if the matter relates to a Disputed Claim, in which case the matter may be

initiated at any time during the pendency of any timely Filed objection to the Disputed Claim,

including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court

estimates any contingent or unliquidated Claim, that estimated amount would constitute either the

Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the

Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Disputed

Claim, the Control Parties may elect to pursue any supplemental proceedings to object to any

ultimate Distribution on account of such Claim. All objection, estimation and resolution procedures

are cumulative and not necessarily exclusive of one another.

**(c)      Distribution Reserves.**

Distributions due in respect of Disputed Claims shall be made to and/or held in reserve in one

or more Distribution Reserves by the Control Parties for the Post Confirmation Estate or Liquidating

Trust against which was asserted the applicable Disputed Claim.

Each applicable Liquidating Trust will elect to treat Disputed Claim Reserves associated with

such Liquidating Trust as a "Disputed Ownership Fund," pursuant to  Federal Tax Regulations

Section 1.468B-9(c)(2)(ii). As outlined in this election, Creditors holding disputed claims are not

treated as transferors of the money or property transferred to the "Disputed Ownership Fund."

For Federal income tax purposes, a "Disputed Ownership Fund" is treated as the owner of all

assets that it holds. A "Disputed Ownership Fund" is treated as a C corporation for purposes of the

Internal Revenue Code. A "Disputed Ownership Fund" must file all required income and

information tax returns and make all tax payments.

**(d)      No Actual Distributions to be Made to Holders of Disputed
Claims.**

Nonetheless and notwithstanding anything herein to the contrary: (a) no Distribution shall be

made with respect to any Disputed Claim until such Claim becomes an Allowed Claim, and

(b) unless determined otherwise by the Control Parties, as applicable, no Distribution shall be made

to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed

1  Claim(s) have been resolved by withdrawal of the objection to the Claim(s), settlement or Final

2  Order.

3  **(e)    Distributions After Allowance of Initially Disputed Claims.**

4  Within forty-two (42) days of the date that a Disputed Claim becomes an Allowed Claim,

5  e.g., as a result of an objection to a Disputed Claim being withdrawn, resolved by agreement or

6  determined by a Final Order, any Distributions then due and payable on account of any resulting

7  Allowed Claim shall be made by the appropriate Distribution Agent from the Distribution Reserves.

8  No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining

9  the allowance of such Claim.  Although the Trustees, DIP Debtors and Control Parties are to

10  endeavor in good faith to maintain adequate reserves, should a finally Allowed Claim otherwise

11  entitle the Holder to a Distribution in an amount or in excess of the amount allocated for such Holder

12  in the Distribution Reserves, such Holder's entitlement shall be limited to any future amounts

13  otherwise available for Distributions from the Plan Proceeds for the applicable Estate, after payment

14  and appropriate reserve for all post-Effective Date expenses.  The Holder of a Disputed Claim that

15  becomes an Allowed Claim shall in no event have any recourse to: (a) any payments or Distributions

16  theretofore made to or for the benefit of any other Holder of a Claim; (b) amounts owing with

17  respect to post-Effective Date expenses of the Post Confirmation Estates; or (c) other assets of the

18  Trustees, Control Parties, or their Agents.

19  **(f)    Disposition of Assets in Distribution Reserves After Disallowance.**

20  After an objection to a Disputed Claim is sustained in whole or in part by a Final Order or by

21  agreement, such that the Disputed Claim is Disallowed in whole or in part, (a) any Cash held in the

22  Distribution Reserve in respect of the particular Disputed Claim (in excess of the Distributions due

23  on account of any resulting Allowed Claim) shall become the property of the applicable Post

24  Confirmation Estate or Liquidating Trust to be used or distributed by the Control Parties in a manner

25  consistent with this Plan.

26  **8.9.9    Undeliverable Distributions.**

27  Prior to the relevant occasion when a Distribution would become Unclaimed Property, if

28  either (i) after a Distribution was sent to the Creditor and is returned as undeliverable, the applicable

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

payor is notified in writing of a new address for a Creditor or notified in writing to cause the Distribution to be resent, or (ii) no Distribution was sent to a Creditor because no address was known for such Creditor and such Creditor notifies the applicable payor in writing of an address for such Creditor, then the Distribution shall be re-sent, this time to the newly indicated address, within forty-two (42) days after the later of such notification or the last date that the Distribution otherwise was due under the Plan.  After a Distribution is returned as undeliverable, no further Distribution to such Person needs to be made unless and until either the Distribution is successfully re-sent, such as provided above, or the applicable payor is notified in writing of a new address for the subject Creditor.

### 8.9.10  Unclaimed Property.

The Distribution due and any Cash due to a Creditor shall be deemed to be Unclaimed Property if: (i) both such Distribution is returned to the Control Parties or their agents (e.g., as undeliverable) and the check or other similar instrument or Distribution remains unclaimed for one hundred twenty-six (126) days from sending; or (ii) as to Distributions of Cash, the check or other similar instrument or Distribution remains uncashed for one hundred twenty-six (126) days from sending; or (iii) no address is known by the applicable payor for a Creditor for one hundred twenty-six (126) days after the first day such Distribution could have been made; or (iv) the Distribution is de minimis and not distributable in accordance with Plan Section 8.9.6; or (v) the Distribution is a re-sent Distribution, as provided in Plan Section 8.9.9, that either (a) is returned to the Control Parties or their agents as undeliverable or (b) is a check or other similar instrument or Distribution that remains uncashed for twenty-eight (28) days from re-sending.

Unclaimed Property consisting of Cash, shall be added to the Distribution Reserves if the Control Parties decide such additional reserves are necessary or appropriate and, otherwise, Unclaimed Property that is Cash shall vest in the appropriate Post Confirmation Estate for further use or Distribution consistent with the Plan.

Once there becomes Unclaimed Property for a Creditor, no subsequent Distributions for such Creditor which may otherwise be due under the Plan need be accrued or be held for, or paid to, such Creditor; provided that, if the Control Parties are notified in writing of a Creditor's then-current

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

address and status as a Creditor holding an Allowed Claim entitled to undelivered Distributions under the Plan, thereafter, despite such earlier determination of Unclaimed Property, the Creditor will become entitled to its share of Distributions, if any, which first become distributable under the Plan after such notification.

Upon forfeiture of rights under this provision, subject to the terms of this provision, the Claim of any Creditor with respect to such funds shall be discharged and forever barred as to the Post Confirmation Estates notwithstanding any federal or state escheat laws to the contrary, and such Creditors shall have no claim whatsoever against Namco, the DIP Debtors, the Estates, the Post Confirmation Estates, the Liquidating Trusts or their Agents. If at the time of making the final Distribution, Plan Proceeds remain in a Post-Confirmation Estate in a de minimis amount such that the administrative expense of making a final Distribution would absorb any benefit thereto, the Control Parties may contribute the remaining Plan Proceeds to a charitable organization of their choosing that is qualified as tax exempt under Internal Revenue Code section 501(c).

### 8.9.11  Setoff, Recoupment and Prior Payments.

Nothing contained in this Plan shall constitute a waiver or release by the Estates of any right of setoff or recoupment the Estates may have against any Creditor. To the extent permitted by applicable law, after the Effective Date, the Control Parties may set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estates or Post Confirmation Estates may have against the Holder of such Claim or Interest. Similarly, no term or provision of this Plan shall prejudice or affect any rights of any Person to assert a right of setoff or recoupment as a defense to any Litigation Rights.

### 8.9.12  Compliance with Tax Laws.

Notwithstanding any other provision of this Plan, each Holder of an Allowed Claim that has received a Distribution shall have sole and exclusive responsibility for the satisfaction or payment of any Tax obligation imposed by any Governmental Unit, including income, withholding and other Tax obligation, on account of such Distribution. For Tax purposes, Distributions received in respect

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest, if any.

The Post Confirmation Estates and Liquidating Trusts shall be authorized to take all actions necessary to comply with applicable withholding and recording requirements and, specifically, pursuant to section 346(i) of the Bankruptcy Code, the applicable Post Confirmation Estates shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  With respect to any Person from whom a tax identification number, certified tax identification number or other Tax information required by law to avoid withholding has not been received by the applicable Post Confirmation Estate or Liquidating Trust, the applicable Control Party may, at its sole option, withhold the amount required and distribute the balance to such Person or decline to make such Distribution until the information is received.

**8.10    Litigation Rights, Objection to and Estimation of Claims and Determination of Taxes.**

**8.10.1    Preservation, Pursuit and Resolution of Litigation Rights.**

In accordance with section 1123(b) of the Bankruptcy Code, all Litigation Rights, including, but not limited to, (1) Avoidance Actions, and (2) any other Litigation Rights, are preserved and, as of the Effective Date, the Control Parties will retain and may exclusively assert, file, settle, compromise, withdraw, litigate to judgment or otherwise enforce Litigation Rights of each respective Post Confirmation Estate or Liquidating Trust, subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan.  Neither the failure to use a Litigation Right to set off against a Claim, nor the allowance of any Claim, will constitute a waiver or release by any Estate, Trustee, Post Confirmation Estate, Liquidating Trust, or Control Party, of any Litigation Rights that any holder thereof may have against such Creditor.

Litigation Rights may include, without limitation, a broad variety of claims, rights or causes of action, such as, by example only, preference actions, fraud, misrepresentation, or other tort actions, contract actions, fraudulent transfer actions, and the right to seek, among other things, to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

have a Claim disallowed if the Control Party, at the appropriate time, determines that a Post Confirmation Estate or Liquidating Trust has a defense under 11 U.S.C. § 502(d), e.g., there exists a Litigation Right for an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

As of the time that the Proponents are soliciting votes on the Plan, the Trustees and the DIP Debtors have not completed their analyses of Claims (including Administrative Claims), Interests, or Litigation Rights.  Thus, the reservation above of Litigation Rights shall include, without limitation, a reservation by the Estates, the Control Parties, the Post Confirmation Estates, and the Liquidating Trusts, of the Litigation Rights that have already been asserted as well as any other Litigation Rights not specifically identified in the Plan or Disclosure Statement, or of which the Trustees or Cicalese may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Trustees or Cicalese at this time, or facts or circumstances that may change or be different from those that the Trustees or Cicalese now believe to exist.  Therefore and notwithstanding the failure to identify all Litigation Rights, absent an express written waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude any of the Control Parties from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Litigation Rights, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Litigation Rights upon or after Confirmation, the Effective Date or plan consummation.  Specifically, the Litigation Rights may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date and regardless of whether each Litigation Right and the target thereof has been separately listed and identified prior to the Effective Date.

A deadline for filing certain lawsuits in certain of the Cases arose during the Cases and, prior thereto, the Trustees commenced numerous proceedings.  Nonetheless, no limitations period yet bars objections to Claims or numerous other Litigation Rights.  Thus, for purposes of voting on or objecting to the Plan, any Person who has been in control of or done business with a Debtor or Trustee or with whom a Debtor or Trustee has entered into a transaction or to whom a Debtor or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Trustee has incurred an obligation or made a transfer of money or property, prepetition or postpetition, should assume that such obligation, transfer, or transaction or their interactions with the Debtor or Trustee may be reviewed by the Trustees and Control Parties, subsequent to the solicitation of votes on the Plan or after the Effective Date and that such Person may be the subject of an action, proceeding or claim by a Post Confirmation Estate or Liquidating Trust after the solicitation of votes on the Plan or after the Effective Date.

By example only and without limiting the foregoing, the utilization or assertion of a Litigation Right or the initiation of any proceeding with respect thereto against a Person, by any of the Control Parties, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of: (a) the solicitation of a vote on the Plan from such Person or such Person's predecessor in interest; (b) the Claim, Interest or Administrative Claim of such Person or such Person's predecessor in interest having been listed in the Debtors' Schedules, List of Equity Security Holders, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim, Interest or Administrative Claim of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Without notice or any need to obtain Bankruptcy Court approval, the Control Parties are hereby granted authority to and may evaluate and determine strategy to, prosecute, transfer, settle, release or waive any of their Litigation Rights including objections to Claims if no specific amount was sought by the Post Confirmation Estate/Liquidating Trust or if the amount to be received by the Post Confirmation Estate/Liquidating Trust is within $100,000 of the amount that had been sought (after deduction from such amount sought of 10% of any General Unsecured Claim and 100% of any other Claim waived under the compromise or settlement, to the extent not the subject of an objection thereto), or if the amount of the Disputed Claim is within $100,000 of the Allowed amount under the proposed compromise and settlement. Otherwise, the applicable Control Party may evaluate and determine strategy as to, prosecution, transfer, settlement, release or waiver of any Litigation Rights or objections to claims with Bankruptcy Court approval.

### 8.10.2  <u>Objection to Claims and Objection Deadline.</u>

As of the time that the Proponents are soliciting votes on the Plan, the Trustees and the DIP Debtors have not completed their analyses of Claims (including Administrative Claims) or Interests. All objections to Claims pending as of the Effective Date shall continue and the Control Parties shall have the authority, exclusive of all others, to assert, file, settle, compromise withdraw or litigate to judgment objections to Claims, or to settle or compromise any Disputed Claim against the Post Confirmation Estate(s), except that any party in interest may timely object to applications for Professional Fees incurred prior to the Effective Date.  All objections to Disputed Claims shall be Filed on or before the Claims Objection Deadline.  The Control Parties shall have the right to seek an extension of that date from the Bankruptcy Court, without notice or a hearing, if a complete review of all Claims and action thereupon in not completed by such date.  Settlements of any Claim or Disputed Claim against an Estate may be effectuated by stipulation or signed writing between the applicable Creditor and the Control Parties or by the Creditor amending its claim to reduce its amount to an amount agreed upon by the Control Parties; provided however that such settlements shall be subject to Court Approval pursuant to Section 8.10.1 hereof.

### 8.10.3  <u>Determination of Taxes.</u>

Except as may be expressly provided otherwise in the Plan, the applicable Control Party shall be responsible for the determination of Tax issues and liabilities with respect to the applicable Post Confirmation Estate or Liquidating Trust.  In addition to any other available remedies or procedures with respect to Tax issues or liabilities, the Control Parties, at any time, may utilize (and receive the benefits of) Bankruptcy Code § 505 with respect to: any Tax issue or liability relating to an act or event occurring prior to the Effective Date; or any Tax liability arising prior to the Effective Date.  If the Control Parties utilize Bankruptcy Code § 505(b): (1) the Bankruptcy Court shall determine the amount of the subject Tax liability in the event that the appropriate Governmental Unit timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with Bankruptcy Code § 505(b), the Estates, Trustees, DIP Debtors, Control Parties and their Agents shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**8.11    Cancellation of Existing Notes, Securities and Agreements.**

As of the Effective Date, all notes, securities and all agreements not assumed as described or provided under the Plan shall be cancelled and deemed null and void and of no further force or effect without any further action on the part of the Bankruptcy Court, the Trustees, the DIP Debtors, the Control Parties, the Estates, the Post Confirmation Estates, the Liquidating Trusts, or any other Person.

**8.12    Tax Identification Numbers.**

The Post Confirmation Estates and the Liquidating Trusts may require any Holders of Allowed Claims to furnish their social security number, employer or taxpayer identification number, and the Control Parties may condition any Distribution due to such Holder upon receipt of such identification number and supporting documentation (including, without limitation, an IRS Form W-9).

**8.13    Official Committees and Their Dissolution.**

On the Effective Date, the Official Committees shall be dissolved and the members of the Official Committees shall be released and discharged from any further authority, duties, responsibilities, liabilities and obligations related to, or arising from, the Cases, except that the Official Committees shall continue in existence and have standing and capacity to prepare and prosecute applications for or objections to the payment of Professional Fees incurred prior to the Effective Date.  The Professionals retained by the Official Committees and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred in such capacity after the Effective Date, except for services rendered and expenses incurred in connection with any applications for or objections to the payment of Professional Fees incurred prior to the Effective Date.

**8.14    Final Decree.**

At any time following the Effective Date, the Control Parties shall be authorized to File a motion for the entry of a final decree closing the applicable Case pursuant to section 350 of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# IX.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 9.1    Overview.

The Plan provides for the rejection or assumption of executory contracts and unexpired leases (except as to a real property lease subject to Bankruptcy Code § 365(d)(4) unless otherwise agreed by the lessor) to occur on or before two possible dates.  First, the Plan provides for assumption or rejection to occur on or before the Effective Date of the Plan.  Second, the Plan provides for a blanket extension of the last day for the Control Parties to assume or reject any unexpired lease, through and including the Deferred Assumption Rejection Deadline.  The provisions below establish the procedures with respect to assumption obligations, rejection damage claims, any election under section 365(n) of the Bankruptcy Code, and other applicable provisions relating to the Plan's treatment of executory contracts and unexpired leases.

### 9.2    Assumption and Assignment.

As of the Effective Date, pursuant to section 1123(b)(2) of the Bankruptcy Code, (a) the executory contracts and unexpired leases of the Estates that have been expressly identified in the Plan Supplement for assumption (together with any additions, deletions, modifications or other revisions to such exhibit as may be made by the Trustees or DIP Debtors prior to the Effective Date) will be deemed automatically assumed by the applicable Post Confirmation Estates or assumed and assigned to the applicable Liquidating Trust.  The Assumption Obligations, if any, for such contracts or leases will be identified in the Plan Supplement.  Any such cure amount shall be paid in accordance with the provisions of Section 9.4 of the Plan, below.  Each executory contract and unexpired lease listed in the Plan Supplement shall include any modifications, amendments and supplements to such agreement, whether or not listed in the Plan Supplement.  There also may be assumed, or assumed and assigned, any executory contract or unexpired lease that is the subject of a motion by a DIP Debtor or Trustee initially heard before confirmation of the Plan, or as to which the motion or any subsequent proceeding in respect thereof is pending, as of the Effective Date, to the extent such motion is granted.  The assignee of an unexpired contract or lease shall be exclusively liable for all obligations thereunder arising after the Effective Date.

### 9.3    Extension of Time to Assume or Reject

Except with respect to a real property lease subject to Bankruptcy Code § 365(d)(4) (unless otherwise agreed by the lessor), and except as to any executory contract or unexpired lease previously assumed or rejected on the Effective Date, a DIP Debtor, Post Confirmation Estate or Liquidating Trust may assume or reject any remaining executory contract or unexpired lease until and including the date that is ninety (90) days prior to the Claims Objection Deadline (the "Deferred Assumption Rejection Deadline").  As to any such deferred assumption or rejection, assumption or rejection shall automatically occur within twenty-eight (28) days following: (i) written notice by the Control Parties delivered by U.S. Mail to the last known service address of any party to such executory contract or lease; and (ii) filing a Notice of Assumption or Rejection in the Bankruptcy Court.  Such Notice of Assumption or Rejection shall state the amount of any cure amount in the event of assumption.  In the event a non-Debtor party disputes such cure amount or otherwise disputes the assumption or rejection of such executory contract or unexpired lease, such non-Debtor party shall File an objection to the rejection or to the assumption and cure amount within twenty eight (28) days of the date of service of the Notice of Assumption or Rejection.  In such event, the applicable Control Party shall promptly file a motion in the Bankruptcy Court with service upon such objecting party, to establish the ability of the Control Party to assume such contract or lease, and to establish such cure amount, if any, to be set for hearing in the Bankruptcy Court.  In the event no timely objection is filed by a party to any unexpired lease or executory contract noticed to be assumed, such unexpired lease or executory contract shall conclusively be deemed assumed and the cure amount fixed as stated in the Notice of Assumption or Rejection.

Except with respect to a real property lease subject to Bankruptcy Code § 365(d)(4) (unless otherwise agreed by the lessor), in the event that a Control Party becomes aware after the Effective Date of the existence of an executory contract or unexpired lease that was not included in the Plan Supplement as an unexpired lease or executory contract, the Control Party may move to assume such contract or lease until the date that is twenty-eight (28) days after the date on which the applicable Control Party becomes aware of the existence of such contract or lease.

**9.4** **Assumption Obligations.**

(a)    *With respect to those executory contracts or leases assumed on the Effective Date as identified in the Plan Supplement*, the Post Confirmation Estates, or Liquidating Trusts, as applicable shall satisfy each Assumption Obligation, if any (a) by making a Cash payment equal to the amount specified therefor in the Plan Supplement on the later of (i) the Effective Date (or as soon as practicable thereafter), or (ii) the date when due in the ordinary course of business, or (b) in the manner and on such other terms as the non-Debtor party or parties to the applicable executory contract or unexpired lease and the applicable Trustee, DIP Debtor, or Control Party may otherwise agree, unless an objection to such proposed amount is Filed with the Bankruptcy Court and served on counsel to the applicable Trustee, DIP Debtor or Control Party on or prior to the date set by the Bankruptcy Court for Filing objections to Confirmation of the Plan, and the Bankruptcy Court, after notice and hearing, determines that the applicable DIP Debtor, Trustee or Estate is obligated to pay a different amount or provide a different cure, compensation or adequate protection under Bankruptcy Code § 365, in which case, if prior to the Effective Date, Proponents shall have the right to remove such executory contract or lease from the list of contracts to be assumed and assigned pursuant to Section 9.2 of the Plan, or, if following the Effective Date, the Control Party shall File a motion within twenty-eight (28) days after such determination to seek an order of the Bankruptcy Court rejecting such executory contract or unexpired lease.

(b)    *With respect to those executory contracts or unexpired leases assumed pursuant to the Deferred Assumption Rejection Deadline and as identified on the Plan Supplement Exhibit of Deferred Assumptions and Rejections*, the Post Confirmation Estates or Liquidating Trusts shall satisfy each Assumption Obligation, if any (a) by making a Cash payment equal to the amount specified therefor in the Plan Supplement on the later of (i), twenty-eight (28) days after the Deferred Assumption Rejection Deadline (or as soon as practicable thereafter), or (b) in the manner and on such other terms as the non-Debtor party or parties to the applicable executory contract or unexpired lease and the applicable Control Party may otherwise agree, unless an objection to such proposed amount is Filed with the Bankruptcy Court and served on counsel to the applicable Control Party.

1    Any Person that fails to object to the Assumption Obligation specified in the Plan

2  Supplement (as to an Effective Date assumption or rejection) on or prior to the date set by the

3  Bankruptcy Court for Filing objections to Confirmation of the Plan, or (as to a Deferred Assumption

4  or Rejection) by the date(s) set forth above, shall be forever barred from: (a) asserting any other,

5  additional or different amount on account of such obligation against Namco, the DIP Debtors, the

6  Estates, the Trustees, the Control Parties, the Post Confirmation Estates, the Liquidating Trusts, or

7  their Agents or property, and (b) sharing in any other, additional or different Distribution under the

8  Plan on account of such obligation.

9      **9.5**    **Rejection.**

10    Except as set forth in this Article, supra, of the Plan, as of the Effective Date, pursuant to

11  section 1123(b)(2) of the Bankruptcy Code:

12    (a)    the following contracts and leases are rejected:

13        (i)    those contracts and leases expressly identified for rejection in the Plan

14  Supplement (together with any additions, deletions, modifications or other revisions thereto as may

15  be made by the Trustees or the DIP Debtors prior to the Effective Date);

16        (ii)    any and all executory contracts and unexpired leases of the Estates (1) not

17  previously assumed in these Cases, including as of the Deferred Assumption Rejection Deadline,

18  and (2) not otherwise identified for assumption and assignment (A) under the Plan, including Article

19  9.2 and the Plan Supplement, or (B) in a motion to assume, or assume and assign, such contract or

20  lease by a DIP Debtor or Trustee initially heard before, or as to which the motion or any subsequent

21  proceeding in respect thereof is pending, as of the Effective Date, to the extent such motion is

22  granted; and

23    (b)    all indemnification obligations owed to any Person who was, prior to the applicable

24  Order for Relief, a director, officer, managing member, member, partner, employee, asset manager,

25  attorney, accountant, financial advisor or other agent of a Debtor, are deemed to be, and shall be

26  treated as though they are, executory contracts that are rejected (unless (i) previously assumed by

27  order of the Bankruptcy Court, (ii) assumed under the Plan, *including as of the Deferred Assumption*

28  *Rejection Deadline*, or (iii) the subject of a motion to assume, or assume and assign, by a DIP Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   or Trustee initially heard before, or as to which the motion or any subsequent proceeding in respect

2   thereof is pending, as of the Effective Date, to the extent such motion is granted).

3       **9.6      Rejection Claims Bar Date.**

4       Any Person asserting any Claim for damages arising from the rejection under this Plan or

5   after the Effective Date of an executory contract or unexpired lease of the Estates shall File a proof

6   of such Claim (in compliance with Bankruptcy Rule 3001) on or before the Rejection Claims Bar

7   Date (which is defined more specifically in **Exhibit B** and, generally, is twenty-eight (28) days

8   following entry of the later of the Effective Date or order effectuating rejection), or be forever barred

9   from: (a) asserting such Claim against Namco, the DIP Debtors, the Estates, the Post Confirmation

10  Estates, the Liquidating Trusts, the Control Parties, or their Agents or property, and (b) sharing in

11  any Distribution under the Plan.  For Claims <u>other than</u> ones for damages arising from the rejection

12  under this Plan of an executory contract or unexpired lease of the Estates and for matters other than

13  Claims, any otherwise applicable Bar Dates remain applicable and are unaffected by this provision.

14  The Rejection Claims Bar Date is the following date:  (a) if rejection of an executory contract or

15  unexpired lease occurs under the Plan, the first Business Day that is at least twenty-eight (28) days

16  after the Effective Date; and (b) if rejection of an executory contract or unexpired lease occurs after

17  the Effective Date, the first Business Day that is at least twenty-eight (28) days after the later of the

18  date of (i) entry of an order approving such rejection, or (ii) rejection, as provided by the first order

19  approving such rejection.

20      **9.7      <u>Bar Date for Bankruptcy Code § 365(n) Election.</u>**

21      If the rejection of an executory contract gives rise to the right by a non-Debtor party or

22  parties to such contract to make an election under Bankruptcy Code § 365(n) to either treat such

23  contract as terminated or to retain its or their rights under such contract, unless an order of the

24  Bankruptcy Court provides otherwise, such other party or parties to such contract will be deemed to

25  elect to treat such contract as terminated unless, by the Bankruptcy Code § 365(n) Election Bar Date

26  (which is the date no later than the earlier of (i) the Confirmation Date or, as to any executory

27  contract rejected as of the Effective Date, the Effective Date, or (ii) as to any executory contracts

28  rejected as of the Deferred Assumption Rejection Deadline, the first Business Day at least twenty-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    eight (28) days after service of notice of the rejection of such contract or the intent hereunder to

2    reject such contract on the non-Debtor party to the applicable contract), such other party or all such

3    other parties File and serve on the Control Parties a notice of its or their election to retain its or their

4    rights under such contract, in which case such non-Debtor party or parties shall retain its or their

5    rights under such contract.

6    **9.8**    **Retention of Property Rights.**

7    To the extent that a matter that provides a Debtor, a DIP Debtor, Trustee or Estate with

8    property rights does not constitute an executory contract or unexpired lease, or a DIP Debtor,

9    Trustee or Estate has obtained property rights under the executed portion of an executory contract or

10   unexpired lease, the Effective Date of the Plan and any rejection thereunder shall not cause an

11   abandonment or rescission by the applicable Estate of or as to any such property rights.  The status

12   of any contract or lease identified in the Plan Supplement as not being executory or as being expired

13   shall not be subject to challenge by the non-Debtor, non-Estate party to such contract or lease, absent

14   objection to such status prior to the Confirmation Date.  The status as executory or unexpired of any

15   contract listed in the Plan Supplement for rejection shall not be binding on the Control Parties.

16   **9.9**    **Effect of Confirmation Order as to Contracts, Leases and Insurance.**

17   Pursuant to Bankruptcy Code §§ 365(a) and 1123(b)(2), the Confirmation Order shall

18   constitute an order of the Bankruptcy Court approving, *as to those unexpired leases and executory*

19   *contracts assumed or rejected as of the Effective Date*, as of the Effective Date, (a) the assumption

20   and assignment of all executory contracts and unexpired leases of the Estates assumed under the

21   Plan, specifically those identified for assumption in the Plan Supplement (as may be amended) and

22   (b) the rejection of such executory contracts and unexpired leases of the Estates specifically

23   identified on the Plan Supplement as to be rejected.  As to all unexpired leases and executory

24   contracts rejected or assumed as the case may be pursuant to the Deferred Assumption Rejection

25   Deadline, the assumption or rejection of such leases or executory contracts *shall be as of* the

26   Effective Date.  The contracts and leases identified in this Plan will be assumed and assigned or

27   rejected, respectively, only to the extent that such contracts or leases constitute executory contracts

28   or unexpired leases of the Estates, and the identification of such agreements under this Plan does not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

constitute an admission with respect to the characterization of such agreements or the existence of any unperformed obligations, defaults, or damages thereunder.  Specifically, this Plan does not affect whether any executory contracts or unexpired leases are assumed, rejected or terminated to the extent that they: (a) have been assumed, rejected or terminated prior to the Confirmation Date, or (b) are the subject of a pending motion to assume as of the Confirmation Date that is not withdrawn or denied.

Each executory contract and unexpired lease assumed pursuant to the Plan shall remain in full force and effect and be fully enforceable by the applicable Post Confirmation Estate, Liquidating Trustee or Control Party in accordance with its terms under the law, except as modified by the provisions of the Plan, including this Plan Section, or any order of the Bankruptcy Court or applicable law.  To the extent applicable, all executory contracts or unexpired leases assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control" or an unauthorized assignment, however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

Continuing obligations of third parties to the DIP Debtors, Trustees or their Estates under insurance policies, contracts, or leases that have otherwise ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, shall continue and shall be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the DIP Debtors, Trustees, Control Parties or by order of Bankruptcy Court.

To the extent a Trustee, DIP Debtor or Control Party hereafter learns that there exists an insurance policy or agreement under which an insurer has a continuing obligation to pay a Debtor, DIP Debtor, Trustee, Estate, Control Party or a third party on behalf of any of them and that it is held by the Bankruptcy Court to be an executory contract and has not otherwise been assumed upon motion by a Final Order, the applicable Control Party may elect by notice to the insurer, specifying

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

any Assumption Obligations, that such insurance policy be treated as though it is an executory

contract that is assumed under the Plan pursuant to Bankruptcy Code § 365.  Thereafter, the

provisions of Plan Section 9.4(b) shall be applicable except that the insurer shall have until fourteen

(14) days after notice to serve its objection to the Assumption Obligations and the applicable Control

Party shall until the twenty-eighth (28th) day after its original notice to elect instead to reject such

contract, which rejection may be effectuated by the serving of the notice thereof.

### 9.10   Post-Order for Relief Agreements.

Unless inconsistent with the provisions of the Plan, all contracts, leases and other agreements

entered into by the DIP Debtors or Trustees on or after entry of an Order for Relief in the respective

Cases, or previously assumed by any of the Estates prior to the Confirmation Date (or the subject of

a pending motion to assume by any of the Estates as of the Confirmation Date that is granted by the

Bankruptcy Court), which have not expired or been terminated in accordance with their terms and

not listed for rejection in the Plan Supplement, shall be performed by the applicable Post

Confirmation Estate, in the ordinary course of business and shall survive and remain in full force and

effect following the Effective Date.

### 9.11   Modifications to Plan Supplement.

The Trustees, the DIP Debtors or the Control Parties shall have the right, any time prior to

the Effective Date or the Deferred Assumption Rejection Deadline, to make additions, deletions,

modifications and/or other revisions to the identification of executory contracts and leases to be

assumed or rejected by the Estates on notice to the non-Debtor party to such contract or lease.

## X.

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### 10.1   Conditions to Confirmation.

Entry of the Confirmation Order is the condition to Confirmation.

### 10.2   Conditions to Plan Effectiveness.

The Plan will not be consummated and the Effective Date will not occur unless and until

(a) the Confirmation Order shall be a Final Order, (b) the Trustees and the DIP Debtors shall have

received any authorization, consent, regulatory approval, ruling, letter, opinion or other documents

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

that the Trustees, in consultation with the DIP Debtors, believe may be necessary to implement this Plan or believe is required by any law, regulation or order; (c) all actions, documents and agreements that the Trustees believe are necessary to implement the Plan other than the following requirement shall have been effected or executed as determined by the Trustees in their sole and absolute discretion in consultation with the DIP Debtors; and (d) the Trustees have Filed an Effective Date Statement with the Bankruptcy Court indicating that the Confirmation Order is Final and that, upon the Filing of such Effective Date Statement, the conditions to Plan effectiveness all appear to have been met or waived.  (The Trustees may delay the Filing of the Effective Date Statement pending, inter alia, negotiations over the payment of Administrative Claims.)  Any of the foregoing conditions may be waived by the Trustees and DIP Debtors.

## XI.

## EFFECT OF CONFIRMATION

### 11.1    Binding Effect.

Confirmation of the Plan shall bind and govern the acts after the Effective Date of the Estates, the Post Confirmation Estates, the Trustees, the DIP Debtors, the Official Committees, the Control Parties, and all Holders of any Claims against, and Interests, in the Debtors or their Estates, whether or not: (i) a proof of Claim or proof of Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to section 502 of the Bankruptcy Code, (iii) a Claim or Interest is Impaired or Unimpaired under the Plan; or (iv) the Holder of a Claim or Interest has accepted the Plan.

### 11.2    Property Retained Free and Clear.

Except as otherwise provided in the Plan, upon the Effective Date, title to the remaining Assets shall be retained in the Estates as Post Confirmation Estates as provided in the Plan for the purposes contemplated under the Plan.  Except as otherwise provided in the Plan, upon the Effective Date, all of the Assets shall be free and clear of all Claims, Liens, charges, other Encumbrances and Interests.

**11.3    Permanent Injunction.**

The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in Debtors as against the Assets and as against Namco, the DIP Debtors, their Estates, the Post Confirmation Estates, the Liquidating Trusts, the Control Parties, or their Agents or property.

*Except as otherwise expressly provided* in the Plan, the documents executed pursuant to the Plan, or the Confirmation Order, on and after the Effective Date, *all Persons who have held, currently hold, or may hold a debt, Claim, or Interest against a Debtor or its Estate* (including but not limited to States and other Governmental Entities, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units, other than as to matters excepted from the automatic stay by Bankruptcy Code § 362(b)(4)) *shall be permanently enjoined from*:

(a)    taking any of the following actions *on account of any such debt, Claim, or Interest*:

(1)    commencing or continuing in any manner any action or other proceeding against the Trustees, Namco, the Estates, the Post Confirmation Estates, the Liquidating Trustee, the Control Parties, their Agents, or their property;

(2)    enforcing, attaching, executing, collecting, or recovering in any manner, including by way of setoff recuperation or right of subrogation, any judgment, award, decree, or order against the Trustees, Namco, the Estates, the Post Confirmation Estates, the Liquidating Trustee, the Control Parties, or their Agents or property; and

(3)    creating, perfecting, or enforcing any Lien or Encumbrance against the Trustees, Namco, the Estates, the Post Confirmation Estates, the Liquidating Trusts, the Control Parties, their Agents or property; and

(b)    challenging the Distributions to be effected by the Plan or the classification of Claims or Interests set forth in the Plan, except as expressly provided in and permitted by the Plan.

Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.  Nothing contained in the foregoing shall affect the liability of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Ezri for any debt of the Estates or affect the liability, to the full extent provided under section 524(e)

2  of the Bankruptcy Code, of any other Person or their property for any debt of the Estates that is

3  treated under the Plan.

4      **11.4    Limitation of Liability.**

5      Under Bankruptcy Code § 1125(e), entities that solicit acceptances or rejections of the Plan

6  and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the

7  Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall

8  not be liable, on account of such solicitation or participation, for violation of any applicable law,

9  rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer,

10 issuance, sale, or purchase of securities.  Entry of the Confirmation Order shall be a finding that the

11 Trustees, the DIP Debtors, Namco, the Estates, the Post Confirmation Estates, the Liquidating

12 Trusts, the Control Parties, and their Agents, acted in good faith and in compliance with the

13 applicable provisions of the Bankruptcy Code to the extent that they participated in the soliciting of

14 acceptances or rejections of the Plan or participated in the offer, issuance, sale, or purchase of

15 securities offered or sold under the Plan and they and their property shall not be liable, on account of

16 such solicitation or participation, for violation of any applicable law, rule, or regulation governing

17 the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of

18 securities.

