1  JEFFER MANGELS BUTLER & MITCHELL LLP
   THOMAS M. GEHER (Bar No. 130588)
2  1900 Avenue of the Stars, 7th Floor
   Los Angeles, CA 90067-4308
3  Telephone:  (310) 203-8080
   Facsimile:  (310) 203-0567
4  Email:      tgeher@jmbm.com

5  LAW OFFICES OF DAVID W. MEADOWS
   DAVID W. MEADOWS (Bar No. 137052)
6  1801 Century Park East, Suite 1235
   Los Angeles, California 90067
7  Telephone:     (310) 557-8490
   Facsimile:     (310) 557-8493
8  Email:         david@davidwmeadowslaw.com

9  Attorneys for Former Debtor and Debtor in Possession,
   Beshmada, LLC, and its successor The Beshmada Liquidating
10 Trust

11

12              UNITED STATES BANKRUPTCY COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                 LOS ANGELES DIVISION

15 In re                          |  CASE NO.     2:09-bk-25523 BR

16 BESHMADA, LLC,                 |
                                  |  Chapter 11
17           Debtor.              |
                                  |  TRIAL BRIEF OF THE BESHMADA
18                                |  LIQUIDATING TRUST, SUCCESSOR TO
                                  |  BESHMADA, LLC
19 _____ |

20 241 FIFTH AVE. HOTEL, LLC, a Delaware
   limited liability company, and HAZAK
21 ASSOCIATES, LLC,  a New York limited
   liability company,             |  Date:  May 6, 2015
22                                |  Time: 10:00 a.m.
              Claimants,          |  Ctrm: 1668
23                                |
   v.                             |
24                                |
   BRADLEY D. SHARP, TRUSTEE OF THE
25 BESHMADA LIQUIDATING TRUST, as
   successor to Beshmada, LLC,    |
26                                |
              Objecting Party.    |
27

28

# **TABLE OF CONTENTS**

Page

I      INTRODUCTION ..................................................................................................1

II     NO VIABLE CLAIM EXISTS FOR BREACH OF THE 241 DELAWARE
       OPERATING AGREEMENT ...................................................................................3

       A.     Additional Capital Contributions.................................................................4

              1.     Section 4.02(a): .................................................................................4

              2.     Section 7.01(a): .................................................................................5

              3.     Section 7.01(b): .................................................................................5

              4.     Section 7.02(f): .................................................................................6

              5.     Section 7.02(n): .................................................................................6

       B.     The Partial Settlement Agreement (Post-Petition). ......................................8

       C.     The Pledge Agreement (Pre-Petition).........................................................11

              1.     The Relevant Facts. .........................................................................11

              2.     The Relevant Provisions of the 241 Delaware Operating Agreement.......15

              3.     Analysis. ..........................................................................................16

                     a.     Hazak Waived Its Right to Take Any Action Concerning the
                            Pledge Agreement and Any Alleged Breach Caused Thereby. ......16

                     b.     The Pledge Agreement and the Transactions Contemplated
                            Therein Are Not the Reason or Legal Proximate Cause for 241
                            Delaware's Loss of the 241 Property or Hazak's/241
                            Delaware's Alleged Damages.......................................................18

                            i.     There is No Evidence to Calculate Damages as of the
                                   Date of the Alleged Breach.................................................19

                            ii.    The Pledge Agreement Did Not Cause Damages to
                                   Hazak or 241 Delaware or Cause the Loss of the 241
                                   Property...............................................................................20

       D.     Damages Claimed by Hazak and 241 Delaware are Uncertain, Contingent,
              Conjectural and Speculative. .....................................................................23

       E.     In the Event 241 Delaware and Hazak Establish Recoverable Damages, They
              Failed to Mitigate Such Damages...............................................................25

PRINTED ON

RECYCLED PAPER

LA 11708539v2

F.   Any Damages Recoverable by Hazak Must be Offset by Hazak's Obligation
to Pay Beshmada the "True Up Contribution." ........................................................26

III   NO VIABLE CLAIM EXISTS FOR BREACH OF FIDUCIARY DUTY .....................28

IV   CONCLUSION.....................................................................................................29

PRINTED ON

RECYCLED PAPER

LA 11708539v2

# TABLE OF AUTHORITIES

**PAGE**

CASES

AM General Holdings LLC v. The Renco Group, Inc., et al.,
    2013 WL 5863010 (Del. Ch. October 31, 2013) ........................................................29

American General Corp. v. Cont'l Airlines Corp.,
    622 A.2d 1 (Del. Ch. 1992), aff'd, 620 A.2d 856 (Del. 1992) ............................3, 26

Blue Chip Capital Fund II Ltd. P'ship v. Tubergen,
    906 A.2d 827 (Del. Ch. August 22, 2006) ...........................................................29

Callahan v. Rafail,
    2001 WL 283012 (Del. Super. March 16, 2001) ..............................................3, 18, 23

Comrie v. Enterasys Networks, Inc.,
    837 A.2d 1 (Del. Ch. 2003) .............................................................................18, 19, 24

HIFN, Inc. v. Intel Corp.,
    2007 WL 1309376 (Del. Ch. May 2, 2007).........................................................17

In re Rainbow Magazine, Inc.,
    77 F.3d 278 (9th Cir. 1996) ...........................................................................11

LaPoint v. AmerisourceBergen Corp.,
    2007 WL 2565709 (Del. Ch. 2007) ..................................................................18, 20

Nemec v. Shrader,
    991 A.2d 1120 (Del. 2010) ...........................................................................29

Progressive Int'l Corp. v. E.I. DuPont de Nemours & Co.,
    2002 WL 1558382 (Del. Ch. July 9, 2002) .....................................................3, 16, 18

Tanner v. Exxon Corp.,
    1981 WL 191389 (Del. Super. July 23, 1981).............................................3, 18, 20, 23

VLIW Tech., LLC v. Hewlett-Packard Co.,
    840 A.2d 606 (Del. 2003) ................................................................................3

JMBM  Jeffer Mangels
Butler & Mitchell LLP

1

# I

2

## INTRODUCTION[1]

3       241 Fifth Ave. Hotel, LLC ("241 Delaware") and Hazak Associates LLC ("Hazak") have

4 asserted a claim, designated as Claim No. 18-1, in the sum of $33,650,000, against Beshmada, LLC

5 ("Beshmada") with respect to Hazak's and Beshmada's membership interest in, and rights and

6 duties with respect to, 241 Delaware and each other (the "Claim").  Specifically, Hazak and 241

7 Delaware allege that (i) Beshmada breached its obligations under that "Limited Liability Company

8 Agreement of 241 Fifth Ave. Hotel, LLC" (the "241 Delaware Operating Agreement") by (a)

9 failing to make "Additional Capital Contributions" requested by Hazak and its manager, Dan

10 Shavolian ("Shavolian"), (b) entering into that "Loan, Pledge and Security Agreement" (the "Pledge

11 Agreement"), and the transaction contemplated thereby, and (c) entering into that "Partial

12 Settlement Agreement", and the transaction contemplated thereby, and (ii) Beshmada breached its

13 fiduciary duties, if any, by entering into the Pledge Agreement and/or the Partial Settlement

14 Agreement, and the transactions contemplated thereby. See, PTS, pages 40 and 41, and Issues of

15 Law Nos. 1, 2, 3, and 10.  241 Delaware and Hazak allege that the foregoing alleged breaches by

16 Beshmada caused them damage of $33,650,000, representing the speculative, alleged profit and

17 equity they might have obtained had a luxury hotel been built on the real property located at 241

18 Fifth Avenue, New York, New York (the "241 Property").  See, Sharp Exhibit Nos. 2 and 152.

19       In short, and as explained in detail below:

20       1.       241 Delaware did not make any valid, authorized, binding and enforceable

21 demand/capital call for an "Additional Capital Contribution" because an "Additional Capital

22 Contribution" must be agreed to and authorized by the unanimous approval of the two members of

23 241 Delaware's Executive Committee and no such unanimous approval was ever obtained;

24 _____

25       [1] Due to a trial brief's page limitation (see, LBR 9013-2(b)), the length of the undisputed
"Stipulated Facts" (the "Undisputed Facts") set forth in the Joint Pre-Trial Stipulation, docket no.
26 763 (the "PTS"), the unobjected to exhibits of Bradley D. Sharp, Trustee of The Beshmada
Liquidating Trust set forth in the PTS (the "Sharp Exhibits") and the lengthy recitation of facts set
27 forth in the concurrently filed Declaration of Louis Cicalese ("Cicalese Decl."), this Trial Brief will
not recite the full facts again.  Instead, this Trial Brief, where necessary, will refer and cite to the
Undisputed Facts in the PTS and/or the Sharp Exhibits and/or the Cicalese Decl.

28

PRINTED ON

RECYCLED PAPER
LA 11708539v2

2.      The Partial Settlement Agreement, as set forth in the final ruling of the United States District Court, did not effectuate any transfer of any of Beshmada's interests in 241 Delaware, and, therefore, there is no transfer for 241 Delaware and Hazak to complain about;

3.      While the pre-petition Pledge Agreement did, without the consent of Hazak, pledge, for security purposes only, Beshmada's 50% membership interest in 241 Delaware, such pledge was not the proximate cause of 241 Delaware's loss of the 241 Property and such pledge did not prevent any legitimate refinance (there was none) of the loan from Inland Mortgage Capital Corporation ("Inland") secured by the 241 Property (the "Inland Loan") or any other relevant action to preserve the 241 Property; and

4.      Beshmada did not breach its fiduciary duties, if any, to 241 Delaware and/or Hazak by entering into the Pledge Agreement and/or the Partial Settlement Agreement, and the transactions contemplated therein, and even if it did, (i) such was not the proximate cause of the loss of the 241 Property, and, (ii) under Delaware law, as a matter of law, such breach of fiduciary duty claim is barred because it is a contract claim, not a tort claim.

