1  JOHN P. KREIS (BAR NO. 103737)
   JOHN P. KREIS, PC
2  1000 Wilshire Blvd., Suite 570
   Los Angeles, CA 90017
3  Tel: 213.613.1049
   Fax: 213.330.0258
4  Email: jkreis@kreislaw.com

5  Claude Castro
   Claude Castro & Associates PLLC
6  444 Madison Avenue, Suite 500
   New York, New York 10022
7  (212) 826-3800
   (212) 486-6583 (fax)
8  Email: ccastro@ccastrolaw.com

9
   Counsel for Dan Shavolian,
10 Hazak Associates, LLC, and
   241 Fifth Ave. Hotel, LLC

11
                **UNITED STATES BANKRUPTCY COURT**
12
                **CENTRAL DISTRICT OF CALIFORNIA**
13
                    **LOS ANGELES DIVISION**
14
15 In re:                                     ) Case No.: 2:09-bk-25523-BR
   BESHMADA, LLC,                             )
16            Debtor.                         )
                                              ) Chapter 11
17 Bradley D. Sharp, Trustee of The Beshmada  )
   Liquidating Trust, as successor to Beshmada LLC, ) **REPLY DECLARATION OF DAN**
18                                            ) **SHAVOLIAN**
              Movant,                         )
19                                            )
   Dan Shavolian,                             )
20 127 West 25th LLC, Hazak Associates LLC    ) Date:  May 6-8, 2015
   And 241 Fifth Avenue Hotel LLC,            ) Time:  10:00 am
21                                            ) Place: Ctrm 1669
              Respondents.                    )
22                                            )
                                              )
23                                            )

24
       I, Dan Shavolian, declare:

25     1.     I have personal knowledge of the matter set forth herein and if called as a witness would

26 and could testify competently with respect thereto.

27

28

                                    -1-

2.    I am the managing member of Hazak Associates, LLC, a New York limited liability company ("Hazak"). Hazak is the co-managing member of and owns a 50% membership interest in 241 Fifth Ave. Hotel, LLC ("241"), a Delaware limited liability company doing business in New York.

3.    In view of the allegations made by Louis Cicalese and Uzzi Ranaan in opposition to the Respondents' submissions, I submit this Reply Declaration in further support of the Respondents' claim and in order to clarify the Record before the Court.

4.    With regard to the allegations made by Mr. Ranaan regarding a telephone call held on May 18, 2009, Mr. Ranaan is mistaken when he alleges that I told him that it would take $1,000,000.00 to render the owned by 241 Fifth Ave. Hotel LLC ("241 Fifth") "habitable". What I told Mr. Ranaan during that telephone call, and which I repeated to Mr. Cicalese, is that we would need approximately $500,000.00 to render the Premises in a "white box", i.e. ready for a build-out, rentable condition and that we would be then able to rent the Premises at a rental of $1,000,000.00 per year. I told Mr. Ranaan during that telephone conversation, and which I repeated to Mr. Cicalese, by renting the Premises on a short term basis, it would permit 241 Fifth to generate a substantial amount of rental income that would allow 241 Fifth to raise sufficient income to ride out the down market that developed in 2008/2009.

5.    I respectfully remind the Court that I made this proposal to Mr. Ranaan and Mr. Cicalese based on my extensive experience in the New York commercial real estate market. I have responsibility for almost 2 million square feet of commercial space in the New York Metropolitan area and have had extensive experience managing commercial property in New York in up markets and in down markets. Indeed, it is in a down market that a real developer's experience becomes crucial. In fact, I can attest to this Court that during my career in real estate in New York, I have never defaulted on any mortgage and never lost a single property to foreclosure (except the instant property in which I was in partnership via Hazak with Mr. Namvar and his entites) during any of the down markets of the past 25 years.

6.    It is in large part due to my track record that Mr. Ezri Namvar decided to invest in New York real estate with me and my entities. Mr. Namvar told me that he was partnering up with me in the New York City market because of my expertise and that we would both use my New York City real estate experience and contacts to make sure that our mutual investments in New York City would be successful. In fact, the first investment that I participated with Mr. Namvar was in 2006 when we partnered to buy a

1    building located at 35 West 36th Street, New York, New York. Within a few months, we sold that property

2    and netted a profit of $8,000,000.00 on this transaction. Thus, Mr. Namvar told me that he recognized the

3    value of my experience in New York real estate and then teamed up with me on the instant project which

4    was the second project that I partnered up with Mr. Namvar. I did not know Mr. Namvar prior to these

5    two transactions and relied upon Mr. Namvar's reputation as a real estate developer in Los Angeles.