19     **11.5    Exculpation.**

20     Notwithstanding contrary provisions of non-bankruptcy law, except as expressly set forth

21 otherwise in the Plan, as of the Effective Date, neither the Trustees, the DIP Debtors, nor the Control

22 Parties, and their Agents (the "Exculpated Parties") shall have any liability to any Holder of any

23 Claim or Interest or any other Person for, any act or omission, forbearance from action, decision, or

24 exercise of discretion taken at any time after the Petition Dates in connection with or arising out of

25 the negotiation, preparation and pursuit of confirmation of the Plan, the Disclosure Statement, the

26 consummation of the Plan, the administration of the Plan, the Cases or the property to be distributed

27 under the Plan, or any contract, instrument, document or other agreement entered into pursuant

28 thereto through and including the Effective Date, except for liability:  (a) for damages proximately

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

caused by (i) intentional misconduct as finally determined by a Final Order of the Bankruptcy Court or (ii) gross negligence in connection with (1) implementing the Distribution provisions of the Plan and (2) the making or withholding of Distributions pursuant to the Plan; (b) other than liability resulting from the order of payment of any such Distributions if such order of payment is not expressly set forth in the Plan (the "Exculpated Claims").  The Exculpated Parties may reasonably rely upon the opinions of their respective counsel, accountants, and other experts and Professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or intentional misconduct; *provided however*, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or intentional misconduct.

### 11.6    Releases By Estate.

In addition to the foregoing exoneration, the Estates shall be deemed to unconditionally, irrevocably and generally release, acquit and forever discharge, waive and relinquish the Exculpated Claims against the Exculpated Parties.  **THIS RELEASE INCLUDES AN EXPRESS, INFORMED, KNOWING AND VOLUNTARY WAIVER AND RELINQUISHMENT TO THE FULLEST EXTENT PERMITTED BY LAW OF RIGHTS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH READS AS FOLLOWS, AND UNDER ANY SIMILAR OR COMPARABLE LAWS ANYWHERE IN THE WORLD:**

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

Each Estate, by this release, waives and relinquishes any right or benefit that such Estate has or may have under section 1542 of the California Civil Code or any similar provision of statutory or non-statutory law of California or any other jurisdiction to the fullest extent that such releasing Estate may lawfully waive such rights and benefits pertaining to the subject matter of the release set forth above.  In that regard, each such releasing Estate, by this release, further acknowledges that such Estate is aware that such Estate or the attorneys of such Estate may hereafter discover claims or facts in addition to or different from those which such Estate or such attorneys now know or believe

to exist with respect to the subject matter of the release, and that it is each such releasing Estate's intention fully, finally, and forever to settle and release any and all Exculpated Claims against each and every Exculpated Party.  Through the release, each such releasing Estate is expressly acknowledging that it understands that, notwithstanding the discovery or existence of any such additional or different claims or facts, the release shall be and remain in full force and effect as a full and complete general release with respect to any and all Exculpated Claims against each and every Exculpated Party.  Through the release, each such releasing Estate further acknowledges that no Exculpated Party has made any representation of any kind or character whatsoever in order to induce the execution of the release.

The Confirmation Order, without more, shall effectuate the release, waiver and relinquishment described or referenced in this Section for the Exculpated Parties in accordance herewith.

**11.7    No Third Party Release.**

**Nothing in this Plan shall be deemed to release claims held by non-Debtor parties against the Exculpated Parties or any other non-Debtor party.**

**XII.**

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court shall retain jurisdiction over the Cases and any of the proceedings related to the Cases pursuant to Bankruptcy Code § 1142 and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to a Claim;

(b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

(c)     Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor or Estate is a party and to hear, determine and, if necessary, liquidate, any Claims arising from, or cure amounts related to, such assumption or rejection;

(d)     Resolve any matters with respect to the timeliness or amount of Distributions to Holders of Allowed Claims in accordance with the Plan;

(e)     Decide or resolve any motions, adversary proceedings, contested or litigated matters, matters involving Litigation Rights and any other matters and grant or deny any applications or motions involving any Debtor, Trustee or Estate that may be pending on the Effective Date;

(f)     Resolve matters concerning ownership and rights to prosecute Litigation Rights;

(g)     Approve, interpret or enforce any settlements or compromises relating to the Plan or the Estates, including settlements or compromises of Claims;

(h)     Enter such other orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation or consummation of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(i)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's obligations incurred in connection with the Plan;

(j)     Modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan and the Disclosure Statement, in such manner as may be necessary or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(k)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(l)    Enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

(m)    Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(n)    Enter an order closing the Cases at the appropriate time; and

(o)    Determine such other matters as may be authorized under the provisions of the Bankruptcy Code and exercise such other and further jurisdiction as is authorized or permitted under the Bankruptcy Code.

## XIII.

### AMENDMENT, WITHDRAWAL OF PLAN AND VACATION OF CONFIRMATION ORDER

**13.1    Amendment of the Plan.**

Subject to the restrictions set forth in Bankruptcy Code § 1127, the Trustees and the DIP Debtors reserve the right to alter, amend, or modify the Plan before its substantial consummation.

**13.2    Vacating Confirmation Order if Failure of Conditions to Plan Effectiveness.**

If the Confirmation Order is vacated for failure to satisfy a condition to the Effective Date, the Plan shall be deemed null and void in all respects (including, without limitation, (1) the assumptions, assumptions and assignments or rejections of executory contracts and unexpired leases pursuant to the Plan will be deemed null and void, and (2) nothing contained in the Plan will constitute a waiver or release of, or admission or acknowledgment as to, (a) any Litigation Rights,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 (b) allowance, disallowance, admission or acknowledgment of or as to any Claim (including an

2 Administrative Claim) or Interest, or (c) prejudice in any manner the rights of a Trustee, DIP Debtor

3 or Estate).  Any such motion seeking to have the Bankruptcy Court vacate the Confirmation Order

4 must be made by a party in interest before the time that each condition to the Effective Date

5 described in Article X of the Plan has been satisfied or duly waived and upon notice to the Trustees,

6 DIP Debtors, Official Committees, U.S. Trustee and such other parties in interest as the Bankruptcy

7 Court may direct.  Notwithstanding the Filing of such motion, however, the Confirmation Order may

8 not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before

9 the Bankruptcy Court enters an order granting such motion.

10       **13.3    <u>Revocation or Withdrawal of the Plan.</u>**

11       The Trustees and the DIP Debtors reserve the right to revoke or withdraw this Plan prior to

12 the Confirmation Date.

13                                      **XIV.**

14                                **<u>MISCELLANEOUS</u>**

15       **14.1    <u>Effectuating Documents; Further Transactions; Timing.</u>**

16       The Trustees and the DIP Debtors and, after the Effective Date, the Post Confirmation

17 Estates, Liquidating Trusts, and the Control Parties shall be authorized and directed to execute,

18 deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and

19 to take such actions as may be necessary or appropriate to effectuate and further evidence the terms

20 and conditions of the Plan.  All transactions required to occur on the Effective Date under the terms

21 of the Plan shall be deemed to have occurred simultaneously.

22       **14.2    <u>No Regulated Rate Change Without Government Approval.</u>**

23       From and after the Effective Date, in accordance with Bankruptcy Code § 1129(a)(6), no rate

24 charged by any Debtor over which any governmental regulatory commission would have jurisdiction

25 under applicable non-bankruptcy law will be changed through the Plan without obtaining the

26 approval of such governmental regulatory commission.

27

28

### 14.3    Pension Plans, Other Retiree Benefits and Labor Contracts.

From and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Post Confirmation Estates are to continue to pay all "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code), if any, at the level established pursuant to subsection (e)(I)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period that the applicable Debtor had obligated itself to provide such benefits.  The Debtors were not parties to any prepetition union labor contracts, nor do the DIP Debtors or Trustee's Estates have any obligations to provide any "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code).  Because the DIP Debtors and Trustee's Estates do not owe any such retiree benefits, no payments will be owing or made pursuant to this statutory requirement.

### 14.4    Exemption From Transfer Taxes.

In accordance with section 1146(a) of the Bankruptcy Code, neither (i) the issuance, transfer or exchange of a security, nor (ii) the making, delivery, or recording of a deed or other instrument of transfer under this Plan shall be subject to any stamp tax or similar Tax, fee or assessment, and the appropriate officials or agents of a Governmental Entity are directed to forego the collection of any such Tax, fee or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such Tax, fee or assessment.  The Confirmation Order may reiterate this direction to appropriate officials or agents of Government Entities.

### 14.5    Modification of Payment Terms.

The Control Parties may modify the treatment of any Allowed Claim or Allowed Interest in any manner adverse only to the Holder of such Claim or Interest at any time after the Effective Date upon the prior written consent of the Person whose Allowed Claim or Allowed Interest treatment is being adversely affected.

### 14.6    Provisions Enforceable.

The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan is valid and enforceable in accordance with its terms.

**14.7    Quarterly Fees to the United States Trustee.**

All fees payable under 28 U.S.C. § 1930(a)(6) shall be paid by the DIP Debtors and Trustees for their respective Estates in the amounts and at the times such fees may become due up to and including the Effective Date.  Thereafter, the Control Parties, as applicable, shall pay all fees payable under 28 U.S.C. § 1930(a)(6) based on Distributions by the Post Confirmation Estates or Liquidating Trusts  until the Cases are closed, dismissed or converted.

**14.8    Post-Confirmation Status Report.**

Unless otherwise ordered by the Bankruptcy Court, within 175 days following the entry of the Confirmation Order, a status report for each Post Confirmation Estate or Liquidating Trust shall be Filed with the Bankruptcy Court by the Control Parties(s) explaining what progress has been made toward consummation of the confirmed Plan and, at least annually, setting forth the annual fees, expenses, and other costs incurred, and annual Distributions of Plan Proceeds made.  The status report shall be served on the United States Trustee, and the Notice Parties.  Unless otherwise ordered, further status reports shall be Filed every 175 days and served on the same Persons (or their successors or assigns).

**14.9    Successors and Assigns.**

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person.

**14.10    Notices.**

Except as otherwise provided in the Plan, any notice or other communication required or permitted under the Plan will be in writing and deemed to have been validly served, given, delivered, and received upon the earlier of: (i) the first (1st) calendar day after transmission by facsimile or hand delivery or deposit with an overnight express service or overnight mail delivery service; or (ii) the third (3rd) calendar day after deposit in the United States mail, with proper first class postage prepaid.

### 14.10.1  **Notices of Confirmation and the Effective Date.**

Consistent with Bankruptcy Rule 2002(f), as soon as practicable following Confirmation, the Trustees and the DIP Debtors shall serve a notice on Creditors of the entry of the Confirmation Orders in the Cases.  The notice may further identify the Plan's Effective Date, various Bar Dates, and any other deadlines that may be established under the Plan or the Confirmation Order.

As soon as practicable following the Effective Date of the Plan, the Trustees and the DIP Debtors shall File and serve a notice of the occurrence of the Effective Date on the Persons requesting special notice in the Cases, the U.S. Trustee and counsel to the Official Committee.

### 14.10.2  **Addresses and Change of Addresses.**

Notices to Persons holding a Claim or Interest will be sent to the addresses set forth in such Person's proof of Claim or Interest or, if none was Filed, at the address set forth in the Schedules.  If a Person provided a different address, such as through a Filing on the main docket in any of the Cases or a notice to a Trustee or DIP Debtor, such other address also may, but need not, be utilized.

Notices to the Control Parties, and U.S. Trustee shall be addressed as follows:

| Estate Representatives | R. Todd Neilson, Trustee |
|---|---|

Estate Representatives            R. Todd Neilson, Trustee
                                  Berkeley Research Group ("BRG")
                                  2049 Century Park East, Suite 2525
                                  Los Angeles, CA  90067
                                  Telephone:  (310) 499-4750
                                  Facsimile:  (310) 557-8982

                                  with copies to:
                                  Debra Grassgreen, Esq.
                                  Pachulski Stang Ziehl & Jones LLP
                                  150 California Street, 15th Floor
                                  San Francisco, CA  94111
                                  Telephone:  (415) 263-7000
                                  Facsimile:  (415) 263-7010

                                  Richard K. Diamond, Esq.
                                  Danning, Gill, Diamond & Kollitz, LLP
                                  2029 Century Park East, Third Floor
                                  Los Angeles, CA  90067
                                  Phone:  (310) 277-0077
                                  Fax:  (310) 277-5735

                                  Bradley D. Sharp, Trustee
                                  Development Specialists, Inc.
                                  333 S. Grand Avenue, Suite 4070
                                  Los Angeles, CA  90071
                                  Telephone:  (213) 617-2717
                                  Facsimile:  (213) 617-2718

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

with copies to:
David Poitras, Esq.
Jeffer, Mangels, Butler & Mitchell, LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles CA  90067
Telephone:  (310) 203-8080
Facsimile:  (310) 203-0567

[Liquidating Trustees]         Bradley D. Sharp
Development Specialists, Inc.
333 S. Grand Avenue, Suite 4070
Los Angeles, CA  90071
Telephone:  (213) 617-2717
Facsimile:  (213) 617-2718

U.S. Trustee         Office of The United States Trustee
725 S. Figueroa Street, Suite 2600
Los Angeles, CA  90017
Telephone:  (213) 894-6811
Facsimile:  (213) 894-2603

Any party, including Creditors or the Control Parties, may effectuate a change of address after the Confirmation Date.  The Control Parties shall not be obligated to honor any notice of change of address unless and until it is received by them and, prior to the closing of the applicable Case, unless and until it is Filed with the Court.  The notice is to be in writing, legible, and clearly indicate for such Person the Person's name, contact Person (if any), address, telephone number and facsimile number to which prior notices in the Cases had been sent and the Person's new contact Person (if any), address, telephone number and facsimile number.  Prior to the closing of an applicable Case, any change of address notice by the Control Parties shall be Filed in all of the remaining open Cases.

### 14.10.3    Persons Entitled to Post-Effective Date Notices.

Except as expressly provided otherwise in the Plan, following the Effective Date, notices of pleadings Filed with the Bankruptcy Court only need be served on:  (a) the Person affected (if the matter at issue is a particular, discrete matter such as an objection to that Person's claim); (b) all Control Parties, (c) the Office of the U.S. Trustee (if such type of matter, prior to the Effective Date, would have been required to be served on an Official Committee) and (d) those Persons who, after the Confirmation Date, File with the Bankruptcy Court and serve upon the Control Parties a request that such Person receive notice of post-Effective Date matters (if the request also specifies such Person's name, contact Person, address, telephone number and facsimile number).  Persons not

specified in this Plan Section for service who had previously Filed with the Bankruptcy Court requests for special notice of the proceedings and other Filings in the Cases will not receive notice of post-Effective Date matters unless such Persons File a new request in accordance with this Plan Section.

**14.11   Incorporation by Reference.**

All exhibits, schedules and supplements to the Plan are incorporated and are made a part of the Plan as if set forth in full in the Plan.

**14.12   Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  Any reference to "day" or "days" shall mean calendar days, unless otherwise specified herein.

**14.13   Conflict of Terms.**

In the event of a conflict between the terms of this Plan and the Disclosure Statement, the terms of this Plan will control.

**14.14   Headings.**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the provisions of this Plan or their meaning.

**14.15   Severability of Plan Provisions.**

If, prior to Confirmation, any non-material term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  In

addition, in the event that certain Debtors or Estates are excluded from the scope of the Plan or the Plan is determine to be invalid, void or unenforceable as to such Debtors, the remaining provisions of the Plan shall remain valid and enforceable against the remaining Debtors or Estates.

**14.16    Governing Law.**

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflict of laws thereof.

**14.17    Good Faith and Compliance with Laws.**

Confirmation of the Plan shall constitute findings that:  (i) this Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; (ii) the Trustees, the DIP Debtors, Namco, the Estates, the Post Confirmation Estates, the Control Parties, or their Agents, acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code to the extent that they participated in the soliciting of acceptances or rejections of the Plan or participated in the offer, issuance, sale, or purchase of securities offered or sold under the Plan; and (iii) the Proponents (and each of their respective Agents and members) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable law with regard to the Distributions in conformance with the Plan.

**14.18    No Admission.**

Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will:  (a) be deemed to be an admission by any DIP Debtor, Trustee or Estate with respect to any matter set forth in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against, or any Interests in, any Debtor or Estate, or of any Litigation Rights of any DIP

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Debtor, Trustee or Estate; or (c) prejudice in any manner the rights in any further proceedings of any

2    DIP Debtor, Trustee, or Estate or any creditors or Interest Holders.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Dated:  July 5, 2011                    BRADLEY D. SHARP,
                                        AS CHAPTER 11 TURSTEE FOR
                                        NAMCO CAPITAL GROUP, INC.


                                        By:        /s/
                                                Trustee

Dated:  July 5, 2011                    R. TODD NEILSON,
                                        AS CHAPTER 11 TRUSTEE FOR EZRI NAMVAR


                                        By:        /s/
                                                Trustee

Dated:  July 5, 2011                    BESHMADA OF DELAWARE, LLC,
                                        AS DEBTOR AND DEBTOR IN POSSESSION


                                        By:        /s/

Dated:  July 5, 2011                    BESHMADA, LLC,
                                        AS DEBTOR AND DEBTOR IN POSSESSION


                                        By:        /s/

Dated:  July 5, 2011                    DIMES, LLC,
                                        AS DEBTOR AND DEBTOR IN POSSESSION


                                        By:        /s/

Respectfully submitted by,

PACHULSKI STANG ZIEHL
    & JONES LLP


By:      /s/ Malhar S. Pagay
        Richard M. Pachulski
        Debra I. Grassgreen
        Robert B. Orgel
        Stanley E. Goldich
        Malhar S. Pagay

        Joint Special Counsel for Namco
        Trustee and Ezri Trustee

LAW OFFICES OF DAVID W. MEADOWS


By:      /s/ David W. Meadows
        David W. Meadows
        Counsel for Beshmada of Delaware, LLC,
        debtor and debtor-in-possession

DOCS_SF:77260.6 59701-001

1    LAW OFFICES OF DAVID W. MEADOWS

2

By:    _/s/ David W. Meadows_____
3          David W. Meadows
          Counsel for Beshmada LLC,
4          debtor and debtor-in-possession

5    LAW OFFICES OF DAVID W. MEADOWS

6

By:    _/s/ David W. Meadows_____
7          David W. Meadows
          Counsel for Dimes, LLC,
8          debtor and debtor-in-possession

# EXHIBIT A

# Inter-Debtor Claims

| Claim | Amount | Comments |
|-------|-------:|----------|
| **Inter-Debtor Post-Petition Advances** [1] | | |
| Namco Claim in Namvar | $3,266,361 | Per Namco's records of post-petition advances |
| Namco Claim in Beshmada | 149,928 | Per Namco's records of post-petition advances |
| Namco Claim in Beshmada of DE | 79,935 | Per Namco's records of post-petition advances |
| Namco Claim in Dimes | 44,020 | Per Namco's records of post-petition advances |
| **Inter-Debtor General Unsecured Claims - Class 4** | | |
| Namco Claim in Beshmada | $255,000,000 | Per amended proof of claim |
| Namco Claim in Beshmada of DE | 26,983,931 | Per Beshmada of DE Schedule F |
| Namco Claim in Dimes | 8,364,324 | Per Dimes Schedule F |
| Namco Claim in Ezri | 150,000,000 | Per negotiated settlement |
| Beshmada Claim in Dimes | 2,867,868 | Per Dimes Schedule F |
| Beshmada of DE Claim in Beshmada | 11,737,546 | Per Beshmada of DE Filed Claim in Beshmada |
| Dimes Claim in Ezri | 6,500 | Per Dimes Schedule B |

1) Post-petition advances in the Namvar estate primarily relate to advances for professional fees. Other amounts include certain miscellaneous expenses.

# EXHIBIT B

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# DEFINITIONS

As used in this Plan, the following terms have the meanings specified below:[1]

**2.1.1    Administrative Claim.**  Any Claim against a Debtor or Estate thereof, incurred on or after the applicable Petition Date for the applicable Debtor through and including the Effective Date, for any cost or expense of administration of the Case of the applicable Debtor, which Claim is entitled to priority under section 507(a)(2) or (3) of the Bankruptcy Code, including, without limitation, any fee or charge assessed against an Estate of a Debtor under section 1930 of Title 28 of the United States Code and any Gap Administrative Claim.

**2.1.2    Administrative Claims Bar Date(s).**  The General Administrative Claims Bar Date, Administrative Tax Claims Bar Date, Gap Administrative Claims Bar Date, Ordinary Course Administrative Claims Bar Date and Professional Fees Bar Date, individually or collectively.

**2.1.3    Administrative Tax Claims.**  A request for payment of an Administrative Claim by a Governmental Unit for Taxes (or for interest or penalties related to such Taxes) for any Tax year or period, all or any portion of which occurs or falls within the period from and including the applicable Order for Relief Date and through and including the Effective Date.

**2.1.4    Administrative Tax Claims Bar Date.**  The earlier of:  (a) any Bar Date applicable to such Claim established by the Bankruptcy Court prior to the Effective Date; and (b) the first Business Day following the later of (i) the fifty-sixth (56th) day after the Effective Date, or (ii) the one-hundred seventy-fifth (175th) day after the filing of the Tax return for such Tax, for such Tax year or period, with the applicable Governmental Unit.

**2.1.5    Affiliated Interest**.  An ownership interest of an Estate in another Person (other than another Debtor), including, without limitation, membership interests in LLCs affiliated with the Debtors and/or LLCs that may be the subject of Litigation Rights.

**2.1.6    Agent.**  With reference to a described Person:  an individual holding, after December 22, 2008 and not prior thereto, the role of director, officer, employee, asset manager, attorney, accountant, or financial advisor (solely in their respective capacities as such and not in any other

---

[1]  Whenever the context requires, each of the terms defined herein includes the plural as well as the singular, the masculine gender includes the feminine gender, and the feminine gender includes the masculine gender.

1  capacity); representing a Trustee, an Estate Representative, or Cicalese; provided that such Person

2  did not also previously act as an agent for a Debtor.

3  **2.1.7    Allowed.**  This term is used both separately and in conjunction with other defined

4  terms in the Plan (*e.g.*, Allowed General Unsecured Claims) and means:

5  a.    with respect to any Administrative Claim:  (1) if the Claim is based

6  upon a Fee Application Filed by the Professional Fees Bar Date, an unsecured Claim in the amount

7  approved by a Final Order of the Bankruptcy Court; (2) if the Holder of such Claim was required to

8  File, and has Filed, proof thereof with the Bankruptcy Court prior to an Administrative Claims Bar

9  Date, (i) in the amount and with the status as secured or unsecured and in the statutory priority as

10  stated in such proof of Administrative Claim if no objection to such proof of Administrative Claim is

11  interposed by the Claims Objection Deadline, or (ii) in the amount and with the status as secured or

12  unsecured and in the statutory priority as fixed by Final Order of the Bankruptcy Court if an

13  objection to such proof was interposed by the Claims Objection Deadline; or (3) if such Claim is

14  contingent or unliquidated, in the estimated amount and with the status as secured or unsecured and

15  in the statutory priority as fixed by Final Order of the Bankruptcy Court; and (4) in the amount of

16  zero, if the Holder of such Claim was required to File and has not Filed proof thereof with the

17  Bankruptcy Court prior to an Administrative Claims Bar Date, in which event no Distribution shall

18  be made on account of such Claim (other than discretionary Distributions on Ordinary Course

19  Administrative Claims); and

20  b.    with respect to any Claim which is not an Administrative Claim: (1) if

21  no objection to such Claim was interposed by the Claims Objection Deadline, (i) if the Holder of

22  such Claim did not File proof thereof with the Bankruptcy Court on or before the applicable

23  Prepetition Claims Bar Date, if a Scheduled Claim, in the amount thereof, with the status as secured

24  or unsecured thereof and with the statutory priority thereof ,and (ii) if the Holder of such Claim has

25  Filed a Proof of Claim therefor with the Bankruptcy Court on or before the applicable Prepetition

26  Claims Bar Date, in the amount and with the status as secured or unsecured and in the statutory

27  priority as stated in such Proofs of Claim; or (2) if an objection to such Claim was interposed by the

28  Claims Objection Deadline, in the amount or any estimated amount for purposes of allowance and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

with the status as secured or unsecured and in the statutory priority thereof as fixed by Final Order of the Bankruptcy Court; and (3) if the Holder of such Claim did not File proof thereof with the Bankruptcy Court on or before the applicable Prepetition Claims Bar Date, the Claim is not a Scheduled Claim, and the Claim is not deemed Allowed under the terms of this Plan, in the amount of zero and no Distribution shall be made on account of such Claim; and

c.    with respect to any Interest, (1) if no objection to such Interest was interposed by the Claims Objection Deadline, (i) if the Holder of such Interest did not File proof thereof with the Bankruptcy Court by the applicable Bar Date, in the number, amount or percentage of such Interest and with the nature thereof as listed in the applicable Debtor's Schedules if listed as neither disputed, contingent or unliquidated and (ii) if the Holder of such Interest has Filed a proof of Interest therefor with the Bankruptcy Court by the applicable Bar Date, in the number, amount or percentage of such Interest and with the nature thereof as stated in such proof of Interest, or (2) if an objection to such proof was interposed by the Claims Objection Deadline, in the number, amount or percentage of such Interest and nature thereof as fixed by Final Order of the Bankruptcy Court; but

d.    with respect to any Administrative Claim, Claim or Interest, the term "Allowed" does not signify whether or not such Administrative Claim, Claim or Interest has been subordinated to another Administrative Claim, Claim or Interest or is entitled to the benefits of such subordination.

**2.1.8    Allowed Amount.** The amount in which a Claim or Interest is Allowed.

**2.1.9    Asset.** Any property of any Estate, including, without limitation, Cash, Available Real Estate, Litigation Rights and Other Assets.

**2.1.10    Assumption Obligations.** Any monetary amounts payable to the non-Debtor party to any executory contract or unexpired lease, pursuant to section 365(b)(1) of the Bankruptcy Code, as a condition to the assumption of such contract or lease.

**2.1.11    At-Risk Creditors.** Creditors entitled to receive a Hardship Distribution as described in section 8.9.7 of the Plan.

**2.1.12    Available Plan Proceeds.** The Plan Proceeds that are available, after payment of expenses of the Post Confirmation Estates and Higher Priority Claims, for Pro Rata distribution to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

holders of Allowed General Unsecured Claims, Allowed Bank Guaranty Claims and Allowed Other Claims.

**2.1.13  Available Real Estate.**  Any Asset identified in **Exhibit B** (the "Identified Available Real Estate") and any Asset identified by the Proponents in the Plan Supplement as "Available Real Estate."  (In all cases, such Assets are intended to consist of (1) any Estate's Real Estate and (2) interests of any Estate in affiliated LLCs that hold Real Estate, directly or indirectly.)

**2.1.14  Avoidance Actions.**  All claims, defenses, or causes of action of or accruing to the Debtors or their Estates under sections 502(d), 506(c), 506(d), 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, whether or not such actions seek an affirmative recovery or are raised as a defense to, or offset against, the allowance of a Claim.

**2.1.15  Ballot.**  The ballot to vote to accept or reject the Plan.

**2.1.16  Bankruptcy Code.**  Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Cases.

**2.1.17  Bankruptcy Code § 365(n) Election Bar Date.**  For an executory contract, which, if rejected, entitles the non-Debtor party or parties thereto to make an election under Bankruptcy Code § 365(n) to either treat such contract as terminated or to retain its or their rights under such contract, the earlier of (i) the Confirmation Date or (ii) the first Business Day at least thirty (30) days after service on a subject non-Debtor party to such contract of the Plan Supplement reflecting, or other notice of, the rejection of such contract, or the intent hereunder to reject such contract, by which date, unless an order of the Bankruptcy Court entered prior to the Confirmation Date provides otherwise, such non-Debtor party must File and serve on the Trustees, DIP Debtors and Official Committees a notice of its or their election to retain its or their rights under such contract in order to elect to retain its or their rights under such contract.

**2.1.18  Bankruptcy Court.**  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to section 157 of Title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.19  Bank Guaranty Claim.**  The General Unsecured Claims listed on **Exhibit C** of the Plan.

**2.1.20  Bankruptcy Rules.**  Collectively, the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075 and any Local Rules of the Bankruptcy Court, as applicable to the Cases.

**2.1.21  Bar Date.**  A deadline fixed by the Bankruptcy Court or under the Plan for a Person to (a) File a proof (or amended proof) of Claim or Interest (*e.g.*, the Prepetition Claims Bar Date, Unsecured Deficiency Claims Bar Date and Administrative Claims Bar Date, including the General Administrative Claims Bar Date, Administrative Tax Claims Bar Date, Ordinary Course Administrative Claims Bar Date and Professional Fees Bar Date) or (b) make an election under Bankruptcy Code § 365(n) (*e.g.*, the Bankruptcy Code § 365(n) Election Bar Date).

**2.1.22  Beshmada.**  Beshmada, LLC, the chapter 11 debtor and debtor in possession in Case No. 2:09-bk-25523 BR.

**2.1.23  Beshmada of DE.**  Beshmada of Delaware, LLC, the chapter 11 debtor and debtor in possession in Case No. 2:09-bk-25510 BR.

**2.1.24  Business Day.**  Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a); provided that with reference to the date on which something is to be Filed, it shall not include a day on which the applicable court is inaccessible for the purpose of Filing such paper.

**2.1.25  Case.**  The above-captioned chapter 11 case of the applicable Debtor, pending before the Bankruptcy Court.

**2.1.26  Cash.**  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

**2.1.27  Cicalese.**  Louis A. Cicalese and/or Louis A. Cicalese LLC, a Delaware limited liability company, the current managing member of each DIP Debtor.

**2.1.28  Claim.**  A claim — as Bankruptcy Code section 101(5) defines the term "claim"— against any Debtor or any Debtor's property, including, without limitation (a) any right to payment

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured and (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Debtors, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.

**2.1.29  Claims Objection Deadline.**  The date that is:

(a) for Professional Fees asserted in a Fee Application, the last date established for objections thereto as established by the Local Rules, Bankruptcy Rules or the Bankruptcy Court; and

(b) for other Claims, the first Business Day following one year after the later of (1) the Effective Date or (2) the applicable Bar Date for the Claim, provided that:

(i) upon application to the Bankruptcy Court, the Estate Representatives may obtain an extension of any such date as the Bankruptcy Court may order for cause shown;

(ii) any such date may be extended by agreement of the potential target of the objection and the Estate Representatives;

(iii) the Filing of a motion to extend such date by an Estate Representative shall automatically extend the date until a Final Order is entered on such motion; and

(iv) in the event a motion to extend the date is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, the date shall be the later of the then current date (as previously extended, if applicable) or forty-five (45)days after entry of a Final Order denying the motion to extend the date.

**2.1.30  Claims Register(s).**  The official Claims Register of the Bankruptcy Court for each of the Cases.

**2.1.31  Class(es).**  Each group of Claims or Interests classified in Article 5 of the Plan pursuant to sections 1122 and 1123 of the Bankruptcy Code.

**2.1.32  Confirmation.**  Entry of the Confirmation Order by the Bankruptcy Court.

**2.1.33  Confirmation Date.**  The date on which the Bankruptcy Court enters the Confirmation Order.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.34  Confirmation Hearing.**  The hearing or hearings to consider Confirmation of the Plan under section 1129 of the Bankruptcy Code, as such hearing(s) may be adjourned from time to time.

**2.1.35  Confirmation Order.**  The order of the Bankruptcy Court Confirming the Plan.

**2.1.36  Consenting Creditors.**  A Creditor that elects to opt-in to the deferral of Distributions in favor of At-Risk Creditors as set forth in section 8.9.7 of the Plan.

**2.1.37  Control Parties.**  Collectively, the Estate Representatives and the Liquidating Trustees.

**2.1.38  Creditor.**  Any Person who is or asserts to be the Holder of a Claim against any Debtor that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise become due, owing, and payable on or before the applicable Debtor's Confirmation Date, including, without limitation, Claims asserted to be of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

**2.1.39  Debtor[s].**  Namco, Ezri, Behsmada, Beshmada of DE and/or Dimes.

**2.1.40  Deferred Assumption Rejection Deadline.**  The Deadline set forth in section 9.3 of the Plan.

**2.1.41  Deferred Assumptions and Rejections.**  The executory contracts and unexpired leases listed in the Plan Supplement as "deferred."

**2.1.42  Dimes.**  Dimes, LLC, a chapter 11 debtor and debtor in possession in Case No. 2:09-bk-25517 BR.

**2.1.43  DIP Debtor(s).**  Beshmada, Beshmada of DE and Dimes.

**2.1.44  Disclosure Statement Hearing.**  The first date on which begins or began the hearing to approve the Disclosure Statement as containing information sufficient to enable Creditors to vote on the Plan.

**2.1.45  Disclosure Statement.**  The *Disclosure Statement With Respect to Joint Chapter 11 Plan for Namco Capital Group, Inc., Ezri Namvar, Beshmada, LLC, Beshmada of Delaware, LLC and Dimes, LLC Proposed by the Chapter 11 Trustees, Official Committees and DIP Debtors*, including, without limitation, all exhibits and schedules to such Disclosure Statement, in the form

approved by the Bankruptcy Court under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

**2.1.46  Disputed Claim.**  All or any part of a Claim that is not Allowed, including, without limitation, all or part of a Claim as to which any one of the following applies: (i) no Proof of Claim has been Filed with respect to such Claim and it is not deemed Allowed under the Plan, and either (a) the Claim is not listed in the Schedules or (b) the Claim is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount, (ii) the liability for, amount, priority or status of the Claim as secured or status as unsecured (a) is the subject of a pending proceeding, whether arbitration, mediation, litigation, adversary proceeding or otherwise; (b) is subject to offset based upon a filed judgment, filed order, filed stipulation or express provision in an executed agreement that was filed or executed, as appropriate, after the alleged right to offset arose; (c) is the subject of a timely objection; or (d) is the subject of a request for estimation made in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court or the Plan, in each case that is filed on or before the Claims Objection Deadline, provided that any such proceeding, objection, or request for estimation has not been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated as a "Disputed Claim" pursuant to the Plan.

**2.1.47  Distribution.**  Payment of Cash, in accordance with the Plan, to a Holder of an Allowed Claim.

**2.1.48  Distribution Agent.**  A Person with responsibility for making Distributions under the Plan.  Any such Person may make such Distributions through delegation to subagents or other professionals.

**2.1.49  Distribution Date.**  With respect to any Allowed Claim, the date on which a Distribution is required to be made under the Plan or as soon as practicable thereafter.

**2.1.50  Distribution Record Date.**  The last Business Day at least fourteen (14) days prior to the Disclosure Hearing.

**2.1.51  Distribution Reserves.**  The reserve created pursuant to Plan section [8.9.8(c)] of the Plan to hold Cash or property for distribution to holders of General Unsecured Claims pending resolution of Disputed Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.52  Effective Date.**  A date designated by the Trustees that is no earlier than the first day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date have been satisfied or waived in accordance with the Plan.

**2.1.53  Encumbrance.**  Any Lien (statutory or otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge, instrument, unassumed affirmative obligation under a development agreement or subdivision improvement agreement, license, preference, priority, security agreement, easement, covenant, encroachment, option or other interest in the subject Asset, including any right of recovery, Tax (including foreign, federal, state and local Tax), Order of any governmental authority or other claim there against or therein, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claims based on any theory that the acquirer is a successor, transferee or continuation of the sellers or their business, and (iv) any leasehold interest, license or other right, in favor of a person other than the transferor in connection with a sale or conveyance, to use any portion of the subject Project), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

**2.1.54  Estate Representative(s).**  The Person to manage a Post Confirmation Estate as provided under the Plan and the Estate By-Laws.  As more fully set forth in the Plan, the initial Estate Representatives shall be R. Todd Neilson and Bradley Sharp.

**2.1.55  Estates.**  The bankruptcy estates of the Debtors created pursuant to section 541 of the Bankruptcy Code.

**2.1.56  Estate By-laws.**  The by-laws of each of the Post-Confirmation Estates, which will be filed as part of the Plan Supplement.