The evidence shows that the real reason the 241 Property was lost in foreclosure (which is the entire basis for 241 Delaware's and Hazak's claim and alleged speculative damages) was because (i) the loan from Inland, in the original principal balance of $22,750,000, matured and was not paid, (ii) the 241 Property had no equity, (iii) the Executive Committee of 241 Delaware, which was, essentially, 241 Delaware's governing body, did not require 241 Delaware's members, Beshmada and Hazak, to make any "Additional Capital Contribution" and, therefore, Beshmada had no legal obligation to make an "Additional Capital Contribution" and (iv) the Executive Committee of 241 Delaware and the members of 241 Delaware (Beshmada and Hazak) did not authorize or approve any refinance of the Inland Loan and, therefore, 241 Delaware had no authority to enter into any new loan.  Thus, there is no factual basis for the Claim.

Additionally, Shavolian (Hazak's manager), after the commencement of Beshmada's involuntary bankruptcy case, hijacked 241 Delaware and used it as if it was his own property. Shavolian, as shown below, (i) concealed material facts about a sham loan proposal by a misnamed entity (Vision Capital Partners LLC) that (a) Shavolian, through one of his entities, owned and (b)

PRINTED ON
RECYCLED PAPER
LA 11708539v2

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    was managed and controlled by Shavolian's brother in law, Afshin Hedvat ("Hedvat"), (ii) without

2    the knowledge of Beshmada, purchased the Inland Loan and (iii) without the knowledge of

3    Beshmada, sold the Inland Loan and pocketed a multi-million dollar profit.

4        This Court should enter an Order disallowing the Claim in its entirety.

5

6                                            **II**

7              **NO VIABLE CLAIM EXISTS FOR BREACH OF**

8              **THE 241 DELAWARE OPERATING AGREEMENT**

9        The first asserted legal basis for the Claim is the allegation that Beshmada breached the 241

10   Delaware Operating Agreement.

11       Under Delaware law, which governs the 241 Delaware Operating Agreement (see, 241

12   Delaware Operating Agreement, Section 13.04, PTS, Sharp Exhibit No. 8), the elements of a breach

13   of contract claim are "first, the existence of a contract, whether express or implied; second, the

14   breach of an obligation imposed by that contract; and third, the resultant damage to plaintiff."

15   *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  Further, requiring

16   parties to live with "the language of the contracts they negotiate holds even greater force when, as

17   here, the parties are sophisticated entities that bargained at arm's length."  *Progressive Int'l Corp. v.*

18   *E.I. DuPont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002).

19       "It is axiomatic that a plaintiff, in order to recover damages from a defendant for breach of

20   contract, must demonstrate with reasonable certainty that the defendant's breach caused the loss.

21   (Citations omitted.)  . . . The requirement that plaintiff show defendant's breach to be the cause of

22   his injury with 'reasonable certainty' merely means that the fact of damages must be taken out of

23   the area of speculation."  *Tanner v. Exxon Corp.*, 1981 WL 191389, at *1 (Del. Super. July 23,

24   1981).  "No recovery can be had for loss of profits which are determined to be uncertain,

25   contingent, conjectural or speculative."  *Callahan v. Rafail*, 2001 WL 283012, at *1 (Del. Super.

26   March 16, 2001).  Additionally, the nonbreaching party has a "general duty to mitigate damages."

27   See, *American General Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 11 (Del. Ch. 1992), *aff'd*, 620

28   A.2d 856 (Del. 1992)(Table).

A.      <u>Additional Capital Contributions.</u>

The first asserted basis for Beshmada's alleged breach of the 241 Delaware Operating Agreement is the allegation that Beshmada failed and refused to make an "Additional Capital Contribution" as required by the 241 Delaware Operating Agreement.  This allegation is without merit.  Beshmada did not breach the 241 Delaware Operating Agreement by failing to make an "Additional Capital Contribution" because 241 Delaware never made any valid, authorized, binding and enforceable demand for Beshmada to make an "Additional Capital Contribution."

The relevant provisions of the 241 Delaware Operating which govern and control 241 Delaware's authority and ability to make a valid, authorized, binding and enforceable demand on Beshmada to make an "Additional Capital Contribution" are the following

1.      Section 4.02(a):

If at any time or from time to time after all of the Initial Capital Contributions have been contributed, the Executive Committee reasonably determines that additional funds (a "Shortfall") are required (i) for costs contemplated by the Initial Operating Budget, Capital Budget and Operating Plan, including but not limited to costs associated with due diligence, costs of acquiring, demolishing, rebuilding or renovating the Initial Company Property, startup costs or costs associated with working capital, but only to the extent not included in the Initial Capital Contributions made pursuant to Section 4.01, (ii) to meet the ongoing obligations, liabilities, Expenses or reasonable business needs of the Company in accordance with the then applicable Operating Budget, Capital Budget or Operating Plan (subject to the variances permitted under Section 7.01(a)(vi)), or comparable or other costs which are not provided for in the Operating Budget, Capital Budget and Operating Plan, but which are agreed to by the Executive Committee, or for any other purpose, **the Executive Committee may (but shall not be obligated to), require that the Members make further capital contributions to the Company ("Additional Capital Contributions")** in the amount of such Shortfall.  (Emphasis added.)  If so requested by the Executive Committee, each Member shall, within

PRINTED ON

RECYCLED PAPER
LA 11708539v2

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1    thirty (30) calendar days after delivery of such request, contribute such Member's pro

2    rata share (based on the Initial Contribution Percentages of the Members at the time

3    of such request, if such request is made before the True-Up Date and based on the

4    Percentage Interests of the Members if such request is made on or after the True-Up

5    Date) amount of the applicable Shortfall.  Notwithstanding anything to the contrary

6    in this Agreement, [Beshmada] and [Hazak] (subject to Section 4.02(c)) shall not be

7    obligated to make aggregate Additional Capital Contributions in excess of

8    $15,000,000.00.

9    2.    Section 7.01(a):

10    Except as otherwise expressly provided in this Agreement, **the business and affairs**

11    **of [241 Delaware] shall be vested in and controlled solely by the Executive**

12    **Committee** (emphasis added) as provided below.  [241 Delaware] and the Co-

13    Managing Members shall act by means of and through a committee of persons

14    appointed in writing pursuant to Section 7.02 (the "Executive Committee"). **Each**

15    **person appointed by a Member to the Executive Committee shall act at the**

16    **exclusive direction of, be the agent of and shall be free to represent the views**

17    **and positions of such appointing Member. The Executive Committee shall have**

18    **responsibility for establishing the policies and operating procedures with**

19    **respect to the business and affairs of the Company and for making all decisions**

20    **as to all matters which the Company has authority to perform, as fully as if all**

21    **the Members were themselves making such decisions in lieu thereof. All**

22    **decisions made with respect to the management and control of the Company**

23    **and approved by the Executive Committee (except for such decisions which by**

24    **the express terms of this Agreement require the approval of all Members) shall**

25    **be binding on the Company and all Members.**  (Emphasis added.)

26    3.    Section 7.01(b):

27    Subject to those matters that are specifically within the authority of the

28    Administrator [Shavolian] pursuant to this Agreement, the Members acknowledge

PRINTED ON

RECYCLED PAPER
LA 11708539v2

and agree that the Co-Managing Members, in their capacity as such, do not have the

power of "managers" under the Delaware Act, or of general partners of a general or

limited partnership under the laws of the State of Delaware, the parties agreeing that

all such rights, together with the other rights referenced herein, have been vested in

the Executive Committee, and that the Executive Committee, and only the Executive

Committee, and such Persons as the Executive Committee may appoint, have the

ability to implement Major Decisions[, including requiring an "Additional Capital

Contribution"].

4.    Section 7.02(f):

Provided that notice of a meeting has been given to each Member as called for by

paragraph [7.02](d), above, the act of all of the members of the Executive Committee

present shall be the act of the Executive Committee; and **no action shall be deemed**

**to have taken place unless a [sic] <u>all of the members of the Executive Committee</u>**

**<u>shall have approved the same</u>**.  (Emphasis added.)

5.    Section 7.02(n):

Notwithstanding anything to the contrary in this Agreement, if the approval of the

Executive Committee is required (1) on any Major Decision other than Sections

7.01(a)(iii), (viii) and (xiii) or (2) to request or cause an Additional Capital

Contribution pursuant to Section 4.02(a), and there are insufficient votes to approve

or disapprove such matter (each, a "Deadlock"), the Executive Committee members

shall promptly appoint an unrelated neutral third party ("Independent Director") who

shall, after good faith discussions with the Executive Committee, resolve the

deadlocked matter (including, if necessary, by casting his or her vote in favor of a

proposed resolution). If neither of these individuals are able or willing to resolve the

dispute, then the Independent Director shall be selected by the Executive Committee

within ten (10) calendar days of the occurrence of the Deadlock. If the Executive

Committee cannot agree on the selection of an Independent Director, any Executive

Committee member shall be entitled to request that an official of the local office of

PRINTED ON

RECYCLED PAPER
LA 11708539v2

1    the American Arbitration Association ("AAA") appoint the Independent Director …

2    See, PTS, Undisputed Fact No. 6 and Sharp Exhibit No. 8, and Cicalese Decl. ¶ ¶ 22, 24d, 24e, 24i

3    and 25.