6         7.    When Mr. Ranaan spoke to me by phone on May 18, 2009, the 241 Fifth project was in

7    trouble. The mortgage on the Premises was due and in danger of being foreclosed. Mr. Ezri and his main

8    company, Namco Capital, had filed for bankruptcy protection. Trustees had been appointed for Mr. Ezri

9    and Namco Capital. Funds were not forthcoming from Beshmada to meet 241 Fifth's carrying charges.

10   Mr. Ezri and Beshmada had refused to consent to any capital calls that would allow 241 Fifth to remain

11   afloat and meet its obligations. No one from Namco Capital or Beshmada was responding to my urgent

12   pleas to work with me with regard to the refinance of the mortgage on the Premises. In short, I had no

13   partner to talk to in order to rescue this project.

14        8.    The Court is respectfully reminded that at the time of our May 18, 2009 telephone call,

15   Beshmada, acting through Mr. Namvar, had already pledged its 50% interest in 241 Fifth to Nader & Sons

16   and Sisko without the consent of the other 50% member, Hazak, of which I was the managing member.

17   However, neither Mr. Namvar, Namco, Beshmada nor any of their attorneys provided me or Hazak with

18   a copy of the Pledge Agreement. In fact, my specific request for a copy of the Pledge Agreement referred

19   in the emails from Mr. Namvar and/or his attorneys, were ignored. Inexplicably, they all simply failed and

20   refused to provide me or Hazak with a copy of the Pledge Agreement so that neither I nor Hazak had any

21   knowledge of the Pledge and the circumstances relating to this Pledge. It was not until discovery was

22   conducted that I was able to obtain a copy of the Pledge Agreement that Mr. Ezri and Beshmada withheld

23   from me. By May 18, 2009, I truly had no partner to talk to since the principals of Nader & Sisko (the

24   "Hakakians") claimed to have obtained the Pledge of Beshmada's interest in 241 Fifth without authority

25   and in contravention of the terms of the Operating Agreement of 241 Fifth (and they too refused to provide

26   me or Hazak with a copy of the Pledge Agreement); since the Hakakians told me that they would not agree

27   to be bound by the terms of the Operating Agreement; and ( c) the Hakakian told me that they would not

28   fund any capital calls needed to operate the affairs of 241 Fifth. Indeed, it is important to note that neither

241 Fifth nor Beshmada were the recipient of the loan made by the Nader & Sisko to Namco Capital. Thus, in reality, Beshmada gave the Pledge to Nader & Sisko for no consideration.

9.    Thus, on May 18, 2009, my hands, as managing member of Hazak, were tied and the affairs of 241 Fifth were literally in limbo.

10.    It was in this context that Mr. Ranaan and I spoke on May 18, 2009. At that time, I did not know the status of Beshmada. I did not know what the Trustees' intentions were with regard to 241 Fifth. However, what I did know at that time is that 241 Fifth's Premises was located in excellent Fifth Avenue location and in one of the most dynamic areas of Manhattan; that the Premises had great development potential, including the addition of substantial air/development rights that were purchased by 241 Fifth which allowed the Premises to be developed to its maximum; and that the Premises represented a substantial asset that would be difficult to replace.

11.    During our telephone call on May 18, 2009, Mr. Ranaan advised me that the lender had filed a motion to lift the automatic stay in order to be able to proceed with the foreclosure of the Premises in the Supreme Court, New York County. I urged Mr. Ranaan no to allow the Premises to be foreclosed on. During that call, I explained to Mr. Rannan the true value of the Premises and told him that with a minimal investment of $500,000.00, the Premises would generate a substantial amount of rental income of approximately $1,000,000.00 which would allow 241 Fifth to retain the Premises and to preserve 241 Fifth's equity in the Premises.

12.    Mr. Ranaan is also wrong when he states that I told him that even though the lender was amenable to reducing the principal amount of the mortgage from a sum in excess of $25,000,000.00 to between $15,000,000.00 to $17,000,000.00 and to possibly a lower amount that the Premises would have no equity. On the contrary, I told Mr. Ranaan, as I told Mr. Cicalese, that by reducing the loan to between $15,000,000.00 and $17,000,000.00 or an even lower amount and by generating rental income of $1,000,000.00 per year with a minimal expenditure of $500,000.00, 241 Fifth would have significant equity in the Premises which would also allow 241 Fifth to "ride out" the economic downturn. In fact, my projections were correct since (a) the Premises have been appraised at $30,300,000.00 as of July 1, 2011 (b) within a year of the foreclosure sale, the Premises were developed into a luxury residential condominium building which was built based on the exact approved plans prepared by 241 Fifth, and ( c)

the entire condominium project sold out in a matter of months for a sum in excess of $120,000,000.00. The development of this project using the approved plans and air rights/development rights obtained by 241 Fifth fully demonstrates the value of the Premises and the substantial equity that 241 Fifth had in the Premises.