**2.1.57  Exonerated Claims.**  Claims against the Exonerated Parties, except Claims (a) for damages proximately caused by (i) intentional misconduct as finally determined by a Final Order of the Bankruptcy Court, or (ii) gross negligence in connection with (1) implementing the Distribution provisions of the Plan, and (2) the making or withholding of Distributions pursuant to the Plan; or

(b) other than liability resulting from the order of payment of any such Distributions if such order of payment is not expressly set forth in the Plan

    **2.1.58  Exonerated Parties.**  the Trustees, the Control Parties, and their Agents.

    **2.1.59  Ezri.**  Ezri Namvar, the chapter 11 debtor in Case No. 2:08-bk-32349 BR.

    **2.1.60  Ezri Case.**  The chapter 11 case of Ezri, pending in the Bankruptcy Court.

    **2.1.61  Ezri Estate.**  The bankruptcy estate of Ezri, created pursuant to section 541 of the Bankruptcy Code.

    **2.1.62  Ezri Trustee.**  R. Todd Neilson, the duly appointed chapter 11 trustee in the Ezri Case (also identified as "Neilson").

    **2.1.63  Fee Application.**  An application of a Professional for fees for services rendered and for reimbursement of expenses incurred on or before the Effective Date.

    **2.1.64  Filed.**  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" and "Filing" shall have correlative meanings.

    **2.1.65  Final Order.**  An order or judgment of the Bankruptcy Court that has been entered upon the docket in the Case(s) and: (a) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; or (b) in the event that an appeal, writ of certiorari, reargument or rehearing has been sought, such order or judgment shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided that*, the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order or judgment shall not cause such order or judgment not to be a "Final Order."

    **2.1.66  Form W-9.**  IRS Request for Taxpayer Identification Number and Certification form.

    **2.1.67  Gap Administrative Claim.**  An Administrative Claim under Bankruptcy Code § 502(f) arising (a) in the ordinary course of business or financial affairs in the Cases and (b) after the respective Petition Dates and before the Order for Relief Dates.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.68  Gap Administrative Claim Bar Date.**  The deadline for filing Gap Administrative Claims which was the applicable Prepetition Claims Bar Date.

**2.1.69  General Administrative Claims Bar Date.**  The first Business Day following the fifty-sixth (56th) day after the Effective Date, unless such date is extended by the Bankruptcy Court after appropriate notice, by which date certain entities asserting an Administrative Claim against any of the Estates must have filed a request for payment with the Bankruptcy Court under section 503(a) of the Bankruptcy Code, or be forever barred from asserting an Administrative Claim against the Estates and/or sharing in any Distribution under the Plan.

**2.1.70  General Unsecured Claim.**  A Claim against any Debtor, including Claims arising under section 502(h) of the Bankruptcy Code, that is *not*:

(a) an Administrative Claim;

(b) a Priority Tax Claim;

(c) a Secured Claim;

(d) a Priority Claim;

(e) a Bank Guaranty Claim;

(f) an Other Guaranty Claim. or

(g) a Small Convenience Claim.

**2.1.71  General Unsecured Creditor(s).**  A Holder of a General Unsecured Claim.

**2.1.72  Governmental Entity.**  Government or associated political subdivision, governmental agency, Governmental Unit or governmental authority.

**2.1.73  Hardship Distributions.**  The Distributions to At-Risk Creditors as set forth in section 8.9.7 of the Plan.

**2.1.74  Higher Priority Claims.**  Collectively, Administrative Claims, Secured Claims and Priority Claims.

**2.1.75  Holder.**  A Person holding a Claim or Interest.

**2.1.76  Impaired.**  Not Unimpaired.

11

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.77  Inter-Debtor Claims.**  A Claim held by any Estate against any other Estate, whether or not a proof of Claim is filed or deemed filed pursuant to section 501 of the Bankruptcy Code in the Cases.

**2.1.78  Inter-Debtor Settlement.**  The Settlement of the Inter-Debtor Claims under the Plan.

**2.1.79  Interest(s).**  (a) Any equity security or interest in any Debtor within the meaning of section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, membership interests, and all rights arising with respect thereto or any other equity security or interest, and (b) the interest of Ezri in the Ezri Estate under the Bankruptcy Code. .

**2.1.80  Inter-Estate Loan.**  A loan from one Estate to another made by a DIP Debtor or Trustee in connection with the Plan or by one Post Confirmation Estate to another Post Confirmation Estate after the Effective Date.

**2.1.81  IRS.**  Internal Revenue Service.

**2.1.82  Lien.**  A lien as defined in section 101(37) of the Bankruptcy Code, but not including a lien to the extent that it has been avoided in accordance with sections 506(d), 510, 544, 545, 546, 547, 548, 553, or 549 of the Bankruptcy Code.

**2.1.83  Liquidating Trust.**  Each trust to be created on the Effective Date in accordance with the provisions of the applicable Liquidating Trust Agreement for the benefit of each DIP Debtor's Liquidating Trust Beneficiaries.

**2.1.84  Liquidating Trust Agreement.**  Each trust agreement applicable to a particular Estate and the applicable Liquidating Trust Assets and Plan Proceeds, in form and substance satisfactory to the Trustees and agreed to by the other Proponents, and substantially similar to the form thereof to be Filed as part of the Plan Supplement, that, among other things: (a) establishes and governs the applicable Liquidating Trust; (b) sets forth the respective powers, duties and responsibilities of the applicable Liquidating Trustee; and (c) provides for Distribution of Plan Proceeds of the applicable Estate, if any, to the applicable Liquidating Trust Beneficiaries.

**2.1.85  Liquidating Trust Assets.**  As to each DIP Debtor's Estate, all of such Estate's Assets remaining as of the Effective Date, any earnings thereupon and upon any Plan Proceeds.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.86  Liquidating Trust Beneficiaries.**  As to each Estate, the Holders of Allowed Class 4,5 and 6 under the Plan.

**2.1.87  Liquidating Trust Interest.**  The beneficial interest in a Liquidating Trust being afforded to the Liquidating Trust Beneficiary.

**2.1.88  Liquidating Trustee.**  The Person to manage a Liquidating Trust as provided under the Plan and applicable Liquidating Trust Agreement.  The initial Liquidating Trustees shall be Bradley Sharp.

**2.1.89  Litigation Rights.**  Any and all interests of the Estates, Post Confirmation Estates Debtors, Estate Representatives, in any and all claims (including Inter-Debtor Claims), rights, causes of action, and objections or defenses (including to Claims or Encumbrances) that have been or may be commenced or asserted by the Estates, Debtors, Estates Representatives, as the case may be (whether or not actually asserted through litigation), including, but not limited to (i) Avoidance Actions; (ii) claims, rights or causes of action for turnover of property to the Estates or Post Confirmation Estates; (iii) claims, rights or causes of action for the recovery of property by, or payment of money to, the Estates or the Post Confirmation Estates; (iv) objections to Claims on any ground, including any set forth in Bankruptcy Code § 502; and (v) the right of the Post Confirmation Estates to damages, recoupment, or setoff.

**2.1.90  LLCs.**  Limited Liability Companies.

**2.1.91  Miscellaneous Secured Claims.**  A Secured Claim that is not a Secured Tax Claim.

**2.1.92  Namco.**  Namco Capital Group, Inc., the Chapter 11 Debtor in Case No. 2:08-bk-32333 BR.

**2.1.93  Namco Case.**  The Chapter 11 Case of Namco pending in the Bankruptcy Court.

**2.1.94  Namco Committee.**  The Official Committee of Unsecured Creditors in the Namco Case.

**2.1.95  Namvar Relatives.**  The Persons listed on **Exhibit D** to the Plan.

**2.1.96  Namco Trustee.**  Bradley D. Sharp, the duly appointed chapter 11 trustee in the Namco Case (also identified as "Sharp").

**2.1.97  Neilson.**  The Ezri Trustee.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.98  NOL.**  Net operating loss.

**2.1.99    Notice Parties.**  (a) all Control Parties, (b) the Office of the United States Trustee and (c) those Persons who, after the Confirmation Date, File with the Bankruptcy Court and serve upon the Control Parties a request that such Person receive notice of Post Effective Date matters.

**2.1.100    Office of the United States Trustee.**  Office of the United States Trustee for the Central District of California, Los Angeles Division.

**2.1.101    Official Committee.**  The Namco Committee or the Ezri Committee.

**2.1.102    Order(s) for Relief.**  Orders for relief in the Cases entered by the Bankruptcy Court pursuant to the Bankruptcy Code section 303 on the following dates or deemed to occur on the Petition Dates as follows:

| | |
|---|---|
| Ezri Case: | January 29, 2009 |
| Namco: | January 29, 2009 |
| Beshmada: | July 1, 2010 |
| Beshmada of DE: | July 2, 2010 |
| Dimes: | July 2, 2010 |

**2.1.103    Order for Relief Date.**  The date of entry of the order for relief applicable to a specific case, as indicated above.

**2.1.104    Ordinary Course Administrative Claims.**  Administrative Claims that are for ordinary course trade obligations and routine payroll obligations incurred in the ordinary course of an Estate's business on or after the applicable Order for Relief Date and through and including the Effective Date.

**2.1.105    Ordinary Course Administrative Claims Bar Date.**  The date that is the earlier of:  (1) any Bar Date applicable to a particular Claim as previously established for such Claim in these Cases; and (2) the first Business Day that is the later of (a) the fifty-sixth (56th) day following the Effective Date or (b) any other Administrative Claims Bar Date established under this Plan.

**2.1.106    Other Asset.**  An Asset other than: Cash; Available Real Estate; or a Litigation Right.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.107**  **Other Guaranty Claim.**  A General Unsecured Claim against the Ezri Estate, other than a Bank Guaranty claim, based on a guaranty agreement.

**2.1.108**  **Person.**  An individual, unincorporated association or organization, joint venture, partnership, limited liability company, joint-stock company, corporation, trust, business trust, Governmental Entity, estate, committee or other entity of whatever nature.

**2.1.109**  **Petition Date(s).**  The December 22, 2008 date involuntary chapter 11 petitions were filed against Namco and Ezri, and the June 19, 2009 date involuntary chapter 7 petitions were filed against Beshmada, Beshmada of DE, and Dimes.

**2.1.110**  **Plan.**  The *Joint Chapter 11 Plan for Namco Capital Group, Inc., Ezri Namvar, Beshmada, LLC, Beshmada of Delaware, LLC and Dimes, LLC Proposed by the Chapter 11 Trustees, and DIP Debtors*, either in its present form or as it may be amended, supplemented or modified from time to time, including all of its annexed exhibits and schedules**.**

**2.1.111**  **Plan Assets.**  As to each Estate, all of such Estate's Assets remaining as of the Effective Date, any earnings thereupon, and upon any Plan Proceeds.

**2.1.112**  **Plan Proceeds.**  All Cash on hand as of the Effective Date and any Cash, interest, profits, dividends, proceeds, products, and rents, including all "proceeds" as defined under section 9102(a)(64) of the California Uniform Commercial Code, earned, accrued, collected, derived, received or recovered on account of the liquidation, sale, collection, transfer, refinancing, enforcement or other disposition of any Plan Asset.

**2.1.113**  **Plan Supplement.**  A compilation of documents and forms of documents, schedules and exhibits to the Plan, including any exhibits to the Plan that are not Filed contemporaneously with the filing of the Plan, and any amendments to exhibits Filed contemporaneously with the filing of the Plan, to be Filed and served on parties in interest no later than fourteen (14) days prior to the Voting Deadline, which, *inter alia*, include:

    (i)    the list of executory contracts and unexpired leases to be assumed under the Plan and any assignees therefore and Assumption Obligations with respect thereto;

    (ii)    the Estate By-laws;

    (iii)    the Liquidating Trust Agreements; and

1    (iv)    documents appointing each Liquidation Trustees as attorney in fact for each

2    corresponding DIP Debtor after the Effective Date.

3    **2.1.114    Post Confirmation Estate(s).**  Each Estate following the Effective Date.

4    **2.1.115    Post-Effective Date Earnings.**  Earnings of Ezri from or after the Effective Date

5    from personal services or other than in connection with the Assets.

6    **2.1.116    Postpetition.**  After the dates of the Involuntary Petitions in the respective Cases of

7    the Debtors.

8    **2.1.117    Postpetition Earnings.**  The portion of earnings of Ezri from or after the Ezri

9    Petition Date and prior to the Effective Date from personal services or other than in connection with

10    the Assets that Ezri is permitted to retain pursuant to the *Order Approving Trustee's Motion for*

11    *Approval of Stipulation With Debtor Regarding the Handling of the Debtor's Post-Petition Earnings*

12    *and the Dismissal of the Debtor's Appeal of the Denial of His Motion to Convert*.

13    **2.1.118    Prepetition Claims Bar Date.**  The following Bar Dates for any Claim, including a

14    Gap Administrative Claim (but not including other Administrative Claims):  (a) for Claims for

15    damages arising from the rejection of executory contracts or unexpired leases, the earlier of: (i) any

16    otherwise applicable Bar Date established by the Bankruptcy Court at any time during the Cases or

17    (ii) the Rejection Claims Bar Date; (b) for Claims resulting from the successful prosecution or

18    settlement of Avoidance Actions, the later of (i) any otherwise applicable Bar Date, including under

19    other clauses of this definition or (ii) forty-five (45) days following entry of the Final Order

20    determining such Avoidance Action; (c) for Claims of Governmental Units, the later of:  (i) any

21    otherwise applicable Bar Date, including under other clauses of this definition or (ii) 180 days after

22    the date of the applicable order for relief under Bankruptcy Code §§ 301 or 303, as applicable; and

23    (d) for other Claims, November 13, 2009 for Claims against Ezri and Namco, November 15, 2010

24    for Claims against Beshmada, Beshmada of DE, and Dimes, as were established by orders of the

25    Bankruptcy Court.

26    **2.1.119    Priority Claim.**  Any Claim, other than an Administrative Claim or a Priority Tax

27    Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.120   Priority Tax Claims.**  A Claim (or portion of such Claim) of a Governmental Unit entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**2.1.121   Pro Rata.**  With respect to any Distribution in respect of any Allowed Claim, proportionately, so that the ratio of (i) (1) the amount of property distributed on account of such Allowed Claim to (2) the amount of such Allowed Claim, is the same as the ratio of (ii) (1) the amount of property distributed on account of all Allowed Claims of the Class or Classes of the applicable Estate sharing in such Distribution to (2) the amount of all Allowed Claims in such Class or Classes of the applicable Estate.

**2.1.122   Professional.**  Each Person: (a) employed in accordance with an order of the Bankruptcy Court under sections 327 or 1103 of the Bankruptcy Code, or a Trustee, and to be compensated for services under sections 327, 328, 329, 330, 331 and 504 of the Bankruptcy Code, and for which compensation or reimbursement is requested under section 503(b)(2)-(b)(6) of the Bankruptcy Code; (b) who is employed after confirmation by an Estate Representative or Post Confirmation Estate if payment of such Person employed in such capacity by a trustee, debtor in possession or committee during a chapter 11 case would require, *inter alia*, employment under sections 327 or 1103 of the Bankruptcy Code; (c) who is a member of an Official Committee; or (d) is an Estate Representative.

**2.1.123   Professional Fees.**  Amounts asserted by a Professional for compensation for services rendered or reimbursement of expenses, or by a member of an Official Committee submitted for reimbursement of expenses, either (a) in accordance with sections 330, 331, or 503(b) of the Bankruptcy Code for fees and expenses incurred on or after the Order for Relief Date and through and including the Effective Date, or (b) under the Plan for services or expenses incurred by a Professional for a Post Confirmation Estate.

**2.1.124   Professional Fees Bar Date.**  The first Business Day following the fifty-sixth (56th) day after the Effective Date, unless such date is extended by the Bankruptcy Court after appropriate notice, by which date any Professional seeking an award of Professional Fees incurred prior to the Effective Date must have filed an application with the Bankruptcy Court under section 330(a) of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Bankruptcy Code, or be forever barred from an award of Professional Fees incurred prior to the Effective Date.

**2.1.125    Proof of Claim.**  A proof of claim as referenced in Bankruptcy Code section 501(a).

**2.1.126    Proof of Interest.**  A proof of interest as referenced in Bankruptcy Code section 501(a).

**2.1.127    Proponents.**  Sharp, Neilson, and the DIP Debtors.

**2.1.128    Real Estate.**  Real estate, real property, or a direct ownership or other interest (*e.g.*, Encumbrance) therein.

**2.1.129    Rejection Claims Bar Date.**  The following dates: (a) if rejection of an executory contract or unexpired lease occurs under the Plan, the first Business Day that is at least twenty-eight (28) days after the Effective Date; and (b) if rejection of an executory contract or unexpired lease occurs after the Effective Date, the first Business Day that is at least thirty (30) days after the later of the date of (i) entry of an order approving such rejection or (ii) rejection, as provided by the first order approving such rejection.

**2.1.130    SEC.**  Securities and Exchange Commission.

**2.1.131    Scheduled Claim.**  A Claim or Interest listed in a Debtor's Schedules, if listed as neither disputed, contingent or unliquidated, (a) for a Claim: in the amount for such Claim, with the status as secured or unsecured for such Claim and with the statutory priority for such Claim, as listed in the applicable Debtor's Schedules; and (b) for an Interest: in the number, amount or percentage of such Interest and with the nature thereof as listed in the applicable Debtor's Schedules.

**2.1.132    Schedules.**  The schedules of assets and liabilities, the lists of holders of Interests, and the statements of financial affairs Filed in the Cases under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists, and statements may have been or may be supplemented or amended from time to time.

**2.1.133    Secured Claim.**  Any Claim, including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code section 506, to the extent that it is secured by a valid and unavoidable Lien on an Asset or Assets of one or more Debtors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.1.134** **Secured Real Property Tax Claim.** Any Claim, for real property taxes including interest, fees, costs, and charges to the extent allowable pursuant to Bankruptcy Code section 506, to the extent that it is secured by a valid and unavoidable Lien on an Asset or Assets of one or more Debtors.

**2.1.135** **Sharp.** The Namco Trustee.

**2.1.136** **Small Convenience Claim.** Any Claim against any of the Estates that would otherwise be a General Unsecured Claim but for the fact that the Claim is Allowed in an amount that is greater than $0 and less than or equal to $100,000 or for which the Creditor elects to reduce the Allowed amount of its Claim to $100,000; *provided, however*, that a Claim may not be sub-divided into multiple Claims of $100,000 or less for purposes of receiving treatment as a Small Convenience Claim.

**2.1.137** **Tax or Taxes.** Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding taxes. "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

**2.1.138** **Trustees.** Collectively, the Namco Trustee (Sharp) and the Ezri Trustee (Neilson).

**2.1.139** **Unclaimed Property.** The Distribution due and any Cash due to a Creditor under this Plan if: (1) both such Distribution is returned to Post Confirmation Estate or its agents (e.g., as undeliverable) and the check or other similar instrument or Distribution remains unclaimed for one hundred twenty (120) days from sending; or (2) as to Distributions of Cash, the check or other similar instrument or Distribution remains uncashed for one hundred twenty-four (124) days from sending; or (3) no address is known by the applicable payor for a Creditor for one hundred twenty (120) days after the first day such Distribution could have been made under the Plan; or (4) the Distribution is *de minimis* and not distributable in accordance with Plan section 8.9.6.

**2.1.140** **Unimpaired.** When used with reference to a Claim, subclass or Class, as more specifically set forth in various sections of the Plan, the circumstance where such Claim, subclass or Class is treated in a manner comporting with the requirements of Bankruptcy Code § 1124,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   providing, with certain exceptions, that the treatment has left unaltered the legal, equitable, and

2   contractual rights to which such particular Claim entitles the Holder of such Claim.  In accordance

3   with, by example, Bankruptcy Code §§ 365 or 1123(a)(5)(G), unless expressly specified otherwise,

4   such treatment includes the waiver or curing of defaults and the reinstatement of maturity of such

5   Claim, without payment of penalties or other default-related amounts.

6       **2.1.141   Unsecured Deficiency Claim.**  A Claim by a Person holding a Secured Claim to

7   the extent the value of such Creditor's collateral, as determined in accordance with sections 506(a)

8   and 1111 of the Bankruptcy Code, is less than the Allowed amount of such Creditor's Claim, after

9   taking into account any election made pursuant to section 1111(b) of the Bankruptcy Code.

10      **2.1.142   Unsecured Deficiency Claim Bar Date.**  The date that is the first Business Day

11  that is at least thirty (30) days following the Effective Date, by which, <u>regardless of any prior Filing

12  by such Holder of one or more proofs of Claim,</u> a Holder of an Allowed Miscellaneous Secured

13  Claim that contends it holds or wishes to assert an Unsecured Deficiency Claim related to its

14  Allowed Miscellaneous Secured Claim must File (and serve upon the applicable Estate

15  Representatives) an amended proof of Claim (in compliance with Bankruptcy Rule 3001) asserting,

16  inter alia, the amount of such Unsecured Deficiency Claim.

17      **2.1.143   U.S. Trustee.**  The Office of the United States Trustee.

18      **2.1.144   Voting Deadline.**  _____ at 4:00 P.M. prevailing Pacific Time, the date ordered by

19  the Bankruptcy Court to serve as the voting deadline for submission of ballots in respect of the Plan.

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# EXHIBIT C

# EXHIBIT C

Bank Guaranty Claims

| Creditor Name | POC# | Filed Amount |
|---|---|---|
| Arbor Participation Realty, LLC | #13 | 38,000,000 |
| Bank First | #12 | 18,934,246 |
| Bank Midwest | #148 | 15,392,795 |
| Bank of Nevada | #91 | 2,347,942 |
| BH Commercial Capital I, Inc | #162 | 2,526,310 |
| Burbank LLC, A Nevada Limited Liability Company | #37 | 9,342,716 |
| Canyon Springs Shopping Center, LLC | #141 | 6,368,611 |
| Cathay Bank | #22 | 36,850,733 |
| Cathay Bank | #20 | 4,750,000 |
| Cathay Bank | #21 | 1,968,029 |
| Center Bank | #120 | 1,000,129 |
| Community Bank of Nevada | #40 | 14,907,565 |
| East West Bank, a California Corporation | #234 | 10,250,000 |
| Garrison Credit Investment | #64 | 30,000,000 |
| General Electric Capital Corp. | #19 | 26,027,712 |
| Midfirst Bank | #9 | 41,603,475 |
| Pacific Capital Bank, N.A. | #236 | 5,041,975 |
| United Commercial Bank | #122 | 10,109,821 |
| United Commercial Bank | #121 | 4,583,447 |
| Wells Fargo | #90 | 67,071,912 |
| Wells Fargo | #48 | 20,295,472 |
| Wilshire State Bank as assignee of Mirae Bank | #139 | 2,305,926 |

# EXHIBIT D

# EXHIBIT D

Namvar Relatives

## Ezri Namvar
## Namvar Family Members and Relatives

| Name | Relation to Ezri Namvar |
|------|--------------------------|
| Aaron/Ahaorn Shirazi | Uncle |
| Aghajan Namvar | Uncle |
| Alex Haroonian | Cousin-in-law (Ilana's cousin) |
| Alexi Namvar | Tony's Child |
| Arash Esmailzadeh | Cousin |
| Ariel Namvar | Mousa's Child |
| Avishai Shraga | Lida's Child |
| Avishai Shraga | Nephew |
| Benjamin Namvar | Son |
| Daniel Namvar | Son |
| Danielle Namvar | Mousa's Child |
| David Namvar | Cousin |
| David Shadi | Helen's Child |
| Davina Namvar | Mousa's Child |
| Davoud Namvar | Cousin |
| Desiree Shadi | Helen's Child |
| Dina Shadi | Helen's Child |
| Djahangir Shadi | Brother-in-law (Helen's Husband) |
| Dudi Shirazi | Cousin |
| Edward Lavi | Ilana's cousin |
| Eilel Namvar | Father |
| Eliana Namvar | Ramin's Child |
| Eliora Namvar | Mousa's Child |
| Ezra Namvar | Cousin |
| Faramarz Raban | Mousa's Brother-in-law |
| Farnaz Namvar (Maiden Raban) | Sister-in-law (Mousa's Wife) |
| Gabriella Namvar | Mousa's Child |
| George Harounian | Cousin-in-law (Ilana's cousin) |
| Guity Namvar | Cousin-in-law (David's Wife) |
| Helen Shadi | Sister |
| Hilda Bayanfar | Sister |
| Homayoun Bayanfar | Brother-in-law (Hilda's Husband) |
| Homayoun 'Tony' Namvar | Brother |
| Hooshang "Sean" Namvar | Brother |
| Ilana Namvar (Maiden Harounian) | Wife |
| Jack Shadi | Helen Shadi's brother-in-law |
| Jacques Moussa | Cousin-in-law (Ilana's cousin) |

| Name | Relation to Ezri Namvar |
|---|---|
| John Harounian | Brother-in-law |
| Katie Namvar | Sister-in-law (Tony's Wife) |
| Leora Namvar | Sister-in-law (Ramin's Wife) |
| Lida Shraga | Sister |
| Madeleine Moussa Lavi | Ilana's aunt |
| Madeline Moussa | Aunt-in-law |
| Malka Namvar | Daughter |
| Messian Shadi | Unknown |
| Mousa Namvar | Brother |
| Nassim Bayanfar | Hilda's Child |
| Natalie Namvar (Maiden Harounian) | Sister-in-law (Sean's Wife) |
| Navid Bayanfar | Hilda's Child |
| Noah Namvar | Tony's Child |
| Nosrat Esmailzadeh | Mother |
| Omid Bayanfar | Hilda's Child |
| Parvin Esmailzadeh | Aunt |
| Parviz Lavi | Father of Edward Lavi (Ilana's cousin) |
| Rachel Namvar | Tony's Child |
| Ramin Namvar | Brother |
| Rouhollah Esmailzadeh | Uncle |
| Said Esmailzadeh | Cousin |
| Sarah Harounian | Mother-in-law |
| Shabab Namvar | Cousin |
| Shahram Elyaszadeh | Cousin |
| Sheyda Harounian | Sister-in-law |
| Shirah Namvar | Daughter |
| Yadid Shraga | Brother-in-law (Lida's Husband) |
| Yael Shraga | Lida's Child |
| Yanathon Shraga | Nephew |
| Yeaerl Shraga | Niece |
| Yedida Shraga | Brother-in-law |
| Yochanna Namvar | Tony's Child |
| Yoni Shraga | Lida's Child |

1

## **EXHIBIT 2**

2

### **(Disclosure Statement Approval Order)**

3

*[To be attached]*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

# **EXHIBIT 3**

## **(Liquidation Analysis)**

DOCS_LA:238119.7 59925-001

**Namco Capital Group, Inc.**

**Projected Liquidation Analysis**

Notes to Projected Liquidation Analysis:

As further discussed in the Disclosure Statement, while presented with numerical specificity this Liquidation Analysis is based on a variety of assumptions and estimates which, though considered reasonable by the Proponents, may not be realized and are inherently subject to significant economic, financial, legal and other uncertainties and contingencies, future events that are unknown at this time and actions of other parties that are unknown and beyond the control of the Proponents.   Uncertainties and contingencies, include, without limitation, new information regarding Assets and Liabilities, uncertainties in valuations of Assets, changes in marketing and sale of Assets, and settlements or adjudications of Rights of Action and Claims Objections under the Plan or in a chapter 7 that may be materially better or worse than projected.   While an attempt has been made to provide a reasonable estimate of recoveries to Creditors based on current information, the ultimate recovery to Creditors may be significantly different than projected and should not be relied on as a guarantee or other assurance of the actual results that will occur.

In addition to the higher projected recovery in a chapter 11 due to the efficiencies in continuity of management and professionals under the Plan and the knowledge and familiarity of the Trustees and their professionals with the Assets, Litigation Rights and complex financial affairs of the Debtors, the Proponents believe that payment of all or a substantial portion of distributions to unsecured creditors in a chapter 7 may take years longer than under the Plan.

| | Note | Estimated Allowed Claim | Plan Recoveries | | Chapter 7 Recoveries | |
|---|---|---|---|---|---|---|
| | | | Value / Amount | Recovery % | Value / Amount | Recovery % |
| Unrestricted Cash | [1] | | $843,300 | | $843,300 | |
| Restricted Cash | [2] | | 157,700 | | 157,700 | |
| Real Property and Other Non-Cash Assets | [3] | | 9,581,500 | | 8,981,500 | |
| Litigation Rights | [4] | | 30,865,400 | | 28,865,400 | |
| Post-Petition Inter-Debtor Advances | [5] | | 3,540,200 | | 3,540,200 | |
| Pre-Petition Inter-Debtor Claims Recovery | [6] | | 40,120,200 | | 38,488,800 | |
| **Total Assets** | | | **85,108,300** | | **80,876,900** | |
| | | | | | | |
| Chapter 11 Costs (Prof. Fees/Expenses) | [7] | $10,804,653 | (10,804,653) | 100.0% | (10,804,653) | 100.0% |
| Chapter 11 Costs (Inter-Debtor Post-Petition Advances) | [8] | - | - | - | - | - |
| **Net Assets Available for Creditors** | | | **74,303,647** | | **70,072,247** | |
| | | | | | | |
| Unsecured Priority Tax Claims | [9] | 617,319 | (617,319) | 100.0% | (617,319) | 100.0% |
| Classes 1 and 2: Secured Claims | [10] | 2,073,966 | (2,073,966) | 100.0% | (2,073,966) | 100.0% |
| Class 3: Priority Claims | | - | | | | |
| Class 7: Small Convenience Claims Recovery | [11] | 7,663,469 | (766,347) | 10.0% | (1,001,995) | 13.1% |
| **Net Assets Available for Unsecured Creditors *** | | | **$70,846,015** | **14.0%** | **$66,378,967** | **13.1%** |
| | | | | | | |
| Class 4: General Unsecured Claims | | 507,680,257 | 70,846,015 | 14.0% | 66,378,967 | 13.1% |
| Class 5: Bank Guaranty Claims | [12] | - | - | - | - | - |
| Class 6: Other Guaranty Claims | [13] | - | - | - | - | - |
| **Net Recoveries for Classes 4, 5 and 6** | | | **$70,846,015** | **14.0%** | **$66,378,967** | **13.1%** |

* Unsecured creditors are exclusive of Small Convenience Class Claims.

**Namco Capital Group, Inc.**
**Projected Liquidation Analysis**
**Additional Notes**

Note

[1] Unrestricted Cash    Projected unrestricted cash of the Debtor as of December 31, 2011.

[2] Restricted Cash    This represents restricted Cash of the Debtor as of December 31, 2011 that is
stated to become available in the future upon the outcome of certain
litigation, negotiations or other resolutions that would remove restrictions on
the funds.

[3] Real Property and    This represents estimates for the equity value of the Debtor's interest in Real
Other Non-Cash    Property and Other Non-Cash Assets, which may include promissory notes,
Assets    direct interests in real property, interests in entities with direct and indirect
interests in real property or other assets, interests in LLCs that were formerly
owned by the Debtor that were transferred to other parties and are the subject of
pending litigation to void the transfers, undocumented interests in real property,
and furniture and equipment.

Numerous assumptions were made to arrive at the equity value of each Real
Property and Other Non-Cash Assets, including gross values, third-party debt,
third-party debt service and expenses, disputes and issues regarding Debtor's
ownership interests, outstanding tax obligations, closing costs and other factors.
Any taxable income is assumed to be covered by net operating losses in the
Namvar estate.   In addition,  the amounts realized for liquidation of Real
Property and other Non-Cash Assets under the Plan and in a Chapter 7 are also
net of estimated post-Effective Date management expenses and legal fees (other
than fees relating to Litigation Rights).

As discussed further in the Disclosure Statement, it is assumed that in a chapter
7 liquidation a new trustee will be appointed or selected and each Debtor will
need to employ a new set of professionals which will result in significant
incremental professional fees as a result of (1) the significant amount of time
and fees that will be required to become familiar with the Debtor's complex
financial affairs, including real property and LLC interests and other Non-Cash
Assets and analysis and resolution of claims, (2) the need to address issues,
including Inter-Debtor claims, that are resolved under the Plan and otherwise
may be the subject of litigation.

In addition to substantially lower projected fees and costs under the Plan than in
chapter 7, the Liquidation Analysis assumes a greater recovery from liquidation
of Real Property and Other Assets under the Plan than in chapter 7 based on the
institutional knowledge of the Trustees and their professionals gained over the
past 3 years that is likely to enable them to realize better results than a chapter 7
trustee and new professionals starting from scratch, even if the chapter 7 trustee
is also a very experienced trustee.

| [4] | Litigation Rights | This represents an estimate for recoveries of identified Litigation Rights, net of litigation fees and costs.  As well, although this amount is presented in good faith, projecting litigation recoveries with accuracy is made particularly difficult due to the uncertainties arising from incomplete discovery in pending litigation, disputed legal issues, limited data regarding collectability and the possibility that certain litigation may be resolved through transfers of property in kind, which property itself is difficult to accurately value. Actual net recoveries may be materially higher or lower. |
| | | In addition to substantially lower projected fees and costs under the Plan than in chapter 7, the Liquidation Analysis assumes a greater recovery from Litigation Rights than in chapter 7 based on the institutional knowledge of the Trustees and their professionals gained over the past 3 years that is likely to enable them to realize better results than a chapter 7 trustee and new professionals starting from scratch. |
| [5] | Post-Petition Inter Debtor Receivables | This represents the amounts advanced by Namco to or for the benefit of the other four other Debtors after the Petition Date of December 22, 2008.  Under the Plan this amount will be repaid by each Debtor on the Effective Date. It is assumed that each of the four Debtors will ultimately repay Namco for 100% of post-petition amounts due. |
| [6] | Pre-Petition Inter-Debtor Claims Recovery | This represents the estimated recoverable value of Debtor's claims against other Debtor(s).  Under the Plan these amounts have either been addressed in the inter-debtor settlements or by allowed scheduled or filed claims.  For purposes of the Liquidation Analysis the Claim amounts against the other Debtors are assumed to be the same.  These values are a function of the claims (either scheduled, filed or negotiated) and assets available for unsecured creditors in each estate. |
| [7] | Chapter 11 Costs (Prof. Fees/Expenses) - Unpaid | This represents unpaid professional fees and expenses to estate professionals and may be substantially higher if there is a contested confirmation hearing. |
| [8] | Chapter 11 Costs (Inter-Debtor Loans) - Unpaid | None.  Other than professional fees, all post-petition obligations are current and are being paid in the ordinary course of business. |
| [9] | Unsecured Priority Tax Claims | Unsecured Priority Tax Claims include estimates of Allowed Claims of the Internal Revenue Service, City of Los Angeles and Los Angeles County as set forth and subject to the qualifications in the Disclosure Statement. |
| [10] | Classes 1 and 2: Secured Claims | Secured Claims include estimates of Allowed Claims of Soleman Naim, Fereshteh Kohanim, Nojan Holdings, Ali Varastehpour and Maryam Pirian as set forth and subject to the qualifications in the Disclosure Statement |

[11]  Class 7: Small Convenience Claims Recovery

As set forth in the Disclosure Statement, Small Convenience Class Claims are estimated in the amount of $7,663,469, exclusive of Creditors with unsecured claims in excess of $100,000 who opt to reduce their claims to $100,000 and be treated as a Small Convenience Class Claim.

The recovery to Small Convenience Class Claims in a chapter 7 is shown to be $1,001,995 or 13.1%.  The timing of such amount may take 5 years to recover, which based on a discount rate of 10% would imply a present value recovery of $622,160 or 8.1%.  Based on the present value of this recovery in a chapter 7, the Small Convenience Class would receive a higher recovery under the Plan.

[12]  Class 5: Bank Guaranty Claims

None.

[13]  Class 6: Other Guaranty Claims

None.