4    Thus, in order for 241 Delaware to make a valid, authorized, binding and enforceable

5    demand on Beshmada to make an "Additional Capital Contribution" **each member** of 241

6    Delaware's Executive Committee must, at a meeting of the Executive Committee, vote to approve

7    that a demand for an "Additional Capital Contribution" be made.  See, Sharp Exhibit No. 8, 241

8    Delaware Operating Agreement, Sections 4.02(a) and 7.02(f).  In fact, the express terms of Section

9    7.02(f) require that "all of the members of the Executive Committee" must approve the demand for

10    an "Additional Capital Contribution" in order for it to be effective, binding and enforceable.  There

11    is no dispute, and, in fact, 241 Delaware's/Shavolian's/Hazak's written communications

12    acknowledge, that each of the two members of the Executive Committee, i.e., Namvar/Cicalese and

13    Shavolian, never both agreed to cause the members to make an "Additional Capital Contribution."

14    See, Sharp Exhibit Nos. 69, 76 and 106. [2]  As both members of the Executive Committee did not

15    vote to approve and require an "Additional Capital Contribution", Beshmada did not breach the 241

16    Delaware Operating Agreement by failing to make an "Additional Capital Contribution."[3]

17

18    [2] As evidenced by (a) Shavolian's letter to Beshmada, dated February 12, 2009, wherein
Shavolian references the Executive Committee's failure to agree to cause 241 Delaware to demand

19    that Beshmada and Hazak make an "Additional Capital Contribution" (see, PTS, Undisputed Fact
C.84 and Sharp Exhibit No. 69), (b) Hazak/Shavolian's May 19, 2009 letter to Beshmada stating

20    that a deadlock exists with respect to "Additional Capital Contributions" (see, PTS, Undisputed Fact
C.92 and Sharp Exhibit No. 76) and (c) 241 Delaware's/Shavolian's letter to Louis Cicalese

21    ("Cicalese"), dated May 18, 2010, wherein it references that Ezri Namvar ("Namvar") refused to
consent to an "Additional Capital Contribution" (see, PTS, Undisputed Fact C.133 and Sharp

22    Exhibit No. 106), the Executive Committee never agreed to, authorized or made a demand for an
"Additional Capital Contribution."  There cannot be any dispute that the issue of the whether a

23    valid, authorized, binding and enforceable demand was made for more capital is governed by the
provisions of the 241 Delaware Operating Agreement concerning "Additional Capital

24    Contributions."

25    [3] Namvar and Cicalese were Beshmada's representatives on the Executive Committee (see,
PTS, Undisputed Fact Nos. C.9 and C.96 and Sharp Exhibit No. 78) and both Namvar and Cicalese

26    voted to not have the members make an "Additional Capital Contribution."  As such decision/vote
was made by Namvar and Cicalese, as individuals, and not Beshmada, Beshmada cannot have any

27    liability for the Executive Committee's refusal to agree to cause a demand for an "Additional
Capital Contribution" be made.

28

JMBM | Jeffer Mangels Butler & Mitchell LLP

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1  241 Delaware and Hazak have no claim against Beshmada for breach of the 241 Delaware

2  Operating Agreement for Beshmada's refusal to make an "Additional Capital Contribution."

3      B.    The Partial Settlement Agreement (Post-Petition).

4  241 Delaware and Hazak further contend that Beshmada breached Section 9.01 of the 241

5  Delaware Operating Agreement by entering into the Partial Settlement Agreement.  241 Delaware

6  and Hazak contend that Beshmada's entry into the Partial Settlement Agreement constituted a

7  transfer of Beshmada's interest in 241 Delaware without the consent of Hazak, which violated

8  Section 9.01 of the 241 Delaware Operating Agreement.  As shown below, the Partial Settlement

9  Agreement did not result in any breach of Beshmada's obligations under the 241 Delaware

10 Operating Agreement or Section 9.01 thereof.

11 Section 9.01 of the 241 Delaware Operating Agreement provides:

12     **No Transfer**.  Except as expressly permitted or contemplated by this Agreement, no

13     Member may sell, assign, give, hypothecate, pledge, encumber or otherwise transfer

14     (each, a "**Transfer**") all or any portion of its Interest[4], whether directly or indirectly,

15     without the written consent of the other Members.  Except as expressly permitted or

16     contemplated by this Agreement, each Member agrees not to permit any Transfer of

17     any equity interest in such Member, or in its managing member.  Any Transfer in

18     contravention of this Article IX shall be null and void.  No Member, without the

19     prior written consent of the other Members, shall resign or withdraw (either

20     voluntarily or involuntarily) from the Company except as a result of such Member's

21     involuntary dissolution or final adjudication as a bankrupt or in connection with a

22
23     [4] Pursuant to the 241 Delaware Operating Agreement the term "Interest" "means, with
respect to any Member at any time, the interest of such Member in the Company at such time,
**including the right of such Member to any and all of the benefits to which such Member may
be entitled as provided in this Agreement**, together with the obligations of such Member to
comply with all of the terms and provisions of this Agreement."  (Emphasis added.) See, PTS,
Sharp Exhibit 8, page 6 thereof.  Thus, as "Interest" includes all of a member's "benefits" under the
241 Delaware Operating Agreement, Beshmada's "Interest" in 241 Delaware includes Beshmada's
right to be paid the "True Up Contribution" and enforce Hazak's obligation under the 241 Delaware
Operating Agreement to pay Beshmada the "True Up Contribution", as required by Section 4.02(c)
of the 241 Delaware Operating Agreement.

PRINTED ON
RECYCLED PAPER
LA 11708539v2

1    Transfer permitted by this Article IX.

2    See, PTS, Sharp Exhibit 8, pages 5-6.

3    On or about January 18, 2010, (a) **one month after** Shavolian secretly entered into the

4    "Limited Forbearance Agreement" and began his maneuvers to acquire and sell the Inland Loan for

5    a personal multi-million dollar profit and (b) **over four months after** Inland commenced its

6    foreclosure action against the 241 Property, Beshmada entered into the Partial Settlement

7    Agreement.  See, PTS, Undisputed Facts C.104, C.116 and C.121 and Sharp Exhibit No. 100.

8    By the Partial Settlement Agreement, as it relates to 241 Delaware[5], Beshmada, on an "as is"

9    basis, without any warranties or representations and subject to the terms of the 241 Delaware

10    Operating Agreement and approval of the United States Bankruptcy Court, transferred its

11    membership interest in 241 Delaware to Nader & Sons, LLC ("Nader") and Sisko Enterprises, LLC

12    ("Sisko").  See, PTS, Sharp Exhibit No. 100.

13    On June 30, 2010, the Bankruptcy Court having jurisdiction over Beshmada's bankruptcy

14    case conducted a hearing and approved the "Partial Settlement Agreement" and the transactions

15    contemplated by the terms thereof.  On July 28, 2010, the Bankruptcy Court entered an "Order

16    Granting Motion of Beshmada, LLC for an Order Approving Partial Settlement Agreement Re

17    Disputes Over Certain Collateral Related to 127 West 25th LLC and 241 Fifth Ave. Hotel, LLC"

18    (the "Partial Settlement Approval Order").  See, PTS, Undisputed Facts C.147 and Sharp Exhibit

19    No. 120.

20    The Partial Settlement Approval Order specifically provided that "the Court makes no

21    findings of fact or conclusions of law as to any factual or legal matter at issue in either 241 Fifth

22    Ave. Hotel LLC v. Beshmada, LLC, et al. …or in any other case or proceeding."  See, PTS, Sharp

23    Exhibit No. 120.  Thus, by this term of the Partial Settlement Approval Order, as well as the

24    statements made by the Bankruptcy Court at the June 30, 2010 hearing to approve the Partial

25    Settlement Agreement, Beshmada's contemplated transaction, pursuant to the Partial Settlement

26

27    [5] The Partial Settlement Agreement also included a transaction concerning an entity known as N.Y. 18, LLC.

28

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1   Agreement, with Nader and Sisko was and remained subject to the Section 9.01 of the 241

2   Delaware Operating Agreement.

3           Shavolian and Hazak filed a timely appeal of the Partial Settlement Approval Order, which

4   appeal was heard by the United States District Court.  See, PTS, Undisputed Facts C.147.

5           On May 24, 2011, the United States District Court, with The Honorable Gary Feess, judge

6   presiding, issued its ruling dismissing Hazak's and Shavolian's appeal from the Partial Settlement

7   Approval Order for lack of standing because such Order "did not diminish any of [Hazak's or

8   Shavolian's] property, increase their burdens or detrimentally affect their rights."  In its ruling

9   dismissing the appeal from the Partial Settlement Approval Order, the District Court found and

10  ruled that the "Partial Settlement Agreement did not effectuate such a transfer [of an absolute

11  assignment of Beshmada's membership interest in 241 Delaware]."  See, PTS, Undisputed Facts

12  C.168 and Sharp Exhibit No. 137.

13          In making its ruling, the United States District Court found:

14                  The parties' rights and liabilities with regard to … 241 [Delaware] are currently

15                  being litigated in the New York Actions.  The bankruptcy court was fully aware of

16                  this issue when it specifically stated in the order approving the [Partial Settlement

17                  Agreement] that it was making 'no findings of fact or conclusions of law as to any

18                  factual or legal matter at issue' in the New York Actions.  (Citation omitted.)  In fact

19                  when this issue was raised during oral argument, the bankruptcy court emphasized

20                  that the Partial Settlement Agreement does not establish [Nader's and Sisko's] rights

21                  to … [Beshmada's membership interest in 241 Delaware and Beshmada's rights

22                  under the 241Delaware Operating Agreement]; rather the agreement merely

23                  transferred whatever rights [Beshmada] may have, if any, in these assets to [Nader

24                  and Sisko] **to the extent that they even have the ability to make such a transfer**

25                  (Emphasis added) [As stated by The Honorable Barry Russell at the hearing to

26                  approve the Partial Settlement Agreement]:

27                  I'm granting this motion with the understanding, what I have said before, that the

28                  only thing **you're transferring is not even clear that you have the ability to**

Jeffer Mangels
Butler & Mitchell LLP

JMBM

PRINTED ON

RECYCLED PAPER
LA 11708539v2

1    **transfer**. (Emphasis in original.)  Whatever it is, because of this pledge agreement

2    make it – make it clear ad nauseam, that you're transferring – they may not be

3    getting anything, but they are well aware of the arguments.  And you're transferring

4    whatever rights you have.  And make it clear in the order that you're not – **it's not**

5    **even clear whether or not you have a right to transfer, period.**  (Emphasis in

6    original.)  (Citations to record omitted.)