13.    Contrary to Mr. Ranaan's allegations, I did not discuss any purchase of Beshmada's interest in 241 Fifth during our telephone conversation. Indeed I would not have done so in light of the Pledge made by Beshmada of its interest in 241 Fifth to Nader & Sisko without the consent of Hazak. As a real estate professional, I can attest to this Court that Beshmada would not be able to sell its interests in 241 Fifth to me or anyone else subject to the Pledge given by Beshmada to Nader & Sisko.

14.    Also contrary to Mr. Ranaan's allegations, I did not tell Mr. Ranaan that I was in financial difficulty. What I told Mr. Ranaan during that telephone call and at a meeting held in Los Angeles on April 15, 2010, was that because of the Pledge made by Beshmada of its interest in 241 Fifth, if 241 Fifth was not able to refinance the Premises and if the lender foreclosed on the Premises, I would become in financial difficulty because of the personal guaranties that I, along with Ezri Namvar and others signed in connection with the Inland Mortgage. Since Mr. Namvar and his controlling entity, Namco, had filed for bankruptcy protection, Inland Mortgage, the lender, would look to me to satisfy the entire deficiency that would result from a foreclosure sale. The amount of that deficiency based on the $25,000,000.00 principal and interest due as of that time would have created a substantial financial burden for me. It would also have created additional liability against the Estates of Ezri Namvar and Namco Capital. That is why I made every effort to avoid foreclosure, that is why I made every effort to restructure the loan with Inland Mortgage and that is why I made every effort to obtain other financing to avoid foreclosure.

15.    Unfortunately, neither Mr. Ranaan nor Mr. Cicalese listened to my pleas. Instead, they ignored the illegality of the pledge made by Beshmada and allowed 241 Fifth's sole asset to be foreclosed on. In fact, Mr. Cicalese refused to authorize the retention of counsel on behalf of 241 Fifth to defendant against the foreclosure proceeding commenced by the lender or to negotiate with the lender since the lender was very amenable to a work out.

16.    I repeatedly asked Mr. Cicalese, Mr. Ranaan (at every Court appearance before this Court), and to other counsel for the Trustees to take steps to have the Pledge declared illegal and unenforceable

1  since it was admitted by all that the Pledge was given without the consent of Hazak, the other 50% member

2  of Beshmada. All my requests were ignored. Instead, I was advised by Mr. Ranaan in Court and by Mr.

3  Cicalese by telephone that they would not take any steps to have the Pledge declared invalid because of

4  the threat of litigation by Nader & Sisko.

5       17.    Indeed, I told Mr. Ranaan about Inland Mortgage's offer to sell the note and mortgage for

6  $13,500,000.00 on numerous occasions.  I urged Mr. Cicalese to have Beshmada participate in that

7  purchase.  However, Mr. Cicalese ignored my pleas.  In yet another attempt to rescue the Premises from

8  foreclosure, I advised Mr. Ranaan in open Court before this very Court that there was an opportunity to

9  restructure the loan by reducing it to $18,000,000.00 See Transcript dated June 30, 2010, at p. 15.  At that

10  Court conference, in order to underscore the plight of 241 Fifth and Hazak, my counsel told this Court

11  repeatedly "who is our partner?"  How can 241 Fifth continue to function when we don't even know who

12  the other 50% member of 241 Fifth is and who is authorized to act on behalf of the other 50% member of

13  241 Fifth.

14       18.    The fact is that Mr. Cicalese did not act in the best interest of Beshmada and 241 Fifth. He

15  sided with Nader & Sisko for unknown reasons and permitted Nader & Sisko to purchase Beshmada's

16  interest in 241 Fifth on a quit claim basis for $250,000.00 thereby sealing 241 Fifth's fate and insuring

17  that 241 Fifth's sole and substantial asset would be foreclosed.  Mr. Cicalese, based on his professed real

18  estate experience, knew very well that a foreclosure would wipe out 241 Fifth's interest in the Premises

19  and would cause Beshmada and Hazak to lose their entire investment. Yet, he took no steps to avoid this

20  catastrophic result. Mr. Cicalese and the Trustees made the decision to sell Beshmada's interest in 241 to

21  Nader & Sisko even though I had offered to purchase that same interest for $700,000.00.  Yet, Mr. Cicalese

22  and the Trustees rebuffed by higher and better offer in order to accept $250,000.00 from Nader & Sisko

23  thereby depriving the Beshmada Estate an extra $450,000.00 and thereby preventing 241 Fifth from

24  preserving its sole asset.

25       19.    With regard to the allegations made by Mr. Cicalese in his declaration, he too makes

26  erroneous statements. The Court is respectfully reminded that Mr. Cicalese has admitted at his deposition

27  that he had no experience with New York City commercial real estate. He admitted that he did not consult

28  any New York City brokers to determine the sales value of the Premises or the rental value of the Premises.