# Ezri Namvar

## Projected Liquidation Analysis

Notes to Projected Liquidation Analysis:

As further discussed in the Disclosure Statement, while presented with numerical specificity this Liquidation Analysis is based on a variety of assumptions and estimates which, though considered reasonable by the Proponents, may not be realized and are inherently subject to significant economic, financial, legal and other uncertainties and contingencies, future events that are unknown at this time and actions of other parties that are unknown and beyond the control of the Proponents. Uncertainties and contingencies, include, without limitation, new information regarding Assets and Liabilities, uncertainties in valuations of Assets, changes in values of Assets, success in marketing and sale of Assets, and settlements or adjudications of Rights of Action and Claims Objections under the Plan or in a chapter 7 that may be materially better or worse than projected. While an attempt has been made to provide a reasonable estimate of recoveries to Creditors based on current information, the ultimate recovery to Creditors may be significantly different than projected and should not be relied on as a guarantee or other assurance of the actual results that will occur.

In addition to the higher projected recovery in a chapter 11 due to the efficiencies in continuity of management and professionals under the Plan and the knowledge and familiarity of the Trustees and their professionals with the Assets, Litigation Rights and complex financial affairs of the Debtors, the Proponents believe that payment of all or a substantial portion of distributions to unsecured creditors in a chapter 7 may take years longer than under the Plan.

| | Note | Estimated Allowed Claim | Plan Recoveries | | Chapter 7 Recoveries | |
|---|---|---|---|---|---|---|
| | | | Value / Amount | Recovery % | Value / Amount | Recovery % |
| Unrestricted Cash | [1] | | $15,817,700 | | $15,817,700 | |
| Restricted Cash | [2] | | 2,108,900 | | 2,108,900 | |
| Real Property and Other Non-Cash Assets | [3] | | 25,467,900 | | 23,767,900 | |
| Litigation Rights | [4] | | 906,500 | | 846,500 | |
| Post-Petition Inter-Debtor Advances | [5] | | - | | - | |
| Pre-Petition Inter-Debtor Claims Recovery | [6] | | - | | - | |
| **Total Assets** | | | **44,301,000** | | **42,541,000** | |
| Chapter 11 Costs (Prof. Fees/Expenses) | [7] | $6,916,214 | (6,916,214) | 100.0% | (6,916,214) | 100.0% |
| Chapter 11 Costs (Inter-Debtor Post-Petition Advances) | [8] | 3,266,361 | (3,266,361) | 100.0% | (3,266,361) | 100.0% |
| **Net Assets Available for Creditors** | | | **34,118,425** | | **32,358,425** | |
| Unsecured Priority Tax Claims | [9] | 847,387 | (847,387) | 100.0% | (847,387) | 100.0% |
| Classes 1 and 2: Secured Claims | [10] | - | - | - | - | - |
| Class 3: Priority Claims | | - | - | - | - | - |
| Class 7: Small Convenience Claims Recovery | [11] | 177,083 | (17,708) | 10.0% | (13,663) | 7.7% |
| **Net Assets Available for Unsecured Creditors *** | | | **$33,253,330** | **8.1%** | **$31,497,375** | **7.7%** |
| Class 4: General Unsecured Claims | | 202,990,299 | 16,535,447 | 8.1% | 15,662,286 | 7.7% |
| Class 5: Bank Guaranty Claims | [12] | 190,308,655 | 15,502,409 | 8.1% | 14,683,799 | 7.7% |
| Class 6: Other Guaranty Claims | [13] | 14,921,232 | 1,215,473 | 8.1% | 1,151,290 | 7.7% |
| **Net Recoveries for Classes 4, 5 and 6** | | | **$33,253,330** | **8.1%** | **$31,497,375** | **7.7%** |

* Unsecured creditors are exclusive of Small Convenience Class Claims.

**Ezri Namvar**
**Projected Liquidation Analysis**
**Additional Notes**

| Note | | |
|------|--|--|
| [1] | Unrestricted Cash | Projected unrestricted cash of the Debtor as of December 31, 2011. |
| [2] | Restricted Cash | This represents restricted Cash of the Debtor as of December 31, 2011 that is estimated to become available in the future upon the outcome of certain litigation, negotiations or other resolutions that would remove restrictions on the funds. |
| [3] | Real Property and Other Non-Cash Assets | This represents the estimated recovery on liquidation for the equity value of the Debtor's interest in Real Property and Other Non-Cash Assets, which may include promissory notes, direct interests in real property, interests in entities with direct and indirect interests in real property or other assets, interests in LLCs that were formerly owned by the Debtor that were transferred to other parties and are the subject of pending litigation to void the transfers, undocumented interests in real property, and furniture and equipment. |

Numerous assumptions were made to arrive at the equity value of each Real Property and Other Non-Cash Assets, including gross values, third-party debt, third-party debt service and expenses, disputes and issues regarding Debtor's ownership interests, outstanding tax obligations, closing costs and other factors. Any taxable income is assumed to be covered by net operating losses in the Namvar estate.  In addition,  the amounts realized for liquidation of Real Property and other Non-Cash Assets under the Plan and in a Chapter 7 are also net of estimated post-Effective Date management expenses and legal fees (other than fees relating to Litigation Rights).  Actual net recoveries may be materially higher or lower.

As discussed further in the Disclosure Statement, it is assumed that in a chapter 7 liquidation a new trustee will be appointed or selected and each Debtor will need to employ a new set of professionals which will result in significant incremental professional fees as a result of (1) the significant amount of time and fees that will be required to become familiar with the Debtor's complex financial affairs, including LLC interests and other Non-Cash Assets and analysis and resolution of claims, (2) the need to address issues, including Inter-Debtor claims, that are resolved under the Plan and otherwise may be the subject of litigation.

In addition to substantially lower projected fees and costs under the Plan than in chapter 7, the Liquidation Analysis assumes a greater recovery from liquidation of Real Property and Other Assets under the Plan than in chapter 7 based on the institutional knowledge of the Trustees and their professionals gained over the past 3 years that is likely to enable them to realize better results than a chapter 7 trustee and new professionals starting from scratch, even if the chapter 7 trustee is also a very experienced trustee.

[4]    Litigation Rights    This represents an estimate for recoveries of identified Litigation Rights, net of litigation fees and costs.  As well, although this amount is presented in good faith, projecting litigation recoveries with accuracy is made particularly difficult due to the uncertainties arising from incomplete discovery in pending litigation, disputed legal issues, limited data regarding collectability and the possibility that certain litigation may be resolved through transfers of property in kind, which property itself is difficult to accurately value. Actual net recoveries may be materially higher or lower.

In addition to substantially lower projected fees and costs under the Plan than in chapter 7, the Liquidation Analysis assumes a greater recovery from Litigation Rights than in chapter 7 based on the institutional knowledge of the Trustees and their professionals gained over the past 3 years that is likely to enable them to realize better results than a chapter 7 trustee and new professionals starting from scratch.

These amounts include an additional reduction of value in connection with estimated recoveries of Litigation Rights of Namco from entities owned by the Namvar estate in order to recognize additional value in the Namco estate and lower value in the Namvar estate.

[5]    Post-Petition Inter Debtor Receivables    None.

[6]    Pre-Petition Inter-Debtor Claims Recovery    None.

[7]    Chapter 11 Costs (Prof. Fees/Expenses) - Unpaid    This represents unpaid professional fees and expenses to estate professionals and may be substantially higher if there is a contested confirmation hearing.

[8]    Chapter 11 Costs (Inter-Debtor Loans) - Unpaid    This represents the amounts advanced by Namco to or for the benefit of the other four other Debtors after the Petition Date of December 22, 2008.  Under the Plan this amount will be repaid by each Debtor on the Effective Date. It is assumed that each of the four Debtors will ultimately repay Namco for 100% of the funds advanced in a chapter 7 Liquidation as allowed administrative claims.

[9]    Unsecured Priority Tax Claims    Unsecured Priority Tax Claims include estimates of Allowed Claims of the Franchise Tax Board as set forth and subject to the qualifications in the Disclosure Statement.

| [10] | Classes 1 and 2: Secured Claims | None. |
|------|--------------------------------|-------|

| [11] | Class 7: Small Convenience Claims Recovery | As set forth in the Disclosure Statement, Small Convenience Class Claims are estimated in the amount of $177,083, exclusive of Creditors with unsecured claims in excess of $100,000 who opt to reduce their claims to $100,000 and be treated as a Small Convenience Class Claim. |
|------|--------------------------------------------|-------|

| [12] | Class 5: Bank Guaranty Claims | This Plan Recovery Analysis assumes that <u>none of the members of this Class opt in</u> to the settlement offered in the Plan. As a result, the Proponents have assumed that Class 5 Creditors will receive their Pro Rata share of the Available Plan Proceeds available for Claims 4, 5 and 6 General Unsecured Creditors if their claims are ultimately Allowed and for purposes of this analysis have adjusted the Claim amounts to reflect Claims that are overstated but have not taken into account the Ezri Trustee's objections to the validity and enforceability of these Claims. Because the Ezri Trustee currently disputes the validity and enforceability of the guarantees underlying these Claims, if there is no settlement, the Allowed Amounts of these Claims could be substantially less. |
|------|-------------------------------|-------|

| [13] | Class 6: Other Guaranty Claims | For purposes of this analysis the Proponents have assumed that <u>all of the members of this class opt in</u> to the settlement as described in the Plan. Accordingly, the estimated "Allowed Amount" of Class 6 Other Guaranty Claims represents 15% of the asserted amount of these Claims. If, the Holders of certain Class 6 Other Guaranty Claims do not opt in to the proposed settlement, then the Estimated Claim Amounts will differ from the amount listed because the Ezri Trustee will continue to object to these Claims in their entirety. The Ezri Trustee has assumed that in a Chapter 7, the Trustee will litigate the allowance of Class 6 claims and will be unsuccessful on approximately 15% of the Claims. As a result, approximately 15% of Class 6 creditors will receive their pro rata share of the net assets available for unsecured creditors in a Chapter 7 and 85% of Class 6 creditors will receive nothing. |
|------|--------------------------------|-------|

**Beshmada, LLC**

**Projected Liquidation Analysis**

Notes to Projected Liquidation Analysis:

As further discussed in the Disclosure Statement, while presented with numerical specificity this Liquidation Analysis is based on a variety of assumptions and estimates which, though considered reasonable by the Proponents, may not be realized and are inherently subject to significant economic, financial, legal and other uncertainties and contingencies, future events that are unknown at this time and actions of other parties that are unknown and beyond the control of the Proponents.   Uncertainties and contingencies, include, without limitation, new information regarding Assets and Liabilities, uncertainties in valuations of Assets, changes in marketing and sale of Assets, and settlements or adjudications of Rights of Action and Claims Objections under the Plan or in a chapter 7 that may be materially better or worse than projected.   While an attempt has been made to provide a reasonable estimate of recoveries to Creditors based on current information, the ultimate recovery to Creditors may be significantly different than projected and should not be relied on as a guarantee or other assurance of the actual results that will occur.

In addition to the higher projected recovery in a chapter 11 due to the efficiencies in continuity of management and professionals under the Plan and the knowledge and familiarity of the Trustees and their professionals with the Assets, Litigation Rights and complex financial affairs of the Debtors, the Proponents believe that payment of all or a substantial portion of distributions to unsecured creditors in a chapter 7 may take years longer than under the Plan.

| | Note | Estimated Allowed Claim | Plan Recoveries | | Chapter 7 Recoveries | |
|---|---|---|---|---|---|---|
| | | | Value / Amount | Recovery % | Value / Amount | Recovery % |
| Unrestricted Cash | [1] | | $104,300 | | $104,300 | |
| Restricted Cash | [2] | | 5,839,700 | | 5,839,700 | |
| Real Property and Other Non-Cash Assets | [3] | | 18,148,300 | | 16,948,300 | |
| Litigation Rights | [4] | | (423,300) | | (423,300) | |
| Post-Petition Inter-Debtor Advances | [5] | | - | | - | |
| Pre-Petition Inter-Debtor Claims Recovery | [6] | | 333,900 | | 324,100 | |
| **Total Assets** | | | **24,002,900** | | **22,793,100** | |
| Chapter 11 Costs (Prof. Fees/Expenses) | [7] | $181,277 | (181,277) | 100.0% | (181,277) | 100.0% |
| Chapter 11 Costs (Inter-Debtor Post-Petition Advances) | [8] | 149,928 | (149,928) | 100.0% | (149,928) | 100.0% |
| **Net Assets Available for Creditors** | | | **23,671,695** | | **22,461,895** | |
| Unsecured Priority Tax Claims | [9] | 3,253 | (3,253) | 100.0% | (3,253) | 100.0% |
| Classes 1 and 2: Secured Claims | [10] | 1,200,088 | (1,200,088) | 100.0% | (1,200,088) | 100.0% |
| Class 3: Priority Claims | | - | | | | |
| Class 7: Small Convenience Claims Recovery | [11] | 20,713 | (2,071) | 10.0% | (1,498) | 7.2% |
| **Net Assets Available for Unsecured Creditors *** | | | **$22,466,283** | **7.6%** | **$21,257,056** | **7.2%** |
| Class 4: General Unsecured Claims | | 293,850,782 | 22,466,283 | 7.6% | 21,257,056 | 7.2% |
| Class 5: Bank Guaranty Claims | [12] | - | - | - | - | - |
| Class 6: Other Guaranty Claims | [13] | - | - | - | - | - |
| **Net Recoveries for Classes 4, 5 and 6** | | | **$22,466,283** | **7.6%** | **$21,257,056** | **7.2%** |

* Unsecured creditors are exclusive of Small Convenience Class Claims.

**Beshmada, LLC**
**Projected Liquidation Analysis**
**Additional Notes**

<u>Note</u>

[1]  Unrestricted Cash      Projected unrestricted cash of the Debtor as of December 31, 2011.

[2]  Restricted Cash        This represents restricted Cash of the Debtor as of December 31, 2011 that is
                            estimated to become available in the future upon the outcome of certain
                            litigation, negotiations or other resolutions that would remove restrictions on
                            the funds.

[3]  Real Property and      This represents the estimated recovery on liquidation for the equity value of the
     Other Non-Cash         Debtor's interest in Real Property and Other Non-Cash Assets, which may
     Assets                 include promissory notes, interests in entities with direct and indirect interests
                            in real property or other assets, and interests in LLCs and real property that
                            were formerly owned by the Debtor that were transferred to other parties and
                            are the subject of pending litigation to void the transfers.

                            Numerous assumptions were made to arrive at the equity value of each Real
                            Property and Other Non-Cash Assets, including gross values, third-party debt,
                            third-party debt service and expenses, disputes and issues regarding Debtor's
                            ownership interests, outstanding tax obligations, closing costs and other factors.
                            Any taxable income is assumed to be covered by net operating losses in the
                            Namvar estate.   In addition,  the amounts realized for liquidation of Real
                            Property and other Non-Cash Assets under the Plan and in a Chapter 7 are also
                            net of estimated post-Effective Date management expenses and legal fees (other
                            than fees relating to Litigation Rights).  Actual net recoveries may be materially
                            higher or lower.

                            As discussed further in the Disclosure Statement, it is assumed that in a chapter
                            7 liquidation a new trustee will be appointed or selected and each Debtor will
                            need to employ a new set of professionals which will result in significant
                            incremental professional fees as a result of (1) the significant amount of time
                            and fees that will be required to become familiar with the Debtor's complex
                            financial affairs, including LLC interests and other Non-Cash Assets and
                            analysis and resolution of claims, (2) the need to address issues, including Inter-
                            Debtor claims, that are resolved under the Plan and otherwise may be the
                            subject of litigation.

                            In addition to substantially lower projected fees and costs under the Plan than in
                            chapter 7, the Liquidation Analysis assumes a greater recovery from liquidation
                            of Real Property and Other Assets under the Plan than in chapter 7 based on the
                            institutional knowledge of the Trustees and their professionals gained over the
                            past 3 years that is likely to enable them to realize better results than a chapter 7
                            trustee and new professionals starting from scratch, even if the chapter 7 trustee
                            is also a very experienced trustee.

| [4] | Litigation Rights | This represents an estimate for recoveries of identified Litigation Rights, net of litigation fees and costs.  As well, although this amount is presented in good faith, projecting litigation recoveries with accuracy is made particularly difficult due to the uncertainties arising from incomplete discovery in pending litigation, disputed legal issues, limited data regarding collectability and the possibility that certain litigation may be resolved through transfers of property in kind, which property itself is difficult to accurately value. Actual net recoveries may be materially higher or lower.

In addition to substantially lower projected fees and costs under the Plan than in chapter 7, the Liquidation Analysis assumes a greater recovery from Litigation Rights than in chapter 7 based on the institutional knowledge of the Trustees and their professionals gained over the past 3 years that is likely to enable them to realize better results than a chapter 7 trustee and new professionals starting from scratch.

These amounts include an additional reduction of value in connection with estimated recoveries of Litigation Rights of Namco from an entity owned by the Beshmada estate in order to recognize additional value in the Namco estate and lower value in the Beshmada estate. |
| [5] | Post-Petition Inter Debtor Receivables | None. |
| [6] | Pre-Petition Inter-Debtor Claims Recovery | This represents the estimated recoverable value of Debtor's claims against other Debtor(s).  Under the Plan these amounts have either been addressed in the inter-debtor settlements or by allowed scheduled or filed claims.  For purposes of the Liquidation Analysis the Claim amounts against the other Debtors are assumed to be the same.  These values are a function of the claims (either scheduled, filed or negotiated) and assets available for unsecured creditors in each estate. |
| [7] | Chapter 11 Costs (Prof. Fees/Expenses) - Unpaid | This represents unpaid professional fees and expenses to estate professionals and may be substantially higher if there is a contested confirmation hearing. |
| [8] | Chapter 11 Costs (Inter-Debtor Loans) - Unpaid | This represents the amounts advanced by Namco to or for the benefit of the other four other Debtors after the Petition Date of December 22, 2008.  Under the Plan this amount will be repaid by each Debtor on the Effective Date. It is assumed that each of the four Debtors will ultimately repay Namco for 100% of the funds advanced in a chapter 7 Liquidation as allowed administrative claims. |
| [9] | Unsecured Priority Tax Claims | Unsecured Priority Tax Claims include estimates of Allowed Claims of the Franchise Tax Board, California Secretary of the State, City of Los Angeles and State of California as set forth and subject to the qualifications in the Disclosure Statement. |
| [10] | Classes 1 and 2: Secured Claims | Secured Claims include estimates of Allowed Claims of Magdiel LLC and Wishlab 90 LLC as set forth and subject to the qualifications in the Disclosure Statement |

| [11] | Class 7: Small Convenience Claims Recovery | As set forth in the Disclosure Statement, Small Convenience Class Claims are estimated in the amount of $20,713, exclusive of Creditors with unsecured claims in excess of $100,000 who opt to reduce their claims to $100,000 and be treated as a Small Convenience Class Claim. |
| [12] | Class 5: Bank Guaranty Claims | None. |
| [13] | Class 6: Other Guaranty Claims | None. |

**Beshmada of Delaware, LLC**

**Projected Liquidation Analysis**

Notes to Projected Liquidation Analysis:

As further discussed in the Disclosure Statement, while presented with numerical specificity this Liquidation Analysis is based on a variety of assumptions and estimates which, though considered reasonable by the Proponents, may not be realized and are inherently subject to significant economic, financial, legal and other uncertainties and contingencies, future events that are unknown at this time and actions of other parties that are unknown and beyond the control of the Proponents. Uncertainties and contingencies, include, without limitation, new information regarding Assets and Liabilities, uncertainties in valuations of Assets, changes in values of Assets, success in marketing and sale of Assets, and settlements or adjudications of Rights of Action and Claims Objections under the Plan or in a chapter 7 that may be materially better or worse than projected. While an attempt has been made to provide a reasonable estimate of recoveries to Creditors based on current information, the ultimate recovery to Creditors may be significantly different than projected and should not be relied on as a guarantee or other assurance of the actual results that will occur.

In addition to the higher projected recovery in a chapter 11 due to the efficiencies in continuity of management and professionals under the Plan and the knowledge and familiarity of the Trustees and their professionals with the Assets, Litigation Rights and complex financial affairs of the Debtors, the Proponents believe that payment of all or a substantial portion of distributions to unsecured creditors in a chapter 7 may take years longer than under the Plan.

| | Note | Estimated Allowed Claim | Plan Recoveries | | Chapter 7 Recoveries | |
|---|---|---|---|---|---|---|
| | | | Value / Amount | Recovery % | Value / Amount | Recovery % |
| Unrestricted Cash | [1] | | $16,200 | | $16,200 | |
| Restricted Cash | [2] | | - | | - | |
| Real Property and Other Non-Cash Assets | [3] | | 550,000 | | 510,000 | |
| Litigation Rights | [4] | | (411,800) | | (411,800) | |
| Post-Petition Inter-Debtor Advances | [5] | | - | | - | |
| Pre-Petition Inter-Debtor Claims Recovery | [6] | | 897,400 | | 849,100 | |
| **Total Assets** | | | **1,051,800** | | **963,500** | |
| Chapter 11 Costs (Prof. Fees/Expenses) | [7] | $105,745 | (105,745) | 100.0% | (105,745) | 100.0% |
| Chapter 11 Costs (Inter-Debtor Post-Petition Advances) | [8] | 79,935 | (79,935) | 100.0% | (79,935) | 100.0% |
| **Net Assets Available for Creditors** | | | **866,120** | | **777,820** | |
| Unsecured Priority Tax Claims | [9] | 3,712 | (3,712) | 100.0% | (3,712) | 100.0% |
| Classes 1 and 2: Secured Claims | [10] | - | - | - | - | - |
| Class 3: Priority Claims | | - | - | | - | |
| Class 7: Small Convenience Claims Recovery | [11] | - | - | - | - | - |
| **Net Assets Available for Unsecured Creditors *** | | | **$862,408** | **3.2%** | **$774,108** | **2.9%** |
| Class 4: General Unsecured Claims | | 26,983,931 | 862,408 | 3.2% | 774,108 | 2.9% |
| Class 5: Bank Guaranty Claims | [12] | - | - | - | - | - |
| Class 6: Other Guaranty Claims | [13] | - | - | - | - | - |
| **Net Recoveries for Classes 4, 5 and 6** | | | **$862,408** | **3.2%** | **$774,108** | **2.9%** |

* Unsecured creditors are exclusive of Small Convenience Class Claims.

**Beshmada of Delaware, LLC**
**Projected Liquidation Analysis**
**Additional Notes**

| Note |
| --- |

[1]   Unrestricted Cash      Projected unrestricted cash of the Debtor as of December 31, 2011.

[2]   Restricted Cash        None.

[3]   Real Property and      This represents the estimated recovery on liquidation for the equity value of the
      Other Non-Cash         Debtor's interest in Real Property and Other Non-Cash Assets, which may
      Assets                 include interests in entities with direct and indirect interests in real property or
                             other assets.

                             Numerous assumptions were made to arrive at the equity value of each Real
                             Property and Other Non-Cash Assets, including gross values, third-party debt,
                             third-party debt service and expenses, disputes and issues regarding Debtor's
                             ownership interests, outstanding tax obligations, closing costs and other factors.
                             Any taxable income is assumed to be covered by net operating losses in the
                             Namvar estate.   In addition,  the amounts realized for liquidation of Real
                             Property and other Non-Cash Assets under the Plan and in a Chapter 7 are also
                             net of estimated post-Effective Date management expenses and legal fees (other
                             than fees relating to Litigation Rights).  Actual net recoveries may be materially
                             higher or lower.

                             As discussed further in the Disclosure Statement, it is assumed that in a chapter
                             7 liquidation a new trustee will be appointed or selected and each Debtor will
                             need to employ a new set of professionals which will result in significant
                             incremental professional fees as a result of (1) the significant amount of time
                             and fees that will be required to become familiar with the Debtor's complex
                             financial affairs, including LLC interests and other Non-Cash Assets and
                             analysis and resolution of claims, (2) the need to address issues, including Inter-
                             Debtor claims, that are resolved under the Plan and otherwise may be the
                             subject of litigation.

                             In addition to substantially lower projected fees and costs under the Plan than in
                             chapter 7, the Liquidation Analysis assumes a greater recovery from liquidation
                             of Real Property and Other Assets under the Plan than in chapter 7 based on the
                             institutional knowledge of the Trustees and their professionals gained over the
                             past 3 years that is likely to enable them to realize better results than a chapter 7
                             trustee and new professionals starting from scratch, even if the chapter 7 trustee
                             is also a very experienced trustee.

| [4] | Litigation Rights | This represents an estimate for recoveries of identified Litigation Rights, net of litigation fees and costs.  As well, although this amount is presented in good faith, projecting litigation recoveries with accuracy is made particularly difficult due to the uncertainties arising from incomplete discovery in pending litigation, disputed legal issues, limited data regarding collectability and the possibility that certain litigation may be resolved through transfers of property in kind, which property itself is difficult to accurately value. Actual net recoveries may be materially higher or lower. |
| | | In addition to substantially lower projected fees and costs under the Plan than in chapter 7, the Liquidation Analysis assumes a greater recovery from Litigation Rights than in chapter 7 based on the institutional knowledge of the Trustees and their professionals gained over the past 3 years that is likely to enable them to realize better results than a chapter 7 trustee and new professionals starting from scratch. |
| | | These amounts include an additional reduction of value in connection with estimated recoveries of Litigation Rights of Namco from an entity owned by the Beshmada of DE estate in order to recognize additional value in the Namco estate and lower value in the Beshmada of DE estate. |
| [5] | Post-Petition Inter Debtor Receivables | None. |
| [6] | Pre-Petition Inter-Debtor Claims Recovery | This represents the estimated recoverable value of Debtor's claims against other Debtor(s).  Under the Plan these amounts have either been addressed in the inter-debtor settlements or by allowed scheduled or filed claims.  For purposes of the Liquidation Analysis the Claim amounts against the other Debtors are assumed to be the same.  These values are a function of the claims (either scheduled, filed or negotiated) and assets available for unsecured creditors in each estate. |
| [7] | Chapter 11 Costs (Prof. Fees/Expenses) - Unpaid | This represents unpaid professional fees and expenses to estate professionals and may be substantially higher if there is a contested confirmation hearing. |
| [8] | Chapter 11 Costs (Inter-Debtor Loans) - Unpaid | This represents the amounts advanced by Namco to or for the benefit of the other four other Debtors after the Petition Date of December 22, 2008.  Under the Plan this amount will be repaid by each Debtor on the Effective Date. It is assumed that each of the four Debtors will ultimately repay Namco for 100% of the funds advanced in a chapter 7 Liquidation as allowed administrative claims. |
| [9] | Unsecured Priority Tax Claims | Unsecured Priority Tax Claims include estimates of Allowed Claims of the Internal Revenue Service and Delaware Division of Corporations as set forth and subject to the qualifications in the Disclosure Statement. |
| [10] | Classes 1 and 2: Secured Claims | None. |

| [11] | Class 7: Small Convenience Claims Recovery | None. |
| [12] | Class 5: Bank Guaranty Claims | None. |
| [13] | Class 6: Other Guaranty Claims | None. |

**Dimes, LLC**

**Projected Liquidation Analysis**

Notes to Projected Liquidation Analysis:

As further discussed in the Disclosure Statement, while presented with numerical specificity this Liquidation Analysis is based on a variety of assumptions and estimates which, though considered reasonable by the Proponents, may not be realized and are inherently subject to significant economic, financial, legal and other uncertainties and contingencies, future events that are unknown at this time and actions of other parties that are unknown and beyond the control of the Proponents.   Uncertainties and contingencies, include, without limitation, new information regarding Assets and Liabilities, uncertainties in valuations of Assets, changes in valuations of Assets, success in marketing and sale of Assets, and settlements or adjudications of Rights of Action and Claims Objections under the Plan or in a chapter 7 that may be materially better or worse than projected.   While an attempt has been made to provide a reasonable estimate of recoveries to Creditors based on current information, the ultimate recovery to Creditors may be significantly different than projected and should not be relied on as a guarantee or other assurance of the actual results that will occur.

In addition to the higher projected recovery in a chapter 11 due to the efficiencies in continuity of management and professionals under the Plan and the knowledge and familiarity of the Trustees and their professionals with the Assets, Litigation Rights and complex financial affairs of the Debtors, the Proponents believe that payment of all or a substantial portion of distributions to unsecured creditors in a chapter 7 may take years longer than under the Plan.

| | Note | Estimated Allowed Claim | Plan Recoveries | | Chapter 7 Recoveries | |
|---|---|---|---|---|---|---|
| | | | Value / Amount | Recovery % | Value / Amount | Recovery % |
| Unrestricted Cash | [1] | | - | | - | |
| Restricted Cash | [2] | | 920,500 | | 920,500 | |
| Real Property and Other Non-Cash Assets | [3] | | 467,900 | | 437,900 | |
| Litigation Rights | [4] | | 219,700 | | 204,700 | |
| Post-Petition Inter-Debtor Advances | [5] | | - | | - | |
| Pre-Petition Inter-Debtor Claims Recovery | [6] | | 800 | | 790 | |
| **Total Assets** | | | 1,608,900 | | 1,563,890 | |
| | | | | | | |
| Chapter 11 Costs (Prof. Fees/Expenses) | [7] | $15,106 | (15,106) | 100.0% | (15,106) | 100.0% |
| Chapter 11 Costs (Inter-Debtor Post-Petition Advances) | [8] | 44,020 | (44,020) | 100.0% | (44,020) | 100.0% |
| **Net Assets Available for Creditors** | | | 1,549,774 | | 1,504,764 | |
| | | | | | | |
| Unsecured Priority Tax Claims | [9] | 12,195 | (12,195) | 100.0% | (12,195) | 100.0% |
| Classes 1 and 2: Secured Claims | [10] | - | - | - | - | - |
| Class 3: Priority Claims | | - | - | - | - | - |
| Class 7: Small Convenience Claims Recovery | [11] | 3,746 | (375) | 10.0% | (423) | 11.3% |
| **Net Assets Available for Unsecured Creditors *** | | | **$1,537,204** | **11.6%** | **$1,492,146** | **11.3%** |
| | | | | | | |
| Class 4: General Unsecured Claims | | 13,202,181 | 1,537,204 | 11.6% | 1,492,146 | 11.3% |
| Class 5: Bank Guaranty Claims | [12] | - | - | - | - | - |
| Class 6: Other Guaranty Claims | [13] | - | - | - | - | - |
| **Net Recoveries for Classes 4, 5 and 6** | | | **$1,537,204** | **11.6%** | **$1,492,146** | **11.3%** |

* Unsecured creditors are exclusive of Small Convenience Class Claims.

**Dimes, LLC**
**Projected Liquidation Analysis**
**Additional Notes**

**Note**

[1]    Unrestricted Cash    Projected unrestricted cash of the Debtor as of December 31, 2011.

[2]    Restricted Cash    This represents restricted Cash of the Debtor as of December 31, 2011 that is estimated to become available in the future upon the outcome of certain litigation, negotiations or other resolutions that would remove restrictions on the funds.

[3]    Real Property and Other Non-Cash Assets    This represents the estimated recovery on liquidation for the equity value of the Debtor's interest in Real Property and Other Non-Cash Assets, which may include promissory notes, interests in entities with direct and indirect interests in real property or other assets, and interests in LLCs and real property that were formerly owned by the Debtor that were transferred to other parties and are the subject of pending litigation to void the transfers.

Numerous assumptions were made to arrive at the equity value of each Real Property and Other Non-Cash Assets, including gross values, third-party debt, third-party debt service and expenses, disputes and issues regarding Debtor's ownership interests, outstanding tax obligations, closing costs and other factors. Any taxable income is assumed to be covered by net operating losses in the Namvar estate.   In addition,  the amounts realized for liquidation of Real Property and other Non-Cash Assets under the Plan and in a Chapter 7 are also net of estimated post-Effective Date management expenses and legal fees (other than fees relating to Litigation Rights).  Actual net recoveries may be materially higher or lower.

As discussed further in the Disclosure Statement, it is assumed that in a chapter 7 liquidation a new trustee will be appointed or selected and each Debtor will need to employ a new set of professionals which will result in significant incremental professional fees as a result of (1) the significant amount of time and fees that will be required to become familiar with the Debtor's complex financial affairs, including LLC interests and other Non-Cash Assets and analysis and resolution of claims, (2) the need to address issues, including Inter-Debtor claims, that are resolved under the Plan and otherwise may be the subject of litigation.

In addition to substantially lower projected fees and costs under the Plan than in chapter 7, the Liquidation Analysis assumes a greater recovery from liquidation of Real Property and Other Assets under the Plan than in chapter 7 based on the institutional knowledge of the Trustees and their professionals gained over the past 3 years that is likely to enable them to realize better results than a chapter 7 trustee and new professionals starting from scratch, even if the chapter 7 trustee is also a very experienced trustee.

| [4] | Litigation Rights | This represents an estimate for recoveries of identified Litigation Rights, net of litigation fees and costs.  As well, although this amount is presented in good faith, projecting litigation recoveries with accuracy is made particularly difficult due to the uncertainties arising from incomplete discovery in pending litigation, disputed legal issues, limited data regarding collectability and the possibility that certain litigation may be resolved through transfers of property in kind, which property itself is difficult to accurately value. Actual net recoveries may be materially higher or lower. |
|---|---|---|
| | | In addition to substantially lower projected fees and costs under the Plan than in chapter 7, the Liquidation Analysis assumes a greater recovery from Litigation Rights than in chapter 7 based on the institutional knowledge of the Trustees and their professionals gained over the past 3 years that is likely to enable them to realize better results than a chapter 7 trustee and new professionals starting from scratch. |
| [5] | Post-Petition Inter Debtor Receivables | None. |
| [6] | Pre-Petition Inter-Debtor Claims Recovery | This represents the estimated recoverable value of Debtor's claims against other Debtor(s).  Under the Plan these amounts have either been addressed in the inter-debtor settlements or by allowed scheduled or filed claims.  For purposes of the Liquidation Analysis the Claim amounts against the other Debtors are assumed to be the same.  These values are a function of the claims (either scheduled, filed or negotiated) and assets available for unsecured creditors in each estate. |
| [7] | Chapter 11 Costs (Prof. Fees/Expenses) - Unpaid | This represents unpaid professional fees and expenses to estate professionals and may be substantially higher if there is a contested confirmation hearing. |
| [8] | Chapter 11 Costs (Inter-Debtor Loans) - Unpaid | This represents the amounts advanced by Namco to or for the benefit of the other four other Debtors after the Petition Date of December 22, 2008.  Under the Plan this amount will be repaid by each Debtor on the Effective Date. It is assumed that each of the four Debtors will ultimately repay Namco for 100% of the funds advanced in a chapter 7 Liquidation as allowed administrative claims. |
| [9] | Unsecured Priority Tax Claims | Unsecured Priority Tax Claims include estimates of Allowed Claims of the California Secretary of the State, Franchise Tax Board, Internal Revenue Service and City of Los Angeles as set forth and subject to the qualifications in the Disclosure Statement. |
| [10] | Secured Claims | None. |

| [11] | Small Convenience Class Claims Recovery | As set forth in the Disclosure Statement, Small Convenience Class Claims are estimated in the amount of $3,746, exclusive of Creditors with unsecured claims in excess of $100,000 who opt to reduce their claims to $100,000 and be treated as a Small Convenience Class Claim. |
| --- | --- | --- |
| | | The recovery to Small Convenience Class Claims in a chapter 7 is shown to be $423 or 11.3%. The timing of such amount may take 5 years to recover, which based on a discount rate of 10% would imply a present value recovery of $263 or 7.0%. Based on the present value of this recovery in a chapter 7, the Small Convenience Class would receive a higher recovery under the Plan. |
| [12] | Class 5: Bank Guaranty Claims | None. |
| [13] | Class 6: Other Guaranty Claims | None. |

**EXHIBIT 4**

**(Cash Available and Disbursements Required to Confirm Plan)**

DOCS_LA:238119.7 59925-001

**Cash Available and Disbursements Required to Confirm Plan**

Note:  Amounts are estimated as of December 31, 2011.  While the Proponents believe the estimates are reasonable based on current information as of June 30, 2011, actual amounts as of December 31, 2011 may be materially different than projected herein based on new information, further analysis and future events and this schedule may be updated at or before the hearing on confirmation of the Plan.

| | Note | Namco | Ezri | Beshmada | Beshmada of DE | Dimes |
|---|---|---|---|---|---|---|
| **Cash Available and Other** | | | | | | |
| Unrestricted Cash Available to Fund Plan | [1] | $843,300 | $15,817,700 | $104,300 | $16,200 | - |
| Post-Petition Inter-Debtor Advances | [2] | 3,540,200 | (3,266,400) | (149,900) | (79,900) | (44,000) |
| Inter-Debtor Loans at Confirmation | [3] | 4,000,000 | (7,225,000) | 2,500,000 | 325,000 | 400,000 |
| Total Cash Available and Other | | 8,383,500 | 5,326,300 | 2,454,400 | 261,300 | 356,000 |
| **Disbursements Required to Confirm Plan** | | | | | | |
| Admin. Exp.: Professional Fees (Less Deferral) | [4] | 2,161,000 | 1,383,200 | 36,300 | 21,100 | 3,000 |
| Priority Tax Claims | [5] | 617,300 | 847,400 | 3,300 | 3,700 | 12,200 |
| Class 7: Small Convenience Claims | [6] | 766,300 | 17,700 | 2,100 | - | 400 |
| Fund Post-Confirmation Estates/Liquidating Trusts | [7] | 4,600,000 | 2,450,000 | 2,400,000 | 225,000 | 325,000 |
| Total Disbursements Required to Confirm Plan | | 8,144,600 | 4,698,300 | 2,441,700 | 249,800 | 340,600 |
| **Cash Remaining After Required Disbursements** | [8] | **$238,900** | **$628,000** | **$12,700** | **$11,500** | **$15,400** |

## Cash Available and Disbursements Required to Confirm Plan
## Additional Notes

<u>Note</u>

[1]    Projected unrestricted Cash as of December 31, 2011.  Namvar estate cash balance assumes
FIRPTA withholding related to sale of 12121 Wilshire Boulevard, in the amount of
approximately $9.9 million, is recovered from the Internal Revenue Service and Franchise Tax
Board in November 2011.