7    See, PTS, Sharp Exhibit No. 137.

8        The foregoing ruling by the United States District Court with respect to the Partial

9    Settlement Agreement, 241 Delaware and Hazak is the "law of the case." See, *In re Rainbow*

10   *Magazine, Inc.*, 77 F.3d 278, 281 (9th Cir. 1996)("The law of the case doctrine states that the

11   decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the

12   same case.  (Citations omitted).")

13       Accordingly, the Partial Settlement Agreement did not effectuate any transfer of

14   Beshmada's (i) membership interest in 241 Delaware and (ii) rights under the 241 Delaware

15   Operating Agreement.  Thus, the Partial Settlement, and the transactions contemplated thereby,

16   remained subject to Hazak's right to consent or not and was not a breach of the 241 Delaware

17   Operating Agreement (because it did not effectuate any transfer at all.)

18       C.    The Pledge Agreement (Pre-Petition).

19           1.    The Relevant Facts.

20       On or about June 12, 2008, (a) forty three (43) days <u>after</u> the Inland Note fully matured by

21   its own terms and 241 Delaware failed to pay off the Inland Note (see, PTS, Undisputed Fact C.22)

22   and (b) twenty eight (28) days <u>after</u> Inland's May 15, 2008 "Notice of Default" to 241 Delaware (a)

23   asserting a default under the Inland Note and Inland Loan and (b) demanding payment of all money

24   due under the Inland Note, which was in excess of $23,777,000 (see, PTS, Undisputed Fact C.31),

25   the Pledge Agreement was executed whereby Beshmada, as pledgor, pledged its membership

26   interest in 241 Delaware to Nader as security for Nader's[6] multi-million dollar loan to Namco

27   _____

28       [6] The Pledge Agreement was later amended to add Sisko as an additional lender and

PRINTED ON
RECYCLED PAPER
LA 11708539v2

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1    Capital Group, Inc. ("Namco").  See, PTS, Undisputed Fact C.37 and Sharp Exhibit No. 31.

2            On June 30, 2008, Afshin Hakim, Namco's lawyer, sent a series of emails to Shavolian,

3    among others, stating (a) "Ezri is pledging his membership interest in 127 West 25th LLC and 241

4    Fifth Ave. Hotel LLC as collateral in connection with a short-term third party loan.  Lender has

5    asked for us to provide consent of the other member.  I will prepare the form and send it to you for

6    approval" and (b) "Here is a draft for [the proposed form of consent] for [the pledge concerning]

7    127 [West 25th LLC].  To the extent you don't have any comments, I will provide a similar one for

8    241 Fifth Ave. Hotel, LLC."  See, PTS, Undisputed Fact C.45 and Sharp Exhibit No. 37.[7]

9            Thus, on June 30, 2008, Shavolian and Hazak knew and had actual knowledge that

10   Beshmada pledged its membership interest in 241 Delaware.

11           On July 1, 2008, Mr. Hakim sent an email to Shavolian, which enclosed a form of consent

12   for execution by Hazak concerning Beshmada's pledge of its membership interest in 241 Delaware,

13   stating: "Here are the two consents we need signed.  Thank you."  See, PTS, Undisputed Fact C.46

14   and Sharp Exhibit No. 38.  Shavolian/Hazak ignored, and did not respond, to this email.

15           On July 29, 2008, Nader recorded, in the New York City Department of Finance Office of

16   the City Register, a UCC 1 Financing Statement, which named 241 Delaware as the debtor and

17   described the collateral as "the 50% Membership Interest in the Debtor owned by the California

18   Limited Liability Company known as Beshmada, LLC …"  See, PTS, Undisputed Fact C.52 and

19   Sharp Exhibit No. 43.

20           On August 1, 2008, GSY Corp. recorded, in the New York City Department of Finance

21   Office of the City Register, a UCC 1 Financing Statement, which named 241 Delaware as the

22   debtor, and described the collateral as "pursuant to pledge agreement for 241 5th Ave. Hotel LLC

23   for loan from GSY Corp." (the "GSY UCC 1").  See, PTS, Undisputed Fact C.53 and Sharp Exhibit

24   _____

25   pledgee.  See, PTS, Undisputed Fact C.37 and Sharp Exhibit No. 31.

26           [7] The earliest email in this email string (Sharp Exhibit No. 37) is an email from the attorney
     for Nader and Sisko asking for the delivery of the consent of Hazak to Beshmada's pledge of its
27   membership interest in 241 Delaware.  Apparently, Nader and Sisko knew that the consent of Hazak
     was required for the pledge of Beshmada's membership interest in 241 Delaware.

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

No. 44.

On October 23, 2008, Shavolian wrote an email to Namvar stating: "Your pledging the membership interest of 127 w 25 and 241 5th ave are completely illegal.  Not allowed under the terms of the loan documents and/or the operating agreement.  Since you insisted that I be patient and don't seek legal remedy, I have done so till now.   Unfortunately, we are at a juncture where I must move to protect my ownership."  See, PTS, Undisputed Fact C.74 and Sharp Exhibit No. 59.  This was Shavolian's first written communication to Beshmada/Namvar concerning Beshmada's pledge of its membership interest in 241 Delaware.

On May 14, **2010**, Shavolian, on behalf of Hazak, sent a "Notice of Default" to Beshmada, in care of Cicalese, which among other things, asserts that Beshmada is in "default of your obligations under the terms of the [241 Delaware Operating Agreement], in that, … you improperly pledged your membership interests in [241 Delaware] to third parties in violation of paragraph 9.01 of the [241 Delaware Operating] Agreement …"  See, PTS, Undisputed Fact C.131 and Sharp Exhibit No. 105.

On June 10, 2010, Nader recorded, in the New York City Department of Finance Office of the City Register, a UCC Financing Statement Amendment which terminated that UCC 1 Financing Statement of Nader recorded on July 29, 2008, naming 241 Delaware as the debtor.  See, PTS, Undisputed Fact C.139 and Sharp Exhibit No. 113.

On or about August 5, 2010, 241 Delaware commenced, in the New York Supreme Court, an action against GSY Corp. ("GSY") and Jack Hazan ("Hazan"), a member of Hazak (which is a member of 241 Delaware), seeking (a) an injunction to compel the removal and expungement of the GSY UCC 1 and (b) damages (the "GSY Action").  See, PTS, Undisputed Fact A.3, A.4 and C.153.

In the course of the GSY Action, 241 Delaware filed, in the GSY Action, the following: (a) "Affidavit of Facts" signed by Shavolian, sworn on October 14, 2010, wherein paragraph 9 states: "As a result of the Defendants [GSY and Hazan's] improper and unlawful conduct [in recording the GSY UCC 1], the Plaintiff [241 Delaware] has been unable to extend and/or refinance its mortgage on the [241 Property].  Thus, by reason of Defendants' unlawful tortious interference with [241 Delaware's] contractual and business relations, as well as [241 Delaware's] reputation and

1  prospective economic advantage, [241 Delaware] has been severely damaged.", (b) "Affirmation in

2  Opposition to Defendant GSY Corp.'s Motion and in Support of Cross-Motion for Summary

3  Judgment" signed by Shavolian, sworn on May 24, 2012, wherein paragraph 14 states: "Further, as

4  a result of the Defendants [GSY and Hazan's] improper and unlawful conduct [in recording the

5  GSY UCC 1], Plaintiff [241 Delaware] was unable to extend and/or refinance its mortgage on the

6  [241 Property] and eventually lost the [241 Property] in foreclosure.  Thus, by reason of

7  Defendants' foregoing unlawful tortious interference with [241 Delaware's] contractual and

8  business relations, and [241 Delaware's] reputation and prospective economic advantage, [241

9  Delaware] has been severely damaged.", and (c) "Affirmation in Opposition to Motion and in

10  Support of Cross-Motion" signed by Claude Castro ("Castro") (241 Delaware's and Hazak's

11  present counsel), under the penalty of perjury, on March 7, 2014, wherein paragraph 16 states: "As

12  a direct result of the improper and unlawful conduct of GSY and Hazan [in recording the GSY UCC

13  1], the Plaintiff [241 Delaware] was unable to extend and/or refinance its mortgage on the [241

14  Property].  In fact, [241 Delaware] had viable refinancing options extinguished as a direct

15  consequence of GSY's refusal to remove the UCC-1 Financing Statement of record.  Further, [241

16  Delaware] eventually lost the [241 Property] in foreclosure due to the improper filing of the UCC-1

17  Financing Statement by GSY and Hazan, a multimillion dollar loss."  See, PTS, Undisputed Fact

18  C.154 and Sharp Exhibit No. 124, 125 and 126.

19        On October 27, 2011, Hazak and 241 Delaware, as plaintiffs, filed, in the Supreme Court of

20  New York, a "Verified Complaint" against Nader and Sisko seeking to declare Beshmada's pledge

21  of its membership interest in 241 Delaware null and void (the "Hazak Nader NY Action").  See,

22  PTS, Undisputed Fact C.175 and Sharp Exhibit No. 144.

23        On July 3, 2012, the New York Supreme Court issued its "Final Disposition" with respect to

24  the Hazak Nader NY Action which stated, in part: "ORDERED that plaintiffs are entitled to

25  summary judgment is [sic] to the first cause of action for a declaratory judgment, specifically that

26  the transfer by Beshmada of its membership interest in [241 Delaware] is unauthorized and

27  therefore any purported assignment is null and void."  See, PTS, Undisputed Fact C.180 and Sharp

28  Exhibit No. 149.

1    Based on the foregoing facts, 241 Delaware and Hazak allege that Beshmada's pledge

2    transaction under the Pledge Agreement, as amended, constituted a breach of the 241 Delaware

3    Operating Agreement which proximately caused 241 Delaware and Hazak damages in the sum of

4    $33,650,000.  241 Delaware and Hazak allege that the transaction under the Pledge Agreement

5    caused 241 Delaware to (a) be unable to obtain any loan or refinance or money to satisfy and pay

6    off the Inland Loan and (b) lose the 241 Property in foreclosure.