He admitted that he made the unilateral decision that the Premises had no "equity" and that therefore he, acting in his capacity as managing member of Beshmada, would not spend any money or do anything with regard to the Premises. He did so without consulting with me, in my capacity as manager for Hazak, the other 50% member of 241 Fifth. Not once did Mr. Cicalese ever call me or contact to discuss how to rescue the Premises from foreclosure. Not once did Mr. Cicalese ever call me or contact me to discuss how to refinance the mortgage on the Premises or to conclude an agreement with the lender to reduce the amount of the mortgage.

20.     On the contrary, Mr. Cicalese acted only to thwart every recommendation and suggestion that I made to save this project. Mr. Cicalese, who admittedly has no experience in New York real estate and no experience in how to handle foreclosure proceedings in New York, refused to consult with me, refused and failed to consult with a single person who had knowledge of the New York City commercial real estate market. He did not consult a single person with knowledge of the zoning opportunities in New York and the ability to utilize air rights/development rights to enhance the value of real estate in Manhattan. Instead, Mr. Cicalese inexplicably and very curiously consulted a broker from Philadelphia with no known New York City experience on a limited basis to determine if that Philadelphia broker knew of anyone interested in purchasing the Premises. Again, if Mr. Cicalese wanted to sell the Premises, this Court must question why he did not consult with me about such a sale and why he did not ask for recommendations from me for experience brokers in New York City familiar with this type of development property.

21.     What is even more curious is the fact that during his tenure as managing member of Beshmada, Mr. Cicalese had more contact with the Hakakians, in essence the enemies of 241 Fifth, than with me, his partner. He inexplicably refused to have the Pledge given by Beshmada to Nader & Sisko declared invalid even though he admitted at his deposition that he was well aware of the fact that the Pledge was invalid since it was not consented to by Hazak. He also inexplicably agreed to "sell" Beshmada's interest to Nader & Sisko for $250,000.00 without even trying to preserve Beshmada's substantial interest in 241 Fifth and the Premises. More egregiously, Mr. Cicalese and the Trustees agreed not only to assign Beshamada's interest in 241 Fifth to Nader & Sisko, but also agreed **not to contest the validity of the Pledge that they knew was invalid since consent of all members was never obtained.**

-7-

This Court must question why Mr. Cicalese would act in the best interest of Nader & Sisko at the expense and prejudice of Beshmada, Hazak and 241 Fifth.

22.    Despite Mr. Cicalese's total abandonment of Beshmada's. Hazak's and 241 Fifth's rights in the Premises, I did everything in my power to save 241 Fifth sole asset, the Premises:

(A) I had arranged for a $70,000,000.00 financing from Infinity Funding Group (Exhibit 7 to my Declaration dated March 11, 2015) on November 10, 2008 for this project. However, because of the Pledge made by Beshmada to Nader & Sisko, it was impossible to proceed with that loan transaction since 241 Fifth could not provide unanimous consent for the loan, as required by 241 Fifth's Operating Agreement. Mr. Cicalese admitted at his deposition that he was aware of the consent requirements of operating agreements in general and he also acknowledged at his deposition that if an Operating Agreement requires unanimous consent for the financing or sale of real property (as is the case in the Operating Agreement of 241 Fifth), the unanimous consent of all members of the limited liability company is required in order to finalize a financing of sale of real property.

(B) I also received many other verbal interest from other lenders based on the location of the Premises and the development potential of the Premises. However, because of the Pledge and because of 241 Fifth's inability to provide unanimous consent to any financing proposal, I could not pursue these financing leads.   In effect, the Pledge effectively prevented 241 Fifth from either refinancing or restructuring the mortgage on the Premises. Yet, Mr. Cicalese and the Trustees refused to take any steps to cancel this improper Pledge.

(C )   I negotiated a proposed amendment to the Mortgage and Note in January, 2009 (Exhibit 17 to my Declaration dated March 11, 2015) that (i) would have reduced the amount of the mortgage from a sum in excess of $25,000,000.00 to $17,000,000.00 and (ii) provided 241 First with the right of first refusal to purchase the mortgage in the event that Inland Bank received an offer to purchase the mortgage at a lower amount. Inland agreed to these terms because they believed in the project and believed in my ability to finalize the project. Representatives of Inland Bank, in particular, Ms. Fran Panico, came to New York on several occasions to meet with me to discuss the project. I had numerous

-8-

telephone calls every day with Fran Panico and other representatives of the bank to pursue the refinance and/or restructuring of the loan. I also went to Chicago to meet with officers of the Inland Bank to discuss the project. I was advised that the bank could not proceed with the proposed restructuring of the mortgage because they could not get title insurance due to the Pledge. The foregoing was also confirmed to me by my title company who refused to issue title insurance on any refinance or restructuring of the loan. Accordingly, the bank advised me that a foreclosure was the bank's only remedy. Mr. Cicalese and Afshin Hakim, counsel for Beshmada, had received copies of the proposed amendment to the Note and Mortgage and were aware of these negotiations – yet, Mr. Cicalese refused to even consider any attempt to save the Premises by asking this Court to declare the Pledge to be invalid. At this point, Inland Mortgage began an aggressive campaign to sell the note and mortgage in the open market.