[2]    These amounts reflect reimbursement to Namco of funds advanced by Namco to or for the
benefit of the other four Debtors after the Petition Dates pursuant to the Inter-Debtor
Settlement.

[3]    Assumes intercompany loans will be used to make required disbursements.  Amounts shown
reflect loans by the Ezri Estate to the other Debtors under the Plan to fund their Effective Date
payments under the Plan.

[4]    These amounts reflect each Estates pro rata amount of projected unpaid Professional Fees as of
December 31, 2011 of approximately $18.0 million, less an agreed fee deferral of up to
approximately $14.4 million, representing 80% of estimated unpaid Allowed Fees, subject to
participation by all Estate Professionals.

In the event not all Estate Professionals agree to defer up to 80% of Allowed Fees, other
Professionals may agree to defer additional amounts.  All other Administrative Claims are
current and being paid in the ordinary course of business of each Debtor.

[5]    Payment or reserve for estimated Allowed Priority Tax Claims against each Debtor.

[6]    Payment or reserve for Convenience Class Claims.  This is based on the estimated Allowed
amount of Convenience Class Claims, exclusive of any Allowed Unsecured Claims in excess
of $100,000 who elect to reduce their claims to $100,000 and be treated as Convenience Class
Claims.

[7]    Funding of the Post-Confirmation Estates and Liquidating Trusts to fund post-Effective Date
management and operations, including litigation costs, management costs, real property related
disbursements and other expenses.

[8]    Cash remaining after required disbursements would be used to pay down deferred professional
fees and expenses assuming no shortfall in the amounts needed to fund the Post-Confirmation
Estates and Liquidating Trusts as discussed in the note above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT 5**

**(List of Identified Available Property and Other Non-Cash Assets)**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:238119.7 59925-001

# Namco Capital Group, Inc.
## List of Identified Available Property and Other Non-Cash Assets

Note: This list includes the primary non-Cash Assets of the Debtor identified as of June 30, 2011 based on the investigation and analysis of the Debtor's Assets which is ongoing.  The list remains subject to update and revisions, including with respect to the descriptions and amounts of the Debtor's interests and should not be relied on for any purposes as being a complete list of all Assets of the Debtor and the value and interests of the Debtor in the Assets may materially or significantly differ from the amounts and percentages in the list.

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| **I Promissory Notes and Contractual Rights to Payments** | | |
| 1 Participation Interest in Sale Proceeds of Tempe Town Lakes | Namco estate will receive up to $4.35 million if the NTL and NTL II properties are sold before June 30, 2012 and such sale generates sufficient proceeds to pay Boucherian in full on account of her secured claims. An additional 24% of any additional sale proceeds over and above the amount necessary to pay  Boucherian in full and the $4.35 million referenced above will also be paid to the Namco estate. | 100.000% |
| 2 1222 E. Grand Ave | Promissory note and deed of trust on unoccupied industrial building in El Segundo, CA. | 100.000% |
| 3 25 W. Walnut | Promissory notes and deeds of trust on 1.67 acres of vacant land parcel in Pasadena, CA (assigned to other parties; litigation pending). | 100.000% |
| 4 810-20 Marengo | Promissory note and deed of trust on vacant land parcel in Pasadena, CA (assigned to other parties; litigation pending). | 100.000% |
| 5 16045 Victory Blvd. | Promissory note and deed of trust on 4,435 sq. ft. retail center in Van Nuys, CA. | 100.000% |
| 6 Sierra Coast Development- Donner Pass | Promissory note (disputed) and deed of trust on development property in Truckee, CA (currently an unoccupied single tenant office building). | 100.000% |
| **II Direct Interests in Real Property** | | |
| 7 1929 Pico | 100% interest in single tenant warehouse building near downtown Los Angeles. | 100.000% |
| **III Interests in Entities with Direct or Indirect Interests in Real Property or Other Assets** | | |
| 8 Hesperia Land | 50% interest in partnership which owns 0.88 acres of vacant commercial land in Hesperia, CA. | 50.000% |
| 9 Kurtistown Heights Land | Collective 100% interest in LLC which has 20% TIC ownership of 45.95 acres of vacant agricultural land located off Volcano Road in Keaau, HI (on the Island of Hawaii). | 16.000% |
| 10 Floba - SEC Florida & Saboda | 18.214% interest in partnership which owns 11 acres of land in Hemet, California | 18.214% |

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| 11 924 Linda Flora | 50% economic interest in single family residence in Los Angeles, CA. Namco is sole owner on title subject to 50% share of proceeds per Settlement Agreement. | 50.000% |

**IV Interest Transferred to Other Party and Subject of Pending Litigation (Pre-Transfer Interests Shown)**

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| 12 Buckingham Heights Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 404,000 sq. ft. office park in Culver City, CA. | 0.010% |
| 13 Culver Marina Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 59,000 sq. ft. industrial building in Los Angeles, CA. | 0.010% |
| 14 McConnell Marina Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 52,100 sq. ft. industrial building in Los Angeles, CA. | 0.010% |
| 15 Watt Leed Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 136,188 sq. ft. industrial warehouse building in Brea, CA. | 0.010% |

**V Debtors' Interest Currently Undocumented**

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| 16 4630 Koval Lane Unit 64 | Namco has verbal ownership agreement with party on title.  Property is a residential condo unit in Las Vegas, NV. | 100.000% |
| 17 4660 Koval Lane Unit 20R | Namco has verbal ownership agreement with party on title.  Property is a residential condo unit in Las Vegas, NV. | 100.000% |
| 18 4630 Koval Lane Unit 59R | Namco has verbal ownership agreement with party on title.  Property is a residential condo unit in Las Vegas, NV. | 100.000% |
| 19 4660 Koval Lane Unit 33R | Namco has verbal ownership agreement with party on title.  Property is a residential condo unit in Las Vegas, NV. | 100.000% |
| 20 1725 Pomerado Drive | Namco has verbal ownership agreement with party on title.  Property is a single family home in Las Vegas, NV. | 100.000% |
| 21 10962 Civiletti St. | Namco has verbal ownership agreement with party on title.  Property is a single family home in Las Vegas, NV. | 100.000% |

# Ezri Namvar
# List of Identified Available Property and Other Non-Cash Assets

Note: This list includes the primary non-Cash Assets of the Debtor identified as of June 30, 2011 based on the investigation and analysis of the Debtor's Assets which is ongoing.  The list remains subject to update and revisions, including with respect to the descriptions and amounts of the Debtor's interests and should not be relied on for any purposes as being a complete list of all Assets of the Debtor and the value and interests of the Debtor in the Assets may materially or significantly differ from the amounts and percentages in the list.

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| **I Promissory Notes and Contractual Rights to Payments** | | |
| 1 Payments from Sale of Weintraub Real Estate | $2,500,000 promissory note dated July 13, 2010, bearing no interest with payments due over 5 years ($40,540.54 due from months 6-42 and $55,555.56 due from the month 43-60), secured by Security Agreement made by Americana Investors (REW DeSoto Investors), Liane C. Weintraub and Richard E. Weintraub; Deed of Trust with Assignment of Rents made by WN Malibu Lot LLC; payment guaranty made by Richard E. Weintraub. | 58.932% |
| **II Direct Interests in Real Property** | | |
| None | | |
| **III Interests in Entities with Direct or Indirect Interests in Real Property or Other Assets** | | |
| 2 6219 De Soto Ave., Woodland Hills, CA | 15% economic interest LLC; if default occurs under Restructuring Agreement, Beshmada's transferred membership interest serves as collateral.  LLC owns 175,300 sq. ft. industrial building on 10.46 acres. | 15.000% |
| 3 Kurtistown Heights Land | Collective 100% interest in LLC which has 20% TIC ownership of 45.95 acres of vacant agricultural land located off Volcano Road in Keaau, HI (on the Island of Hawaii). | 4.000% |
| 4 Pacibel Retail | 40% interest in LLC which owns a shopping center at 6001-6021 Pacific Blvd., Huntington Park, CA. | 40.000% |
| 5 Sunset Springs-10705 Rose Ave Las Vegas | Collective 53.6% interest in LLCs which owns 71.4 acres of vacant industrial land in Henderson, NV. | 11.600% |
| **IV Interest Transferred to Other Party and Subject of Pending Litigation (Pre-Transfer Interests Shown)** | | |
| 6 Daisy Lady Retail | 30% interest (assigned to other party; complaint filed) in LLC which owns shopping center at 6041-6081 Pacific Blvd., Huntington Park, CA. | 30.000% |

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| 7 Manchester Mall | 10% interest (assigned to other party; complaint filed) in LLC which owns office and retail shopping center - 298,713 SF retail space and 342,440 SF office space on 31.61 acres of land in Fresno, CA. | 10.000% |
| 8 Nam 5, LTD. Property(ies) | 20% interest (assigned to other party; complaint filed) in partnership which owns condominium building in Tel Aviv, Israel. | 20.000% |
| 9 Buckingham Heights Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 404,000 sq. ft. office park in Culver City, CA. | 48.995% |
| 10 Culver Marina Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 59,000 sq. ft. industrial building in Los Angeles, CA. | 48.995% |
| 11 McConnell Marina Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 52,100 sq. ft. industrial building in Los Angeles, CA. | 48.995% |
| 12 Watt Leed Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 136,188 sq. ft. industrial warehouse building in Brea, CA. | 48.995% |
| 13 Parox - 14 Section 8 Apartment Buildings in Venice | Collective 70% interest in LLC which has 75% interest in 4 partnerships which own 14 Section 8 apartment buildings (242 units) in Venice, CA. | 26.250% |
| 14 Juniper Hills, Lancaster, CA | 50% interest (assigned to other party; complaint filed) in LLC which owns vacant land near Lancaster, CA. | 50.000% |

**V Debtors' Interest Currently Undocumented**

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| 15 613 Westminster Ave. | Namvar has 15% interest in LLC which has verbal ownership agreement with party on title. Property is a four-unit multifamily building in Venice, CA. | 15.000% |
| 16 634 Westminster Ave. | Namvar has 15% interest in LLC which has verbal ownership agreement with party on title. Property is a six-unit multifamily building in Venice, CA. | 15.000% |
| 17 671 Broadway Ave. | Namvar has 15% interest in LLC which has verbal ownership agreement with party on title. Property is a five-unit multifamily building in Venice, CA. | 15.000% |
| 18 705 5th Ave. | Namvar has 15% interest in LLC which has verbal ownership agreement with party on title. Property is a four-unit multifamily building in Venice, CA. | 15.000% |
| 19 775 Indiana Ave. | Namvar has 15% interest in LLC which has verbal ownership agreement with party on title. Property is a four-unit multifamily building in Venice, CA. | 15.000% |
| 20 1030 Pleasant View Ave. | Namvar has 15% interest in LLC which has verbal ownership agreement with party on title. Property is a four-unit multifamily building in Venice, CA. | 15.000% |

# Beshmada LLC
# List of Identified Available Property and Other Non-Cash Assets

Note: This list includes the primary non-Cash Assets of the Debtor identified as of June 30, 2011 based on the investigation and analysis of the Debtor's Assets which is ongoing.  The list remains subject to update and revisions, including with respect to the descriptions and amounts of the Debtor's interests and should not be relied on for any purposes as being a complete list of all Assets of the Debtor and the value and interests of the Debtor in the Assets may materially or significantly differ from the amounts and percentages in the list.

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| **I Promissory Notes and Contractual Rights to Payments** | | |
| 1 Payments from Sale of Weintraub Real Estate | $2,500,000 promissory note dated July 13, 2010, bearing no interest with payments due over 5 years ($40,540.54 due from months 6-42 and $55,555.56 due from the month 43-60), secured by Security Agreement made by Americana Investors (REW DeSoto Investors), Liane C. Weintraub and Richard E. Weintraub; Deed of Trust with Assignment of Rents made by WN Malibu Lot LLC; payment guaranty made by Richard E. Weintraub. | 41.068% |
| **II Direct Interests in Real Property** | | |
| None | | |
| **III Interests in Entities with Direct or Indirect Interests in Real Property or Other Assets** | | |
| 2 Sunset Blvd & Doheny Dr. West Hollywood, CA | 25% economic interest in LLC (may be diluted to 15%); if default occurs under Restructuring Agreement, Beshmada's transferred membership interests in LLC serves as collateral. LLC owns 1.37 acres of vacant land in West Hollywood, CA. | 25.000% |
| 3 10635-10647 Burbank Blvd. | 100% interest in LLC which owns 9,440 sq. ft., 9-unit retail complex building, in North Hollywood, CA. | 100.000% |
| 4 Ahwatukee - Foothill Corporate Park | 75% interest in LLC which owns 87,772 sq ft office complex in Phoenix, Arizona. | 75.000% |
| 5 Coalinga Pistachio Farm (Parcel 5; 116.6 acres) | 50% TIC ownership of 116.6 acres of planted pistachio trees in Fresno, CA. | 50.000% |
| 6 Sullivan Canyon Land | 100% interest in LLC which has 20% TIC ownership of 12.5 acres vacant land in Brentwood area of Los Angeles. | 20.000% |
| 7 GH-VFG, LLC | 50% interest in LLC which owns a 0.01% interest in a 200 unit affordable housing apartment building in Gainesville, FL and receives 85% of the cash flow. | 50.000% |

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| 8 Baseline & Val Vista Shopping Center | 20% interest in LLC which owns a retail center in Gilbert, AZ. | 20.000% |
| 9 IMAX TK Partners (Japan) | 11.47% interest in entity which owns various properties in Japan. | 11.470% |
| 10 Pappas LLC | 5% interest in LLC which is current property manager of Coalinga Pistachio Farm (116.6 acres of planted pistachio trees in Fresno, CA). | 5.000% |
| 11 Sunset Springs- 10705 Rose Ave Las Vegas | Collective 53.6% interest in LLCs which owns 71.4 acres of vacant industrial land in Henderson, NV. | 29.400% |
| 12 Pecos Plaza, Las Vegas, NV | 25% interest in LLC which owns a shopping center in Las Vegas, NV. | 25.000% |

**IV** **Interest Transferred to Other Party and Subject of Pending Litigation (Pre-Transfer Interests Shown)**

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| 13 Buckingham Heights Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 404,000 sq. ft. office park in Culver City, CA. | 49.995% |
| 14 Culver Marina Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 59,000 sq. ft. industrial building in Los Angeles, CA. | 49.995% |
| 15 McConnell Marina Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 52,100 sq. ft. industrial building in Los Angeles, CA. | 49.995% |
| 16 Watt Leed Ground Lease | Collective 99-100% interest (80% pledged to other party; complaint filed) in LLC which owns land subject to long-term ground lease and reversionary interest in 136,188 sq. ft. industrial warehouse building in Brea, CA. | 49.995% |
| 17 Parox - 14 Section 8 Apartment Buildings in Venice | Collective 70% interest in LLC which has 75% interest in 4 partnerships which own 14 Section 8 apartment buildings (242 units) in Venice, CA. | 26.250% |
| 18 Courvoisier Court | 50% interest (assigned to other party; complaint filed) in LLC which owns 3 condominium units in 275 unit building in Miami, FL. | 50.000% |
| 19 2.4 Acres in Las Vegas | 50% interest (assigned to other party; complaint filed) in LLC which owns 2.4 acres of raw land in Las Vegas, NV. | 50.000% |
| 20 75th & Peoria, Peoria AZ | 50% interest (assigned to other party; complaint filed) in LLC which owns 6.63 acres of raw land in Peoria, AZ located at 75th & Peoria. | 50.000% |
| 21 87th and Peoria, Peoria, AZ | 50% interest (assigned to other party; complaint filed) in LLC which owns 6.78 acres of raw land in Peoria, AZ located at 87th & Peoria. | 50.000% |
| 22 Gilmore Ranch Pistachio Farm (4,560 acres) | 9.72% (or more) interest (assigned to other party; complaint filed) in LLC(s) which own(s) 4,560 acre pistachio farm in Kerman, CA (Fresno county). | 9.720% |

| Asset | Description of Asset | Current Interest Percentage in Asset |
|-------|---------------------|--------------------------------------|

**V Debtors' Interest Currently Undocumented**

None

# Beshmada of Delaware LLC
# List of Identified Available Property and Other Non-Cash Assets

Note: This list includes the primary non-Cash Assets of the Debtor identified as of June 30, 2011 based on the investigation and analysis of the Debtor's Assets which is ongoing. The list remains subject to update and revisions, including with respect to the descriptions and amounts of the Debtor's interests and should not be relied on for any purposes as being a complete list of all Assets of the Debtor and the value and interests of the Debtor in the Assets may materially or significantly differ from the amounts and percentages in the list.

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| **I Promissory Notes and Contractual Rights to Payments** | | |
| 1 Proceeds from West Deptford under Riverwinds Agreement | Payment of up to $625,000 from from Township of West Deptford once assets are sold and selling costs are paid, per restructuring agreement. Assets include 1,100 acres covering four parcels of vacant land in the Township of West Deptford, Gloucester County, NJ. | 100.000% |
| **II Direct Interests in Real Property** | | |
| None | | |
| **III Interests in Entities with Direct or Indirect Interests in Real Property or Other Assets** | | |
| 2 Sierra Coast Development- Donner Pass | 60% interest in LLC which owns development property in Truckee, CA (currently an unoccupied single tenant office building). | 60.000% |
| 3 Cambria at Polos South (216 unit condominium) Kissimmee, FL | 50% interest in LLC which owns 216-unit condominium complex in Kissimmee, FL. | 50.000% |
| 4 Secret Beach, Kauai, HI | Collective 100% interest in LLC which owns 9.365 acres of land in Kauai, Hawaii. | 50.000% |
| **IV Interest Transferred to Other Party and Subject of Pending Litigation (Pre-Transfer Interests Shown)** | | |
| None | | |
| **V Debtors' Interest Currently Undocumented** | | |
| None | | |

# Dimes LLC
# List of Identified Available Property and Other Non-Cash Assets

Note: This list includes the primary non-Cash Assets of the Debtor identified as of June 30, 2011 based on the investigation and analysis of the Debtor's Assets which is ongoing.  The list remains subject to update and revisions, including with respect to the descriptions and amounts of the Debtor's interests and should not be relied on for any purposes as being a complete list of all Assets of the Debtor and the value and interests of the Debtor in the Assets may materially or significantly differ from the amounts and percentages in the list.

| Asset | Description of Asset | Current Interest Percentage in Asset |
|---|---|---|
| **I Promissory Notes and Contractual Rights to Payments** | | |
| 1 Payments from Green Acres (For Exercise of Option to Repurchase Rancho Malibu Property) | $200,000 promissory note (to be executed) bearing no interest with payments due over 3 years (36 equal monthly installments of $5,555.56). | 100.000% |
| **II Direct Interests in Real Property** | | |
| None | | |
| **III Interests in Entities with Direct or Indirect Interests in Real Property or Other Assets** | | |
| 2 Pesteh Land Pistachio Farm (Parcels 1-2) | 50% interest in LLC which owns 643.7 acres of pistachio farms over 2 parcels in Fresno, CA. | 10.000% |
| 3 Riverdale Farm, LLC | 10% interest in LLC which is property manager of Pestehland Pistachio Farm (2 parcels of pistachio farms totaling 643.7 acres in Fresno, CA). | 10.000% |
| 4 Sunset Springs- 10705 Rose Ave Las Vegas | Collective 53.6% interest in LLCs which owns 71.4 acres of vacant industrial land in Henderson, NV. | 12.600% |
| 5 Secret Beach, Kauai, HI | Collective 100% interest in LLC which owns 9.365 acres of land in Kauai, Hawaii. | 50.000% |
| **IV Interest Transferred to Other Party and Subject of Pending Litigation (Pre-Transfer Interests Shown)** | | |
| 6 1317-1457 E. Los Angeles Ave Simi Valley CA | 10% interest (assigned to other party; complaint filed) in LLC which has 50% TIC ownership of 218,698 sq. ft retail shopping center in Simi Valley, CA. | 5.000% |
| **V Debtors' Interest Currently Undocumented** | | |
| None | | |

**<u>EXHIBIT 6</u>**

**(List of Identified Litigation Rights)**

DOCS_LA:238119.7 59925-001

**EXHIBIT "6" – List of Identified Litigation Rights**

As stated in the Disclosure Statement, the Trustees and the DIP Debtors have been reviewing available information regarding potential causes of action against third parties, which review is ongoing and which will continue to be conducted by the Trustees and the DIP Debtors and/or their respective successors or representatives after the Effective Date.  Due to the size and scope of the business operations of the Debtors and the multitude of business transactions therein, there may be various causes of action that currently exist or may subsequently arise in addition to any matters identified herein.  Existing or potential causes of action that may be pursued by the Trustees, DIP Debtors, the Estates Representatives and/or their respective successors or representatives (as applicable) include, without implied limitation, the following: (i) all litigation claims and rights, and causes of action, identified in Exhibit "6" hereto;  (ii) any other causes of action against current or former officers, directors, employees, and/or insiders of the Debtors; (iii) any and all causes of action relating to the matters listed on the Debtors' Schedules; (iv) any other litigation, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, including, without limitation: disputes with creditor/investors, purported lienholders and pledgees in property of any of the Estates, principals and guarantors of any obligations owed to the Estates, direct and indirect transferees of property of the Estates, vendors and customers, overpayments, any amounts owed by any creditor/investor, creditor, vendor or other entity, employee, management, or operational matters, disputes with current or former employees, financial reporting, environmental matters, insurance matters, accounts receivable, contractual obligations, or tort claims that may exist or subsequently arise; and (v) any causes of action not expressly identified in Exhibit "6" hereto. This Exhibit "6" is a non-exclusive list of potential or actual Causes of Action and Defenses that the Trustees and DIP Debtors have asserted or may potentially assert.  The Proponents reserve their right to modify such list to amend such Causes of Action and Defenses or otherwise update the list, but disclaim any obligation to do so.

This Exhibit "6" has four sub-exhibits provided by each of the law firms representing one or more of the Estates in litigation.  The sub-exhibits are 6A (from Jeffer Mangels Butler & Mitchell LLP, counsel to the Namco Trustee), 6B (from Danning, Gill, Diamond & Kollitz, LLP, counsel to the Ezri Trustee), 6C (from Pachulski Stang Ziehl & Jones LLP, joint counsel to the Namco Trustee and Ezri Trustee) and 6D (from Ezra Brutzkus Gubner, LLP, special counsel to the Namco Trustee).

**SUB-EXHIBIT "6A" – List of Identified Litigation Rights
<u>from Jeffer Mangels Butler & Mitchell LLP, counsel to the Namco Trustee</u>**

**Alireza Varastehpour v. Namco Capital Group (no adversary number assigned):** action involves perfection of security interest in $2,000,000 promissory note and related deed of trust. Namco is named as beneficiary under the note and deed of trust. Namco purportedly assigned and transferred its interest in the note and deed of trust to defendant prepetition. Namco alleges that the transfer was postpetition. Face amount of note is $2,000,000 and note is secured by a first priority deed of trust against the real property generally described as 16045 Victory Boulevard, Van Nuys, California. Matter was recently settled. Under the settlement, defendant will have a senior lien against Namco's interest to secure a claim of $1,000,000. Settlement was approved by the bankruptcy court at a hearing held June 20, 2011.

**Namco Capital Group and Beshmada, LLC v. Sam Shakib - Adv. No. 2:10-ap-02699-BR:** breach of contract and fraud action arising out of sale of membership interests in GH Capital. Matter was settled in exchange for $200,000 payment to Namco and Beshmada. Settlement order is final.

**Wall Street Mart v. Rassol, LLC - Adv. No. 2:10-ap-01950-BR:** fraudulent transfer action by Wall Street Mart LP which seeks to avoid conveyance of property with an estimated value of between $15-25 million. Benefit of successful action would inure to Namco (creditor of Wall Street $12.6 million), Namvar estate (avoidance of pledge of 40% partnership interest) and Beshmada (avoidance of pledge of 40% partnership interest). Projected trial date:April 2012.

**Namco Capital Group v. Shayefar - Adv. No. 2:10-ap-02491-BR:** action involved perfection of security interest in $435,000 promissory note and related deed of trust. Namco is named as beneficiary under the note and deed of trust. Namco purportedly assigned and transferred its interest in the note and deed of trust to defendant prepetition. Namco asserts that the assignment was unperfected as of the petition date. The matter has been settled and the order approving the settlement is final. Under the settlement, Defendant will be paid $50,000 upon a sale of the property and the assignment is otherwise voided. Property owner has filed chapter 11. Trustee is pursuing relief from stay to complete foreclosure sale of property.

**Namco Capital Group v. Mayer Separzadeh - Adv. No. 2:10-ap-02187-BR:** action involves perfection of security interest in $2,780,000 promissory note and related deed of trust. Namco is named as beneficiary under the note and deed of trust. Namco purportedly assigned and transferred its interest in the note and deed of trust to defendant prepetition. Namco asserts that the assignment was unperfected as of the petition date. Amount at issue: $1.9 million (property was sold for $2.2 million less costs pursuant to order of the bankruptcy court). Trial date: July 13, 2011.

**Kamran Group, LLC v. Namco Capital Group et al - Adv. No. 2:10-ap-01244-BR:** action involves claim of improper foreclosure by Namco and perfection of security interests in notes and deeds of trust totaling approximately $7,000,000. Amount at issue: approximately $4,000,000 to $6,000,000 (value of underlying property located in Pasadena, California). Trial on foreclosure action concluded in favor of Namco on April 27, 2011. Namco is named as beneficiary under the applicable notes and deeds of trust. Namco purportedly assigned and transferred interests in the applicable notes and deeds of trust to defendants prepetition. Namco asserts that the assignments were unperfected as of the petition date. Assignment/perfection

issue was tentatively settled at a mediation held June 20, 2011.  The settlement is subject to documentation and Bankruptcy Court approval.

**Namco Capital Group v. Pacesetter Fabrics, LLC - Adv. No. 2:11-ap-01274-BR:** action is to avoid and recover a fraudulent and preferential transfer in the amount of $1,043,000.00 and to disallow claim of the defendant.  Pacesetter filed a chapter 11 case on June 17, 2011.  Namco will file a claim in the bankruptcy case and monitor the proceedings.

**Namco Capital Group v. Ozora Trading, Inc. - Adv. No. 2:11-ap-01272-BR:** action is to avoid and recover a fraudulent and preferential transfer in the amount of $37,000.00 and to disallow claim of the defendant.

**Namco Capital Group v. Elyaszadeh - Adv. No. 2:11-ap-01261-BR:** action is to avoid and recover a fraudulent and preferential transfer in the amount of $31,000.00 and to disallow claim of the defendant.  Default has been entered and Namco is pursuing a default judgment.

**Namco Capital Group v. 1762 Westwood et al - Adv. No. 2:11-ap-01341-BR:** action is to avoid and recover fraudulent and preferential cash transfers in the amount of $5,012,943.80, property transfers of approx. $11,000,000.00,  and to disallow claims of the defendants.

**Namco Capital Group v. Aka - Adv. No. 2:11-ap-01369-BR:** action is to avoid and recover fraudulent and preferential transfers of an interest in a deed of trust against the property generally known as 10635-10647 Burbank Boulevard, North Hollywood, California, and to disallow claim of the defendant.

**Namco Capital Group v. Denis - Adv. No. 2:11-ap-01374-BR:** action is to avoid and recover fraudulent and preferential transfers of an interest in a deed of trust against the property generally known as 10635-10647 Burbank Boulevard, North Hollywood, California, and to disallow claim of the defendant.

**Namco Capital Group v. Naim - Adv. No. 2:11-ap-01363-BR:**  action is to avoid and recover fraudulent and preferential cash transfers in the amount of $97,958.33, transfers of an interest in a deed of trust against the property generally known as 1929 Pico Boulevard, Los Angeles, California, and to disallow claim of the defendant.  The matter is settled subject to bankruptcy court approval.  Under the settlement, the defendant will reconvey the assignment of the interest in the deed of trust at issue and the Trustee's claim for the monetary preference will be waived and released.

**Namco Capital Group v. Pirian - Adv. No. 2:11-ap-01365-BR:** action is to avoid and recover a fraudulent and preferential transfer of an interest in a deed of trust against the property generally known as 10635-10647 Burbank Boulevard, North Hollywood, California, and to disallow claim of the defendant.  Matter has been settled.  Defendant reconveyed the assignment that was the subject of the lawsuit and the lawsuit has been dismissed and the case is closed.

**Namco Capital Group v. Rabiezadh - Adv. No. 2:11-ap-01372-BR:** action is to avoid and recover a fraudulent and preferential transfer of an interest in a deed of trust against the property generally known as 10635-10647 Burbank Boulevard, North Hollywood, California, and to disallow claim of the defendant.

**Namco Capital Group v. Rahbar - Adv. No. 2:11-ap-01382-BR:** action is to avoid and recover a fraudulent and preferential transfer of a note and mortgage against the real property and improvements thereon as The Summit Place Mall in Waterford, Michigan.

**Namco Capital Group v. Rahmanizad - Adv. No.  2:11-ap-01366-BR:** action is to avoid and recover fraudulent and preferential cash transfers in the amount of $52,391.67, transfer of an interest in a deed of trust against the property generally known as .88 acres of vacant commercial land in Hesperia, California, and to disallow claim of the defendant.

**Namco Capital Group v. Torbati - Adv. No. 2:11-ap-01368-BR:** action is to avoid and recover fraudulent and preferential transfer of an interest in a deed of trust against the property generally known as .88 acres of vacant commercial land in Hesperia, California, and to disallow claim of the defendant.

**SUB-EXHIBIT "6B" – List of Identified Litigation Rights
from Danning, Gill, Diamond & Kollitz, LLP, counsel to the Ezri Trustee**

## DGDK NAMVAR LITIGATONS

**Adversary Proceedings filed in Namvar (Namco co-plaintiff in some actions below):**

2:11-ap-01045-BR *Namvar, et al. v. Ilana Namvar*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $1,490,000, for accounting, turnover of personal property, recovery of funds from a resulting trust and a constructive trust, and the disallowance of the claim of the defendant filed in the case. **Pending.  Discovery.**

2:11-ap-01046-BR *Namvar, et al. v. Prudential Insurance Company of America*: DGDK filed this action to recover proceeds of the Debtor's life insurance policy which has a cash redemption value of approximately $107,000, for turnover and an accounting, and for violation of the automatic stay. **Settled, awaiting settlement funds.**

2:11-ap-01304-BR *Namvar v. Hershel Babajoni*: DGDK filed this action to avoid and recover fraudulent and preferential transfers, for turnover, imposition of constructive trust and the disallowance of the claim of the defendant filed in the case. **Settled in principle.**

2:11-ap-01309-BR *Namvar v. Boyle Avenue, LLC, Rolling Hills, LLC, Brickwalk, LLC, Robert Hanasab, Safco Holding Corporation and Starpoint Properties, LLC*: DGDK filed this action to avoid and recover fraudulent transfers, avoid a statutory lien, for conspiracy to commit fraudulent transfers, for turnover, imposition of constructive trust and the avoidance of a statutory lien. **Pending.**

2:11-ap-01340-BR *Namvar, et al. v. Shahram Elyaszadeh*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $974,676, for turnover and imposition of constructive trust and the disallowance of the claim of the defendant filed in the case. **Pending.**

2:11-ap-01344-BR *Namvar, et al. v. All Century Incorporated*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $1,000,000, for turnover and to disallow claim of the defendant.  **Default and hearing set on prove up 9/20/11.**

2:11-ap-01371-BR *Namvar, et al. v. TN Management, LLC*: DGDK filed this action to avoid and recover a fraudulent transfer of the Debtor's 30% membership interest in Daisy Lady Victoria, LLC which was assigned by the Debtor on behalf of the Namvar Family Trust, for turnover and for the disallowance of the claim filed by the defendant. **Pending.**

2:11-ap-01380-BR *Namvar, et al. v. The Kermani Trust*: DGDK filed this action to avoid and recover a fraudulent and preferential transfer in the amount of $58,800, for turnover and to disallow claim of the defendant. **Pending.  Discovery.**

2:11-ap-01384-BR *Namvar, et al. v. Mobil 601 Plaza, LLC*: DGDK filed this action to avoid and recover a fraudulent and preferential transfer in the amount of $2,845,972.20, for turnover and to disallow claim of the defendant. **Pending. Discovery.**

2:11-ap-01387-BR *Namvar, et al. v. The 1993 Farkhoudepour Family Trust*: DGDK filed this action to avoid and recover a fraudulent and preferential transfer in the amount of $171,500, for turnover and to disallow claim of the defendant. **Pending. Discovery.**

2:11-ap-01389-BR *Namvar, et al. v. Yedidia Investments, Inc.*: DGDK filed this action to avoid and recover a fraudulent and preferential transfer in the amount of $57,134, for turnover, and to disallow the defendant's claim. **Pending. Discovery.**

2:11-ap-01390-BR *Namvar, et al. v. The Neman Family Irrevocable Trust*: DGDK filed this action to avoid and recover a fraudulent and preferential transfer in the amount of $114,366, for turnover, and to disallow the defendant's claim. **Pending. Discovery.**

2:11-ap-01391-BR *Namvar, et al. v. The Kermani Revocable Family Trust*: DGDK filed this action to avoid and recover a fraudulent and preferential transfer in the amount of $88,200, for turnover, and to disallow the defendant's claim. **Pending. Discovery.**

2:11-ap-01392-BR *Namvar, et al. v. The Paul and Judith Laska Family Trust*: DGDK filed this action to avoid and recover a fraudulent and preferential transfer in the amount of $500,000, for turnover and to disallow the defendant's claim. **Pending. Discovery.**

2:11-ap-01393-BR *Namvar, et al. v. Synergy Holding, LLC*: DGDK filed this action to avoid and recover a fraudulent and preferential transfer in the amount of $1,144,825.95, for turnover, and to disallow the defendant's claim. **Pending. Discovery.**

2:10-ap-02557-BR *Namvar, et al. v. Sean Namvar*: DGDK filed this action to avoid and recover fraudulent and preferential transfer of the Debtor's interest in 200 shares of an Israel Corporation known as Nam 5, Ltd. valued in the amount of $15,000,000, for turnover, unjust enrichment, to establish a resulting trust and to disallow the defendant's claim. **Settled. Hearing on 7/12/11.**

2:10-ap-03427-BR *Namvar, et al. v. Mousa Namvar*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $1,467,663.65, for turnover, for conspiracy to commit fraudulent transfers, unjust enrichment, imposition of constructive trust and declaratory relief. **Pending.**

2:10-ap-01736-BR *Namvar, et al. v. Daniel Namvar; Malka Namvar; Shirah Namvar; Benjamin Namvar; and Woodman Partners, LLc*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in defendants' membership interests in various LLCs', for turnover, unjust enrichment and imposition of constructive trust. **Settled in principle with defendants, Daniel, Namvar, Malka Namvar, Shirah Namvar and Benjamin Namvar. Action pending against Woodman Partners, LLC**.