7                    2.      The Relevant Provisions of the 241 Delaware Operating Agreement.

8    In addition to Section 9.01 of the 241 Delaware Operating Agreement, Article XII of the 241

9    Delaware Operating Agreement is also relevant concerning the Pledge Agreement.

10    Article XII of the 241 Delaware Operating Agreement states:

11            12.01.  Events of Default.    If a Member commits a material violation or breach of

12            any of the provisions of this [241 Delaware Operating] Agreement that is not cured

13            … within a Reasonable Period, such Member shall have committed an Event of

14            Default." [Pursuant to the 241 Delaware Operating Agreement, the term

15            "Reasonable Period", as relevant here, "means, with respect to any defaulting

16            Member or any defaulting Administrator, a period of thirty (30) calendar days after

17            such defaulting Member receives written Notice of its default from a non-defaulting

18            Member …"]

19            12.02.  Effect of Event of Default.  Upon the occurrence of an Event of Default by

20            any Member, [Hazak] (if the defaulting Member is [Beshmada]) … shall have the

21            right, at any time within forty (40) days from the date of such Event of Default and

22            upon giving the defaulting Member ten (10) calendar days written notice of such

23            election (and provided such Event of Default is continuing through the end of such

24            ten (10)-day period) to take any of the following actions: (a) Dissolve the Company;

25            and (b) Pursue any other right or remedy available at law or in equity.

26    See, PTS, Sharp Exhibit No. 8, page 48.

27

28

1        3.  <u>Analysis</u>.

2          a.  <u>Hazak Waived Its Right to Take Any Action Concerning the Pledge</u>

3    <u>Agreement and Any Alleged Breach Caused Thereby.</u>

4        The 241 Delaware Operating Agreement sets forth a non-breaching member's rights and

5    ability to seek redress and remedies for a breaching members' alleged defaults under the 241

6    Delaware Operating Agreement.

7        On June 12, 2008, the Pledge Agreement was entered into by Beshmada.  See, PTS,

8    Undisputed Fact C. 37.  On June 30, 2008, Mr. Hakim, in an email sent to Shavolian (Hazak's

9    manager), advised Shavolian of Beshmada's pledge of its membership interest in 241 Delaware.

10   See, PTS, Undisputed Fact C. 37 and Sharp Exhibit No. 37.

11       On October 23, 2008, Shavolian sent an email to Namvar stating that Beshmada's pledge of

12   its membership interest in 241 Delaware is "completely illegal" and "not allowed under the terms of

13   the … [241 Delaware] [O]perating [A]greement. … Unfortunately, we are at a juncture where I

14   must move to protect [Hazak's] ownership."  See, PTS, Undisputed Fact C. 74 and Sharp Exhibit

15   No. 59.

16       Under applicable Delaware law, requiring parties to live with "the language of the contracts

17   they negotiate holds even greater force when, as here, the parties are sophisticated entities that

18   bargained at arm's length."  *Progressive Int'l Corp. v. E.I. DuPont de Nemours & Co.*, 2002 WL

19   1558382, at *7 (Del. Ch. July 9, 2002).

20       Here, Section 12.01of the 241 Delaware Operating Agreement provides that an "Event of

21   Default" under the 241 Delaware Operating Agreement occurs if a breach is uncured "within a

22   Reasonable Period," *i.e.* a period of thirty (30) calendar days after such defaulting member receives

23   written notice of its default.  See, PTS, Sharp Exhibit No. 8 (pages 8 and 48 thereof).

24       The October 23, 2008 email from Shavolian (PTS, Sharp Exhibit No. 59) was a written

25   notice to Beshmada of Beshmada's alleged default for the pledge made under the Pledge

26   Agreement.  Accordingly, Beshmada's alleged "event of default" occurred thirty days after October

27   23, 2008, *i.e.* November 22, 2008.

28       Section 12.02 of the 241 Delaware Operating Agreement provides

PRINTED ON

RECYCLED PAPER
LA 11708539v2

1          12.02.  <u>Effect of Event of Default.</u>  Upon the occurrence of an Event of Default by

2          any Member, [Hazak] (if the defaulting Member is [Beshmada]) … shall have the

3          right, at any time within forty (40) days from the date of such Event of Default and

4          upon giving the defaulting Member ten (10) calendar days **written notice** of such

5          election (and provided such Event of Default is continuing through the end of such

6          ten (10)-day period) to take any of the following actions: (a) Dissolve the Company;

7          and (b) Pursue any other right or remedy available at law or in equity.  (Emphasis

8          added.)

9  See, PTS, Sharp Exhibit No. 8 (page 48 thereof).[8]

10      Additionally, section 13.23 of the 241 Delaware Operating Agreement provides that "time is

11  of the essence of this [241 Delaware Operating] Agreement."  See, PTS, Sharp Exhibit No. 8 (page

12  54 thereof).

13      Accordingly, pursuant to section 12.02 of the 241 Delaware Operating Agreement, Hazak

14  had the "right, at any time <u>within forty (40) days from the date of such Event of Default</u>" (emphasis

15  added) to elect to dissolve 241 Delaware or "pursue any other right or remedy available at law or in

16  equity."  (See, *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)("When

17  time is of the essence in a contract, a failure to perform by the time stated is a material breach of the

18  contract …")  Thus, Hazak had forty days from November 22, 2008, i.e., through January 1, 2009,

19  to elect, in writing, to take action against Beshmada for its alleged breach of the 241 Delaware

20  Operating Agreement.  At all times through January 1 (and 2), 2009, Hazak failed to elect (in any

21  manner) to, and took no action to, either dissolve 241 Delaware or pursue some legal or equitable

22  right or remedy.  Thus, Hazak failed to timely exercise its rights and remedies under Article 12 of

23  the 241 Operating Agreement concerning Beshmada's alleged "event of default" (the alleged pledge

24  under the Pledge Agreement).  Hazak waived its right to pursue any legal or equitable right or

25  remedy against Beshmada with respect to the Pledge Agreement and, therefore, 241/Hazak cannot

26

27         [8] "Delaware adheres to the 'objective' theory of contracts – a contract's construction should
be that which would be understood by an objective, reasonable third party.  (Citation omitted.)"
*HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007).

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    assert a claim against Beshmada (and its successor The Beshmada Liquidating Trust) with respect

2    to the Pledge Agreement and the transaction contemplated thereby.

3            Such a result is supported by applicable Delaware law.  See, *Progressive Int'l Corp. v. E.I.*

4    *DuPont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002)(Under applicable

5    Delaware law, requiring parties to live with "the language of the contracts they negotiate holds even

6    greater force when, as here, the parties are sophisticated entities that bargained at arm's length.")

7                    b.        The Pledge Agreement and the Transactions Contemplated Therein

8    Are Not the Reason or Legal Proximate Cause for 241 Delaware's Loss of the 241 Property or

9    Hazak's/241 Delaware's Alleged Damages.

10           As set forth above, and due to the inactions of Hazak, the Pledge Agreement cannot be the

11   foundation for any claim of Hazak/241 Delaware.

12           Notwithstanding, even if the Pledge Agreement resulted in Beshmada being in breach of the

13   241 Delaware Operating Agreement and such can act as the foundation for Hazak/241 Delaware's

14   proof of claim, this technical breach is not the legal proximate cause of (i) 241 Delaware losing the

15   241 Property in foreclosure or (ii) any alleged claimed loss (damages) suffered by Hazak or 241

16   Delaware.

17           Under Delaware law, to prevail on a claim for damages for breach of contract, Hazak/241

18   Delaware "must show both the existence of damages provable to a reasonable certainty (citations

19   omitted), and that **these damages flowed from defendant's violation of the contract**.  (Emphasis

20   added.)  (Citations omitted.)"  *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 2565709, at *9 (Del.

21   Ch. 2007).  "It is axiomatic that a plaintiff, in order to recover damages from a defendant for breach

22   of contract, **must demonstrate with reasonable certainty that the defendant's breach caused**

23   **the loss**.  (Emphasis added.)  (Citations omitted.) . . . The requirement that plaintiff show

24   defendant's breach to be the cause of his injury with 'reasonable certainty' merely means that the

25   fact of damages must be taken out of the area of speculation."  *Tanner v. Exxon Corp.*, 1981 WL

26   191389, at *1 (Del. Super. July 23, 1981).  "No recovery can be had for loss of profits which are

27   determined to be uncertain, contingent, conjectural or speculative."  *Callahan v. Rafail*, 2001 WL

28   283012, at *1 (Del. Super. March 16, 2001).)  Additionally, "damages [for breach of contract] are to

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    be measured as of the time of the breach." *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 17

2    (Del. Ch. 2003).

3            Even if somehow the Pledge Agreement can act as the foundation for the claim of

4    Hazak/241 Delaware, damages cannot be awarded to 241Delaware/Hazak because: (a) the Pledge

5    Agreement and the transaction contemplated therein did not cause such damages (such damages do

6    not "flow from" the Pledge Agreement and it is not the proximate cause of damages), (ii) the

7    asserted damages are not "reasonably certain" and are "uncertain, contingent, conjectural or

8    speculative", and (iii) there is absolutely no evidence to calculate the alleged damages, if any, as of

9    "the time of the breach."

10                          i.        There is No Evidence to Calculate Damages as of the Date of

11    the Alleged Breach.