(D) Although I knew after my meetings with Inland Bank that there was little that I could do to refinance or restructure the loan, I refused to give up. As noted above, now that Inland Mortgage was aggressively marketing the note and mortgage, if a third party purchased the note and mortgage, any opportunity of a loan restructuring or refinance would have vanished. Furthermore, a new note holder, most likely a vulture fund, would have immediately foreclosed on the Premises and would have pursued its remedy against me and Mr. Namvar on our personal guaranties. This would have caused me and the Estate of Ezri Namvar terrible financial damage. As an alternative, I negotiated a Forebearance Agreement with Inland Mortgage (Exhibit 21 to my Declaration dated March 11, 2015) on October 5, 2009 pursuant to which 241 Fifth averted foreclosure and was given the opportunity to have **the mortgage reduced from $25,000,000.00 to $13,500,000.00**. This agreement allowed the reduced mortgage amount to be paid in installments and would have allowed 241 Fifth not only to preserve its asset, but to do so on exceptional terms. In fact, I went to Los Angeles on April 15, 2010 to meet with Mr. Cicalese, the Trustess and their counsel to discuss the negotiations relating to the Forebearance Agreement and to request that they participate with me in this Agreement. Even though my attorney and I travelled

3,000 miles to discuss this proposal and to discuss ways to remove the Pledge and allow 241 Fifth to restructure its debt, we were literally asked to leave the meeting in less than 15 minutes after being told that because of the Pledge, there was nothing that Mr. Cicalese or the Trustees could do;

(E)    In yet another attempt to save the Premises from foreclosure, I arranged for a term sheet to be submitted by Vision Capital, an entity formed by my brother-in-law and other investors who created Vision Capital for the purpose of making opportunity financing for troubled assets. While Mr. Cicalese suggests that the fact that my brother-in-law was involved in this entity that the proposal was somehow improper, the fact remains that Vision Capital made approximately a $10,000,000.00 loan to another project that I was involved in which permitted that troubled asset, a building located at 127 West 25th Street, New York, New York, to be stabilized and which permitted that project to refinance its mortgage and pay off the loan to Vision in full with interest. What Mr. Cicalese does not understand is why would I arrange to have an entity, whether or not my brother-in-law was involved in or not, make a loan to 241 Fifth except to allow 241 Fifth to avoid foreclosure? However, there was nothing that I could say or do to change Mr. Cicalese's stubborn refusal to have the Pledge declared invalid.  Accordingly, I organized a group of investors to participate in the purchase of the loan pursuant to the terms of the Forebearance Agreement. Significantly, pursuant to the terms of the Forebearance Agreement, all of the personal guaranties given to Inland Mortgage by me, Ezri Namvar and others were terminated. Thus, not only did the Forebearance Agreement reduce the amount of the mortgage by more than $12,000,000.00, it also got rid of the personal guaranties that would have created economic havoc on me and on the Estate of Ezri Namvar.  The investors, of which I was one, paid the amount due under the Forebearance Agreement and obtained the Note and Mortgage. However, not wanting to foreclose on an entity that I was involved in, I declined to have me or the investors participate in the foreclosure on the Premises. Instead, the investors assigned their rights under the Forebearance Agreement to a third party that none of the investors, including me, had any relationship to. While I made a profit of approximately

$1,000,000.00 on this investment, the purpose of entering into the Forebearance Agreement was not to make any profit personally – it was to save the sole asset of 241 Fifth. Thus, Mr. Cicalese's suggestion that I acted improperly in entering into the Forebearance Agreement is totally misplaced. It was the actions of Mr. Cicalese and his stubborn refusal to address the drastic consequences of the Pledge that he admits was improper forced me to pursue that Agreement because all other options were foreclosed due to the actions of Mr. Cicalese and the actions of the Trustees.

23.    In short, every recommendation that I made to save the Premises from foreclosure was shot down by Mr. Cicalese and the Trustees. Their response to all such proposals was either to ignore it or to state that the Pledge prevented them from even considering a refinance or restructuring of the mortgage.