2:10-ap-03410-BR *Namvar, et al. v. Starpoint Properties, LLC, et al.*: DGDK filed this action to avoid and recover fraudulent and preferential transfers, for turnover, unjust enrichment, and for imposition of constructive trust. **Pending.**

2:10-ap-03428-BR *Namvar, et al. v. Nadar & Sons, LLC and Sisko Enterprises, LLC*: DGDK filed this action to avoid and recover fraudulent and preferential transfers, for turnover, unjust enrichment, and imposition of constructive trust. **Pending. Discovery.**

2:10-ap-03417-BR *Namvar, et al. v. Moiz Ashourpor and Saraly Anivim*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $1,467,663.55, for turnover, unjust enrichment, imposition of constructive trust, and to determine validity, priority and extent of lien. **Settled in principle.**

2:10-ap-03423-BR *Namvar, et al. v. Nejat Sarshar and Homa Sarshar*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $1,900,000.00, for turnover, unjust enrichment, imposition of constructive trust, and to determine validity, priority and extent of lien. **Pending.**

2:10-ap-03420-BR *Namvar, et al. v. David York and Mojgan York*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $3,000,000.00, for turnover, unjust enrichment, imposition of constructive trust and to disallow the defendant's claim. **Pending.**

2:10-ap-03421-BR *Namvar, et al. v. Brickwalk, LLC*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $1,554,993.00, for turnover, unjust enrichment, imposition of constructive trust and to disallow the defendant's claim. **Pending.**

2:10-ap-03422-BR *Namvar, et al. v. Rolling Hills Capital, LLC*: DGDK filed this action to avoid and recover fraudulent and preferential transfers in the amount of $1,558,751.00, for turnover, unjust enrichment, imposition of constructive trust and to disallow the defendant's claim. **Pending.**

**Adversary Proceedings filed in TIC case Bundy Dimes, LLC:**

2:10-ap-03415-BR *Bundy Dimes, LLC v. Boyle Avenue, LLC, et al.*: DGDK filed this action to avoid and recover fraudulent and preferential transfers, conspiracy to commit fraudulent transfers, for turnover, unjust enrichment, imposition of constructive trust, avoidance of statutory lien and objection to claim.   **Pending.**

**Adversary Proceedings filed in TIC case Bunwil Capital, LLC:**

2:10-ap-03414-BR *Bunwil Capital, LLC v. Boyle Avenue, LLC, et al.*: DGDK filed this action to avoid and recover fraudulent and preferential transfers, conspiracy to commit fraudulent transfers, for turnover, unjust enrichment, imposition of constructive trust, avoidance of statutory lien and objection to claim.   **Pending.**

**Adversary Proceedings filed in TIC case Mission Real Associates, LLC:**

2:10-ap-03411-BR *Mission Real Associates, LLC v. Boyle Avenue, LLC, et al.*: DGDK filed this action to avoid and recover fraudulent and preferential transfers, conspiracy to commit fraudulent transfers, for turnover, unjust enrichment, imposition of constructive trust, avoidance of statutory lien and objection to claim.   **Pending.**

2:10-ap-03429-BR *Mission Real Associates, LLC v. Lurie and Park, LLP, Iran Moosiki, Inc. and Elena and Robert Rad.*: DGDK filed this action for discharge of attachment lien, wrongful attachment, trespass, conversion, abuse of process-improper attachment, intentional interference with contractual relationship, intentional interference with prospective economic disadvantage, negligent interference with contractual relationship, negligent interference with prospective economic disadvantage and negligence.   **Pending.**

2:10-ap-03424-BR *Mission Real Associates, LLC v. Mousa Namvar*: DGDK filed this action to avoid and recover fraudulent and preferential transfers, conspiracy to commit fraudulent transfers, for turnover, unjust enrichment, imposition of constructive trust, for declaratory relief and objection to claim.   **Pending.**

2:10-ap-01714-BR *Varastehpour v. Civic Palm, LLC, et al.*: DGDK removed the State Court Action Varastehpour v. Civic Palm, LLC, Case No. BC 410781, to bankruptcy court, in which Mission Real Associates, LLC is a plaintiff and cross-defendant.   **Pending.**

2:10-ap-0_____-BR *Mission Real Associates, LLC  v. Civic Palm, LLC, et al.*: DGDK removed the State Court Action <u>Varastehpour v. Civic Palm, LLC</u>, Case No. BC 410017, to bankruptcy court, in which Mission Real Associates, LLC is a plaintiff and cross-defendant.  **Pending.**

**Adversary Proceedings filed in TIC case Beshmada LLC:**

None

**SUB-EXHIBIT "6C" – List of Identified Litigation Rights
from Pachulski Stang Ziehl & Jones LLP, joint counsel
to the Namco Trustee and Ezri Trustee**

**PSZJ Summary of Pending Litigation for Plan & Disclosure Statement**

## NAMCO

Namco Account Receivable Collections

The Namco Trustee is in the process of pursuing accounts receivable claims arising from loans and transfers that Namco made to third parties. The Namco Trustee has commenced Adversary Proceedings each bringing claims for money lent, open book account and/or to avoid and recover fraudulent transfers with respect to Namco:

**2:11-ap-01318-BR:** *Sharp v. Banam LLC*

**2:11-ap-01354-BR:** *Sharp v. Elbon LLC*

**2:11-ap-01358-BR:** *Sharp v. Fresman LLC*

**2:11-ap-01352-BR:** *Sharp v. Montana 18 LLC*

**2:11-ap-01355-BR:** *Sharp v. Pentaco Management, Inc.*

**2:11-ap-01321-BR:** *Sharp v. Seven Mills*

**2:11-ap-01351-BR:** *Sharp v. Tranrich*

**2:11-ap-01322-BR:** *Sharp v. Tri-City Associates, LLC*

**2:11-ap-01359-BR:** *Sharp v. Whittier 26 LLC*

**2:11-ap-01361-BR:** *Sharp v. Wilfar LLC*

Namco Avoidance Actions

The Namco Trustee is pursuing avoidance actions to include claims arising under 11 U.S.C. §§ 544, 547, 548, 549, 550 and 502 and California Civil Code § 3439, et. seq. The Namco Trustee has filed claims seeking to avoid fraudulent transfers, preferential transfers made within 90-days of the filing of the involuntary petition filed against Namco on December 22, 2008 ("Namco Petition Date") and transfers made to "insiders" within one year of the Namco Petition Date. Below is a list of these pending avoidance actions:

**2:10-ap-02945-BR:** *Sharp v. Namvar, et al.*

The Namco Trustee has brought a lawsuit against thirteen individuals and twenty limited liability companies ("LLCs"), alleging the dissipation of hundreds of millions of dollars entrusted to Namco, much of which was distributed to Ezri Namvar and the other Namvar family members, principally Ezri's four children; his brothers, Mousa, Sean, Tony, and Ramin Namvar; and Ezri's three sisters, Helen Shadi, Hilda Bayanfar, and Lida Shraga, along with their spouses and children (collectively, the "Namvar Defendants").  Namco distributed funds either directly to the Namvar Defendants, or to limited liability companies ("LLCs") that Ezri and/or the Namvar Defendants owned and controlled.  Much of the money was used to acquire and/or develop real estate projects, often with little due diligence or regard to economic fundamentals.  Namco advanced the funds without written agreements or security to LLCs that almost invariably were uncapitalized and that contributed nothing to the transactions.  In this way, all of the Defendants enriched themselves at the expense of Namco's creditors.

The General Allegations in the complaint track discrete, specifically identified investments or other uses of Namco money in which Namco funds were transferred to or for the benefit of specified entities and individuals.  Necessarily, each describes the multiple layers of LLC Defendants through which the Namvar Defendants held property for which Namco paid without Namco receiving benefit for those payments.  The Namco Trustee sues the Namvar Defendants for breach of contract, open book account, unjust enrichment, aiding and abetting breaches of fiduciary duty, fraudulent transfers, and preferential transfers.  The bankruptcy court denied motions to dismiss the operative first amended complaint in this case.  No trial date has been set in this case.  Discovery is at its beginning stages.

**2:11-ap-01394-BR:** *Sharp v. Wells Fargo Bank, N.A.*

**2:11-ap-01395-BR:** *Sharp v. Keycorp Real Estate Capital Markets, Inc., et al.*

**2:11-ap-01377-BR:** *Sharp v. Beverly Hills Bancorp, Inc.*


## NAMVAR

Namvar Avoidance Actions.

The Namvar Trustee is pursuing avoidance actions to include claims arising under 11 U.S.C. §§ 544, 547, 548, 549, 550 and 502 and California Civil Code § 3439, et. seq.  The Namvar Trustee has filed claims seeking to avoid fraudulent transfers, preferential transfers made within 90-days of the filing of the involuntary petition filed against Namco on December 22, 2008 ("Namco Petition Date") and transfers made to "insiders" within one year of the Namco Petition Date.  The following avoidance action is currently pending:

**2-11-ap-01303-BR:** *Neilson v. Canyon Springs Shopping Center, LLC*

The Namvar Chapter 11 Trustee has commenced an avoidance action to avoid a Ezri Namvar's personal guaranty and pledge of membership interests in a valuable LLC on behalf of Namco's obligations to Canyon Springs Shopping Center, LLC ("Canyon Springs").  Ezri did not receive any consideration for making the guaranty or pledge.  The relevant facts start with Namco Financial Exchange ("NFE"), which was an Internal Revenue Code section 1031 exchange intermediary, charged with holding sale proceeds in trust.  NFE owed Canyon Springs approximately $6.2 million that it was supposed to be holding on Canyon Springs' behalf.  NFE was unable to repay that amount to Canyon Springs.  Therefore, Canyon Springs accepted a promissory note from Namco, secured by an Assignment and Security Agreement by which Ezri Namvar, certain of his brothers, and Beshmada, LLC (which Ezri managed and his children own) each pledged as security for Namco's obligation their respective membership interests in Parox, LLC ("Parox"), which held valuable property.  Ezri had no previous liability to Canyon Springs and received nothing in exchange for pledging his property.  Therefore, the Namvar Chapter 11

Trustee seeks to avoid the guaranty and pledge of membership interests in Parox.  The Court has not set a trial date in this case.  The parties are conducting discovery.

## BESHMADA, LLC

Beshmada, LLC Avoidance Actions.

Beshmada is pursuing avoidance actions to include claims arising under 11 U.S.C. §§ 544, 547, 548, 549, 550 and 502 and California Civil Code § 3439, et. seq.  Beshmada has filed claims seeking to avoid fraudulent transfers, preferential transfers made within 90-days of the filing of the involuntary petition filed against Beshmada, LLC in 2009 ("Beshmada Petition Date") and transfers made to "insiders" within one year of the Beshmada Petition Date.  The following avoidance actions are currently pending:

**2:10-ap-02361-BR:** *Beshmada, LLC v. Starpoint Properties, LLC, et al.*

Beshmada, LLC, as debtor and debtor in possession ("Beshmada"), has commenced an adversary proceeding to avoid fraudulent transfers and preferential transfers, and for declaratory relief.  The first portion of the complaint alleges that Ezri Namvar caused Beshmada to execute a number of documents in favor of the Starpoint Defendants (that is, the named defendants other than Princeton Holdings, LLC ("Princeton")) in order to secure obligations of third parties, including Namco.  By executing a guaranty, a pledge agreement, a stipulation for entry of judgment, an indemnity agreement, and a settlement agreement, Beshmada obligated itself and its assets but received no consideration in return.  Accordingly, Beshmada seeks to avoid these arrangements as fraudulent transfers and preferential transfers.

The other portion of the complaint involves Beshmada, LLC's execution of a guaranty, settlement agreement, and stipulated judgment, and the resulting issuance of charging orders in two state courts all to the potential benefit of Princeton.  Princeton loaned $1.2 million to Namco.  However, Ezri Namvar caused Beshmada to obligate itself in favor of Princeton on that

loan to Namco when Beshmada did not benefit from the loan.  Therefore, Beshmada seeks to avoid these obligations as fraudulent transfers and preferential transfers, and seeks a declaration of the court that the charging order that the California state court issued against Beshmada and in favor of Princeton is void on its face.  No trial date has been set in this adversary proceeding. Discovery is in process.

### 2:11-ap- 01320-BR: *Beshmada, LLC v. Canyon Springs Shopping Center, LLC*

Beshmada, LLC, as debtor and debtor in possession ("Beshmada"), has commenced an avoidance action to avoid Beshmada's pledge of its membership interests in a valuable entity, Parox, LLC ("Parox").  Beshmada pledged these interests on behalf of Namco's obligations to Canyon Springs Shopping Center, LLC ("Canyon Springs").  Beshmada did not receive any consideration for making pledge.  The relevant facts start with Namco Financial Exchange ("NFE"), which was an Internal Revenue Code section 1031 exchange intermediary, charged with holding sale proceeds in trust.  NFE owed Canyon Springs approximately $6.2 million that it was supposed to be holding on Canyon Springs' behalf.  NFE was unable to repay that amount to Canyon Springs.  Therefore, Canyon Springs accepted a promissory note from Namco, secured by an Assignment and Security Agreement by which Beshmada (which Ezri managed and his children own), Ezri, and certain of Ezri's brothers each pledged as security for Namco's obligation their respective membership interests in Parox, which held valuable property. Beshmada had no previous liability to Canyon Springs and received nothing in exchange for pledging its valuable membership interests.  Therefore, Beshmada seeks to avoid the pledge of membership interests in Parox.  The Court has not set a trial date in this case.  The parties are conducting discovery.

**SUB-EXHIBIT "6D" – List of Identified Litigation Rights
from Ezra Brutzkus Gubner, LLP, special counsel to the Namco Trustee**

90-Day Preference Transfer - Pending Litigation

| Defendant(s) | Adv. Case No. | Case Status |
|---|---|---|
| 26 Etehad LLC | 2:11-ap-01094-BR | Active |
| 4M Investments LLC | 2:11-ap-01095-BR | Active |
| Alhashim, Parisa | 2:11-ap-01096-BR | Default entered |
| Ashoori, Dorita | 2:11-ap-01185-BR | Active |
| Babajooni, Hersel | 2:11-ap-01306-BR | Active |
| Benji, Kamran & Atoosa - Trust | 2:11-ap-01378-BR | Dismissed |
| Cape Apartments, Inc. | 2:11-ap-01186-BR | Settled |
| Cohanim, Eliaho | 2:10-ap-03274-BR | Active |
| Droger. Ariel | 2:11-ap-01188-BR | Default entered |
| Epsilon Electronics Inc. | 2:11-ap-01097-BR | Settled |
| Eshaghian, George | 2:11-ap-01189-BR | Active |
| Eshmoili, Massoud | 2:11-ap-01190-BR | Active |
| Fesheraki, Maryam | 2:11-ap-01343-BR | Default entered |
| Friedman, Thomas | 2:10-ap-03275-BR | Default entered |
| Gabayan, Ramin | 2:11-ap-01098-BR | Settled |
| Gametronics | 2:10-ap-03277-BR | Active |
| Gidanean, Koorosh | 2:11-ap-01099-BR | Active |
| Gospel Christian Fellowship | 2:10-ap-03278-BR | Active |
| Haghani, David | 2:11-ap-01101-BR | Active |
| Haghnazarzadeh, Nader | 2:11-ap-01191-BR | Active |
| Hakakian, Eskander (Alex) | 2:11-ap-01307-BR | Default entered |
| Homapour, Shahriar | 2:10-ap-03280-BR | Settled |
| Homayounjam, Morteza | 2:11-ap-01102-BR | Settled |
| IJAY, Inc. | 2:11-ap-01381-BR | Default entered |

90-Day Preference Transfer - Pending Litigation

| Defendant(s) | Adv. Case No. | Case Status |
|---|---|---|
| Issakharian, Mansour | 2:10-ap-03281-BR | Settled |
| JJJK Partners LLC | 2:11-ap-01103-BR | Default entered |
| Kashani, Kakhere | 2:11-ap-01199-BR | Active |
| Kaye Scholer LLP | 2:11-ap-01105-BR | Dismissed |
| Kermani, Abner | 2:10-ap-03284-BR | Settled |
| Kermani, Ebrahim | 2:11-ap-01317-BR | Settled |
| Kermani, Elizabeth | 2:10-ap-03286-BR | Default entered |
| Khadavi, Sion | 2:11-ap-01100-BR | Default entered |
| Khalilirad, Eshagh, as Trustee for Khalilirad Family Trust | 2:11-ap-01319-BR | Dismissed |
| Khavarani, Behzad | 2:10-ap-03289-BR | Active |
| Kohannim, Mojgan | 2:10-ap-03291-BR | Active |
| Lahijani, Malihe | 2:11-ap-01200-BR | Active |
| Lavian, Ramin | 2:11-ap-01104-BR | Active |
| Massachi, Pari | 2:10-ap-03293-BR | Default entered |
| Melamed, Nadab | 2:11-ap-01106-BR | Default entered |
| Micheals Desert Development, Inc . | 2:10-ap-03296-BR | Default entered |
| Mohaber, Rachel | 2:10-ap-03297-BR | Active |
| Motamed, Shahla | 2:10-ap-03273-BR | Active |
| Motthedeh, Rachel | 2:11-ap-01110-BR | Settled |
| Muraoka, Val | 2:10-ap-03276-BR | Active |
| Nazarian, Kamran | 2:11-ap-01209-BR | Active |
| Nedjathaiem, Michel | 2:11-ap-01194-BR | Active |
| Noparast, Sharona | 2:10-ap-03279-BR | Default entered |
| Okhowat, Mannocher | 2:11-ap-01345-BR | Active |

90-Day Preference Transfer - Pending Litigation

| Defendant(s) | Adv. Case No. | Case Status |
|---|---|---|
| Pakravan, Massoud | 2:11-ap-01210-BR | Default entered |
| Park General, Inc. | 2:10-ap-03282-BR | Default entered |
| Rabbani, Joseph | 2:10-ap-03283-BR | Active |
| Rabiezadeh, Farahnaz | 2:11-ap-01211-BR | Default entered |
| Raminfard, Kamran | 2:11-ap-01212-BR | Active |
| Rashti, John | 2:11-ap-01213-BR | Settled |
| Reihanian, Shahram | 2:11-ap-01111-BR | Active |
| Reynolds, Shirin | 2:10-ap-03285-BR | Default entered |
| Sabar, Michael, individually and as Trustee of Sabar Family Trust | 2:11-ap-01215-BR | Default entered |
| Sakhai, Michael | 2:11-ap-01113-BR | Dismissed |
| Salim, Roshanak | 2:11-ap-01114-BR | Active |
| Sarshar, Nedjat | 2:11-ap-01115-BR | Active |
| Selki, David | 2:11-ap-01216-BR | Settled |
| Selki, Maryam | 2:11-ap-01116-BR | Settled |
| Shaheri, Mahvash | 2:11-ap-01217-BR | Active |
| Shahian, Farahnaz | 2:10-ap-03288-BR | Settled |
| Sherman Plaza Enterprise, LLC | 2:11-ap-01218-BR | Settled |
| Shirazi, Iraj | 2:10-ap-03290-BR | Settled |
| Solouki, Nahid | 2:10-ap-03292-BR | Active |
| Solouki, Rouhollah | 2:10-ap-03294-BR | Default entered |
| Taklifi, Ladan | 2:11-ap-01201-BR | Active |
| Varastehpour, Alireza | 2:11-ap-01117-BR | Settled |
| Varastehpour, Khalil | 2:11-ap-01118-BR | Settled |
| Yaroushalam, Abraham aka Abraham Yeroushlami | 2:11-ap-01119-BR | Default entered |

90-Day Preference Transfer - Pending Litigation

| Defendant(s) | Adv. Case No. | Case Status |
|---|---|---|
| Yazdinian, Farhad, Vicenti Asset LLC | 2:11-ap-01290-BR | Active |
| Yodeem, Sudabeh Eshaghian | 2:10-ap-03295-BR | Active |
| Zarabi, Minoo | 2:11-ap-01120-BR | Active |

Fraudulent Transfer - Pending Litigation

| Defendant(s) | Adv. Case No. | Case Status |
|---|---|---|
| American Savings Bank | 2:11-ap-01298-BR | Active |
| Armed Forces Bank (formerly:Bank Midwest) | 2:11-ap-01299-BR | Active |
| Bank of Nevada | 2:11-ap-01336-BR | Active |
| Cathay Bank | 2:11-ap-01362-BR | Active |
| Center Bank | 2:11-ap-01349-BR | Active |
| Countrywide Commercial Real Estate Finance, Inc. | 2:11-ap-01300-BR | Active |
| Countrywide Home Loans, Inc. | 2:11-ap-01301-BR | Active |
| Firstmerit Bank, NA | 2:11-ap-01350-BR | Active |
| Hanmi Bank | 2:11-ap-01316-BR | Active |
| Merrill Lynch Mortgage  Lending, Inc. | 2:11-ap-01302-BR | Active |
| Midfirst Bank | 2:11-ap-01314-BR | Active |
| PNC Bank (formerly: Midland Loan Services, Inc.) | 2:11-ap-01353-BR | Active |
| Pacific Capital Bank, N.A., et al. | 2:11-ap-01312-BR | Active |
| Town & Country Bank | 2:11-ap-01334-BR | Active |

Accounts Receivable - Pending Litigation

| Defendant(s) | Adv. Case No. | Case Status |
|---|---|---|
| 1175 SMV, LLC | 2:11-ap-01205-BR | Active |
| 11920  Chandler Blvd LLC | 2:11-ap-01333-BR | Active |
| 8 Mile Partners LLC | 2:11-ap-01173-BR | Active |
| Abselet, Amir and Kamran Abselet | 2:11-ap-01166-BR | Active |
| Amin, Joseph | 2:11-ap-01220-BR | Active |
| Amona Investments, Inc. | 2:11-ap-01383-BR | Active |
| Arlington 360 Associates, L.P. and Bruton Buckner Associates, L.P. | 2:11-ap-01357-BR | Active |
| Armstrong, Kevin; Allan Martia | 2:11-ap-01137-BR | Default Entered |
| Ashourpour, Moiz and Kasgo LLC dba Pasta Roma | 2:11-ap-1280-BR | Active |
| Avonnam LLC, a Delaware limited liability company; Seven Investment Holdings LLC, an Arizona limited liability company | 2:11-ap-01204-BR | Active |
| Burton 25 LLC | 2:11-ap-01348-BR | Active |
| Burtonam Properties LLC | 2:11-ap-01326-BR | Active |
| Cook, Susan | 2:11-ap-01175-BR | Settled |
| Courvoisier Courts LLC | 2:11-ap-01292-BR | Dismissed |
| Drivers Way Investment, LLC; Maya 7, LLC | 2:11-ap-01356-BR | Active |
| Enpalm, LLC | 2:11-ap-01328-BR | Active |
| Flamingo West LLC, fka Flamingo Chateau 2, LLC; Simon Shakib | 2:11-ap-01219-BR | Active |
| Frontieri, Robert | 2:10-ap-03252-BR | Settled |
| Golshan, Joseph | 2:11-ap-01133-BR | Active |
| Golshan, Kevin | 2:11-ap-01278-BR | Active |
| Harounian, John | 2:11-ap-01244-BR | Active |
| Kohan, Raymond | 2:11-ap-01135-BR | Active |
| Kohan, Richard S. | 2:11-ap-01136-BR | Active |
| Kohan, Theodore; Business to Business Markets, Inc., a California corporation | 2:10-ap-02489-BR | Active |

Case 2:09-bk-25523-BR  In re DYNAMIC CAPITAL GROUP, Inc.  Doc 1416 Filed 07/05/11 23:27:11    Desc
Main Document   Page 342 of 372
Bk case no. 2:08-bk-32333-BR

Accounts Receivable - Pending Litigation

| Defendant(s) | Adv. Case No. | Case Status |
|---|---|---|
| Lavi, Nasser | 2:11-ap-01174-BR | Default Entered |
| Lavi, Parviz and Madeline Parviz | 2:11-ap-01170-BR | Active |
| Lavi, Simon, aka Simon Kashfian | 2:11-ap-01206-BR | Active |
| M.V. 14 LLC | 2:11-ap-01332-BR | Active |
| McBride, Michael B | 2:11-ap-01279-BR | Active |
| Nahai, Hamid David and Nahai Law Corporation | 2:11-ap-01325-BR | Active |
| New Leg LLC | 2:11-ap-01347-BR | Active |
| New Life Holdings, LLC | 2:11-ap-01329-BR | Active |
| Nikbakht, Farshad | 2:11-ap-01171-BR | Default Entered |
| Olympic 20 LLC | 2:11-ap-01346-BR | Active |
| Paul DeRobbio and WVCH Acquisition Corp | 2:11-ap-01364-BR | Dismissed |
| Rechnitz, Robert | 2:11-ap-01134-BR | Default Entered |
| Reed, Kent | 2:11-ap-01296-BR | Default Entered |
| Shakib, Simon; Nevada K LLC | 2:10-ap-03164-BR | Active |
| Shaw, Dan/Joseph Mandelbaum | 2:11-ap-1277-BR | Active |
| Waded, LLC | 2:11-ap-01168-BR | Active |
| WN Cliffside, LLC | 2:11-ap-01330-BR | Active |
| Yasmeh, Bruce; Koval Ln 21, LLC; Nato Fund, Inc.; Koval Ln 6, LLC; International Villa, LLC; International Villas Phase One Homeowners Association Inc.; International Villas Phase Two Homeowners Association Inc.; United Building Management, LLC; United Building LLC | 2:10-ap-03166-BR | Active |
| Zarabi, Khosrow | 2:11-ap-01294-BR | Active |

# In re: NAMCO CAPITAL GROUP, INC.

## Insider Preference Transfer - Pending Litigation

| Defendant(s) | Adv. Case No. | Case Status |
|---|---|---|
| 780 La Brea LLC | 2:11-ap-01224-BR | Active |
| All Century Inc. | 2:11-ap-01385-BR | Active |
| Arshadnia, Ariyah | 2:11-ap-01235-BR | Dismissed |
| Arshadnia, Shervin | 2:11-ap-01236-BR | Dismissed |
| Azadeh, Guity | 2:11-ap-01237-BR | Dismissed |
| California Wholesale Electric, Inc. | 2:11-ap-01227-BR | Active |
| Galloway Captial, LLC, Galloway Holdings, LLC, Hino-Gal, LLC | 2:11-ap-01386-BR | Active |
| Lavi, Edward. | 2:11-ap-01238-BR | Active |
| Lavi, Vida | 2:11-ap-01239-BR | Active |
| Liton Lighting, et al. | 2:11-ap-01226-BR | Active |
| MAGD Enterprises Inc. | 2:11-ap-01228-BR | Active |
| Nahai, Bijan | 2:11-ap-01282-BR | Active |
| Nahai, Enayat; Nahai Family Trust | 2:11-ap-01325-BR | Active |
| Nahai, Linda. | 2:11-ap-01283-BR | Active |
| Namco Insurance Services, Inc. | 2:11-ap-01240-BR | Active |
| Namtel, Inc.; Ezra Namvar | 2:11-ap-01284-BR | Active |
| Namvar, Guity and David Namvar | 2:11-ap-01285-BR | Active |
| Panamex Group, Inc. | 2:11-ap-01225-BR | Active |
| PCH U.S.A. 26 LLC | 2:11-ap-01286-BR | Active |
| Rastegar, Sharaheh, Rastegar, Roxana, Solomon Rastegar, Rastegar Family Trust, Rastegar, Mahi, Kimiabakhash, Jessica, Kimiabakhash, Michele, Kimiabakhash, Shabnam | 2:11-ap-01397-BR | Active |
| Rastegar, Solomon and Inglewood Investment Co. | 2:11-ap-01399-BR | Active |
| Tahour, Morris, Ventura Wholesale Electric, Inc. | 2:11-ap-01376-BR | Active |
| Vadjdi, Ladan | 2:11-ap-01241-BR | Active |

**<u>EXHIBIT 7</u>**

**(Claims Charts)**

DOCS_LA:238119.7 59925-001

## Namco Capital Group, Inc.
## Claims Chart

Notes to Claims Chart:  An attempt has been made to identify in the list below all Scheduled Claims and Filed Claims against the Debtor and the alleged amount of such Claims.  However, the list is subject to further review and update and should not be relied on as being a complete list of all Claims against the Debtor, and except where a Claim has been Allowed in the Case the Claims remain subject to objection.  In addition, the amounts include duplicate claims and do not include the amounts of unliquidated claims.  For voting purposes, and reserving all rights to object to the amount, classification or any other aspect of such Claims, the Proponents presently intend to send ballots based on the Classifications in this list.  Creditors with filed Unsecured Claims in excess of $100,000 or unliquidated claims have not been included in Class 7 Small Convenience Claims, but under the Plan, Creditors with Unsecured Claims in excess of $100,000 may elect to reduce their Claim to $100,000 and be treated as a Small Convenience Claim.