12            Assuming *arguendo* that the Pledge Agreement may act as the foundation for a breach of

13    contract claim (which it cannot), Hazak and 241 Delaware have not provided this Court with the

14    necessary and required evidence to calculate damages.  As set forth above, "damages [for breach of

15    contract] are to be measured as of the time of the breach."  *Comrie v. Enterasys Networks, Inc.*, 837

16    A.2d 1, 17 (Del. Ch. 2003).

17            Thus, in order for Hazak and 241 Delaware to seek damages they must calculate and provide

18    evidence of their damages as of the "time of the breach" (see, *Comrie v. Enterasys Networks, Inc.*,

19    837 A.2d 1, 17 (Del. Ch. 2003)).  Thus, the damages sought by Hazak and 241 Delaware are to be

20    calculated as of either (i) June, 2008, when the Pledge Agreement was executed (see, PTS, Sharp

21    Exhibit No. 31) or (ii) November 22, 2008, thirty days after Hazak's October 23, 2008 email (see,

22    PTS, Sharp Exhibit No. 59) causing an alleged "event of default" by Beshmada.

23            As the entire basis for Hazak's/241 Delaware's alleged monetary damages is the loss of the

24    241 Property in foreclosure, Hazak and 241 Delaware would have to provide this Court with the

25    value of the 241 Property as of June, 2008 or October, 2008 (the only potential dates of the alleged

26    breach by Beshmada).  Hazak and 241 Delaware have (and will) fail to do so.

27            The only evidence of value to be submitted to this Court by Hazak and 241 Delaware will be

28    the expert testimony of David E. Fields ("Fields").  On January 7, 2014, Hazak and 241 Delaware

JMBM | Jeffer Mangels
       Butler & Mitchell LLP

1   filed, in this claim objection proceeding, a declaration of Fields (see, PTS, Sharp Exhibit No. 152),

2   which had attached thereto a report entitled "Real Property Valuation" setting forth the

3   "retrospective and current market value of the fee simple interest in the [241 Property], as if vacant

4   land that is available to be develop [sic] to its highest and best use, free and clear of financing, as of

5   **July 1, 2011 and September 1, 2013**.  (Emphasis added.)"[9]

6       As no evidence exists concerning the value of the 241 Property as of either June, 2008 or

7   November, 2008, there is no evidence from which this Court can calculate breach of contract

8   damages as of "the time of the breach."  As damages are an essential element of a breach of contract

9   claim, and no evidence exists to calculate damages, if any, Hazak and 241 Delaware cannot prevail

10  on a claim for breach of contract.

11              ii.      The Pledge Agreement Did Not Cause Damages to Hazak or

12  241 Delaware or Cause the Loss of the 241 Property.

13      For Hazak and 241 Delaware to prevail they "must show both the existence of damages

14  provable to a reasonable certainty (citations omitted), and that **these damages flowed from**

15  **defendant's violation of the contract**.  (Emphasis added.)  (Citations omitted.)"  *LaPoint v.*

16  *AmerisourceBergen Corp.*, 2007 WL 2565709, at *9 (Del. Ch. 2007).  "It is axiomatic that a

17  plaintiff, in order to recover damages from a defendant for breach of contract, **must demonstrate**

18  **with reasonable certainty that the defendant's breach caused the loss**.  (Emphasis added.)

19  (Citations omitted.)."  *Tanner v. Exxon Corp.*, 1981 WL 191389, at *1 (Del. Super. July 23, 1981).

20  Thus, 241 Delaware and Hazak must show that the Pledge Agreement was the legal proximate

21  cause of its damages, i.e., the loss of the 241 Property.  They cannot.

22      Hazak's and 241 Delaware's mantra is that the 241 Property was lost in foreclosure because

23  Beshmada, in breach of the 241 Operating Agreement, entered into the Pledge Agreement and the

24  transaction contemplated thereby.  Hazak's and 241 Delaware's claim that the Pledge Agreement

25

26      [9] At his October 15, 2014 deposition, Fields produced a "Real Property Valuation" report for
    the 241 Property (see, PTS, 241 Delaware/Hazak Exhibit No. 99) which was somewhat different

27  than the "Real Property Valuation" report attached to his declaration.  Notwithstanding, both reports
    value the 241 Property as of the same dates, July 1, 2011 and September 1, 2013.

28

PRINTED ON
RECYCLED PAPER
LA 11708539v2

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1  prevented a refinance of the Inland Loan is a fantasy and ignores reality.[10]  Like the "Wizard of Oz"

2  who wants everyone to ignore the "man behind the curtain", Hazak and 241 Delaware want this

3  Court to ignore the following, which was the real, actual proximate legal cause for the loss of the

4  241 Property: (a) the Inland Loan matured by its own terms and 241 Delaware had no money to

5  satisfy the Inland Loan and the members of 241 Delaware had no legal obligation to contribute

6  money to satisfy the Inland Loan, (b) the "loan proposal" from Vision Capital Partners/Group LLC

7  was a sham[11] and Shavolian lied that he had no interest "whatsoever" in such lender (see, PTS,

8  Sharp Exhibit No. 117) because his own limited liability company was always a member of Vision

9  Capital Partners/Group LLC (see, PTS, Undisputed Fact C. 127) and Shavolian concealed the fact

10  that the manager of Vision Capital Partners/Group LLC was his sister's husband, Afshin Hedvat

11  (see, PTS, Undisputed Fact C. 126), and (c) by 241 Delaware's own admission (as well as the same

12  admission made Castro), GSY and the GSY UCC 1 caused the 241 Property to be lost in

13  foreclosure.

14       The 241 Property was lost in foreclosure because the Inland Loan matured by its own terms,

15  241 Delaware simply did not have the money to satisfy the Inland Loan and Beshmada had no

16  obligation to contribute money to satisfy the Inland Loan.  This is the proximate cause of the loss

17  and foreclosure of the 241 Property.  241 Delaware and Hazak have not and will not present any

18  evidence showing that the Pledge Agreement caused 241 Delaware to lose the 241 Property.

19       Second, in the GSY Action, both Shavolian and Castro affirmative and unambiguously

20  testified, under the penalty of perjury, that the GSY UCC 1 was the sole cause of 241 Delaware

21  being "unable to extend and/or refinance [the Inland Loan]" and losing the 241 Property in a

22  foreclosure.  See, PTS, Undisputed Fact C.154 and Sharp Exhibit Nos. 124, 125 and 126.  In their

---

[10] 241 Delaware and Hazak also allege that the 241 Property was lost in foreclosure because Beshmada refused to make an "Additional Capital Contribution."  As already proved, 241 Delaware never made an authorized, binding and enforceable request for an "Additional Capital Contribution" and, therefore, 241 Delaware and Hazak will not prevail on the "additional capital contribution call" issue.

[11] Vision Capital Partners/Group LLC had, at that time, never made a loan to anyone.  See, PTS, Undisputed Fact C.128.

PRINTED ON
RECYCLED PAPER
LA 11708539v2

testimony under the penalty of perjury in the GSY Action, Shavolian and Castro never make any

mention to the New York Supreme Court about the actions of Beshmada.  In the GSY Action, 241

Delaware, Shavolian and Castro lay **100% of the blame/cause for the loss of the 241 Property at**

**the feet of GSY**.  It is abundantly clear what 241 Delaware/Hazak/Shavolian/Castro are doing – in

the GSY Action in New York they blame GSY for the loss of the 241 Property and all damages and

never make mention of Beshmada; in the Beshmada bankruptcy case in California they blame

Beshmada for the loss of the 241 Property and all damages and never make mention of GSY – they

are talking out of both sides of their mouths and presumed (in error) that Beshmada would not

become aware of the GSY Action and the testimony presented therein.  This Court cannot condone

such blatant fraudulent, unethical gamesmanship.  Notwithstanding such bad faith conduct, <u>241</u>

<u>Delaware and Hazak must now live and die by their prior statements made under the penalty of</u>

<u>perjury in the GSY Action</u>.  GSY, not Beshmada, caused the loss of the 241 Property.

Next, concerning the Vision Capital Partners/Group, LLC ("Vision Capital") loan proposal

(see, PTS, Sharp Exhibit No. 101), the Pledge Agreement did not cause Beshmada to refuse to

consent to 241 Delaware entering into the alleged proposed loan.  Under the 241 Delaware

Operating Agreement, in order for 241 Delaware to have accepted and take the loan offered by

Vision Capital, the Executive Committee of 241 Delaware unanimously had to authorize 241 to do

so.  See, PTS, Undisputed Fact No. 107 and 241 Delaware Operating Agreement, Sharp Exhibit No.

8 (page 23 and 24 thereof, sections 7.01(a)(ii), 7.01(a)(vii) and 7.01(b)(ii)).  In fact, the Executive

Committee of 241 Delaware never unanimously agreed to allow 241 Delaware to accept and take

the "loan" offered by Vision Capital (assuming it was ever real) and the Vision Capital loan

proposal expired by its own terms on May 15, 2010.

241 Delaware and Hazak have further argued that the Pledge Agreement (see, PTS, Sharp

Exhibit No. 31), and specifically paragraph 4(h) thereof, prevented Namvar and Cicalese, as

Executive Committee members, and without the consent of the pledgees, from authorizing 241

Delaware to enter into any loan transaction to "take out" the Inland Loan and, therefore, the Pledge

Agreement was a breach of the 241 Delaware Operating Agreement and the proximate cause of 241

Delaware's/Hazak's damages.  This argument has no merit at all.

PRINTED ON

RECYCLED PAPER
LA 11708539v2

1    Paragraph 4(h) of the Pledge Agreement has absolutely no impact on 241 Delaware's

2    Executive Committee members authorizing 241 Delaware to obtain any loan or funds to satisfy the

3    Inland Loan.  With respect to 241 Delaware, by paragraph 4(h) of the Pledge Agreement Beshmada

4    agreed that it, without the consent of the pledgees, would not "give any consent under, any of the …

5    agreements constituting or governing [Beshmada's membership interest] … **except as necessarily**

6    **required pursuant to the provisions of the [241 Delaware] Operating Agreement or as**

7    **otherwise approved by [pledgee]**."  (Emphasis added.)  Thus, there was never an absolute bar to

8    the Executive Committee's approval (including approval by Namvar or Cicalese as an Executive

9    Committee member) to any loan.  Notwithstanding, even if the Pledge Agreement and paragraph

10   4(h) caused Beshmada to be in breach of the 241 Operating Agreement, as explained above, such

11   was not the proximate cause of the loss of the 241 Property and any damages claimed by Hazak and

12   241 Delaware (and there is no evidence to the contrary).