24.    At his deposition, Mr. Cicalese testified that he was not even aware of the Pledge and had not seen the Pledge Agreement until just a few days prior to his deposition in this matter. Incredibly, Mr. Cicalese, who was appointed as managing member of Beshmada and whose stated duties were to review the real estate holdings of Beshmada, claimed that he was not even aware that a Pledge of Beshmada's interest in 241 Fifth was outstanding. If that is true, how then could Mr. Cicalese be in a position to properly review the status of Beshmada's rights and obligations in 241 Fifth?

25.    Mr. Cicalese also testified at his deposition that when the Partial Settlement Agreement entered into by Nader & Sisko and Namco Capital, Beshmada and others was approved by this Court, it was his understanding that Beshmada sold all of its interest in 241 Fifth to Nader & Sisko for $250,000.00 and that from the date of the approval of the Partial Settlement Agreement, Beshmada had nothing further to do with 241 Fifth. Yet, in his declaration, he claims that I still required his consent, in his capacity as managing member for Beshmada, for any action required to refinance and/or restructure the mortgage on the Premises. It is indeed curious that Mr. Cicalese could at the same time claim that once the Partial Settlement Agreement was approved, Beshmada no longer had any interest in 241 Fifth while now alleging in his declaration that up until the foreclosure sale, I still needed his consent to take any steps to protect the asset of 241 Fifth from being foreclosed. What is clear is that Mr. Cicalese's position is a shifting one was at all times intended to block any and all of my efforts to save the Premises from foreclosure.

26.    Mr. Cicalese attempts to justify his action in yet a different way by alleging that he made the determination that the Premises had no equity and that therefore he would not authorize any expenditure by Beshmada to save its position in 241 Fifth. Yet, at his deposition, Mr. Cicalese admitted that Beshmada had funds available to it up to $5,000,000.00. Certainly, a portion of that sum could have been used to avoid foreclosure by proceeding with any one of the many refinancing/restructuring deals that I brought to table. However, to get around this basic truth, Mr. Cicalese, the Trustees and their counsel stated to me on numerous occasions that they Mr. Cicalese and the Trustees could not agree to any refinance or restructuring of the mortgage on the Premises because of the Pledge. They all told me that not only could Mr. Cicalese and the Trustees not give their consent, they were concerned that if they took any steps to have the Pledge declared invalid, which they all acknowledge is the fact, that Nader & Sisko would seek additional damages against them in connection with the loan made by Nader & Sisko to Namco Capital.

27.    Thus, what is very clear is that Mr. Cicalese and the Trustees decided to sacrifice Beshmada's equity and rights in 241 Fifth in order to protect Namco Capital and the Estate of Ezri Namvar. This calculated decision, however, was made without consideration for the rights of Hazak, as a 50% member of 241 Fifth, and in violation of the obligations that they had to Hazak pursuant to the terms of the Operating Agreement of 241 Fifth. Indeed, had Mr. Cicalese agreed to participate in the Forebearance Agreement, the reduction of the mortgage from $25,000,000.00 to $13,500,000.00 would have created at least $3,500,000 of equity based on Mr. Cicalese's flawed appraisal (as discussed in the following paragraph) showing an appraised value of $17,000,000.00. Using the correct appraisal value made by Mr. Fields, as discussed in the following paragraph, the equity in the Premises would have been $17,500,000.00.

28.    In yet another attempt to bolster his claim that the Premises had no equity, Mr. Cicalese refers to a "Restricted Appraisal" for the premises which he obtained in August, 2009. Mr. Cicalese admitted at his deposition that he advised his appraiser that the Premises had 52,000 square feet of development rights and that the appraiser made his appraisal based upon this information. The appraisal that was then provided to Mr. Cicalese appraised the Premises with a land value in excess of $17,000,000.00. Mr. Cicalese did not send me a copy of that appraisal and did not discuss that appraisal

1   with me at all. Significantly, Mr. Cicalese testified at his deposition that he did not retain any professional

2   with knowledge of New York real estate and/or land development and did not obtain a zoning analysis to

3   determine the true square footage available for development.  In my long experience in New York City

4   real estate and land development, I can attest to this Court that in New York City, the amount of square

5   footage available for development is one of the most important factors in determining value of the subject

6   real property.

7         29.     Had Mr. Cicalese contacted me about this appraisal, I would have advised him that the

8   Premises had **73,000 square feet of development available** due to the fact that when we purchased the

9   Premises, I had arranged to purchase additional air rights/development rights in order to increase the size

10  of the project and to enhance the value of the Premises. Indeed, Afshin Hakim had requested information

11  from about the premises in the middle part of 2009 and I sent Mr. Hakim an email, with a copy to Mr.