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| **Priority Tax Claims** | | | |
| City of Los Angeles Office of Finance | TBD/Unliquidated | #149 | 616,954 |
| City of Los Angeles | | #240 | 426,925 |
| Department of the Treasury - Internal Revenue Service | | #10 | 2,221 |
| Los Angeles County Treasurer and Tax Collector | | #541 | 365 |
| LA County Treasurer and Tax Collector | | #142 | 129 |
|   Total | - | | **1,046,594** |
| | | | |
| **Class 1: Secured Real Property Tax Claims** | | | |
| LA County Treasurer and Tax Collector | | #183-2 | 369,191 |
| Los Angeles County Treasurer and Tax Collector | | #543 | 53,787 |
| County of San Bernardino | | #332 | 118 |
|   Total | - | | **423,096** |
| | | | |
| **Class 2: Miscellaneous Secured Claims** | | | |
| Physicians Reciprocal Insurers | 15,000,000 | #527 | 15,529,739 |
| Yazdinian, Farhad | 2,127,000 | | |
| Soleiman, Israel Naim | 1,400,000 | | |
| M.M.P. Family Trust | 800,000 | | |
| Pirian, Mantootcher | 500,000 | | |
| Kohanim, Fereshteh | 310,000 | | |
| Pirian, Maryam; Pirian, Joseph; Pirian, Manoucher; Pirian, N | 133,000 | #412 | 1,850,000 |
| Pirian, Nahal | 41,150 | | |
| Rassol, LLC | | #87 | 18,525,000 |
| 450 Roxbury Properties, LLC | | #494 | 8,362,000 + |
| Starpoint Properties, LLC | | #491 | 8,362,000 + |
| 450 Roxbury Properties II, LLC | | #496 | 8,362,000 + |
| 450 Roxbury Properties III, LLC | | #495 | 8,362,000 + |
| 450 Roxbury Properties IV, LLC | | #497 | 8,362,000 + |
| 450 Roxbury Properties V, LLC | | #498 | 8,362,000 + |
| 450 Roxbury Properties VI, LLC | | #499 | 8,362,000 + |
| Mill Avenue Properties II, LLC | | #490 | 8,362,000 + |
| Mill Avenue Properties III, LLC | | #492 | 8,362,000 + |
| Mill Avenue Properties, LLC | | #488 | 8,362,000 + |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Blackhawk Properties. LLC | | #489 | 8,362,000 + |
| Colfax Properties, LLC | | #500 | 8,362,000 + |
| Greenhut, Jennifer | | #503 | 8,362,000 + |
| Foothill Ridge Properties, LLC | | #501 | 8,362,000 + |
| Mill Avenue Properties IV, LLC | | #493 | 8,362,000 + |
| Virgil Avenue Properties, LLC | | #502 | 8,362,000 + |
| Deutsche Bank National, Inc. | | #3 | 7,507,613 |
| Mirae Bank | | #137 | 6,000,000 |
| Cathay Bank | | #289 | 5,037,242 |
| York, David  and Mojgan K | | #290 | 3,171,042 |
| Babajooni, Hersel | | #353 | 3,000,000 |
| Parviz Haiem, Carsten Nadjet Haiem, GP Haiem, Inc. | | #95 | 2,900,000 |
| Shakib, Sohrab | | #307 | 2,241,220 |
| Hekmatravan, Mehrnaz | | #102 | 1,900,000 |
| Issakharian, Mansour and/or Daniel Jacob Issak | | #330 | 1,631,300 |
| Baharvar, Jamshid James  & Shohreh Baharvar | | #474 | 1,542,000 |
| Ashourpour, Moiz | | #101 | 1,422,664 |
| Davoodian, David | | #540 | 1,297,066 |
| Shaw Blackstone LLC | | #303 | 1,290,000 |
| Krakov, Nadine | | #180 | 1,100,000 |
| The Mouris & Diana Separzadeh Trust | | #276 | 1,045,444 |
| Farid Afra, Trustee of the Farid Afra Profit Sharing Plan | | #97 | 1,000,000 |
| Soleimani, Darioush | | #383 | 1,000,000 |
| Radiant Services | | #357 | 1,000,000 |
| The Amended and Restated Kamran and Atoosa Benji 1993 T | | #244 | 945,484 |
| Homayounjam, Morteza | | #375 | 933,449 |
| The Jacob & Soraya Separzadeh Trust | | #277 | 856,726 |
| Sawtelle Properties, LLC | | #373 | 795,557 |
| Mottahedeh Family | | #176 | 664,558 |
| Massachi, Faramarz | | #233 | 650,000 |
| Dennis, Ezra & Yvonne | | #243 | 600,000 |
| The Sunset Trust | | #485 | 600,000 |
| Mahmoud Fatorechi & Soussan Hashemi, Trustees of the Fato | | #372 | 509,972 |
| Anavim, Saraly | | #99 | 500,000 |
| Moosai, Haroon (Moosai Trust) | | #295 | 500,000 |
| Alhashim, Parisa | | #316 | 472,187 |
| Farmo Trust dated January 1, 2007 | | #391 | 457,225 |
| Ashland Properties | | #374 | 428,377 |
| John Shayefar & Behnaz Razi Shayefar | | #237 | 406,367 |
| Radfar, Morad | | #310 | 369,600 |
| Varastehpour, Khalil | | #379 | 350,000 |
| The John and Katrin Separzadeh Revocable Trust | | #275 | 305,983 |
| Aka, Victoria | | #242 | 270,000 |
| Sarafian, Faranak | | #371 | 264,983 |
| Gozarkhah, Manoucher & Mahin | | #188 | 262,813 |
| Keywanfar, Shahrokh | | #350 | 250,000 |
| Khadavi Family Trust | | #80 | 230,928 |
| Razi, Omid | | #231 | 224,146 |
| Novahian, Rita | | #438 | 214,899 |
| Penhun Ltd. | | #71 | 161,520 |
| Mehrdad Naim | | #103 | 140,000 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Hassid, Afagh | | #82 | 123,051 |
| Gozarkhah, Manoucher & Mahin | | #189 | 122,800 |
| Doostan Investments | | #52 | 120,000 |
| Mottahedeh Family | | #177 | 102,140 |
| Mottahedeh Family | | #178 | 93,141 |
| Batol Jafari | | #53 | 85,000 |
| Eximo, Inc. | | #48 | 60,000 |
| Jafari, Mojtab | | #54 | 60,000 |
| Ezilan | | #50 | 50,000 |
| Mottahedeh Family | | #179 | 41,787 |
| Sherafatmand, Azam | | #49 | 25,000 |
| **Total** | **20,311,150** | | **227,030,020** |
| | | | |
| **Class 3: Priority Claims** | | | |
| Namvar, Ezri | 115,050 | | |
| Golkar, David | | #148 | 4,150,000 |
| Lavi, Edward | | #5 | 358,500 |
| Rabiezadeh, Farahnaz | | #143 | 250,000 |
| Jalil, Mariana | | #141 | 140,000 |
| Abrishami, Plan | | #104 | 55,000 |
| De Castro, West, Chodorow, Glickfeld & Nass, Inc. | | #329 | 23,723 |
| Hedvat, Sharareh | | #32 | 3,800 |
| Kahenian, Joseph | | #226 | 2,425 |
| Kahenian, Jinus | | #225 | 2,425 |
| Pension Benefit Guaranty Corp | | #484 | TBD/Unliquidated |
| Pension Benefit Guaranty Corp | | #482 | TBD/Unliquidated |
| Pension Benefit Guaranty Corp | | #481 | TBD/Unliquidated |
| **Total** | **115,050** | | **4,985,873** |
| | | | |
| **Class 4: General Unsecured Claims** | | | |
| *Inter-Debtor Claims* | | | |
| Beshmada of Delaware, LLC | | #365 | TBD/Unliquidated |
| Beshmada, LLC | | #364 | TBD/Unliquidated |
| Dimes LLC | | #363 | TBD/Unliquidated |
| **Sub-Total** | **-** | | **-** |
| *Other Claims* | | | |
| Namco Financial Exchange Corp | 37,002,572 | | |
| Security Pacific Credit Corp. | 29,805,000 | #300 | 32,616,677 |
| Labcog | 23,691,687 | | |
| Rassol, LLC | 18,525,000 | | |
| Boucherian, Roya | 16,500,035 | #361 | 17,534,757 |
| Roxy 15, LLC | 16,030,000 | #260 | 16,030,000 |
| Lacy 20, LLC | 13,477,555 | #248 | 14,902,905 |
| The Abulafia Trust (Development Ventures, LLC) | 10,000,000 | #129 | 10,391,587 |
| WFS 22706 PCH LLC | 9,361,127 | | |
| Tri City Associates, LLC | 8,030,000 | #265 | 6,254,340 |
| 4M Investments | 7,290,321 | #247 | 8,027,067 |
| RPM | 6,787,056 | | |
| Epsilon Electronics | 6,486,700 | #377 | 6,486,700 |
| Canyon Springs Shopping Center, LLC | 6,198,507 | #369 | 6,368,611 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Buckingham Heights | 6,117,300 | #252 | 6,117,300 |
| Unitex Industries, Inc. | 6,000,000 | #267 | 6,000,000 |
| Sharaby, Elliott | 6,000,000 | #238 | 6,340,825 |
| Assil, Abraham | 5,811,506 | | |
| Cohanim, Eliaho | 5,700,000 | | |
| Wilshire Bundy | 5,447,600 | | |
| Nasco, LLC | 5,196,229 | #258 | 5,348,652 |
| Shabatian, Haron | 5,050,000 | #477 | 5,350,000 |
| Hanasab, Haroon | 5,030,000 | #380 | 5,187,188 |
| M & Y Management | 5,000,000 | #382 | 12,188,235 |
| Santa Barbara Bank | 4,836,334 | | |
| Lanam, LLC | 4,515,340 | #395 | 4,515,340 |
| Wilshire 19 LLC | 4,178,172 | #269 | 6,009,172 |
| Rainbow LV Properties LLC | 4,166,542 | | |
| Golkar, David | 4,150,000 | | |
| Zarabi, David | 3,850,000 | #146 | 3,946,333 |
| All Century Inc. | 3,828,227 | | |
| Namco Financial Inc | 3,632,392 | | |
| Coach 20 LLC | 3,499,673 | | |
| Montana 18 LLC | 3,276,480 | #257 | 5,368,389 |
| Elyaszadeh, Shahram | 3,100,000 | #443 | 3,100,000 |
| Benji, Kamran | 3,023,252 | | |
| Taban, David | 3,000,000 | #291 | 3,103,606 |
| York, David  and Mojgan K | 3,000,000 | | |
| Haghnazarzadeh "Zadeh", David | 2,936,190 | #115 | 3,534,264 |
| 1826 Nikoo | 2,838,869 | #8 | 2,913,271 |
| SRF INVESTMENTS | 2,778,397 | #245 | 2,812,973 |
| Gabayan, Ramin | 2,750,000 | | |
| Khavarani, Behzad | 2,585,000 | #529 | 2,812,500 |
| Expo | 2,538,003 | | |
| LTLR, Inc. | 2,500,000 | #524 | 2,753,224 |
| Safco Holdings | 2,420,083 | #544 | 8,232,400 |
| Babajooni, Hersel | 2,196,620 | | |
| WN Cliffside | 2,152,484 | | |
| Tricommerce, LLC | 2,146,387 | #266 | 7,140,000 |
| Gharibian, Kamran | 2,056,580 | | |
| Shakib, Sohrab | 2,040,000 | | |
| Hekmatravan, Mehrnaz | 2,000,000 | | |
| Haghnazarzadeh, Joseph | 2,000,000 | | |
| Melamed, Ruben | 2,000,000 | #110 | 2,231,879 |
| Mirzaie, Anthony | 2,000,000 | | |
| Schayfer Financial (Schaeffer) | 2,000,000 | | |
| Shahery, Henry | 2,000,000 | | |
| Varastehpour, Ali | 2,000,000 | | |
| Harbor | 1,980,912 | | |
| Ozora Trading | 1,980,000 | #198 | 2,007,647 |
| Pakravan, Maryam (Said) | 1,975,305 | #294 | 1,975,305 |
| 780 La Brea LLC | 1,973,000 | | |
| LA Top Convenient Stores | 1,900,000 | | |
| Cohen, Saeed | 1,900,000 | #325 | 2,090,066 |
| Namvar, Homayoun | 1,890,456 | #283 | 16,866,000 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Avonnam, LLC | 1,718,474 | #255 | 1,549,798 |
| Blackhawk Properties. LLC | 1,700,000 | #489 | |
| Gardner Family Trust Dated 1984 | 1,700,000 | | |
| Haghani, David | 1,700,000 | #537 | 1,743,917 |
| Separzadeh, Mayer | 1,650,000 | #109 | 1,683,037 |
| Issakharian, Mansour and/or Daniel Jacob Issak | 1,600,000 | | |
| Yamin Family (Trust) | 1,600,000 | #378 | 1,667,889 |
| Separzadeh, Shokrolah | 1,560,000 | #157 | 1,591,012 |
| Baharvar, Jamshid James  & Shohreh Baharvar | 1,542,000 | #474 | 29,233 |
| Haiem, GP | 1,520,052 | | |
| Hekmat, Robin | 1,500,000 | | |
| Sanoor, Inc. | 1,500,000 | | |
| Leoni Family Trust | 1,500,000 | #274 | 1,561,927 |
| Pourbaba, David | 1,500,000 | #445 | 1,557,333 |
| Siona Alyeshmerni | 1,500,000 | #526 | 1,500,000 |
| Ashourpour, Moiz | 1,467,664 | | |
| Massachi, Faramarz | 1,450,000 | | |
| Sisko - Hakakian, Daniel | 1,446,133 | | |
| Anthony Mobasser | 1,440,000 | #528 | 1,665,856 |
| Efraim, Azita | 1,416,000 | | |
| Sisko - Hakakian, Babak | 1,384,267 | | |
| Sisko - Hakakian, Siamak | 1,337,867 | | |
| Broumand, Houshang | 1,300,000 | #419 | 1,404,000 |
| Kashani, Ebrahim or Parichehr | 1,300,000 | #184 | 1,339,460 |
| Shaw Blackstone LLC | 1,290,000 | | |
| Lavi, Vida | 1,285,513 | #241 | 1,328,598 |
| Woodman Partners LLC | 1,256,217 | #272 | 6,390,707 |
| Aframian, Kayvan | 1,250,000 | #220 | 1,276,357 |
| Davoodian, David | 1,200,000 | | |
| Cohen, John | 1,200,000 | #296 | 1,200,000 |
| Princeton Holdings | 1,200,000 | #366 | 1,489,567 |
| 450 Roxbury Properties, LLC | 1,200,000 | | |
| Behnam Soroudi Retirement Trust | 1,180,347 | #367 | 693,769 |
| Crenshaw Medical | 1,171,318 | | |
| Sisko Enterprises | 1,160,000 | | |
| Calexico | 1,136,840 | | |
| M & S Partnership (Torbati) | 1,120,000 | #432 | 1,188,355 |
| Krakov, Nadine | 1,100,000 | | |
| Miles, Fariba | 1,050,000 | #18 | 1,050,000 |
| The Mouris & Diana Separzadeh Trust | 1,025,000 | | |
| Efraim, Feizollah | 1,024,000 | | |
| Colfax Properties, LLC | 1,000,000 | | |
| Farid Afra, Trustee of the Farid Afra Profit Sharing Plan | 1,000,000 | | |
| Esmailzadeh, Parvin & Rouhollah | 1,000,000 | #214 | 1,021,583 |
| Park General, Inc. | 1,000,000 | | |
| Rami & Co | 1,000,000 | | |
| Varastehpour, Ali | 1,000,000 | | |
| Aframian, Emanuel | 1,000,000 | #219 | 1,121,449 |
| Hersel, Bani-Esraili | 1,000,000 | | |
| Kalimi, Farokhlaga/Mousa | 1,000,000 | #222 | 324,750 |
| Kianmahd, Bijan | 1,000,000 | #347 | 1,031,250 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Radiant Services | 1,000,000 | | |
| Eshmoili, Massoud | 997,867 | #455 | 1,015,093 |
| Moosiki, Iran/Elena Rad | 995,000 | | |
| Farhany, Lila | 985,800 | #507 | 1,010,000 |
| Robhana, Inc. | 977,000 | #381 | 977,000 |
| Pirian, Maryam | 950,000 | #410 | 1,250,000 |
| Soleimani, Darioush | 920,000 | | |
| Homayounjam, Morteza | 915,000 | | |
| Watt Leed Lease LLC | 900,700 | #268 | 900,700 |
| Okhovat Living Trust | 900,000 | #230 | 900,000 |
| Anavim, Said (Saeed) | 855,000 | #358 | 860,000 |
| Selki, David | 850,000 | #301 | 867,542 |
| Esko LLC | 801,027 | #215 | 814,995 |
| Drivers Way | 800,000 | | |
| Farajzadeh, Bijan | 800,000 | | |
| Wilshire Ardmore | 785,596 | #108 | 555,626 |
| Mottahedeh Family | 781,447 | | |
| Sawtelle Properties, LLC | 780,000 | | |
| The Jacob & Soraya Separzadeh Trust | 780,000 | | |
| The Sunset Trust | 750,000 | #485 | 162,085 |
| Rabbani, Joseph | 741,000 | #63 | 764,250 |
| Selki, Maryam | 722,500 | 301.C | 259,978 |
| JJJK Partners | 719,000 | #170 | 752,000 |
| Saghian, Carolin | 700,000 | | |
| Abdi, Naser | 688,000 | #88 | 688,000 |
| Yedidia Investments | 650,000 | | |
| Namvar, Guity | 625,000 | #195 | 625,000 |
| Wholesale Produce Plaza | 610,000 | | |
| Messian, Shadi | 601,490 | | |
| Bostani, Payam | 600,000 | #100 | 600,000 |
| Dennis, Ezra & Yvonne | 600,000 | | |
| Namvar, Ilana | 576,977 | #77 | 596,274 |
| Harounian, Sarah | 573,902 | #83 | 583,586 |
| Bral, Said | 550,000 | | |
| Liton Lighting | 550,000 | #216 | 560,236 |
| Pakravan, Danny | 550,000 | #297 | 600,000 |
| Sarshar, Nedjat | 550,000 | #111 | 564,564 |
| Amin, Mark | 550,000 | | |
| Eloy Farming-Dehqan-Zamin-Upto | 544,090 | | |
| Amid, Farnoush | 535,000 | | |
| Naimollah, Nasser | 525,000 | #322 | 525,000 |
| Foothill Ridge Properties, LLC | 500,000 | | |
| Mahmoud Fatorechi & Soussan Hashemi, Trustees of the Fate | 500,000 | | |
| 5140 Pacific Blvd, LLC | 500,000 | #69 | 515,000 |
| Moosai Revocable Trust | 500,000 | | |
| Naim, Mark | 500,000 | | |
| Neman, Hersel | 500,000 | | |
| Neman, Sion | 500,000 | | |
| Pakravan, Farzad | 500,000 | #512 | 500,000 |
| Panamex Group | 500,000 | #196 | 500,000 |
| Nahai, Bijan | 500,000 | #420 | 538,750 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Razi, Jacob | 500,000 | #235 | 558,493 |
| Anavim, Saraly | 499,970 | | |
| Kashani, Rouhollah | 495,000 | #299 | 504,900 |
| Culver Marina Lease LLC | 479,100 | #251 | 479,100 |
| Pari, Kalimeh Massachi | 477,001 | | |
| Koshki, Mozafar | 476,226 | #387 | 476,226 |
| Shamoeil, Ghazaleh | 475,570 | #338 | 510,214 |
| Alhashim, Parisa | 461,000 | | |
| Behrouz Aframian & Jaclin Aframian as Trustees of the Afra | 458,531 | #221 | 521,438 |
| Rabbi, Mitchell | 450,000 | #204 | 460,500 |
| Zarabian, Mousa ( Revocable Trust) | 450,000 | #11 | 450,000 |
| Kermani, Ebrahim | 442,000 | #173 | 462,000 |
| McConnell Marina Lease LLC | 442,000 | #256 | 442,000 |
| Ghodsian, Minoo Sueke | 440,000 | | |
| Omrani, Soheila | 433,000 | #205 | 440,465 |
| Motamed, Shahla | 425,000 | #81 | 425,000 |
| The Khalilirad Family | 422,500 | | |
| Ashland Properties | 420,000 | | |
| Namvar, Ezra | 417,250 | #227 | 340,000 |
| Sunpec Plaza LLC | 409,537 | #531 | 409,203 |
| Mesri, Massoud | 404,200 | #287 | 407,200 |
| Parviz Haiem, Carsten Nadjet Haiem, GP Haiem, Inc. | 400,000 | | |
| Bral, Sharam | 400,000 | | |
| Javinian, LLC | 400,000 | #45 | 414,667 |
| Nojan Holdings | 400,000 | | |
| Radnia, Bijan | 400,000 | | |
| Serena Peters Living Trust | 400,000 | #520 | 421,167 |
| Marc Asheghian | 400,000 | #21 | 415,000 |
| Fesheraki, Marya | 396,600 | | |
| Kashani, Fakhere (John) | 390,000 | #298 | 401,373 |
| Steven Dean & Associates Profit Sharing Plan | 381,000 | #159 | 380,400 |
| Roham, Attaollah | 380,954 | #16 | 387,882 |
| Gozarkhah, Manoucher & Mahin | 370,000 | | |
| Sabar Family Trust 2006 Revocable | 365,000 | #43 | 376,876 |
| Radfar, Morad | 360,000 | | |
| Broukhim, Bejan | 359,436 | #315 | 359,436 |
| Lavi, Edward | 358,500 | | |
| Greenhut, Jennifer | 350,000 | | |
| Babajooni, Daniel | 350,000 | #112 | 359,142 |
| Razi, Bahram | 350,000 | #232 | 350,000 |
| SMB Corp. | 350,000 | | |
| Razi, Jacob & Khorshid | 350,000 | #236 | 383,165 |
| Poursalimi, Massoud | 340,000 | #305 | 340,000 |
| PES Family Trust | 328,855 | #105 | 335,890 |
| Fereydouny, Bijan | 320,000 | #439 | 326,000 |
| Neufeld Law Group | 303,828 | #397 | 655,719 |
| Rahmanizad, Jacob | 300,000 | #421 | 300,000 |
| Rashtian, Sepideh | 300,000 | #138 | 300,000 |
| Satrap, Abbas | 300,000 | | |
| The FMN | 300,000 | | |
| Wall Street | 300,000 | | |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Separzadeh, John | 300,000 | | |
| Varastehpour, Khalil | 300,000 | | |
| Harounian, George | 278,549 | #208 | 278,549 |
| The Bibijan Melamed Family Trust | 275,000 | #156 | 275,000 |
| Bayanfar, Hilda | 275,000 | #342 | 279,950 |
| Aka, Victoria | 270,000 | | |
| Haiem, Carsten | 265,000 | | |
| Darvish, Eshagh | 264,000 | #130 | 268,737 |
| Sarafian, Faranak | 260,000 | | |
| Rabiezadeh, Farahnaz | 250,000 | | |
| Kest Enterprises | 250,000 | #522 | 263,854 |
| Keywanfar, Shahrokh | 250,000 | #31 | 250,000 |
| Kohanim, Mehrdad | 250,000 | #319 | 260,938 |
| Azadegan, Soleiman | 250,000 | #218 | 253,229 |
| Zand, Yousefi | 249,970 | #390 | 249,970 |
| Sisko - Domus Design | 247,467 | | |
| Farhadian, Iraj , (Shahla Farhadian, Farshad (Jason) Far-hadia | 245,500 | | |
| Koshki, Massoud | 243,597 | #388 | 243,598 |
| Alyeshmerni, Mansoor | 241,783 | | |
| Mottahedeh, Morad | 240,312 | #308 | 244,318 |
| Kohannim, Mojgan | 240,000 | #318 | 250,000 |
| Mashian, Janet | 240,000 | | |
| Pakravan, Massoud | 240,000 | #17 | 250,000 |
| Kermani, Elizabeth | 239,500 | #171 | 254,000 |
| Vajdi, Lodan E | 236,000 | #535 | 250,000 |
| Mill Avenue Properties, LLC | 232,045 | | |
| Taklifi, Ladan-Hakhamian Ashkan | 230,000 | #93 | 230,000 |
| Khadavi Family Trust | 226,000 | | |
| Rabbani, Bijan | 225,000 | #89 | 232,031 |
| Sisko - Hakakian, Nader | 224,267 | | |
| D.D.M. Group | 215,291 | #228 | 219,321 |
| Kermanian, Doron | 215,000 | #90 | 225,000 |
| Novahian, Rita | 210,000 | | |
| Noparast, Sharona | 209,910 | #428 | 213,611 |
| Ashoori, Dorita | 200,000 | #125 | 207,000 |
| Broukhim, Esther | 200,000 | #30 | 200,000 |
| Cohen, Jacob | 200,000 | | |
| Morteza, Farzadmehr | 200,000 | #175 | 103,000 |
| Nazarian, Nahid | 200,000 | | |
| Nehoray, Farzaneh and/or Farshid | 200,000 | #447 | 217,300 |
| Patel, Matilal | 200,000 | | |
| Shamtub, Farhad | 200,000 | | |
| Hekmat Niaz, Saeed | 200,000 | #152 | 215,918 |
| Razi, Omid | 200,000 | | |
| Pentaco | 197,989 | | |
| Kohan, Parvaneh | 196,550 | #213 | 202,550 |
| Lavian, Ramin | 195,846 | #424 | 195,846 |
| Benji, Joseph | 195,000 | #194 | 195,000 |
| Mottahedeh, Rachel | 190,000 | #40 | 193,090 |
| Or-Emona Cultural Center | 190,000 | #154 | 190,000 |
| Naziri, Kourosh | 185,000 | #28 | 188,714 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Solouki, Rouhollah | 183,000 | #151 | 185,111 |
| Shraga, Yedidia | 182,000 | #67 | 178,318 |
| Cowen, Nancy | 182,000 | #122 | 183,272 |
| Berookhim, Barookh | 180,126 | | |
| The MMN Family Trust | 180,000 | #85 | 187,125 |
| Soofer, Soraya | 179,299 | #145 | 259,696 |
| Kermani, Abner | 177,500 | #172 | 190,000 |
| Sepehr, Mahnaz | 177,000 | #416 | 200,000 |
| Elbon LLC | 172,805 | | |
| Manoocher, Okhowat | 170,000 | | |
| Torbati, Melody | 168,000 | #433 | 176,550 |
| Illulian, Benjamin | 160,200 | #201 | 203,848 |
| Arshadnia, Shervin | 159,508 | #62 | 162,901 |
| Arshadnia, Eshmail | 158,000 | #61 | 160,752 |
| Rabiei, Andrew | 158,000 | | |
| Ghodsian, Michael | 156,000 | #73 | 162,043 |
| Penhun Ltd. | 155,370 | | |
| Fereydouny, David | 155,000 | #84 | 162,744 |
| Rug Warehouse | 154,000 | #207 | 154,000 |
| Solouki, Nahid | 151,000 | #167 | 152,782 |
| Farahnaz, Shahian | 150,000 | #126 | 153,268 |
| Minazadeh, Joseph | 150,000 | | |
| Paris, David | 150,000 | #127 | 151,048 |
| Raminfard, Kamran | 150,000 | #165 | 150,000 |
| Saadat, Lida | 147,000 | #29 | 150,000 |
| Mirharooni, Pari | 145,000 | #153 | 156,083 |
| Chadorchi, Jaffa | 140,000 | #22 | 141,666 |
| Jalil, Mariana | 140,000 | | |
| Ghadir, Joseph | 135,651 | #161 | 135,650 |
| Reihanian, Shahram | 134,970 | #452 | 134,970 |
| Hezghian, Fahimeh | 134,000 | #340 | 139,150 |
| Kiai, Azadeh | 130,000 | | |
| Aghai, Kourosh | 129,969 | #118 | 129,969 |
| Puritan International Inc. | 128,540 | #423 | 131,030 |
| Kahenian, Joseph | 126,734 | | |
| Rabeie, Sheri | 125,500 | | |
| Melamed, Nadab | 125,000 | | |
| St. Patrick's Day Lease, LLC | 124,200 | #261 | 124,200 |
| Hassid, Afagh | 120,921 | | |
| Doostan Investments | 120,000 | | |
| Kashi, Eshag | 118,000 | #515 | 118,000 |
| Mahjoubi, Ben | 118,000 | #47 | 120,000 |
| Wilshire Bundy Holdings LLC | 117,000 | #270 | 117,000 |
| Nazarian, Kamran | 111,000 | #437 | 111,000 |
| Survivors Trust of Darvish Family Trust | 110,072 | #517 | 115,700 |
| Yeroushlami, Abraham | 110,000 | #25 | 110,000 |
| Tabibzadeh, Majid | 109,350 | #335 | 109,350 |
| Nedjathaiem, Michel | 107,000 | #121 | 110,344 |
| Kohanof, Ruben | 105,940 | #454 | 305,198 |
| Khoubian, Ifrah | 105,000 | #442 | 107,319 |
| Farr, Massachi | 104,000 | | |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Namvar, David | 101,980 | #193 | 101,980 |
| Nahai, Enayat | 101,750 | | |
| Zarrin, Greg (Greg, Zarrin) | 100,395 | #327 | 50,000 |
| Efraim, Esther | 90,000 | #343 | 2,591,486 |
| Patel, Sanjay | 100,000 | #114 | 359,142 |
| Pashai, Pouran | 95,000 | #35 | 295,000 |
| IJAY, Inc. | 100,000 | #311 | 175,000 |
| Kermanian, Dorit | 100,000 | #74 | 157,800 |
| Soleimanzadeh, Manijeh | 100,000 | #174 | 150,000 |
| Jack & Gitta Nagel Foundation | 100,000 | #309 | 124,741 |
| Saidnia, Bijan | 100,000 | #23 | 110,000 |
| Arshadnia, Roya | 100,000 | #59 | 106,813 |
| Tabrizi, Sabahat | 100,000 | #131 | 105,167 |
| Marino, Lynda | 98,000 | #521 | 103,431 |
| Abramian, Haroot | 100,000 | #55 | 102,333 |
| Nourhian, Elena | 100,000 | #186 | 101,944 |
| Aminzadeh, Beni | 100,000 | #98 | 101,742 |
| Mebtahi, Babak | 100,000 | #19 | 101,742 |
| Namco Financial Exchange Corporation, Heidi Kurtz, Chapte | | #304 | 50,000,000 |
| Security Pacific Credit Corp. | | #376 | 29,805,000 |
| Namvar, Eilel | | #394 | 27,672,360 |
| Town & County Bank | | #12 | 26,568,805 |
| Getlin, Holly; Karsin, Ronald and Gordon | | #212 | 17,645,909 |
| Town & County Bank | | #14 | 17,640,175 |
| Namvar, Ramin | | #285 | 15,366,000 |
| Wilshire Bundy Plaza | | #271 | 14,482,600 |
| United Commercial Bank | | #349 | 10,109,821 |
| Namvar, Homayoun | | #282 | 10,000,000 |
| Namvar, Ramin | | #286 | 10,000,000 |
| Hino 8, LLC / Eilel Namvar | | #250 | 9,301,486 |
| Kambiz Kohanim | | #532 | 7,864,026 |
| Sisko - Nader & Sons, LLC and Sisko Enterprises, LLC | | #362 | 7,662,399 |
| Boyle Avenue LLC | | #246 | 7,090,598 |
| Pacific Capital Bank, N.A. | | #323 | 5,041,975 |
| Namvar, Hooshang | | #281 | 5,000,000 |
| United Commercial Bank | | #348 | 4,583,447 |
| Holly Getlin as Trustee of the Irene Karsin Family Trust c/o I | | #211 | 3,697,754 |
| 26 Etehad, LLC | | #273 | 3,645,000 |
| Timana LLC | | #262 | 3,033,437 |
| Mirae Bank | | #137 | 2,170,687 |
| L.A. County Metropolitan Transportation Authority | | #339 | 2,140,000 |
| Kim, Jennifer | | #288 | 2,100,000 |
| Shayfar Financial Services | | #51 | 2,000,000 |
| Naim, Soleman | | #352 | 1,500,000 |
| Hekmat Hekmatravan | | #96 | 1,500,000 |
| Lancam Properties, LLC | | #396 | 1,425,350 |
| Magdiel, LLC | | #400 | 1,302,180 |
| Trifish, LLC | | #264 | 1,301,016 |
| Onyx Capital Group, LLC | | #360 | 1,199,514 |
| TN Management, LLC / Homayoun Namvar | | #263 | 1,173,456 |
| SC Springfield, LLC | | #460 | 1,112,182 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Shlomo Miles | | #518 | 1,050,000 |
| Wishlab 90, LLC/Magdiel LLC | | #404 | 1,020,046 |
| Janina M. Elder, Trustee of Sand Hill Chapter 7 | | #355 | 1,000,000 |
| Shavolian, Dan | | #385 | 1,000,000 |
| Esmailzadeh, Youseff and Youseffzadeh, Nahid | | #320 | 1,000,000 |
| Namvar, Hooshang | | #279 | 1,000,000 |
| Pico Plaza Properties, LLC | | #234 | 865,123 |
| Farajzadeh, David | | #448 | 800,000 |
| New York Moda, LLC | | #480 | 800,000 |
| SC Management, LLC | | #461 | 782,804 |
| Vasquez, Ernesto and Socorro | | #476 | 766,379 |
| Hino Gal, LLC | | #249 | 685,265 |
| Behnam Soroudi Retirement Trust | | #368 | 509,866 |
| Watchhill Consultants LLC | | #293 | 500,000 |
| Selki, Sam | | #301.B | 479,000 |
| Ghodsian, Minoo | | #91 | 445,684 |
| Eshagh Kahalilirad | | #337 | 427,119 |
| Jeff Belle | | #472 | 421,400 |
| Javahery, Aziz | | #44 | 414,667 |
| Kohanim, Fereshteh | | #351 | 378,094 |
| Golkar, David | | #148 | 372,033 |
| Frank Navi, Trustee of the FNM Family Trust | | #113 | 352,863 |
| The Satrap Family Trust | | #38 | 305,750 |
| Crawford Living Trust dated September 23, 1983 | | #470 | 298,604 |
| Rox Consulting Group, Inc. | | #150 | 285,483 |
| SC Karcher, LLC | | #467 | 278,299 |
| The Bibijan Melamed Family Trust | | #509 | 275,000 |
| Iraj Farhadian, Shahla Farhadian, Farshad (Jason) Far-hadian, | | #417 | 250,000 |
| Arnel Investments, LLC | | #359 | 233,461 |
| Khadavi Family Trust | | #538 | 232,966 |
| DDM Group Inc | | #341 | 219,321 |
| Behfarin, Fred | | #514 | 216,200 |
| Berookhim Family Trust | | #422 | 196,830 |
| Dehqan LLC | | #510 | 182,041 |
| Upto 26, LLC | | #504 | 180,485 |
| Barookh Said Berookhim Trust | | #182 | 180,126 |
| Wishlab 90 LLC, RPM | | #401 | 180,041 |
| SC El Centro, LLC | | #463 | 170,694 |
| Chapar, LLC | | #408 | 157,840 |
| Zamin 28, LLC | | #459 | 156,109 |
| Innoprise XVI, LLC and Richard Strombert | | #458 | 150,000 |
| Innoprise XVII, LLC and Richard Strombert | | #486 | 150,000 |
| Harounian, John | | #431 | 136,574 |
| Kaivan Kiai | | #163 | 134,118 |
| Kahenian, Joseph | | #226 | 124,309 |
| Hassid, Afagh | | #539 | 123,051 |
| Trifish, LLC | | #399 | 118,380 |
| Paul and Judith Laska Family Trust of October 9, 1997 | | #473 | 0 |
| 26 Etehad, LLC | | #398 | TBD/Unliquidated |
| Artech Properties, LLC | | #116 | TBD/Unliquidated |
| Banam, LLC | | #409 | TBD/Unliquidated |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Beshmada of Delaware, LLC | | #365 | TBD/Unliquidated |
| Beshmada, LLC | | #364 | TBD/Unliquidated |
| Dimes LLC | | #363 | TBD/Unliquidated |
| JHB Inc. and JHB Inc., International | | #471 | TBD/Unliquidated |
| Laska, Paul and Judith | | #530 | TBD/Unliquidated |
| Lenmar Goshen, LLC a Calif Ltd Lisb Co fka Marmar Goshe | | #306 | TBD/Unliquidated |
| Namvar, Mousa | | #411 | TBD/Unliquidated |
| Namvar, Mousa | | #406 | TBD/Unliquidated |
| Pension Benefit Guaranty Corp | | #483 | TBD/Unliquidated |
| SC Development, LLC | | #466 | TBD/Unliquidated |
| SC Napavine, LLC | | #453 | TBD/Unliquidated |
| SC Northgate, LLC | | #465 | TBD/Unliquidated |
| Sisko - Hakakian, Eskander | | #117 | TBD/Unliquidated |
| Theodore Kohan and Related Entities | | #197 | TBD/Unliquidated |
| Wilfar LLC | | #405 | TBD/Unliquidated |
| Wishlab 90, LLC | | #403 | TBD/Unliquidated |
| **Sub-Total** | **518,591,393** | | **656,666,325** |
| **Total** | **518,591,393** | | **656,666,325** |
| | | | |
| **Class 5: Bank Guaranty Claims** | | | |
| None | | | |
| | | | |
| **Class 6: Other Guaranty Claims** | | | |
| None | | | |
| | | | |
| **Class 7: Small Convenience Claims** | | | |
| Levy, Afshin | 100,000 | #217 | 100,000 |
| Mossahebfar, David | 100,000 | #321 | 100,000 |
| Reza-Karimi, Mohammad | 100,000 | #346 | 100,000 |
| Ridgeway Business Park, LLC | 100,000 | #162 | 100,000 |
| Yamini, Haroun | 100,000 | #20 | 100,000 |
| Yousefi, Keyvan | 100,000 | #331 | 100,000 |
| Mahjoubi, Fred | 100,000 | #46 | 100,000 |
| Raminfard, Talia & Mani | 100,000 | #166 | 100,000 |
| Shabboui, Nemat and Edna | 100,000 | #119 | 100,000 |
| Norhian, Manocher | 95,000 | #187 | 96,804 |
| Sakhai, Michael | 95,001 | #164 | 96,728 |
| Ghadir, Parvin | 95,000 | #160 | 95,000 |
| Tahami, Mohammad | 50,000 | #15 | 90,000 |
| Paris, Robert | 14,401 | #123 | 89,335 |
| Arshadnia, Eskandar | 85,000 | #39 | 88,365 |
| Elodie Khavarani | 80,000 | #534 | 86,062 |
| Abdolla Laura Hendifar | 80,000 | #356 | 80,000 |
| Hoorfar, Bijan | 66,000 | #147 | 79,351 |
| Paris, Rachel | 23,427 | #124 | 79,013 |
| Paris, Charles/Rachel | 15,525 | #168 | 79,013 |
| Aghai, Mojgan | 75,000 | #155 | 78,500 |
| Harounian, Sheyda | 63,000 | #430 | 76,901 |
| Emrani, Mitra | 72,000 | #239 | 73,362 |
| Zarabian, Elham | 72,000 | #70 | 72,000 |
| Galdjie, Manoucher | 70,000 | #37 | 71,327 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Micheals, Desert | 59,500 | #144 | 70,000 |
| Trust B Banafsheh (Banafsheh Trust) | 68,000 | #33 | 68,815 |
| Pakravan, Khosrow | 58,866 | #27 | 67,500 |
| Kahen, Nicole | 65,333 | #427 | 66,471 |
| Kahen, Justin | 65,333 | #426 | 66,471 |
| Kahen, Michael | 65,333 | #429 | 66,471 |
| Arshadnia, Ariyah | 42,000 | #169 | 66,432 |
| Lavian, Hooshang | 64,880 | #384 | 64,940 |
| Baharvar, Jonathan | 62,100 | #333 | 63,086 |
| Nourhian, Elian | 61,412 | #185 | 62,553 |
| Arshadnia, Leeor | 60,079 | #58 | 61,218 |
| MAGD Enterprises | 60,000 | #444 | 60,775 |
| Kohanim, Farideh | 58,000 | #66 | 59,162 |
| Farr "Massachi", Nicole & Brian | 59,000 | #313 | 59,000 |
| Iraj Farhadian FBO Farhadin Family Trust | 57,512 | #414 | 57,512 |
| Nahai, Angela | 53,000 | #456 | 55,000 |
| Nazarian, Odette | 50,000 | #519 | 54,521 |
| Illulian, Levy | 41,408 | #200 | 54,427 |
| Arshadnia, Shahriar | 52,726 | #60 | 53,644 |
| Tabatabai, Majid | 50,290 | #344 | 51,176 |
| Aghai, Sima | 50,000 | #158 | 50,000 |
| Hakhamian, Rebecca | 50,000 | #92 | 50,000 |
| Okhovat, Siamak | 50,000 | #229 | 50,000 |
| Shirazi, Iraj | 45,000 | #72 | 46,103 |
| Pacesetter Fabrics, LLC | 44,492 | #278 | 46,080 |
| Arshadnia, Shanit | 41,000 | #57 | 43,793 |
| Tahour, Morris | 41,000 | #326 | 41,554 |
| Iraj Kanani, Trustee of the Kanai Family Trust | 40,000 | #508 | 40,956 |
| Hakhamian, Ardeshir | 37,000 | #78 | 40,000 |
| Hakhamian, Arash | 35,000 | #79 | 40,000 |
| Mohaber, Rachel David Dalia Jack | 37,000 | #120 | 37,000 |
| Rashti, Roya | 37,000 | #7 | 37,000 |
| Namvar, Ramin | 36,544 | #284 | 36,544 |
| Khadavi, Sion | 35,000 | #354 | 35,459 |
| Illulian, Yousef | 25,357 | #199 | 35,107 |
| Pacibel LLC | 35,000 | #259 | 35,000 |
| Illulian, Danny | 24,045 | #202 | 33,959 |
| Shadi, Helen | 29,173 | #224 | 33,000 |
| Koshki, Sanaz | 30,000 | #386 | 30,000 |
| The Manoucher & Mahin Mehdizadeh Family Trust | 20,000 | #413 | 28,267 |
| Abrishami, Elias | 27,930 | #516 | 27,930 |
| Illulian Chaya Rachel | 22,700 | #203 | 27,106 |
| Tabatabai, Hamid | 25,000 | #336 | 25,000 |
| Pashai, Samie | 20,000 | #34 | 25,000 |
| Baharvar, Jacob | 24,365 | #334 | 24,752 |
| M Y Levy | 24,750 | #56 | 24,750 |
| Master Fabric, Morris Tahour | 23,000 | #324 | 23,000 |
| Baharvar, Gabriela | 18,217 | #475 | 18,534 |
| Baharvar, Ariella | 18,217 | #134 | 18,534 |
| Baharvar, Daniela Azizeh | 18,217 | #511 | 18,534 |
| Baharvar, Leila | 18,217 | #505 | 18,504 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Namvar, Hooshang | 12,720 | #280 | 12,720 |
| Baharvar, Aaron | 11,536 | #506 | 11,660 |
| Eshaghian, Nader | 10,250 | #446 | 10,250 |
| Mike & Shala Pashai Family Trust | 100,000 | | |
| Anvarzadeh, Arash | 97,000 | | |
| Kahenian, Jinus | 95,000 | | |
| Sakhai, Mischel | 95,000 | | |
| Davidian, Joseph | 90,000 | | |
| Batol Jafari | 85,000 | | |
| Ramani, Joseph | 79,107 | | |
| Pirian, Joseph | 69,285 | | |
| Tahour, Maria | 65,000 | | |
| Eximo, Inc. | 60,000 | | |
| Jafari, Mojtab | 60,000 | | |
| Weber, Geraldine | 60,000 | | |
| Abrishami, Plan | 55,000 | | |
| Ezilan | 50,000 | | |
| Chung, John | 50,000 | | |
| Westland LLC | 50,000 | | |
| The Jacob Shabtai | 49,970 | | |
| Hedvat, Sharareh | 45,000 | | |
| SMN Family Trust | 45,000 | | |
| Greenberg Traurig, LLP | 42,693 | | |
| Nagdechi, Parham | 40,018 | | |
| Unity Ent. | 40,000 | | |
| Nikgohar, Shahla | 35,000 | | |
| Tara, Y. | 34,000 | | |
| Kohan, Haroun | 31,750 | | |
| Sherafatmand, Azam | 25,000 | | |
| Poury, Broumand | 25,000 | | |
| Rofeim, Roni | 25,000 | | |
| Mousa, Madeline | 24,101 | | |
| Broumand, Brenden | 20,000 | | |
| Raban, Parvaneh | 20,000 | | |
| Separzadeh, Elizabeth | 20,000 | | |
| Separzadeh, Monica | 20,000 | | |
| Separzadeh, Raphael | 20,000 | | |
| Tehrani, David | 20,000 | | |
| Baharvar, Leah (Mahboubian, Leah B. & Shahab) | 14,000 | | |
| Shemouel, Jennifer | 10,000 | | |
| Krichmar, Larisa | 8,126 | | |
| Cohen, Abner | 6,000 | | |
| Farzadmehr Morteza & Shahla Farzadmehr Delijani | | #192 | 100,000 |
| Yousefi, Keyvan | | #389 | 100,000 |
| Far-hadian, F. Jason | | #418 | 100,000 |
| Paradigm Tax Group, Inc | | #392 | 91,732 |
| Harounian, Isabel | | #94 | 76,791 |
| SC Ontario Meadows LLC | | #451 | 63,255 |
| SC Glenwood, LLC | | #468 | 60,780 |
| SC Newport Meadows, LLC | | #450 | 60,455 |
| SC Donner Pass, LLC | | #462 | 57,391 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Zarrin, Greg (Greg, Zarrin) | | #328 | 50,395 |
| Hedvat, Sharareh | | #32 | 46,200 |
| SC Fallon, LLC | | #469 | 43,757 |
| Kahenian, Jinus | | #225 | 42,575 |
| OPICS Property, LLC | | #407 | 39,460 |
| Moosai, Haroon (Moosai Trust) | | #295 | 39,417 |
| Namvar, Mousa | | #478 | 37,000 |
| Daimler Trust | | #76 | 28,822 |
| High Canyon LLC | | #479 | 25,700 |
| Innoprise XXI, LLC and Richard Strombert | | #441 | 25,000 |
| Nahai, Tara | | #440 | 25,000 |
| Farr "Massachi", Nicole & Brian | | #314 | 19,000 |
| City of Los Angeles | | #240 | 18,344 |
| Paradigm Tax Group, Inc | | #393 | 16,984 |
| Believers, LLC / Hooshang Namvar | | #253 | 12,720 |
| Hollis Development Inc | | #132 | 10,059 |
| Moses & Singer, LLP | | #487 | 8,580 |
| Shraga, Yonathan | | #65 | 7,188 |
| Shraga, Yael | | #64 | 5,391 |
| Securitas Security Services USA | | #1 | 4,750 |
| Nesbit Vassar Mccown and Roden LLP | | #75 | 4,603 |
| Baraka Enterprises | | #254 | 3,643 |
| S K Lim | | #435 | 2,754 |
| Clifford & Brown | | #464 | 2,500 |
| Roberto Cisneros or Cisneros Landscaping | | #533 | 1,500 |
| Magdiel, LLC | | #542 | 1,500 |
| American Express Bank FSB | | #223 | 418 |
| Verizon Wireless | | #317 | 161 |
| **Total** | **5,904,906** | | **5,770,856** |