13         D.      Damages Claimed by Hazak and 241 Delaware are Uncertain, Contingent,

14   Conjectural and Speculative.

15         If somehow this Court finds that (a) Beshmada breached the 241 Operating Agreement, (ii)

16   such breach was the legal proximate cause of the loss of the 241 Property and (iii) there is evidence

17   of damages as of the time of the alleged breach, Hazak and 241 Delaware have no recoverable

18   damages because such damages are "uncertain, contingent, conjectural and speculative" and,

19   therefore, not recoverable.

20         The requirement that plaintiff show defendant's breach to be the cause of his injury with

21   'reasonable certainty' merely means that the fact of damages must be taken out of the area of

22   speculation."  *Tanner v. Exxon Corp.*, 1981 WL 191389, at *1 (Del. Super. July 23, 1981).  "No

23   recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural

24   or speculative."  *Callahan v. Rafail*, 2001 WL 283012, at *1 (Del. Super. March 16, 2001).

25         In reliance upon Mr. Fields' valuation reports, 241 Delaware and Hazak allege that

26   Beshmada's breach of the 241 Operating Agreement caused them damage in the total sum of

27   $33,650,000.  Pursuant to Mr. Fields' prior declaration and his valuation reports (see, PTS, Sharp

28   Exhibit No. 152 and 241 Delaware/Hazak Exhibit No. 99), as well as his deposition testimony, the

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1   alleged damages of $33,650,000 represents (i) $26,100,000 as the "developer's (entrepreneurial)

2   profit, as if the [241] [P]roperty were completed and stabilized as a luxury hotel with two penthouse

3   condominiums and retail, <u>as of September 1, 2013</u>" (emphasis added) (see, Fields Declaration,

4   paragraph 11 thereof, PTS, Sharp Exhibit No. 152) plus (ii) $7,550,000 as the equity in the 241

5   Property as of <u>July 1, 2011</u>, calculated as the "$30,300,000 market value of the land [241 Property,

6   as of July 1, 2011,] less the mortgage amount of $22,750,000" (see, Fields Declaration, paragraphs

7   7 and 12 thereof, PTS, Sharp Exhibit No. 152).  Thus, Fields concludes that "equity is estimated at

8   $33,650,000" (see, Fields Declaration, paragraph 13 thereof, PTS, Sharp Exhibit No. 152).

9   　　　　First, with respect to the alleged $7,550,000 equity as of July 1, 2011, as damages are to be

10  calculated as of the date of the alleged breach (see, *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1,

11  17 (Del. Ch. 2003))("damages [for breach of contract] are to be measured as of the time of the

12  breach"), this element of damages calculated as of July 2011, rather than the 2008 date of the

13  alleged breach/pledge (June or November, 2008; see section II.C.3.b.i above), is irrelevant and in

14  violation of Delaware law with respect to the calculation of damages.  Fields' equity calculation

15  three years after the alleged breach has no relevance in this proceeding.

16  　　　　Second, the "developer's (entrepreneurial) profit" of $26,100,000 is "uncertain, contingent,

17  conjectural or speculative" and, therefore, cannot be awarded to 241 Delaware or Hazak.  This

18  alleged element of damages presumes something that undisputedly never happened – that the 241

19  Property was "completed and stabilized as a luxury hotel with two penthouse condominiums and

20  retail, as of September 1, 2013," five years after the alleged breach.  See, Fields Declaration,

21  paragraphs 7 and 12 thereof, PTS, Sharp Exhibit No. 152.

22  　　　　The "developer's profit" element of 241 Delaware's/Hazak's damage claim is completely

23  uncertain and speculative because it presumes that, and is contingent upon, the following: (i) that

24  somehow 241 Delaware would have found a way to obtain the tens of millions of dollars necessary,

25  and in no event less than $13,500,000, to pay off and satisfy the Inland Loan, (ii) that,

26  notwithstanding the Great Recession, that 241 Delaware would have been able to construct and

27  build the "a luxury hotel with two penthouse condominiums and retail", which according to

28  Kimpton Hotel & Restaurant Group, LLC, a company retained by 241 Delaware to operate the

PRINTED ON
RECYCLED PAPER
LA 11708539v2

JMBM | Jeffer Mangels
Butler & Mitchell LLP

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1   proposed luxury hotel, would cost the estimated sum of $94,789,567 to develop (which includes the

2   sum of $32,125,000 to acquire the 241 Property, leaving a balance of $62,664,567 being required to

3   construct and open such a luxury hotel) (see, PTS, Undisputed Fact C.68 and Sharp Exhibit No. 55),

4   (iii) that 241 Delaware would have had the ability to obtain debt financing[12] in a sum sufficient

5   ($62,664,567) to develop the 241 Property[13], (iv) that a luxury hotel could have been timely

6   constructed without any delays or cost overruns, (v) that a luxury hotel would have been

7   "stabilized" by 2013 and (vi) that the luxury hotel would have been successful.  241 Delaware and

8   Hazak want this Court to forget the harsh economic realities that occurred from 2008 and were still

9   in existence through the time Shavolian implemented his plan to buy and sell the Inland Loan for

10   his own account for a multi-million dollar profit.

11        In order for this Court to buy into the damage claims of Hazak and 241 Delaware, this Court

12   must engage in speculation without any foundation in fact.  241 Delaware and Hazak have not

13   produced any evidence to prove any damages which are not "uncertain, contingent, conjectural or

14   speculative."

15        E.    In the Event 241 Delaware and Hazak Establish Recoverable Damages, They Failed

16   to Mitigate Such Damages.

17        Under Delaware law, "there is a general duty to mitigate damages if it is at all feasible to do

18   _____

19        [12] Of course, if 241 Delaware sought "equity financing" such financing would reduce the
    interests of both Hazak and Beshmada in 241 Delaware.

20        [13] On May 14, 2008, fourteen days after the April 30, 2008 maturation of the Inland Note
    and one day before Inland's May 15, 2008 "Notice of Default" (see, PTS, Undisputed Fact C.31 and
21   Sharp Exhibit No. 26), Shavolian sent an email to Namvar, which email included an email string
    among Shavolian and persons at The Carlton Group and various attachments, stating the following
22   to Namvar: "Take a look at these.  I am trying to get the Hotel Group Kimpton to participate with
    equity.  They may take 50%.  The total equity requirement went from 15 mm to 30 mm, since the
23   **credit crash**.  (Emphasis added.)  This deal still makes lots of sense."  See, PTS, Undisputed Fact
    C.30 and Sharp Exhibit No. 25.  As is evident by this email, due to the "market crash" the
24   economics of financing a hotel development drastically changed; much more equity in property was
    required to obtain financing to develop and construct a hotel.  241 Delaware had no way to create
25   equity in the 241 Property or to self-finance or obtain third party financing on its own to develop the
    hotel and penthouses.  In fact, the evidence will show that on May 18, 2009, Shavolian, in a
26   telephone conversation, told Uzzi Raanan, counsel to Ezri Namvar's chapter 11 trustee, that if 241
    Delaware could hold on to the 241 Property for a "year or two" 241 Delaware could have equity in
27   the 241 Property.  See, Declaration of Uzzi Raanan, paragraph 5.F, filed concurrently herewith.
    Thus, in May, 2009 Shavolian himself acknowledged that the 241 Property had no equity.

28

1    so." *American General Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 11 (Del. Ch. 1992), *aff'd*,

2    620 A.2d 856 (Del. 1992)(Table).  In the event that this Court determines that 241 Delaware and

3    Hazak may recover damages, such damages must be reduced by their respective failure to mitigate

4    such damages.

5    　　　　Here, 241 Delaware's and Hazak's opportunity to mitigate was stolen by Shavolian, who,

6    for his own account, purchased the Inland Loan and sold it to Terrace RE, LLC ("Terrace RE") for

7    a multi-million dollar profit.  See, PTS, Undisputed Facts C.151, C.152, C.170, C.172, C.173 and

8    Sharp Exhibit Nos. 122, 123, 140 and 141.  There is no reason that this corporate opportunity of 241

9    Delaware and Hazak could not have been implemented by them; instead it was diverted to

10   Shavolian for his own personal profit.  Such money to buy the loan could have been loaned by

11   Shavolian/Hazak to 241 Delaware or contributed as capital by Shavolian/Hazak pursuant to 241

12   Delaware Operating Agreement and such loan would have been repaid when the Inland Loan was

13   sold to Terrace RE or caused Beshmada's membership interest to be diluted.  See, 241 Delaware

14   Operating Agreement, Article IV, PTS, Sharp Exhibit 8.  Yet, Shavolian never presented this

15   opportunity to 241 Delaware or Hazak and usurped it for his own gain.  As Shavolian is the

16   manager of Hazak (see, PTS, Undisputed Fact A.5) and "Administrator" of 241 Delaware (see, 241

17   Delaware Operating Agreement, Article 7.03, PTS, Sharp Exhibit 8), 241 Delaware and Hazak

18   should not benefit by Shavolian's (i) intentional diversion of the opportunity to mitigate any

19   damages and (ii) multi-million dollar profit.

20   　　　　F.    Any Damages Recoverable by Hazak Must be Offset by Hazak's Obligation to Pay

21   Beshmada the "True Up Contribution."

22   　　　　Section 4.02(c) of the 241 Delaware Operating Agreement provides:

23   　　　　　　True-Up Provision.  Notwithstanding anything to the contrary in this Agreement,

24   　　　　　　after forty eight (48) months from Closing Date ("True-Up Date"), [Hazak] shall

25   　　　　　　contribute additional funds to the Company ("True-Up Contribution") (which True-

26   　　　　　　Up Contribution shall be distributed immediately to [Beshmada]) such that

27   　　　　　　immediately follow-bag such True-Up Contribution (and related distribution) the

28   　　　　　　Unreturned Capital Contributions of all Members shall be equal in amount.  If

PRINTED ON
RECYCLED PAPER
LA 11708539v2

[Hazak] fails to make all or any portion of the True-Up Contribution, the Percentage

Interests of the Members shall be adjusted (in the sole discretion of [Beshmada]) so

that each Member's Percentage Interest shall be a fraction, the numerator of which

represents the aggregate amount of such Member's total Unreturned Capital

Contributions as of the True-Up Date and the denominator of which represents the

sum of all Members' Unreturned Capital Contributions as of the True-Up Date.