12  Cicalese, confirming that the Premises had at least 70,000 square feet of development rights. Apparently,

13  Mr. Cicalese chose to ignore this information and proceeded to determine that the Premises had no equity

14  based on an appraisal that was flawed due to Mr. Cicalese's own conduct.  Even if Mr. Cicalese had

15  determined, for whatever reason, that he would not discuss anything with me having to do with the

16  valuation of our jointly held asset, had he at least retained the services of a zoning attorney familiar with

17  New York City zoning laws, he would have discovered that the appraisal that he obtained is seriously

18  flawed. **That appraisal is based upon development rights that were undercut by almost one-third**

19  thereby resulting in an appraisal that by its own standards was deficient by one third.

20        30.     Mr. Cicalese's error was compounded by the fact that he never ordered an updated

21  appraisal during 2010 and 2011, even though the real estate market in New York was improving. His

22  excuse for not obtaining updated appraisal reports before dooming the Premises to foreclosure was that

23  he had made the unilateral decision that the Premises had no equity and therefore there was no need to get

24  updated appraisals. Once again, Mr. Cicalese made that decision without consulting with me and, as he

25  admitted at his deposition, without consulting with any professional with experience in New York City

26  real estate.

27        31.     The Court is respectfully referred to the appraisal report of David Fields (Exhibit 1 to David

28  Fields' declaration dated March 11, 2015), which is based upon accurate information and which shows a

-13-

land value of $30,300,000.00 as of July 1, 2011 and a developer's profit of $26,100,000.00. Taking into account the mortgage on the 241 Property, the net loss suffered by 241 as a result of Beshmada's conduct and multiple defaults is $33,650,000.00.Mr. Fields used a proper methodology to appraise the Premises and based his appraisal upon the correct development square footage of 73,000 square feet, not the erroneous 52,000 square feet used by Mr. Cicalese's appraiser. Significantly, the Movants have not challenged Mr. Fields' credentials as an expert appraiser, nor could they in light of his extensive background and experience. The Movants have also not submitted any expert's report that in any way challenges Mr. Fields' expert opinion as to value and have not submitted any competent testimony as to the value of the Premises.

32.    Mr. Cicalese made the same mistake when he refused to accept my plan to get the Premises ready for rental and rent the Premises at an annual rental of $1,000,000.00 per year. He ignored my experience in leasing of commercial property in New York City and failed to understand how vacant property is leased in New York City. Once again, instead of listening to my advice and, if he did not trust my advice for any reason, instead of hiring a professional with knowledge of commercial leasing in New York City, Mr. Cicalese simply made the unilateral and uninformed decision not to pursue the leasing of the Premises and, instead, chose to doom the Premises to foreclosure.

33.    Based on the foregoing, I respectfully submit to this Court that 241 Fifth and Hazak were substantially damaged by the actions and inactions of Mr. Cicalese and of the Trustees. It was as a result of these actions and inactions that caused 241 Fifth and Hazak to sustain the damages demanded herein.

1    I declare under penalty of perjury under the laws of the United States of America that the

2 foregoing is true and correct. Executed this 8th day of April, 2015 at New York, New York.



Dan Shavolian

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1000 Wilshire Blvd., Suite 570, Los Angeles, CA 90017

A true and correct copy of the foregoing document entitled (*specify*): REPLY DECLARATION OF DAN SHAVOLIAN will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 3/11/15, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 4/8/15 Vicki Berndt | | s/Vicki Berndt |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                          **F 9013-3.1.PROOF.SERVICE**

Gillian N Brown on behalf of Counter-Defendant Beshmada, LLC gbrown@pszjlaw.com, gbrown@pszjlaw.com

Richard Burstein on behalf of Debtor Beshmada LLC rburstein@ebg-law.com, ecf@ebg-law.com

Brian L Davidoff on behalf of Creditor Mousa Namvar Entities bdavidoff@greenbergglusker.com, kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com

H Alexander Fisch on behalf of Counter-Claimant Canyon Springs Shopping Center, LLC afisch@stutman.com

Thomas M Geher on behalf of Trustee Bradley D. Sharp, Liquidating Trustee tmg@jmbm.com, we1@jmbm.com;fc3@jmbm.com;tmg@ecf.inforuptcy.com

Stanley E Goldich on behalf of Creditor Bradley D. Sharp, Chapter 11 Trustee for the Bankruptcy Estate of Namco Capital Group, Inc. sgoldich@pszjlaw.com

David Gould on behalf of Interested Party Courtesy NEF dgould@gglawllp.com

Steven T Gubner on behalf of Debtor Beshmada LLC sgubner@ebg-law.com, ecf@ebg-law.com

William W Huckins on behalf of Creditor Safco Holding Corporation whuckins@allenmatkins.com, clynch@allenmatkins.com

David S Kadin on behalf of Petitioning Creditor Robbana, Inc. dsklaw@earthlink.net

Talin Keshishian on behalf of Plaintiff Beshmada, LLC tkeshishian@ebg-law.com, ecf@ebg-law.com