**Ezri Namvar**

**Claims Chart**

Notes to Claims Chart:  An attempt has been made to identify in the list below all Filed Claims
against the Debtor and the alleged amount of such Claims.  However, the list is subject to further
review and update and should not be relied on as being a complete list of all Claims against the
Debtor, and except where a Claim has been Allowed in the Case the Claims remain subject to
objection.  In addition, the amounts include duplicate claims and do not include the amounts of
unliquidated claims.  For voting purposes, and reserving all rights to object to the amount,
classification or any other aspect of such Claims, the Proponents presently intend to send ballots
based on the Classifications in this list.  Creditors with filed Unsecured Claims in excess of $100,000
or unliquidated claims have not been included in Class 7 Small Convenience Claims, but under the
Plan, Creditors with Unsecured Claims in excess of $100,000 may elect to reduce their Claim to
$100,000 and be treated as a Small Convenience Claim.

| Creditor Name | POC# | Filed Amount |
|---|---|---|
| **Priority Tax Claims** | | |
| Franchise Tax Board | #112 | 847,387 |
|  Total | | **847,387** |
| | | |
| **Class 1: Secured Real Property Tax Claims** | | |
| None | | |
| | | |
| **Class 2: Miscellaneous Secured Claims** | | |
| Inland Mortgage Capital Corporation | #55 | 24,878,985 |
| Sisko Enterprises | #131 | 7,662,399 |
| Wilshire State Bank as assignee of Mirae Bank | #139 | 6,000,000 |
| York, David  and Mojgan K | #72 | 3,171,042 |
| Babajooni, Hersel | #124 | 3,000,000 |
| Rolling Hills Capital, LLC | #73 | 1,836,365 |
| Brickwalk, LLC | #75 | 1,831,466 |
| Issakharian, Mansour and/or Daniel Jacob Issak | #114 | 1,631,300 |
| Shaw Blackstone LLC | #100 | 1,290,000 |
| The Mouris Separzadeh Trust | #128 | 1,045,444 |
| The Sunset Trust | #212 | 600,000 |
| Moosai, Haroon (Moosai Trust) | #78 | 500,000 |
| Radfar, Morad | #117 | 369,600 |
| The John and Katrin Separzadeh Revocable Trust | #126 | 305,983 |
| Razi, Omid | #58 | 224,146 |
| Novahian, Rita | #169 | 214,899 |
| BMW Financial Services | #237 | 42,309 |
| Canyon Springs Shopping Center, LLC | #142 | TBD/Unliquidated |
|  Total | | **54,603,936** |
| | | |
| **Class 3: Priority Claims** | | |
| None | | |

| Creditor Name | POC# | Filed Amount |
|---|---|---|
| **Class 4: General Unsecured Claims** | | |
| *Inter-Debtor Claims* | | |
| Namco Capital Group, Inc. | #156 | TBD/Unliquidated |
| Beshmada of Delaware, LLC | #134 | TBD/Unliquidated |
| Beshmada, LLC | #133 | TBD/Unliquidated |
| Dimes LLC | #132 | 6,500 |
| **Sub-Total** | | 6,500 |
| *Other Claims* | | |
| Namco Financial Exchange Corporation, Heidi Kurtz, Chapte | #115 | 50,000,000 |
| Lavi, Parviz | #105 | 12,000,000 |
| Bertha Ann Yacoobian | #230 | 10,000,000 |
| Martin C. Yacoobian, Sr. | #229 | 10,000,000 |
| Yacoobian Enterprises, L.P. | #227 | 10,000,000 |
| MCY III Trust dated 7/11/96 | #216 | 10,000,000 |
| Namvar, Homayoun | #68 | 10,000,000 |
| Namvar, Hooshang | #67 | 5,000,000 |
| Gabayan, Ramin | #157 | 2,804,255 |
| Drivers Way Investment, LLC | #238 | 2,660,000 |
| La Crescenta Foothill Investment, LLC | #239 | 2,660,000 |
| Los Angeles County Metropolitan Transportation Authority | #118 | 2,140,000 |
| David Morrow | #217 | 1,750,000 |
| Haghani, David | #232 | 1,743,917 |
| Tabibzadeh, Manouchehr | #10 | 1,337,166 |
| Aframian, Kayvan | #53 | 1,276,357 |
| Onyx Capital Group, LLC | #129 | 1,199,514 |
| M & S Partnership (Torbati) | #235 | 1,188,355 |
| Kianmahd, Bijan | #123 | 1,031,250 |
| Namvar, Homayoun | #69 | 1,000,000 |
| Namvar, Ramin | #70 | 1,000,000 |
| Esmailzadeh, Youseff and Youseffzadeh, Nahid | #89 | 1,000,000 |
| Behnam Soroudi Retirement Trust | #136 | 693,769 |
| Nahai, Bijan | #163 | 538,750 |
| Behrouz Aframian & Jaclin Aframian as Trustees of the Afra | #54 | 521,438 |
| Behnam Soroudi Retirement Trust | #137 | 509,866 |
| Selki, Sam | #93 | 479,000 |
| Namvar, Mousa | #155 | 425,143 |
| Jeff Belle | #195 | 421,400 |
| Soofer, Soraya | #30 | 259,696 |
| Alyeshmerni, Mansoor | #24 | 241,783 |
| Behfarin, Fred | #206 | 216,200 |
| Cowen, Nancy | #98 | 183,272 |
| Raminfard, Kamran | #35 | 150,000 |
| Puritan International Inc. | #164 | 131,030 |
| Mahjoubi, Ben | #96 | 120,000 |
| Iraj Farhadian FBO Farhadin Family Trust | #158 | 57,512 |
| Sisko - Hakakian, Eskander | #16 | TBD/Unliquidated |
| Namvar, Mousa | #153 | TBD/Unliquidated |
| Namvar, Mousa | #154 | TBD/Unliquidated |

| Creditor Name | POC# | Filed Amount |
|---|---|---|
| Kohan, Theodore | #42 | TBD/Unliquidated |
| Artech Properties, LLC | #15 | TBD/Unliquidated |
| **Sub-Total** | | **144,739,673** |
| **Total** | | **144,746,173** |
| | | |
| **Class 5: Bank Guaranty Claims** | | |
| Wells Fargo | #90 | 67,071,912 |
| Midfirst Bank | #9 | 41,603,475 |
| Arbor Participation Realty, LLC | #13 | 38,000,000 |
| Cathay Bank | #22 | 36,850,733 |
| Garrison Credit Investment | #64 | 30,000,000 |
| General Electric Capital Corp. | #19 | 26,027,712 |
| Wells Fargo | #48 | 20,295,472 |
| Bank First | #12 | 18,934,246 |
| Bank Midwest | #148 | 15,392,795 |
| Community Bank of Nevada | #40 | 14,907,565 |
| East West Bank, a California Corporation | #234 | 10,250,000 |
| United Commercial Bank | #122 | 10,109,821 |
| Burbank LLC, A Nevada Limited Liability Company | #37 | 9,342,716 |
| Canyon Springs Shopping Center, LLC | #141 | 6,368,611 |
| Pacific Capital Bank, N.A. | #236 | 5,041,975 |
| Cathay Bank | #20 | 4,750,000 |
| United Commercial Bank | #121 | 4,583,447 |
| BH Commercial Capital I, Inc | #162 | 2,526,310 |
| Bank of Nevada | #91 | 2,347,942 |
| Wilshire State Bank as assignee of Mirae Bank | #139 | 2,305,926 |
| Cathay Bank | #21 | 1,968,029 |
| Center Bank | #120 | 1,000,129 |
| **Total** | | **369,678,815** |
| | | |
| **Class 6: Other Guaranty Claims** | | |
| Getlin, Holly; Karsin, Ronald and Gordon | #49 | 17,645,909 |
| Boucherian, Roya | #130 | 17,534,757 |
| Eloy R LLC | #106 | 10,456,672 |
| The Abulafia Trust (Development Ventures, LLC) | #23 | 10,391,587 |
| Starpoint Properties, LLC | #220 | 8,362,000 + |
| 450 Roxbury Properties II, LLC | #209 | 8,362,000 + |
| 450 Roxbury Properties III, LLC | #210 | 8,362,000 + |
| 450 Roxbury Properties IV, LLC | #208 | 8,362,000 + |
| 450 Roxbury Properties V, LLC | #207 | 8,362,000 + |
| 450 Roxbury Properties VI, LLC | #204 | 8,362,000 + |
| 450 Roxbury Properties, LLC | #211 | 8,362,000 + |
| Blackhawk Properties. LLC | #219 | 8,362,000 + |
| Colfax Properties, LLC | #203 | 8,362,000 + |
| Foothill Ridge Properties, LLC | #202 | 8,362,000 + |
| Greenhut, Jennifer | #199 | 8,362,000 + |
| Mill Avenue Properties II, LLC | #215 | 8,362,000 + |
| Mill Avenue Properties III, LLC | #214 | 8,362,000 + |
| Mill Avenue Properties IV, LLC | #213 | 8,362,000 + |
| Mill Avenue Properties, LLC | #218 | 8,362,000 + |
| Virgil Avenue Properties, LLC | #201 | 8,362,000 + |

| Creditor Name | POC# | Filed Amount |
|---|---|---|
| Kambiz Kohanim (Cohanim, Eliaho) | #225 | 7,864,026 |
| Boyle Avenue LLC | #140 | 7,090,598 |
| Sharaby, Elliott | #62 | 6,340,825 |
| Hanasab, Haroon | #146 | 5,187,188 |
| Zarabi, David | #31 | 3,946,323 |
| Holly Getlin as Trustee of the Irene Karsin Family Trust c/o I | #50 | 3,697,754 |
| Haghnazarzadeh "Zadeh", David | #17 | 3,534,264 |
| Taban, David | #76 | 3,103,606 |
| SRF INVESTMENTS | #116 | 2,812,973 |
| Shakib, Sohrab | #103 | 2,241,220 |
| Melamed, Ruben | #14 | 2,231,879 |
| Sunnylane Partners, LLC | #83 | 2,031,943 |
| Golshan, Joseph | #74 | 1,897,875 |
| Pirian, Maryam; Pirian, Joseph; Pirian, Manoucher; Pirian, N | #80 | 1,850,000 |
| Gardner Family Trust Dated 1984 | #221 | 1,748,000 |
| Yamin Family (Trust) | #152 | 1,667,889 |
| Anthony Mobasser | #222 | 1,665,856 |
| Cohen, Saeed | #107 | 1,628,636 |
| Leoni Family Trust | #65 | 1,561,927 |
| Pourbaba, David | #174 | 1,557,333 |
| Siona Alyeshmerni | #224 | 1,500,000 |
| Soleiman, Israel Naim | #138 | 1,500,000 |
| Princeton Holdings | #197 | 1,489,567 |
| Aframian, Emanuel | #52 | 1,121,449 |
| SC Springfield, LLC | #196 | 1,112,182 |
| Hersel, Bani-Esraili | #29 | 1,030,067 |
| Robhana, Inc. | #145 | 977,000 |
| Pirian, Maryam | #79 | 975,000 |
| The Amended and Restated Kamran and Atoosa Benji 1993 T | #119 | 945,484 |
| 87th Peoria, LLC | #39 | 872,378 |
| Selki, David | #94 | 867,542 |
| Pico Plaza Properties, LLC | #61 | 865,123 |
| Anavim, Said (Saeed) | #125 | 860,000 |
| The Jacob & Soraya Separzadeh Trust | #127 | 856,726 |
| SC Management, LLC | #184 | 782,804 |
| Vasquez, Ernesto and Socorro | #178 | 766,379 |
| Laska, Paul and Judith | #179 | 737,502 |
| Paul and Judith Laska Family Trust of October 9, 1997 | #43 | 737,502 |
| Saghian, Carolin | #113 | 700,000 |
| Massachi, Faramarz | #57 | 650,000 |
| Denis, Ezra | #63 | 600,000 |
| Razi, Jacob | #59 | 558,493 |
| Alhashim, Parisa | #104 | 472,187 |
| Zarabian, M. Revocable Trust | #167 | 450,000 |
| Ghodsian, Minoo | #176 | 445,684 |
| Omrani, Soheila | #47 | 440,465 |
| Marc Asheghian | #4 | 415,000 |
| Amin, Mark | #143 | 402,927 |
| Razi, Jacob & Khorshid | #60 | 383,165 |
| Kohanim, Fereshteh | #135 | 378,094 |
| Sabar Family Trust 2006 Revocable | #41 | 376,786 |

| Creditor Name | POC# | Filed Amount |
|---|---|---|
| Varastehpour, Khalil | #144 | 350,000 |
| PES Family Trust | #11 | 335,890 |
| Kalimi, Farokhlaga/Mousa | #56 | 324,750 |
| Kohanof, Ruben | #175 | 305,198 |
| Crawford Living Trust dated September 23, 1983 | #187 | 298,604 |
| SC Karcher, LLC | #190 | 278,299 |
| Selki, Maryam | #92 | 259,979 |
| Azadegan, Soleiman | #51 | 253,229 |
| Iraj Farhadian, Shahla Farhadian, Farshad (Jason) Far-hadian. | #233 | 250,000 |
| Hekmat Niaz, Saeed | #32 | 215,918 |
| Berookhim, Barookh | #165 | 196,830 |
| The MMN Family Trust | #189 | 183,274 |
| Torbati, Melody | #166 | 176,550 |
| SC El Centro, LLC | #193 | 170,694 |
| The Sunset Trust | #212 | 162,085 |
| Ghodsian, Michael | #177 | 162,043 |
| Mirharooni, Pari | #33 | 156,083 |
| Paris, David | 84.A | 151,048 |
| Jalil, Mariana | #27 | 140,000 |
| Jack & Gitta Nagel Foundation | #99 | 124,741 |
| Far-hadian, Farshad (Jason) | #159 | 100,000 |
| Paris, Robert | #97 | 89,335 |
| Paris, Charles/Rachel | #85 | 79,013 |
| SC Hawk's Nest, LLC | #183 | 76,780 |
| Pirian, Joseph | #81 | 75,000 |
| Zarabian, Elham | #168 | 72,000 |
| SC Ontario Meadows LLC | #182 | 63,255 |
| SC Glenwood, LLC | #180 | 60,780 |
| MAGD Enterprises | #198 | 60,775 |
| SC Newport Meadows, LLC | #186 | 60,455 |
| SC Donner Pass, LLC | #188 | 57,391 |
| Nahai, Angela | #171 | 55,000 |
| Zarrin, Greg (Greg, Zarrin) | #111 | 50,395 |
| Moosai, Haroon (Moosai Trust) | #78 | 50,000 |
| Zarrin, Greg (Greg, Zarrin) | #110 | 50,000 |
| Pirian, Nahal | #82 | 45,000 |
| SC Fallon, LLC | #185 | 43,757 |
| SC Development, LLC | #191 | TBD/Unliquidated |
| SC Napavine, LLC | #181 | TBD/Unliquidated |
| SC Northgate, LLC | #192 | TBD/Unliquidated |
| M & Y Management | #147 | TBD/Unliquidated |
| 26 Etehad, LLC | #151 | TBD/Unliquidated |
| JHB Inc. and JHB Inc., International | #194 | TBD/Unliquidated |
| **Total** | | **283,334,707** |
| | | |
| **Class 7: Small Convenience Claims** | | |
| Mahjoubi, Fred | #95 | 100,000 |
| Raminfard, Talia & Mani | #36 | 100,000 |
| Shabboui, Nemat and Edna | #18 | 100,000 |
| Sakhai, Mischel | #34 | 96,731 |
| Paradigm Tax Group, Inc | #150 | 91,732 |

| Creditor Name | POC# | Filed Amount |
|---|---|---|
| Elodie Khavarani | #231 | 86,062 |
| Baharvar, Jonathan | #7 | 63,086 |
| Mariscal Weeks McIntyre & Friedlander PA | #5 | 40,669 |
| Khadavi, Sion | #173 | 35,459 |
| Broumand, Brenden | #161 | 31,320 |
| Daimler Trust | #8 | 28,822 |
| Nahai, Tara | #170 | 25,000 |
| Cushman and Wakefield of Texas, Inc | #109 | 17,500 |
| Paradigm Tax Group, Inc | #149 | 16,984 |
| Moses & Singer, LLP | #200 | 8,580 |
| American Express Centurion Bank | #3 | 1,618 |
| American Express Bank FSB | #1 | 418 |
| **Total** | | **843,981** |

# Beshmada LLC
# Claims Chart

Notes to Claims Chart:  An attempt has been made to identify in the list below all Scheduled Claims and Filed Claims against the Debtor and the alleged amount of such Claims.  However, the list is subject to further review and update and should not be relied on as being a complete list of all Claims against the Debtor, and except where a Claim has been Allowed in the Case the Claims remain subject to objection.  In addition, the amounts include duplicate claims and do not include the amounts of unliquidated claims.  For voting purposes, and reserving all rights to object to the amount, classification or any other aspect of such Claims, the Proponents presently intend to send ballots based on the Classifications in this list.  Creditors with filed Unsecured Claims in excess of $100,000 or unliquidated claims have not been included in Class 7 Small Convenience Claims, but under the Plan, Creditors with Unsecured Claims in excess of $100,000 may elect to reduce their Claim to $100,000 and be treated as a Small Convenience Claim.

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| **Priority Tax Claims** | | | |
| State of California | 3,148 | | |
| California Secretary of State | Unknown | | |
| City of Los Angeles | Unknown | | |
| Franchise Tax Board | | #9 | 105 |
| **Total** | **3,148** | | **105** |
| | | | |
| **Class 1: Secured Real Property Tax Claims** | | | |
| None | | | |
| | | | |
| **Class 2: Miscellaneous Secured Claims** | | | |
| Starpoint Properties, LLC | 5,000,000 | | |
| Magdiel LLC/Wishlab 90 LLC | Unknown | #24 | 1,020,046 |
| Magdiel LLC/Wishlab 90 LLC | Unknown | #26 | 180,041 |
| **Total** | **5,000,000** | | **1,200,088** |
| | | | |
| **Class 3: Priority Claims** | | | |
| Ian Brown | | #2 | 160,000 |
| Steven Delson | | #6 | 180,000 |
| Steven Delson | | #3 | 180,000 |
| Richard A. Marshack, Ch. 7 Trustee for Steven Delson | | #31 | 180,000 |
| Richard A. Marshack, Ch. 7 Trustee for Steven Delson | | #32 | 180,000 |
| **Total** | **-** | | **880,000** |
| | | | |
| **Class 4: General Unsecured Claims** | | | |
| **_Inter-Debtor Claims_** | | | |
| Namco Capital Group, Inc. | 45,127,396 | #17 | 45,026,539 + |
| Beshmada of Delaware | | #15 | 11,737,857 + |
| Dimes LLC | | #16 | 0 + |
| **Sub-Total** | **45,127,396** | | **56,764,396** |
| **_Other Claims_** | | | |
| Panamo, LLC (Ezri 100%) | 5,200,000 | | |
| Safco Holding Corp. | 200,000 | #8 | 200,000 |
| John Harounian | 136,574 | | |
| Ian Brown | | #2 | 64,900,000 |
| Steven Delson | | #3 | 64,900,000 |
| Steven Delson | | #6 | 63,900,000 |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Richard A. Marshack, Ch. 7 Trustee for Steven Delson | | #31 | 63,900,000 |
| Richard A. Marshack, Ch. 7 Trustee for Steven Delson | | #32 | 63,900,000 |
| Delson Brown Properties | | #1 | 23,488,468 |
| Delson Brown Properties | | #7 | 23,488,468 |
| Richard A. Marshack, Ch. 7 Trustee for Steven Delson | | #33 | 23,488,468 |
| DBN Development, LLC | Unknown | #4 | 17,946,845 |
| Richard A. Marshack, Ch. 7 Trustee for Steven Delson | | #34 | 17,946,845 |
| 450 Roxbury Properties IV, LLC | | #35 | 8,362,000 |
| Colfax Properties, LLC | | #36 | 8,362,000 |
| Foothill Ridge Properties, LLC | | #37 | 8,362,000 |
| Virgil Avenue Properties, LLC | Unknown | #38 | 8,362,000 |
| 450 Roxbury Properties III, LLC | | #39 | 8,362,000 |
| Mill Avenue Properties IV, LLC | | #40 | 8,362,000 |
| Blackhawk Properties, LLC | | #42 | 8,362,000 |
| Starpoint Properties, LLC | | #41 | 8,362,000 |
| Starpoint Properties, LLC | | #27 | 5,000,000 |
| Safco Holding Corp. | | #28 | 5,000,000 |
| Robert Hanasab | | #29 | 5,000,000 |
| Homayoun Namvar | | #11 | 2,700,000 |
| Ramin Namvar | | #30 | 2,700,000 |
| Robhana, Inc. | | #20 | 2,700,000 |
| Robhana, Inc. | | #21 | 2,700,000 |
| Robhana, Inc. | | #22 | 2,700,000 |
| MidFirst Bank | Unknown | #13 | 2,045,392 |
| MidFirst Bank | Unknown | #12 | 1,832,569 |
| Mousa Namvar | | #23 | 1,592,135 |
| Princeton Holdings, LLC | | #19 | 1,489,567 |
| Haft Holding Co. LLC (Ted Kohan) | | #43 | 390,000 |
| Magdiel LLC (Mousa Namvar) | Unknown | #25 | 147,134 |
| Theodore Kohan and related entities | | #5 | TBD/Unliquidated |
| 241 5th Avenue Hotel, LLC | Unknown | #18 | TBD/Unliquidated |
| Namwest, LLC | Unknown | #44 | TBD/Unliquidated |
| 10705 Rose Avenue, LLC | Unknown | | |
| 11920 Chandler Blvd., LLC | Unknown | | |
| 1411 Barry Avenue, LLC | Unknown | | |
| 780 La Brea, LLC | Unknown | | |
| 780A La Brea, LLC | Unknown | | |
| Afrinam, LLC | Unknown | | |
| Ahwatukee Foothill Corporate, LLC | Unknown | | |
| AILA Corp. | Unknown | | |
| Arlington 360 Associates, L.P. | Unknown | | |
| Banam, LLC | Unknown | | |
| BankFirst | Unknown | | |
| Burton Burckner Associates, L.P. | Unknown | | |
| Courvousier Court Holding, LLC | Unknown | | |
| Douglaston Equities, LLC | Unknown | | |
| Dunhill Golf Associates, LLC | Unknown | | |
| Emporia Investments, LLC | Unknown | | |
| Ezilan 5, LLC | Unknown | | |
| FG Berkshire FM Holdings, LLC | Unknown | | |
| GH Capital, LLC | Unknown | | |
| GH-VFG, LLC | Unknown | | |
| Harbor Town, LLC | Unknown | | |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| Hyde Park Place, Ltd. | Unknown | | |
| Innoprize XVI, LLC | Unknown | | |
| Innoprize XVII, LLC | Unknown | | |
| Innoprize XX, LLC | Unknown | | |
| Innoprize XXIV, LLC | Unknown | | |
| Innoprize XXV, LLC | Unknown | | |
| Kohnam 26, LLC | Unknown | | |
| Meadow Run Investors, LLC | Unknown | | |
| Namcal, LLC | Unknown | | |
| Older & Wiser, LLC | Unknown | | |
| OSF/BES Fontana Investor Partners | Unknown | | |
| Park View Plaza Real Estate Holding | Unknown | | |
| Parox, LLC | Unknown | | |
| Pecos Capital, LLC | Unknown | | |
| San Diego National Bank | Unknown | | |
| SFH II, LLC | Unknown | | |
| Shira Education Center, LLC | Unknown | | |
| Sora Inc. | Unknown | | |
| Stone Mountain Acquisition, LLC | Unknown | | |
| Tranmar Properties, LLC | Unknown | | |
| Victorville Tefft, LLC | Unknown | | |
| Wall Street Mart | Unknown | | |
| WFS 22706 PCH, LLC fka Whitsett LLC | Unknown | | |
| Wilfar, LLC | Unknown | | |
| WN Cliffside, LLC | Unknown | | |
| WN Indio, LLC | Unknown | | |
| WN Malibu Lot, LLC | Unknown | | |
| WN Sunset, LLC | Unknown | | |
| WN2, LLC | Unknown | | |
| Zarnam, LLC | Unknown | | |
| **Sub-Total** | **5,536,574** | | **530,951,891** |
| **Total** | **50,663,970** | | **587,716,286** |
| | | | |
| **Class 5: Bank Guaranty Claims** | | | |
| None | | | |
| | | | |
| **Class 6: Other Guaranty Claims** | | | |
| None | | | |
| | | | |
| **Class 7: Small Convenience Claims** | | | |
| Mission Real Associates, LLC | 5,300 | | |
| Bundy Dimes | 4,500 | | |
| Wilshire Bundy Holdings, LLC | 1,000 | | |
| Wilshire 19, LLC | 800 | | |
| State of California | 662 | | |
| Bunwil, LLC | 500 | | |
| Civic Palm, LLC | 500 | | |
| MidFirst Bank | Unknown | #14 | 16,439 |
| Franchise Tax Board | | #9 | 3,174 |
| Texas Comptroller of Public Accounts | | #10 | 1,100 |
| **Total** | **13,262** | | **20,713** |

## Beshmada of Delaware LLC
## Claims Chart

Notes to Claims Chart: An attempt has been made to identify in the list below all Scheduled Claims and Filed Claims against the Debtor and the alleged amount of such Claims. However, the list is subject to further review and update and should not be relied on as being a complete list of all Claims against the Debtor, and except where a Claim has been Allowed in the Case the Claims remain subject to objection. In addition, the amounts include duplicate claims and do not include the amounts of unliquidated claims. For voting purposes, and reserving all rights to object to the amount, classification or any other aspect of such Claims, the Proponents presently intend to send ballots based on the Classifications in this list. Creditors with filed Unsecured Claims in excess of $100,000 or unliquidated claims have not been included in Class 7 Small Convenience Claims, but under the Plan, Creditors with Unsecured Claims in excess of $100,000 may elect to reduce their Claim to $100,000 and be treated as a Small Convenience Claim.

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| **Priority Tax Claims** | | | |
| Delaware Division of Corporations | Unknown | #13 | 472 |
| Internal Revenue Service | 3,240 | | |
| **Total** | **3,240** | | **472** |
| | | | |
| **Class 1: Secured Real Property Tax Claims** | | | |
| None | | | |
| | | | |
| **Class 2: Miscellaneous Secured Claims** | | | |
| None | | | |
| | | | |
| **Class 3: Priority Claims** | | | |
| None | | | |
| | | | |
| **Class 4: General Unsecured Claims** | | | |
| *Inter-Debtor Claims* | | | |
| Namco Capital Group, Inc. | 26,983,931 | #4 | 26,910,629 |
| Dimes, LLC | | #3 | TBD/Unliquidated |
| **Sub-Total** | **26,983,931** | | **26,910,629** |
| *Other Claims* | | | |
| SC Springfield, LLC | | #5 | 1,112,182 + |
| JHB Inc. et. al. (Belle) | | #11 | 978,864 + |
| SC Management, LLC | | #9 | 782,804 + |
| Jeff Belle | | #12 | 421,400 + |
| SC Karcher, LLC | | #18 | 278,299 + |
| Ted Kohan and Related Entities | | #1 | TBD/Unliquidated |
| SC Development, LLC | | #6 | TBD/Unliquidated |
| SC Northgate, LLC | | #8 | TBD/Unliquidated |
| SC Napavine, LLC | | #14 | TBD/Unliquidated |
| **Sub-Total** | **-** | | **3,573,550** |
| **Total** | **26,983,931** | | **30,484,178** |
| | | | |
| **Class 5: Bank Guaranty Claims** | | | |
| None | | | |
| | | | |
| **Class 6: Other Guaranty Claims** | | | |
| None | | | |

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| | | | |
| | | | |
| **Class 7: Small Convenience Claims** | | | |
| ***Inter-Debtor Claims*** | | | |
| Beshmada, LLC | | #2 | 311 |
| **Sub-Total** | **-** | | **311** |
| ***Other Claims*** | | | |
| SC Hawk's Nest, LLC | | #16 | 76,780 + |
| SC Fallon, LLC | | #19 | 76,780 + |
| SC El Centro, LLC | | #7 | 60,983 + |
| SC Glenwood, LLC | | #15 | 60,780 + |
| SC Newport Meadows, LLC | | #17 | 60,455 + |
| SC Donner Pass, LLC | | #10 | 57,391 + |
| **Sub-Total** | **-** | | **393,169** |
| **Total** | **-** | | **393,480** |

# Dimes LLC
# Claims Chart

Notes to Claims Chart:  An attempt has been made to identify in the list below all Scheduled Claims and Filed Claims against the Debtor and the alleged amount of such Claims.  However, the list is subject to further review and update and should not be relied on as being a complete list of all Claims against the Debtor, and except where a Claim has been Allowed in the Case the Claims remain subject to objection.  In addition, the amounts include duplicate claims and do not include the amounts of unliquidated claims.  For voting purposes, and reserving all rights to object to the amount, classification or any other aspect of such Claims, the Proponents presently intend to send ballots based on the Classifications in this list.  Creditors with filed Unsecured Claims in excess of $100,000 or unliquidated claims have not been included in Class 7 Small Convenience Claims, but under the Plan, Creditors with Unsecured Claims in excess of $100,000 may elect to reduce their Claim to $100,000 and be treated as a Small Convenience Claim.

| Creditor Name | Scheduled Amount | POC# | Filed Amount |
|---|---|---|---|
| **Priority Tax Claims** | | | |
| Internal Revenue Service | 2,160 | | |
| City of Los Angeles | Unknown | #9 | 7,050 |
| California Secretary of State - Business Programs Division | Unknown | | |
| Franchise Tax Board | - | #1 | 5,146 |
|   Total | **2,160** | | **12,195** |
| | | | |
| **Class 1: Secured Real Property Tax Claims** | | | |
| None | | | |
| | | | |
| **Class 2: Miscellaneous Secured Claims** | | | |
| None | | | |
| | | | |
| **Class 3: Priority Claims** | | | |
| None | | | |
| | | | |
| **Class 4: General Unsecured Claims** | | | |
| *Inter-Debtor Claims* | | | |
| Namco Capital Group, Inc. | 8,364,324 | #8 | 6,310,631 + |
| Beshmada, LLC | 2,830,506 | #4 | 2,867,868 + |
| Beshmada of Delaware LLC | | #5 | TBD/Unliquidated |
|   Sub-Total | **11,194,830** | | **9,178,499** |
| *Other Claims* | | | |
| Equimax Mortgage & Loan | 480,422 | #3 | 480,422 |
| Princeton Holdings LLC | | #7 | 1,489,567 |
| 127 West 25th LLC (John Kreis) | | #6 | TBD/Unliquidated |
| Beshmada of Delaware LLC | | #5 | TBD/Unliquidated |
|   Sub-Total | **480,422** | | **1,969,989** |
|   Total | **11,675,252** | | **11,148,487** |
| | | | |
| **Class 5: Bank Guaranty Claims** | | | |
| None | | | |
| | | | |
| **Class 6: Other Guaranty Claims** | | | |
| None | | | |

| **Class 7: Small Convenience Claims** | | | |
|---|---|---|---|
| Internal Revenue Service | 21 | #2 | 2,260 |
| Franchise Tax Board | | #1 | 1,486 |
| **Total** | **21** | | **3,746** |