**Notwithstanding anything to the contrary in this Agreement, if [Beshmada]**

**elects not to adjust the Percentage Interests as set forth in the preceding**

**sentence, or a Repayment Event occurs on or before the True-Up Date and**

**[Beshmada] has Unreturned Capital Contributions, [Hazak] shall pay to**

**[Beshmada] in cash an amount sufficient to equalize the amount of [Hazak's]**

**and [Beshmada's] then Unreturned Capital Contributions (to illustrate, as a**

**numerical example only, if on the True-Up Date [Beshmada] has an outstanding**

**balance of Unreturned Capital Contributions of $1,000,000.00 and[Hazak] has**

**Unreturned Capital Contributions of $100,000.00, [Hazak] shall pay to**

**[Beshmada] $450,000.00)**.  (Emphasis added.)

See, PTS, Sharp Exhibit No. 8, Article 4.02(c).

Article I of the 241 Delaware Operating Agreement defines (a) "Closing Date" as "the day

of the "Closing" for the [241 Property]", (b) "Repayment Event" as "any or all of the following

events: (i) [241 Delaware's] dissolution, or (ii) the sale, transfer or other disposition of all or

substantially all of [241 Delaware's] property, **in each case whether voluntarily or involuntarily**"

(emphasis added), and (c) "Unreturned Capital Contribution" as "with respect to a Member, the

amount of that Member's Capital Contributions in cash to [241 Delaware] less the amount of cash

(other than cash distributed pursuant to Section 6.03(a), Section 6.03(b) or as a Code Section 707(c)

payment) distributed to the Member, but in no case shall mean an amount less than zero."  See,

PTS, Sharp Exhibit No. 8, Section 1.01.

Further, Section 5.05 of the 241 Delaware Operating Agreement states that "as a material

inducement to [Beshmada] to enter into this Agreement, [Hazak] hereby agrees to pay to

PRINTED ON

RECYCLED PAPER

LA 11708539v2

JMBM | Jeffer Mangels
Butler & Mitchell LLP

[Beshmada] within thirty (30) days following the occurrence of a Repayment Event, an amount equal to one-half (1/2) of the difference between (a) the sum of [Beshmada's] and [Hazak's] (and their permitted transferees) total Capital Contributions and (b) [Hazak's] (and its permitted transferees) total Capital Contributions."  See, PTS, Sharp Exhibit No. 8, Section 5.05.

It cannot be disputed that (i) Beshmada's capital contributions in 241 Delaware total $7,940,866.09 (see, PTS, Undisputed Facts C.10, C.35, C.44, C.48, C.63, C.112 and Sharp Exhibit Nos. 92 and 93), (ii) Hazak has not contributed capital in excess of its initial capital contribution of $1,820,000 (see, 241 Delaware Operating Agreement, Schedules A and B thereto, PTS, Sharp Exhibit 8), (iii) on June 23, 2011, a "Repayment Event" occurred when the 241 Property, 241 Delaware's sole asset, was transferred to Victor at Fifth, LLC (see, PTS, Undisputed Fact C.172), (iv) Beshmada elected, in writing, that Hazak pay Beshmada the "True-Up Contribution", rather than adjust their respective membership interests in 241 Delaware (see, PTS, Undisputed Fact C.174 and Sharp Exhibit Nos. 142 and 143) and (v) Hazak (and its guarantor Shavolian) has not paid Beshmada the True-Up Contribution.

Hazak owes Beshmada[14] the True-Up Contribution, which is in the sum of $3,060,433.04. In the event that Hazak is awarded any money on its claim, such amount must be offset by $3,060,433.04, which Hazak owes to Beshmada.

## III

## NO VIABLE CLAIM EXISTS FOR

## BREACH OF FIDUCIARY DUTY

Pursuant to the PTS, the only fiduciary duty issues in this proceeding is whether (i) Beshmada owed a fiduciary duty to Hazak and/or 241 Delaware and, if so, (ii) did Beshmada's

---

[14] As (i) Hazak never consented to the Pledge Agreement or Partial Settlement Agreement, (ii) the New York Supreme Court ruled that Beshmada's transfer of its interests in 241 Delaware is "null and void" (see, PTS, Undisputed Fact C.180 and Sharp Exhibit No. 149) and (iii) Judge Feess ruled that the Partial Settlement Agreement did not transfer anything (see, PTS, Undisputed Fact C.168 and Sharp Exhibit No. 137), Beshmada holds the right and interest to collect the True-Up Contribution from Hazak.

PRINTED ON
RECYCLED PAPER
LA 11708539v2

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1   entry into (a) the Pledge Agreement and/or (b) the Partial Settlement Agreement breach such

2   fiduciary duty.  See, PTS, page 41, Issue of Law No. 10.

3         The issue of whether Beshmada's entry into the Pledge Agreement and the Partial

4   Settlement Agreement is a violation of Beshmada's fiduciary duty to 241 Delaware and Hazak is, in

5   reality, a contract issue controlled by section 9.01 of the 241 Operating Agreement (which is cited

6   and discussed above).  241 Delaware and Hazak are seeking to convert their breach of contract

7   claim into a breach of fiduciary duty claim.  As both legal theories (breach of contract and breach of

8   fiduciary duty) rely on the same set of facts, they are duplicative.  241 Delaware and Hazak cannot

9   maintain a duplicative claim for breach of fiduciary duty.

10        "'Where a dispute arises from obligations that are expressly addressed by contract, that

11  dispute will be treated as a breach of contract claim' and thus 'any fiduciary claims arising out of

12  the same set of facts that underlie the contract obligations would be foreclosed as superfluous.'

13  [See,] *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010), [and] *Blue Chip Capital Fund II Ltd.*

14  *P'ship v. Tubergen*, 906 A.2d 827, 832-33 (Del. Ch. August 22, 2006)."  *AM General Holdings*

15  *LLC v. The Renco Group, Inc., et al.*, 2013 WL 586310, at *10 (Del. Ch. October 31, 2013).

16        As 241 Delaware's and Hazak's breach of fiduciary duty claim arises out of the same

17  operative facts as the breach of contract claim concerning the Pledge Agreement and the Partial

18  Settlement Agreement and the 241 Delaware Operating Agreement has express provisions

19  addressing this issue (see, section 9.01 of the 241 Delaware Operating Agreement), the breach of

20  fiduciary duty claim must be dismissed "as superfluous."  241 Delaware and Hazak cannot maintain

21  a claim for breach of fiduciary duty.

22

23                                      **IV**

24                               **CONCLUSION**

25        The loss of the 241 Property was not caused by any breach of the 241 Delaware Operating

26  Agreement.  As no authorized, binding and enforceable call for an "Additional Capital

27  Contribution" was made by 241 Delaware, Beshmada did not breach the 241 Delaware Operating

28  Agreement by failing to make an "Additional Capital Contribution."  Also, the Partial Settlement

Agreement did not transfer any of Beshmada's interests in 241 Delaware.  Thus, Beshmada's entry

into the Partial Settlement Agreement did not breach the 241 Delaware Operating Agreement.

While the Pledge Agreement may have been a technical breach of the 241 Operating

Agreement, 241 Delaware and Hazak cannot assert such as a breach of contract because no timely

action was taken concerning this issue within the required time period allowed by the 241 Operating

Agreement.  Therefore, such claim is waived.  Notwithstanding, as shown above, the Pledge

Agreement (i) was not the legal proximate cause of the loss of the 241 Property; there is not a

scintilla of evidence that the Pledge Agreement interfered in any way or was a factor whatsoever in

obtaining new financing, and (ii) the damages asserted by 241 Delaware and Hazak are uncertain,

contingent, conjectural or speculative.  Also, 241 Delaware and Shavolian, Hazak's manager, have

stated, under the penalty of perjury, in the GSY Action that the actions of GSY (and not Beshmada)

caused 241 Delaware to lose the 241 Property in foreclosure – they cannot now claim otherwise.

Finally, as no evidence exists with respect to damages as of the date of the alleged breach, 241

Delaware or Hazak cannot prove any damages, i.e., claim amount.

The claim of 241 Delaware and Hazak should be disallowed in its entirety and, due to the

attorney fee provision in the 241 Delaware Operating Agreement (see, PTS, 241 Operating

Agreement, section 13.05, Sharp Exhibit No. 8), the Beshmada Liquidating Trust is entitled to an

award of its attorney's fees and costs.

Dated:  March 25, 2015                    JEFFER MANGELS BUTLER & MITCHELL LLP

                                          By:/s/ Thomas M. Geher_____
                                             THOMAS M. GEHER,
                                             Attorneys for The Beshmada Liquidating Trust

PRINTED ON

RECYCLED PAPER
LA 11708539v2

- 30 -

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067-4308

A true and correct copy of the foregoing document entitled (*specify*): ***TRIAL BRIEF OF THE BESHMADA LIQUIDATING TRUST, SUCCESSOR TO BESHMADA, LLC*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _March 25, 2015_, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
**See NEF for confirmation of electronic transmission to the U.S. Trustee and any trustee in this case, and to any attorneys who receive service by NEF.**

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge _will be completed_ no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _March 25, 2015_, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge _will be completed_ no later than 24 hours after the document is filed.
**Served by Overnight Mail**:
Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 25, 2015 | Wilma Escalante | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                    **F 9013-3.1.PROOF.SERVICE**