Stuart I Koenig on behalf of Creditor Committee Official Unsecured Creditors Committee of Namco Capital Group Skoenig@cmkllp.com

John P Kreis on behalf of Creditor DAN SHAVOLIAN jkreis@kreislaw.com, j.kreis@ca.rr.com

Jeffrey A Krieger on behalf of Creditor Princeton Holdings, LLC, c/o Jeffrey Krieger, Esq.
jkrieger@ggfirm.com, kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com

Charles Liu on behalf of Creditor Richard A. Marshack cliu@marshackhays.com, ecfmarshackhays@gmail.com

Melissa Davis Lowe on behalf of Attorney Official Committee of Unsecured Creditors of the bankruptcy estate of Ezri Namvar
mdavis@shbllp.com, lverstegen@shbllp.com

Ron Maroko on behalf of U.S. Trustee United States Trustee (LA) ron.maroko@usdoj.gov

Alexis M McGinness on behalf of Interested Party Courtesy NEF amm@jmbm.com, vr@jmbm.com;fc3@jmbm.com

David W. Meadows on behalf of Attorney David W. Meadows david@davidwmeadowslaw.com

Ethan B Minkin on behalf of Interested Party Courtesy NEF ethan.minkin@kutakrock.com

Susan I Montgomery on behalf of Attorney Susan I. Montgomery susan@simontgomerylaw.com

Darren B Neilson on behalf of Debtor Beshmada LLC dneilson@ebg-law.com, darrenneilson@gmail.com

Michael S Neumeister on behalf of Defendant Canyon Springs Shopping Center, LLC mneumeister@omm.com

David Norouzi on behalf of Interested Party Courtesy NEF david@norouzi.us

Walter K Oetzell on behalf of Interested Party Bundy Dimes, LLC woetzell@dgdk.com, DanningGill@gmail.com;woetzell@ecf.inforuptcy.com

Robert B Orgel on behalf of Creditor Bradley D. Sharp, Chapter 11 Trustee for the Bankruptcy Estate of Namco Capital Group, Inc.
rorgel@pszjlaw.com, rorgel@pszjlaw.com

Malhar S Pagay on behalf of Creditor Bradley D. Sharp, Chapter 11 Trustee for the Bankruptcy Estate of Namco Capital Group, Inc.
mpagay@pszjlaw.com, mpagay@pszjlaw.com

David M Poitras on behalf of Creditor Bradley D. Sharp, Chapter 11 Trustee for the Bankruptcy Estate of Namco Capital Group, Inc.
dpoitras@jmbm.com, bt@jmbm.com;vr@jmbm.com;dmp@ecf.inforuptcy.com

Samuel Price on behalf of Interested Party Courtesy NEF sprice@poolshaffery.com

Uzzi O Raanan, ESQ on behalf of Interested Party Courtesy NEF uor@dgdk.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com

Christopher S Reeder on behalf of Defendant Beshmada, LLC csreeder@rkmc.com

Christopher S Reeder on behalf of Defendant Unitex Industries, Inc. a California corporation csreeder@rkmc.com

Henley L Saltzburg on behalf of Creditor Namvar, Homayoun hls@srblaw.com, ar@srblaw.com;lb2@srblaw.com

Joel G Samuels on behalf of Interested Party Courtesy NEF jsamuels@sidley.com

Robert M Saunders on behalf of Creditor Party Todd Neilson rsaunders@pszjlaw.com, rsaunders@pszjlaw.com

Kambiz J Shabani on behalf of Interested Party Courtesy NEF kevin@shabanipartners.com

David B Shemano on behalf of Interested Party Courtesy NEF DBShemano@rkmc.com

Michael N Sofris on behalf of Defendant Richard Stromberg michaelsofris@gmail.com, filmlawyer@aol.com

Robyn B Sokol on behalf of Attorney Ezra Brutzkus Gubner LLP ecf@ebg-law.com, rsokol@ebg-law.com

Sam Tabibian on behalf of Defendant Princeton Holdings, LLC sam.tabibian@gmail.com

United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

Elissa A Wagner on behalf of Debtor Beshmada LLC ewagner@pszjlaw.com

Michael A Wallin on behalf of Creditor MidFirst Bank mwallin@slaterhersey.com, mrivera@slaterhersey.com

Howard J Weg on behalf of Attorney Michael J. Weg HJWeg@rkmc.com

Michael H Weiss on behalf of Attorney Michael H. Weiss mw@weissandspees.com, lm@weissandspees.com

Dean A Ziehl on behalf of Liquidator Bradley D. Sharp, Liquidating Trustee of the Beshmada, LLC Liquidating Trust
dziehl@pszjlaw.com, dziehl@pszjlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE